UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

Priority _____
Send _____
Enter _____
Closed _____
JS-5/JS-6 _____
Scan Only _____

CASE NO.:  CV 12-00551 SJO (PJWx)          DATE: November 29, 2012

TITLE:  Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.

========================================================================
PRESENT:  THE HONORABLE S. JAMES OTERO, UNITED STATES DISTRICT JUDGE

Victor Paul Cruz                                Not Present
Courtroom Clerk                                 Court Reporter

COUNSEL PRESENT FOR PLAINTIFFS:                 COUNSEL PRESENT FOR DEFENDANTS:

Not Present                                     Not Present

========================================================================
PROCEEDINGS (in chambers): ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTIONS TO DISMISS [Docket Nos. 117, 122, 123]

This matter comes before the Court on two separate motions by Defendants DLA, a Designated Local Authority ("DLA") and Successor in Interest to Community Redevelopment Agency of the City of Los Angeles ("CRA"), the City of Los Angeles ("City"), and the Oversight Board for the DLA ("Board") (collectively, "Defendants") to dismiss Plaintiffs Independent Living Center of Southern California, Fair Housing Council of San Fernando Valley, and Communities Actively Living Independent and Free's (collectively, "Plaintiffs") claims against them. DLA and the City filed a joint Motion to Dismiss ("Joint Motion") and the Board filed a separate Motion to Dismiss ("Board Motion") (collectively, "Motions"). Plaintiffs oppose both the Joint Motion ("Joint Opposition") and the Board Motion ("Board Opposition") (collectively, "Oppositions"). Replies in support of the Motions were filed both by DLA and the City ("Joint Reply") and by the Board ("Board Reply") (collectively, "Replies"). The Court found this matter suitable for disposition without oral argument and vacated the hearing set for November 5, 2012. *See* Fed. R. Civ. P. 78(b). For the following reasons, the Court **GRANTS IN PART AND DENIES IN PART** the Motions.

I.      FACTUAL AND PROCEDURAL HISTORY

Plaintiffs allege the following facts. Plaintiffs are all non-profit organizations whose missions include "assisting people with disabilities to obtain affordable housing." (Second Am. Compl. ("SAC") ¶¶ 1, 9-20, ECF No. 98.; Joint Opp'n 1, ECF No. 130.) DLA[1] is a public agency

---

[1] Plaintiffs originally brought claims against the City and CRA. However, on February 1, 2012, DLA became the successor-in-interest to CRA. Cal. A.B. Abx 1 26 (2011) ("AB 26"). As a result, the Court permitted Plaintiffs to file an amended complaint naming DLA and the Board as Defendants, neither of which had existed prior to California's legislative action.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 12-00551 SJO (PJWx)</u>          DATE: <u>November 29, 2012</u>

responsible for conducting redevelopment and revitalization activities in certain areas of Los Angeles. (SAC ¶ 36.) DLA's activities on this front are subject to approval by the City (SAC ¶¶ 41-42), and to oversight by the Board (SAC ¶¶ 54-55).

Defendants have received and continue to receive significant federal and state funding in support of their efforts to develop community housing projects. (SAC ¶¶ 146-157.) They have used this money to "acquire property [for], finance, operate, build, or substantially alter" units; the Defendants have over 29,000 units of housing, with an additional 4500 units in the "pipeline." (SAC ¶¶ 158, 160.) However, Defendants have "failed, and continue to fail, to take steps to ensure that [housing] is accessible to people with disabilities." (SAC ¶ 168.) They have not adopted policies that would promote such access, monitored efforts to achieve such access, or maintained a list of available accessible units. (SAC ¶¶ 172-78.) They also have failed to ensure that developers comply with accessibility laws, including when federal funds are helping to pay for such developments. (SAC ¶¶ 180-83.) Throughout this time, Defendants have consistently represented that they are in compliance with statutory obligations. (SAC ¶ 189.)

In short, Plaintiffs allege that Defendants "knowingly allocated millions of dollars in federal, state and other funds to finance housing throughout Los Angeles without ensuring that their programs as a whole and the housing they developed, funded, and significantly assisted is accessible and made meaningfully available to people with disabilities." (SAC ¶ 2.) Plaintiffs have joined to this action the current owners of 61 housing developments that received federal funds but whose alleged failure to provide sufficient access to people with disabilities is at issue in this case. (SAC ¶¶ 3, 57-116.)

As a result of Defendants' actions, Plaintiffs have encountered difficulties achieving their missions, which have undermined the effectiveness of their programs and services. (SAC ¶¶ 202, 211, 223.) Plaintiffs have also found it necessary to divert resources from other programs to obtain housing for their client communities. (SAC ¶¶ 204-06, 212-15, 224-26.)

    A.   <u>Statutory Framework</u>

Based on the above, Plaintiffs bring claims for violations of the following four statutory provisions: (1) Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act" or "Section 504"); (2) Act II of the Americans with Disabilities Act ("ADA"); (3) the Fair Housing Act ("FHA"); and (4) Section 11135 of the California Government Code ("Section 11135"). (*See generally* SAC.)

///

---

Because DLA is the successor-in-interest to CRA (SAC ¶¶ 43-52), the Court hereinafter refers to CRA activities as having been carried out by DLA, even where such activities predate DLA itself.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 12-00551 SJO (PJWx)</u>     DATE: <u>November 29, 2012</u>

    1.    <u>Section 504 of the Rehabilitation Act</u>

The Rehabilitation Act of 1973 was designed to "maximize employment, economic self-sufficiency, independence, and inclusion and integration into society" of people with disabilities. 29 U.S.C. § 701(b)(1). Section 504 specifically requires that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be . . . denied the benefits of . . . any program or activity receiving Federal financial assistance." 29 U.S.C. § 794. Put differently, disabled people must be provided "meaningful access" to such programs and activities. *Alexander v. Choate*, 469 U.S. 287, 301-02 (1985).

The provisions of Section 504 have been implemented by the U.S. Department of Housing and Urban Development ("HUD"). HUD requires that recipients of federal funding ("Recipients") "may not, directly or through contractual, licensing, or other arrangements . . . [a]id or perpetuate discrimination against a qualified individual with handicaps by providing significant assistance to an agency, organization, or person that discriminates on the basis of handicap in providing any housing, aid, benefit, or service." 24 C.F.R. § 8.4(b)(1)(v). Recipients also may not "[o]therwise limit a qualified individual with handicaps in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by other qualified individuals." 24 C.F.R. § 8.4(b)(1)(viii). Similar requirements adhere to Recipients' use of "criteria or methods of administration"—such criteria must refrain from perpetuating or impairing efforts to ensure equal access to housing and other benefits. 24 C.F.R. § 8.4(b)(4).

HUD Section 504 regulations also establish specific requirements for certain types of housing projects. For example, five percent of the units in new multifamily housing projects must meet Uniform Federal Accessibility Standards protecting people with mobility impairments, and an additional two percent must be accessible for people with hearing or vision impairments. 24 C.F.R. §8.22(a), (b). Such projects must also ensure that these accessible units are in fact occupied by people for whom such accessibility is designed, both through a preferential selection process and through public awareness efforts. 24 C.F.R. §8.27.

To establish a cause of action under Section 504, Plaintiffs must demonstrate that (1) they are (or represent)[2] individuals with a disability; (2) these individuals are otherwise qualified to receive the benefits at issue; (3) they were denied the benefits of the program solely because of their disability; and (4) the program receives federal financial assistance. *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).

///

---

    [2]  The Ninth Circuit has held, and Defendants do not challenge, that organizations of or for persons with disabilities have standing to pursue group claims under Section 504. *Greater L.A. Council on Deafness, Inc. v. Sheridan*, 812 F.2d 1103, 1115 (9th Cir. 1987).

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 12-00551 SJO (PJWx)</u>        DATE: <u>November 29, 2012</u>

      2.      <u>Title II of the Americans with Disabilities Act</u>

The ADA was enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b). No public entity, including state and local governments and their departments, agencies, and instrumentalities, may exclude any qualified individual with a disability from the benefits of its services, solely because of the disability. 42 U.S.C. §§ 12131-32. Like Section 504, the ADA has been held to require "meaningful access" to programs, services, and activities. *Crowder v. Kitagawa*, 81 F.3d 1480 (9th Cir. 1996).

The ADA is also implemented by the U.S. Department of Justice ("DOJ"). These regulations enact substantially similar requirements of public agencies as those enacted by HUD under Section 504, in many cases using identical language. 28 C.F.R. §§ 35.130(b)(1), (b)(3).

A claim for relief under the ADA requires Plaintiffs to demonstrate that (1) they are qualified individuals with a disability; (2) they were excluded from participation in or denied the benefits of a public entity's services; and (3) this exclusion was by reason of their disability. *Weinreich v. L.A. Cnty. MTA*, 114 F.3d 976, 978 (9th Cir. 1997). The ADA was modeled after Section 504, and so those requirements are also relevant to a finding of liability under the ADA. *Lovell v. Chandler*, 303 F.3d 1039, 1052 (9th Cir. 2002).

      3.      <u>The Fair Housing Act</u>

Congress amended the FHA in 1988 to include a number of provisions prohibiting discrimination on the basis of disability. As relevant in this litigation, the FHA prohibits intentional discrimination against individuals with disabilities, as well as any failure to accommodate or otherwise neutral policies and practices that have a disproportionate adverse impact on people with disabilities. 42 U.S.C. §§ 3604(f)(1)-(2).

To establish their FHA claim, Plaintiffs must prove that (1) they suffer from a handicap; (2) Defendants know or should know of this handicap; (3) accommodation may be necessary to afford an equal opportunity to use and enjoy the dwelling; and (4) Defendants refused to make such accommodation. *United States v. Cal. Mobile Home Park Mgmt.*, 107 F.3d 1374, 1380 (9th Cir. 1997).

      4.      <u>Section 11135 of the California Government Code</u>

Section 11135 imposes obligations on entities receiving financial assistance from the State of California. It prohibits discrimination on the basis of disability, incorporating the ADA's definitions and implementing regulations such that a violation of the ADA is also deemed a violation of Section 11135. Cal. Gov. Code § 11135(b). As such, the analysis below relating to the ADA applies equally to Section 1135.

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 12-00551 SJO (PJWx)</u>     DATE: <u>November 29, 2012</u>

II.     <u>DISCUSSION</u>

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of the claims asserted in the complaint." *Ileto v. Glock, Inc.*, 349 F.3d 1191, 1199-200 (9th Cir. 2003). In evaluating a motion to dismiss, a court accepts the plaintiff's factual allegations in the complaint as true and construes them in the light most favorable to the plaintiff. *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). "Dismissal can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).

Rule 12(b)(6) must be read in conjunction with Rule 8(a), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Ileto*, 349 F.3d at 1200. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). To plead sufficiently, Plaintiffs must proffer "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

In their Motions, Defendants assert that Plaintiffs' claims should be dismissed because (1) Plaintiffs' claims are barred by the applicable statute of limitations; (2) Plaintiff FHC is a suspended corporation, and so it has no right to pursue this litigation; (3) Plaintiffs cannot state a cause of action for their claims under Section 504; (4) Plaintiffs cannot state a cause of action for their claims under the ADA; (5) Plaintiffs cannot state a cause of action for their claims under the FHA; and (6) Plaintiffs cannot state a cause of action for their claims under Section 11135. (Joint Mot. 5-6; Board Mot. 1.) The Board additionally asserts that (7) Plaintiffs did not exhaust their administrative remedies as to the Board; and (8) the Board does not have the authority to impose controls on housing decisions, with the result that it cannot redress Plaintiffs' alleged injury. (Board Mot. 1.) The Court addresses each of these arguments in turn.[3]

  A. <u>Statute of Limitations</u>

Defendants characterize Plaintiffs' complaint as alleging "failure to design and construct" appropriate housing facilities, and argue that the applicable statutes of limitations bar the action here. (Joint Mot. 20.) Plaintiffs are subject to a two-year statute of limitations for their claims under all four statutory structures utilized. *Darensburg v. Metro. Transp. Comm'n*, 611 F. Supp. 2d 994, 1039 (N.D. Cal. 2009), *aff'd*, 636 F.3d 511 (9th Cir. 2011) ("The statute of limitations for

---

[3] The Court primarily addresses these questions as argued and responded to in the Joint Motion, Joint Opposition, and Joint Reply, although it notes that the Board also raised substantially the same arguments in the Board Motion. As such, the Court's analysis of the Joint Motion applies equally to the Board.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

**CASE NO.:** <u>CV 12-00551 SJO (PJWx)</u>     **DATE:** <u>November 29, 2012</u>

Plaintiffs' claims under [] Section 11135 is two years."); 42 U.S.C. § 3613(a)(1) ("An aggrieved person may commence a civil action [under the FHA] . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice."); *Pimentel v. Orloff*, C-08-0249, 2008 WL 4963049, at *2 (N.D. Cal. Nov. 19, 2008) (noting that California's two-year statute of limitations for personal injury actions applies to Rehabilitation Act claims). Thus, to the extent that the alleged wrong-doing by defendants falls outside this two-year period, Plaintiffs' claims will be barred.

Claims alleging a failure to design or construct appropriate housing are triggered at the conclusion of the design-and-construction phase. *Garcia v. Brockway*, 526 F.3d 456 (9th Cir. 2008). In this case, Defendants argue that the design-and-construction phase ended when the allegedly noncompliant housing was built. (Joint Mot. 21.) Because the Complaint alleges that Plaintiffs have been working with disabled individuals to find housing since 2009 or earlier, Defendants therefore claim that the statute of limitations expired in 2011. (Joint Mot. 21.)

This misstates the nature of Plaintiffs' Complaint, however. Plaintiffs did not file this case because a particular building violated provisions under the various statutes; they allege here a past **and continuing** failure to ensure that housing projects receiving state and federal funding comply with statutory requirements. (SAC ¶ 164 (noting that the "Redevelopment Housing Program" includes projects not yet completed); SAC ¶ 168 (noting that Defendants continue to fail to ensure that accessible units are provided).) The main focus of this lawsuit is the legality of the overall housing program, and the Court finds no discrete action that would trigger the statute of limitations here. Plaintiffs' claims are therefore not barred by any statutes of limitations.

  B. <u>FHC's Corporate Status</u>

Defendants next argue that FHC cannot pursue this matter, because California has suspended its corporate status for failure to file certain tax forms. (Joint Mot. 19; Decl. of Melissa T. Daugherty in Supp. of Joint Mot., Ex. A, ECF No. 122-2.) FHC acknowledges that its corporate status was temporarily suspended (Joint Opp'n 22), but it provides the Court with documentation indicating that although it disagrees with California's Franchise Tax Board that it owes money, it has paid in advance all moneys requested by California (*see generally* Decl. of Diana C. Bruno in Supp. of Joint Opp'n.) The Court accepts this as sufficient evidence to keep FHC as a plaintiff in this case for now, although it will revisit this issue if FHC does not provide further documentation confirming reinstatement of its corporate status.

  C. <u>Section 504 of the Rehabilitation Act</u>

Defendants allege that Plaintiffs fail to state a claim under Section 504 because (1) Plaintiffs have no private right of action to enforce HUD regulations; (2) it would be impossible to secure housing for all qualified individuals, regardless of disability; (3) Plaintiffs failed to seek reasonable accommodation; (4) Plaintiffs do not state a claim supported by sufficient factual allegations; and

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   **CV 12-00551 SJO (PJWx)**          DATE:   **November 29, 2012**

(5) Section 504 requirements do not accrue to Defendants as non-owners of the properties in question.  (Joint Mot. 11-15.)

      1.    <u>Private Right of Action</u>

Plaintiffs base their claim under Section 504 in part on their contention that Defendants have violated the statute itself, specifically its provision that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of his or her disability, be . . . denied the benefits of . . . any program or activity receiving Federal financial assistance."  29 U.S.C. § 794.  When examining whether a statutory provision provides a private right of action, a court considers three factors:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so 'vague and amorphous' that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997) (internal citations omitted).  In this case, it is clear that Section 504 has created a cause of action specifically for the use of entities like Plaintiffs, intends that they use it, and imposes a binding obligation.  Thus, at the least it is clear that Plaintiffs have the right to bring their statutory claims.

Plaintiffs' claims under HUD Section 504 regulatory requirements require a separate analysis.  As the Supreme Court has held, "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not . . . .  Agencies may play the sorcerer's apprentice but not the sorcerer himself."  *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001).  The Ninth Circuit provides additional guidance on this point:

> [T]o be enforceable through the § 504 implied private right of action, regulations must be tightly enough linked to § 504 that they 'authoritatively construe' that statutory section, rather than impose new obligations.  Regulations that do not impose obligations beyond § 504's prohibition on disability-based disadvantage but instead implement that prohibition are part of the bargain struck between states and the federal government [and therefore enforceable through private action].

*Mark H. v. Lemahieu*, 513 F.3d 922, 939 (9th Cir. 2008).  Here, HUD has passed multiple regulations, which can be divided into two categories.  One set of regulations consists of general compliance language, and requires that Recipients avoid perpetuating discrimination or otherwise

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 12-00551 SJO (PJWx)</u>   DATE: <u>November 29, 2012</u>

depriving qualified individuals with disabilities the benefits of federal programs. 24 C.F.R. §§ 8.4(b)(1), (4). These regulations do not add new obligations; instead, they provide further guidance to help entities comply with the statutory text. (SAC ¶¶ 121-22.) As such, they are enforceable under Section 504. *See Lemahieu*, 513 F.3d at 939.

Another set of regulations provides specific guidance to housing developers, based on HUD's best reading of what can be required of different entities under the law. *See* 24 C.F.R. §§ 8.22, .27. Although they are also based on Section 504, these rules impose affirmative numeric requirements that developers must consider separately and apart from statutory requirements. They are not natural extensions of Section 504—they do not merely "implement" the law—and so this Court finds them unenforceable here.[4]

Defendants' reliance on caselaw stating that regulations cannot create a cause of action is misplaced. In *Three Rivers Center for Independent Living v. Housing Authority of City of Pittsburgh*, 382 F.3d 412 (3d Cir. 2004), the court in fact came to the same conclusion as this Court draws here: Plaintiffs may maintain a cause of action with respect to clarifying regulations, but not those enacting independent numeric requirements. *Id.* at 426. And in *Taylor ex rel. Wazyluk v. Housing Authority of City of New Haven*, 645 F.3d 152 (2d Cir. 2011), the court declined to provide a private right of action only over regulations imposing requirements that were not explicitly part of Section 504. *Id.* at 154. Thus, even if these cases were binding on this Court (which they are not), their findings are consistent with Ninth Circuit caselaw.

    2.    <u>Impossibility of Compliance</u>

Defendants also ask the Court to dismiss Plaintiffs' claims because Defendants cannot possibly provide housing to all qualified people. (Joint Mot. 14.) This argument is not compelling: the Court believes that there is a severe lack of affordable housing in Los Angeles, and that not all of Plaintiffs' clients will be able to obtain housing, but Plaintiffs' claim is not based on the inability of a single client to obtain housing. Rather, it is based on an alleged system-wide implementation of public housing programs in a discriminatory manner. (*See* Joint Opp'n 14.) Nowhere does Seciton 504 require that there be enough housing for all before its anti-discrimination protections begin; indeed, it is exactly when housing and funding is scarce that parties might be expected to cut corners by declining to accommodate certain communities and their needs. Thus, Defendants' arguments fail here.

    3.    <u>Reasonable Accommodation</u>

---

[4] Plaintiffs have stated that they do not seek to enforce this latter set of regulations, and that they only mentioned those regulations because they constitute evidence of noncompliance with Section 504. (Joint Opp'n.) The validity of using such noncompliance as evidence is not at issue here, and the Court will not address it at this time.

CASE NO.: <u>CV 12-00551 SJO (PJWx)</u>     DATE: <u>November 29, 2012</u>

Defendants next argue that Plaintiffs cannot bring their claims here because they never sought reasonable accommodations for their clients. It is a long-standing rule of the Ninth Circuit that a party may not challenge a rule or policy "to which he has not submitted himself by actually applying for the desired benefit." *Madsen v. Boise State Univ.*, 976 F.2d 1219, 1220-1221 (9th Cir. 1992) (per curiam). The purpose of this requirement is "to ensure that the challenged policy actually affect[]s the person challenging it." *United States v. Baugh*, 187 F.3d 1037, 1042 (9th Cir. 1999). This policy does not require absolute compliance, though: the Ninth Circuit "does not require exercises in futility." *Taniguchi v. Schultz*, 303 F.3d 950, 957 (9th Cir. 2002).

In this case, Plaintiffs have sufficiently demonstrated that they "actually applied" for public housing benefits. While Plaintiffs might have sought reasonable accommodation for each of their clients, such requests would present an administrative burden that, assuming Plaintiffs' allegations are true, runs contrary to the law. Further, it is far from clear that Defendants could satisfy every reasonable accommodation request; if they could, perhaps the need for this suit would have been obviated. And finally, Plaintiffs do not seek individual accommodations; they seek to bring Defendants' programs into compliance with the law, so that they can avoid spending limited resources dealing with a program allegedly unlawfully stacked against their clients. Reasonable accommodations for individual clients thus cannot provide the relief Plaintiffs seek. The Court will not impose a pretextual requirement to seek reasonable accommodation where, as here, such requests present a severe administrative burden to Plaintiffs and would ultimately prove futile.

    4.    <u>Failure to State a Claim</u>

Defendants' argument that Plaintiffs have failed to state a proper claim for relief is clearly inaccurate. A complaint must proffer "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Here, Defendants challenge the adequacy of Plaintiffs' claims that Defendants denied meaningful access to appropriate housing because Plaintiffs allegedly did not provide supportive facts for these claims. (Joint Mot. 14-15.)

The Court does not agree that Plaintiffs failed to state a claim here. As is required under the Rehabilitation Act, Plaintiffs have alleged that (1) they represent individuals with disabilities; (2) their clients qualify for public housing; (3) their clients could not obtain public housing because of their disability; and (4) Defendants, who receive financial assistance, failed to ensure that housing programs they oversee comply with Section 504. (Joint Opp'n 12-13; *see generally* SAC.) The proof of this is in the pudding: publicly funded housing in Los Angeles has allegedly failed to provide meaningful access to Plaintiffs' clients. Defendants apparently believe that Plaintiffs should be required to identify specific affirmative decisions that led to their failures; but a failure to act where action is mandated is itself unlawful, and Plaintiffs identify multiple fronts on which Defendants have failed to act. (SAC ¶¶ 165-183.) Any more detail would require a level of

knowledge Plaintiffs may not have until discovery, which cannot be required at this stage in the litigation. Plaintiffs' claims satisfy *Iqbal* and *Twombly* and may therefore continue.

      5.      <u>Obligations on Non-Owners</u>

Finally, Defendants argue that Section 504 does not apply to them at all, because they are not the owners of the housing complexes deemed to be in noncompliance with Section 504. This claim is similarly unavailing. Defendants cite to no authority suggesting that Section 504 only applies to owners or managers of real estate[5]—to the contrary, the plain language of the statutory text establishes the rights of disabled persons to the benefits of "any program or activity," with "program or activity" defined to include "all the operations of . . . a department, agency, special purpose district, or other instrumentality . . . of a local government." 29 U.S.C. § 794 (a), (b). This language does not explicitly spell out a duty to supervise actions taken by other parties, but HUD's implementing regulations do: Recipients "may not, directly **or through contractual, licensing, or other arrangements** . . . [a]id or perpetuate discrimination." 24 C.F.R. § 8.4(b)(1)(v) (emphasis added). The Court is bound by the Ninth Circuit's determination that "Congress has a strong interest in ensuring that federal funds are not used in a discriminatory manner." *Lovell*, 303 F.3d at 1051. As Plaintiffs observe, this "strong interest" would be undermined if government entities could avoid liability by transferring funds to private parties. (Joint Opp'n 11.)

The Court draws further support for this conclusion from caselaw in other courts. The Second Circuit is particularly persuasive here in holding that "Congress's intent would best be effectuated by imposing supervisory liability on [] state defendant[s]." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 287 (2d Cir. 2003) (basing its conclusion here "upon the function of the State in the scheme of the Rehabilitation Act"). This fits with the finding that Congress's interest in eliminating disability-based discrimination "flows with every dollar spent by a department or agency receiving federal funds." *Koslow v. Pennsylvania*, 302 F.3d 161, 175-76 (3rd. Cir. 2002).[6]

---

[5] Defendants' assertions that California Government Code section 12955(a) ("Section 12955") limits liability to owners, or that cases such as *Holley v. Crank*, 400 F.3d 667, 670-71 (9th Cir. 2005) impose liability on landlords for the actions of management companies, miss the mark: Plaintiffs do not bring a claim under Section 12955, nor do they attempt to impose liability on Defendants as landlords. That other parties may be held liable under other statutes has no bearing whatsoever on the question whether Defendants may be held liable under Section 504.

[6] The Court further notes that this result is consistent with Judge Wilson's Decision in *Mei Ling v. City of Los Angeles, et al.*, case no. 11-CV-07774 (Aug. 30, 2012), to which Defendants cite. Judge Wilson dismissed the plaintiff's claims **under other statutory sections** based on the absence of supervisory liability on July 6, 2012; when revisiting the same issue in August, he agreed with this Court that Section 504 imposes supervisory liability on government agencies.

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:   <u>CV 12-00551 SJO (PJWx)</u>           DATE:   <u>November 29, 2012</u>

The Court therefore **MAINTAINS** Plaintiffs' Rehabilitation Act claims against Defendants.

      D.    <u>ADA</u>

Defendants' arguments under the ADA largely mirror those made under Section 504. This is partially because "[t]here is no significant difference in analysis of the rights and obligations created by the ADA and the Rehabilitation Act." *Zukle v. Regents of Univ. of California*, 166 F.3d 1041, 1045 n.11 (9th Cir. 1999).[7] The Court thus incorporates its analysis of Section 504 above to resolve that Plaintiffs have a private right of action, which they have pleaded sufficiently, and may impose on Defendants as supervisors of housing developers allegedly out of compliance with the ADA.

The Court therefore **MAINTAINS** Plaintiffs' ADA claims against Defendants.

      E.    <u>FHA</u>

Defendants challenge liability under the FHA primarily based on their assertion that the FHA applies "only to landlords, owners, and others who offer dwellings for rent or sale." (Joint Mot. 17-18.) In response, Plaintiffs argue that the FHA "does not limit the parties who may be named as defendants" and that Plaintiffs may therefore sue any party who has committed a discriminatory housing practice.

In this case, the plain language of the FHA, as well as available precedent, suggest that Plaintiffs may not bring FHA claims against Defendants. The primary prohibitions in the FHA naturally lie against owners or managers of property: entities may not "discriminate in the sale or rental, or [] otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 U.S.C. § 3604(f)(1). The FHA does not mention any binding obligations specific to public agencies; in fact, it explicitly refuses to impose such obligations on agencies in their regulatory capacity: "A State or unit of general local government **may** review and approve" dwellings, and the federal government "shall encourage, **but may not require**, States and units of local government to include . . . determinations as to whether the design and construction of such dwellings are consistent with [the FHA]." 42 U.S.C. § 3604(f)(5) (emphasis added). Several other courts across the country have drawn similar conclusions. *Growth Horizons, Inc. v. Delaware Cnty., Pa.*, 983 F.2d 1277, 1283 (3d Cir. 1993) ("The conduct and decision-making that Congress sought to affect was . . . primarily, at least, those who own the property of choice and their representatives."); *see also Dinapoli v. DPA Wallace Ave II, LLC*, 07-CV-1409, 2009 WL 755354

---

    [7] Plaintiffs are correct that ADA applies to all state and local public entities, whether or not they receive federal funding. (Joint Opp'n 19.) However, this does not otherwise affect the Court's analysis.

(S.D.N.Y. Mar. 23, 2009) *Liberty Res., Inc. v. Phil. Hous. Auth.*, 528 F. Supp. 2d 553, 569 (E.D. Pa. 2007).

Plaintiffs' attempts to distinguish the above cases and provide alternative support for their FHA claims are not convincing. Most notably, the court in *Growth Horizons* did hold, as Plaintiffs allege (Joint Opp'n 20), that a claim could be made against a government entity—but such a claim would necessarily weigh against an entity in its capacity as owner or manager of residential properties. And the Ninth Circuit, in *Pfaff v. U.S. Department of Housing & Urban Development*, 88 F.3d 739, 745 (9th Cir. 1996), merely approved enforcement of the FHA against private landlords, which is fully in keeping with this Court's analysis. The Court finds no reason to deviate from the plain language of the FHA and the overwhelming weight of judicial authority here; Plaintiffs may not assert their FHA claims against Defendants.

The Court therefore **DISMISSES** Plaintiffs' FHA claims against Defendants.

F.  Section 11135 of the California Code

Defendants concede that Section 11135 is "identical to the Rehabilitation Act except the entity must receive State financial assistance rather than Federal financial assistance." *Williams v. Grannis*, 09-CV-1245, 2010 WL 1405669, at *7 n.3 (E.D. Cal. Feb. 24, 2010). Defendants also do not contest that they received financial assistance from California. (*See generally* Joint Mot.) As with the ADA, then, the Court incorporates its prior reasoning and holds that Plaintiffs may bring their claims under Section 11135.

The Court therefore **MAINTAINS** Plaintiffs' Section 11135 claims against Defendants

G.  Exhaustion

The first of two arguments the Board makes in its Motion, separate and apart from those made in the Joint Motion, is its claim that Plaintiffs cannot assert their claims against it because they failed to exhaust their administrative remedies. (Board Mot. 5-6.) California state law holds that "no suit for money or damages may be brought against a public entity . . . until a written claim therefor has been presented to the public entity and has been acted upon by the board." Cal. Gov't Code § 945.4. Plaintiffs do not deny that the Board is a California public entity in accordance with this definition. (*See generally* Board Opp'n.) However, this restriction cannot apply to claims brought in federal court. *Ford v. Long Beach Unified Sch. Dist.*, 461 F.3d 1087, 1090 (9th Cir. 2006); *see also Snyder v. Altman*, 444 F. Supp. 1269, 1270 (C.D. Cal. 1978) ("The general rule is that there is no need to exhaust possible state remedies before pursuing a civil rights action in federal court.") The restriction also does not apply to federal claims brought in any court. *Williams v. Horvath*, 16 Cal. 3d 834, 840 (Cal. 1976) ("California may not impair federally created rights or impose conditions upon them.") And finally, the restriction does not affect claims for injunctive relief by its own language. Here, Plaintiffs seek injunctive relief under state law, and

**UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.: <u>CV 12-00551 SJO (PJWx)</u>       DATE: <u>November 29, 2012</u>

both damages and injunctive relief under federal law, all of which is brought in federal court. For multiple reasons, California's exhaustion requirement cannot bar Plaintiffs' claims here.

    H.    <u>Oversight Board's Liability</u>

The larger portion of the Board's complaint centers on its authority and liability under the various statutes basing Plaintiffs' claim. The Board argues that it cannot be held liable because (1) the Board was not created until May 2, 2012 (SAC ¶ 55), after Plaintiffs filed this case on January 13, 2012; and (2) Plaintiffs' complaint and requested relief are unrelated to the Board's statutory authority. (Board Mot. 6-7, 12-14.) Plaintiffs respond that the Board is liable "as an interconnected part of the succession team for the [CRA]" and that the Board has ample authority to grant the relief requested. (Board Opp'n 2-4, 12-13.)

As an initial matter, the Board's argument that, because it came into being after Plaintiffs filed their complaint, it cannot be liable, is without foundation. During early stages of the litigation process, plaintiffs often identify and add new parties to their claims as their understanding of the case develops. As discussed above, Plaintiffs' claims here include allegations of ongoing failure to supervise developers in the creation of appropriate publicly funded housing. And the Board predates the operative complaint here by five months: the SAC was filed on August 20, 2012. To the extent that the Board has relevant oversight authority, its inclusion in the litigation at this stage is appropriate.

The question whether the Board has relevant statutory authority is more complicated, and centers around the transition that was implemented from CRA to DLA in the past year. In June 2011, California passed AB 26, which dissolved the existing redevelopment administrative structure, and transferred existing powers to successor entities with substantially the same authorities, rights, powers, duties, and obligations. (Board Opp'n 1-2.) The new administrative structure has now been formalized in the California Code. Cal. Health & Safety Code. §§ 34161, *et seq.* Among other changes, AB 26 led to the dissolution of CRA and the creation of DLA as its successor-in-interest. The transition also necessitated the creation of the Board, whose function is to "supervise the activities of the [DLA] and the wind down of the [CRA's] affairs pursuant to [AB 26]." (Decl. of Dara L. Schur in Supp. of Board Opp'n ("Schur Decl.), Ex. C, at 1, ECF No. 134-3.) Specifically, the Board was given the authority over:

    (a)    The establishment of new repayment terms for outstanding loans . . .;
    (b)    The issuance of bonds or other indebtedness . . .;
    (c)    Setting aside of amounts in reserves as required by indentures . . .;
    (d)    Merging of project areas;
    (e)    Continuing the acceptance of federal or state grants, or other forms of financial assistance from either public or private sources . . .;

 (f) If a city, county, or city and county wishes to retain any properties or other assets for future redevelopment activities, [reaching] a compensation agreement with the other taxing entities to provide payments to them . . .;
 (g) Establishment of the Recognized Obligation Payment Schedule;
 (h) [Managing a] request by the successor agency to enter into an agreement with the city, county, or city and county that formed the redevelopment agency that it is succeeding . . .; [and]
 (i) [Handling a] request by a successor agency or taxing entity to pledge, or to enter into an agreement for the pledge of, property tax revenues.

Cal. Health & Safety Code. § 34180. The Board must also direct the DLA in its efforts to:

 (a) Dispose of all assets and properties of the former redevelopment agency . . .;
 (b) Cease performance in connection with and terminate all existing agreements that do not qualify as enforceable obligations;
 (c) Transfer housing assets pursuant to Section 34176;
 (d) Terminate any agreement, between the dissolved redevelopment agency and any public entity located in the same county . . .; [and]
 (e) Determine whether any contracts, agreements, or other arrangements between the dissolved redevelopment agency and any private parties should be terminated or renegotiated to reduce liabilities and increase net revenues.

Cal. Health & Safety Code. § 34181. California also gave the Board authority under certain other sections of the code, including the power to: (1) consider the "overall value to the community" of keeping properties intact or dividing them between public and private entities; (2) issue bonds or other enforceable obligations; (3) approve cash and cash equivalents for disbursement to taxing entities; and (4) approve the DLA's "long-range property management plan that addresses the disposition and use of the real properties of the former redevelopment agency." Cal. Health & Safety Code. §§ 34176, 34177.5, 34179, 34179.6, 34191.3, and 34191.5. Within this boundary of responsibilities, the Board's decisions supersede those of the DLA. Cal. Health & Safety Code. § 34179(p).

At issue here is whether the above roles and responsibilities above are sufficiently broad that they can be seen as relating to obligations to comply with federal and state accessibility standards. Plaintiffs argue that the Board's responsibilities squarely fall within the realm of public housing decision-making activity and note particularly that the Board has already taken several actions that have affected public financing of low-income housing units. (Board Opp'n 4-6.) Plaintiffs are correct that the Board's actions have affected and will continue to affect the disposition of public housing assets; the Court particularly notes that the Board is charged with helping the DLA to transfer or otherwise dispose of CRA's housing assets as well as with approving the DLA's long-range property management plan. However, the Court cannot end its inquiry with a determination that the Board's actions may implicate public housing assets; the Board itself must be involved,

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES - GENERAL**

CASE NO.:  CV 12-00551 SJO (PJWx)                    DATE: November 29, 2012

even if indirectly, in the supervision of private developers to be subject to Plaintiffs' claims under Section 504, the ADA, and Section 11135.

It is this determination that ultimately relieves the Board from liability in this case. The Board was constituted to supervise the DLA, and to wind down CRA's affairs, and the weight of statutory authority here suggests strongly that the Board's primary purpose is as a financial oversight agency. The Board must issue or cancel monetary instruments, manage assets, review agreements with other government entities, and provide general financial oversight and guidance to DLA in its work. To the extent that the Board is tasked with working with DLA on housing issues, its role is largely limited to financial, rather than regulatory, considerations. (*See, e.g.*, Board Opp'n 6 (describing the Board's activity "highlight[ing] any funding shortfalls in the Low and Moderate Income Housing fund"). The Court will not stretch the boundaries of the Rehabilitation Act, ADA, and Section 11135 far beyond their intended purpose, and allow Plaintiffs to assert what amount to anti-discrimination claims against a government entity whose work is limited to temporary financial oversight of allegedly discriminating entities.

The Court therefore **DISMISSES** all of Plaintiffs' Claims against the Board.

III.     RULING

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motions. The Court **DISMISSES** Plaintiffs' claims under the FHA as to DLA and the City, and **DISMISSES** all of Plaintiffs' Claims as to the Board. The remaining claims shall proceed accordingly.

IT IS SO ORDERED.