MICHAEL G. ALLEN, *pro hac vice*
JOHN P. RELMAN, *pro hac vice*
D. SCOTT CHANG #146403
JENNIFER I. KLAR, *pro hac vice*
RELMAN, DANE & COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
mallen@relmanlaw.com
schang@relmanlaw.com

MARONEL BARAJAS #242044
DISABILITY RIGHTS LEGAL CENTER
Loyola Public Interest Law Center
256 S. Occidental Blvd., Suite B
Los Angeles, CA 90057
Telephone: (213) 736-1496
Facsimile: (213) 736-1428
Maronel.barajas@drlcenter.org

*Attorneys for Plaintiffs*

DAVID GEFFEN #129342
DAVID GEFFEN LAW FIRM
530 Wilshire Blvd., Ste. 205
Santa Monica, CA 90401
Telephone: (310) 434-1111
Facsimile: (310) 434-1115
Geffenlaw@aol.com

DARA SCHUR #98638
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Ste. 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510) 267-1201
Dara.Schur@disabilityrightsca.org

AUTUMN ELLIOTT #230043
SRIVIDYA PANCHALAM #265398
DISABILITY RIGHTS CALIFORNIA
350 S. Bixel Street., Ste. 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Autumn.Elliott@disabilityrightsca.org

## UNITED STATES DISTRICT COURT FOR THE
## CENTRAL DISTRICT OF CALIFORNIA (WESTERN DIVISION)

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al.* | ) Case No.: 12-CV-00551 FMO (PJWx) |
| Plaintiffs, | ) **SETTLEMENT AGREEMENT AND** |
| vs. | ) **RELEASE OF CLAIMS** |
| CITY OF LOS ANGELES, CALIFORNIA, and COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES, | ) |
| Defendants. | ) |

## TABLE OF CONTENTS

SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS............. 1

    RECITALS ................................................................. 1

    DEFINITIONS ........................................................... 4

    SCOPE AND TERMS OF THE AGREEMENT........................ 11

    MONITORING ......................................................... 333

    RECORD KEEPING AND REPORTING ................................ 377

    MUTUAL RELEASE OF CLAIMS ........................................ 388

        DISPUTE RESOLUTION ..................................................... 411

        COMPENSATION AND FEES ............................................. 422

    COURT'S RETENTION OF JURISDICTION ......................... 444

    MISCELLANEOUS................................................................ 444

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims (the "Agreement") is entered into between the City of Los Angeles (the "City"), a municipal corporation, and Independent Living Center of Southern California ("ILCSC"), Fair Housing Council of San Fernando Valley ("FHC"), and Communities Actively Living Independent and Free ("CALIF") (collectively referred to herein as "Plaintiffs"). The City and the Plaintiffs are referred to herein collectively as "the Parties."

## RECITALS

This Agreement is made and entered into with reference to the following facts:

On January 13, 2012, Plaintiffs commenced litigation against the City and CRA/LA, A Designated Local Authority, Successor to Community Redevelopment Agency of the City of Los Angeles ("CRA/LA") known as *Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.*, filed on January 13, 2012, in the U.S. District Court for the Central District of California, Case No. 2:12-cv-00551-FMO-PJW (the "Litigation"). The Litigation concerns multifamily apartment buildings that received or will receive any Federal financial assistance from the City after July 11, 1988, and/or (2) was or will be designed, constructed, altered, operated, administered, or financed, in whole or in part, in connection with a program administered in whole or in part by the City since January 26, 1992. Plaintiffs also joined, for Rule 19 purposes, a total of 61 owners of multifamily properties that had been assisted by the City or CRA ("Owner Defendants"). The CRA/LA and Owner Defendants are not Parties to this agreement.

On August 20, 2012, the Plaintiffs filed a Second Amended Complaint ("SAC"), which remains the operative complaint in this proceeding. The SAC alleges that the City and CRA/LA engaged in a pattern or practice of discrimination against people with disabilities---in violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; Title II of the Americans with

1

Disabilities Act ("ADA"), 42 U.S.C. § 12132; and California Government Code Section 11135, et seq. ("Section 11135")—by failing to ensure that multifamily housing funded, developed or significantly assisted by the City or CRA is accessible and made meaningfully available to people with disabilities. The SAC names the City as a defendant in its own capacity and in its capacity as the successor housing agency under the Redevelopment Dissolution Law, following dissolution of the former Community Redevelopment Agency of the City of Los Angeles, as further described in the SAC, Paragraph 35 et seq.

On November 29, 2012, the Hon. S. James Otero denied the City's and CRA/LA's motion to dismiss with respect to Plaintiffs' claims under Section 504, the ADA and Section 11135.

Plaintiffs sought by this Litigation to ensure that multifamily housing developments in Los Angeles built at least in part with public funds or in connection with City programs are made accessible and meaningfully available to people with disabilities. They also sought to ensure that the City and CRA/LA comply with their own program access and other obligations to people with disabilities with respect to the operation of multifamily housing programs as they relate to people with disabilities, in accordance with the requirements of Section 504, the ADA, and Section 11135.

The City represents that Exhibit A to this Agreement is a full and complete listing of (1) all of the Housing Developments that received any Federal financial assistance from the City since July 11, 1988, plus (2) all of the Housing Developments that were designed, constructed, altered, operated, administered, or financed, in whole or in part, in connection with a program administered in whole or in part by the City since January 26, 1992, with the exception of Housing Developments listed in Exhibit B to this Agreement. The City further represents that there are no omissions from the listing other than those Housing Developments listed in Exhibit B and that the City will promptly advise Plaintiffs and supplement

the listing if it learns at any time that any Housing Development that should have been on the listing was excluded.

Exhibit B to this Agreement is a list of 22 Housing Developments that received Federal funds through the City and the CRA since July 11, 1988, and in which the City and former Community Redevelopment Agency of the City of Los Angeles entered into Cooperation Agreements or other agreements prior to June 28, 2011, which explicitly required the former Community Redevelopment Agency to fulfill outstanding obligations imposed by the U.S. Department of Housing and Urban Development in connection with the funds, including compliance with Section 504 of the Rehabilitation Act. The Housing Developments in Exhibit B are not covered by the accessibility and remediation provisions at Paragraphs III.10.(a) through III.10.(j) of this Agreement.

The City denies that it violated Section 504, the ADA, or Section 11135 or that it committed any discrimination. The City enters into this Agreement for settlement purposes only. The entry of the attached Final Judgment, the terms of this Agreement, and actions taken pursuant to those documents shall not be construed as an admission by the City of any fault or wrongdoing, or as an admission of the validity of any claims made by the Plaintiffs. This Agreement shall not be treated as an admission of liability or wrongdoing by any party for any purpose and shall not be used by any party in any future proceeding, in any venue whatsoever, either within the City or otherwise, on the issue of liability, knowledge, or past practice and custom.

During the pendency of the Litigation, Plaintiffs and the City undertook extensive discovery and engaged in extensive discussions regarding a potential resolution and settlement of the Plaintiffs' claims in the Litigation, including in mediation before private mediators. As a result of such discussions, the Parties now wish to effect a complete resolution and settlement of the claims, disputes, and controversies relating to the Plaintiffs' allegations in the Litigation, and to resolve

their differences by settling such claims, disputes, and controversies under the terms set forth in this Agreement.

The Parties intend this Agreement to bind and apply to the City and Plaintiffs. Entry of Judgment pursuant to this Agreement shall extinguish all Released Claims (as defined below) and constitute final and complete resolution of all issues addressed herein.

The goal of the Agreement is to significantly enhance the accessibility of multifamily housing in Los Angeles, the availability of fair and accessible housing for individuals with a variety of disabilities, including mobility, visual and hearing disabilities, and the accessibility of the City's housing programs.

## DEFINITIONS

"Accessible," when used with respect to a Housing Unit or a Housing Development, means and refers to full compliance with the requirements of the Accessibility Standards for purposes of Section 504, the ADA, and Section 11135, as well as adoption of the policies attached hereto as Exhibit C.

"Accessible Housing Development" means a Housing Development that is Accessible, including Accessible public and common use areas, as required by Section 504 and the ADA, as well as the number and type of Accessible Housing Units that are required to be Accessible by this Agreement.

"Accessible Housing Units" refers collectively to Housing Units with Mobility Features and Housing Units with Hearing/Vision Features.

"Accessibility Laws" means Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 et seq.; the Americans with Disabilities Act, 42 U.S.C. §12131 et seq.; California Government Code Section 11135 et seq.; implementing regulations and design standards for each of the preceding statutes; and the California Building Code.

For purposes of this Agreement, "Accessibility Standards" means only the following compliance standards:

a.    For Housing Developments constructed or substantially altered before March 15, 2012, the new construction requirements of 24 C.F.R. pt. 8, including 24 C.F.R. §§ 8.22 and 8.32 as well as the new construction requirements of UFAS, or their successor standards;

b.    For Housing Developments constructed or substantially altered on or after March 15, 2012:

    i.    the requirements in 5(a);

    ii.    the Alternative Accessibility Standard; or

    iii.    any future accessibility standard and other regulatory requirements applicable to newly constructed facilities in federally-assisted programs that may be adopted in a final rule issued by HUD pursuant to notice and comment rulemaking under Section 504 so long as such accessibility standard and regulatory requirements do not provide for less accessibility for persons with disabilities than either (i) or (ii).

c.    For Housing Developments constructed after April 12, 2016:

    i.    the requirements in 5(b);

    ii.    the requirements in ANSI A117.1-1986 and the Fair Housing Accessibility Guidelines, March 6, 1991, in conjunction with the Supplement to Notice of Fair Housing Accessibility Guidelines: Questions and Answers About the Guidelines, June 28, 1994; and

    iii.    the accessibility provisions of the California Building Code Chapter 11B, or any future accessibility standard and other regulatory requirements applicable to newly

constructed facilities adopted as part of the California Building Code.

"Alternative Accessibility Standard" means and refers to the alternative accessibility standard for new construction set out in HUD's notice at 79 Fed. Reg. 29,671 (May 23, 2014), when used in conjunction with the new construction requirements of 24 C.F.R. pt. 8, 24 C.F.R. § 8.22, and the new construction requirements of 28 C.F.R. pt. 35, including the 2010 Standards for Accessible Design as defined in 28 C.F.R. § 35.104 and as applied to public entities (excluding any elevator exceptions).

"Assistance Animals" means and refers to animals that work, provide assistance, or perform tasks for the benefit of a person with a disability as well as animals that provide emotional support that alleviates one or more identified symptoms or effects of a person's disability.  Assistance Animals include animals that are trained and untrained and include dogs and other animals.

"Auxiliary Aids" means and refers to aids, services, or devices that enable persons with vision, hearing, manual, or speech impairments to have an equal opportunity to participate in, or enjoy the benefits of, programs, services, or activities, including housing and other programs, services, and activities subject to the requirements of Section 504 of the Rehabilitation Act and/or the Americans with Disabilities Act.  Auxiliary aids include but are not limited to the aids, services, and devices set out in the definition of auxiliary aids auxiliary aids in 24 C.F.R. § 8.3 and the definition of auxiliary aids and services in 28 C.F.R. § 35.104.  *See also* 42 U.S.C. § 12103(1).

"Certification of Compliance with Accessibility Standards" means and refers to a Certification issued by the City, certifying that the Housing Development and accessible Housing Units meet the Accessibility Standards.

"Certification of Adoption of Housing Policies" means and refers to a Certification issued by the City certifying that the Housing Development has adopted the Housing Policies.

"City" means and refers to the City of Los Angeles, California.

"Covered Housing Development" includes all Housing Developments listed on Exhibit A, and all Housing Developments and Housing Units that are financially assisted, designed, constructed, altered, operated, administered, or financed in connection with a program administered by the City (directly or in its role as the "Housing Successor Agency" pursuant to the Redevelopment Dissolution Act), or by its Subrecipients, during the Settlement Term. Housing Developments listed in Exhibit B are covered solely for the purposes of application of Housing Policies and non-discrimination provisions, as set out in Paragraphs III.10(k), III.10(m), and III.19.

"Effective Date" means and refers to the effective date of this Agreement, which is the date of the latest signature on this Agreement by any of the Parties.

"HCID" includes the City of Los Angeles's Housing + Community Investment Department and any successor department or agency;

"Housing Development" or "Development" means and refers to the whole of one or more residential structures and appurtenant structures, equipment, roads, walks, and parking lots that (1) received or will receive any Federal financial assistance from or through the City and/or (2) were or are designed, constructed, altered, operated, administered, or financed in connection with a program administered by the City (directly or in its role as the "Housing Successor Agency" pursuant to the dissolution legislation) or by its Subrecipients.

"Housing Policies" means the policies attached as Exhibit C to this Agreement, or any mutually agreed upon subsequent policies.

"Housing Unit" or "Unit" means and refers to a single unit of residence that provides spaces for living, bathing, and sleeping, provided such definition shall not be construed to exclude Single Room Occupancy Units. A Housing Unit or Unit is the same as a dwelling unit.

"Housing Unit with Hearing/Vision Features" means and refers to a Housing Unit that complies with 24 C.F.R. § 8.22 and all applicable provisions of UFAS or the comparable provisions of the Alternative Accessibility Standard, and shall include but not be limited to section 809.5 of the 2010 Standards for Accessible Design. Hearing/Vision Features include but are not limited to visual alarms (UFAS §§ 4.34.10, 4.28.3), auxiliary alarms (UFAS §§ 4.34.10, 4.28.4), telephone volume controls and hearing aid compatibility (UFAS § 4.31.5), protections against protruding objects (UFAS § 4.4), stairway requirements (UFAS §§ 4.9, 4.26.4), protections against exposed pipes and surfaces (UFAS §§ 4.19.4, 4.24.6, 4.34.6.5(8)), audible alarms (UFAS § 4.28.2), signage (UFAS § 4.30), push button controls for telephones (UFAS § 4.31.6), consumer information (UFAS § 4.34.4), and range, cooktop, and oven controls (UFAS §§ 4.34.6.6, 4.34.6.7).

"Housing Unit with Mobility Features" means and refers to a Housing Unit that is located on an accessible route and complies with the requirements of 24 C.F.R. § 8.22 and all applicable provisions of UFAS or the comparable provisions of the Alternative Accessibility Standard including but not limited to sections 809.2 through 809.4 of the 2010 Standards for Accessible Design. A Housing Unit with Mobility Features can be approached, entered, and used by persons with mobility disabilities, including individuals who use wheelchairs.

"Judgment" means a judgment entered by the District Court in this Litigation, substantially in the form attached to this Agreement as Exhibit D that, among other things, fully approves and incorporates the terms of this Agreement and retains the District Court's jurisdiction to enforce the Agreement throughout the Settlement Term.

8

"Owner" means and refers to an owner of a Housing Development and such owner's successors and assigns that (1) has received, receives, or will receive any Federal financial assistance from the City since July 11, 1988, and/or (2) was, is, or will be the Owner of a Housing Development designed, constructed, altered, operated, administered, or financed, in whole or in part, in connection with a program administered in whole or in part by the City since January 26, 1992. An Owner may also be a Subrecipient.

"Person with a Disability" means and refers to a person who has a physical or mental impairment that substantially limits one or more major life activities such as caring for oneself, manual tasks, walking, seeing, hearing, speaking, breathing, or learning; has a record of such impairment; or is regarded as having such an impairment. *See* 24 C.F.R. § 8.3, as modified by the ADA Amendments Act of 2008, Pub. L. 110-325, §7(2), 122 Stat. 3558 (September 25, 2008), amending 29 U.S.C. §705(20). This definition includes people with disabilities as defined in Cal. Gov. Code Sec. 12926 to the extent that provision is more inclusive than federal law.

"Program Access" means applicable Accessibility Laws directing a public entity to operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by Persons with Disabilities.

"Property Management Agent" means and refers to a person or entity that manages one or more of the Housing Developments Covered by this Agreement on behalf of an Owner.

"Reasonable Accommodation" means a change in rules, policies, practices, or procedures that is necessary, pursuant to the Fair Housing Act, to provide a person with a disability an equal opportunity to use and enjoy a Housing Unit.

"Reasonable Modification" means a change in rules, policies, practices, or procedures that is necessary, pursuant to Section 504 or the ADA, to provide a person with a disability an equal opportunity to use and enjoy a Housing Unit. Pursuant to the Fair Housing Act, "Reasonable Modification" means any reasonable physical or structural change to a Housing Unit or a public or common use area.

"Registry" refers to the Internet-based Accessible Housing Registry described in Paragraph III.10.(m), below.

"Settlement Coordinator" or "Section 504/ADA Coordinator for Accessible Housing" means the individual designated by the City pursuant to and in accordance with Paragraph III.14, below.

"Settlement Term" means the period of time commencing with the Effective Date and extending for ten (10) years after the District Court's entry of Judgment, or until the Target Number of Accessible Units is achieved, whichever occurs later.

"Subrecipient" means and refers to any public or private agency, institution, organization, or other entity or person to which Federal financial assistance or financial assistance from or through the City is extended. A Subrecipient also means a non-Federal entity that receives a sub-award from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program. A Subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency. 24 C.F.R. §200.93. A Subrecipient may also be an Owner.

"Substantial Rehabilitation" has the same meaning as in 24 C.F.R. § 8.23.

"Target Number of Accessible Units" means the number of apartment units the City must cause to be Accessible pursuant to this Agreement to meet its obligations under this Agreement within ten (10) years of the Effective Date. The

10

Parties have agreed that the Target Number of Accessible Units is Four Thousand (4,000).

"Uniform Federal Accessibility Standards" or "UFAS" means and refers to a set of scoping requirements and standards for the design and construction of buildings and facilities to ensure that they are readily accessible to and usable by persons with disabilities. *See* Appendix A to 24 C.F.R. subpart 40 for residential structures and Appendix A to 41 C.F.R. subpart 101-19.6 for general-type. Pursuant to 24 C.F.R. § 8.32(a), effective July 11, 1988, the design, construction, or alteration of buildings in conformance with sections 3-8 of UFAS shall be deemed to comply, *inter alia*, with the requirements of 24 C.F.R. § 8.22.

## SCOPE AND TERMS OF THE AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties stipulate, and intend that the District Court will make the following findings as part of the Final Judgment:

**Recitals**.  The recitals set forth above are incorporated by reference in this Section and made a part of this Agreement.

**Jurisdiction.**  The Court has personal jurisdiction over Plaintiffs and the City for purposes of this Action and jurisdiction over this Action pursuant to 28 U.S.C. §§ 1331 and 1367, and 28 U.S.C. §§ 2201 and 2202.  Relief may be granted pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 12132 et seq.  Venue is proper in this District.

**Binding Effect**.  The provisions of this Agreement shall be binding upon the Parties, and shall become effective on the Effective Date.

**Purpose of Settlement**.  To avoid the cost, expense, and uncertainty of protracted litigation, the City and Plaintiffs enter into this Agreement, which shall be binding upon the City and Plaintiffs and extinguish all Released Claims and shall constitute the final and compete resolution of all issues addressed herein.  Pursuant

11

to the terms of this Agreement, the City will undertake the actions described below for the purpose of ensuring that City-assisted housing programs, services, and activities are in compliance with the accessibility requirements of Section 504, the ADA, and Section 11135.

**Approval by the District Court**. The Parties intend that this Agreement be approved by the District Court, and that the District Court retain jurisdiction for the Term of this Agreement to resolve any dispute regarding compliance with the Agreement that cannot be resolved through the process described in Section VII, below. Furthermore, upon such approval, the District Court shall enter the Judgment under Rule 54(b) of the Federal Rules of Civil Procedure (substantially in the form attached to this Agreement as Exhibit D.)

**Term of Agreement**. The District Court shall have continuing jurisdiction over this Agreement throughout the Settlement Term. This Agreement shall expire ten (10) years after entry of Judgment by the District Court, or when the Target Number of Accessible Units is achieved, whichever is later. Nothing in this Paragraph shall bar any Party from moving for an extension of the Agreement to enforce any obligations herein.

**City's Commitment to Provide Affordable, Accessible Housing.**
The City shall take the actions set forth in this Agreement to provide accessibility for persons with disabilities in its housing-related programs. Among other things, the City shall ensure over the Settlement Term the production of the Target Number of Accessible Units by means of inspecting Existing Housing Developments to determine compliance with this Agreement, causing, to the extent possible, Subrecipients and Owners to carry out construction to remedy non-compliance with requirements set out in this Agreement, and taking all other actions necessary to provide for Four Thousand (4,000) Accessible Housing Units in Accessible Housing Developments as required by this Agreement by no later than ten years after the Effective Date. The failure of the City to secure the cooperation of any Subrecipient

12

or Owner with efforts to remedy non-compliance with requirements set out in this Agreement shall not excuse the City's obligation to achieve the Target Number of Accessible Units. To accomplish the activities in this Agreement, the City shall carry out a program with a value that averages a minimum of $20 million per year over the Settlement Term, which amount may be adjusted by mutual agreement of the Parties upon completion of the Target Number of Accessible Units. Completion of the Target Number of Accessible Units shall not relieve the City of the obligation to comply with other provisions of the Agreement. The City shall also take the actions set forth in this Agreement and such other actions as may be necessary to ensure that the City, Subrecipients, and Owners comply with the obligation to operate housing programs and Housing Developments in accordance with Federal and California law and comply with the other obligations set forth in this Agreement.

**City's Compliance**. The City shall comply with the requirements of Section 504, the ADA, Section 11135, and other applicable nondiscrimination laws with respect to all aspects of its own housing-related programs, services, and activities, including administration and financing.

**Reporting of Activities to Ensure Compliance**. Pursuant to its reporting obligations set out in Paragraph III.11, below, and elsewhere in this Agreement, the City shall report on the actions it takes to ensure its own compliance and to require and ensure its Subrecipients' and Owners' compliance with Section 504, the ADA, Section 11135, and the terms of this Agreement.

**Specific Commitments to Achieving Accessibility**. This Agreement provides for the following:

(a)   **Architectural Accessibility**. The City shall cause Four Thousand (4,000) Housing Units ("Target Number of Accessible Units") to come into compliance with the architectural accessibility standards under Section 504, the ADA, and Section 11135 within ten (10) years

13

of the Effective Date.  At least Two Thousand Six Hundred and Fifty-Five (2,655) of such units must be Housing Units with Mobility Features.  In order to count a Housing Unit toward the Target Number of Accessible Units, the City must provide a Certification of Compliance with Accessibility Standards to the Monitor that the Housing Unit and the Housing Development meet the requirements of Accessibility Standards.

(b)   **Accessible Housing Unit Plan**.  Annual production schedules will be established pursuant to an Accessible Housing Unit Plan ("Plan"), recommending locations of accessible housing units, which will be agreed to by the Parties within twelve (12) months of the Effective Date.

The Plan shall be developed by one or more experts, agreed to by the Parties and compensated by the City, in an amount not to exceed Six Hundred Thousand Dollars ($600,000), who will conduct accessibility surveys and otherwise advise the Parties on compliance with federal and state accessibility requirements, as set forth in Paragraph III.10(d), below.  The Plan shall provide for geographic distribution of accessible units throughout Los Angeles, and in a range of unit sizes, and shall maximize affordability and access to public transportation and other amenities.  Consistent with federal relocation and Reasonable Accommodation and Reasonable Modification requirements, the Plan shall provide that the City, when appropriate, temporarily relocate, or require Owners to temporarily relocate, existing tenants occupying units to be retrofitted, at Owner or City expense, and shall address potential temporary displacements of tenants.  The Parties agree that Plaintiffs shall be consulted in the event that changes must be made to the Accessible Housing Unit Plan.

14

(c) **Qualifications of Experts**: Each expert hired by the City to implement Paragraph III.10(b), above, shall: (1) be an architect; (2) have substantial experience in evaluating or assisting public entities in evaluating the accessibility of facilities under Section 504, the ADA, and California Building Code; (3) be knowledgeable in current federal and California accessibility standards; (4) have a minimum of three (3) years' experience in providing Section 504 and/or ADA services related to accessible facilities; and (5) be CASp certified.

(d) **Development of Accessible Housing Unit Plan**:  The experts identified in Paragraph III.10(c), above, shall assist the City in the following:

Identifying which existing Housing Developments are in compliance or not in compliance with the Accessibility Standards.  To this end, the City shall provide to the experts those accessibility survey reports and related documentation previously prepared by the City's accessibility consultants and other consultants for the Parties. The experts' review of survey reports prepared by the City's accessibility consultant may include on-site reviews to determine the accuracy and sufficiency of the survey reports.  If the experts determine that existing survey reports are accurate and provide all of the information required to ensure compliance with the Accessibility Standards, the accessibility reports may be used for purposes of assessing the relevant Housing Development's compliance with the Accessibility Standards.  The experts may also rely on other accessibility surveys of any Housing Developments covered by this Agreement that they deem to be reliable. The City shall take steps to ensure that persons working on behalf of the City shall not waive, ignore, or otherwise fail to identify noncompliance with Accessibility Standards in Housing Developments.

*ILC, et al v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

Utilizing the information gathered to develop the Accessible Housing Unit Plan.

Assisting the City in developing protocols, assessment tools, checklists, and standards for ensuring accessibility and for issuance of Certifications of Compliance with Accessibility Standards.

Assisting the City to develop internal capacity, including the capacity of designated staff in HCID, the City Department on Disability, and the City Department of Building and Safety to ensure compliance by Subrecipients and Owners with applicable accessibility requirements, including the Accessibility Standards.

Developing a quality assurance program that ensures the quality and consistency of work performed by City staff and agents pursuant to this Agreement, advising the City of issues identified through the quality assurance program, and making recommendations about how to address such performance problems (*e.g.*, additional training, extra oversight, limiting functions performed).

Providing training to the City staff and agents who will implement the accessibility provisions of this Agreement, including training for designated staff for HCID, the City Department on Disability, and the City Department of Building and Safety regarding the interpretation and application of the Accessibility Standards, conducting and documenting on-site accessibility surveys, and such other issues as the experts deem prudent and appropriate.

(e)    **Flexibility in Meeting Target Number of Accessible Units**.  Subject to the requirements of the Plan and Section 504, the City shall have flexibility to meet its annual and overall production schedules through a combination of new construction, substantial alteration, remediation of existing housing units, provision of Housing Units under the Enhanced

16

Sensory Unit Program, or certification that existing Housing Units meet federal and California accessibility standards.

(f)  **Accessibility of Future Housing Developments**.  The City shall ensure that Housing Developments that are newly constructed or substantially altered after April 12, 2016, are designed, constructed, and maintained in full compliance with the Accessibility Standards in this Agreement through specialized review of plans and specifications and on-site compliance inspections throughout the design and construction process. With respect to any future new construction or future substantial alterations, the City shall require developers to construct at least 10% of units to comply with UFAS requirements for mobility accessibility and an additional 4% of units to comply with UFAS requirements for sensory accessibility, and to ensure that they are affordable for households with incomes at 30%, 50%, and 80% of area median income. The Parties agree that the City may count toward the Target Number of Accessible Units up to a total of 20% of Housing Units in a single Housing Development that meet UFAS requirements, provided that no more than 5% of such units be designated for sensory accessibility.

(g)  **Accessibility in Existing Buildings to be Remediated**.  For purposes of meeting the Target Number of Accessible Units, the City may count a remediated unit to the extent the unit and the project's common areas meet the Accessibility Standards, and the unit and common areas are located on accessible routes.

(h)  **Credit for Early Performance**.  The Parties agree that any units made accessible pursuant to the terms of this Agreement after April 12, 2016, and before the entry of Judgment by the District Court shall count towards the City's Target Number of Accessible Units.

(i)   **Enhanced Sensory Unit Program**.  The City will establish a program to provide auxiliary aids and services and enhanced accessibility features for individuals with hearing and vision disabilities who reside in existing Housing Developments.  The program will provide assistance to make additional structural features and assistive technology available that assure that people with sensory disabilities have equal access to City-assisted housing opportunities.  These Housing Units must, at a minimum, meet UFAS standards for Housing Units with Hearing/Vision features. The City may count no more than 200 such units during the Settlement Term toward the Target Number of Accessible Units.

(j)   **Ensuring Program Accessibility**.  The City shall adopt policies, procedures, and training to ensure that its affordable housing program complies with the program accessibility requirements of Section 504, the ADA, and Section 11135 and promotes maximum utilization of accessible units by people with disabilities needing the accessibility features, including provisions regarding Reasonable Accommodations, Reasonable Modifications, Effective Communication, Auxiliary Aids and Services, and Assistance Animals.

     Within 180 days of the Effective Date, and in consultation with the Plaintiffs, the City will conduct a self-evaluation pursuant to Section 504 and the ADA, of the Housing + Community Investment Department and the Department of Building and Safety, and develop a transition plan to address accessibility deficiencies identified in the self-evaluation.

     Within 180 days of the Effective Date, and in consultation with the Plaintiffs, HCID will revise its effective communication policy to ensure that it complies with the requirements of Section 504, the ADA, and Section 11135.

18

(k) **Management Policies to Ensure Accessibility**.  To ensure maximum utilization of accessible units by people with disabilities needing the accessibility features, the City shall, within 60 days of the Effective Date, require all owners and managers of City-assisted housing to adopt the uniform marketing and leasing policies that are attached hereto as Exhibit C, and incorporated by reference into this Settlement Agreement.  These policies are the product of collaboration between the City and Plaintiffs, and the Parties are of the opinion that they comply with Section 504, the ADA, and Section 11135.  These policies provide for affirmative marketing directed at people with disabilities, uniform application, waiting list, and tenant selection practices (including unit assignment and transfer standards), effective communication with people with disabilities, assistance and support animals, the provision of reasonable modifications and reasonable accommodations, and grievance procedures. The City shall enforce those policies: (1) with respect to newly constructed or substantially altered buildings, from the time of construction or alteration through the end of the Settlement Term, and (2) with respect to existing buildings, from the date the uniform marketing and leasing policies are implemented through the end of the Settlement Term.  Thereafter, while the City may exercise continuing authority to impose such policies on buildings with remaining affordability covenants, the City's obligation to enforce such policies cannot be compelled through this Settlement Agreement.  .

(l) **Ensuring Compliance with Management Policies**.

The City shall monitor its Subrecipients and Owners and require that its Subrecipients and Owners comply with the applicable requirements of Section 504 and applicable HUD regulations, the ADA and applicable HUD regulations, California

19

Accessibility Standards, and this Agreement in designing, constructing, altering, operating, administering, and financing housing. Failure or refusal of a Subrecipient or Owner to comply with the Accessibility Standards and applicable provisions of this Agreement may result in progressive steps by the City to compel compliance such as declaring an event of default under active loan agreements, suing for breach of loan or covenant agreements with demand for specific performance and damages, negative evaluations and reduction in rating factor points for future project consideration through existing contractor evaluation and contractor responsibility ordinances, or debarment proceedings or the filing of a complaint or referral to HUD for further enforcement actions.

Within 180 days of the Effective Date, the City shall, in consultation with Plaintiffs, develop and begin to carry out a monitoring, compliance, and enforcement plan to ensure that Owners and Property Management Agents of Covered Housing Developments comply with management policies to ensure accessibility. That plan will include a Unit Utilization Plan based on unit utilization surveys and audits of occupancy, waiting lists, and transfer lists to assess the extent to which people with disabilities occupy accessible units or need or have requested accessible units; and that describes the steps the City will take to maximize appropriate utilization. It will also require Owners and Project Management Agents to adopt corrective action plans to maximize the occupancy of accessible units by families that need accessibility features.

   A.    Occupancy utilization surveys and audits shall identify, by unit number, bedroom size, and accessibility type: a) accessible units that are not occupied by a Person with a

Disability needing the accessibility features, and whether those households have executed the required lease addendum, and b) vacant accessible units.

B.  Transfer audits shall identify, by address, name, and desired unit type and bedroom size, and requested accessibility features, existing residents of Covered Housing Developments to determine if any Persons with a Disability desire or have previously requested a unit with accessibility features, if they are on a transfer list for such a unit, and what steps are being taken to meet their accessibility needs.

C.  Waiting list audits shall examine waiting lists for Covered Housing Developments and, subject to a protective order to be negotiated by the parties or secured through an appropriate petition to the Court, identify by name and application date any individuals on the list who are Persons with Disabilities who desire a Housing Unit with accessibility features, the nature of the features needed, and the bedroom size, and what steps are being taken to meet their accessibility needs.

The City shall issue a Certification of Adoption of Housing Policies when it reasonably confirms that the Owner or Property Management Agent of a Covered Housing Development has adopted the Housing Policies for that Housing Development and notified the tenants of the adoption.

(m)  **Internet-based Accessible Housing Registry ("Registry")**. Within 270 days from the Effective Date, the City will, with input from the Plaintiffs as to content, features, usability, and accessibility, develop an accessible website listing all Housing Units in Covered Housing

21

Developments, including real-time availability of accessible units, lists
of accessible features, numbers of bedrooms, rent information, and
contact information for each housing development.  The website shall
meet version 2.0 Levels AA of the "Web Content Accessibility
Guidelines" published by the Web Accessibility Initiative (WAI) of the
World Wide Web Consortium (W3C), or any subsequent version(s) that
are published during the Settlement Term.  Documents posted on the
Registry should conform to the W3C's Guidance on Applying WCAG
2.0 to Non-Web Information and Communications Technologies
(WCAG2ICT) and be in formats that can be recognized and read by
software commonly used by individuals who are blind or have low
vision to read digital information.

The City shall maintain the Registry for the entire
Settlement Term, and information shall be kept current.  The City
shall develop a mechanism for providing information and options
equivalent to those on the Registry for Persons with Disabilities who
do not have internet access or whose disabilities limit their ability to
communicate electronically, including making information available
in map format, written format and alternative formats through the
Settlement Coordinator or designee.

The purposes of the Registry include: 1) allowing
Persons with Disabilities to obtain detailed current information about
accessible Housing Units and Housing Developments; 2) allowing
People with Disabilities to use the Registry to sign up to be notified
about accessible housing units that are available for rent, make
application for such units, and be placed on waiting lists for such
units; 3) ensuring that accessible Housing Units are occupied by
people who need the accessible features; and 4) assisting Owners and

22

1  Property Management Agents in conducting targeted outreach to
2  People with Disabilities. The City will require Owners and Property
3  Management Agents in Covered Housing Developments to post
4  information about the Developments on the Registry and to use the
5  applicant information provided through the Registry in conducting
6  outreach and leasing accessible housing. The City shall also post and
7  maintain in an easily locatable place and accessible format (*i.e.*,
8  HTML or Word – not PDF) on its main website a list of all Covered
9  Housing Developments, which shall be maintained throughout the
10  Term of the Agreement and updated on a quarterly basis, as needed.

11  (n)  **Training and Education**. The City will develop and implement a
12  curriculum to train City housing staff and owners and property managers
13  of Covered Housing Developments about disability rights obligations in
14  assisted housing under Section 504, the ADA, and the Fair Housing Act.
15  The curriculum will also address implementation of the terms of the
16  Agreement. Trainings will be provided on a regular basis to new City
17  staff and new property managers of assisted housing and current staff
18  and employees will be required to attend refresher classes. The Parties
19  agree that Plaintiffs shall be consulted in the development of the training
20  curriculum and materials within a reasonable time prior to any such
21  training, and shall be invited to attend such training, either as
22  participants or as presenters.

23  (o)  **Provision of Funding**. The City shall provide an average of $20 million
24  per year during the Settlement Term, which it estimates as the funding
25  required to perform its obligations under the Agreement in accordance
26  with the timeframes set out therein.

27
28

(p)   **Flexibility in Use of Funding**.  The City shall have discretion to use
funds budgeted for the Agreement for the following purposes:

Leveraging additional development funds to support new
construction of affordable rental housing.

Assisting owners of Covered Housing Developments to
achieve compliance with accessibility requirements of Section 504, the
ADA, and Section 11135.

Assisting with structural modifications to dwelling units in
Covered Housing Developments at the request of individual tenants or
applicants.

Oversight and enforcement of architectural accessibility
requirements and management policies in Covered Housing
Developments.

Development of the Internet-based Accessible Housing
Registry.

Development and implementation of training and education
programs.

Record keeping and reporting.

Hiring of experts and consultants to assist the City in
carrying out its obligations under the Agreement.

**Reporting Requirements**.  The Settlement Coordinator shall prepare a
semi-annual report containing qualitative and quantitative data detailing the
activities carried out under this Agreement for the preceding reporting period
pursuant to Paragraphs III.12-13, below, to be provided to Plaintiffs' Counsel and
the Monitor on or before June 30 and December 31 of each year beginning
December 31, 2016.

**Report Contents**. Reports referenced in Paragraph III.11, above, shall include, at a minimum, a detailed description of the following:

(a)     Compliance efforts which have been made since the last report with respect to each of the substantive terms of this Agreement, and the actions taken to ensure the City's own compliance and to require and ensure its Subrecipients' and Owners' compliance with Section 504, the ADA, Section 11135, and the terms of this Agreement.

(b)     Quarterly, annual, and overall progress in achieving the Target Number of Accessible Units and annual production schedules under the Accessible Housing Unit Plan, including information regarding geographic distribution of accessible units in a range of unit sizes; affordability and access to public transportation and other amenities; and the provision of temporary replacement housing for tenants displaced by remediation efforts, sufficient to evaluate compliance with the requirements of this Agreement and the Accessible Housing Plan in those areas.

(c)     Progress in completing unit utilization surveys, and audits of occupancy, waiting lists, and transfer lists, and progress on implementing corrective action plans to maximize occupancy of accessible units by Persons with Disabilities that need the accessibility feature.

(d)     Progress in ensuring that Housing Developments adopt the Housing Policies, and of monitoring and enforcement efforts to ensure compliance with the Housing Policies.

(e)     Progress in implementing disability rights training and education for City housing staff and for owners and property managers of City-assisted buildings.

(f)     Progress in the development and maintenance of the Internet-based Accessible Housing Registry and its use by Housing Developments and

housing applicants.

(g)    Compliance efforts which the City intends to take during the next
reporting period.

(h)    The Report shall also include:

A list by address and unit number of all Housing
Developments and Housing Units which have received Certifications
of Compliance with Accessibility Standards and Certifications of
Adoption of Housing Policies since the last report.

Specific quantitative data as identified in Paragraph
III.13, below.

A list of the grievances or complaints that were received
by the City through the Grievance Procedure (including copies of any
written grievances or complaints) since the last report and the actions
taken in response, redacting any private, personal information
concerning residents of, or applicants for, Housing Units.  The City
shall make clear in the Report when any such information is redacted.
To the extent Plaintiffs' Counsel or the Monitor reasonably determine
after consultation with the City that such private information must be
reviewed in unredacted form in order to analyze the Report or assess
compliance with this Agreement, Plaintiffs' Counsel and the Monitor
may request that disclosure of such information be made pursuant to a
protective order, and the City shall provide such information pursuant
to a protective order to be negotiated by the Monitor and the parties or
secured through an appropriate petition to the Court.

The amount and sources of City funds expended since the
last report.

**Quantitative Data**. Quantitative data referenced in Paragraph
III.12(h)ii, above, shall include the number of properties inspected; numbers/types of
units under construction; number/types of Accessible Units completed; number of
Housing Developments in/out of compliance with policy obligations; number/types
of Accessible Units occupied by persons with disabilities who need the accessibility
features; number/types of Accessible Units occupied by persons who do not need the
accessibility features; number of persons with disabilities on waitlists and transfer
lists for Housing Developments; number of Developments in compliance with
Registry posting requirements; number of Housing Developments listed on the web-
based registry; number of persons with disabilities on the web-based registry;
number of requests for reasonable accommodations and reasonable modifications
granted or denied; number of grievances filed with Owners and their resolution;
number of grievances filed with the City and their resolution; and other data that the
City deems relevant. The report shall be submitted to the Monitor pursuant to
Paragraph III.11, above.

**Appointment of Settlement Coordinator ("Settlement Coordinator"
or "Coordinator")**. Within 90 days of the Effective Date, the City shall hire a
Settlement Coordinator and provide the individual's name and contact information
to Plaintiffs' Counsel and the Monitor. The Settlement Coordinator will coordinate
effective implementation of this Agreement, shall be retained throughout the term of
this Agreement, and shall be directed and compensated by the City. The Settlement
Coordinator will report directly to the General Manager of HCID concerning matters
relating to this Agreement. The City shall commit sufficient resources, authority,
and independence so that the Settlement Coordinator can successfully accomplish
his or her responsibilities under this Agreement.

**ADA Coordinator**. The Settlement Coordinator position is in addition
to, not a replacement for, the City's current Section 504/ADA Coordinator, who
generally performs the functions set out in 24 C.F.R. § 8.53(a) and 28 C.F.R.

§ 35.107 for the City.  The Settlement Coordinator and the Section 504/ADA Coordinator shall coordinate as appropriate.

**Qualifications of Settlement Coordinator**.  The initial Settlement Coordinator, and any Settlement Coordinator subsequently hired shall: (a) have substantial experience in evaluating or assisting public entities in evaluating the accessibility of facilities under Section 504 and the ADA; (b) be knowledgeable in current federal and California accessibility standards; and (c) have experience in coordinating and implementing complex projects.  It is highly desirable for the Settlement Coordinator to also have a minimum of three (3) years' experience in providing Section 504 and/or ADA services related to accessible facilities and be licensed either as an architect or as a registered civil engineer.

**Responsibilities and Authority of the Settlement Coordinator**.

(a)    At all times during the term of the Agreement, the Settlement Coordinator shall have responsibility and authority to:

Receive and respond to reasonable inquiries and complaints from Plaintiffs and others concerning accessibility barriers affecting Housing Developments, the Registry, and the City's Housing Programs.

Recommend the adoption or modification of the City's policies and procedures concerning accessibility barriers affecting Housing Units and Housing Developments.

Ensure the City's adoption of written policies and procedures concerning the maintenance of accessible features in Housing Units and Housing Developments.

Coordinate all compliance activities under this Agreement, including:

A.    Implementation of the provisions of this Agreement.

B.    Coordination of the activities of City personnel who

28

will implement this Agreement.

Issue, or oversee the issuance of, Certifications of Compliance with Accessibility Standards for Housing Units and Housing Developments pursuant to Paragraph III.10(a), and Certifications of Adoption of Housing Policies pursuant to Paragraph III.10(l)iii.

Review, contribute to, and timely submit all reports required by this Agreement, as well as any underlying documentation.

Consult, as the Settlement Coordinator deems appropriate, with City personnel, contractors, or representatives to obtain information concerning the City's compliance with the terms of this Agreement.

Provide or oversee training identified in Paragraph III.10(d).

Oversee the development and implementation of the Registry identified in Paragraph III.10(m) - the Registry shall be made available to the parties and the Civil Rights Monitor (i) in electronic form and (ii) in written form through the office of the Settlement Coordinator.

Oversee the development and implementation of assistance in financing remediation, as set out in Paragraphs III.10(a), (b).

Conduct or oversee field spot checks of Covered Housing Developments to confirm compliance with the physical accessibility and policy provisions of this Agreement.

Adopt and carry out procedures under which the Settlement Coordinator will accept, review, and resolve grievances or complaints arising under this Agreement, including through the

29

grievance procedure set out in Paragraph III.19, below, from Plaintiffs, the disability community, residents in and applicants for tenancy at the Housing Developments Covered by this Agreement, and other organizations that advocate for persons with disabilities.

Receive and respond to inquiries regarding the implementation of this Agreement by the City, Subrecipients, Owners, and Property Management Agents.

Recommend, subject to consultation with the Plaintiffs, the adoption or modification of the City's Housing Policies.

Oversee the performance of the City, Subrecipients, Owners, and Property Management Agents regarding the accessibility of Housing Units and Housing Developments and the Housing Policy provisions of this Agreement to ensure that they do not waive, ignore, or otherwise fail to identify and address noncompliance with Federal fair housing and civil rights requirements or any requirements of this Settlement.

Ensure the City's adoption of and compliance with written policies and procedures contemplated by this Agreement.

Respond to Plaintiffs' or Plaintiffs' Counsel's requests for information and documents relating to any provisions of this Agreement.

(b)     The Settlement Coordinator may utilize staff and designees to carry out activities and obligations of the Settlement Coordinator, but the City shall require the Settlement Coordinator to retain the responsibility and the authority for performing Settlement Coordinator functions.

30

**Settlement Coordinator Responsibilities for Registry.** As part of developing the Accessible Housing Unit Plan, the Settlement Coordinator shall oversee the creation of a database to include the following information:

    (a)    Identification by address and Owner of all Covered Housing Developments.

    (b)    The Housing Developments and Units (identified by Unit number) that meet the Housing Accessibility Standards, pursuant to a Certification of Compliance by the City.

    (c)    The date remediation or construction began and concluded on each of the existing Housing Developments and Housing Units.

    (d)    The date a Certification of Compliance was issued by the City.

    (e)    Which units are Accessible in each Housing Development, identifying separately and by unit number the Housing Units with Mobility Features and the Housing Units with Sensory Mobility Features.

**Grievance and Complaint System.** Within 30 days of the Effective Date, the City shall establish policies and procedures mutually acceptable to the parties for submission of grievances or complaints to, and responses by, the City concerning accessibility in housing and programs covered by this Agreement, including complaints about the City's implementation of its Housing Program and complaints about Owner or Management actions in Housing Units and Housing Developments covered by this Agreement, as well as complaints about the Internet Registry. The grievance procedures shall comply with the requirements of 28 C.F.R. § 35.107, and shall at a minimum:

    (a)    Describe the procedures and timelines for submitting a complaint and obtaining a response.

    (b)    Provide for accessibility, effective communications, and reasonable accommodations in utilizing the procedures.

    (c)    Identify staff responsible for investigating and resolving complaints.

(d)     Provide and describe a progressive set of sanctions that the City may use against Owners for policy noncompliance.

(e)     Include maintenance of a log of complaints and their resolution or outcome.

**Plaintiffs' Rights With Respect to Testing**:  In order to further the Parties' intent that the Agreement will be successfully implemented, the Parties agree that Plaintiffs may at their discretion conduct tests in Housing Units and Housing Developments and otherwise monitor implementation to determine whether the terms of the Agreement are being followed. Where Plaintiffs may need to secure cooperation with Owners in order to conduct such tests, the City agrees not to interfere in Plaintiffs' efforts to gain such cooperation.  However, nothing contained herein shall constitute a guarantee by the City that Plaintiffs shall receive such cooperation from Owners, and the failure of Owners to cooperate with Plaintiffs shall not constitute a breach of this Agreement on the part of the City.  Should Plaintiffs discover any purported issues or problems with the implementation as a result of any tests conducted or monitoring, Plaintiffs will make best efforts to notify the City of the results.

**Training regarding this Agreement to Supervisory Employees:** Within fifteen (15) days of the approval of this Agreement, the City shall train each of its employees having supervisory authority for any components of this Agreement on the requirements of this document.  Thereafter, the City shall provide such training to any newly hired employee with such authority within fifteen (15) days of hiring and to any employee newly given such authority within fifteen (15) days of conferring on that employee such authority.

## MONITORING

**Court Appointment of Monitor**.  Within seventy-five (75) days of
Effective Date, the Parties will ask the District Court to appoint a Monitor to ensure
that this Agreement is implemented effectively and to assist the Court in monitoring
the City's compliance with this Agreement.  The Parties shall jointly propose to the
District Court one or more candidates to serve as a court-appointed Monitor.  The
Monitor will assess the City's progress toward achieving the Target Number of
Accessible Units and implementation of policies and procedures by reviewing plans,
policies, procedures, expenditures, staffing, and production of accessible units,
among other things.  The Monitor shall serve throughout the Settlement Term and
shall report to the Court.  For the purposes of this Settlement Agreement, the
Monitor's authority shall derive from the Court, not the Parties.

(a)   **Monitor Qualifications.**  The Monitor's qualifications shall include, but
not be limited to the following: (1) familiarity with and experience in the
monitoring and enforcement of disability rights laws; and (2) familiarity
with and experience in the education and training of employees in (a)
disability rights laws, and (b) the requirements of compliance with
settlement agreements or court orders. Preference shall be given to an
individual who is familiar with compliance with disability housing
accessibility laws.

(b)   **Monitor Responsibility and Authority**.  The Monitor shall evaluate the
City's compliance with the provisions of this Agreement to ensure full
compliance with all of its terms.  The  Monitor shall have the obligation
and authority to take steps to carry out this responsibility including but
not limited to the obligation and authority to:

Monitor, review, collect, evaluate, and verify written and
electronic data and information on progress and completion of the
Accessible Unit Housing Plan, accessibility of Housing Units and

Housing Developments, City Housing Program Accessibility, City monitoring of Owner compliance, and all other components of the Agreement

Conduct inspections, with appropriate notice to affected individuals, of selected Housing Units and Housing Developments as the Monitor deems appropriate, and measure, photograph, or otherwise document accessibility compliance.

Interview City staff, consultants, contractors, and agents as the Monitor deems appropriate.

Hire experts or staff as needed, within the budgetary limits in Paragraph III.10.(b), above, to assist in carrying out these responsibilities.

Review and assess all reports prepared by the City as required by the terms and provisions of this Agreement, and prepare recommendations for additional action as needed.

Maintain records of the Monitoring team's activities and relevant documents.

Provide Counsel for Plaintiffs and the City any relevant information known to or available to the Monitor under any provision of this Agreement upon reasonable request.

Prepare a written semi-annual report for submission to Counsel for Plaintiffs and the City on or before June 30 and December 31 of each year, beginning December 31, 2016, which shall describe, at a minimum, the Monitor's assessment of the City's progress in complying with all of the provisions of this Agreement, and the Monitor's comments on Reports submitted by the City.  A copy will be filed with the Court. The parties shall meet and confer among themselves or with the Monitor to resolve any problems identified by the

34

Monitor or any of the parties. If the parties cannot reach agreement, either party can request that the Monitor submit an additional report to the Court with recommendations for action, and shall file a motion with the Court for consideration of such recommendations or other requested relief.

Meet and confer with Plaintiffs and the City, to consider suggestions for implementing the spirit and letter of the Agreement, and to clarify information contained in the Monitor's reports.

(c) **Records and Other Information Available to Monitor.** For the duration of this Agreement, except to the extent that disclosure of information is prohibited by law or applicable privileges, the City shall provide the Monitor upon request information and records (or other computerized counterparts) sufficient to adequately monitor the City's compliance with all provisions of this Agreement and to complete the reporting described in Paragraphs III.9 and III.11, including but not limited to all records relating to implementation of the Accessible Housing Unit Plan, architectural accessibility compliance for existing and new Housing Developments (including surveys, plans, and architectural drawings), issuance of Certifications of Compliance with Accessibility Standards and Certifications of Adoption of Housing Policies, the City's program accessibility and ADA/504 self-evaluations, occupancy and utilization surveys and audits, reasonable accommodation and reasonable modification logs, grievances and complaints, progress in meeting Target Number, the Registry, training materials, and annual funding devoted to the program. The City must make available to the Monitor any records relating to the implementation of any provision of this Agreement, including records submitted by or required to be maintained by Owners and Property Management Agents. The City shall make clear when any

35

such information or records are being withheld from the Monitor in accordance with this section.  To the extent the Monitor reasonably determines after consultation with the City that such information or records must be reviewed in order for the Monitor to satisfy his or her responsibilities under this Agreement or to the Court, the Monitor may request that disclosure of such information or records be made pursuant to a protective order, and the City shall provide such information pursuant to a protective order to be negotiated by the Monitor and the parties or secured through an appropriate petition to the Court.

(d)   **Meetings with Monitor**.

Preliminary Meeting:  No later than ninety (90) days following the commencement of employment by the Monitor, the Monitor and counsel for all Parties shall attend a preliminary meeting at a location designated by the Monitor. The purpose of the meeting shall be for the City to describe the activities that have been and will be taken with respect to the implementation of the Agreement and for the parties' counsel to discuss any relevant issues concerning the implementation of the Agreement.

Additional Meetings:  In addition to the preliminary meeting, the Monitor shall hold at least one annual meeting with the City and Plaintiffs to review progress.  The Monitor may, as he or she deems appropriate, schedule other meetings and/or conference calls with the Parties' counsel to discuss any relevant issues concerning the implementation and enforcement of the Agreement.

(e)   **Cost of Monitor**:  The City shall bear the cost of the Monitor during the Settlement Term, capped at the amounts specified below:

Years 1-3: Eight Hundred Fifty Thousand Dollars ($850,000) per year.

Years 4-6: Six Hundred Fifty Thousand Dollars ($650,000) per year.

Years 7-10: Three Hundred Seventy-Five Thousand Dollars ($375,000) per year.

(f) **Monitoring Authority**.  The Monitor shall have the authority to hire others to assist him or her, including but not limited to the authority to hire one or more persons with technical expertise to assist in monitoring the implementation of the Accessible Housing Unit Plan and certification of accessible units, within the budgetary limits in Paragraph IV.1(e), above, to assist in carrying out this authority.

## RECORD KEEPING AND REPORTING

### Record Keeping and Reporting.

(a) During the Settlement Term, the City shall maintain all records necessary to verify compliance with the terms of this Agreement.  The City shall instruct Owners and Property Management Agencies to maintain all records regarding compliance with the terms of the Agreement.

(b) Subject to the limitations cited in Paragraph IV.1.(c)., the City shall, upon reasonable request, make best efforts to provide a copy of any data and reports that it, its agents, Subrecipients, Owners, or Property Management Agents generate to comply with this Agreement, whether maintained electronically or otherwise, including but not limited to records identified in various provisions of this Agreement and documents that support the Reports required by this Agreement, to the Monitor or Plaintiffs' Counsel.



**City's Duty to Retain Documents**.  The City shall maintain all documents and records provided to the Monitor as well as all documents and records maintained and/or generated by the City that pertain to the Agreement for a period of five (5) years.  For a period not to exceed six (6) months beyond the expiration of this Agreement, Plaintiffs' Counsel shall, upon request, be provided access to any of the records described in the Record-Keeping provisions of this Agreement.

## MUTUAL RELEASE OF CLAIMS

Plaintiffs, for and in consideration of this Agreement, including any and all recitals, promises, covenants, and terms herein, for themselves (and for their executors, assigns, and successors, as well as their administrators, agents, and representatives acting in their official capacities on behalf of Plaintiffs) (collectively "Plaintiff Releasing Parties"), do hereby fully and finally remise, release, acquit, and forever discharge the City and, in their official capacities, its respective successors, directors, officers, employees, agents, its past, present and future departments (including HCID (formerly known as the Los Angeles Housing Department)), boards, commissions, predecessors, and successors-in-interest, (collectively "Defendant Released Entities") from any and all claims and demands of any and every kind, name, nature, or description, and from any rights, disputes, complaints, charges, actions and causes of action, suits, debts, injuries, reimbursements, contracts, covenants, liens, liabilities, losses, costs, expenses, obligations, and damages of any nature, kind, and description, whether asserted or unasserted, known or unknown, anticipated or unanticipated, suspected or unsuspected, or actual or contingent, in law or in equity, which the Plaintiff Releasing Parties now have against the Defendant Released Entities or any of the Defendant Released Entities, whether or not the same be now existent or known to the Plaintiff Releasing Parties, by reason of or arising out of the claims as more particularly alleged in this

38

Litigation and arising up until the date of Judgment, including but not limited to any claim or cause of action, including but not limited to injunctive, declaratory, or other non-monetary relief, however described, that the Plaintiff Releasing Parties asserted or could have asserted in this Litigation against the Defendant Released Entities, pertaining to accessibility under Section 504, the ADA, and Section 11135, and availability to people with disabilities of any and all of the multifamily housing funded, developed, or significantly assisted by the City at any time prior to this Agreement ("Released Claims"). Such Released Claims, however, shall not include any claims to enforce the terms of this Agreement, nor shall they include claims set forth in any other action filed between January 1, 2011 and March 31, 2011 against the Defendant Released Entities and currently pending in the United States District Court for the Central District of California.

The City, for itself and its respective successors, directors, officers, employees, agents, their past, present and future departments (including HCID (formerly known as the Los Angeles Housing Department)), boards, commissions, predecessors, and successors-in-interest, (collectively "Defendant Releasing Parties"), for and in consideration of this Agreement including any and all recitals, promises, covenants, and terms herein, does hereby fully and finally remise, release, acquit, and forever discharge Plaintiffs (and their assigns, and successors, as well as their administrators, agents, and representatives acting in their official capacities on behalf of Plaintiffs) (collectively "Plaintiff Released Entities") from any and all claims and demands of any and every kind, name, nature, or description, and from any rights, disputes, complaints, charges, actions and causes of action, suits, debts, injuries, reimbursements, contracts, covenants, liens, liabilities, losses, costs, expenses, obligations, and damages of any nature, kind, and description, whether asserted or unasserted, known or unknown, anticipated or unanticipated, suspected or unsuspected, or actual or contingent, in law or in equity, which the City now has against the Plaintiff Released Entities, whether or not the same be now existent or

known to the City, by reason of or arising out of the claims as more particularly alleged in this Litigation and arising up until the date of Judgment, including but not limited to any claim or cause of action, including but not limited to injunctive, declaratory, or other non-monetary relief, however described, that the City asserted or could have asserted in the Action, pertaining to the accessibility under Section 504, the ADA, and Section 11135, and availability to people with disabilities of any and all of the multifamily housing funded, developed, or significantly assisted by the City at any time prior to this Agreement ("Released Claims").  Such Released Claims, however, shall not include any claims to enforce the terms of this Agreement.

Waiver of Civil Code Section 1542:  With respect to the release of claims by reason of or arising out of the claims as more particularly alleged in the this Litigation and arising up until the date of Judgment, as provided in Paragraphs VI.1 and VI.2, above, the Plaintiff Releasing Parties and the Defendant Releasing Parties waive and relinquish any and all rights and benefits afforded by California Civil Code Section 1542, and acknowledge and understand that the facts with respect to the Action and this Agreement may, after the date of execution of this Agreement, be discovered to be other than or different from the facts now known and believed to be true.  The Plaintiff Releasing Parties and the Defendant Releasing Parties knowingly accept and assume the risk of the facts being different, agree that this Agreement shall be and remain in all aspects effective and not subject to termination by virtue of any such difference in facts, understand and acknowledge the significance and consequences of such specific waiver of California Civil Code Section 1542, and expressly assume full responsibility for any losses or consequences that may be incurred by making such waiver.  The Plaintiff Releasing Parties and the Defendant Releasing Parties expressly understand that California Civil Code Section 1542 provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

The Plaintiff Releasing Parties and the Defendant Releasing Parties, being aware of the foregoing code section, freely, voluntarily, and expressly waive to the fullest extent applicable any rights they may have thereunder. The Plaintiff Releasing Parties and the Defendant Releasing Parties acknowledge that, in agreeing to the foregoing release, they have not relied on any inducements, promises, or representations by the Plaintiff Released Entities or the Defendant Released Entities, other than as expressly set forth in and this Agreement. Such Released Claims, however, shall not include any claims to enforce the terms of this Agreement, nor shall they include claims set forth in any other action filed between January 1, 2011 and March 31, 2011 against the Defendant Released Entities and currently pending in the United States District Court for the Central District of California.

### DISPUTE RESOLUTION

**Meet and Confer Obligation**. If any Party believes that a dispute exists relating to any violation of or failure to perform any of the provisions of this Settlement Agreement, it shall notify the other Party in writing and describe the alleged violation or failure to perform with particularity. The Parties shall meet and confer within ten (10) business days of receipt of such notice. If they are unable to resolve their differences, they shall resort to mediation as described below.

**Mediation**. If the Parties are unable to resolve a dispute through the meet and confer process described above, the Parties shall mediate the dispute. The Parties shall have fifteen (15) business days to jointly select a mediator. If the Parties

are unable to reach agreement on a mediator, each side may submit three (3) names of proposed mediators to the District Court and the District Court shall select the mediator. The mediation shall be conducted within thirty (30) days of the selection of the mediator, in the manner determined by the mediator, and the Parties shall engage in good faith efforts to resolve the dispute through such mediation.

**Resolution by the District Court.** If the Parties are unable to resolve a dispute through the mediation process described above, any Party may make a motion to the District Court to enforce the Agreement in order to resolve the dispute.

### COMPENSATION AND FEES

**Compensation to Plaintiffs.** The City agrees to pay Plaintiffs a total of Four Million, Five Hundred Thousand Dollars ($4,500,000) to resolve their claims for monetary damages. Payment shall be made no earlier than forty-five (45) days, and no later than sixty (60) days, from the Effective Date. Payment shall be made by wire transfer to Plaintiffs' Counsel, Relman, Dane & Colfax, PLLC, 1225 19th Street N.W., Suite 600, Washington, D.C. 20036-2456, for distribution to Plaintiffs.

**Attorneys' Fees.** The parties agree that attorneys' fees will be submitted to the Court for determination. Plaintiffs' Counsel shall submit a fee petition to the Court within forty-five (45) days of the Effective Date of this Agreement."

**Costs.** Within thirty (30) days of the Effective Date of this Agreement, Plaintiffs' Counsel shall supply to the City documentation of costs incurred by Plaintiffs' Counsel in this Litigation, in an amount not to exceed One Million Dollars ($1,000,000). Within forty-five (45) days of receipt of such documentation, the City agrees to reimburse Plaintiffs' Counsel for all such documented costs. Payment shall be made by wire transfer to Relman, Dane & Colfax, PLLC, 1225 19th Street N.W., Suite 600, Washington, D.C. 20036-2456, for distribution among Plaintiffs' Counsel.

**Prospective Monitoring Fees and Costs for Plaintiffs' Counsel**:  In
addition to the fees described in Paragraph VIII.2, the City shall pay to Plaintiffs'
Counsel their reasonable and necessary monitoring fees and expenses during the
Settlement Term not to exceed the following amounts, exclusive of any disputes
resolved by the District Court:

(c)    Years 1-3: Two Hundred Fifty Thousand Dollars ($250,000) per year.

(d)    Years 4-6: One Hundred Fifty-Six Thousand Dollars ($156,000) per
       year.

(e)    Years 7-10: One Hundred Thirty-Five Thousand ($135,000) per year.

Payment of fees, costs, and expenses for the monitoring work to be
performed by Plaintiffs' Counsel shall be made as follows:

No later than sixty (60) days following the Effective Date, the City shall
deposit Eighty-Three Thousand, Three Hundred and Thirty-Three Dollars and
Thirty-Three Cents ($83,333.33) into each of three separate sub-accounts
("Monitoring Accounts"), for purposes of allocating funds for the payment of
fees to counsel for each of the three respective Plaintiffs.  Such Monitoring
Accounts are to be maintained with a national banking association designated
by Plaintiffs' Counsel and approved by the Court.  Thereafter, during the
Settlement Term, on each anniversary of the Effective Date, the City shall
deposit into each such Monitoring Account one-third of the amount specified
in that respective year in Paragraph VIII.4, above.

Funds from the Monitoring Accounts shall be disbursed to Plaintiffs'
Counsel no later than the first day of each calendar quarter during the Settlement
Term in amounts reflecting (a) the number of hours of monitoring work performed
during the previous three month period, multiplied by a reasonable hourly rate, and
(b) costs and expenses incurred during the previous three month period.  No less
than thirty (30) days prior to any such disbursal, Plaintiffs' Counsel shall submit to
the City invoices for actual fees and expenses incurred on a quarterly basis,  together

43

with a signed declaration from Plaintiffs' Counsel attesting to the accuracy of such.
In the event the parties cannot agree informally on the amount to be disbursed to
Plaintiffs' Counsel from the Monitoring Accounts for a particular three month
period, the matter shall be submitted to the Court for resolution. Fees shall be made
payable to Relman, Dane & Colfax, PLLC, for distribution among Plaintiffs'
Counsel.

## COURT'S RETENTION OF JURISDICTION

The Parties agree, and the Parties intend that, the Judgment will provide
that the District Court shall retain continuing jurisdiction to interpret and enforce the
terms of this Agreement during the Settlement Term, and that the Judgment will
incorporate the terms of this Settlement Agreement by reference. The Court
thereafter shall retain jurisdiction to resolve any disputes that may arise during the
Settlement Term. Only the Parties may seek to enforce the terms of the Agreement
through the dispute resolution process provided for in Section VII, above. Three (3)
months before the end of the Settlement Term, the City shall prepare a final report to
the Monitor and Plaintiffs showing that it has fully complied with the provisions of
this Settlement Agreement, and may move the Court for an Order terminating its
jurisdiction of this matter as of a date following the Settlement Term, on the basis
that all of its obligations under the Settlement Agreement have been fully
discharged.

## MISCELLANEOUS

**Entire Agreement; Severability**. This Agreement constitutes the
entire agreement between the City and Plaintiffs and supersedes all prior
agreements, written or oral. Each provision and term of this Agreement shall be
interpreted in such manner as to be valid and enforceable. In the event any provision
or term of this Agreement is determined to be or is rendered invalid or

44

unenforceable, all other provisions and terms of this Agreement shall remain unaffected to the extent permitted by law.

**Modification of Settlement Agreement.**

(a)     This Settlement Agreement may only be modified or amended in writing, signed by all parties, that specifically states that its purpose is to amend or modify this Settlement Agreement.

(b)     All deadlines and dates for performance by the City under this Settlement Agreement may be extended or modified by written agreement between Plaintiffs and the City.

(c)     If the City should be delayed, interrupted, or prevented from performing any of its obligations under this Settlement Agreement and such delay, interruption, or prevention is due to fire, act of God, or other unforeseeable events, including, but not limited to any cause outside the reasonable control of the City, as the case may be, then the time for performance of the affected obligation of City may be extended, by written agreement of the Parties, for a period equivalent to the period of such delay, interruption, or prevention.

(d)     Any Party may file a written motion with the District Court for the purpose of modifying a term or provision of the Settlement Agreement.  Before filing a motion with the District Court, the moving Party must discuss the reasons for the proposed modification with all Parties for the purpose of determining whether there is agreement on the need for the modification.

**Claims Against CRA/LA.**  Nothing in this Agreement releases the Defendant CRA/LA, A Designated Local Authority, Successor to Community Redevelopment Agency of the City of Los Angeles ("CRA/LA"), from any claims that Plaintiffs have asserted against it in the Litigation or from any claims that the City may have against the CRA/LA.  Plaintiffs intend to continue to pursue all

45

pending claims against the CRA/LA in litigation.

**Conditions Precedent.** The Parties agree that this Settlement Agreement shall be conditioned upon, and shall be effective only upon, the occurrence of each and every one of the following events:

(a)   The Settlement Agreement has been approved by the City Council and the Mayor.

(b)   The Settlement Agreement has been fully executed by the Parties.

(c)   The Court has entered an Order substantially in the form attached as Exhibit D.

**Notice to the Parties**: All notices required or permitted hereunder shall be in writing and shall be served on the Parties at the addresses set forth below. Any such notices shall be:

(a)   Sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered one (1) business day after deposit with such courier; or

(b)   Personally delivered, in which case notice shall be deemed delivered upon receipt by the Party to whom the notice was delivered. As a courtesy only, email may be used to provide a Party with notification that a notice has been sent and may include a copy of the notice. A Party's address may be changed by written notice to the other Party; provided that no notice of a change of address shall be effective until receipt of such notice as provided for above.

To Plaintiffs:

Independent Living Center of Southern California
c/o Norma Jean Vescovo, Chief Executive Officer
14407 Gilmore Street, #101
Van Nuys, CA 91401
nvescovo@ilcsc.org

Fair Housing Council of San Fernando Valley
c/o Sharon Kinlaw, Executive Director
14621 Titus Street, Suite 100
Panorama City, CA 91402
skinlaw@fairhousingcouncil.org

1

Communities Actively Living Independent and Free
c/o Lillibeth Navarro, Executive Director
634 South Spring Street, Second Floor
Los Angeles, CA 90014
lnavarro@calif-ilc.org

With a copy to:

Michael Allen, Esq.
Relman, Dane & Colfax, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
Email: mallen@relmanlaw.com

Autumn Elliott, Esq.
Disability Rights California
350 S. Bixel Ave., Suite 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Autumn.Elliott@disabilityrightsca.org

To City of Los Angeles:

Miguel A. Santana
City Administrative Officer
1500 City Hall East
200 North Main St., 15th Floor
Los Angeles, CA 90012
Telephone: (213) 473-7534
Facsimile: (213) 473-7510
Miguel.Santana@lacity.org

Rushmore Cervantes
General Manager
Housing + Community Investment Department
1200 West 7th St., 9th Floor
Los Angeles, CA 90017
Telephone: (213) 808-8808
Facsimile: (213) 808-8616
Rushmore.Cervantes@lacity.org

With a copy to:

James P. Clark
Chief Assistant City Attorney
800 City Hall East
200 North Main St., 8th Floor
Los Angeles, CA 90012
Telephone: (213) 978-8100
Facsimile: (213) 978-8312
James.P.Clark@lacity.org

Noreen S. Vincent
Senior Assistant City Attorney
800 City Hall East
200 North Main St., 9th Floor
Los Angeles, CA
Telephone: (213) 978-7730
Facsimile: (213) 978-7714
Noreen.Vincent@lacity.org

47

**Opportunity to Consult with Counsel**:  The Parties represent that prior to signing this Settlement Agreement, they have read it, consulted with counsel of their choice, and each understood its terms and conditions. The Parties hereto accept this Settlement Agreement as their own free and voluntary act, without duress, and intend to be legally bound by it. This Settlement Agreement is made without reliance upon any statements or representations by the Parties or their representatives that are not contained herein.

**Settlement Agreement Binding on Successors and Assigns**:  This Agreement shall be binding on, and enforceable by, the Parties, their employees, and their successors and assigns.

**Titles**:  The titles used in this Settlement Agreement are non-substantive descriptions included solely for the Parties' ease of reference and shall not be construed to alter the substantive provisions of this Settlement Agreement.

**Weekends and Holidays:**  If a reporting day or other deadline under this Agreement falls on a weekend or state or federal holiday, the report or other required action will be due on the first business day after the weekend or holiday.

**Counterparts and Facsimiles**:  This Settlement Agreement may be executed in counterparts and facsimiles, all of which when taken together shall constitute a single instrument.

**Parties Agree to Cooperate**:  The Parties agree to cooperate in submitting this Settlement Agreement to the Court for execution, and to cooperate and execute additional documents or take other actions necessary to perform their respective obligations under this Settlement Agreement.

**Construction**:  This Settlement Agreement is the result of negotiations and joint drafting, undertaken in good faith and in that regard the rule of contractual construction that an ambiguous term shall be construed against the drafter shall not be employed.

1    Agreed to by the Parties, as evidenced by signatures below.

2

3    Dated: 5/12/16

                      Norma Jean Vescovo

                      Norma Vescovo, Chief Executive Officer

4                           Independent Living Center of Southern California

5

6    Dated:

                       Sharon Kinlaw, Executive Director

7                         Fair Housing Council of San Fernando Valley

8    Dated:

                       Lillibeth Navarro, Executive Director

9                         Communities Actively Living Independent and

10                        Free

11

12    Approved as to Form:

   Dated: May 12, 2016

13                       John P. Relman

14                       Michael G. Allen

15                       RELMAN, DANE & COLFAX PLLC

                      1225 19th St. NW, Suite 600

16                       Washington, D.C. 20036

17                       Telephone: (202) 728-1888

                      Facsimile: (202) 728-0848

18                       mallen@relmanlaw.com

19                       Autumn Elliott

20                       DISABILITY RIGHTS CALIFORNIA

                      350 S. Bixel Ave., Suite 290

21                       Los Angeles, CA 90017

22                       Telephone: (213) 213-8000

                      Facsimile: (213) 213-8001

23                       Autumn.Elliott@disabilityrightsca.org

24                       Dara Schur

25                       DISABILITY RIGHTS CALIFORNIA

                      1330 Broadway, Suite 500

26                       Oakland, CA 94612

27                       Telephone: (510) 267-1200

                      Facsimile: (510) 267-1201

28                       Dara.Schur@disabilityrightsca.org

*ILC, et al v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

1    Agreed to by the Parties, as evidenced by signatures below.

2

3    Dated:                                    Norma Vescovo, Chief Executive Officer
                                               Independent Living Center of Southern
4                                              California

5
     Dated: *May 12, 2016*
6                                              *Sharon Kinlaw*
                                               Sharon Kinlaw, Executive Director
7                                              Fair Housing Council of San Fernando Valley

8    Dated:

9                                              Lillibeth Navarro, Executive Director
                                               Communities Actively Living Independent and
10                                             Free

11
     Approved as to Form:
12   Dated:

13                                             John P. Relman
                                               Michael G. Allen
14                                             RELMAN, DANE & COLFAX PLLC
                                               1225 19th St. NW, Suite 600
15                                             Washington, D.C. 20036
                                               Telephone: (202) 728-1888
16                                             Facsimile: (202) 728-0848
                                               mallen@relmanlaw.com
17

18
                                               Autumn Elliott
19                                             DISABILITY RIGHTS CALIFORNIA
                                               350 S. Bixel Ave., Suite 290
20                                             Los Angeles, CA 90017
                                               Telephone: (213) 213-8000
21                                             Facsimile: (213) 213-8001
                                               Autumn.Elliott@disabilityrights.org
22

23
                                               Dara Schur
24                                             DISABILITY RIGHTS CALIFORNIA
                                               1330 Broadway, Suite 500
25                                             Oakland, CA 94612
                                               Telephone:  (510) 267-1200
26                                             Facsimile:  (510) 267-1201
                                               Dara.Schur@disabilityrights.org
27

28

49

*ILC, et al v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

1   Agreed to by the Parties, as evidenced by signatures below.

2

3   Dated: _____

4                                   Norma Vescovo, Chief Executive Officer
                                    Independent Living Center of Southern
                                    California

5

6   Dated: _____

7                                   Sharon Kinlaw, Executive Director
                                    Fair Housing Council of San Fernando Valley

8   Dated: _____         *Lillibeth Navarro*

9                                   Lillibeth Navarro, Executive Director
                                    Communities Actively Living Independent and
10                                  Free

11  Approved as to Form:

12  Dated: _____

13                                  John P. Relman
                                    Michael G. Allen
14                                  RELMAN, DANE & COLFAX PLLC
15                                  1225 19th St. NW, Suite 600
                                    Washington, D.C. 20036
16                                  Telephone: (202) 728-1888
                                    Facsimile: (202) 728-0848
17                                  mallen@relmanlaw.com

18

19                                  Autumn Elliott
                                    DISABILITY RIGHTS CALIFORNIA
20                                  350 S. Bixel Ave., Suite 290
21                                  Los Angeles, CA 90017
                                    Telephone: (213) 213-8000
22                                  Facsimile: (213) 213-8001
23                                  Autumn.Elliott@disabilityrightsca.org

24                                  Dara Schur
25                                  DISABILITY RIGHTS CALIFORNIA
                                    1330 Broadway, Suite 500
26                                  Oakland, CA 94612
27                                  Telephone: (510) 267-1200
                                    Facsimile: (510) 267-1201
28                                  Dara.Schur@disabilityrightsca.org

                                        49

Maronel Barajas
DISABILITY RIGHTS LEGAL CENTER
Loyola Public Interest Law Center
256 S. Occidental Blvd., Suite B
Los Angeles, CA 90057
Telephone: (213) 736-1496
Facsimile: (213) 736-1428
Maronel.barajas@drlcenter.org

David Geffen
DAVID GEFFEN LAW FIRM
530 Wilshire Blvd., Ste. 205
Santa Monica, CA 90401
Telephone: (310) 434-1111
Facsimile: (310) 434-1115
Geffenlaw@aol.com

Counsel for Plaintiffs

Dated: _____

Miguel A. Santana
City Administrative Officer
CITY OF LOS ANGELES

Approved as to Form:

Dated: _____

James P. Clark
Chief Deputy City Attorney
CITY OF LOS ANGELES

Attest:

Holly L. Wolcott, City Clerk
CITY OF LOS ANGELES

By: _____

Date: _____

Council File Number: _____; Date of Approval: _____

Said Agreement is Number _____ of City Contracts

51

*ILC, et al v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

## Exhibits

**Exhibit A**: List of Existing Covered Housing Developments, Excluding Units in Exhibit B.

**Exhibit B**: List of 22 CRA/LA Housing Developments Not Part of Agreement

**Exhibit C-1**: City of Los Angeles Fair Housing Policy in Regards to Disability Guidance and Requirements for Owners and Property Managers, May 12, 2016

**Exhibit C-2**: Tenant Handbook of Rental Occupancy Policies Regarding Disability for [Housing Development], May 12, 2016

**Exhibit D**: Proposed Judgment

*T.C., et al v. City of Los Angeles, et al., Case No. 12-CT-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS