1  MICHAEL G. ALLEN, *pro hac vice*
   JOHN P. RELMAN, *pro hac vice*
2  JENNIFER I. KLAR, *pro hac vice*
   D. SCOTT CHANG #146403
3  LAURA GAZTAMBIDE-ARANDES
   #298373
4  RELMAN, DANE & COLFAX PLLC
   1225 19th St. NW, Suite 600
5  Washington, D.C. 20036
   Telephone: (202) 728-1888
6  Facsimile: (202) 728-0848
   schang@relmanlaw.com
7
   MARONEL BARAJAS #242044
8  DISABILITY RIGHTS LEGAL
   CENTER
9  350 South Grand Ave., Suite 1520
   Los Angeles, CA 90071
10 Telephone: (213) 736-1496
   Facsimile: (213) 736-1428
11 maronel.barajas@drlcenter.org

   DAVID GEFFEN #129342
   DAVID GEFFEN LAW FIRM
   1717 4th Street, 3rd Floor
   Santa Monica, CA 90401
   Telephone: (310) 434-1111
   Facsimile: (310) 434-1115
   Geffenlaw@aol.com

   DARA SCHUR #98638
   DISABILITY RIGHTS CALIFORNIA
   1330 Broadway, Suite 500
   Oakland, CA 94612
   Telephone: (510) 267-1200
   Facsimile: (510) 267-1201
   Dara.Schur@disabilityrightsca.org

   AUTUMN ELLIOTT #230043
   SRIVIDYA S. PANCHALAM #265398
   DISABILITY RIGHTS CALIFORNIA
   350 S. Bixel Ave., Suite 290
   Los Angeles, CA 90017
   Telephone: (213) 213-8000
   Facsimile: (213) 213-8001
   Autumn.Elliott@disabilityrightsca.org

13

14

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION)

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al.*, | ) Case No.: 12-CV-551 FMO (PJWx) |
| Plaintiffs, | ) |
| vs. | ) PLAINTIFFS' MOTION FOR ) ATTORNEYS' FEES |
| CITY OF LOS ANGELES, CALIFORNIA, *et al.*, | ) Date: November 10, 2016 ) Time: 10:00 a.m. ) Room: Courtroom 22, Fifth Floor – ) Courtroom of the Honorable |
| Defendants. | ) Fernando M. Olguin |
| | ) |

**NOTICE OF MOTION AND MOTION**

1
2    PLEASE TAKE NOTICE that on November 10, 2016, at 10:00 a.m. in
3  Courtroom 22 of the U.S. District Court for the District of California, located at 312
4  North Spring Street, Los Angeles, California, Plaintiffs will move the Court for an
5  Award of Reasonable Attorneys' Fees pursuant to the federal Americans with
6  Disabilities Act, 42 U.S.C. § 12205; the federal Rehabilitation Act, 29 U.S.C.
7  § 794a(b); and California Code of Civil Procedure Section 1021.5.
8    The Settlement Agreement in this case along with applicable law entitle
9  Plaintiffs to seek recovery of their reasonable attorneys' fees, as the prevailing parties
10  in this action. Plaintiffs seek to recover their lodestar, after exercising substantial
11  billing judgment, adjusted upward by a modest 1.2 multiplier, as justified under
12  California law. The total amount of fees requested herein is $19,497,298.26.
13    This Motion is based upon the accompanying Memorandum of Points and
14  Authorities; the Settlement Agreement and Release; declarations of counsel for
15  Plaintiffs with supporting time records and from twelve other individuals familiar
16  with the qualifications of Plaintiffs' counsel, the time required to litigate complex
17  civil rights actions, and prevailing hourly rates charged in the Los Angeles legal
18  marketplace; the other records, pleadings, and papers filed in this case; and upon such
19  other documentary and oral evidence or argument as may be presented to the Court at
20  the hearing on this Motion.

21
22  Dated: October 7, 2016

23           Respectfully submitted,

24
25           /s/ Michael G. Allen
            MICHAEL G. ALLEN, *pro hac vice*
26          JOHN P. RELMAN, *pro hac vice*
            JENNIFER I. KLAR, *pro hac vice*
27          D. SCOTT CHANG #146403
            LAURA GAZTAMBIDE-ARANDES
28          #298373

- 1 –

RELMAN, DANE & COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
schang@relmanlaw.com

MARONEL BARAJAS #242044
DISABILITY RIGHTS LEGAL CENTER
350 South Grand Ave., Suite 1520
Los Angeles, CA 90071
Telephone: (213) 736-1496
Facsimile: (213) 736-1428
maronel.barajas@drlcenter.org

DAVID GEFFEN #129342
DAVID GEFFEN LAW FIRM
1717 4th Street, 3rd Floor
Santa Monica, CA 90401
Telephone: (310) 434-1111
Facsimile: (310) 434-1115
Geffenlaw@aol.com

DARA SCHUR #98638
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510) 267-1201
Dara.Schur@disabilityrightsca.org

AUTUMN ELLIOTT #230043
SRIVIDYA S. PANCHALAM #265398
DISABILITY RIGHTS CALIFORNIA
350 S. Bixel Ave., Suite 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Autumn.Elliott@disabilityrightsca.org

*Attorneys for Plaintiffs*

**TABLE OF CONTENTS**

1

2    I.    INTRODUCTION .......................................................................................... 1

3    II.   HISTORY OF THE LITIGATION AND SUMMARY OF TIME DEVOTED
4          TO THE CASE ............................................................................................. 4

5              A. Factual Overview .............................................................................. 4

6
              B. Time Expended on Pre-suit Investigations and Pleadings .................. 5
7

8              C. Rule 12 Motion Practice and Early Case Development ...................... 7

9
              D. Discovery and Mediation Efforts through January 2014 ................... 9
10

11                1. Discovery relating to Plaintiffs' standing ..................................... 9

12                2. Discovery concerning the need for accessible
                     affordable housing .................................................................... 11
13

14                3. Motion practice to establish the proper scope of discovery ........ 11

15                4. Architectural inaccessibility ...................................................... 12
16

17                5. Program inaccessibility .............................................................. 15

18                6. Written discovery practice ......................................................... 16

19
                  7. Simultaneous efforts at settlement through January 2014 ........... 20
20

21             E. Renewed Efforts at Mediation and Ongoing Discovery Through January
               2015 Term Sheet ................................................................................ 21
22

23             F. January 2015 Term Sheet – May 31, 2015 ........................................ 21

24             G. Renewed Discovery – Execution of April 2016 Term Sheet .............. 22

25
               H. April 2016 Term Sheet – Settlement Agreement Execution ............... 23
26

27

28

- i –

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

III.   THE SETTLEMENT AND ITS BENEFIT TO THE PUBLIC .................. 23

IV.   ARGUMENT ................................................................................................ 27

　　A. *Plaintiffs Are Prevailing Parties* ........................................................ 27

　　B. *The Requested Fees Are Reasonable* ................................................ 30

　　　　1.  Statutory fee-shifting methodology ............................................... 30

　　　　2.  Plaintiffs' requested lodestar is based on prevailing local hourly rates for attorneys with comparable skill and experience ...................... 31

　　　　3.  The amount of time included in the lodestar is reasonable and is supported by detailed, contemporaneous billing records ............. 38

　　　　4.  Plaintiffs' counsel have exercised substantial billing judgment ... 44

　　　　　　(a) *Relman, Dane & Colfax* ........................................................ 45

　　　　　　(b) *Disability Rights California* ................................................ 46

　　　　　　(c) *Disability Rights Legal Center* ............................................ 46

　　　　　　(d) *David Geffen Law Firm* ........................................................ 47

　　　　5.  Further across-the-board reduction ............................................... 47

　　C. *A Multiplier Is Necessary to Fully Compensate Plaintiffs' Counsel* ............................................................................ 48

　　　　1.  Risk based on the contingent nature of the fee award .................. 49

　　　　2.  Results obtained ............................................................................ 51

　　　　3.  Novelty and difficulty of the issues involved and skill displayed in presenting them ........................................................................ 52

　　　　4.  Preclusion of other employment .................................................. 53

　　　　5.  An enhancement would also be justified under federal law .......... 55

- ii -

1

V.      CONCLUSION ............................................................................................. 5

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## TABLE OF AUTHORITIES

2

<u>**Cases**</u>

3    *Alexander v. Choate*, 469 U.S. 287 (1985) ................................................. 52

4    *Armstrong v. Davis*, 318 F.3d 965 (9th Cir. 2003).................................... 30

5    *Bernardi v. Cty. of Monterey*, 167 Cal. App. 4th 1379 (2008) .........................49-50

6    *Blum v. Stenson*, 465 U.S. 886 (1984)............................................... 30, 31

7    *Bucci v. Chromoalloy Am. Corp.*, 927 F.2d 608 (9th Cir. 1991) ........................... 51

8    *Chabner v. United of Omaha Life Ins. Co.*, No. C-95-0447 MHP,

9        1999 WL 33227443 (N.D. Cal. Oct. 12, 1999)........................................... 54

10   *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109

11       (C.D. Cal. 2012) ....................................................................43-44

12   *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014)...................... 3, 48

13   *Children's Hosp. & Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740 (2002) ................. 31

14   *Collado v. Toyota Motor Sales, U.S.A., Inc.*, 550 F. App'x 368

15       (9th Cir. 2013) ..................................................................... 30

16   *Davis v. City & Cty. of San Francisco*, 976 F.2d 1536

17       (9th Cir. 1992) ..................................................................... 43

18   *De La Cruz v. Cal-Pac Sonoma, LLC*, No. A129889,

19       2013 WL 782283 (Cal. Ct. App. Feb. 28, 2013)........................................ 52

20   *Democratic Party of Wash. State v. Reed*,

21       388 F.3d 1281 (9th Cir. 2004)........................................................ 43

22   *Dowd v. City of Los Angeles*, 28 F. Supp. 3d 1019

23       (C.D. Cal. 2014) .................................................................... 38

24   *Exotic Feline Breeding Compound, Inc. v. Dep't of Fish & Wildlife*,

25       2016 WL 3564206 (Cal. Ct. App. June 22, 2016) ................................... 29-30

26   *Fitzgerald v. City of Los Angeles*, 2009 WL 960825

27       (C.D. Cal. Apr. 7, 2009).............................................................. 48

28

- ii -

*Folsom v. Butte County Association of Governments*, 32 Cal. 3d 668
    (1982) ......................................................................................... 28

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545
    (9th Cir. 1989) ........................................................................41-42

*Gates v. Deukmejian*, 987 F.2d 1392 (9th Cir. 1992) ............................ 31

*Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553 (2004)................ 30, 31, 49, 51

*Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982) ........................ 10

*Hensley v. Eckerhart*, 461 U.S. 424 (1983)........................................... 30, 31, 38, 44

*Heritage v. Town of Woodside*, Nos. A120749, A120757,
    2008 WL 4868816 (Cal. Ct. App. Nov 12, 2008)........................ 52

*Horsford v. Bd. of Trustees of Cal. State Univ.*,
    132 Cal. App. 4th 359 (2005)........................................................ 49

*In re Butler*, 236 Cal. App. 4th 1222 (2015) ........................................ 28

*In re Ginji Corp.*, 117 B.R. 983 (Bankr. D. Nev. 1990) ........................ 43

*In re Marriage of Carney*, 24 Cal. 3d 725 (1979)................................. 52

*In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249
    (D.N.H. 2007)................................................................................. 44

*Johnson v. Triple Leaf Tea Inc.*, No. 3:14-CV-01570-MMC,
    2015 WL 8943150 (N.D. Cal. Nov. 16, 2015)............................ 43

*Khazan v. Braynin.*, No. A128536, 2012 WL 3990692 (N.D. Cal. Feb. 18, 1996)
    (Cal. Ct. App. Sept. 12, 2012)..................................................... 52

*Kraszewski v. State Farm Gen. Ins. Co.*, Civ. A. No. C-79-1261 TEH, 1996 WL
    11745 (N.D. Cal. Feb. 18, 1996)................................................. 44

*K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 78 F. Supp. 3d 1289
    (C.D. Cal. 2015) ........................................................................... 37

*Kelly v. Wengler*, 822 F.3d 1085 (9th Cir. 2016) ................................. 30

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975)............ 31

1   *Ketchum v. Moses*, 24 Cal. 4th 1122 (2001) ........................................ 30, 49, 50, 53

2   *La Asociacion de Trabajadores de Lake Forest v. City of Lake*

3        *Forest*, 624 F.3d 1083 (9th Cir. 2010) ........................................................ 27

4   *Leuzinger v. Cty. of Lake*, No. C 06-00398 SBA, 2009 WL 839056

5        (N.D. Cal. Mar. 30, 2009) ......................................................................... 52

6   *Lyons v. Chinese Hosp. Ass'n*, 136 Cal. App. 4th 1331 (2006) ............................ 28

7   *MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884 (N.D. Cal. 2015) ................ 28

8   *Missouri v. Jenkins*, 491 U.S. 273 (1989) ................................................................ 31

9   *Moreno v. City of Sacramento*, 534 F.3d 1106 (9th Cir. 2008) ...................... *passim*

10  *Nadarajah v. Holder*, 569 F.3d 906 (9th Cir. 2009) ................................................ 31

11  *Nat'l Fed'n of the Blind v. Target Corp.*, No. C 06-01802 MHP,

12       2009 WL 2390261 (N.D. Cal. Aug. 3, 2009)................................... 48-49, 52

13  *PAI Corp. v. Integrated Science Sols., Inc.*, No. 06-CV-05349-JCS,

14       2015 WL 2265671, (N.D. Cal. May 13, 2015) ............................................ 37

15  *Parks v. Eastwood Ins. Servs., Inc.*, 240 F. App'x 172

16       (9th Cir. 2007) ........................................................................................... 54

17  *Peak-Las Positas Partners v. Bollag*, 172 Cal. App. 4th 101 (2009) ................... 42

18  *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010).................................... 30, 55

19  *Perkins v. Mobile Hous. Bd.*, 847 F.2d 735 (11th Cir. 1988)................................. 40

20  *PGA Tour, Inc. v. Martin*, 432 U.S. 661 (2001)..................................................... 52

21  *Pooshs v. Fluoroware, Inc.*, 83 F.3d 428 (9th Cir. 1996) ................................. 52-53

22  *Press v. Lucky Stores, Inc.*, 34 Cal. 3d 311 (1983) ................................................ 30

23  *Prison Legal News v. Schwarzenegger*, 608 F.3d 446 (9th Cir. 2010) ............ 31, 38

24  *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776 (9th Cir. 1986)........................ 43

25  *Ramon v. Cty. of Santa Clara*, 173 Cal. App. 4th 915 (2009) ............................... 30

26  *Rodriguez v. Cty. of Los Angeles*, 96 F. Supp. 3d 1012

27       (C.D. Cal. 2014) ..............................................................................51, 52, 53

28

1   *Rutti v. Lojack Corp., Inc.*, No. SACV 06-350- DOC JCX,

2       2012 WL 3151077 (C.D. Cal. July 31, 2012)..........................................38-39

3   *Saint John's Organic Farm v. Gem Cty. Mosquito Abatement Dist.*,

4       574 F.3d 1054 (9th Cir. 2009).......................................................... 27

5   *Serrano v. Priest*, 20 Cal. 3d 25 (1977)..................................................... 49

6   *Stetson v. Grissom*, 821 F.3d 1157 (9th Cir. 2016) ................................... 55

7   *Stokus v. Marsh*, 217 Cal. App. 3d 647 (1990) .......................................... 42

8   *Tex. State Teachers Ass'n v. Garland Indep. School Dist.*,

9       489 U.S. 782 (1989) ........................................................................ 27

10  *United States v. Baran*, No. 14CV02639RGKAJWX,

11      2015 WL 6745151 (C.D. Cal. Oct. 18, 2015) ................................... 38

12  *United Steelworkers v. Phelps Dodge Corp.*, 896 F.2d 403

13       (9th Cir. 1990)................................................................................ 43

14  *Vasquez v. Rackauckas*, No. SACV09-1090 VBF RNBX,

15      2011 WL 3320482 (C.D. Cal. July 29, 2011) ................................... 54

16  *Vaughn v. Darwish*, 2016 WL 3680015 (Cal. Ct. App. July 6, 2016) .................. 51

17  *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224 (2001) .......................... 49

18  *Young v. Mountain Empire Unified Sch. Dist.*, No. D061228,

19      2013 WL 3729172 (Cal. Ct. App. July 15, 2013)........................................53

20

21                                  **Statutes**

22  29 U.S.C. § 794 *et seq.* ...................................................................................

23  42 U.S.C. § 12131 *et seq.* .................................................................................

24  42 U.S.C. § 12205 ...........................................................................................

25  Cal. Civ. Proc. Code § 1021.5 .......................................................................

26  Cal. Gov't Code § 11135 ................................................................................

27

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**

## I.   INTRODUCTION

In this action, Plaintiffs challenged the failure of the City of Los Angeles ("City") and its Community Redevelopment Agency ("CRA") to ensure that hundreds of millions of dollars of housing and community development funds were actually used, as required, to develop a minimum number of affordable housing units that are highly accessible to people with disabilities. During the course of the case, Plaintiffs showed that hundreds of buildings and thousands of units that developers built with state and federal funds allocated by the City and CRA were inaccessible and that the City and CRA failed to ensure that units designated as accessible were actually made available to people with disabilities. The consequences of the City and CRA's failures meant that people with disabilities on low incomes struggled to find housing in the City and were sometimes forced to live on the street, in their cars, in nursing homes, in homeless shelters, or in other inadequate and dangerous housing. The settlement of this case will end that unfortunate reality for many thousands of people with disabilities in the City and will have a real, lasting effect on their lives.

The Settlement Agreement, which will be in effect for at least ten years, will ensure the creation of 4,000 units of highly accessible affordable housing in the City; the expenditure of at least $200 million to improve disability access in affordable units; that all new or substantially rehabilitated housing developments will be accessible and provide twice as many such units as currently required under federal law; and the adoption of state-of-the-art policies and practices applicable to the City and to managers of City-supported affordable housing to ensure full utilization of such units and compliance with disability rights laws. It also provides for $4.5 million in compensatory damages to Plaintiffs. The scope of relief this Agreement achieves ranks it among the largest accessibility settlements ever.

1    These monumental achievements, which are resulting in unprecedented

2   benefits for people with disabilities in Los Angeles, were not easily reached and

3   required the expenditure of over forty thousand hours of time by Plaintiffs' highly

4   qualified team of lawyers and legal assistants, who brought widely recognized

5   expertise in fair housing law, disability rights, and complex federal court litigation.

6   That attorney time is worth over $21 million under the prevailing rates for attorneys

7   with similar skills, experience, and reputation in the Los Angeles legal marketplace,

8   before the exercise of billing judgment.

9    Plaintiffs' counsel expended all of this time over the five-year life of this

10   matter without any compensation. The Settlement Agreement did not resolve the

11   amount of attorneys' fees to which Plaintiffs' are entitled as prevailing parties under

12   Section 504 of the federal Rehabilitation Act, 29 U.S.C. § 794 *et seq.* ("Section

13   504"), Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

14   ("ADA"), and California Government Code Section 11135 ("Section 11135"). The

15   resolution of that question has been reserved for the Court.

16    Plaintiffs seek an award of fees that is significantly less than the total amount

17   expended in the case. In the exercise of billing judgement, Plaintiffs' counsel have

18   excluded from this petition the following categories of time: time billed on necessary

19   litigation tasks during a 144-day period in 2015 when Plaintiffs' counsel agreed to

20   litigate without seeking payment while the parties continued to explore settlement;

21   time expended to continue litigating this matter between May 12, 2016, when

22   Plaintiffs executed the Settlement Agreement, and the end of August 2016 when the

23   City Council approved the Settlement Agreement; travel time for attorneys and

24   paralegals from Relman, Dane & Colfax between Washington DC and Los Angeles;

25   and time billed by attorneys who performed relatively minimal work. Plaintiffs'

26   counsel also seek reduced hourly rates for outside contract attorneys. The total value

27

28

of the time excluded through these and other miscellaneous reductions is $3,475,148.00 or 16.16% of the unadjusted lodestar.

Counsel have also applied additional across-the-board reductions, which exclude an additional $1,766,875.95, from the value of the total hours expended in the litigation. After these significant reductions, Plaintiffs' counsel's lodestar is $16,247,748.55, which is over $5 million (or 24.43%) less than the $21,499,772.50 value of the 40,419.15 hours actually spent litigating this matter.

Finally, Plaintiffs seek a modest multiplier to the adjusted lodestar, which this federal court may apply to all the time reasonably expended by Plaintiffs' counsel to prevail on the federal and state law claims alike. *See, e.g.*, *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1112 (9th Cir. 2014). A multiplier is appropriate in this matter to ensure that Plaintiffs' counsel recover a fee that will fully compensate them for the contingent nature of the representation, the outstanding results obtained for Plaintiffs and the public, the novelty and difficulty of the issues involved and the skill displayed by Plaintiffs' counsel in presenting them, and the preclusion of other employment. Plaintiffs seek a multiplier of 1.2, which is significantly less than the multipliers ranging from a factor of 2 to 4 that have been applied in cases, like this one, where the factors justifying a multiplier have been present. When applied to counsel's adjusted lodestar of $16,247,748.55, a 1.2 multiplier results in a total request of an attorneys fee award of $19,497,298.26.

Plaintiffs therefore ask that the Court find that they are entitled to reasonable attorneys' fees as prevailing parties under federal and state law, find that their counsel's requested lodestar of $16,247,748.55 is reasonable, apply a 1.2 multiplier to the lodestar, and award their counsel a total of $19,497,298.26 in attorneys' fees.

- 3 -

## II.  HISTORY OF THE LITIGATION AND SUMMARY OF TIME DEVOTED TO THE CASE

### A.  *Factual Overview*

Plaintiffs Independent Living Center of Southern California ("ILCSC"), Fair Housing Council of the San Fernando Valley ("FHCSFV"), and Communities Actively Living Independent and Free ("CALIF")—three nonprofit advocacy organizations whose missions include expanding housing choice for people with disabilities—allege in the Second Amended Complaint (Doc. 98) ("SAC") that Defendants City and the CRA allocated federal and state funding to finance housing throughout the City without ensuring that their housing programs and the housing they developed, funded, and significantly assisted were accessible to people with disabilities in violation of Section 504, the ADA, and Section 11135.[1]

In Los Angeles, people with disabilities are disproportionately low-income because of the work limitations imposed by their disabilities, and a majority require either housing-payment assistance or a rent-restricted unit. For many years prior to this litigation, the City failed to ensure the availability of adequate housing that is both affordable and accessible to individuals with disabilities, which has led to many being unable to find stable, permanent housing. *See* Decl. of Michael Allen ("Allen Decl."), Ex. C (Declarations).[2] Many low-income people with disabilities sought Plaintiffs' assistance in locating accessible affordable housing. A few examples of the individuals who contacted Plaintiffs for help over the last few years illustrate the extraordinary harms the absence of accessible affordable housing has had on Los Angeles' citizens: a man with physical and mental disabilities who has been on waitlists for an accessible affordable unit since 2002 and has been living in homeless shelters and in his vehicle for fourteen years; a man with cerebral palsy who is a full-

---

[1] Plaintiffs also brought a Fair Housing Act ("FHA") claim, 42 U.S.C. § 3601 *et seq.*

[2] Plaintiffs have sought leave to file this exhibit under seal because the declarations contain declarants' confidential medical and financial information and other personal details.

1  time wheelchair user and has been living in his car since 2008 because his eight

2  applications for tenancy at CRA-assisted apartment developments were denied

3  because the developments could not provide him with an accessible unit; a social

4  security recipient who limited her diet to salads and soups for almost four years

5  because her unit lacked an accessible kitchen; a woman with a hearing impairment

6  and osteoporosis who for the last eight years has only bathed with sponge baths

7  because the bathroom in her unit is not accessible; and a former service member who

8  lives in a Lamp Community shelter for chronically homeless people because he

9  cannot find an accessible affordable apartment. Many of the individuals who came to

10 Plaintiffs seeking help had been searching for housing for years and were frustrated,

11 depressed, and even suicidal because of their inability to obtain adequate housing that

12 they could afford anywhere in the City. *Id.* These individuals' stories are not isolated

13 examples. As of 2014, the City had almost 400,000 non-institutionalized adults with

14 mobility or sensory disabilities, and this population is disproportionately among those

15 in poverty. Allen Decl., Ex. F (Parnell Expert Report).

16      As Plaintiffs attempted to locate accessible affordable housing for the many

17 people with disabilities who came to them for help, Plaintiffs realized that the lack of

18 accessible housing was systemic across the entire portfolio of housing built with

19 assistance from the CRA ("CRA Housing Program"). Allen Decl. ¶ 4.

20      **B.    Time Expended on Pre-suit Investigations and Pleadings**

21      In 2007, Plaintiffs began to investigate the City's failure to ensure the

22 accessibility of the CRA Housing Program to people with disabilities. During the

23 course of that investigation Plaintiffs repeatedly asked the City and CRA to identify

24 housing projects that met the Uniform Federal Accessibility Standards ("UFAS")

25 requirements, brought accessibility violations to Defendants' attention, and urged

26 Defendants to adopt proper policies to ensure that noncompliant units be made

27 accessible to people with disabilities. The City and CRA, however, could not identify

28

1   compliant projects, otherwise ignored Plaintiffs' concerns, and disclaimed

2   responsibility for accessibility violations. *Id.* ¶¶ 4-5.

3          When it became clear to Plaintiffs in 2011 that the City and the CRA would

4   not agree to meet their obligations to ensure accessibility in the CRA Housing

5   Program, Plaintiffs retained four law offices to represent them in this litigation:

6   Relman, Dane & Colfax, Disability Rights California ("DRC"), Disability Rights

7   Legal Center ("DRLC"), and David Geffen Law Firm ("Geffen"). Relman, Dane &

8   Colfax served as lead counsel in the litigation, managing the litigation and ensuring

9   that the four offices allocated work in the most efficient and effective way possible.

10  DRC and DRLC assumed primary responsibility for much of the Los Angeles-based

11  fact development and oversaw the extensive review of individual project files.

12  Attorneys from DRC developed the litigation strategy regarding the dissolution of the

13  CRA and coordinated discovery strategy with attorneys from RDC. Mr. Geffen, with

14  his deep connections to the community of people with disabilities in Los Angeles and

15  who uses a wheelchair, was uniquely positioned to conduct outreach to individuals

16  with disabilities. Mr. Geffen was immediately able to translate their stories of

17  struggling to find accessible affordable housing into evidence of broad disability

18  rights violations. *See generally id.* ¶¶ 63-69, 172-173.

19         Plaintiffs and their counsel spent the next seven months gathering evidence of

20  the lack of accessible affordable housing throughout the City, federal and state

21  financial assistance to the City and the CRA, the extensive portfolio of multifamily

22  projects in the CRA Housing Program, the extent of accessibility within the Program

23  and at individual developments, and the investment of federal and state funds in

24  individual developments. Counsel also researched potential claims under federal and

25  state law, reviewed material secured through public records requests, and consulted

26  with advocacy groups that had investigated accessibility issues in the CRA Housing

27  Program on behalf of individual clients. *Id.* ¶ 6.

28

1      Based on that research and in consultation with Plaintiffs, counsel identified

2  the elements of proof for various claims, developed an overall case strategy, gave the

3  notice required for state-law claims, and drafted and filed the original Complaint,

4  which identified at least thirty-four multifamily projects that received federal funds

5  yet were not accessible under UFAS standards. *Id.* ¶ 7.

6      For this phase of the litigation, from pre-suit investigations to the filing of the

7  Complaint, Plaintiffs' counsel spent 218.55 hours, valued at $148,317.50 (calculated

8  after the exercise of billing discretion). *See id.* ¶ 157.

9      **C.**    ***Rule 12 Motion Practice and Early Case Development***

10      Plaintiffs amended the Complaint twice. The Second Amended Complaint

11  (Doc. 98) ("SAC") alleges that the City and CRA violated Section 504, the ADA, and

12  Section 11135 by, among other things: (1) denying people with disabilities

13  meaningful access to Defendants' housing programs; (2) aiding or perpetuating

14  discrimination against people with disabilities by providing significant assistance to

15  developers of housing projects who failed to provide accessible housing; and (3)

16  using methods of administration that have the effect of discriminating against people

17  with disabilities and otherwise limiting people with disabilities from obtaining and

18  enjoying housing built or developed by Defendants. In addition, the SAC names as

19  nominal defendants the owners of the sixty-one federally funded multifamily projects

20  ("Owner Defendants") for the purposes of injunctive relief. It also clarifies that the

21  City is named in its own right and as the successor housing agency for the CRA, and

22  it names the CRA/LA Designated Local Authority ("CRA/LA") and the Oversight

23  Board for the CRA/LA Designated Local Authority ("Oversight Board"). Plaintiffs

24  added these entities following the dissolution of the CRA to ensure the inclusion of

25  any entity potentially liable for the CRA's conduct. *See* Doc. 209.[3]

---

26  [3] The CRA was dissolved as of February 1, 2012, pursuant to a state legislation that

27  eliminated community redevelopment agencies, and its obligations were mostly transferred to its successor agency, the CRA/LA. Certain obligations transferred to

28  the City as the "housing successor agency".

1    In September 2012, the City and two other defendants filed two motions to

2 dismiss. Plaintiffs' counsel expended substantial time to research and draft response

3 memoranda, totaling forty-five pages, as well as two requests for judicial notice with

4 extensive supporting documents, and they submitted a detailed declaration from

5 FHCSFV's executive director. (Docs. 130 through 135-8)

6    The Court denied the motion to dismiss Plaintiffs' Section 504, ADA, and

7 Section 11135 claims,[4] agreeing with Plaintiffs that these laws require that people

8 with disabilities be provided meaningful access to any housing program operated by

9 Defendants and that Defendants have a duty to ensure that federal funds they receive

10 and either use or re-allocate for the purpose of funding any housing program cannot

11 be used in a manner that discriminates against people with disabilities. (Doc. 209)

12    Plaintiffs also submitted briefing in support of the Owner Defendants' Motion

13 to Dismiss Crossclaims by the City and the CRA/LA (Doc. 242), setting out the legal

14 framework that supported the Court's decision to dismiss the crossclaims (Doc. 308)

15 This briefing refuted Defendants' arguments that they could delegate their obligations

16 under Section 504 and the ADA to the Owner Defendants and thereby shift

17 responsibility for any accessibility violations to the Owners. In a thirty-page ruling,

18 the Court dismissed the cross-claims, agreeing with Plaintiffs that Defendants had a

19 duty to impose federal accessibility standards on sub-recipients of federal funds and

20 that Section 504 and the ADA disallow indemnification or contribution. (Doc. 308)

21    During this phase of the litigation, in addition to briefing the two Rule 12

22 motions, Plaintiffs' counsel conducted research regarding the dissolution of the CRA,

23 identified additional developments that had received federal funding, met and

24 conferred with the City and the CRA to discuss the scope of the litigation, attended

25 conferences with the Court to plan the schedule for the case, and conducted

26 additional factual and legal research necessary to prepare the First and Second

27 _____

28 [4] The Court dismissed the FHA claim and claims against Defendant Oversight Board.

- 8 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

Amended Complaints. Counsel planned an initial discovery strategy and developed and served Plaintiffs' first set of written discovery. Allen Decl. ¶¶ 6, 8-10.

For the period from the filing of the original Complaint through the Court's November 2012 ruling on the Rule 12 motions, Plaintiffs' counsel include in this petition 1,693.40 hours, valued at $1,067,344.00, after the exercise of billing discretion. *Id.* ¶ 158.

More recently, in early 2016, Plaintiffs' counsel spent considerable time researching and briefing their opposition to the CRA's motion for judgment on the pleadings. Plaintiffs' nineteen-page response memorandum discussed intricate and novel issues of redevelopment law and the CRA's liability following the statewide dissolution. (Doc. 503) The Court again agreed with Plaintiffs, holding that their Section 11135 claim is based on enforceable state-law obligations; liability for Plaintiffs' claims did not transfer to the City as the housing successor; and the CRA was subject to successor liability under federal law. (Doc. 535)

### D. *Discovery and Mediation Efforts through January 2014*

Discovery in this case was intensive given the complexity of the issues and the number of parties and properties involved, as well as the City's litigation strategy during the first portion of the case when it was represented by outside counsel. The following summary demonstrates the significant time required of Plaintiffs' counsel during the discovery phase of the litigation:[5]

### 1. Discovery relating to Plaintiffs' standing

As a threshold matter, Plaintiffs had to demonstrate their organizational standing. This required them to show that they had to expend staff time to investigate and counteract Defendants' discriminatory failure to ensure accessibility in their

___

[5] The discovery described in this section encompasses work done during this phase as well as work done from January 2014 to January 2015, when the City and the Plaintiffs entered a Term Sheet, and from June 2015 to March 2016, after the January 2015 Term Sheet did not result in settlement until the March 2016 Term Sheet was executed. *See infra* II.H. For ease of presentation, the types of discovery conducted through the entire litigation are discussed in this section.

1  housing program ("diversion of resources") and that their missions to promote

2  community-based housing for people with disabilities had been frustrated by

3  Defendants' failures to comply with federal accessibility requirements ("frustration of

4  mission"). *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-80 (1982).

5  Plaintiffs' counsel worked extensively with Plaintiffs to collect paper and electronic

6  documents and prepare time logs that demonstrated their standing and damages. The

7  scope of City-initiated discovery on these topics was hotly litigated, primarily over

8  the City's unprecedented pursuit of information and documents not typically

9  produced in an organizational damages case. The parties submitted multiple letter

10  briefs to Magistrate Judge Walsh, who conducted two hearings on the issue of

11  discovery relating to Plaintiffs' damages in 2014.[6] On July 31, 2014, Magistrate

12  Judge Walsh rejected Defendants' demand that Plaintiffs provide all information

13  related to their organizations' expenditures and affirmed that Plaintiffs could

14  establish diversion of resources through an "opportunity costs" method of proof

15  (Doc. 389). Plaintiffs' counsel then expended significant time collecting and

16  reviewing all of Plaintiffs' relevant paper and electronic documents over many years,

17  and eventually produced 9,373 pages of documents. Allen Decl. ¶ 20.

18      Plaintiffs' counsel identified and worked closely with two experts on the issues

19  of diversion of resources and frustration of mission. Marca Bristo (the President and

20  Chief Executive Officer of Access Living of Metropolitan Chicago and President of

21  the National Council on Independent Living) served as a damages expert for ILCSC

22  and CALIF. Anne Houghtaling (the Executive Director of the HOPE Fair Housing

23  Center and the former Director of Enforcement at the National Fair Housing

24  Alliance) developed an expert report on behalf of FHCSFV. *Id.* ¶ 55.

25

26

27  ―――――――――――――

28  [6] The parties attended many additional telephonic discovery hearings. *See* Part II.E.

### 2. Discovery concerning the need for accessible affordable housing

To demonstrate the impact of Defendants' failure to ensure that the CRA Housing Program is accessible to people with disabilities, Plaintiffs' counsel developed additional expert testimony and secured declarations from people with disabilities who had been deprived of accessible affordable housing. They retained Dr. Allan Parnell to draft an expert report assessing the specific and significant need for accessible affordable units in the City of Los Angeles. Obtaining Dr. Parnell's report was critical to the case because his findings supported the conclusion that the need for accessible housing far outstripped the supply, as Defendants knew or should have known. Dr. Parnell also opined that these individuals were significantly more likely, because of their disabilities, to be poor and, therefore, to need affordable housing, which established an important link between affordable housing and accessible housing. Allen Decl. ¶ 54 & Ex. F (Parnell Expert Report) at 11.

In order to demonstrate that Defendants' conduct—failing to ensure that developments in the CRA Housing Program contained accessible units and that those units were made available to individuals with disabilities—had tangible negative consequences for people with disabilities, and excluded them from that Program, Plaintiffs' counsel obtained declarations from more than forty such individuals who were unable to find accessible affordable housing in Los Angeles. *See* Allen Decl., Ex. C (Declarations). These declarations provide tangible evidence that would be used at summary judgment or trial that the CRA Housing Program failed to include and address the needs of individuals with disabilities in the community.

### 3. Motion practice to establish the proper scope of discovery

A key issue in the case was the identification of multifamily housing developments within the CRA Housing Program that were funded with federal financial assistance, and Plaintiffs therefore sought discovery about additional properties beyond those specifically identified in the SAC. Defendants refused to

1  provide such information, however, and Plaintiffs' counsel expended substantial time

2  litigating a motion to establish the proper scope of discovery (Doc. 299). The Court

3  granted the motion, finding that Plaintiffs' case put at issue the entire inventory of

4  housing built or rehabilitated by the CRA, and allowed discovery regarding that

5  inventory (Doc. 300), which led to Plaintiffs' gathering evidence relating to

6  numerous additional multifamily developments that received assistance from the

7  CRA. Allen Decl. ¶¶ 38-39.

8  **4.  Architectural inaccessibility**

9  To prove their architectural inaccessibility claims, Plaintiffs developed proof

10  that: the City routinely approved architectural drawings/blueprints for developments

11  in the CRA Housing Program that did not comply with the UFAS standard; the

12  developments in the CRA Housing Program were not built in compliance with the

13  UFAS standard; and the developments in the CRA Housing Program were not built

14  in compliance with the California Building Code ("CBC").[7] The discovery needed to

15  develop those reports was complex and time-intensive.

16  First, Plaintiffs had to identify all developments built in the City after 1988 that

17  received financial or other assistance from the CRA. Because Defendants did not

18  provide responsive documents on this topic, Plaintiffs first attempted to assemble this

19  information from publicly available sources, requiring time-consuming review of

20  City Council Transmittals on the City Council files website. Allen Decl. ¶ 44.

21  More than two years after Plaintiffs' discovery requests for identification of all

22  properties in the CRA Housing Program, the City first produced Electronically Stored

23  Information ("ESI") containing hundreds of spreadsheets reflecting additional

24  properties in the CRA Housing Program that had never been disclosed. Plaintiffs'

25  counsel spent considerable time reviewing and analyzing the spreadsheets, ultimately

26  ─────────────────

27  [7] Defendants indicated that they would defend on grounds that the developments at
issue complied with the CBC as an equivalent or more accessible standard than that
set out in UFAS or required by the ADA, obliging Plaintiffs' counsel to develop

28  evidence of noncompliance with the CBC throughout the CRA Housing Program.

1  identifying almost 100 additional properties that received CRA assistance. Plaintiffs'

2  counsel then had to request project files for the newly identified properties and

3  compare these documents with publicly available documents to ascertain their

4  funding, type of construction, construction history, and construction start date.

5  Plaintiffs eventually determined that there were at least 253 apartment buildings

6  covered by the litigation. *Id.* ¶¶ 26, 45, 47.

7       <u>Second</u>, Plaintiffs had to develop and implement a plan for inspecting a

8  statistically valid sample of buildings in the CRA Housing Program. The sheer size of

9  the CRA Housing Program made it impracticable and prohibitively expensive to

10 review building plans and as-built conditions for each property.[8] Plaintiffs retained

11 statisticians to identify a statistically valid sample of buildings to assess and then had

12 to gathered information for each of the 253 buildings to ensure that similarly-situated

13 developments were analyzed together. *Id.* ¶¶ 42-43.

14      Plaintiffs' counsel engaged in detailed, time-consuming research so that they

15 could divide the developments into four tranches of similarly situated properties:

16 those that received federal funding for new construction, other assistance from the

17 CRA for new construction, federal funding for rehabilitations, or other assistance

18 from the CRA for rehabilitations.[9] Plaintiffs' counsel also had to determine the

19 construction start date for each development, information that Defendants did not

20 reliably retain or provide. This was necessary in order for Plaintiffs' counsel to assess

21                      _____

22 [8] Plaintiffs proposed that the parties hire a single mutually acceptable accessibility

23 expert to measure and photograph units and common areas in each building in the CRA Housing Program. Rather than doing so, the City chose to hire its own expert,

24 and then refused to turn over the measurements and photographs that expert collected from more than 200 developments using a standardized checklist for measuring

25 accessibility, even though the surveys were responsive to Plaintiffs' discovery requests. The Court subsequently granted Plaintiffs' motion to compel production of

26 the measurements and photographs contained in these surveys. *See* Doc. 458; Allen Decl. ¶¶ 41-42.

27 [9] Construction on ten developments in the CRA Housing Program began after commencement of this litigation, Plaintiffs' counsel removed them from the

28 statistical randomization and assessed them individually.

- 13 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

whether Section 504, the ADA, and/or Section 11135 (which have different coverage dates) applied to each development, and in order for Plaintiffs' expert to assess the property using the correct version of the CBC. *See id.*¶¶ 45, 47.

A statistician randomized each tranche twice to identify properties to be subjected to Plan Review (review of as-approved plans for compliance) and others to be subjected to Measurement Review (on-site review of as-built conditions for compliance). *Id.* ¶¶ 43-46. Once, the randomized lists were created Plaintiffs' counsel then spent several hundred hours obtaining plans for each development to be reviewed (including issuing subpoenas for the 85 of the 253 developments for which the Los Angeles Department of Building and Safety ("LADBS") did not have plans); arranging for thirty-five on-site inspections in forty-four days for randomly selected properties; and compelling the City to produce the measurements and photographs it had taken. *Id.*

Third, Plaintiffs' counsel coordinated and analyzed Plan Review, Measurement Review, and review of the City's own measurements and photographs by two architectural experts on a substantial portion of the developments in the CRA Housing Program. Of the 253 developments in the CRA Housing Program subject to Section 504, 184 developments were subject to at least one type of review by Plaintiffs' accessibility expert, and *all* showed a "failure" to comply with the correct federal accessibility standards. Allen Decl., Ex. D (Hecker Expert Report) at 87. Plaintiffs also retained a second accessibility expert who performed a similar analysis under the CBC. He found, based on thirty-six measurement reviews of developments in the CRA Housing Program and analysis of the City's eighty-two reports containing accessibility measurements and photographs, that "all developments that were the subject of this report have 'failed' to meet the accessibility provisions of the California Building Code," and that "[t]he extent of facility and usability noncompliance that is documented in this report is broad and among the most

- 14 -

1   remarkable I have observed in 15 years of accessibility consulting on behalf of

2   private and public entities." Allen Decl., Ex. E (Dea Expert Report) at 33.

3          Plaintiffs' counsel also spent considerable time working with a testifying

4   expert statistician, Dr. Bernard Siskin, who concluded that based on the 100% failure

5   rate of the randomized Plan Review, he could be 97.5% confident that if all

6   developments subject to Section 504 were subject to a Plan Review, at least 93.1%

7   would fail. Based on the 100% failure rate of the randomized Measurement Review,

8   he could be 97.5% confident that if all developments subject to Section 504 were

9   subject to a Measurement Review, at least 82.4% would fail. Allen Decl., Ex. G

10  (Siskin Expert Report) at 20.

11          **5.     Program inaccessibility**

12          Beyond securing discovery materials to establish that Defendants permitted the

13  construction of architecturally inaccessible buildings and common areas, Plaintiffs

14  sought discovery on whether Defendants operated the CRA Housing Program in

15  violation of the program accessibility requirements of Section 504 and the ADA. The

16  time that Plaintiffs' counsel expended on written discovery and depositions in this

17  area yielded potent evidence that Plaintiffs would have used in summary judgment

18  briefing, including evidence that neither the City nor the CRA had any reliable list of

19  UFAS-accessible units in Los Angeles; that neither Defendant enforced federally

20  mandated policies to ensure that UFAS-accessible units were reserved for people

21  whose disabilities made the highly-accessible features of UFAS-compliant units

22  necessary; and that neither Defendant had a knowledgeable Section 504/ADA

23  Coordinator guiding efforts to ensure accessibility. This evidence became the

24  foundation for a number of provisions of the Settlement Agreement. Allen Decl. ¶ 53.

25          Plaintiffs furthermore retained, and spent dozens of hours working with, John L.

26  Wodatch, the former Chief of the Disability Rights Section, Civil Rights Division of

27  the U.S. Department of Justice, who prepared a report regarding Defendants' failure to

28

- 15 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1    comply with their program accessibility obligations under Section 504 and the ADA.

2    The time that Plaintiffs' counsel spent working with Mr. Wodatch—whose report

3    concluded that Defendants had systemically failed to ensure that the CRA Housing

4    Program was accessible to people with disabilities—resulted in powerful evidence of

5    the City's liability and contributed significantly to securing the Settlement Agreement.

6    *Id.* ¶ 52.

7                    **6.      Written discovery practice**

8          This case required substantially more extensive written discovery than a run-

9    of-the-mill civil action by many orders of magnitude. Given the scope of their

10   claims—in terms of, *inter alia*, the number of properties and units at issue; the legal

11   relationships between the City, the CRA, and housing providers; the federal funding

12   component of the Section 504 claims; and the state funding component of the Section

13   11135 claims—Plaintiffs had to pursue necessarily broad discovery to prove their

14   case. Indeed, the Court agreed with Plaintiffs about the permissible scope of

15   discovery and rejected Defendants' attempt to narrow it in granting Plaintiffs' motion

16   to establish that the scope of discovery included the entire inventory of housing built

17   or rehabilitated by the CRA and allowed discovery regarding that inventory. *See*

18   *supra* Part II.C. The City also aggressively pursued discovery from Plaintiffs.

19         Requests for production of documents. Plaintiffs served 431 requests for

20   production of documents. In response, the City produced 97,984 paper documents

21   and the CRA produced 75,350 paper documents, in addition to ESI (discussed *infra*).

22   Plaintiffs' counsel also reviewed hundreds of thousands of pages of project files and

23   other documents made available for inspection by the City and the CRA. Allen Decl.

24   ¶ 19.

25         Defendants were aggressive in their own discovery of information from

26   Plaintiffs, pursuant to the no-holds-barred litigation strategy they adopted while

27   represented by outside counsel during the first part of the litigation. They served

28

1   more than 2,000 requests for production of documents, which required hundreds of

2   hours for Plaintiffs' counsel to prepare written objections and locate and produce

3   approximately 23,800 responsive paper documents on behalf of Plaintiffs. *Id.* ¶ 18.

4   <u>Requests for admission and interrogatories.</u> Defendants propounded

5   approximately 4,500 requests for admission and 130 interrogatories, many of which

6   were contention interrogatories, requiring significant time to answer. *Id.* ¶¶ 29-30.

7   Plaintiffs' counsel propounded a total of ninety interrogatories and 5,000

8   requests for admission. This large number of requests for admission that Plaintiffs

9   served was appropriate in this case because they were necessary to secure evidence to

10   rule out various statutory exemptions from full UFAS compliance. Plaintiffs had to

11   propound requests for admission addressing how more than ten possible exemptions

12   applied to individual properties within the 253-development CRA Housing Program.

13   *Id.* ¶¶ 29, 31.

14   <u>Electronically Stored Information.</u> Because a significant portion of the

15   communications and documents evidencing Defendants' noncompliance with federal

16   and state accessibility requirements was conveyed internally via e-mail, Plaintiffs

17   engaged in a hard-fought battle to secure basic ESI, expending an enormous amount

18   of paralegal and attorney time over a period of more than two years.

19   Beginning in July 2013, the parties attempted to draft a mutually agreeable ESI

20   Order and Search Terms and Parameters. After negotiating for months, several issues

21   remained unresolved, and as of May 2014, the City had only produced emails from

22   2010-2014 for a single custodian and partially produced emails for a second

23   custodian. In June 2014, the City stated that it had a universe of approximately

24   2,000,000 documents to search from twenty-four custodians. In response to

25   subsequent Court orders regarding predictive coding and timely production, the City

26   finally produced its first set of ESI on December 30, 2014. Shortly thereafter, the

27   parties agreed to extend discovery to allow the parties to engage in settlement

28

1    discussions. 1/21/15 Order to Extend Discovery Deadlines (Doc. 442). The remainder

2    of the City's approximately 10,000 email documents were produced on July 8, 2015.

3    Allen Decl. ¶¶ 22-24.

4         Defendants also propounded extensive discovery requests for ESI from

5    Plaintiffs. After substantially narrowing the request, Plaintiffs searched over ten years

6    of emails for twenty-one email custodians. Responding to Defendants' ESI requests

7    required significant time from counsel to negotiate keyword search parameters, run

8    those searches, conduct a privilege review, and produce the responsive, non-

9    privileged emails. Plaintiffs' counsel also worked with Plaintiffs to gather and

10   produce extensive records from their databases and other native format documents

11   requested by the City. All told, Plaintiffs produced almost 29,000 ESI documents. *Id.*

12   ¶¶ 27-28.

13        Depositions. Plaintiffs deposed twenty defense witnesses, including seven

14   30(b)(6) witnesses. Plaintiffs deposed City and CRA officials regarding, among other

15   things, their policies and practices related to architectural accessibility,

16   communications regarding architectural requirements, funding for housing projects

17   within the CRA Housing Portfolio, policies and procedures regarding the marketing

18   and utilization of accessible units, policies and procedures regarding the review of

19   construction plans, monitoring of the accessibility requirements, the transfer of

20   properties, obligations and records from the CRA to the City as a result of the

21   dissolution of the CRA, and the CRA's task force to address disability discrimination.

22   *Id.* ¶ 32.

23        Some of the key depositions securing evidence of the City's noncompliance

24   with the accessibility requirements of federal and state law were as follows:

25        Plaintiffs' counsel deposed Alfred Muhammad, head of the Architectural

26   Services Unit within the City's Housing and Community Investment Department

27   ("HCID"), both as the City's Rule 30(b)(6) witness on architectural accessibility

28

- 18 -

1   issues and in his individual capacity. The preparation time required for those

2   depositions—by counsel and paralegals—was extensive and critical, given the

3   magnitude of developments in the CRA Housing Program. That preparation involved

4   confirming the existence of federal funding in more than 120 properties, and

5   securing, reviewing, and analyzing the City Council Transmittals, submissions to

6   HUD, and architectural design review letters for each individual development so that

7   appropriate questions could be developed for the depositions, and relevant exhibits

8   prepared with which to confront Mr. Muhammad. Plaintiffs' counsel also had to

9   research and analyze several sets of "architectural requirements" that HCID imposed

10  on developers seeking HCID financial assistance to build multifamily housing.

11  Finally, substantial preparation time was required for these depositions in order to

12  understand and articulate the differences between the modest CBC accessibility

13  requirements and the more stringent UFAS requirements. *Id.* ¶ 33(c).

14       The deposition testimony of Rushmore Cervantes, HCID's General Manager,

15  and of Tim Elliott, head of HCID's Affordable Housing Trust Fund, was critical in

16  confirming that HCID did not apply or enforce the UFAS requirements on developers

17  receiving federal funds through HCID, and that no HCID employee ever visited

18  completed developments to ensure they complied with UFAS. Finally, meticulous

19  and time-consuming attention by Plaintiffs' counsel secured admissions by Mr.

20  Cervantes that HCID effectively enforced requirements for many other elements of

21  affordable housing development, but had none to ensure accessibility. Plaintiffs'

22  counsel devoted substantial time reviewing HCID policy documents, City Council

23  Transmittals, and HCID notices of funding availability over nearly twenty years, in

24  order to be prepared for these important depositions. *Id.* ¶ 33(a), (d).

25       Plaintiffs' counsel also spent hundreds of hours reviewing HCID loan

26  agreements and underwriting and monitoring policies and procedures to prepare for

27  the depositions of HCID Assistant General Manager Helmi Hisserich, HCID Chief

28

1  Management Analyst Suzette Flynn and Sally Richman, HCID's director of

2  knowledge management and evaluation. That preparation secured testimony

3  confirming that HCID's loan agreements and policies and procedures governing the

4  distribution of City assistance did not uniformly recite that compliance with UFAS

5  requirements was mandatory. Similarly, that testimony also confirmed that HCID did

6  not monitor owners or require them to employ policies to ensure priority access to

7  units by people with disabilities, track the location and features of accessible units, or

8  reprimand employees for approving non-compliant plans or buildings. *Id.* ¶ 33(b).

9     Plaintiffs' counsel furthermore defended the executive directors of each of the

10  Plaintiff organizations in their depositions taken by the City. *Id.* ¶ 34.

11     The parties conducted twenty-nine days of deposition in total. *Id.* ¶ 35.

12          **7.     Simultaneous efforts at settlement through January 2014**

13     At the same time that Plaintiffs were conducting the robust and time-

14  consuming discovery discussed above, their counsel were also working hard to

15  achieve the precedential settlement over a three-year period, including two full-day

16  mediations with a mediator, and over a dozen in-person or telephonic meetings.

17     The first mediation was held on April 24, 2013 and ended with counsel for the

18  Plaintiffs and outside counsel for the City executing a term sheet, pursuant to which

19  they agreed to seek a ninety-day stay of the litigation to pursue settlement. Thereafter,

20  Plaintiffs' counsel drafted and circulated a proposed agreement providing for an

21  exchange of expert accessibility inspection reports and development of retrofit plans

22  for existing buildings, protocols to ensure compliance with applicable accessibility

23  requirements in future construction, and development of uniform policies to ensure

24  compliance with the federal and state accessibility laws for the entire CRA Housing

25  Program. On May 6, 2013, settlement negotiations broke down and did not resume

26  until the parties held a second mediation session in January 2014. They exchanged

27  settlement proposals following that session, but negotiations broke down again on

28

1    March 6, 2014. Allen Decl. ¶¶ 57-58.

2           The time expended between the ruling on the motions to dismiss and the

3    second mediation constitutes 6,749.40 hours valued at $3,476,536.00. *Id.* ¶ 159.

4           **E.    *Renewed Efforts at Mediation and Ongoing Discovery Through January 2015 Term Sheet***

5
            After the second (January 2014) mediation failed, the intense discovery
6
     described in Part II.D continued. For example, Plaintiffs' counsel continued to pursue
7
     extensive written discovery and tried to resolve contentious disputes related to the
8
     scope of discovery permissible on Plaintiffs' damages claims based on diversion of
9
     resources. Defendants' broad requests to Plaintiffs resulted in multiple meet and
10
     confers and hearings before Magistrate Judge Walsh. *See infra* Part II.D.1. Plaintiffs'
11
     counsel also produced extensive responsive documents and prepared and defended
12
     their clients' depositions on damages. Counsel further expended substantial time
13
     negotiating and participating in meet and confers, extensive informal briefing, and
14
     hearings regarding the City's ESI obligations, as well as reviewing and producing
15
     Plaintiffs' ESI and reviewing ESI produced by the City. Plaintiffs' counsel continued
16
     to develop their affirmative evidence by taking depositions, conducting interviews of
17
     individuals with disabilities, and developing the strategy and materials (such as
18
     architectural plans) necessary for their experts' opinions. In late 2014, the City
19
     Attorney's Office resumed representation of the City, and the parties conducted a
20
     settlement conference that led to the execution of a Term Sheet on January 7, 2015.
21
     Allen Decl. ¶¶ 20-21, 23-24, 33, 34, 59.
22
            After applying billing discretion, counsel invested 12,909.15 hours, worth
23
     $6,125,761, on discovery and settlement tasks from January 2014 through early
24
     January 2015. *Id.* ¶ 160.
25
            **F.    *January 2015 Term Sheet – May 31, 2015***
26
            Pursuant to the January 7, 2015 Term Sheet, Plaintiffs' counsel agreed to
27
     forego a claim against the City for any fees expended on litigation for a ninety-day
28

- 21 -

1    period during which the parties would continue to negotiate a settlement agreement,

2    even in the absence of a stay of the discovery deadlines imposed by the Court. *Id.*

3    ¶ 59.

4          Plaintiffs' counsel, however, felt ethically bound to continue discovery and

5    other litigation tasks to avoid prejudicing Plaintiffs' ability to prove their claims in

6    the event no settlement was consummated. In early April 2015, at the expiration of

7    the ninety-day period, some progress toward settlement had occurred, but no firm

8    agreement had been negotiated. Even as they continued to work to meet discovery

9    and litigation deadlines, as a show of good faith in support of settlement, Plaintiffs'

10   counsel voluntarily extended the settlement negotiation's no-fee period by fifty-three

11   days, through May 31, 2015. When settlement was not within reach even after the

12   extension, Plaintiffs' counsel advised the City that they would resume their claim for

13   fees effective June 1, 2015. *Id.* ¶ 59.

14         After removing time pursuant to the Term Sheet with the City and exercising

15   billing discretion, Counsel invested 1,369.35 hours valued at $1,115,119.50 for its

16   work on settlement during this stage of the case. *Id.* ¶ 161.

17         **G.     Renewed Discovery – Execution of April 2016 Term Sheet**

18         After the January 2015 Term Sheet did not result in a settlement, Plaintiffs'

19   counsel spent the next year securing the evidence needed to prove their claims at

20   summary judgment and trial, as described in detail in Part II.D. For example, counsel

21   continued to gather the extensive documentation and arrange the inspections upon

22   which its expert reports were based, as described above in Part II.D.4, shortly after

23   which the City began pursuing settlement in earnest instead of attempting to rebut

24   those reports. During this period, Plaintiffs' counsel completed their production of

25   ESI; reviewed and analyzed Defendants' voluminous ESI production in preparation

26   for depositions; prepared for and took depositions needed to demonstrate liability

27   against the City and CRA; drafted and responded to time-consuming final sets of

28

written discovery; and continued their interviews of people with disabilities. At the same time that they conducted all the discovery necessary to prepare their claims for summary judgment or trial, Plaintiffs' counsel continued settlement negotiations with the City that resulted in a new Term Sheet on April 12, 2016. Allen Decl. ¶¶ 18-20, 24, 26-31, 32-33, 44-55, 60.

After billing discretion, counsel invested 10,289.45 hours valued at $5,357,379.50 during this stage of the case. *Id.* ¶ 162.

### H.    April 2016 Term Sheet – Settlement Agreement Execution

On April 12, 2016, the Plaintiffs and the City signed a new Term Sheet outlining a settlement in principle that was to be executed by the parties no later than May 12, 2016. Plaintiffs' counsel drafted that extensive agreement and secured the approval of its text by the City Attorney's Office. Plaintiffs executed and returned the Settlement Agreement to the City on May 12, 2016. *Id.* ¶¶ 60-61. From that date, this fee petition includes only time spent on settlement issues, and not on the litigation, as described *infra* Part IV.B.4. The City Council voted to endorse the Settlement Agreement on August 29, 2016, and the Mayor signed the associated resolution on September 5, 2016. Allen Decl., Ex. A. This fee petition only includes fees up to August 2016; Plaintiffs reserve the right to request later fees, including fees incurred in litigating this motion, in their reply.

Counsel invested 1,106.45 hours valued at $734,167.00 for work on settlement issues and work other than continued litigation during this stage of the case. Allen Decl. ¶ 163.

## III.   THE SETTLEMENT AND ITS BENEFIT TO THE PUBLIC

The settlement achieved in this matter is historic. The Settlement Agreement is the largest settlement in U.S. history addressing the lack of accessible affordable housing. Allen Decl. ¶ 174.; Decl. of Shanna Smith ("Smith Decl.") ¶¶ 10-11, 16;

1   Decl. of Joseph D. Rich ("Rich Decl.") ¶ 13; Decl. of James Grow ("Grow Decl.") ¶

2   8; Decl. of Shawna Parks ("Parks Decl.") ¶ 15.

3       The Settlement Agreement requires the City to provide at least 4,000 apartment

4   units that will be highly accessible to people with mobility and sensory impairments.

5   *See* Allen Decl., Ex. A (Settlement Agreement), §§ III.7, III.10(a).[10] It will also

6   dramatically increase the amount of funds that the City expends on disability access

7   improvements in its affordable housing program, requiring the City to spend, on

8   average, at least $20 million per year for the next ten years, and as much as is

9   necessary to provide the 4,000 highly accessible units within the term of the

10  Settlement. *Id.* §§ III.7, III.10(*o*).

11      The Settlement Agreement further provides that the City will pay $4.5 million

12  in compensation to the three nonprofit Plaintiff organizations, the largest damages

13  payment to an organizational plaintiff to date in this type of case, and is appropriate

14  based on the scale of activities that Plaintiffs will need to continue undertaking in

15  order to educate people with disabilities about the Settlement Agreement and their

16  rights, assist people with disabilities who need accessible units in finding, applying

17  for, and successfully leasing up those units, and other pertinent work. Allen Decl.

18  ¶ 174 & Ex. A (Settlement Agreement), § VIII.1; Smith Decl. ¶ 16.

19      The Settlement Agreement also proactively addresses the root causes of the

20  pervasive, ongoing inaccessibility of the City's affordable housing program, and goes

21  beyond the 253 developments that were the subject of the SAC. In fact, because

22  Plaintiffs' counsel developed evidence of inaccessibility affecting several hundred

23  other developments assisted by the City, and convinced the City to resolve matters

24  outside the SAC, the Settlement Agreement imposes broad accessibility remedies on

25  a total of 727 separate apartment developments, containing nearly 47,000 units

26  located in neighborhoods throughout Los Angeles. In other words, the relief secured

27  ─────────────

28  [10] Accessibility is defined in the Settlement Agreement in terms of both state and
federal law requirements.

by Plaintiffs' counsel is nearly three times as much as they could have achieved vis-à-vis the City under the SAC, which focused on the CRA Housing Program with its 253 properties. Allen Decl. ¶¶ 9, 174 & Ex. A (Settlement Agreement), §§ I.5, II.12. Some examples of key mechanisms established in the Settlement Agreement that will bring about these systemic reforms are:

(1)     A requirement that the City conduct specialized review of plans and specifications and on-site compliance inspections to ensure that all housing developments that are newly constructed or substantially altered after April 12, 2016, are designed, constructed, and maintained in full compliance with the most stringent accessibility requirements supported by state and federal law. These comprehensive provisions will ensure that equal housing opportunities for disabled individuals in Los Angeles will continue to expand, even beyond the relief obtained through the specific requirement of 4,000 highly accessible units. *Id.* § III.10(f).

(2)     A requirement that the City develop an Accessible Housing Unit Plan with the assistance of experts paid for by the City, which will inform the City's annual production target of highly accessible units and an appropriate geographic distribution of such units throughout the City and in a range of unit sizes. *Id.* § 111.10(b).

(3)     The City's adoption of a set of uniform policies and procedures compliant with both state and federal law to be applied to all housing covered by the Settlement, ensuring that people with disabilities who need accessible features will have priority for the accessible units, and will receive reasonable accommodations and modifications as needed. These model policies are incorporated into the Settlement and Judgment and Exhibits C-1 and C-2 to the Settlement. *Id.* § III.10(k). The City also agreed to adopt policies and procedures for tracking the units, and monitoring and enforcing the priorities and disabilities provisions. *Id.* § III.10(l).

- 25 -

1     (4)    The appointment of a Settlement Coordinator to coordinate effective

2 implementation of the City's obligations during the term of the Agreement, to

3 address the structural defects that Plaintiffs identified in the City's bureaucracy in

4 terms of its failure to have a single office or official in charge of the City's overall

5 efforts to comply with the accessibility obligations of Section 504, the ADA, and

6 Section 11135 with respect to its affordable housing units. *Id.* § III.14. The

7 Coordinator will have proven technical expertise regarding the requirements of

8 federal and state disability access standards and how to make units and common areas

9 accessible to people with disabilities. *Id.* §§ III.16, III.17.

10     (5)    The development of an Internet-based Accessible Housing Registry

11 providing accurate, up-to-date information about the location and availability of

12 UFAS-compliant units within the City's affordable housing portfolio. *Id.* § III.10 (m).

13 The Registry is intended to facilitate the search and application for accessible units

14 and to assist apartment owners with their affirmative marketing efforts.

15     (6)    Reporting mechanisms that require that the City to provide detailed

16 reports to Plaintiffs' counsel semi-annually for the full term of the Settlement

17 Agreement, intended to ensure the City's compliance. *Id.* §§ III.11, III.12, III.13.

18     (7)    The appointment of a Court-appointed Monitor to assist the parties and

19 the Court, during the full term of the Settlement Agreement, in ascertaining the City's

20 compliance with the substantive terms of the Settlement Agreement. *Id.* § IV.1. The

21 costs of the Monitor are to be assumed by the City, subject to cost limitations

22 described in the Settlement Agreement. *Id.* § IV.1(e).

23     This Settlement Agreement achieved all of the relief Plaintiffs sought in

24 bringing their claims against the City, and much more, and confers important benefits

25 on the public. *See, e.g.*, Decl. of Stephanie Haffner ("Haffner Decl.") ¶ 18.

26     The Settlement Agreement did not, however, resolve Plaintiffs' claims for

27 attorneys' fees. As set forth below, as prevailing parties on their claims, Plaintiffs'

28

1 counsel are now entitled to recover attorneys' fees based on the substantial amount of

2 work they performed over the almost five-year course of this litigation and their

3 considerable skill and expertise in achieving the outstanding results that the

4 Settlement Agreement confers on Plaintiffs and people with disabilities in the City.

5 **IV.    ARGUMENT**

6       ***A.    Plaintiffs Are Prevailing Parties***

7       This Settlement Agreement in this case has resolved Plaintiffs' claims against

8 the City under Section 504, the ADA, and Section 11135. As prevailing parties,

9 Plaintiffs are entitled to recover their reasonable attorneys' fees expended to achieve

10 the outstanding results established in the Settlement Agreement, pursuant to 42

11 U.S.C. § 12205 (fee-shifting under ADA); 29 U.S.C. § 794a(b) (fee-shifting under

12 Section 504); and Cal. Civ. Proc. Code § 1021.5 (fee-shifting under California law).

13       Under federal fee-shifting law, Plaintiffs are prevailing parties on their ADA

14 and Section 504 claims because the Settlement Agreement (1) is judicially

15 enforceable, *see* Allen Decl., Ex. A (Settlement Agreement), § II.20; Aug. 4, 2016

16 Judgment (Doc. 532); (2) materially alters the legal relationship between the parties

17 by requiring substantial affirmative conduct from the City*, see supra* Part III; and (3)

18 provides actual relief on the merits of the plaintiff's claim—indeed, in this case,

19 provides considerably more relief than would have been possible by continuing to

20 litigate against the City.[11] *See La Asociacion de Trabajadores de Lake Forest v. City*

21 *of Lake Forest*, 624 F.3d 1083, 1089 (9th Cir. 2010); *Saint John's Organic Farm v.*

22 *Gem Cty. Mosquito Abatement Dist.*, 574 F.3d 1054, 1059 (9th Cir. 2009) (setting out

---

23 [11] *See also Tex. State Teachers Ass'n v. Garland Indep. School Dist.*, 489 U.S. 782,
24 791-92 (1989) ("If the plaintiff has succeeded on any significant issue in litigation
which achieve[s] some of the benefit the parties sought in bringing suit, the plaintiff
25 has crossed the threshold to a fee award of some kind.") (internal quotations omitted).
Here, Plaintiffs have clearly crossed the threshold to a fee award that is fully
26 compensatory, achieving a Settlement Agreement that will provide at least 4,000
units of accessible affordable housing and $4.5 million in damages, in addition to
27 substantial programmatic changes in housing accessibility policies and practices—
much more than the minimum requirement of "some relief." *See La Asociacion de*
28 *Trabajadores*, 624 F.3d at 1090.

1  the applicable test).

2  　　Under California private attorney general fee-shifting law, which governs the

3  analysis of whether Plaintiffs are "successful parties" entitled to fees based on their

4  Section 11135 state law claim, fees should be awarded to a successful plaintiff in an

5  action that "resulted in the enforcement of an important right affecting the public

6  interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been

7  conferred on the general public or a large class of persons, (b) the necessity and

8  financial burden of private enforcement… are such as to make the award appropriate,

9  and (c) such fees should not in the interest of justice be paid out of the recovery, if

10  any." Cal. Civ. Proc. Code § 1021.5. "Relief obtained through a settlement may

11  qualify a [litigant] as the prevailing party . . . ." *Lyons v. Chinese Hosp. Ass'n*, 136

12  Cal. App. 4th 1331, 1345 (2006). Plaintiffs also satisfy this test.

13  　　First, this settlement will result in an enormous benefit to the City's sizable

14  population of people with disabilities by providing for the creation of 4,000 new units

15  of accessible, affordable rental housing, in addition to the adoption of model policies

16  throughout the CRA Housing Program and other substantial programmatic

17  modifications. Here, as in *Folsom v. Butte County Association of Governments*, 32

18  Cal. 3d 668 (1982), Plaintiffs are "successful parties" because the settlement they

19  have achieved with the City will "contribute[] substantially to remedying conditions

20  at which [their lawsuit] was directed." *Id.* at 671; *see also, e.g.*, *In re Butler*, 236 Cal.

21  App. 4th 1222, 1230-44 (2015) (settlement that conferred a substantial benefit on a

22  large class of persons made plaintiff eligible to recover fees under Section 1021.5);

23  Smith Decl. ¶ 15 (describing the Settlement Agreement's benefit to the public); Rich

24  Decl. ¶ 13 (same); Fox Decl. ¶¶ 14, 16; Parks Decl. ¶ 15.

25  　　Second, private enforcement was required because public enforcement was not

26  "sufficiently available." *MacDonald v. Ford Motor Co.*, 142 F. Supp. 3d 884, 896

27  (N.D. Cal. 2015). The necessity of private enforcement in this matter is underscored

28

- 28 -

1  by the fact that the Defendants were public entities whose components—HCID,

2  LADBS, and CRA—were charged with ensuring compliance with federal and state

3  accessibility requirements, but failed to do so. Allen Decl. ¶ 169. When no

4  compliance or enforcement by a governmental entity was forthcoming, Plaintiffs'

5  counsel filed the original Complaint in this action on January 13, 2012. *Id.*

6  Moreover, the "financial burden of private enforcement" in this case was

7  enormous, requiring five years of pre-suit investigation and litigation, almost

8  $750,000 in out-of-pocket expenditures (after billing discretion), and over 40,000

9  hours of attorney time before the exercise of billing judgment described below in Part

10  IV.B.4. *See* Allen Decl. ¶¶ 150-56. The cost of the representation required to achieve

11  the outstanding results in this case, which will benefit the entire Los Angeles

12  community, was significantly greater than what any of the Plaintiffs could have

13  afforded—separately or collectively—and was therefore out of proportion to their

14  individual stakes in the case. *See id.* ¶¶ 170-74; Decl. of Dara Schur ("Schur Decl.")

15  ¶¶ 33-34.

16  Third, it would be unjust to pay counsel's attorneys' fees out of the monetary

17  recovery to Plaintiffs. First, the monetary recovery will assist Plaintiffs in informing

18  people with disabilities about the settlement, helping them obtain access to newly

19  available accessible units, and otherwise enforcing their rights, and should not be

20  diminished. Second, the compensatory damages recovered by Plaintiffs pursuant to

21  the settlement, while substantial, are worth much less than the total attorneys' fees

22  that were reasonably expended to achieve the outstanding results, and much less than

23  the overall monetary value of the settlement, which among other things will result in

24  the City's allocation of at least $200 million towards the provision of accessible

25  affordable housing. Denying fees here would discourage similar future litigation to

26  enforce disability rights, contravening Section 1021.5's goal to "encourage private

27  lawsuits that enforce important public policies." *Exotic Feline Breeding Compound,*

28

1   *Inc. v. Dep't of Fish & Wildlife*, 2016 WL 3564206, at *4, *10, (Cal. Ct. App. June

2   22, 2016) (citing *Graham v. DaimlerChrysler Corp.*, 34 Cal. 4th 553, 565 (2004).

3       **B.**    **The Requested Fees Are Reasonable**

4             **1.**    **Statutory fee-shifting methodology**

5         Courts award fees in a fee-shifting case based on the lodestar method. *Blum v.*

6   *Stenson*, 465 U.S. 886, 895 (1984); *Hensley v. Eckerhart*, 461 U.S. 424, 431 (1983);

7   *Collado v. Toyota Motor Sales, U.S.A., Inc.*, 550 F. App'x 368, 370 (9th Cir. 2013)

8   ("Fee awards granted pursuant to § 1021.5 must be calculated using a lodestar

9   analysis." (citing *Press v. Lucky Stores, Inc.*, 34 Cal. 3d 311, 321-22 (1983))). The

10  lodestar is calculated by multiplying the number of hours "reasonably expended on

11  the litigation, . . . by the prevailing local rate for an attorney of the skill required to

12  perform the litigation." *Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir.

13  2008) (citing *Blum*, 465 U.S. at 895); *see also Ketchum v. Moses*, 24 Cal. 4th 1122,

14  1131-32 (2001) (same, under California law).

15        "The lodestar figure 'roughly approximates the fee that the prevailing attorney

16  would have received if he or she had been representing a paying client who was

17  billed by the hour' . . . . and is, therefore, a presumptively reasonable fee." *Kelly v.*

18  *Wengler*, 822 F.3d 1085, 1099 (9th Cir. 2016) (quoting *Perdue v. Kenny A. ex rel.*

19  *Winn*, 559 U.S. 542, 551 (2010)). Under a fee-shifting statute, an attorney should be

20  compensated for "every item of service which, at the time rendered, would have been

21  undertaken by a reasonably prudent lawyer to advance or protect his client's interest."

22  *Armstrong v. Davis*, 318 F.3d 965, 971 (9th Cir. 2003) (internal quotation marks

23  omitted); *Ramon v. Cty. of Santa Clara*, 173 Cal. App. 4th 915, 925 (2009) (same

24  under California law).

25        Plaintiffs' requested lodestar is based on prevailing local rates for attorneys of

26  comparable skills and experience and the time that was reasonably expended by

27  counsel to obtain the Settlement Agreement with the City. In order to further ensure

28

- 30 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1   the reasonableness of this request for fees, Plaintiffs have reduced the lodestar by

2   more than 23% in the exercise of substantial billing judgment, as set forth below.[12]

3       **2.**    **Plaintiffs' requested lodestar is based on prevailing local**
4                 **hourly rates for attorneys with comparable skill and experience**

5       As a general matter, the Ninth Circuit and California courts determine a

6   reasonable hourly rate by considering the prevailing rates for comparable attorneys in

7   the forum where the action is pending. *Moreno*, 534 F.3d at 1111; *Children's Hosp.*

8   *& Med. Ctr. v. Bonta*, 97 Cal. App. 4th 740, 782-83 (2002). A reasonable hourly rate

9   should reflect the individual's experience, skill, and reputation. *Blum*, 465 U.S. at 896

10  n.11. The same standard applies in civil rights fee-shifting cases. *Hensley*, 461 U.S. at

11  430 n. 4; *see also Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 455 (9th Cir.

12  2010) (holding that reasonable rates are based on a comparison extending "to all

13  attorneys in the relevant community engaged in 'equally complex Federal litigation,'

14  no matter the subject matter" (quoting *Hensley*, 461 U.S. at 430 n.4)).[13]

15      The motion requests fees based on 2016 hourly rates. In long-running cases,

16  courts routinely award current rates for all of the time expended throughout the

17  history of the case as compensation for the delay in receiving fees. *See, e.g., Missouri*

18  *v. Jenkins*, 491 U.S. 273, 283-84 (1989); *Gates v. Deukmejian*, 987 F.2d 1392, 1407

19  (9th Cir. 1992); *Graham*, 34 Cal. 4th at 584; Pearl Decl. ¶ 17 ("Fee awards are almost

20  always determined based on current rates . . . . This is a common and accepted

21  practice to compensate attorneys for the delay in being paid.").

22  _____

23  [12] Several of the "reasonableness factors" set forth in *Kerr v. Screen Extras Guild,*
24  *Inc.*, 526 F.2d 67 (9th Cir. 1975), are subsumed in the lodestar analysis, including the time and labor required, the customary fee, and the experience, reputation, and ability of the attorneys. *See id.* at 70. Additional *Kerr* factors including the novelty and
25  difficulty of the questions involved, the skill required to perform the legal service, the results achieved, and the preclusion of other employment, overlap with the multiplier
26  factors under California law and support an enhancement, as set forth in Part IV.C.

27  [13] The analysis of a reasonable hourly rate is the same for attorneys employed at private firms and attorneys employed by non-profit organizations. *See Nadarajah v.*
28  *Holder*, 569 F.3d 906, 915-16 (9th Cir. 2009).

Plaintiffs seek hourly rates as shown below:

| Relman, Dane & Colfax | | |
|---|---|---|
| **Timekeeper** | **Graduation Year** | **Hourly Rate** |
| John Relman, Founding & Managing Partner | 1983 | $975.00 |
| Michael Allen, Partner | 1985 | $900.00 |
| Tom Keary | 1973 | $750.00 |
| Scott Chang | 1990 | $750.00 |
| Jennifer Klar, Partner | 2002 | $675.00 |
| Liyah Brown | 2004 | $625.00 |
| Sasha Samberg-Champion | 2004 | $625.00 |
| Jia Cobb | 2005 | $625.00 |
| Jamie Crook | 2006 | $600.00 |
| Emilie Burnette | 2007 | $575.00 |
| Tim Smyth | 2007 | $575.00 |
| Jean Zachariasiewicz | 2010 | $500.00 |
| Laura Arandes | 2011 | $500.00 |
| Margaret Burgess | 2015 | $320.00 |
| Law Clerks | n/a | $250.00 |
| Paralegals[14] | n/a | $230.00 |

| Disability Rights California | | |
|---|---|---|
| **Timekeeper** | **Graduation Year** | **Hourly Rate** |
| Dara Schur | 1979 | $900.00 |
| Autumn Elliott | 2003 | $645.00 |
| Panchalam Srividya | 2009 | $540.00 |
| Richard Diaz | 2012 | $475.00 |
| Contract Attorneys | n/a | $320.00 |
| Law Clerks | n/a | $245.00 |
| Paralegal Time | n/a | $215.00 |

| Disability Rights Legal Center | | |
|---|---|---|
| **Timekeeper** | **Graduation Year** | **Hourly Rate** |
| Paula D. Pearlman | 1982 | $855.00 |
| Michelle Uzeta | 1992 | $750.00 |
| Maronel Barajas | 2003 | $650.00 |
| Umbreen Bhatti | 2005 | $600.00 |
| Rebecca Craemer | 2006 | $575.00 |

---

[14] "Paralegal" refers to employees who do the work of a legal assistant, regardless of the employee's job title.

| Disability Rights Legal Center | | |
|---|---|---|
| Timekeeper | Graduation Year | Hourly Rate |
| Law Clerk | n/a | $230.00 |
| Legal Assistant | n/a | $250.00 |

| David Geffen Law Firm | | |
|---|---|---|
| Timekeeper | Graduation Year | Hourly Rate |
| David Geffen | 1986 | $800.00 |
| Abdel Nassar | 2008 | $550.00 |
| Law Clerks/Paralegals | n/a | $210.00 |

As set forth in more detail in the accompanying declarations of Michael Allen, Maronel Barajas ("Barajas Decl."), David Geffen ("Geffen Decl."), Dara Schur, Richard Pearl ("Pearl Decl."), Barrett Litt ("Litt Decl."), and E. Desmond Hogan ("Hogan Decl."), the requested hourly rates are well within the range of current prevailing hourly rates charged by, and awarded to, counsel of similar skill, experience, and expertise for complex federal court litigation in the Los Angeles area.[15]

Relman, Dane & Colfax. The requested rates for attorneys at Relman, Dane and Colfax range from $320 for newly barred and contract attorneys to $975 for the firm's founding and managing partner.[16] The attorneys from Relman, Dane & Colfax who worked on this case brought a wealth of expertise in civil rights law and complex federal court litigation. Mr. Allen, a partner at the firm and lead counsel in this action, describes the qualifications, skills, and experience of each attorney included in this request. Allen Decl. ¶¶ 70-147.[17]

---

[15] Experienced civil rights litigators agree that this case was complex litigation. *See* Litt Decl. ¶ 50; Haffner Decl. ¶ 17; Pearl Decl. ¶ 21.

[16] This hourly rate is consistent with the rate that clients of the firm have paid for Mr. Relman's time as well has his reputation as one of the country's very top civil rights litigators. Allen Decl. ¶ 86; Rich Decl. ¶ 16; Hogan Decl. ¶ 15; Karlan Decl. ¶ 14; Smith Decl. ¶ 25.

[17] The requested hourly rates for Mr. Allen, Mr. Relman, and Ms. Schur exceed those for some other very experienced attorneys included in this petition—such as Mr. Geffen, Mr. Keary, and Ms. Pearlman—based on Mr. Allen, Mr. Relman, and Ms.

- 33 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1    The firm's prominent reputation among fair housing and civil rights

2    practitioners and the strengths of individual attorneys at the firm who worked on this

3    case are further supported by the declarations of Susan Silverstein ("Silverstein

4    Decl."), a senior attorney at AARP Foundation Litigation, who testifies about the

5    firm's reputation and Mr. Allen's long history as a highly skilled and creative civil

6    rights attorney, Silverstein Decl. ¶¶ 12-13, 18; Tim Fox, the Co-Executive Director of

7    the Civil Rights Education and Enforcement Center, who testifies about the firm's

8    "reputation for being amongst the best law firms in the country representing plaintiffs

9    in housing-related civil rights cases," Fox Dec. ¶ 17; James Grow, a senior attorney at

10   the National Housing Law Project, who describes the firm's reputation as a premier

11   housing litigation firm, Grow Decl. ¶ 9; E. Desmond Hogan, the deputy managing

12   partner for the national litigation practice at Hogan Lovells, who concludes from his

13   work co-counseling a long-running class action with Relman, Dane & Colfax that

14   Mr. Relman and Ms. Klar, as well as the firm's associates and paralegals, are highly

15   skilled and qualified and should be awarded rates equivalent to those charged in the

16   private corporate law market where they are litigating for attorneys with comparable

17   skills and experience, Hogan Decl. ¶¶ 9, 16; Joseph Rich, Co-Director of the Fair

18   Housing and Community Development Project at the Lawyers' Committee for Civil

19   Rights Under Law and a former Chief at the Department of Justice's Civil Rights

20   Division, who testifies about Mr. Relman's unique skills and expertise and the firm's

21   reputation for bringing cutting edge civil rights cases, Rich Decl. ¶¶ 6-11; Pamela

22   Karlan, a professor of law at Stanford Law School who testifies about Mr. Relman's

23   reputation as a groundbreaking civil rights litigator and his firm's status as "the

24   premier housing discrimination and public accommodations law firm in the country,"

25   Karlan Decl. ¶¶ 11-12; and Shanna Smith, the President and CEO of the National Fair

26   _____

27   Schur's lead role in this litigation and reputations for specific skills and expertise that contributed to Plaintiffs' overwhelming success in achieving the Settlement Agreement with the City. These skills and expertise are well documented in the

28   supporting declarations from these attorneys' peers, as summarized above in the text.

1  Housing Alliance, who testifies based on her organization's long history as a client of

2  the firm that its attorneys have "substantive disability rights expertise . . . [that] rivals

3  that of the Civil Rights Division of the DOJ," that the firm appropriately assigns

4  substantive work to junior attorneys "while efficiently assigning partners and more

5  experienced lawyers to guide the development of discovery and settlement," and that

6  Mr. Relman, Mr. Allen, Mr. Chang, and Mr. Keary are highly regarded amongst

7  skilled and expert fair housing attorneys, Smith Decl. ¶¶ 19, 25-31.

8      <u>Disability Rights California.</u> The DRC attorneys who worked on this matter are

9  recognized experts in disability rights, complex federal court litigation, and state

10  housing and redevelopment law. The requested hourly rates for attorneys from DRC

11  range from $475 for a more junior attorney to $900 for Ms. Schur. Ms. Schur, DRC's

12  former Director of Litigation, submits a declaration that describes in detail the

13  qualifications, skills, and experience of each DRC attorney included in this request.

14  Schur Decl. ¶¶ 3-27.

15      DRC's reputation as one of the country's most highly regarded disability rights

16  law offices and the specific expertise of its attorneys are further supported by

17  declarations from Deborah Collins, Managing Attorney of the Public Interest Law

18  Project, who testifies about Ms. Schur's stature as a leader among California

19  disability rights attorneys and her deep expertise in affordable housing and

20  redevelopment law, which was necessary to Plaintiffs' success in this action, Collins

21  Decl. ¶¶ 12-14, 17; Mr. Fox, who testifies about Ms. Schur's high reputation among

22  disability rights advocates around the country for her extensive knowledge of

23  disability rights laws, her commitment to accessibility and her creativity with respect

24  to disability advocacy, and about DRC's status as "among the premier disability

25  rights advocacy organizations in the country" with a reputation for "providing the

26  highest-quality work in all of its cases," Fox ¶¶ 18-19; Mr. Grow, who testifies that

27  DRC "is one of the leading disability rights public interest firms in the country," that

28

1    "DRC attorneys are known for being passionate advocates for their clients and

2    skillful litigators," and that Ms. Schur "is highly respected among legal services

3    housing lawyers in California and nationally for the depth of her expertise on a

4    variety of affordable housing topics, including fair housing, housing for people with

5    disabilities and redevelopment housing issues," Grow Decl. ¶¶ 10-11; and Stephanie

6    Haffner, a Senior Litigator at the Western Center on Law and Poverty, who offers

7    testimony regarding the experience, qualifications, and expertise of Ms. Elliott, Ms.

8    Panchalam, and Ms. Schur (whom Ms. Haffner identifies as "being among the most

9    effective and forceful housing advocates in the state"), Haffner Decl. ¶¶ 7-13.

10          <u>Disability Rights Legal Center.</u> Maronel Barajas, the Managing Attorney at

11   DRLC, has submitted a declaration setting out the skills, experience, and

12   qualifications for the DRLC attorneys and staff whose time on this matter is sought

13   through this request. Barajas Decl. ¶¶ 16-44. The attorneys included in DRLC's

14   request for fees are experienced federal court litigators with deep subject matter

15   expertise in anti-discrimination and disability rights law who have conducted

16   successful, groundbreaking civil rights litigation in this District. DRLC seeks to

17   recover fees based on its customary hourly rates, which DRLC regularly compares to

18   the general market to ensure that they compare favorably, and several federal courts

19   have found DRLC's customary rates to be reasonable in awarding fees. DRLC's

20   requested hourly rates range from $575 for an attorney with ten years' experience to

21   $855 for its most senior attorney, with thirty-four years' experience. *Id.* ¶¶ 12, 40, 54.

22   A leading disability rights attorney, Shawna Parks, has submitted a declaration

23   attesting to the "deep subject matter expertise in disability rights law, outstanding

24   legal judgment" and immense litigation skills of the DRLC's attorneys. Parks Decl. ¶

25   16. Ms. Parks describes the "exceptional" qualifications and expertise in complex

26   disability rights litigation of DRLC attorneys Paula Pearlman, Michelle Uzeta, and

27   Maronel Barajas. *Id.* ¶¶ 17-20.

28

1   <u>David Geffen Law Firm.</u> Mr. Geffen has submitted a detailed declaration

2   setting forth his qualifications and experience. Mr. Geffen has been litigating

3   disability rights cases since the beginning of this almost thirty-year career as an

4   attorney and has substantial trial experience, publishes frequently on disability rights

5   issues, and is a regular speaker at conferences on disability rights. Geffen Decl. ¶¶ B-

6   D. He seeks an hourly rate of $800, based on his knowledge of prevailing rates in the

7   forum; his specific skills, experience, and accolades; and unique expertise in the area

8   of disability discrimination. Mr. Geffen seeks an hourly rate of $550.00 for his

9   associate Abdel Nasser, which is consistent with prevailing Los Angeles rates for

10  associates with equivalent experience. *See* Pearl Decl. ¶ 10; Litt Decl. ¶ 43.

11       In further support of their requested hourly rates, Plaintiffs have submitted

12  declarations from:

13       (1)   Richard Pearl, a judicially recognized attorneys' fees expert and the

14  author of a leading treatise on attorneys' fees awards in California, who opines that

15  the rates requested herein "are quite reasonable for this successful litigation" and

16  "well within the range of non-contingent market rates charged for reasonably similar

17  services by Los Angeles Area attorneys of reasonably similar qualifications and

18  experience." Pearl Decl. ¶¶ 10, 12. Mr. Pearl's opinion is based on an exhaustive

19  review of rates awarded by local courts for comparable services, surveys of legal

20  rates, hourly rates charged by other Los Angeles area firms, and a review of the

21  qualifications and experience of counsel in this case.[18] *Id.* ¶¶ 8, 14, 15.

22       (2)   Barrett Litt, a seasoned civil rights litigator based in Pasadena who

23  routinely reviews rates charged and awarded for complex litigation in Southern

24  California and who opines, based on a thorough review of the qualifications and

25  _____

26  [18] *See K.M. ex rel. Bright v. Tustin Unified Sch. Dist.*, 78 F. Supp. 3d 1289, 1304 (C.D. Cal. 2015) (relying on declaration of Mr. Pearl in determining reasonable

27  hourly rate); *PAI Corp. v. Integrated Science Sols., Inc.*, No. 06-CV-05349-JCS, 2015 WL 2265671, at *6 (N.D. Cal. May 13, 2015) (same).

28

- 37 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1    experience of counsel in this case, that the rates requested are reasonable and within

2    the range of prevailing rates for comparable attorneys.[19] Litt Decl. ¶¶ 29-50. Mr.

3    Litt's opinion is based on his own inquiries to area firms to obtain current rate

4    information; "speaking with other attorneys familiar with complex litigation rates;

5    and reviewing court filings regarding attorneys' fees." *Id.* ¶¶ 15, 17, & Ex. B.

6        These sworn declarations by experienced counsel provide competent and

7    probative evidence of the prevailing market rates in Los Angeles for attorneys of

8    similar experience, skill, and reputation, and thus the reasonableness of the requested

9    rates. *See Prison Legal News*, 608 F.3d at 455 (relying on counsel's declaration and

10   declaration from Mr. Pearl, described as an "attorneys' fee expert compiling the

11   hourly rates charged by various San Francisco-area law firms").

12
13   ### 3. The amount of time included in the lodestar is reasonable and is supported by detailed, contemporaneous billing records

14       In determining the lodestar, "[t]he number of hours to be compensated is

15   calculated by considering whether, in light of the circumstances, the time could

16   reasonably have been billed to a private client." *Moreno*, 534 F.3d at 1111 (citing

17   *Hensley*, 461 U.S. at 434). A prevailing plaintiff that obtains excellent results "should

18   recover a fully compensatory fee [for his counsel]. Normally this will encompass all

19   hours reasonably expended on the litigation . . . ." *Hensley*, 461 U.S. at 435. A trial

20   court "should defer to the winning lawyer's professional judgment as to how much

21   time he was required to spend on the case; after all, he won, and might not have, had

22   he been more of a slacker." *Moreno*, 534 F.3d at 1112; *see also Rutti v. Lojack Corp.,

23   Inc.*, No. SACV 06-350- DOC JCX, 2012 WL 3151077, at *2 (C.D. Cal. July 31,

24   2012) ("[A]n attorney's sworn testimony that, in fact, [she] took the time claimed . . .

25

26   [19] *See United States v. Baran*, No. 14CV02639RGKAJWX, 2015 WL 6745151, at *2
27   (C.D. Cal. Oct. 18, 2015) (accepting Litt declaration as probative evidence of prevailing rates); *Dowd v. City of Los Angeles*, 28 F. Supp. 3d 1019, 1052 (C.D. Cal.
28   2014) (same).

1   is evidence of considerable weight on the issue of the time required." (internal

2   quotation marks omitted)).

3       Plaintiffs' counsel took steps to ensure the reasonableness of the time spent on

4   this matter at every step of the litigation. Lead counsel from each law office

5   organized tasks and coordinated duties between the four offices in order to avoid

6   duplication of work and promote efficiency by drawing from each office's areas of

7   expertise and capacity. *See* Allen Decl. ¶¶ 63-69 (describing the distinct roles in

8   conducting the litigation that were assumed by the four offices); Barajas Decl. ¶ 44.

9   Counsel further sought, to the extent practicable, to delegate work to the most junior

10  person appropriate for a particular task. Allen Decl. ¶ 70, 147; Barajas Decl. ¶ 44;

11  Schur Decl. ¶ 19; Geffen Decl. ¶ J. Partners and more senior attorneys were assigned

12  to run aspects of the litigation in which they have expertise, which promoted overall

13  efficiency. Allen Decl. ¶¶ 70, 85; Hogan Decl. ¶¶ 14-15.

14      To prepare this fee petition, lead attorneys for each office conducted a

15  thorough review of the time entries for this action to ensure that the fees requested

16  herein are only those that were reasonably expended on the litigation, and the number

17  of hours claimed by Plaintiffs is documented by contemporaneous time records that

18  describe the tasks performed and the time expended. Allen Decl. ¶ 176 & Ex. B;

19  Barajas Decl. ¶¶ 39, 45 & Ex. F; Geffen Decl. ¶ S & Ex. 1; and Schur Decl. ¶¶ 28-30

20  & Ex. E.[20] Counsel have made substantial additional cuts to the amount of time

21  requested, in the exercise of billing judgment, as set forth below in Part IV.B.4.

22  These declarations establish that attorneys and paralegals from the four law offices

23  that represented Plaintiffs necessarily billed tens of thousands of hours litigating this

24  case, based, *inter alia*, on the scope of Defendants' noncompliance with federal and

25  state accessibility laws and the enormity of discovery tasks required to establish

26  _____

27  [20] Counsel are concurrently seeking leave to submit the time records for *in camera* review, with the City's consent, because the time entries contain work product and

28  Plaintiffs are still litigating their claims against Defendant CRA.

1 Plaintiffs' claims. "Sworn testimony that, in fact, it took the time claimed is evidence

2 of considerable weight on the issue of the time required in the usual case . . . ."

3 *Perkins v. Mobile Hous. Bd.*, 847 F.2d 735, 738 (11th Cir. 1988).

4       The extraordinary results obtained in this case confirm that this substantial

5 expenditure of attorney and paralegal time was time well spent, and justifies an award

6 of a fully compensatory fee. As set out in more detail above in Part III, the Settlement

7 Agreement in this action will result in the provision of thousands of units of

8 accessible affordable housing throughout the City, compliant management policies in

9 more than 700 properties, and the payment of the largest damages award to plaintiffs

10 pursuing an accessibility remedy. It will furthermore achieve lasting and systemic

11 changes to the accessibility of the City's housing programs. Its scope is

12 unprecedented and will have a lasting impact on the lives of people with disabilities

13 in Los Angeles by dramatically expanding their access to City housing programs.

14       An award that fully compensates Plaintiffs' counsel for having obtained these

15 excellent results will permit counsel to continue to take on such litigation and

16 encourage other attorneys to pursue similar civil rights cases. *See* Smith Decl. ¶¶ 10,

17 15-16, 20, 22 (describing the historic nature of the settlement, the positive benefits

18 that it will confer on the people with disabilities, and the importance of an attorneys'

19 fee recovery that fully compensates counsel in order to encourage future litigation);

20 Rich Decl. ¶ 13 (explaining that the relief secured through this settlement is five

21 times larger than a DOJ case that was previously identified as the largest, and that

22 "no other case . . . has successfully reformed an entire city's affordable housing

23 program to bring it into compliance with Section 504 and ADA standards, let alone

24 one as large as the City of Los Angeles."); Grow Decl. ¶ 8 (identifying the settlement

25 as "exceptional" and describing its importance as an example to other advocates "that

26 the accessibility provisions of [Section 504 and the ADA] can be vigorously enforced

27

28

1    through private litigation"); *see also* Fox Decl. ¶¶ 14-15; Haffner Decl. ¶ 18; Parks

2    Decl. ¶ 15; Silverstein Decl. ¶ 17.

3        The reasonableness of the lodestar is further supported by the litigation history

4    discussed in detail above in Part II. The facts and legal issues underlying Plaintiffs'

5    claims are both broad and complex. Plaintiffs' counsel necessarily expended

6    substantial time in pre-suit investigations and filing the Complaint—more than 200

7    hours, valued at \$148,317.50. Plaintiffs' counsel then began the early stages of

8    discovery, while concurrently preparing two amended Complaints and filing a

9    successful opposition to the City and CRA's joint motion to dismiss, requiring almost

10    1,700 hours, worth more than \$1 million. Allen Decl. ¶¶ 7-10.

11        For most of the remainder of the litigation, Plaintiffs' counsel were

12    simultaneously conducting intensive discovery requiring thousands of hours of

13    attorney time (the scope of which is described in detail above in Part II), while also

14    participating in a demanding settlement schedule involving numerous in-person

15    mediations and settlement talks, all-day telephone conferences, and the preparation of

16    term sheets and other incipient settlement documents. *See supra* Part II.D. From the

17    Court's ruling on the motions to dismiss through the April 2016 Term Sheet,

18    Plaintiffs' counsel expended over 31,000 hours, worth over \$16 million dollars.

19    Because counsel could not fulfill their duty of zealous representation by halting work

20    on the litigation pending the settlement execution, they expended close to 1,000

21    additional hours on litigation-related work between May 2016 and the end of August

22    2016, worth almost \$575,000, which is excluded from this request. Allen Decl. ¶ 152.

23        The Court must also evaluate the reasonableness of the time requested through

24    this motion in light of the aggressive litigation strategy that the City initially pursued,

25    particularly with respect to discovery. The Ninth Circuit has recognized that a

26    defendant that "play[s] hardball in contesting [plaintiffs'] claims," should "bear the

27    cost of" the additional time required to defend against an "obstructionist strategy."

28

- 41 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1  *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*, 886 F.2d 1545, 1557 (9th Cir.

2  1989).[21]

3       Because the City resisted production of documents evidencing the full scope of

4  noncompliance, Plaintiffs were required to litigate the scope of permissible discovery

5  with respect to the CRA Housing Program. Furthermore, there were heated discovery

6  controversies concerning Plaintiffs' diversion of resource damages and a protocol for

7  the City's production of ESI. Plaintiffs' counsel were required to respond to several

8  thousand requests for production and requests for admission, and to review tens of

9  thousands of documents produced by Defendants. The litigation strategy adopted by

10  the City's outside counsel—from the inception of the case until 2015, when the City

11  Attorney's Office assumed responsibility for litigation and settlement—contributed

12  significantly to the contentious nature of the litigation, and delayed the ultimate

13  consummation of the Settlement Agreement. Allen Decl. ¶¶ 17-31, 36-39.

14       As amply supported in this fees motion, this litigation imposed demanding and

15  time-intensive work on Plaintiffs' counsel to develop the facts and legal theories

16  underlying Plaintiffs' claims; respond to and survive multiple Rule 12 motions;

17  conduct intensive discovery against a party that chose to go to battle on every

18  discovery dispute that arose; manage, review, and analyze hundreds of thousands of

19  pages of documents; and take twenty defense witness depositions. Given the many

20  overlapping and substantial, time-consuming demands of this complex litigation, no

21  one law office could have litigated this case alone. *See* Allen Decl. ¶¶ 172-73; Schur

22  Decl. ¶¶ 33-34; *see also* Fox Decl. ¶ 10 ("[F]irms . . . like Relman, Dane & Colfax

23  PLLC, which served as lead counsel in the Los Angeles litigation[] must often

24  _____

25  [21] *See also Peak-Las Positas Partners v. Bollag*, 172 Cal. App. 4th 101, 114 (2009)
    ("A defendant 'cannot litigate tenaciously and then be heard to complain about the
26  time necessarily spent by the plaintiff in response.'" (internal quotation marks
    omitted)); *Stokus v. Marsh*, 217 Cal. App. 3d 647, 654 (1990) ("Parties who litigate
27  with no holds barred in cases such as this, in which the prevailing party is entitled to
    a fee award, assume the risk they will have to reimburse the excessive expenses they
28  force upon their adversaries.").

- 42 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

collaborate with other firms or nonprofit legal advocacy organizations in order to withstand the rigors of suing a large municipality . . . ."). Counsel took steps to minimize duplication and inefficiency in assigning work on this case by allocating responsibilities between the four offices based on their comparative expertise, experience, and location, and the time expended by each law office and included in this request was critical to the highly successful outcome of Plaintiffs' claims against the City.[22] Allen Decl. ¶¶ 63-69, 172.

Plaintiffs' counsel appropriately seek to recover fees for time billed by law clerks, paralegals, and legal assistants, which is "properly included and reimbursable under a lodestar analysis" if it is customary in the jurisdiction to bill paying clients for paralegal time. *Johnson v. Triple Leaf Tea Inc.*, No. 3:14-CV-01570-MMC, 2015 WL 8943150, at *8 (N.D. Cal. Nov. 16, 2015) (citing *United Steelworkers v. Phelps Dodge Corp.*, 896 F.2d 403, 407-08 (9th Cir. 1990)). Plaintiffs therefore seek to recover for such time, billed at the prevailing rates for paralegal time in the Los Angeles legal market. Allen Decl. ¶¶ 139-43; Barajas Decl. ¶ 43; Geffen Decl. ¶ M; Schur Decl. ¶ 27;[23] Pearl Decl. ¶ 15.

It is also appropriate to include in the lodestar time expended by outside contract attorneys, at prevailing market rates. *Charlebois v. Angels Baseball LP*, 993

---

[22] The Ninth Circuit has recognized that complex federal litigation "often requires the participation of multiple attorneys." *Davis v. City & Cty. of San Francisco*, 976 F.2d 1536, 1544 (9th Cir. 1992). The presence of multiple attorneys in complex litigation is therefore both common and desirable, *see, e.g.*, *Democratic Party of Wash. State v. Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004); *Probe v. State Teachers' Ret. Sys.*, 780 F.2d 776, 785 (9th Cir. 1986) (holding that in high-stakes litigation "the participation of more than one attorney does not constitute an unnecessary duplication of effort"). It is therefore improper to reduce a fee award based on "necessary duplication [resulting from] the vicissitudes of the litigation process." *Moreno*, 534 F.3d 1113.
[23] DRC has included 1,345.80 hours of time billed by administrative staff on work that is ordinarily performed by legal assistants. Schur Decl. ¶ 27 & Ex. B. Plaintiffs therefore seek to recover a portion of time expended by DRC's administrative staff as legal assistant time. *See In re Ginji Corp.*, 117 B.R. 983, 994 (Bankr. D. Nev. 1990) (recognizing secretaries can be compensated for paralegal-type work).

- 43 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1   F. Supp. 2d 1109, 1124 (C.D. Cal. 2012).[24] In the exercise of billing judgment,

2   however, Plaintiffs seek to recover fees for time billed by outside contract attorneys

3   at the rates for law graduates, and not the rates for attorneys with comparable

4   experience who conducted the litigation. Allen Decl. ¶ 143.

5         **4.**     **Plaintiffs' counsel have exercised substantial billing judgment**

6        Plaintiffs' counsel have exercised substantial billing judgment to ensure that

7   the fees requested herein do not include any unnecessary or duplicative time. *See*

8   *Hensley*, 461 U.S. at 434. Before the exercise of billing judgment described herein,

9   Plaintiffs' lodestar was $21,499,722.50. Through the exercise of the billing judgment

10   described below, Plaintiffs have reduced the lodestar by 16.2%, before applying the

11   across-the-board reduction discussed below in Part IV.B.5.

12        First, counsel have eliminated all time expended on the litigation from January

13   7, 2015, when the parties entered into a settlement term sheet, through May 31, 2015.

14   In order to facilitate a settlement, Plaintiffs agreed not to seek reimbursement from

15   the City for fees or costs incurred during that period while the parties attempted to

16   negotiate a settlement. Plaintiffs nonetheless continued to incur considerable

17   attorneys' fees during this period because they could not stop litigating without

18   running a risk of prejudicing their clients in the event a settlement was not obtained.

19   Allen Decl. ¶ 152(c); Schur Decl. ¶ 30(a). Although all the time expended between

20   January 7, 2015, and May 31, 2015, was reasonably expended on the litigation,

21   Plaintiffs have excluded it from this request. They have also excluded time expended

22   on the litigation from May 12, 2016, to August 31, 2016, because of a 111-day delay

23   between the execution of the Settlement Agreement with the City and the City

24   Council's approval thereof.

25       [24] *See also In re Tyco Int'l, Ltd. Multidistrict Litig.*, 535 F. Supp. 2d 249, 272 (D.N.H.

26   2007) ("appropriate to bill a contract attorney's time at market rates and count these time charges within the lodestar"), *cited with approval in Charlebois*, 993 F. Supp.

27   2d at 1124; *Kraszewski v. State Farm Gen. Ins. Co.*, Civ. A. No. C-79-1261 TEH, 1986 WL 11745 (N.D. Cal. Feb. 18, 1986) (awarding similar rates to contract and

28   billing attorneys).

1    Second, Plaintiffs' counsel have eliminated time billed by attorneys who

2    performed *ad hoc* work on the case with minimal total time, and time spent by

3    attorneys and paralegals newly assigned to the case to become familiar with the

4    factual background and legal theories.

5    Third, Plaintiffs seek lower rates for work performed by outside contract

6    attorneys and attorneys not yet admitted to the bar than would be supported under this

7    Court's precedent.

8    Fourth, although the case law makes clear that an attorney can recover fees for

9    the time spent preparing a fee petition, Plaintiffs have not included any request for

10   fees on fees, although they reserve the right to seek such fees in their reply.

11   After making these and other reductions specific to some but not all law

12   offices, counsel have reduced their requested lodestar by $3,475,148.00, as follows:

13                        *(a)     Relman, Dane & Colfax*

14   Relman, Dane & Colfax has excluded from this request:

15   •      Time related to litigation during unsuccessful settlement negotiations

16   with the City in 2015 during a 144-day period for which Plaintiffs promised they

17   would not seek fees from the City in furtherance of the settlement negotiations. This

18   unpaid work constitutes 2,392 hours, worth $1,061,355.50. Allen Decl. ¶ 152(c).

19   •      Time necessarily expended on the litigation of this matter from May 12,

20   2016, to August 31, 2016, during a 111-day delay between the execution of the

21   Settlement Agreement with the City and the City Council's approval of the

22   Settlement Agreement, constituting 959.30 hours, worth $574,956.00. *Id.* ¶ 152(d).

23   •      All time billed by attorneys who spent fewer than 100 hours on this

24   litigation, constituting a reduction of 230.1 hours, worth $129,228.00. *Id.* ¶ 152(a).

25   •      For attorneys and paralegals who were assigned to this matter mid-

26   litigation, time expended to become familiar with the litigation, constituting a

27   reduction of 29.6 hours, worth $18,945.00. *Id.* ¶ 152(a).

28

1      •    All hours billed entirely to travel, five hours from any entry billed by an

2  attorney and ten hours from any paralegal entry that included travel between

3  Washington, DC and Los Angeles, constituting a reduction of 838.50 hours, worth

4  $510,616.50. *Id.* ¶ 152(f).

5      •    The difference between a law clerk rate and the prevailing market rate

6  for outside contract attorneys, worth $143,398.00. *Id.* ¶ 152(b).

7      •    Additional cuts in the exercise of billing judgment totaling 55.8 hours,

8  worth $22,853.50. *Id.* ¶ 152(g).

9      In sum, from Relman, Dane & Colfax's unadjusted lodestar of $15,885,770.50,

10  the firm has cut $2,545,333.50, or 16% percent, in the exercise of billing judgment.

11              *(b)*    *Disability Rights California*

12      DRC has excluded from this request:

13      •    Time expended on the litigation, other than on settlement-related work,

14  between January 7, 2015, and the end of May 2015. Schur Decl. ¶ 30(a).

15      •    Time expended on the litigation, other than on settlement-related and

16  costs-recovery work, between May 12, 2016, and August 31, 2016. *Id.* ¶ 30(b).

17      •    Time billed by attorneys and staff who billed comparatively little time

18  on the matter. *Id.* ¶ 30(c).

19      •    Other miscellaneous cuts in the exercise of billing judgment. *Id.* ¶ 30(d).

20      In sum, from DRC's unadjusted lodestar of $4,744,930.50, DRC cut 1,442.70

21  hours of time (18% of total time expended by DRC), worth $891,757.50 (almost 19%

22  of the total value of DRC's time) in the exercise of billing judgment. *Id.* ¶ 31.

23              *(c)*    *Disability Rights Legal Center*

24      DRLC has excluded from this request:

25      •    Time billed for all substantive work other than work related to

26  settlement discussions from January 7, 2015, through May 31, 2015, constituting 9.7

27  hours, worth $6,090. Barajas Decl. ¶ 47.

28

1      • Time for non-settlement related work between May 12, 2016, and the

2   settlement execution, constituting 7.9 hours of time, worth $2,845. *Id.* ¶ 48.

3      • All time expended by attorneys who spend less than ten hours on this

4   matter and other reductions to minimize any potential overbilling resulting from the

5   use of additional attorneys, constituting 10.1 hours, worth $5,747. *Id.* ¶ 49.

6      • Time billed by Ms. Barajas to attend depositions that she was not taking

7   or second-chairing, worth $11,895. *Id.*

8      In sum, from DRLC's unadjusted lodestar of $492,066.50, the firm has cut

9   $26,577, or 5.4% percent, in the exercise of billing judgment. *Id.* ¶ 51.

10                  *(d)   David Geffen Law Firm*

11     David Geffen Law Firm has excluded from this request:

12     • Time for travel to meetings and mediations, time spent learning

13   software, and time spent giving instructions to staff, constituting a reduction of 13.9

14   hours, worth $11,120.00.

15     • All work done by attorneys other than Mr. Geffen and Mr. Nassar in this

16   case, constituting a reduction of 0.6 hours, worth $360.

17     In sum, from David Geffen Law Firm's unadjusted lodestar of $377,005, the

18   firm has cut $11,480, or 3% percent, in the exercise of billing judgment.

19                  *        *        *        *

20     The total value of these reductions to the lodestar is $3,475,148.00 or 16.16%.

21     **5.      Further across-the-board reduction**

22     In addition to the specific reductions described above, Plaintiffs' counsel have

23   each applied an across-the-board reduction to address any potential duplication or

24   inefficiency. Relman, Dane & Colfax, DRC, and DRLC—the offices that billed the

25   most time on the matter—have applied an across-the-board reduction of 10% to

26   ensure that this request excludes any potentially duplicative or excessive time. Allen

27

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1    Decl. ¶ 153; Barajas Decl. ¶ 52; Schur Decl. ¶ 32.[25] Plaintiffs thus reduced their

2    lodestar even further by $1,776,875.95.

3         This voluntary reduction is made on top of the considerable billing judgment

4    Plaintiffs' counsel have *already* exercised by eliminating the categories of time

5    entries discussed above, worth 16.2% of the unadjusted lodestar *before* the across-

6    the-board voluntary reduction, and therefore results in a more conservative lodestar

7    calculation than those in cases where courts simply apply an across-the-board

8    reduction to account for excessive billing (which is not the case here, given counsel's

9    substantial voluntary reductions *before* applying an additional across-the-board

10   reduction). *See, e.g.*, *Moreno*, 534 F.3d at 1112, 1116 (across-the-board reduction of

11   no more than a 10% "haircut" suffices to account for excessive billing in the absence

12   of specific reasons for further reduction); *cf. Fitzgerald v. City of Los Angeles*, 2009

13   WL 960825, at *10 (C.D. Cal. Apr. 7, 2009) (plaintiff's voluntary 5% across-the-

14   board cut sufficed to account for potential excessive time).

15        A chart with each timekeeper, their rates, the total hours they worked for which

16   Plaintiffs are seeking to be compensated, and the total amount Plaintiffs' counsel is

17   seeking for each timekeeper, Plaintiff, and in total, is attached as Exhibit A.

18   **C.    *A Multiplier Is Necessary to Fully Compensate Plaintiffs' Counsel***

19        In a case involving federal claims and California law claims, federal courts

20   follow California law which allows the application of a multiplier to the time

21   reasonably expended on the litigation: "[W]hen a plaintiff succeeds on both federal

22   and state claims that support a fee award, the state-law multiplier is available."

23   *Chaudhry*, 751 F.3d at 1112; *see also Nat'l Fed'n of the Blind v. Target Corp.*, No. C

24

25

26

27   ─────────────────
[25] David Geffen Law Firm applied an across-the-board reduction of 3%. Geffen Decl.
28   ¶ T.

1   06-01802 MHP, 2009 WL 2390261, at *8-9 (N.D. Cal. Aug. 3, 2009) (same, and

2   awarding 1.65 multiplier).

3        California law fully supports the application of a multiplier to all the time

4   expended in this case, on Plaintiffs' federal and state law claims. Under California

5   law, a multiplier ranging from a factor of 2 to 4 should be applied when certain

6   factors are present. *Wershba v. Apple Computer, Inc.*, 91 Cal. App. 4th 224, 255

7   (2001).

8        The factors that may support a multiplier include:  (1) the contingent nature of

9   the fee award, (2) the result obtained and the importance of the lawsuit to the public,

10  (3) the novelty and difficulty of the questions involved and the skill displayed in

11  presenting them, and (4) whether by undertaking the representation the attorney or

12  firm was precluded from taking on other employment. *Graham*, 34 Cal. 4th at 582;

13  *Serrano v. Priest*, 20 Cal. 3d 25, 48-49 (1977); *Nat'l Fed'n of the Blind*, 2009 WL

14  2390261, at *6.

15       If ever a case warranted a multiplier, it is this one. This litigation has achieved

16  phenomenal, long-lasting results for both the Plaintiffs and the broader public

17  through a groundbreaking settlement that exceeds the scope of the claims against the

18  City that are pled in the SAC. Awarding Plaintiffs their requested 1.2 multiplier will

19  further the purpose of vindicating "the public interest in the prosecution of

20  meritorious civil rights cases[, which] requires that the financial incentives be

21  adjusted to attract attorneys who are sufficient to the cause." *Horsford v. Bd. of

22  Trustees of Cal. State Univ.*, 132 Cal. App. 4th 359, 399 (2005).

23         **1.**    **Risk based on the contingent nature of the fee award**

24       The risk inherent in the contingent nature of the representation that Plaintiffs'

25  counsel provided to Plaintiffs in this case fully justifies a multiplier. An enhancement

26  to reflect contingency risk is one of the most common grounds for applying a

27  multiplier under California law. *Ketchum*, 24 Cal. 4th at 1132-33; *Bernardi v. Cty. of

28

1  *Monterey*, 167 Cal. App. 4th 1379, 1399 (2008). Uncertainty at the outset of the case

2  as to the possibility of recovery, the likely amount that will be recovered, the effort

3  and expenses required to see the case through to the end, and how much time will

4  pass before any recovery all provide strong support for the application of a multiplier.

5  *See e.g.*, *Ketchum*, 24 Cal. 4th at 1132-1133, 1138. The goal of such a contingency-

6  risk enhancement "is intended to approximate market-level compensation for such

7  services which typically includes a premium for the risk of nonpayment or delay in

8  payment of attorney's fees." *Id.* at 1138.

9      Plaintiffs' counsel took on this litigation on a contingent basis based on their

10  understanding of the desperate housing conditions of people with disabilities who

11  were living in "nursing homes, assisted living, group homes, homeless shelters

12  and . . . on the street" because of the lack of accessible affordable housing in the City.

13  Allen Decl. ¶ 3. Counsel have never required any payment from Plaintiffs because

14  Plaintiffs are nonprofit organizations and lacked the resources even to pay the very

15  modest costs of investigating the claims that resulted in this litigation, let alone the

16  conduct of the litigation itself. *Id.* ¶ 170. Counsel investigated Plaintiffs' claims for

17  several months before the case was filed, and litigated the case for nearly five years

18  without receiving any payment, investing 34,335.75 hours of attorney and paralegal

19  time for which fees are sought and out-of-pocket expenses of almost $750,000 after

20  the exercise of billing discretion. *Id.* ¶ 169. That substantial investment of time and

21  resources involved significant risk by the four law offices that represented

22  Plaintiffs—two non-profits, a solo practitioner, and a small public-interest private

23  firm. *Id.* ¶ 171.

24      In negotiating and achieving the Settlement Agreement, Plaintiffs' counsel

25  prioritized the allocation of settlement funds to remedying the architectural violations

26  in the CRA Housing Program, implementing other policies and practices to improve

27  access to that program, and ensuring that Plaintiffs recovered monetary damages

28

without any diminution based on a contingent fee for their lawyers. *Id.* ¶ 170.

Plaintiffs' counsel have relied, since the inception of this case, only on the prospect

of recovering fees through the "fee shifting" provisions applicable under Section 504,

the ADA and Section 11135, a significant risk for all four law offices. *Id.* ¶ 171.

In support of Plaintiffs' request for a multiplier, Mr. Pearl explains that:

> [a]djusting court-awarded fees upward in contingent fee cases to reflect
> the risk of recovering no compensation whatsoever for tens of thousands
> of hours of labor (as in Plaintiffs' Los Angeles litigation) simply makes
> those fees competitive in the legal marketplace, helping to ensure that
> meritorious cases will be brought to enforce important public interest
> policies and that clients who have meritorious claims will be more likely
> to obtain qualified counsel. . . . [F]ewer and fewer attorneys and firms
> are willing to take on [public interest] litigation [where there is no
> guarantee of payment], and the few who are willing to do so can only
> continue if their fee awards reflect the true market value.

Pearl Decl. ¶¶ 20, 22.

The contingent nature of this lengthy and costly litigation fully supports the

application of the modest enhancement requested by Plaintiffs. *See, e.g.*, *Bucci v.

Chromoalloy Am. Corp.*, 927 F.2d 608 (9th Cir. 1991) (unpublished) (affirming 2.0

multiplier based on contingent risk of the representation); *Rodriguez v. Cty. of Los

Angeles*, 96 F. Supp. 3d 1012, 1025 (C.D. Cal. 2014) (2.0 multiplier based in part on

"financial risk Plaintiff's counsel assumed in litigating this case," as well as "the

difficulty of this case, and . . . counsel's demonstrated skill"); *Vaughn v. Darwish*,

2016 WL 3680015, at *12-13 (Cal. Ct. App. July 6, 2016) (unpublished) (affirming

1.5 multiplier "to compensate counsel for the risks involved in prosecuting the matter

on a contingency basis" that "persisted throughout the case," as well as the case's

complicated legal issues).

### 2.    Results obtained

The results obtained in litigation "can properly be used to enhance a lodestar

calculation where an exceptional effort produced an exceptional benefit." *Graham*,

34 Cal. 4th at 582. Here, Plaintiffs have obtained injunctive and monetary relief that

is unprecedented in its scope, will provide a significant benefit to the public, exceeds

- 51 -

1  the relief that could have been achieved through litigation, and achieves the very

2  objectives that the federal and state legislatures sought to promote in passing Section

3  504, the ADA, and Section 11135. *See supra* Part III; *Alexander v. Choate*, 469 U.S.

4  287, 304 (1985) (identifying the goal of Section 504 "to assure evenhanded treatment

5  and the opportunity for [individuals with disabilities] to participate in and benefit

6  from programs receiving federal assistance"); *PGA Tour, Inc. v. Martin*, 432 U.S.

7  661, 675 (2001) (describing the ADA's "sweeping purpose" to prevent

8  "discrimination against disabled individuals in major areas of public life"); *In re*

9  *Marriage of Carney*, 24 Cal. 3d 725, 740 (1979) (citing Section 11135 as an example

10  of legislation intended to help achieve California's stated policy of attaining the "total

11  integration of handicapped persons into the mainstream of society").

12      Relying on similar showings, other courts have applied enhancements or

13  multipliers substantially greater than what is requested here. For example, in *National*

14  *Federation of the Blind*, the district court awarded a 1.65 multiplier based in part on

15  the fact that the plaintiffs' victory "expand[ed] important civil rights to the disabled,

16  with the assistance of little existing case law" and "compelled defendant" to alter its

17  practices. 2009 WL 2390261, at *7.[26]

18          **3.  Novelty and difficulty of the issues involved and skill
                 displayed in presenting them**

19

20      The application of a multiplier is further supported by counsel's skill in

21  overcoming difficult and novel issues in this litigation, which required complex fact

22  and legal research and presented many questions of first impression. *See, e.g.*, *Pooshs*

23  _____

24  [26] *See also Rodriguez*, 96 F. Supp. 3d at 1026 (discussed *supra*); *Heritage v. Town of Woodside*, Nos. A120749, A120757, 2008 WL 4868816 (Cal. Ct. App. Nov 12,

25  2008) (unpublished) (awarding 2.0 multiplier because the plaintiff's success "added to the jurisprudence of California on legal issues of public interest"); *Khazan v.*

26  *Braynin*, No. A128536, 2012 WL 3990692, at *10 (Cal. Ct. App. Sept. 12, 2012) (unpublished) (affirming 1.5 multiplier based on "social utility of the litigation"); *De*

27  *La Cruz v. Cal-Pac Sonoma, LLC*, No. A129889, 2013 WL 782283, at *14 (Cal. Ct. App. Feb. 28, 2013) (unpublished) (affirming 1.5 multiplier based on importance of

28  the results achieved).

- 52 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1  *v. Fluoroware, Inc.*, 83 F.3d 428 (9th Cir. 1996) (unpublished) (affirming 2.0

2  multiplier based in part on the difficulty and complexity of the case); *Rodriguez*, 96

3  F. Supp. 3d at 1025 (2.0 multiplier based in part on "the difficulty of this case, and

4  based on counsel's demonstrated skill"); *Leuzinger v. Cty. of Lake*, No. C 06-00398

5  SBA, 2009 WL 839056, at *12 (N.D. Cal. Mar. 30, 2009) (applying 2.0 multiplier

6  based on, inter alia, exceptional results achieved, the skill required to litigate

7  complicated issues, and the public interest); *Young v. Mountain Empire Unified Sch.*

8  *Dist.*, No. D061228, 2013 WL 3729172, at *10 (Cal. Ct. App. July 15, 2013)

9  (unpublished) (affirming 1.6 multiplier based on value of the representation).

10      Exceptional skill was required to litigate the complex factual and legal issues

11  in this case, including complicated research into the sources of funding for

12  approximately 253 multifamily housing developments, comprising approximately

13  18,000 units. Allen Decl. ¶¶ 6, 172 (describing the "substantive and procedural

14  complexity of the claims"). Many of the legal issues in the case were issues of first

15  impression that required exceptional skill to develop and present to the Court. *Id.*

16  ¶¶ 6, 172 (describing the novelty and complexity of several matters of first

17  impression in the litigation); *see also, e.g.*, Collins Decl. ¶¶ 15-17 (describing

18  complex, novel issues presented by the dissolution of the CRA requiring "significant

19  and unique expertise and knowledge"); Haffner Decl. ¶ 17 ("The case represents a

20  comprehensive challenge to a systemic failure to ensure that public funded housing in

21  Los Angeles complies with laws requiring access for people with disabilities. This is

22  a difficult case, with issues of first impression . . . ."); Silverstein Decl. ¶ 14

23  (describing the "creativity and tenacity" required to litigate this complex case).

24          **4.      Preclusion of other employment**

25      Evidence that an attorney was precluded from other employment because of

26  the successful representation further supports the application of an enhancement.

27  *Ketchum*, 24 Cal. 4th at 1132. This factor applies equally to for-profit and non-profit

28

1  law offices. *See Chabner v. United of Omaha Life Ins. Co.*, No. C-95-0447 MHP,

2  1999 WL 33227443, at *7 (N.D. Cal. Oct. 12, 1999) (considering non-profit's

3  inability to accept other litigation as part of decision to award 2.0 multiplier).

4        The sheer number of hours that each office expended on this case over an

5  almost five-year period makes clear that each office had to forego other opportunities.

6  Relman, Dane & Colfax expended 30,481.30 hours; DRC expended 7,951.30 hours;

7  DRLC expended 1,179.10 hours; and Mr. Geffen expended 494.25 hours. All of

8  Plaintiffs' counsel, all of which are comparatively small law offices, were forced to

9  turn down other work because of the substantial time commitment required to litigate

10  this case and achieve the remarkable settlement that has been entered. Allen Decl.

11  ¶ 156 ("The deep involvement in this litigation of three of the firm's seven

12  partners . . . meant that they were unable to develop new litigation or billing

13  matters . . . ."); Schur Decl. ¶ 35 ("Due to that substantial commitment of time" to the

14  instant litigation, DRC "had to turn down a number of other meritorious matters in

15  the Los Angeles area . . . ."); Geffen Decl. ¶ W; Barajas Decl. ¶ 43; *see also* Fox

16  Decl. ¶ 15 ("In my experience running a private firm specializing in civil rights and a

17  non-profit legal organization dedicated to civil rights, the devotion of time and

18  resources in this case necessarily kept Plaintiff's counsel from pursuing other

19  cases.").

20        This factor therefore further supports a multiplier. *Parks v. Eastwood Ins.

21  Servs., Inc.*, 240 F. App'x 172, 174-75 (9th Cir. 2007) (affirming 40% enhancement

22  based in part on showing attorney was prevented from accepting other employment);

23  *Vasquez v. Rackauckas*, No. SACV09-1090 VBF RNBX, 2011 WL 3320482, at *3

24  (C.D. Cal. July 29, 2011) (awarding 1.2 multiplier based in part on counsel's inability

25  to accept other cases due to time spent litigating the instant case); *Chabner*, 1999 WL

26  33227443, at *7.

27

28

1   **5.      An enhancement would also be justified under federal law**

2          Federal courts likewise have discretion to enhance the lodestar where "the

3   lodestar does not adequately take into account a factor that may properly be

4   considered in determining a reasonable fee." *Perdue*, 559 U.S. at 554. An

5   enhancement is justified where necessary to achieve the objective of federal fee-

6   shifting law to ensure that civil rights litigants can attract competent counsel. *Id.* at

7   554. Although the Court here need not rely on federal law for determining an

8   enhancement, because the California law factors discussed above fully justify the

9   requested multiplier, the multiplier would also be justified by those *Kerr* factors that

10  are not already subsumed in the lodestar calculation and which overlap with the

11  California multiplier factors discussed above: the results obtained, the novelty and

12  difficulty of the questions involved, the skill required to perform the representation,

13  and the preclusion of other employment. *See Stetson v. Grissom*, 821 F.3d 1157,

14  1166-67 (9th Cir. 2016).

15  **V.      CONCLUSION**

16         For all the reasons set forth above, Plaintiffs request that the Court grant this

17  Motion for Attorneys' Fees and award their requested lodestars, enhanced by a 1.2

18  multiplier, in the amounts set forth in the accompanying Proposed Order.

19

20  Dated: October 7, 2016                    *Respectfully submitted,*

21

22                                           /s/ Michael G. Allen
                                             MICHAEL G. ALLEN, *pro hac vice*
23                                           JOHN P. RELMAN, *pro hac vice*
                                             JENNIFER I. KLAR, *pro hac vice*
24                                           D. SCOTT CHANG #146403
                                             LAURA GAZTAMBIDE-ARANDES
25                                           #298373
                                             RELMAN, DANE & COLFAX PLLC
26                                           1225 19th St. NW, Suite 600
                                             Washington, D.C. 20036
27                                           Telephone: (202) 728-1888
                                             Facsimile: (202) 728-0848
28                                           schang@relmanlaw.com

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Memo. in Support of Pls.' Mot. for Attorneys' Fees

1

2

3

4

MARONEL BARAJAS #242044
DISABILITY RIGHTS LEGAL CENTER
350 South Grand Ave., Suite 1520
Los Angeles, CA 90071
Telephone: (213) 736-1496
Facsimile: (213) 736-1428
maronel.barajas@drlcenter.org

5

6

7

8

DAVID GEFFEN #129342
DAVID GEFFEN LAW FIRM
1717 4th Street, 3rd Floor
Santa Monica, CA 90401
Telephone: (310) 434-1111
Facsimile: (310) 434-1115
Geffenlaw@aol.com

9

10

11

12

DARA SCHUR #98638
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510) 267-1201
Dara.Schur@disabilityrightsca.org

13

14

15

16

17

AUTUMN ELLIOTT #230043
SRIVIDYA S. PANCHALAM #265398
DISABILITY RIGHTS CALIFORNIA
350 S. Bixel Ave., Suite 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Autumn.Elliott@disabilityrightsca.org

18

19

20

21

22

23

24

25

26

27

28

- 56 -

**CERTIFICATE OF SERVICE**
**CENTRAL DISTRICT OF CALIFORNIA**

I hereby certify that on this 7th day of October 2016, I filed the foregoing Plaintiffs' Motion for Attorneys' Fees and Memorandum in Support thereof, which shall serve as notice of such filing on all counsel of record.


/s/ Michael G. Allen
Michael G. Allen

- 57 -