1   MICHAEL G. ALLEN, *pro hac vice*
    JOHN P. RELMAN, *pro hac vice*
2   JENNIFER I. KLAR, *pro hac vice*
    D. SCOTT CHANG #146403
3   LAURA GAZTAMBIDE-ARANDES
    #298373
4   RELMAN, DANE & COLFAX PLLC
    1225 19th St. NW, Suite 600
5   Washington, D.C. 20036
    Telephone: (202) 728-1888
6   Facsimile: (202) 728-0848
    schang@relmanlaw.com
7
    MARONEL BARAJAS #242044
8   DISABILITY RIGHTS LEGAL
    CENTER
9   350 South Grand Ave., Suite 1520
    Los Angeles, CA 90071
10  Telephone: (213) 736-1496
    Facsimile: (213) 736-1428
11  maronel.barajas@drlcenter.org

DAVID GEFFEN #129342
DAVID GEFFEN LAW FIRM
1717 4th Street, 3rd Floor
Santa Monica, CA 90401
Telephone: (310) 434-1111
Facsimile: (310) 434-1115
Geffenlaw@aol.com

DARA SCHUR #98638
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Suite 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510) 267-1201
Dara.Schur@disabilityrightsca.org

AUTUMN ELLIOTT #230043
SRIVIDYA S. PANCHALAM #265398
DISABILITY RIGHTS CALIFORNIA
350 S. Bixel Ave., Suite 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Autumn.Elliott@disabilityrightsca.org

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA
(WESTERN DIVISION)

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, CALIFORNIA, *et al.*,<br><br>Defendants. | Case No.: 12-CV-551 FMO (PJWx)<br><br>DECLARATION OF MICHAEL G. ALLEN IN SUPPORT OF PLAINTIFFS' MOTION FOR ATTORNEYS' FEES |

## DECLARATION OF MICHAEL G. ALLEN

I, Michael G. Allen, hereby declare:

1.      I am a partner at Relman, Dane & Colfax PLLC (the "Firm"). I am lead counsel for the Plaintiffs in the above-captioned matter. I am over the age of 18, am competent to testify, and have personal knowledge of the facts stated herein.

2.      Relman, Dane & Colfax is a law firm with twenty-six attorneys whose practice focuses on fair housing, fair lending, public accommodations, and employment discrimination litigation. The Firm began investigating this matter in June of 2011 and attorneys from our firm served as lead counsel throughout the litigation. Since the investigation began, I have had primary responsibility for the day-to-day litigation of this matter.

3.      The Firm took on this important disability rights litigation on a contingent and fee-shifting basis because—on account of the lack of accessible affordable housing in programs operated by the City of Los Angeles ("City") and the Community Redevelopment Agency ("CRA")—low-income people with disabilities were stranded in nursing homes, assisted living, group homes, homeless shelters, and living on the street, even as the City acknowledged to the U.S. Department of Housing and Urban Development ("HUD") that "there are hundreds of thousands of individuals, and families, in Los Angeles, who require accessible, affordable housing and do not have it." City of Los Angeles 2008-2013 Consolidated Plan, at p. 180.

### Factual and Procedural History of the Litigation

**A.      Pre-Litigation Investigation and the Pleadings**

4.      As early as 2007, Plaintiffs Independent Living Center of Southern California ("ILCSC"), Fair Housing Council of the San Fernando Valley ("FHCSFV"), and Communities Actively Living Independent and Free ("CALIF") received complaints from people with disabilities about the lack of accessible affordable housing in the portfolio of housing projects assisted by the CRA ("CRA

1  Housing Program"). Years before the litigation commenced, Plaintiffs asked the CRA

2  and the City to identify housing developments that received federal funding and then

3  requested that the CRA identify the units within federally-funded developments that

4  met the stringent Uniform Federal Accessibility Standards ("UFAS") applicable to

5  developments within the CRA Housing Program that receive federal funding.

6      5.      After they became aware that multifamily housing developments assisted

7  by the City and the CRA were not in compliance with UFAS and other applicable

8  accessibility requirements, Plaintiffs informed the City and the CRA of their

9  accessibility obligations under Section 504 of the Rehabilitation Act of 1973 ("Section

10  504"), the Americans with Disabilities Act ("ADA"), and related California laws

11  including California Government Code Section 11135 ("Section 11135"), and

12  advocated for the adoption of proper policies to ensure that the CRA Housing Program

13  was accessible to people with disabilities. Over a period of more than three years

14  thereafter, City and CRA officials ignored or downplayed Plaintiffs' concerns,

15  disclaimed any responsibility to ensure accessibility and failed to act to ensure

16  accessibility.

17      6.      Beginning in 2011, Plaintiffs' counsel began a pre-suit investigation of

18  claims and conducted legal and factual research. The primary legal issue in the case

19  was one of first impression, in that no federal court had previously opined on how the

20  "program access" requirements of Section 504 and the ADA applied to municipal

21  agencies operating affordable housing programs. The factual issues in the

22  investigation were similarly complicated, eventually involving approximately 253

23  multifamily housing units and nearly 18,000 units of affordable housing. As a

24  consequence, extensive legal and factual research were necessary. During this period,

25  the California Legislature considered and passed legislation eliminating the CRA (and

26  other redevelopment agencies in California), and it was signed by the Governor. While

27  litigation challenging the validity of the dissolution legislation delayed its effective

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1   date to February 1, 2012, the pending elimination of the CRA required Plaintiffs'

2   counsel to conduct extensive additional research regarding the impact of the

3   dissolution legislation on the parties and claims contemplated in this litigation.

4         7.     The three Plaintiffs retained Relman, Dane & Colfax, Disability Rights

5   California ("DRC"), Disability Rights Legal Center ("DRLC"), and David Geffen

6   Law Firm ("Geffen") to represent them. Counsel spent several months identifying the

7   elements of proof for various claims, developed an overall case strategy, gave the

8   notice required for state-law claims, and drafted and prepared to file the complaint.

9   Plaintiffs filed their original complaint on January 13, 2012, which identified thirty-

10   four multifamily projects within the CRA Housing Program that received federal

11   funds yet were not accessible under UFAS standards.

12         8.     The CRA was dissolved by statute on February 1, 2012. The City elected

13   to become the "successor housing agency" to the CRA, and to receive and retain

14   certain CRA housing assets. Plaintiffs conducted additional factual and legal research

15   necessary to file an amended complaint addressing issues raised by the dissolution of

16   the CRA and a later second amended complaint to address a technical issue in the first

17   amended complaint. At the same time, Plaintiffs began meeting and conferring with

18   the City regarding the scope of the litigation, drafted joint statements of the case,

19   attended conferences with the Court, created an initial discovery strategy, and

20   developed and served Plaintiffs' first set of written discovery.

21         9.     The Second Amended Complaint ("SAC") (Doc. 98) consists of 251

22   paragraphs and describes the lack of accessible affordable housing in the City, federal

23   and state financial assistance to the City and the CRA, and the extensive portfolio of

24   multifamily projects assisted by the CRA that were at issue in the case. In great detail,

25   the SAC alleges that the City and CRA operated the CRA Housing Program in a

26   fashion that denies meaningful access to people with physical and sensory disabilities

27   and identifies sixty-one multifamily projects within the CRA Housing Program that

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1   received federal funds and lack the required level of accessibility. The owners of the

2   sixty-one federally-funded multifamily projects (the "Owner Defendants") were joined

3   as nominal defendants for purposes of relief.

4        10.    Plaintiffs' counsel expended substantial time preparing a successful

5   Opposition to the City/CRA Joint Motion to Dismiss (Doc. 130). On November 29,

6   2012, Judge Otero denied that motion, holding that, under Section 504 and the ADA,

7   people with disabilities must be provided meaningful access to the CRA Housing

8   Program, and that the City and CRA had a duty to ensure that federal funds are not

9   used in a discriminatory manner. (Doc. 209)

10        11.    The City and the CRA cross-claimed against the Owner Defendants,

11   alleging that the Owner Defendants were responsible for the lack of meaningful access

12   to the CRA Housing Program. Supporting the Owner Defendants' motion to dismiss

13   the cross-claims, Plaintiffs filed a brief (Doc. 254) arguing that the City and CRA had

14   a duty to ensure that federal accessibility standards were imposed on sub-recipients of

15   federal funds and that Section 504 and the ADA do not permit the City and the CRA

16   to shift those duties to third parties via claims for indemnification or contribution. The

17   Court granted the Owner Defendants' motion to dismiss the City and CRA's cross-

18   claims. (Doc. 308)

19        12.    Plaintiffs also incurred substantial time opposing the CRA's unsuccessful

20   motion for judgment on the pleadings (Doc. 503) filed in March 2016, more than four

21   years after commencement of the litigation. Plaintiffs filed a lengthy opposition

22   addressing complex issues related to the dissolution of redevelopment agencies in

23   California. The Court denied the CRA's motion, holding that Plaintiffs' claim was

24   viable because Government Code Section 11135 establishes enforceable obligations

25   under state law; liability for Plaintiffs' claims did not transfer to the City as the

26   housing successor; and the CRA was subject to successor liability under Plaintiffs'

27   federal law claims. (Doc. 535)

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1  **B.**     **Overview of Discovery**

2                    Claims and Defenses and the Scope of Discovery

3       13.    The scope of discovery was necessarily broad because of the nature of

4  Plaintiffs' claims and the defenses asserted by the City and CRA. Plaintiffs alleged

5  that the City and CRA violated Section 504, the ADA, and Section 11135 by, among

6  other things:

7              a.     Denying people with disabilities meaningful access to Defendants'

8              CRA Housing Programs;

9              b.     Aiding or perpetuating discrimination against people with

10             disabilities by providing significant assistance to developers of housing projects

11             that discriminate on the basis of disability by failing to provide accessible

12             housing; and

13             c.     Using methods of administration that have the effect of

14             discriminating against people with disabilities and otherwise limiting people

15             with disabilities from enjoying housing built or developed by Defendants or the

16             opportunity to obtain such housing. (Doc. 98, 201)

17      14.    The City denied liability and raised the defenses that no federal housing

18  funds were transferred by the City to the CRA for the properties at issue, the City did

19  not owe the Plaintiffs a duty to monitor, and the Plaintiffs had suffered no injury.

20  (Doc. 122, 201, 212)

21      15.    The CRA denied liability and raised thirty-eight defenses. Among other

22  things, the CRA alleged that: (1) its services, programs and activities when viewed in

23  their entirety were accessible to persons with disabilities; (2) it provided reasonable

24  access to its services, programs and activities; (3) Plaintiffs' requested modifications

25  of policies, practices or procedures were unreasonable and/or unnecessary to avoid

26  discrimination on the basis of disability; (4) Plaintiffs lacked standing; and (5) the

27  relief sought by Plaintiffs would constitute or result in a fundamental alteration in the

28

1   nature of the programs, services, or activities offered by the CRA. (Doc. 122, 201,

2   213)

3        16.    Plaintiffs' claims and the City, CRA, and Owner-Defendants' defenses

4   required them to conduct discovery into the following issues:

5        a.    Funding levels and sources for as many as 253 apartment

6   developments (consisting of nearly 18,000 units) in the CRA Housing Program;

7        b.    Contractual relationships between the City, CRA, and developers

8   of each of the housing projects in the CRA Housing Program;

9        c.    Construction history of each development in the CRA Housing

10  Program;

11       d.    Policies and procedures requiring the provision of accessible units

12  and regulatory review and access of such units by the City and CRA;

13       e.    Policies and procedures concerning marketing of accessible units;

14       f.    Policies and procedures concerning rental and assignment of

15  accessible units;

16       g.    Data and information regarding housing units and projects,

17  including location of units/projects, the total numbers of units/projects, the

18  numbers of units/projects receiving direct federal funds, and accessibility in the

19  subject units;

20       h.    Data and information on applicants requesting or applying for

21  accessible units;

22       i.    Data and information on occupants of accessible units, including

23  their lease agreements;

24       j.    Communications among defendants regarding federal

25  requirements, accessibility, and related topics;

26       k.    Transfer of the CRA's obligations, liabilities, assets, and functions

27  under ABx1 26 (2011) (the "Dissolution Legislation");

28

1    l.  Notice and communications regarding Section 504, the ADA,

2 Section 11135, and their implementing regulations;

3    m.  Use of federal and state financial assistance;

4    n.  Certifications regarding compliance with disability rights laws;

5    o.  The relationship between the City, the CRA, and its successor

6 agency, known as "CRA/LA, a designated Local Authority" (hereinafter

7 "CRA/LA");

8    p.  The relationship between the City, CRA/LA, and the Oversight

9 Board, an entity created by the Dissolution Legislation to oversee the winding

10 down of CRA activities and the appropriate assignment of its recognized legal

11 obligations;

12    q.  Policies and procedures of the City and the CRA;

13    r.  The Disability Task Force of the CRA;

14    s.  Training and monitoring of owners and managers of housing

15 projects within the CRA Housing Program;

16    t.  Complaints regarding accessibility and investigation of complaints;

17 and

18    u.  Accessibility of units and buildings within the CRA Housing

19 Program. (Doc. 201)

20  17.  Substantial disputes arose over the scope of discovery. The City and the

21 CRA refused to produce information and documents in response to Plaintiffs'

22 requests, asserting that the scope of discovery was limited to the 60 properties named

23 in the complaint. Plaintiffs filed a lengthy motion with the district court concerning

24 the scope of discovery (Doc. 299), arguing that the scope of discovery extends to the

25 entire inventory of housing built or rehabilitated with assistance with the CRA. The

26 Court issued an order granting Plaintiffs' motion, finding that Plaintiffs' action put at

27

28

1    issue the entire inventory of housing built or rehabilitated by the CRA and allowing

2    discovery regarding the entire housing portfolio. (Doc. 300)

3                     <u>Requests for Production of Documents</u>

4        18.      The parties made extensive use of requests for production of documents.

5    The City served a total of 1,648 requests for production of documents and the CRA

6    propounded 434 requests for production of documents. Plaintiffs produced

7    approximately 23,800 paper documents in response to the City and the CRA's

8    requests.

9        19.      Plaintiffs served 431 requests for production of documents, including

10    requests for critical documents such as loan agreements, project files and documents

11    reflecting funding for housing projects within the CRA Housing Program. The City

12    produced 97,984 paper documents and the CRA produced 75,350 paper documents in

13    response to Plaintiffs' requests.

14        20.      The parties sharply disputed the scope of Defendants' discovery

15    regarding damages attributable to Plaintiffs' diversion of resources in order to identify

16    and counteract the discriminatory effect of the CRA and City not providing affordable

17    housing units complying with the stringent UFAS requirements. Magistrate Judge

18    Walsh conducted two hearings related to such discovery in 2014. On July 31, 2014,

19    the magistrate limited the scope of discovery regarding diversion of resources to

20    information relevant to the opportunity costs method of proving diversion of

21    resources. (Doc. 389). He required Plaintiffs to produce the time records of any

22    employee of ILCSC, FHCSFV, or CALIF who claimed that they expended time

23    investigating or counteracting the Defendants' discrimination. With the assistance of

24    their counsel, Plaintiffs conducted expansive searches for the time records and

25    produced extensive documents reflecting those records including calendars,

26    notebooks, timesheets, case activity logs, and many other documents. Plaintiffs

27

28

1    produced approximately 9,373 pages of documents in response to the Court's order

2    related to diversion of resources damages.

3                           Electronically Stored Information

4         21.    The parties engaged in a protracted and hard-fought negotiation regarding

5    Electronically Stored Information ("ESI"), involving multiple meet and confer

6    sessions and hearings with Magistrate Judge Walsh over a more than one year.

7    Plaintiffs' efforts to obtain ESI, consisting primarily of email documents, included 16

8    telephonic hearings before the Court, at least as many meet and confer sessions, over

9    60 substantive emails with the Magistrate Judge, and myriad letters and emails.

10   Plaintiffs hired an outside ESI expert to advise them regarding ESI, and expended

11   $21,312.70 on that expert.

12        22.    Beginning in July 2013, the parties attempted to draft a mutually

13   agreeable ESI Order and Search Terms and Parameters. After negotiating for months,

14   several issues remained unresolved, and as of May 2014, the City had only produced

15   emails from 2010-2014 for a single custodian, and partially produced emails for a

16   second custodian.

17        23.    In June 2014, the City identified a universe of approximately 2,000,000

18   documents to search from 24 custodians. Order of June 26, 2014, at 1 (Doc. 375). The

19   Court ordered the City, instead, to use a predictive coding system to identify and

20   produce relevant documents in a timely fashion. Order of June 13, 2014, at 1 (Doc.

21   371). The Court also ordered the City to produce the 10,000 most relevant documents

22   to Plaintiffs, as ranked by the predictive coding system. Order of June 26, 2014, at 2.

23        24.    The City finally produced its first set of documents on December 30,

24   2014. Shortly thereafter, the parties agreed to extend discovery to allow the parties to

25   engage in settlement discussions. Order to Extend Discovery Deadlines of Jan. 21,

26   2015 (Doc. 442). The remainder of the City's approximately 10,000 email documents

27   were produced on July 8, 2015.

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1  25.    Plaintiffs worked through many electronic discovery issues with the

2  CRA, with limited involvement from the Court. The Plaintiffs and the CRA entered

3  into a predictive coding protocol that ultimately resulted in the production of

4  approximately 10,000 documents.

5  26.    Plaintiffs then expended substantial time reviewing and assessing the ESI

6  produced by the City and the CRA. Among other things, the City produced hundreds

7  of spreadsheets that contained developments that were part of the CRA Housing

8  Program that had never been previously disclosed.

9  27.    Plaintiffs' production of ESI was similarly extensive and time

10  consuming. After substantially narrowing Defendants' original requests, Plaintiffs

11  collected email documents from each of 21 relevant custodians for each Plaintiff

12  organization from over a nearly ten year period.

13  28.    After negotiations over the key words, Plaintiffs ran key word search

14  terms on each custodian's emails. Plaintiffs reviewed, for privilege and responsiveness

15  purposes, all the email documents responsive to the searches. Plaintiffs also produced

16  extensive records from their databases and other native format documents requested

17  by the City. Plaintiffs produced approximately 28,894 ESI documents.

18  <u>Requests for Admissions and Interrogatories</u>

19  29.    The parties also propounded a substantial number of requests for

20  admissions to narrow the scope of the case and the issues that needed to be tried. The

21  City propounded 1,313 requests for admissions and the CRA propounded 3,150

22  requests for admissions on Plaintiffs. Plaintiffs propounded 5,000 requests for

23  admissions on the City and the CRA, which were necessary to secure evidence to rule

24  out various statutory exemptions. Plaintiffs thus had to propound up to ten requests for

25  admissions for each of the housing developments in the CRA Housing Program to

26  establish that each development was covered by Section 504 and/or the ADA.

27

28

30.     The City and the CRA each propounded 65 interrogatories, many of which were contention interrogatories requesting all facts supporting contentions made in the SAC. Plaintiffs' responses to Defendants contention interrogatories were lengthy and detailed.

31.     Plaintiffs propounded thirty-three interrogatories to the CRA and fifty-seven interrogatories to the City.

<u>Depositions</u>

32.     Plaintiffs deposed twenty of the City's and CRA's witnesses, including seven Rule 30(b)(6) witnesses. Among other things, Plaintiffs deposed City and CRA officials regarding their policies and practices related to architectural accessibility, communications between the City and the CRA regarding architectural requirements, funding for housing projects within the CRA Housing Program, policies and procedures regarding the marketing and utilization of accessible units, policies and procedures regarding the review of construction plans, and monitoring of the accessibility requirements. The CRA Disability Task Force nominally convened to address concerns about the lack of accessible affordable housing in the CRA Housing Program and other issues related to disability discrimination. In response to Plaintiffs' Rule 30(b)(6) notices, the City produced six witnesses and the CRA produced one.

33.     Plaintiffs deposed the following key witnesses:

        a.      Rushmore Cervantes, Housing and Community Investment Department General Manager. Mr. Cervantes' deposition testimony addressed, among other things, whether the Housing and Community Investment Department ("HCID") ever monitored to ensure compliance with heightened federal accessibility standards, whether HCID relied on Los Angeles Department of Building and Safety ("LADBS") to ensure compliance with accessibility standards, his understanding of state accessibility standards compared to heightened federal accessibility standards, and changes in HCID's

1   policies and procedures regarding accessibility that occurred after the lawsuit

2   was filed. Preparing for this deposition included substantial time reviewing

3   HCID policy documents, City Council Transmittals, and HCID notices of

4   funding availability over nearly twenty years. Mr. Cervantes confirmed that

5   HCID did not apply or enforce the UFAS requirements on developers receiving

6   federal funds through HCID, and that no HCID employee ever visited

7   completed developments to ensure they complied with UFAS. Mr. Cervantes

8   also testified that HCID effectively enforced requirements for many other

9   elements of affordable housing development, but had none to ensure

10  accessibility.

11          b.      Helmi Hisserich, Housing and Community Investment Department,

12  Assistant General Manager, Housing Development Bureau; Suzette Flynn,

13  Housing and Community Investment Department Monitoring Division; and

14  Sally Richman, HCID's Director of Knowledge Management and Evaluation.

15  Plaintiffs' counsel spent hundreds of hours reviewing HCID loan agreements

16  and underwriting and monitoring policies and procedures to prepare for these

17  depositions. Plaintiffs' counsel obtained testimony confirming that HCID's loan

18  agreements and policies and procedures governing the distribution of City

19  assistance did not uniformly recite that compliance with UFAS requirements

20  was mandatory. Similarly, that testimony also confirmed that HCID did not

21  monitor owners or require them to employ policies to ensure priority access to

22  units by people with disabilities, did not track the location and features of

23  accessible units, and never reprimanded any employee for approving non-

24  compliant plans or buildings. Ms. Hisserich's deposition testimony addressed,

25  among other things, whether anyone at HCID or its predecessor agencies was

26  ever reprimanded for allowing buildings that did not comply with heightened

27  federal accessibility standards to be built, the policies and procedures that

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1  applied to accessibility provisions in loan agreements, and policies and

2  procedures regarding plan review. Ms. Flynn's testimony at her deposition

3  addressed, among other things, HCID's policies and practices regarding

4  occupancy monitoring, whether occupancy monitoring included architectural

5  accessibility and compliance with policies required under Section 504, and

6  whether accessibility was addressed in regulatory agreements.

7        c.    Alfred Muhammed, Architect, Architectural Services, Housing and

8  Community Investment Department. Mr. Muhammed's deposition testimony in

9  his individual capacity addressed, among other things, the differences between

10  architectural standards, the architectural standards adopted by HCID after the

11  filing of the lawsuit, and design reviews conducted by him including reviews of

12  accessibility. That testimony revealed that, as the official upon whom HCID

13  relied to ensure compliance with all accessibility requirements, he did not

14  review building plans for conformance with UFAS, and that no City agency

15  conducted on-site inspections to assess UFAS compliance by apartment

16  buildings assisted by the City or CRA. Preparing for Mr. Muhammed's

17  depositions involved confirming the existence of federal funding in more than

18  120 properties, and securing, reviewing, and analyzing the City Council

19  Transmittals, submissions to HUD, and architectural design review letters for

20  each individual development so that appropriate questions could be developed

21  and relevant exhibits prepared. Plaintiffs' counsel also had to research and

22  analyze several sets of "architectural requirements" that HCID imposed on

23  developers seeking HCID financial assistance to build multifamily housing.

24  Finally, substantial preparation time was required in order to understand and

25  articulate the differences between the modest accessibility requirements of the

26  California Building Code ("CBC") and the more stringent UFAS requirements.

27

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1          d.      Tim Elliott, Housing and Community Investment Department,

2     Director, Affordable Housing Trust Fund. Mr. Elliott's deposition addressed,

3     among other things, the policies and procedures that applied to housing projects

4     assisted through the City's Affordable Housing Trust Fund, whether developers

5     who received Affordable Housing Trust Fund monies were required to meet Los

6     Angeles Housing Department architectural requirements, and whether it was

7     assumed that federal requirements applied to all projects that received loans

8     through the Affordable Housing Trust Fund regardless of the source of funding.

9     Preparing for this deposition included substantial time reviewing HCID policy

10     documents, City Council Transmittals, and HCID notices of funding availability

11     over nearly twenty years. Much like Mr. Cervantes, Mr. Elliot confirmed that

12     HCID did not apply or enforce the UFAS requirements on developers receiving

13     federal funds through HCID, and that no HCID employee ever visited

14     completed developments to ensure they complied with UFAS.

15     34.     The City deposed the executive directors of each of the Plaintiff

16     organizations.

17     35.     The parties conducted 29 days of deposition in total.

18                    The City's Efforts to Obstruct Discovery and Motions to Compel

19     36.     The City engaged in discovery conduct and delayed the progress of the

20     case from the very outset. Plaintiffs' efforts to obtain relevant information and

21     documents in discovery and resist inappropriate discovery requests included a total of

22     more than 77 meet and confer sessions, 27 telephonic hearings before the Court on

23     discovery issues, 30 formal written submissions to the Court, and 85 substantive

24     emails to the Magistrate Judge.

25     37.     Plaintiffs filed a motion to compel information and documents in

26     response to FHCSFV's first set of interrogatories, first request for production of

27     documents, and first request for admissions, which was granted in part. Magistrate

28

1  Judge Walsh thereafter agreed to decide most of the parties' discovery disputes

2  informally based on emails from the parties and a telephonic hearing.

3      38.   A substantial dispute arose over the discoverability of building

4  measurements and photographs of more than 200 buildings at issue in the case. The

5  City unilaterally had conducted accessibility surveys of those buildings using a

6  standardized checklist for measuring accessibility features such as the width of doors,

7  the height of counters, the slope of ramps and hundreds of other measurements (the

8  "ADAAG Reports"). Plaintiffs requested documents relating to accessibility surveys

9  in their first request for production of documents and moved to compel when the City

10 refused to produce the ADAAG Reports in discovery. (Doc. 412)

11     39.   The Magistrate Judge initially ruled that the City was not obligated to

12 produce the measurements and photographs in discovery. Plaintiffs objected to the

13 Magistrate Judge's order, arguing that measurements and photographs were purely

14 factual work product and plaintiffs had a substantial need for the documents and

15 would face an undue burden, including substantial costs, if the documents were not

16 disclosed. (Doc. 426) The Court granted Plaintiffs' motion for review and ordered the

17 City to turn over the measurements and photographs for over 200 developments. (Doc.

18 458)

19        Factual Research and Site Inspections Necessary for Expert Analysis

20     40.   Plaintiffs expended considerable time and money ascertaining the full

21 scope of the CRA Housing Program, which included a painstaking analysis of which

22 multifamily housing projects received financial and/or other assistance from the CRA.

23 Plaintiffs ultimately determined that approximately 253 affordable housing projects

24 (comprising nearly 18,000 individual apartment units) received assistance from the

25 CRA and were part of the CRA Housing Program.

26     41.   Plaintiffs had to develop a plan to assess the scope of the architectural

27 inaccessibility throughout the entire Program. Plaintiffs proposed that the parties hire

28

1    a single mutually acceptable accessibility expert to measure and photograph units and

2    common areas in each building in the CRA Housing Program. Rather than doing so,

3    the City chose to hire its own expert and refused to turn over the measurements and

4    photographs collected as part of the ADAAG Reports, even though they were

5    responsive to Plaintiffs' discovery requests.

6         42.    Because the CRA Housing Program was too large, and it would have

7    been prohibitively expensive to conduct plan reviews and site inspections for each of

8    the 253 developments, Plaintiffs retained statistical experts to develop a defensible

9    sampling methodology.

10        43.    To perform the statistical stampling, the CRA Housing Program needed

11   to be segmented into categories so that similarly-situated developments were treated

12   similarly. Many developments in the CRA Housing Program received federal funding

13   and thus had additional, independent obligations to comply with Section 504 beyond

14   the CRA's global responsibility to ensure accessibility throughout the entire CRA

15   Housing Program. Some developments received assistance for the new construction of

16   a multifamily housing complex, while other developments received assistance to

17   rehabilitate an existing structure. Thus, for purposes of expert analysis, the properties

18   were categorized as follows: (1) Federally-Funded New Construction; (2) Non-

19   Federally-Funded New Construction; (3) Federally-Funded Rehabilitations; and (4)

20   Non-Federally-Funded Rehabilitation.

21        44.    The analysis of the scope of the CRA Housing Program and the division

22   of the housing projects into different categories required considerable time. Plaintiffs'

23   counsel reviewed City Council Transmittals reflecting project-specific approvals for

24   funding from the Affordable Housing Trust Fund, and those reflecting the approval of

25   individual CRA housing projects, loan and cooperation agreements, and other

26   contracts, as required by Los Angeles Admin. Code § 8.99.01 *et seq.*, a local

27

28

1    ordinance requiring, until the time of the CRA's dissolution in February 2012, City

2    Council approval of any significant action of the CRA.

3         45.    Plaintiffs' counsel were also required to expend many hours reviewing

4    and analyzing project files produced by the City and the CRA, as well as conducting

5    independent research concerning City Council approval of various CRA actions.

6    Defendants made Plaintiffs' task more difficult by refusing to produce, until the

7    deadline for ESI production, certain electronic spreadsheets in their possession that

8    reflected CRA and federal funding, whether a project was new construction or a

9    rehabilitation, and construction start dates, even though Plaintiffs requested such

10   documents at a very early stage of discovery. Once Defendants produced their ESI,

11   Plaintiffs identified almost 100 additional properties that were part of the CRA

12   Housing Program that had never been disclosed.

13        46.    All of the data gathered by Plaintiffs' counsel was then placed in a

14   spreadsheet so that the appropriate properties could be randomized. If construction for

15   a particular development in the CRA Housing Program began after the date this

16   litigation began, it was assessed individually and not included in the randomization.

17   Once the CRA Housing Program developments were separated into four tranches,

18   each tranche was randomized twice so that two independent reviews could be

19   performed by Plaintiffs' experts: randomized plan review and randomized on-site

20   measurement review.

21        47.    Plaintiffs' counsel spent several hundred hours attempting to obtain

22   building plans from LADBS for each of the 253 housing developments in the CRA

23   Housing Program, and issuing requests and subpoenas to over 80 property owners

24   where LADBS did not have plans. In addition, Plaintiffs' counsel spent significant

25   time arranging for thirty-five site inspections of developments randomly selected for

26   on-site measurement review, which took place over forty-four days. The process of

27   serving Rule 34 subpoenas for on-site inspections of developments, occasionally over

28

1    the objections of building owners, consumed hundreds of hours, and included

2    negotiation with owners and property managers, coordination with experts, and, on

3    one occasion, the submission of letter briefs to Magistrate Judge Walsh to secure

4    access to a development. Plaintiffs ultimately conducted thirty-five site inspections

5    over forty-four days. Similarly, Plaintiffs' counsel spent a significant amount of time

6    reviewing project files, ESI documents and other documents produced in discovery,

7    and publicly available documents to determine the construction start date for each

8    development (essential to establishing which of Plaintiffs' three legal claims, all of

9    which have different coverage start dates, applied).

10    48.    Plaintiffs' main accessibility expert Bill Hecker performed three different

11    accessibility analyses. First, he reviewed all of the ADAAG Reports produced by the

12    City in response to the Court's order, to see if the measurements and photographs

13    taken by Defendants' consultants at developments in the CRA Housing Program

14    demonstrated compliance or lack of compliance with the UFAS and other applicable

15    accessibility requirements. Second, he reviewed measurements and photographs taken

16    during on-site inspections by Plaintiffs' expert for compliance with applicable federal

17    accessibility standards. Third, he reviewed copies of blueprints and/or architectural

18    drawings produced by LADBS for compliance with applicable federal accessibility

19    standards.

20    49.    Mr. Hecker concluded that every one of the multifamily residential

21    projects he evaluated "failed" to comply with UFAS and the standards imposed by the

22    California Building Code. In making each assessment, Mr. Hecker determined that a

23    development "failed" only if the violations found were of a type or frequency that

24    would prevent a person with a disability from being able to use important portions of a

25    dwelling unit and/or common-use facilities. Of the 253 developments in the CRA

26    Housing Program subject to Section 504, 184 developments were subject to at least

27

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1   one type of review and all 184 showed a "failure" to comply with the correct federal

2   accessibility standards. *See* Ex. D at 86.

3       50.    Plaintiffs' second accessibility expert, Glenn Dea, performed a similar

4   analysis under the California Building Code. Based on thirty-six measurement reviews

5   of developments in the CRA Housing Program and analysis of the City's ADAAG

6   Reports, Mr. Dea found that "all developments that were the subject of this report

7   have 'failed' to meet the accessibility provisions of the California Building Code," and

8   that "[t]he extent of facility and usability noncompliance that is documented in this

9   report is broad and among the most remarkable I have observed in 15 years of

10  accessibility consulting on behalf of private and public entities." *See* Ex. E at 33.

11      51.    The findings and conclusions made by Plaintiffs' accessibility experts

12  were then provided to Plaintiffs' testifying statistician, Dr. Bernard Siskin. Dr. Siskin

13  concluded that, based on the 100% failure rate of the randomized Plan Review, if all

14  developments subject to Section 504 were inspected, he could be 97.5% confident that

15  if all developments subject to Section 504 were subject to a Plan Review, at least

16  93.1% would fail. Based on the 100% failure rate of the randomized Measurement

17  Review, Dr. Siskin could be 97.5% confident that if all developments subject to

18  Section 504 were subject to a Measurement Review, at least 82.4% would fail. *See* Ex.

19  G at 20.

20      52.    Plaintiffs also retained John L. Wodatch, the former Chief of the

21  Disability Rights Section, Civil Rights Division of the U.S. Department of Justice, as

22  its program accessibility expert. Mr. Wodatch's expert report concluded that the City

23  and CRA had systemically failed to ensure that their affordable CRA Housing

24  Programs were accessible to people with disabilities, and that the City and CRA had

25  neglected even the most basic obligations, such as conducting periodic self-

26  evaluations and employing a Section 504/ADA coordinator to ensure compliance with

27  federal accessibility requirements. He opined that the City and CRA had failed to heed

28

1   even the most basic elements of guidance from HUD and DOJ concerning those

2   accessibility obligations, had taken no steps to ensure compliance with the

3   architectural accessibility requirements of UFAS, had failed to enforce such

4   obligations against private developers assisted by the City or CRA, and failed to

5   require such developers to prioritize occupancy of accessible units by people with

6   disabilities who needed the accessibility features.

7        53.    Mr. Wodatch's expert testimony explained the importance of the

8   information elicited by Plaintiffs' counsel on these issues, including evidence that

9   neither the City nor the CRA had any reliable list of UFAS-accessible units in Los

10  Angeles, that neither Defendant enforced federally mandated policies to ensure that

11  UFAS-accessible units were reserved for people whose disabilities made the highly-

12  accessible features of UFAS-compliant units necessary, and that neither the City nor

13  the CRA had a knowledgeable Section 504/ADA Coordinator guiding efforts to

14  ensure accessibility.

15       54.    Furthermore, Plaintiffs retained Allan Parnell, an expert demographer, to

16  analyze publicly available Census data concerning the Los Angeles housing market to

17  determine the extent of need for accessible, affordable housing in Los Angeles for the

18  period 1990 through 2014, and what the City and the CRA could reasonably have

19  known concerning that need. Dr. Parnell opined that, in 2014 there were over 388,000

20  people in Los Angeles with mobility or sensory (hearing/vision) impairments, and that

21  many of them are likely to have limited incomes on account of their disabilities and

22  are therefore acutely in need of accessible affordable housing. *See* Ex. F at 10. Dr.

23  Parnell's findings confirm that the need for accessible affordable housing is at least as

24  widespread as the City reported to HUD in its 2008-2013 Consolidated Plan.

25       55.    Plaintiffs also engaged two experienced individuals to serve as experts on

26  the issues of diversion of resources and frustration of mission for Plaintiffs. Marca

27  Bristo, the President and Chief Executive Officer of Access Living of Metropolitan

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1   Chicago, one of the first ten Independent Living Centers in the United States, and the

2   President of the National Council on Independent Living, serving as a damages expert

3   on behalf of Plaintiffs ILCSC and CALIF. Anne Houghtaling, the Executive Director

4   of the HOPE Fair Housing Center and the longtime Director of Enforcement at the

5   National Fair Housing Alliance, served as a damages expert on behalf of Plaintiff

6   FHCSFV.

7        **C.      Mediation and Settlement**

8        56.      Over a three and one-half year period concluding with the entry of

9   judgment on the settlement agreement, the parties met on three occasions, comprising

10   two and one-half days under the supervision of a mediator in Los Angeles, fourteen

11   full- or half-day in-person negotiation sessions in Los Angeles and in the Firm's office

12   in Washington, D.C., and multiple extensive conference calls with top officials from

13   the City and CRA (without the assistance of a mediator).

14        57.      The parties held two full-day and one half-day sessions in Los Angeles,

15   with the assistance of a mediator, on April 24, 2013; January 28, 2014; and November

16   4, 2014. At the close of the April 2013 session, counsel for the Plaintiffs and outside

17   counsel for the City (Byrne & Nixon, LLP) executed their first settlement term sheet,

18   pursuant to which they would seek a ninety-day stay of the litigation to pursue

19   settlement. Thereafter, Plaintiffs' counsel drafted and circulated a proposed agreement

20   providing for an exchange of expert accessibility inspection reports and development

21   of retrofit plans for existing buildings, protocols to ensure compliance with applicable

22   accessibility requirements in future construction, and development of uniform policies

23   to ensure compliance with Section 504, the ADA, and Section 11135 at all properties

24   developed with assistance from the City or CRA. On May 6, 2013, settlement

25   negotiations broke down and did not resume until the parties held a second mediation

26   session in January 2014.

27

28

1    58.    At the conclusion of the mediation session on January 28, 2014, counsel

2  for Plaintiffs and the City entered into a second settlement term sheet, and thereafter

3  exchanged detail settlement proposals, but negotiations broke down again on March 6,

4  2014.

5    59.    In late 2014, the City Attorney's Office resumed representation of the

6  City. The parties' third session with a mediator—held on November 4, 2014—revived

7  settlement negotiations. After additional sessions without a mediator on November 12,

8  2014 and January 5, 2015, the parties entered into a third settlement term sheet setting

9  out the principles of a voluntary resolution. Thereafter, they met without a mediator on

10  the following dates:  November 12, 2014; January 5, 2015; March 9, 2015; March 20,

11  2015 (by telephone); March 30-31, 2015; April 14-16, 2015; May 11-12, 2015; and

12  May 29, 2015. As described more fully below, in furtherance of settlement, Plaintiffs'

13  counsel agreed to forego any claim for fees litigation tasks performed while the

14  January 2015 term sheet was in place. Plaintiffs' counsel, however, were ethically

15  bound to continue discovery and other litigation tasks to avoid prejudicing Plaintiffs'

16  ability to prove their claims in the event no settlement was consummated. In early

17  April 2015, at the expiration of the 90-day period, some progress toward settlement

18  had occurred, but no firm agreement had been negotiated. Even as they continued to

19  work to meet discovery and litigation deadlines, as a show of good faith in support of

20  settlement, Plaintiffs' counsel voluntarily extended the settlement negotiation's no-fee

21  period by 53 days, through May 31, 2015. When that term sheet did not result in a

22  settlement by that latter date, Plaintiffs' counsel advised the City that they would turn

23  their full attention to litigation tasks and resume their claim for fees effective June 1,

24  2015.

25    60.    Thereafter, the parties held settlement discussions on August 4-5, 2015;

26  March 9, 2016; and April 11, 2016 (by telephone). Each settlement meeting lasted at

27  least a half-day, and most were day-long sessions. Plaintiffs' negotiating team

28

1  consisted of John Relman and Michael Allen (of Relman, Dane & Colfax) and Dara

2  Schur and Autumn Elliott (of Disability Rights California). The City's negotiating

3  team included City Administrative Officer Miguel Santana and Chief Deputy City

4  Attorney Jim Clark. On April 12, 2016, counsel for the Plaintiffs and the City entered

5  into a fourth settlement term sheet outlining terms by which Plaintiffs and the City

6  could settle this litigation.

7        61.    That term sheet formed the basis of the Settlement Agreement upon

8  which the Court has entered judgment. (Doc. 532). Plaintiffs' counsel drafted that

9  extensive agreement, secured the approval of its text by the City Attorney's office, and

10 Plaintiffs executed and returned the Settlement Agreement to the City on May 12,

11 2016. The City Council voted to endorse the Settlement agreement on August 29,

12 2016, and the Mayor signed the associated resolution on September 5, 2016.

13       62.    The parties agreed that attorneys' fees would be determined by motion to

14 the Court, and the Court's order entering judgment references such a motion.

15       **D.    Division of Work Between Counsel**

16       63.    In the face of significant resistance by opposing counsel (as outlined

17 above), Plaintiffs' counsel worked diligently to litigate this matter as efficiently as

18 possible. Relman, Dane & Colfax was designated as lead counsel in the litigation and

19 took charge of managing litigation deadlines and ensuring that the four offices were

20 allocating work in the most efficient and effective way possible.

21       64.    For example, Relman, Dane & Colfax assigned Disability Rights

22 California ("DRC") and Disability Rights Legal Center ("DRLC") to run much of the

23 Los-Angeles based fact development, including collecting and analyzing building

24 plans, interviewing bona fides, and preparing declarations.

25       65.    Attorneys from DRC took control of investigating and developing our

26 litigation strategy with respect to the dissolution of the CRA. For example, Srividya

27 Panchalam orchestrated a several-month period of document review at the CRA.

28

1   Contract attorneys preformed the actual review, but Ms. Panchalam managed the

2   entire process, including developing a review protocol, implementing that protocol,

3   and supervising the contract attorneys. That work had to be performed by an attorney

4   in Los Angeles with expertise in disability access housing issues.

5       66.    Autumn Elliott from DRC provided important contributions based on her

6   expertise in disability rights law, years of experience in federal court litigation in

7   California, including in this Court, and extensive familiarity with the operations of the

8   City government (which were critical to both litigation and settlement strategy). Ms.

9   Elliott's skills and experience were critical to successfully managing the day-to-day

10  litigation of the case.

11      67.    DRC also handled drafting portions of the opposition to the joint motion

12  to dismiss, the SAC, and the opposition to the motion for judgment on the pleadings.

13  Based upon the deep expertise of its lawyers in California redevelopment law, DRC

14  took the lead on any matter involving the CRA's affordable housing obligations

15  arising under that body of law and the implications on this litigation of the legislation

16  dissolving redevelopment agencies. Furthermore, DRC was the principal drafter of the

17  comprehensive accessible affordable housing management policies agreed to by the

18  City as part of the Settlement Agreement.

19      68.    DRLC attorneys were instrumental in contributing to management of the

20  extensive paper and ESI discovery produced in the case. In addition, DRLC

21  contributed to the pre-suit investigation, which it began independently based on its

22  preexisting relationship with Plaintiff CALIF. DRLC therefore made important

23  contributions to the early factual development of the case and also took the lead on

24  responding to some discovery requests.

25      69.    David Geffen's role was also critical to the case. Mr. Geffen has deep

26  connections to the community of people with disabilities in Los Angeles and, himself,

27  uses a wheelchair. He was therefore uniquely positioned to conduct much of the

28

1  outreach to bona fides and was immediately able to translate their stories of struggling

2  to find accessible affordable housing into evidence of broad disability rights

3  violations.

4  <u>**Qualifications and Work Performed by Relman, Dane & Colfax**</u>

5      70.    I served as lead counsel in this case and brought my substantial disability

6  law expertise to bear on every aspect of the case. Throughout the litigation, I managed

7  the litigation by overseeing the work allocation between offices (*see infra* Paragraphs

8  63-69), and within our firm I assigned work to the most qualified, and where possible

9  most junior, attorney with capacity and ability to handle the task. I provided direction

10  with respect to research, drafting, litigation, and settlement issues, and partner Jennifer

11  Klar directed the litigation team's discovery efforts.

12      71.    I graduated from the University of Virginia School of Law in 1985. From

13  1985 to 1995, I was an attorney with Legal Services of Northern Virginia (LSNV),

14  with a focus on representing low-income clients, including many with disabilities, in

15  housing litigation and policy advocacy. From 1995 to 2006, I served as Senior Staff

16  Attorney at the Bazelon Center for Mental Health Law ("Bazelon"), where I focused

17  on civil rights policy development and litigation on behalf of people with a broad

18  range of disabilities. I formed and, from 1996 to 1998, led the national Coalition to

19  Preserve the Fair Housing Act, and my advocacy with the U.S. Department of Justice

20  (DOJ) and U.S. Department of Housing and Urban Development (HUD) resulted in

21  the publication of the agencies' 1999 Joint Statement on Group Homes, Local Land

22  Use and the Fair Housing Act, which was a precursor to the 2013 Joint Statement on

23  Accessibility, available at https://www.ada.gov/doj_hud_statement.pdf.

24      72.    While at Bazelon, I headed a team of lawyers, architects and other

25  experts in the development of a Section 504/ADA needs assessment, self-evaluation

26  and transition plan ("Transition Plan") for the Housing Authority of Baltimore City

27  ("HABC"), pursuant to a Voluntary Compliance Agreement between HUD and

28

1    HABC. The Transition Plan identified that HABC had 14,000 public housing units,

2    but only 12 that met the UFAS requirements. It formed the basis for a December 2004

3    consent decree in *Bailey v. Housing Authority of Baltimore City* (D. Md., No. JFM-02-

4    CV-225; entered December 17, 2004), and a supplemental decree on October 29,

5    2015, which required HABC to provide a total of 756 UFAS mobility-compliant units.

6         73.    I joined Relman, Dane & Colfax in 2006 to build the Firm's disability

7    rights practice, and became a partner on January 1, 2010. At the Firm, I have

8    represented scores of individuals and organizations in cases and matters under the Fair

9    Housing Act (FHA), the ADA, Section 504 and related civil rights laws. Throughout

10   my time at the Firm, much of my practice has focused on accessibility litigation under

11   the FHA, and the obligations of designers, developers, builders and managers of

12   multifamily housing. Over the last decade, I estimate the Firm has handled

13   approximately 20 such matters, nearly all of them in federal courts. Those matters

14   have resulted in accessibility improvements in thousands of apartment units

15   throughout the country. *See, e.g.*, *Nat'l Fair Hous. All. v. A.G. Spanos Const., Inc.*,

16   542 F. Supp. 2d 1054 (N.D. Cal. 2008); *Nat'l Fair Hous. All. v. S.C. Bodner Co.*, 844

17   F. Supp. 2d 940 (S.D. Ind. 2012)); and *Nat'l Fair Hous. All. v. HHHunt Corp.*, 919 F.

18   Supp. 2d 712 (W.D. Va. 2013).

19        74.    Another significant part of my practice also focuses on enforcement of

20   the obligation by cities, counties, and public housing authorities to "affirmatively

21   further fair housing" and to comply with other civil rights laws—such as Section 504

22   and the ADA—as a precondition to receiving federal funds. I have brought successful

23   cases in federal court and before HUD in the form of administrative complaints to

24   enforce such obligations. I am well-known for having conceptualized, and

25   successfully pursued, a then-novel theory for using the False Claims Act to enforce

26   the "affirmatively furthering fair housing" mandate against Westchester County, in

27   litigation that resulted in several precedential judicial decisions relating to that

28

1   mandate and which prompted HUD to withhold millions of dollars of funding from

2   Westchester County. Thereafter, HUD substantially increased its enforcement

3   resources to ensure that recipients of federal funds were complying with this particular

4   affirmative civil rights obligation, and in 2015 issued a final regulation directing such

5   recipients to design programs to overcome fair housing impediments, including those

6   related to the inaccessibility of rental housing units.

7          75.     Over the course of my career, I have published more than 30 articles and

8   book chapters concerning federal civil rights protections for people with disabilities

9   and other members of protected classes. I am a co-author of *Reconstructing Fair*

10  *Housing* (2001), having been commissioned by the National Council on Disability to

11  survey the disability protections of the FHA and their enforcement by HUD.

12         76.     My numerous awards and honors include the Reginald Heber Smith

13  Community Lawyer Fellowship (1985-1986), the Wasserstein Public Interest Visiting

14  Fellow, Harvard University School of Law (2005), and the Kind Policy Award from

15  the Delaware Housing Coalition (2013).

16         77.     I drew from the expertise I developed in fair housing litigation and

17  disability rights while at LSNV and Bazelon in developing this litigation, and I had

18  primary responsibility for the litigation of the case from its inception to the present,

19  including the supervision of attorneys and staff both inside the Firm and the entire

20  team of co-counsel. As lead counsel, I participated in and oversaw all aspects of the

21  litigation, from conceptualizing the claims and helping draft the complaints, to leading

22  the preparation of briefing in response to the motions to dismiss, to establishing the

23  elements of the case that needed to be proved through discovery. I took the lead in

24  drafting the original discovery plan, ensured that discovery was coordinated through

25  biweekly calls with all of Plaintiffs' counsel, determined which depositions were

26  necessary, took the depositions of many of the primary defense witnesses, and assisted

27  in preparation for many other defense witness depositions. I reviewed all of the

28

1  documents produced by Defendants that were identified as key documents. I

2  interviewed and supervised the selection of expert witnesses, both on issues related to

3  accessibility at the properties and on issues related to Plaintiffs' damages. I worked

4  closely with experts Bill Hecker, Anne Houghtaling, Marca Bristo, John Wodatch, and

5  Alan Parnell to design the Plaintiffs' expert strategy. I also engaged in regular calls to

6  communicate case developments to the clients over the course of the lengthy

7  discovery process.

8       78.    Furthermore, I played an integral role in developing and implementing

9  the settlement strategy, where my deep knowledge of applicable law was an essential

10  component of negotiating the extensive non-monetary/injunctive relief sought by

11  Plaintiffs. From 2013 to the present, I participated in every major settlement

12  discussion with counsel for the two primary Defendants as well as counsel for the

13  sixty Owner-Defendants. I coordinated and participated in comprehensive settlement

14  discussions and several mediations. Along with Mr. Relman, I served as the principal

15  contact with defense counsel during settlement negotiations. Finally, I served as the

16  primary drafter of the settlement agreement with the City of Los Angeles that was

17  eventually entered by the Court.

18       79.    John P. Relman is the Managing Partner of Relman, Dane & Colfax.

19  Relman, Dane & Colfax litigates civil rights matters in the areas of fair housing, fair

20  lending, employment discrimination, public accommodations discrimination, and

21  police accountability. The Firm presently has twenty-six attorneys and nine paralegals.

22  Relman, Dane & Colfax has a national civil rights practice and is highly regarded

23  within the civil rights community for its expertise in fair housing litigation.

24       80.    Mr. Relman graduated *cum laude* from Harvard College in 1979. In 1983,

25  Mr. Relman graduated from the University of Michigan Law School. Following

26  graduation from law school, Mr. Relman served as a law clerk for the Honorable Sam

27

28

1   J. Ervin, III of the U.S. Court of Appeals for the Fourth Circuit, and for the Honorable

2   Joyce Hens Green of the U.S. District Court for the District of Columbia.

3         81.   In October 1986, Mr. Relman joined the Lawyers' Committee for Civil

4   Rights Under Law as a staff attorney. While there, he litigated a variety of fair

5   housing, employment discrimination, and death penalty cases in jurisdictions across

6   the country. In 1989, Mr. Relman joined the Washington Lawyers' Committee for

7   Civil Rights and Urban Affairs as the Director of the Fair Housing Project, a position

8   that he held for ten years. During the time that Mr. Relman served as Director of the

9   Fair Housing Project, the Washington Lawyers' Committee maintained a national

10   reputation for being one of the country's leading centers for the litigation of fair

11   housing, fair lending, and public accommodations cases. As Director of the Fair

12   Housing Project, Mr. Relman litigated numerous fair housing and public

13   accommodations cases in federal district courts around the country. In October 1999,

14   Mr. Relman left the Washington Lawyers' Committee to found his own law firm,

15   which later became Relman, Dane & Colfax.

16         82.   Throughout his career, Mr. Relman has represented individual plaintiffs,

17   cities and leading civil rights organizations in many of the country's most important

18   civil rights cases. Mr. Relman served as lead counsel in the well-known Denny's

19   Restaurant class action, which resulted in a national settlement of more than $17

20   million. Mr. Relman has won multimillion dollar jury verdicts in landmark housing

21   and public accommodations race discrimination cases involving the denial of basic

22   rights and services, including *Kennedy v. City of Zanesville* ($10.8 million race

23   discrimination jury verdict for denial of public water) and *Timus v. William J. Davis,*

24   *Inc.* ($2.4 million jury verdict for housing discrimination). More recently, Mr. Relman

25   represented the cities of Baltimore and Memphis in ground-breaking reverse redlining

26   cases against Wells Fargo which, in conjunction with a Justice Department

27

28

1   investigation, resulted in settlements for those two cities, and a national settlement, of

2   more than $200 million.

3       83.     Mr. Relman has also lectured widely on civil rights issues at legal

4   conferences in the around the country, and has conducted numerous seminars and

5   trainings for lawyers in civil rights law, litigation, and advocacy. He is also the author

6   of *Housing Discrimination Practice Manual*, published by the West Group.

7       84.     Mr. Relman has received numerous awards and honors, including the

8   Mildred & Richard Loving Civil Rights Award, the Ohio Civil Rights Commission

9   Award for Commitment and Support to Equal Opportunity in Housing, the Fair

10  Housing Council of Greater Washington Award for Outstanding Contributions to Fair

11  Housing in Greater Washington, the Metropolitan Milwaukee Fair Housing Council

12  Award for Outstanding Contributions to Fair Housing in the Nation, and the

13  Government of Montgomery County, Maryland Award for Valuable Contributions to

14  Fair and Affordable Housing. He has repeatedly been named a "Super Lawyer," and

15  one of America and Washington D.C.'s "Best Civil Rights Lawyers."

16      85.     In his role as managing partner of the Firm, Mr. Relman frequently takes

17  the lead on settlement negotiations in the firm's most complex cases. That is the role

18  he played in this case, serving as the primary liaison when all parties were attempting

19  to coordinate a global settlement, and then serving as the point person in working with

20  the City of Los Angeles' representatives to reach a settlement after a global settlement

21  proved unworkable. He also worked closely with me in developing draft settlement

22  term sheets and drafting the final settlement agreement. In addition, Mr. Relman

23  played an important strategic advisory role from the initial investigation of the case

24  through settlement.

25      86.     In addition to civil rights litigation, Mr. Relman advises progressive

26  companies regarding best practices for fair lending and other civil rights issues. In that

27

28

1   context, Mr. Relman has been paid the rate used in the fee petition of $975/hour due to

2   his deep expertise, skill, and extensive experience.

3         87.    Jennifer I. Klar is a partner at Relman, Dane & Colfax. Ms. Klar joined

4   this litigation in 2014 in order to manage the complex discovery that was starting in

5   earnest in the case.

6         88.    After graduating from Harvard Law School in 2002, Ms. Klar worked as

7   an associate at Hogan & Hartson LLP (now Hogan Lovells) and the American Civil

8   Liberties Union, where she litigated several major civil rights actions. Ms. Klar joined

9   Relman, Dane & Colfax in July 2004 as an associate and became a partner in January

10  2011.

11        89.    Ms. Klar litigates housing and employment discrimination cases in

12  federal court and has considerable experience running discovery in complex cases

13  involving numerous parties and extensive discovery. She also has expertise in

14  presenting expert statistical proof of discrimination in pattern or practice disparate

15  treatment and disparate impact litigation. For example, she supervised statistical

16  expert discovery in a nationwide employment class action, including all expert

17  depositions, defeating two *Daubert* motions, and obtaining certification of a class that

18  was upheld by the United States Court of Appeals for the District of Columbia Circuit.

19        90.    In addition to her litigation docket, Ms. Klar is active in evolving

20  discovery issues, including providing testimony to the Judicial Conference Advisory

21  Committee on Civil Rules and the U.S. Senate Subcommittee on Bankruptcy and the

22  Courts regarding proposed amendments to the Federal Rules of Civil Procedure, and

23  participating in the Duke Law Center for Judicial Studies conferences and committees

24  on civil procedure.

25        91.    Ms. Klar has substantial trial experience, including experience trying

26  multi-plaintiff housing and employment cases to successful verdicts in several federal

27  courts. Ms. Klar has twice been named a finalist for Public Justice's "Trial Lawyer of

28

1   the Year," honoring her work in civil rights cases. This year, she was named one of

2   the Best Lawyers in America in Civil Rights Law.

3        92.    As the attorney with the most relevant expertise in complex discovery

4   practice, beginning in April of 2014, Ms. Klar took responsibility for supervising

5   discovery and other aspects of the day-to-day litigation tasks in this case. She

6   supervised all elements of discovery, including the drafting of discovery requests and

7   responses, review of Plaintiffs' and Defendants' productions, deficiency letters,

8   deposition strategy, disputes regarding the scope of discovery, and multiple discovery

9   hearings before the Magistrate Judge. This involved keeping track of all elements of

10  both affirmative and defensive discovery and supervising the distribution of tasks to

11  counsel, both within Relman, Dane & Colfax and to co-counsel. Ms. Klar also

12  supervised the research and arguments related to the process by which the ESI was to

13  be exchanged in the case, the review of Plaintiffs' ESI for production, and the review

14  of ESI by Defendants. During this time, Ms. Klar served as the primary contact person

15  on discovery issues with opposing counsel and engaged in numerous productive meet

16  and confers that prevented a number of issues from having to be presented to the

17  Court for resolution. She prepared and defended Plaintiffs' witnesses when they were

18  deposed by Defendants.

19       93.    Ms. Klar also took responsibility for the management of expert reports

20  and expert discovery, supervising the development and production of Plaintiffs' seven

21  expert reports and supporting documentation. Most significantly, she supervised and

22  managed the Plaintiffs' statistical analysis of the CRA Housing Program, including

23  working with Plaintiffs' experts to establish a statistically-sound methodology, and

24  then implementing that methodology by overseeing the collection of architectural

25  plans and organizing site inspections and plan reviews of numerous properties.

26       94.    Based on the extensive factual knowledge of the case that Ms. Klar

27  developed through running discovery, she also assumed responsibility for keeping

28

1    clients engaged and updated regarding the litigation and participated as necessary in

2    settlement strategy discussions with Mr. Relman and Mr. Allen. Ms. Klar's

3    participation in these discussions was critical because she brought deep knowledge of

4    facts developed through discovery and how they affected the settlement posture.

5         95.    D. Scott Chang has been Counsel at Relman, Dane & Colfax since 2005.

6    Mr. Chang is nationally recognized as a fair housing expert. As the attorney who

7    devoted the most hours litigating this case, he brought that extensive knowledge to

8    bear on all necessary tasks in the litigation.

9         96.    Mr. Chang graduated from the University of California Hastings College

10   of the Law in 1990. Prior to joining the Firm, Mr. Chang was a solo practitioner

11   specializing in fair housing cases and an associate and of counsel with the California

12   fair housing law firm Brancart & Brancart. Among Mr. Chang's key cases are: a

13   precedent-setting case establishing that fair housing organizations have standing in the

14   Ninth Circuit Court of Appeals and affirming a large damages award to a fair housing

15   organization, *Fair Housing of Marin v. Combs*, 285 F.3d 899 (9th Cir.), *cert. denied*,

16   537 U.S. 1018 (2002); a class action case representing a class of disabled tenants

17   excluded from public housing; and a fair housing and hate crime case involving a

18   group of Asian American Stanford University students who were intimidated based on

19   their national origin when they attempted to rent a house. He is a frequent speaker at

20   national fair housing conferences.

21         97.    Given Mr. Chang's seniority and extensive experience litigating fair

22   housing cases in federal courts in California, including representation of fair housing

23   organizations as plaintiffs, he was the most qualified attorney in the Firm to be tasked

24   with running the day-to-day litigation in this matter. Mr. Chang was integrally

25   involved in all aspects of the litigation, including developing the legal theories

26   supporting Plaintiffs' claims, drafting the complaint and other documents filed with

27   the Court, and playing a key role in the discovery process. Mr. Chang conducted

28

1   significant legal research and strategizing relating to, among other things: the

2   requirements of program accessibility, the enforceability of regulations, monitoring

3   requirements under the regulations, the duty of supervision under Section 504,

4   vicarious liability, standards for substantial rehabilitations under HUD regulations,

5   and deliberate indifference under the ADA and Section 504. Mr. Chang also assisted

6   in drafting frameworks to assist in mediation/settlement meetings and participated in

7   drafting mediation statements. He also drafted Plaintiffs' core settlement values.

8       98.    Mr. Chang had primary responsibility for conducting the extensive

9   research and analysis regarding the CRA Housing Program that was critical to

10  Plaintiffs' theory of liability and ultimately increased the size of the Portfolio by

11  approximately 100 properties. Mr. Chang also performed significant research to

12  identify the owners of various properties in the CRA Housing Program to properly

13  identify Owner Defendants. Mr. Chang also performed additional research regarding

14  technical aspects of individual properties as part of the efforts to complete site

15  inspections and subpoenas for plans.

16      99.    Given his extensive knowledge of the factual and legal bases for

17  Plaintiffs' claims, Mr. Chang served as the primary point of contact with each of the

18  representatives of Plaintiff organizations for discovery purposes, and managed the

19  collection, review, and production of documents by Plaintiffs. Mr. Chang also had

20  significant involvement in executing the production of Plaintiffs' ESI. In addition, he

21  drafted many of Plaintiffs' discovery documents, including initial and supplemental

22  disclosures and over twenty sets of responses to discovery requests from Defendant

23  City of Los Angeles, Defendant CRA/LA, and Owner Defendants. Mr. Chang

24  performed significant research regarding organizational standing and damages claims,

25  and served as the primary contact person for discovery disputes with opposing counsel

26  on those issues. In that role, he wrote several discovery letters responding to requests

27  by Defendants and participated in numerous meet and confers and court conferences

28

1   on standing- and damages-related discovery issues. Mr. Chang also prepared

2   Plaintiffs' witnesses for depositions and conducted numerous interviews with

3   individuals with disabilities regarding their efforts to locate accessible affordable

4   housing in Los Angeles and worked with them to draft declarations regarding their

5   experiences. Mr. Chang worked with expert witnesses, particularly by reviewing and

6   providing documents to expert witnesses for review.

7        100.   Mr. Chang likewise played a key role in pursing discovery against

8   Defendants. Mr. Chang participated in drafting more than thirty sets of discovery

9   requests propounded by Plaintiffs. In addition, he participated in drafting the 30(b)(6)

10   notices to Defendants and the strategy for depositions of individual deponents. Mr.

11   Chang also reviewed all of Defendants' written discovery responses and reviewed,

12   analyzed, and identified significant documents produced by both Defendants. In this

13   role, Mr. Chang drafted several discovery letters regarding deficiencies in Defendants'

14   discovery requests and responses. He drafted and coordinated Plaintiffs' portion of the

15   March 2013 motion to compel documents from the City of Los Angeles and

16   participated in the drafting of Plaintiffs' portion of the October 2014 motion to compel

17   ADAAG reports from the City of Los Angeles. Mr. Chang also participated in the

18   review of documents generated by test Boolean searches and documents generated by

19   the seed process during Defendants' use of predictive coding to produce relevant ESI

20   documents. Mr. Chang also participated in supervising the contract attorneys who

21   assisted in review of Defendants' documents.

22        101.   As part of his handling of the day-to-day litigation tasks, Mr. Chang

23   attended and organized regular co-counsel calls, and assisted in coordinating activities

24   among co-counsel.

25        102.   Tom Keary was Of Counsel at Relman, Dane & Colfax from June 2007

26   until April 2015. Mr. Keary brought to the case extensive fair housing litigation

27   experience, including specific experience with accessibility cases.

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1    103.   Upon graduating from George Washington University National Law

2    Center in 1972, Mr. Keary worked as a Trial Attorney at the Federal Trade

3    Commission until 1984. Mr. Keary then worked in the Civil Rights Division of the

4    United States Department of Justice for over twenty years, first as a Senior Trial

5    Attorney in the Voting Rights Section and then as a Senior Trial Attorney in the

6    Housing and Civil Enforcement Section. In that capacity, Mr. Keary served as lead

7    trial counsel in numerous complex, multiparty litigations brought to enforce federal

8    civil rights laws.

9    104.   At Relman, Dane & Colfax, Mr. Keary developed and ran a number of

10   design and construction cases, through which he pursued developers and architects for

11   failing to comply with the accessibility requirements of the federal Fair Housing Act.

12   Given Mr. Keary's extensive litigation and trial background and his subject matter

13   expertise in the legal requirements relating to accessible housing, he played a key role

14   in obtaining valuable third-party discovery from housing counselors and individuals

15   with disabilities in Los Angeles and in working with Plaintiffs to develop their proof

16   of damages. As one of the Firm's most experienced design-and-construction attorneys,

17   he brought efficiency and expertise to the preparation of written discovery relating to

18   UFAS violations and provided legal research on a number of topics, including several

19   questions related to relevant federal regulations and indemnification and contribution

20   under the ADA.

21   105.   Sasha Samberg-Champion is Counsel to Relman, Dane & Colfax. An

22   experienced appellate specialist, Mr. Samberg-Champion provided strategic advice to

23   the team and developed the strategy for and wrote key briefs.

24   106.   After graduating from Columbia Law School in 2004, Mr. Samberg-

25   Champion clerked for the Honorable Jed S. Rakoff on the United States District Court

26   for the Southern District of New York and the Honorable Robert A. Katzmann on the

27   United States Court of Appeals for the Second Circuit. Mr. Samberg-Champion then

28

1    became Assistant Solicitor General at the Office of the New York State Attorney

2    General, where he briefed and argued numerous appeals before the Second Circuit and

3    state appellate courts on a variety of civil issues. In that role, Mr. Samberg-Champion

4    won the New York Attorney General's Louis Lefkowitz Award and a Supreme Court

5    Brief Award from the National Association of Attorneys General.

6        107.   In 2010, Mr. Samberg-Champion became a Senior Attorney in the

7    Appellate Section of the Civil Rights Division in the United States Department of

8    Justice, where he briefed and argued appeals in the U.S. Courts of Appeals, assisted

9    the Office of the Solicitor General in the briefing of cases before the U.S. Supreme

10   Court, and provided legal counsel to the Division's trial sections, front office, and

11   client agencies. Mr. Samberg-Champion won several awards for his work in the Civil

12   Rights Division, including two Distinguished Service Awards in 2013. He joined

13   Relman, Dane & Colfax in 2014.

14       108.   Given Mr. Samberg-Champion's skill and expertise in drafting briefs,

15   Relman, Dane & Colfax assigned him primary responsibility for drafting, reviewing,

16   and revising all of the briefing that occurred after he joined Relman, Dane & Colfax in

17   the summer of 2014, including Plaintiffs' successful appeal of the Magistrate Judge's

18   denial of Plaintiffs' motion to compel key discovery from the City and successful

19   opposition to the CRA's motion for judgment on the pleadings.

20       109.   Mr. Samberg-Champion was also assigned to prepare an elements

21   analysis and the legal framework for an affirmative motion for summary judgment,

22   which Plaintiffs were prepared to file if they had not settled their claims against the

23   City. As part of this assignment, Mr. Samberg-Champion refined Plaintiffs' strategy

24   for arguing about the scope of the coverage of Section 504 federal funding and Title II

25   liability. He furthermore provided guidance for obtaining evidence that he identified

26   as critical to Plaintiffs' case relating to, for example, program access and facility

27   access evidence.

28

1      110.   Mr. Samberg-Champion also assisted in settlement negotiations,

2   including drafting portions of the settlement agreement and attending settlement

3   meetings.

4      111.   Relman, Dane & Colfax hired Liyah Brown to assist with this case from

5   September 2015 to January 2016. Ms. Brown is a 2004 graduate of New York

6   University School of Law, where she was a Root-Tilden-Kern scholar. After

7   graduation, she clerked for the Honorable Sterling Johnson, Jr. on the United States

8   District Court for the Eastern District of New York. Ms. Brown then became an

9   attorney at the Public Defender Service for the District of Columbia. In collaboration

10   with the Relman attorneys on the team, Ms. Brown reviewed ESI produced by

11   Defendants and assisted in preparation for depositions. She also conducted legal and

12   factual research that was critical to effective preparation for the depositions of

13   Rushmore Cervantes and Alfred Muhammad, two key officials at the City's Housing

14   and Community Investment. She digested hundreds of priority documents and

15   organized important timelines with respect to the knowledge of these City officials

16   about the scope of inaccessibility in the CRA Housing Program and in the City's other

17   affordable housing programs. These formed the basis of the most critical questions in

18   the depositions, and secured admissions that were essential to the settlement of the

19   case.

20      112.   Jia Cobb is Counsel at Relman, Dane & Colfax. Ms. Cobb has extensive

21   trial experience as a former Public Defender and in civil rights cases. She brings a

22   keen eye to the development of the evidence necessary to win at trial.

23      113.   Ms. Cobb graduated from Harvard Law School in 2005, where she was

24   an editor of the Harvard Law Review. After law school, she clerked for the Honorable

25   Diane P. Wood of the United States Court of Appeals for the Seventh Circuit.

26   Following her clerkship, Ms. Cobb was awarded Harvard Law School's Heyman

27   Fellowship, a post-graduate fellowship for federal government attorneys. Prior to

28

1   joining Relman, Dane & Colfax, Ms. Cobb worked for many years as a trial attorney

2   at the Public Defender Service for the District of Columbia, where she tried dozens of

3   cases to verdict.

4         114.   Drawing from that extensive trial background, Ms. Cobb provided

5   significant assistance with written discovery. She played a lead role in drafting

6   Plaintiffs' first set of written discovery and reviewed Defendants' responses thereto in

7   order to identify additional evidence to be sought from Defendants. She participated in

8   the meet and confer meetings with opposing counsel regarding the deficiencies

9   identified and successfully resolved numerous discovery issues.[1]

10        115.   Jamie Crook is Counsel at Relman, Dane & Colfax. A prior Ninth Circuit

11  clerk and experienced litigator, Ms. Crook has extensive skill at developing legal

12  strategy and high-level briefing. Many of the cases she has litigated at the Firm have

13  been brought against municipal and state defendants concerning systematic barriers to

14  equal housing access.

15        116.   Ms. Crook received a law degree from the University of California at

16  Berkeley School of Law in 2006 and was admitted to the Order of the Coif based on

17  her law school GPA. While a student at Berkeley, she served on the California Law

18  Review, the Berkeley Journal of African-American Law & Policy, and the Berkeley

19  Journal of International Law, and participated in the Death Penalty Clinic. After

20  graduating from Berkeley, Ms. Crook served as a law clerk to the Honorable Richard

21  A. Paez of the United States Court of Appeals for the Ninth Circuit. Following her

22  clerkship, Ms. Crook was the Natural Resources Defense Council environmental law

23  fellow at the law firm Altshuler Berzon LLP. In 2009, she was awarded a Fulbright

24

25  _____

26        [1] The case went into more active discovery while Ms. Cobb was out of the office for a period of several months and then immediately in trial, and therefore

27  other attorneys became staffed on discovery. The several Relman attorneys who

28  worked less than 100 hours on this litigation have been cut from the fee petition.

- 40 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1   Grant to work as a law clerk to then-Chief Justice Pius Langa of the Constitutional

2   Court of South Africa.

3        117.   Given Ms. Crook's complex litigation experience, and specifically her

4   experience litigating against governmental defendants in cases designed to challenge

5   systemic housing access barriers, Ms. Crook provided valuable insight and legal

6   analysis during the early development of the case. She later assisted in preparing

7   Plaintiffs' oppositions to Defendants' motions to dismiss, provided strategic guidance

8   in the development of Plaintiffs' early discovery efforts, and prepared letters and

9   briefing relating to the parties' initial discovery disputes. Ms. Crook also assisted in

10  developing the legal framework for Plaintiffs' arguments for affirmative summary

11  judgment. Ms. Crook furthermore provided key legal research and analysis on discrete

12  but complicated issues relating to the mediation and settlement process.[2]

13       118.   Timothy Smyth was an associate at Relman, Dane & Colfax from 2013 to

14  2015. He is now the Director of the Office of Systemic Investigations at the

15  Department of Housing and Urban Development.

16       119.   Mr. Smyth graduated from the University of Connecticut School of Law

17  in 2007. After graduation, he worked as an associate at Bingham McCutchen LLP for

18  two years, and then became a senior staff attorney at The Connecticut Fair Housing

19  Center, Inc., where he handled all aspects of state and federal court civil rights

20  litigation.

21       120.   The Firm assigned Mr. Smyth significant responsibility for handling

22  discovery, given his experience litigating civil rights cases in federal court. Mr. Smyth

23  quickly became an expert on ESI discovery and took the lead on the prolonged

24  negotiations with the City regarding the production of electronically stored

25  _____

26       [2] Ms. Crook was temporarily not employed at Relman as discovery became
    more active and therefore was replaced by other attorneys. The several Relman
27  attorneys who worked less than 100 hours on this litigation have been cut from the
    fee petition.
28

1   information. Concentrating the responsibility for ESI with one attorney, Mr. Smyth,

2   ensured efficiency with respect to handling this complex issue. Mr. Smyth performed

3   legal research regarding search terms, breadth of searches, undue burden, databases,

4   and predictive coding. He drafted, reviewed, and revised keyword search terms, lists

5   of custodians, and several versions of a stipulated ESI order. He reviewed Defendants'

6   documents during the keyword search phase and the predictive coding seeding phase

7   for relevance and responsiveness.

8       121.   Mr. Smyth served as Plaintiffs' primary liaison with a consulting expert

9   regarding ESI issues. He also reviewed screenshots and other documents related to the

10  City's production of documents from multiple databases. Mr. Smyth engaged in

11  multiple meet and confers with opposing counsel, and drafted significant

12  correspondence, memoranda, and briefing on these issues. He then represented

13  Plaintiffs before the Magistrate Judge during the multiple hearings held on ESI issues.

14  Mr. Smyth also worked with clients to identify and gather relevant ESI.

15      122.   In addition to leading the Plaintiffs' discovery efforts on ESI, Mr. Smyth

16  conducted additional discovery tasks as needed. For example, Mr. Smyth also

17  researched, drafted, and argued Plaintiff's motion to compel the City's ADAAG

18  measurements and photographs before the Magistrate Judge. Mr. Smyth was involved

19  in responding to discovery requests and drafting the 30(b)(6) Notice to the City.

20      123.   Relman, Dane & Colfax hired Emilie Burnette to assist in this case under

21  the supervision of the Relman litigation team. Ms. Burnette graduated from Boston

22  College Law School in 2007. Ms. Burnette provided assistance in reviewing in the

23  first instance Plaintiffs' electronically stored information. She reviewed all email

24  documents that were responsive to targeted keyword searches for relevance and

25  privilege. Ms. Burnette also assisted in reviewing the ESI documents produced by

26  Defendants. Ms. Burnette's ability to focus exclusively on ESI review allowed the

27

28

1   case to proceed more quickly and ensured efficiency because coordination between a

2   large number of reviewers was not necessary.

3        124.   Jean Zachariasiewicz was employed as an associate at Relman, Dane &

4   Colfax from 2013 to 2015.

5        125.   Ms. Zachariasiewicz received her law degree from Columbia University

6   Law School in 2010, where she was a Hamilton Fellow and Kent Scholar. After

7   graduation, Ms. Zachariasiewicz clerked for the Honorable Myron Thompson on the

8   United States District Court in Alabama and then clerked for the Honorable Fortunato

9   Benavides on the United States Court of Appeals for the Fifth Circuit. She was then

10  appointed the Francis D. Murnaghan, Jr. Appellate Advocacy Fellow at the Public

11  Justice Center, where she reviewed appeals filed in Court of Special Appeals to

12  identify cases with civil rights and poverty law implications and authored merits briefs

13  and amicus briefs in state and federal appellate courts.

14       126.   As a more junior attorney, the Firm assigned Ms. Zachariasiewicz to

15  perform a range of discovery-related assignments under the supervision of more senior

16  Relman lawyers. Among other tasks, Ms. Zachariasiewicz conducted witness outreach

17  and drafted fact declarations for many potential witnesses with firsthand knowledge of

18  accessibility barriers in the Housing Portfolio; assisted in the production of documents

19  by Plaintiffs; coordinated site inspections to facilitate expert analysis; and provided

20  assistance to Mr. Smyth in handling aspects of the ESI discovery process. Ms.

21  Zachariasiewicz performed legal research regarding various issues and assisted in

22  briefing regarding discovery issues.

23       127.   Laura Gaztambide-Arandes is an associate at Relman, Dane & Colfax. As

24  part of her fair housing practice, she has litigated a number of design-and-construction

25  cases under the federal accessibility laws. In addition, she has expertise in issues

26  related to ESI discovery.

27

28

1      128.   Ms. Arandes received her law degree from New York University School

2    of Law in 2011, where she was an Arthur Garfield Hays Civil Rights Fellow. After

3    graduation, Ms. Arandes clerked for the Honorable Martha Craig Daughtrey on the

4    United States Court of Appeals for the Sixth Circuit and for the Honorable Gladys

5    Kessler on the United States District Court for the District of Columbia.

6      129.   As one of the most junior lawyers on the team, Relman, Dane & Colfax

7    efficiently delegated a very significant volume of the daily work of the litigation to

8    Ms. Arandes, with strategic assistance from more senior lawyers, including Ms. Klar

9    and Mr. Chang.

10     130.   Ms. Arandes was assigned significant work on Defendants' and

11   Plaintiffs' email ESI. With respect to Defendants' email ESI, she reviewed seed

12   documents produced by Defendants as part of predictive coding ordered by the

13   Magistrate Judge, and assisted in the drafting of a protocol for review of Defendants'

14   ESI productions. Ms. Arandes then performed research and identified deficiencies in

15   their productions, drafted correspondence based on that research, and participated in

16   meet and confers to address those issues. As a final resolution of email ESI, the parties

17   agreed to produce specific ESI "family members" for production, and she drafted

18   Plaintiffs' requests and responded to Defendants' requests, preparing Plaintiffs' ESI

19   "family members" for production. Ms. Arandes also reviewed Plaintiffs' email ESI for

20   relevance and privilege. She also assisted in preparing the accompanying privilege

21   logs and redactions.

22     131.   Ms. Arandes took the lead on gathering, reviewing, and preparing

23   Plaintiffs' non-email ESI, including numerous database records, for production. This

24   began with Ms. Arandes leading multiple meetings with Plaintiffs and their IT

25   professionals. Ms. Arandes supervised the review of Plaintiffs' database records to

26   help identify individuals who had sought accessible, affordable housing in the City of

27   Los Angeles, both to respond to Defendants' discovery requests and for outreach to

28

1 such individuals as possible witnesses. With respect to Defendants' non-email ESI,

2 she reviewed screenshots of City databases and drafted correspondence requesting

3 additional information and records.

4   132. Under the supervision of Ms. Klar and Mr. Chang, Ms. Arandes took a

5 significant role in responding to written discovery requests from Defendants and

6 drafting Plaintiffs' written discovery requests. For example, Ms. Arandes drafted

7 Plaintiffs' responses to hundreds of individual discovery requests from the City,

8 including working with clients to identify responsive documents and preparing those

9 documents for production. Ms. Arandes also assisted in drafting extensive

10 supplemental disclosures and supplemental interrogatory responses. Ms. Arandes

11 participated in the preparation of Plaintiffs' final sets of requests for admission,

12 requests for production of documents, and interrogatories. She then reviewed

13 responses from Defendants and engaged in numerous meet and confers successfully to

14 obtain supplemental responses and documents. She also drafted discovery to owner-

15 defendants and engaged in follow-up discussions with owner-defendant counsel.

16   133. Ms. Arandes assisted Ms. Klar regarding the development and production

17 of Plaintiffs' seven expert reports and supporting documentation. She assisted in

18 coordinating the gathering of necessary documents for expert review, including

19 blueprints for the properties in the CRA Housing Program from the Los Angeles

20 Department of Building and Safety and third parties. She coordinated on-site

21 inspections with Plaintiffs' experts, opposing counsel, and third parties. Ms. Arandes

22 drafted emails to the court on issues that arose in obtaining this information and

23 argued issues related to third-party inspections before the Magistrate Judge. In

24 addition, she assisted Mr. Chang with reviewing Defendants' and publicly available

25 documents for the relevant information regarding the CRA Housing Program and

26 creating a spreadsheet that included all relevant facts and separated the developments

27 into tranches for expert review.

28

134.   Ms. Arandes also engaged in a variety of other litigation tasks. Ms. Arandes took several depositions and assisted in the preparation for other depositions as second chair. Ms. Arandes also assisted in researching and drafting Plaintiffs' briefs under the supervision of Mr. Samberg-Champion. She assisted with the motion to compel ADAAG measurements and photographs and the reply in support thereof, and with Plaintiffs' successful appeal. She also provided research for and drafted portions of the request for judicial notice associated with CRA motion for judgment on the pleadings. Ms. Arandes supervised outreach efforts to individuals who had sought accessible, affordable housing in the City of Los Angeles and met with many such witnesses, resulting in several fact witness declarations. It was highly efficient for the firm to give these assignments to Ms. Arandes, the most junior attorney capable of handling these more time-intensive tasks.

135.   Margaret Burgess was an Attorney-Fellow with Relman, Dane & Colfax from 2015 to 2016 (and a summer associate at Relman, Dane & Colfax in the summer of 2014, under the name Margaret Dreschel). Ms. Burgess is a 2015 graduate of the University of California at Berkeley School of Law. Although Ms. Burgess was admitted to the bar partway through her time as an Attorney-Fellow, her time on this matter is billed at the lowest possible rate for any attorney, used for individuals who graduated from law school regardless of the year of graduation. In September 2016, Ms. Burgess began a clerkship with the Honorable Amy Totenberg on the U.S. District Court for the Northern District of Georgia.

136.   The Firm assigned Ms. Burgess, as a junior attorney, to provide assistance in discovery tasks, including legal research, creating a protocol to review ESI produced by Defendants, and reviewing ESI. Ms. Burgess also assisted in drafting Plaintiffs' responses to requests for production.

137.   Relman summer associates and term-time law clerks provided legal research regarding issues such as discovery deficiencies, contention interrogatory

1   obligations in the Ninth Circuit, attorney-client privilege, and definitions of financial

2   assistance.

3        138.   Throughout the litigation, paralegals employed by Relman, Dane &

4   Colfax played a host of critical roles. Relman, Dane & Colfax uses the term

5   "paralegal" to refer to an individual who performs the role of a legal assistant and not

6   to signify the technical definition in California Business & Professions Code Sections

7   6450-6456.

8        139.   Paralegals substantially assisted in the factual development of the case.

9   The use of paralegals in this context, as opposed to attorneys at higher billing rates,

10  results in a significantly reduced lodestar. For example, under the supervison of

11  attorneys, paralegals contacted, interviewed, and drafted declarations of people with

12  disabilities who had difficulty finding accessible, affordable housing in the City of Los

13  Angeles. Paralegals also had significant responsibility for developing the facts

14  regarding the identity and funding of the properties in the CRA Housing Program and

15  obtaining the necessary documents for Plaintiffs' expert reports analyzing the

16  accessibility of the portfolio. Paralegals had primary responsibility for obtaining and

17  reviewing building plans for the approximately 253 housing developments in the CRA

18  Housing Program. Paralegals were tasked with reviewing and analyzing City Council

19  Transmittals and other public documents to determine whether housing developments

20  received financial or other assistance from the CRA, the State of California or the

21  federal government. Paralegals also conducted factual research regarding topics such

22  as construction dates for housing projects in the CRA Housing Program and

23  Recognized Obligations of the CRA. Paralegals tracked the factual development of the

24  CRA portfolio in critical spreadsheets used by the attorneys and expert witnesses. In

25  addition, Paralegals had primary responsibility for reviewing documents to locate and

26  identify those that supported Plaintiffs' claims for diversion of resources and

27  frustration of mission.

28

140.   Paralegals had significant responsibility for the production of paper and ESI discovery by Plaintiffs and obtaining and reviewing discovery produced by Defendants. Paralegals gathered both paper and ESI documents from the clients responsive to discovery and reviewed, analyzed, and compiled documents for production by Plaintiffs. Paralegals also drafted privilege and redaction logs for review by attorneys. Under the supervision of attorneys, paralegals reviewed, analyzed, and scanned hundreds of thousands of pages of project files and other documents produced for inspection by Defendants. Paralegals reviewed and coded ESI to be produced by Plaintiffs and participated in initial review of ESI produced by Defendants.

141.   In addition, Paralegals provided other key assistance to attorneys working on the case to promote efficiency. Paralegals performed a variety of additional discovery-related tasks. Paralegals assisted with drafting and revising discovery requests, drafting deposition notices, drafting subpoenas and revising deficiency letters and motions to compel. Paralegals provided important assistance to attorneys on pleadings and briefs. Paralegals assisted with preparation of pleadings and briefs and managed their filing and service. Paralegals organized, attended and drafted notes of co-counsel conference calls during which strategy and assignments were discussed and performed similar roles for conference calls with clients and opposing counsel and hearings with the Magistrate Judge.

142.   From the start of this litigation, consistent with the Firm's practice, all attorneys and paralegals maintained a contemporaneous record of all time spent working on this case, as well as a description of the tasks performed. Time was entered on the Firm's computerized database as it was performed.

143.   Relman, Dane & Colfax efficiently used outside contract attorneys and paralegals to assist in reviewing project files produced by the City and the CRA for housing projects within the CRA Housing Program. Under the supervision of

1    attorneys on the case, these outside contract attorneys reviewed hundreds of thousands

2    of pages of project files, indexed them, and marked them for scanning. The contract

3    attorneys and contract paralegals also reviewed and analyzed voluminous documents

4    produced by the City and the CRA in discovery and coded the documents so that they

5    could be sorted and used by attorneys on the case as evidence. Regardless of

6    graduation year, all such outside contract attorneys are billed at the lowest law

7    graduate rate, and paralegals are billed at the standard paralegal rate.

8        144.   Relman, Dane & Colfax paid for part of the cost of two contract attorneys

9    hired by DRC from October to December of 2013.[3] Those contract attorneys and the

10   hours they worked are:

| Contract Attorney | Year of Graduation | Barred | Hours Worked | Rate Requested | Total Requested |
|---|---|---|---|---|---|
| Christine Challoner | 2011 | Yes | 78.0 | $320.00 | $24,960.00 |
| Keely Masterson | 2012 | Yes | 219.6 | $320.00 | $70,272.00 |

14       145.   Relman, Dane & Colfax then hired four contract attorneys from an

15   outside vendor to continue this work from December 2013 to April 2014. Those

16   contract attorneys and the hours they worked are:

| Contract Attorney | Year of Graduation | Barred | Hours Worked | Rate Requested | Total Requested |
|---|---|---|---|---|---|
| Jeremiah Swett | 2009 | No | 395.7 | $320.00 | $126,624.00 |
| Anna Tarasyuk | 2010 | Yes | 173.6 | $320.00 | $55,552.00 |
| Amanda Moore | 2011 | Yes | 86.6 | $320.00 | $27,712.00 |
| Sarin Neshanian | 2012 | Yes | 312.8 | $320.00 | $100,096.00 |
| Ashley Edwards | 2013 | No | 69 | $320.00 | $22,080.00 |

[3] Relman, Dane & Colfax and DRC split the costs for these contract attorneys. Both organizations have ensured that they are not requesting duplicative fees for these contract attorneys.

1    146.   Relman, Dane & Colfax hired three contract paralegals from the same

2    outside vendor to assist in this work from January 2014 through May 2014. These

3    three paralegals worked 1,477 hours.

4    147.   The use of these junior attorneys and paralegals, hired through outside

5    vendors, who could go onsite to review the hundreds of thousands of documents made

6    available by Defendants was reasonable, particularly because the documents were

7    made available when Plaintiffs' counsel were busy with written discovery requests

8    and responses, negotiations over ESI, and preparing for depositions.

9    **Fees Sought By Relman, Dane & Colfax**

10    148.   The Firm's requested hourly rates are based on the prevailing rates in the

11    Los Angeles legal marketplace for attorneys of similar experiences and qualifications,

12    based on 2016 rates.

13    149.   The requested rates are shown below for each timekeeper included in this

14    request, including the timekeeper's year of graduation from law school:

15

16

| NAME | YEAR OF GRADUATION | RATE |
|---|---|---|
| John Relman, Founding and Managing Partner | 1983 | $975.00 |
| Michael Allen, Partner | 1985 | $900.00 |
| Tom Keary | 1973 | $750.00 |
| Scott Chang | 1990 | $750.00 |
| Jennifer Klar, Partner | 2002 | $675.00 |
| Jia Cobb | 2005 | $625.00 |
| Liyah Brown | 2004 | $625.00 |
| Sasha Samberg-Champion | 2004 | $625.00 |
| Jamie Crook | 2006 | $600.00 |
| Emilie Burnette | 2007 | $575.00 |
| Tim Smyth | 2007 | $575.00 |
| Jean Zachariasiewicz | 2010 | $500.00 |

| | | |
|---|---|---|
| Laura Arandes | 2011 | $500.00 |
| Margaret Burgess | 2015 | $320.00 |
| Outside Contract Attorneys | Varied | $320.00 |
| Law Clerks | | $250.00 |
| Paralegals | | $230.00 |

150.   Through August 31, 2016, Relman, Dane & Colfax attorneys and staff (and their contract attorneys and paralegals) have recorded a total of 30,785.50 hours on this matter. The total uncut lodestar through August 31, 2016, for Relman, Dane & Colfax is $15,885,770.50.

151.   Relman, Dane & Colfax counsel have carefully reviewed the time descriptions for each attorney and staff member at the Firm for whom fees are sought and have exercised billing judgment to insure that the petition does not include time that might involve duplication, unnecessary work, or work on issues where the plaintiffs did not prevail, and to ensure that the fees requested are reasonable.

152.   Before making any across the board cut, Relman, Dane & Colfax has voluntarily made billing discretion cuts of over $2.5 million from the instant fee petition. More specifically, 4,580.20 hours expended by Relman, Dane & Colfax attorneys and paralegals have been voluntarily cut, at a value of $2,545,333.50. I have excluded the following time:

a.   In the exercise of billing discretion, Relman, Dane and Colfax has not charged for any attorney who worked fewer than 100 hours on this case. Notwithstanding the necessity of this work to the successful prosecution of this case, the removal of this time reduced the Firm's lodestar by $129,228. This cut reflects 72.3 hours spent by Firm partners not assigned to the case, but whose perspective on litigation strategy or whose expertise on a particular substantive area of the law was deemed valuable by the three Relman, Dane & Colfax partners who worked actively on the

- 51 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1    litigation. The cut also reflects 157.80 hours of other attorney time,

2    generally reflecting research and other support provided to the core

3    litigation team during particularly busy time periods in the

4    litigation. Similarly, in the exercise of billing discretion, Plaintiffs

5    cut time spent for attorneys and paralegals to reflect the less

6    productive time spent getting up to speed on the case. This exercise

7    of billing discretion cuts 29.6 hours for Relman, Dane & Colfax

8    timekeepers, valued at $18,945.00.

9    b.   Relman, Dane & Colfax also exercised billing discretion in

10    charging the lowest "law graduate" rates for all outside contract

11    attorneys who had passed the bar exam, rather than applying higher

12    standard billing rates based on their year of graduation. This

13    exercise of billing discretion cut $143,398 in fees.

14    c.   Relman, Dane and Colfax voluntarily cut more than $1 million in

15    time related to unsuccessful settlement negotiations in 2015.

16    Pursuant to a settlement "Term Sheet" entered into with the City,

17    Plaintiffs agreed that they "[would] not seek reimbursement from

18    the City for any attorneys' fees or costs incurred by the Plaintiffs

19    for the 90-day period from the date this agreement is signed for

20    work on the case unrelated to settlement negotiations, except to the

21    extent the City's requests or actions specifically require Plaintiffs

22    to spend time during that period." Because the then-current case

23    schedule required Plaintiffs to continue to conduct discovery and

24    prepare for an affirmative summary judgment motion, and because

25    a previous proposed stay agreement had not been fruitful with

26    respect to securing a settlement, Plaintiffs' counsel agreed to

27    litigate without payment from the City for specified work between

28

1            January 7, 2015 and April 7, 2015. While, for reasons beyond their

2            control, no settlement was immediately forthcoming, Plaintiffs

3            voluntarily extended this time an additional fifty-three (53) days,

4            until the end of May, 2015, because they regarded the City's

5            engagement in the settlement process to reflect its good faith

6            interest in resolution. Eventually, though, the sheer scope of

7            discovery and litigation necessary to comply with the Court's

8            schedule required Plaintiffs' counsel to advise the City that they

9            could no longer write off the time. For the 144-day period, Relman,

10            Dane & Colfax (lead counsel in the litigation) has forgone a fees

11            claim against the City for 2,392.00 hours necessarily spent to

12            advance the litigation, valued at $1,061,355.50.

13       d.      Relman, Dane and Colfax has removed from the lodestar sought

14            against the City in the fee petition almost $575,000.00 worth of

15            time necessarily expended litigating this matter from May 12, 2016

16            to August 31, 2016.[4] On May 12, 2016, Plaintiffs executed the

17            Settlement Agreement with the City. However, the City Council

18            did not approve the Settlement Agreement until August 30, 2016,

19            and it was not signed by the Mayor until September 5, 2016. In

20            fact, the Settlement Agreement was brought before the City

21            Council in executive session on June 8, 2016, but no vote for

22            approval was taken. Thus, it would be entirely reasonable for

23            Plaintiffs to continue to include the time spent litigating the case

24            between June 8, 2016 and the Mayor's signature on September 5,

25            2016 in the fee petition. In light of previous mediation sessions in

26            2013 and 2014, when the signed term sheets did not result in a

27 ───────────────

28 [4] Plaintiffs have not included any time after August 31, 2016 in the fee petition.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1      settlement, and given the prolonged period of time between

2      January 7, 2015 and May 26, 2015, for which the Firm has already

3      agreed to write off more than $1 million in time, Plaintiffs

4      reasonably could have included fees for the period between June 8,

5      2016 and September 5, 2016, when the City took its final act to

6      ratify the settlement. Nonetheless, Plaintiffs are not requesting that

7      the City pay for this time. All told, for matters described in this

8      paragraph alone, Relman, Dane and Colfax have cut 959.30 hours

9      spent by attorneys and paralegals, with a value of $574,956.00.

10    e.    In their Motion, Plaintiffs have not requested reimbursement for

11      time spent in the preparation of this fee petition, which is required

12      by the Settlement Agreement. Through August 31, 2016, Relman,

13      Dane & Colfax had accrued 130.70 hours of work on this fee

14      motion, valued at $83,981.00. That amount will certainly increase

15      significantly, given that the bulk of work on the motion and its

16      supporting papers occurred during the month of September 2016.

17      Nor has the Firm sought fees expended by attorneys in its

18      compilation and submission of costs to the City, a step required by

19      the Settlement Agreement. Plaintiffs reserve the right to seek

20      reasonable fees for the preparation of this Motion in their brief in

21      response to any opposition filed by the City.

22    f.    Out of an abundance of caution, Relman, Dane & Colfax has

23      voluntarily cut over $500,000 in time that includes attorney and

24      paralegal travel. Relman, Dane & Colfax was lead counsel in this

25      case. The case necessarily included extensive travel to California

26      for depositions, mediations, deposition preparation of Plaintiffs,

27      collection of client documents in discovery, and myriad other

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1    reasons. However, Relman, Dane and Colfax has voluntarily

2    removed time associated with travel. To effectuate this, the Firm

3    cut ten hours (or the entire time entry, if reflecting less than ten

4    hours, or the travel time if specified) when a paralegal traveled

5    from Washington to California. For attorneys, who work during

6    their travel, the Firm cut five hours (or the entire time entry, if

7    reflecting less than five hours, or the travel time if specified).

8    Having reviewed the time entries, it is clear that that cutting five

9    and ten hours for attorney and paralegals, respectively, cut more

10    time than was committed to travel and was an aggressive cut. The

11    total hours cut for travel are 838.50 hours at a value of

12    $510,616.50.

13    g.    In addition to the specific types of cuts executed in the exercise of

14          billing discretion described above, we reviewed every time entry

15          and made additional cuts in the exercise of billing discretion. This

16          additional review removed 55.8 additional hours, valued at

17          $22,853.50.

18    153.    In addition to all of the reductions described above, I applied a 10%

19    reduction to the adjusted lodestar to ensure that this request does not include any time

20    that was duplicative, administrative, or otherwise not directly necessary to the

21    litigation of Plaintiffs' claims. This is an additional cut for Relman, Dane & Colfax of

22    $1,334,043.70.

23    154.    The total amount sought by Plaintiffs for time spent by Relman, Dane &

24    Colfax attorneys and staff (including contract attorneys and paralegals) is 26,205.30

25    hours valued at $13,340,437. Attached as Exhibit B are the billing records for Relman,

26    Dane & Colfax through August 31, 2016 (which Plaintiffs are submitting to the Court

27    for in camera review and serving on the City).

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1    155.   Relman, Dane & Colfax counsel have reviewed the Firm's time

2    descriptions submitted in conjunction with this fee petition and based on my

3    experience and expertise litigating civil rights cases, especially fair housing cases, I

4    believe that the time for which the Firm seeks compensation was necessary and

5    essential to properly litigate this case and obtain favorable results for our clients.

6    156.   Having invested 30,785.50 uncut hours, as detailed in this declaration,

7    from mid-2011 through early fall of 2016, Relman, Dane & Colfax had to decline

8    requests to undertake other litigation and billing work, or postpone engagements for

9    such work, or play a smaller role in such work. In addition, by virtue of assignment to

10   this litigation, associates and paralegals were simply unavailable to work on other

11   matters on which the firm had been retained, including important litigation

12   challenging predatory lending, discriminatory zoning ordinances or actions, and

13   matters seeking to enforce the accessibility requirements of the Fair Housing Act. The

14   deep involvement in this litigation of three of the firm's seven partners—John

15   Relman, Jennifer Klar, and me—also meant that the Firm withstood a prolonged

16   period during which these partners were extremely limited in their ability to develop

17   new litigation or billing matters and had to reduce the time they spent supervising the

18   work of associates and paralegals on existing matters.

19                    **Total Amount Sought by All Plaintiffs' Counsel**

20   157.   For time spent on pre-suit investigation up to the filing of the original

21   Complaint on January 12, 2012, Plaintiffs' counsel seek to recover for 218.55 hours,

22   valued at $148,317.50.

23   158.   For the period from the filing of the original Complaint through the

24   Court's November 29, 2012 ruling on Defendants' Rule 12 motions, Plaintiffs'

25   counsel include in this petition 1,693.40 hours, valued at $1,067,344.00, after the

26   exercise of billing discretion.

27

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

159.   The total time spent by Plaintiffs' counsel following the ruling on the motion to dismiss through the failed January 2014 mediation constitutes 6,749.40 hours valued at $3,476,536.00 after applying billing discretion.

160.   After applying billing discretion, counsel invested 12,909.15 hours, worth $6,125,761.00, on discovery and settlement tasks from January 2014 through early January 2015.

161.   After removing time pursuant to the Term Sheet with the City and exercising billing discretion, Counsel invested 1,369.35 hours valued at $1,115,119.50 for its work on settlement from January 8, 2015 to May 31, 2015.

162.   After the Term Sheet expired at the end of May in 2015, Plaintiffs simultaneously conducted all the discovery necessary to prepare their claims for summary judgment or trial and continued settlement negotiations with the City that resulted in a new Term Sheet on April 12, 2016. After billing discretion, counsel invested 10,289.45 hours valued at $5,357,379.50 during this stage of the case.

163.   After the term sheet was signed in April 2016, counsel invested 1,106.45 hours valued at $734,167.00 for work on settlement issues and work other than continued litigation through August 31, 2016.

164.   Plaintiffs' counsel expended 40,419.15 hours total worth $21,499,772.50 before the exercise of any billing judgment.

165.   Plaintiffs' counsel reviewed their time entries and exercised billing judgment for a variety of issues, including time spent on necessary litigation tasks during a 144-day period in 2015 when Plaintiffs' counsel agreed to litigate without seeking payment while the parties continued to explore settlement; time expended to continue litigating this matter between May 12, 2016, when Plaintiffs executed the Settlement Agreement and the end of August 2016 when the City Council approved the Settlement Agreement; time billed by attorneys who performed relatively minimal

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1   work; and other billing discretion. The total value of the time excluded through these

2   reductions is $3,475,148.00, or 16.16% of the unadjusted lodestar.

3        166.   Relman, Dane & Colfax, DRC, and DRLC, who billed the vast majority

4   of hours, then applied a 10% across-the-board reduction. This excludes an additional

5   $1,765.909.95 from the value of the total hours expended in the litigation. David

6   Geffen Law Firm applied a 3% across-the-board reduction, excluding an additional

7   $10,966.00. Thus, Plaintiffs' counsel's final lodestar is $16,247,748.55 which is over

8   $5.2 million (or 24.4%) less than the $21,499,772.50 value for the 40,419.15 hours it

9   actually spent litigating this matter.

10        167.   The application of a 1.2 multiplier to Plaintiffs' lodestar of

11   $16,247,748.55 is $19,497,298.26.

12              **Plaintiffs' Requested Lodestar and Multiplier are Reasonable**

13        168.   Plaintiffs initiated this litigation to address the inaccessibility of the

14   City's and CRA's affordable CRA Housing Programs only after vigorous efforts to

15   secure voluntary compliance by the City and CRA with their obligations under

16   Section 504, the ADA, and Section 11135.

17        169.   The necessity of private enforcement in this matter is underscored by the

18   fact the Defendants were public entities whose components—HCID, LADBS and

19   CRA—were charged with ensuring compliance with federal and state accessibility

20   requirements, but failed to do so. When no compliance or enforcement by a

21   governmental entity was forthcoming, Plaintiffs' counsel filed the original complaint

22   in this action on January 13, 2012, on behalf of ILCSC, FHCSFV and CALIF seeking

23   declaratory, injunctive, and monetary relief under federal and state law (the latter of

24   which imposes accessibility standards to a broader category of housing units than the

25   former). Through more than four years of hard-fought discovery and substantive legal

26   battles—achieved only by the investment of the 34,335.75 hours of attorney and

27   paralegal time for which fees are sought and the out-of-pocket expenditure of almost

28

1   $750,000 to hire experts, conduct discovery and to cover other necessary case

2   expenses—Plaintiffs' counsel have achieved results that far exceed those in any

3   previous HUD, DOJ, or California Attorney General enforcement action involving the

4   accessibility of affordable housing units.

5       170.   By virtue of their commitment to resolving the important public policy

6   concern caused by the Defendants' failure to ensure that the CRA Housing Program

7   was accessible to people with disabilities, and because all three of the nonprofit

8   Plaintiff organizations lacked the resources even to pay the very modest costs of

9   investigating the claims later brought in this litigation, all four firms/organizations

10  representing Plaintiffs took on all the financial risk in this litigation, both with respect

11  to the 40,419.15 hours of attorney and paralegal time eventually devoted to it, but also

12  all of the out-of-pocket expenses described above.

13      171.   Furthermore, because this litigation sought to achieve the accessibility of

14  units and buildings within the CRA Housing Program, to ensure the adoption of

15  policies that prioritized such units for people with disabilities, and to secure damages

16  for Plaintiffs consistent with their diversion of resources and frustration of missions,

17  Plaintiffs' counsel had no hope or expectation of securing any contingent recovery in

18  this matter. Rather, Plaintiffs' counsel have relied, since the inception of this case,

19  only on the prospect of recovering fees through the "fee-shifting" provisions

20  applicable under Section 504, the ADA and Section 11135. Such an arrangement

21  constitutes a significant risk for a small, civil rights firm like Relman, Dane & Colfax,

22  and for its co-counsel.

23      172.   Because of the complex legal issues in this case—some of which

24  involved matters of first impression—and the manner in which the City chose to

25  defend it during the first three years of the litigation, this case was far from an

26  ordinary, run-of-the-mill case that could be handled by a single firm or non-profit. To

27  the contrary, we needed not only deep knowledge of the disability civil rights laws and

28

1  the capacity to litigate against the second largest city in the country, but we also

2  needed specialized knowledge about the California legislation dissolving the CRA,

3  local expertise and connections to identify and interview individuals who had been

4  deprived of accessible housing, and deep knowledge of the operations of City

5  agencies. Given those needs and the substantive and procedural complexity of the

6  claims, all four firms representing Plaintiffs played important roles in the litigation

7  and contributed to the successful settlement.

8      173.   In addition, the sheer amount of time and money required to litigate this

9  case meant that no single office could have had the staffing capacity or resources

10  required, or the ability to shoulder the entire contingency risk (in terms of costs

11  incurred and attorney time required) on its own. Given our firm's obligations in other

12  litigation, we were not able to litigate this case without assistance, and the same is true

13  for each of the other law offices.

14      174.   Based on my decades of experience litigating disability rights and

15  housing discrimination cases, and based on my frequent study of settlements in such

16  cases, I believe that the Settlement Agreement we achieved with the City represents

17  the largest settlement in U.S. history addressing the lack of accessible affordable

18  housing. The systemic changes to the CRA Housing Program and the creation of

19  4,000 units of accessible affordable housing will impact 727 separate apartment

20  developments with nearly 47,000 units located in neighborhoods throughout Los

21  Angeles, that comprise the City's affordable housing program. The settlement also

22  includes significant changes to the City's policies and procedures to ensure that people

23  with disabilities have access to and priority for accessible units and that the City has

24  mechanisms in place to ensure that its program, as a whole, is accessible to individuals

25  with disabilities.

26

27

28

- 60 -

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
Declaration of Michael G. Allen in Support of Pls.' Mot. for Attorneys' Fees

1 **Exhibits**

2     175.   Plaintiffs executed and returned the Settlement Agreement to the City on

3 May 12, 2016. The City Council voted to endorse the Settlement Agreement on

4 August 29, 2016, and the Mayor signed the Official Action of the Los Angeles City

5 Council on September 5, 2016. Due to a filing error, the Settlement Agreement that

6 the parties submitted to the Court (*see* Doc. 530-2), was missing section and paragraph

7 numbers. A corrected version of the Settlement Agreement will be re-filed with an

8 errata in order to allow the parties and the Court to more easily reference provisions in

9 the Settlement Agreement. Attached as Exhibit A is a version with text identical to

10 that previously filed with the Court, except that it includes section and paragraph

11 numbers for reference in this declaration and for the convenience of the Court and the

12 parties.

13     176.   Attached hereto as Exhibit B is a true and correct copy of the time

14 records claimed in this petition by Relman, Dane & Colfax on this matter from June

15 27, 2011, to August 31, 2016. These are contemporaneous records of time that were

16 entered into the Firm's computer program for maintaining billing records. Plaintiffs

17 are concurrently seeking leave to submit Exhibit B for in camera review because the

18 time records contain work product and reveal Plaintiffs' legal strategy and Plaintiffs

19 are still litigating their claims against Defendant CRA.

20     177.   Exhibit C to this Declaration consists of true and correct copies of

21 declarations executed by 43 people with disabilities who have faced or are facing

22 challenges obtaining accessible affordable housing in the City. Plaintiffs are

23 concurrently seeking leave to submit Exhibit C under seal because the declarations

24 contain confidential medical information about the individual declarants.

25     178.   Exhibit D to this Declaration is a true and correct copy of the Expert

26 Report (without exhibits) prepared by Plaintiffs' expert Bill Hecker in this Matter that

27 was disclosed to Defendants on March 24, 2016.

28

1    179.  Exhibit E to this Declaration is a true and correct copy of the Amended

2    Expert Report (without exhibits) prepared by Plaintiffs' expert Glenn Dea in this

3    Matter that was disclosed to Defendants on March 29, 2016.

4    180.  Exhibit F to this Declaration is a true and correct copy of the Expert

5    Report (without exhibits) prepared by Plaintiffs' expert Allan Parnell in this Matter

6    that was disclosed to Defendants on March 24, 2016.

7    181.  Exhibit G to this Declaration is a true and correct copy of the Expert

8    Report (without exhibits) prepared by Plaintiffs' expert Bernard Siskin in this Matter

9    that was disclosed to Defendants on April 7, 2016.

10

11   I declare under penalty of perjury that the foregoing is true and correct to the

12   best of my knowledge, information, and belief. Executed this 7th day of October,

13   2016.

14

15                              /s/ Michael G. Allen

                                Michael G. Allen

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT

# A

MICHAEL G. ALLEN, *pro hac vice*
JOHN P. RELMAN, *pro hac vice*
D. SCOTT CHANG #146403
JENNIFER I. KLAR, *pro hac vice*
RELMAN, DANE & COLFAX PLLC
1225 19th St. NW, Suite 600
Washington, D.C. 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
mallen@relmanlaw.com
schang@relmanlaw.com

MARONEL BARAJAS #242044
DISABILITY RIGHTS LEGAL CENTER
Loyola Public Interest Law Center
256 S. Occidental Blvd., Suite B
Los Angeles, CA 90057
Telephone: (213) 736-1496
Facsimile: (213) 736-1428
Maronel.barajas@drlcenter.org

DAVID GEFFEN #129342
DAVID GEFFEN LAW FIRM
530 Wilshire Blvd., Ste. 205
Santa Monica, CA 90401
Telephone: (310) 434-1111
Facsimile: (310) 434-1115
Geffenlaw@aol.com

DARA SCHUR #98638
DISABILITY RIGHTS CALIFORNIA
1330 Broadway, Ste. 500
Oakland, CA 94612
Telephone: (510) 267-1200
Facsimile: (510)267-1201
Dara.Schur@disabilityrightsca.org

AUTUMN ELLIOTT #230043
SRIVIDYA PANCHALAM #265398
DISABILITY RIGHTS CALIFORNIA
350 S. Bixel Street., Ste. 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Autumn.Elliott@disabilityrightsca.org

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT FOR THE
CENTRAL DISTRICT OF CALIFORNIA (WESTERN DIVISION)**

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al.* | ) Case No.:  12-CV-00551 FMO (PJWx) |
| Plaintiffs, | ) |
| vs. | ) **SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS** |
| CITY OF LOS ANGELES, CALIFORNIA, and COMMUNITY REDEVELOPMENT AGENCY OF THE CITY OF LOS ANGELES, | ) |
| Defendants. | ) |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# **<u>TABLE OF CONTENTS</u>**

**SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS............. 1**

I.   RECITALS ....................................................................... 1

II.  DEFINITIONS ............................................................... 4

III. SCOPE AND TERMS OF THE AGREEMENT ........................ 11

IV. MONITORING ......................................................... 333

V.  RECORD KEEPING AND REPORTING ................................ 377

VI. MUTUAL RELEASE OF CLAIMS ................................. 388

VII.   DISPUTE RESOLUTION ....................................... 411

VIII.  COMPENSATION AND FEES........................................... 422

IX. COURT'S RETENTION OF JURISDICTION ........................ 444

X.  MISCELLANEOUS................................................... 444

## SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

This Settlement Agreement and Release of Claims (the "Agreement") is entered into between the City of Los Angeles (the "City"), a municipal corporation, and Independent Living Center of Southern California ("ILCSC"), Fair Housing Council of San Fernando Valley ("FHC"), and Communities Actively Living Independent and Free ("CALIF") (collectively referred to herein as "Plaintiffs"). The City and the Plaintiffs are referred to herein collectively as "the Parties."

## I.   RECITALS

This Agreement is made and entered into with reference to the following facts:

1. On January 13, 2012, Plaintiffs commenced litigation against the City and CRA/LA, A Designated Local Authority, Successor to Community Redevelopment Agency of the City of Los Angeles ("CRA/LA") known as *Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.*, filed on January 13, 2012, in the U.S. District Court for the Central District of California, Case No. 2:12-cv-00551-FMO-PJW (the "Litigation"). The Litigation concerns multifamily apartment buildings that received or will receive any Federal financial assistance from the City after July 11, 1988, and/or (2) was or will be designed, constructed, altered, operated, administered, or financed, in whole or in part, in connection with a program administered in whole or in part by the City since January 26, 1992. Plaintiffs also joined, for Rule 19 purposes, a total of 61 owners of multifamily properties that had been assisted by the City or CRA ("Owner Defendants"). The CRA/LA and Owner Defendants are not Parties to this agreement.

2. On August 20, 2012, the Plaintiffs filed a Second Amended Complaint ("SAC"), which remains the operative complaint in this proceeding. The SAC alleges that the City and CRA/LA engaged in a pattern or practice of discrimination against people with disabilities—in violation of Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; Title II of the Americans with

1

Disabilities Act ("ADA"), 42 U.S.C. § 12132; and California Government Code Section 11135, et seq. ("Section 11135")—by failing to ensure that multifamily housing funded, developed or significantly assisted by the City or CRA is accessible and made meaningfully available to people with disabilities.  The SAC names the City as a defendant in its own capacity and in its capacity as the successor housing agency under the Redevelopment Dissolution Law, following dissolution of the former Community Redevelopment Agency of the City of Los Angeles, as further described in the SAC, Paragraph 35 et seq.

3.     On November 29, 2012, the Hon. S. James Otero denied the City's and CRA/LA's motion to dismiss with respect to Plaintiffs' claims under Section 504, the ADA and Section 11135.

4.     Plaintiffs sought by this Litigation to ensure that multifamily housing developments in Los Angeles built at least in part with public funds or in connection with City programs are made accessible and meaningfully available to people with disabilities.  They also sought to ensure that the City and CRA/LA comply with their own program access and other obligations to people with disabilities with respect to the operation of multifamily housing programs as they relate to people with disabilities, in accordance with the requirements of Section 504, the ADA, and Section 11135.

5.     The City represents that Exhibit A to this Agreement is a full and complete listing of (1) all of the Housing Developments that received any Federal financial assistance from the City since July 11, 1988, plus (2) all of the Housing Developments that were designed, constructed, altered, operated, administered, or financed, in whole or in part, in connection with a program administered in whole or in part by the City since January 26, 1992, with the exception of Housing Developments listed in Exhibit B to this Agreement.  The City further represents that there are no omissions from the listing other than those Housing Developments listed in Exhibit B and that the City will promptly advise Plaintiffs and supplement

the listing if it learns at any time that any Housing Development that should have been on the listing was excluded.

6.     Exhibit B to this Agreement is a list of 22 Housing Developments that received Federal funds through the City and the CRA since July 11, 1988, and in which the City and former Community Redevelopment Agency of the City of Los Angeles entered into Cooperation Agreements or other agreements prior to June 28, 2011, which explicitly required the former Community Redevelopment Agency to fulfill outstanding obligations imposed by the U.S. Department of Housing and Urban Development in connection with the funds, including compliance with Section 504 of the Rehabilitation Act.  The Housing Developments in Exhibit B are not covered by the accessibility and remediation provisions at Paragraphs III.10.(a) through III.10.(j) of this Agreement.

7.     The City denies that it violated Section 504, the ADA, or Section 11135 or that it committed any discrimination.  The City enters into this Agreement for settlement purposes only.  The entry of the attached Final Judgment, the terms of this Agreement, and actions taken pursuant to those documents shall not be construed as an admission by the City of any fault or wrongdoing, or as an admission of the validity of any claims made by the Plaintiffs.  This Agreement shall not be treated as an admission of liability or wrongdoing by any party for any purpose and shall not be used by any party in any future proceeding, in any venue whatsoever, either within the City or otherwise, on the issue of liability, knowledge, or past practice and custom.

8.     During the pendency of the Litigation, Plaintiffs and the City undertook extensive discovery and engaged in extensive discussions regarding a potential resolution and settlement of the Plaintiffs' claims in the Litigation, including in mediation before private mediators.  As a result of such discussions, the Parties now wish to effect a complete resolution and settlement of the claims, disputes, and controversies relating to the Plaintiffs' allegations in the Litigation, and to resolve

their differences by settling such claims, disputes, and controversies under the terms set forth in this Agreement.

9.      The Parties intend this Agreement to bind and apply to the City and Plaintiffs.  Entry of Judgment pursuant to this Agreement shall extinguish all Released Claims (as defined below) and constitute final and complete resolution of all issues addressed herein.

10.      The goal of the Agreement is to significantly enhance the accessibility of multifamily housing in Los Angeles, the availability of fair and accessible housing for individuals with a variety of disabilities, including mobility, visual and hearing disabilities, and the accessibility of the City's housing programs.

## II.   DEFINITIONS

1.      "Accessible," when used with respect to a Housing Unit or a Housing Development, means and refers to full compliance with the requirements of the Accessibility Standards for purposes of Section 504, the ADA, and Section 11135, as well as adoption of the policies attached hereto as Exhibit C.

2.      "Accessible Housing Development" means a Housing Development that is Accessible, including Accessible public and common use areas, as required by Section 504 and the ADA, as well as the number and type of Accessible Housing Units that are required to be Accessible by this Agreement.

3.      "Accessible Housing Units" refers collectively to Housing Units with Mobility Features and Housing Units with Hearing/Vision Features.

4.      "Accessibility Laws" means Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 et seq,; the Americans with Disabilities Act, 42 U.S.C. §12131 et seq.; California Government Code Section 11135 et seq.;  implementing regulations and design standards for each of the preceding statutes; and the California Building Code.

4

5.     For purposes of this Agreement, "<u>Accessibility Standards</u>" means only the following compliance standards:

a.     For Housing Developments constructed or substantially altered before March 15, 2012, the new construction requirements of 24 C.F.R. pt. 8, including 24 C.F.R. §§ 8.22 and 8.32 as well as the new construction requirements of UFAS, or their successor standards;

b.     For Housing Developments constructed or substantially altered on or after March 15, 2012:

    i.     the requirements in 5(a);

    ii.     the Alternative Accessibility Standard; or

    iii.     any future accessibility standard and other regulatory requirements applicable to newly constructed facilities in federally-assisted programs that may be adopted in a final rule issued by HUD pursuant to notice and comment rulemaking under Section 504 so long as such accessibility standard and regulatory requirements do not provide for less accessibility for persons with disabilities than either (i) or (ii).

c.     For Housing Developments constructed after April 12, 2016:

    i.     the requirements in 5(b);

    ii.     the requirements in ANSI A117.1-1986 and the Fair Housing Accessibility Guidelines, March 6, 1991, in conjunction with the Supplement to Notice of Fair Housing Accessibility Guidelines: Questions and Answers About the Guidelines, June 28, 1994; and

    iii.     the accessibility provisions of the California Building Code Chapter 11B, or any future accessibility standard and other regulatory requirements applicable to newly

5

constructed facilities adopted as part of the California Building Code.

6.      "<u>Alternative Accessibility Standard</u>" means and refers to the alternative accessibility standard for new construction set out in HUD's notice at 79 Fed. Reg. 29,671 (May 23, 2014), when used in conjunction with the new construction requirements of 24 C.F.R. pt. 8, 24 C.F.R. § 8.22, and the new construction requirements of 28 C.F.R. pt. 35, including the 2010 Standards for Accessible Design as defined in 28 C.F.R. § 35.104 and as applied to public entities (excluding any elevator exceptions).

7.      "<u>Assistance Animals</u>" means and refers to animals that work, provide assistance, or perform tasks for the benefit of a person with a disability as well as animals that provide emotional support that alleviates one or more identified symptoms or effects of a person's disability.  Assistance Animals include animals that are trained and untrained and include dogs and other animals.

8.      "<u>Auxiliary Aids</u>" means and refers to aids, services, or devices that enable persons with vision, hearing, manual, or speech impairments to have an equal opportunity to participate in, or enjoy the benefits of, programs, services, or activities, including housing and other programs, services, and activities subject to the requirements of Section 504 of the Rehabilitation Act and/or the Americans with Disabilities Act.  Auxiliary aids include but are not limited to the aids, services, and devices set out in the definition of auxiliary aids auxiliary aids in 24 C.F.R. § 8.3 and the definition of auxiliary aids and services in 28 C.F.R. § 35.104.  *See also* 42 U.S.C. § 12103(1).

9.      "<u>Certification of Compliance with Accessibility Standards</u>" means and refers to a Certification issued by the City, certifying that the Housing Development and accessible Housing Units meet the Accessibility Standards.

6

10.    "<u>Certification of Adoption of Housing Policies</u>" means and refers to a Certification issued by the City certifying that the Housing Development has adopted the Housing Policies.

11.    "<u>City</u>" means and refers to the City of Los Angeles, California.

12.    "<u>Covered Housing Development</u>" includes all Housing Developments listed on Exhibit A, and all Housing Developments and Housing Units that are financially assisted, designed, constructed, altered, operated, administered, or financed in connection with a program administered by the City (directly or in its role as the "Housing Successor Agency" pursuant to the Redevelopment Dissolution Act), or by its Subrecipients, during the Settlement Term.  Housing Developments listed in Exhibit B are covered solely for the purposes of application of Housing Policies and non-discrimination provisions, as set out in Paragraphs III.10(k), III.10(m), and III.19.

13.    "<u>Effective Date</u>" means and refers to the effective date of this Agreement, which is the date of the latest signature on this Agreement by any of the Parties.

14.    "<u>HCID</u>" includes the City of Los Angeles's Housing + Community Investment Department and any successor department or agency;

15.    "<u>Housing Development</u>" or "<u>Development</u>" means and refers to the whole of one or more residential structures and appurtenant structures, equipment, roads, walks, and parking lots that (1) received or will receive any Federal financial assistance from or through the City and/or (2) were or are designed, constructed, altered, operated, administered, or financed in connection with a program administered by the City (directly or in its role as the "Housing Successor Agency" pursuant to the dissolution legislation) or by its Subrecipients.

16.    "<u>Housing Policies</u>" means the policies attached as Exhibit C to this Agreement, or any mutually agreed upon subsequent policies.

7

17.   "Housing Unit" or "Unit" means and refers to a single unit of residence that provides spaces for living, bathing, and sleeping, provided such definition shall not be construed to exclude Single Room Occupancy Units.  A Housing Unit or Unit is the same as a dwelling unit.

18.   "Housing Unit with Hearing/Vision Features" means and refers to a Housing Unit that complies with 24 C.F.R. § 8.22 and all applicable provisions of UFAS or the comparable provisions of the Alternative Accessibility Standard, and shall include but not be limited to section 809.5 of the 2010 Standards for Accessible Design.  Hearing/Vision Features include but are not limited to visual alarms (UFAS §§ 4.34.10, 4.28.3), auxiliary alarms (UFAS §§ 4.34.10, 4.28.4), telephone volume controls and hearing aid compatibility (UFAS § 4.31.5), protections against protruding objects (UFAS § 4.4), stairway requirements (UFAS §§ 4.9, 4.26.4), protections against exposed pipes and surfaces (UFAS §§ 4.19.4, 4.24.6, 4.34.6.5(8)), audible alarms (UFAS § 4.28.2), signage (UFAS § 4.30), push button controls for telephones (UFAS § 4.31.6), consumer information (UFAS § 4.34.4), and range, cooktop, and oven controls (UFAS §§ 4.34.6.6, 4.34.6.7).

19.   "Housing Unit with Mobility Features" means and refers to a Housing Unit that is located on an accessible route and complies with the requirements of 24 C.F.R. § 8.22 and all applicable provisions of UFAS or the comparable provisions of the Alternative Accessibility Standard including but not limited to sections 809.2 through 809.4 of the 2010 Standards for Accessible Design.  A Housing Unit with Mobility Features can be approached, entered, and used by persons with mobility disabilities, including individuals who use wheelchairs.

20.   "Judgment" means a judgment entered by the District Court in this Litigation, substantially in the form attached to this Agreement as Exhibit D that, among other things, fully approves and incorporates the terms of this Agreement and retains the District Court's jurisdiction to enforce the Agreement throughout the Settlement Term.

21.   "<u>Owner</u>" means and refers to an owner of a Housing Development and such owner's successors and assigns that (1) has received, receives, or will receive any Federal financial assistance from the City since July 11, 1988, and/or (2) was, is, or will be the Owner of a Housing Development designed, constructed, altered, operated, administered, or financed, in whole or in part, in connection with a program administered in whole or in part by the City since January 26, 1992.  An Owner may also be a Subrecipient.

22.   "<u>Person with a Disability</u>" means and refers to a person who has a physical or mental impairment that substantially limits one or more major life activities such as caring for oneself, manual tasks, walking, seeing, hearing, speaking, breathing, or learning; has a record of such impairment; or is regarded as having such an impairment.  *See* 24 C.F.R. § 8.3, as modified by the ADA Amendments Act of 2008, Pub. L. 110-325, §7(2), 122 Stat. 3558 (September 25, 2008), amending 29 U.S.C. §705(20). This definition includes people with disabilities as defined in Cal. Gov. Code Sec. 12926 to the extent that provision is more inclusive than federal law.

23.   "<u>Program Access</u>" means applicable Accessibility Laws directing a public entity to operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by Persons with Disabilities.

24.   "<u>Property Management Agent</u>" means and refers to a person or entity that manages one or more of the Housing Developments Covered by this Agreement on behalf of an Owner.

25.   "<u>Reasonable Accommodation</u>" means a change in rules, policies, practices, or procedures that is necessary, pursuant to the Fair Housing Act, to provide a person with a disability an equal opportunity to use and enjoy a Housing Unit.

9

26.   "<u>Reasonable Modification</u>" means a change in rules, policies, practices, or procedures that is necessary, pursuant to Section 504 or the ADA, to provide a person with a disability an equal opportunity to use and enjoy a Housing Unit.  Pursuant to the Fair Housing Act, "Reasonable Modification" means any reasonable physical or structural change to a Housing Unit or a public or common use area.

27.   "<u>Registry</u>" refers to the Internet-based Accessible Housing Registry described in Paragraph III.10.(m), below.

28.   "<u>Settlement Coordinator</u>" or "<u>Section 504/ADA Coordinator for Accessible Housing</u>" means the individual designated by the City pursuant to and in accordance with Paragraph III.14, below.

29.   "<u>Settlement Term</u>" means the period of time commencing with the Effective Date and extending for ten (10) years after the District Court's entry of Judgment, or until the Target Number of Accessible Units is achieved, whichever occurs later.

30.   "<u>Subrecipient</u>" means and refers to any public or private agency, institution, organization, or other entity or person to which Federal financial assistance or financial assistance from or through the City is extended.  A Subrecipient also means a non-Federal entity that receives a sub-award from a pass-through entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program. A Subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency. 24 C.F.R. §200.93.  A Subrecipient may also be an Owner.

31.   "<u>Substantial Rehabilitation</u>" has the same meaning as in 24 C.F.R. § 8.23.

32.   "<u>Target Number of Accessible Units</u>" means the number of apartment units the City must cause to be Accessible pursuant to this Agreement to meet its obligations under this Agreement within ten (10) years of the Effective Date.  The

10

Parties have agreed that the Target Number of Accessible Units is Four Thousand (4,000).

33.    "Uniform Federal Accessibility Standards" or "UFAS" means and refers to a set of scoping requirements and standards for the design and construction of buildings and facilities to ensure that they are readily accessible to and usable by persons with disabilities.  *See* Appendix A to 24 C.F.R. subpart 40 for residential structures and Appendix A to 41 C.F.R. subpart 101-19.6 for general-type.  Pursuant to 24 C.F.R. § 8.32(a), effective July 11, 1988, the design, construction, or alteration of buildings in conformance with sections 3-8 of UFAS shall be deemed to comply, *inter alia*, with the requirements of 24 C.F.R. § 8.22.

## III.  **SCOPE AND TERMS OF THE AGREEMENT**

NOW, THEREFORE, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the Parties stipulate, and intend that the District Court will make the following findings as part of the Final Judgment:

1.    **Recitals**.  The recitals set forth above are incorporated by reference in this Section and made a part of this Agreement.

2.    **Jurisdiction.**  The Court has personal jurisdiction over Plaintiffs and the City for purposes of this Action and jurisdiction over this Action pursuant to 28 U.S.C. §§ 1331 and 1367, and 28 U.S.C. §§ 2201 and 2202.  Relief may be granted pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 12132 et seq.  Venue is proper in this District.

3.    **Binding Effect.**  The provisions of this Agreement shall be binding upon the Parties, and shall become effective on the Effective Date.

4.    **Purpose of Settlement**.  To avoid the cost, expense, and uncertainty of protracted litigation, the City and Plaintiffs enter into this Agreement, which shall be binding upon the City and Plaintiffs and extinguish all Released Claims and shall constitute the final and compete resolution of all issues addressed herein.  Pursuant

11

to the terms of this Agreement, the City will undertake the actions described below for the purpose of ensuring that City-assisted housing programs, services, and activities are in compliance with the accessibility requirements of Section 504, the ADA, and Section 11135.

5. **Approval by the District Court**.  The Parties intend that this Agreement be approved by the District Court, and that the District Court retain jurisdiction for the Term of this Agreement to resolve any dispute regarding compliance with the Agreement that cannot be resolved through the process described in Section VII, below.  Furthermore, upon such approval, the District Court shall enter the Judgment under Rule 54(b) of the Federal Rules of Civil Procedure (substantially in the form attached to this Agreement as Exhibit D.)

6. **Term of Agreement**.  The District Court shall have continuing jurisdiction over this Agreement throughout the Settlement Term.  This Agreement shall expire ten (10) years after entry of Judgment by the District Court, or when the Target Number of Accessible Units is achieved, whichever is later.  Nothing in this Paragraph shall bar any Party from moving for an extension of the Agreement to enforce any obligations herein.

7. **City's Commitment to Provide Affordable, Accessible Housing**. The City shall take the actions set forth in this Agreement to provide accessibility for persons with disabilities in its housing-related programs.  Among other things, the City shall ensure over the  Settlement Term the production of the Target Number of Accessible Units by means of inspecting Existing Housing Developments to determine compliance with this Agreement, causing, to the extent possible, Subrecipients and Owners to carry out construction to remedy non-compliance with requirements set out in this Agreement, and taking all other actions necessary to provide for Four Thousand (4,000) Accessible Housing Units in Accessible Housing Developments as required by this Agreement by no later than ten years after the Effective Date.  The failure of the City to secure the cooperation of any Subrecipient

or Owner with efforts to remedy non-compliance with requirements set out in this Agreement shall not excuse the City's obligation to achieve the Target Number of Accessible Units.  To accomplish the activities in this Agreement, the City shall carry out a program with a value that averages a minimum of $20 million per year over the Settlement Term, which amount may be adjusted by mutual agreement of the Parties upon completion of the Target Number of Accessible Units.  Completion of the Target Number of Accessible Units shall not relieve the City of the obligation to comply with other provisions of the Agreement.  The City shall also take the actions set forth in this Agreement and such other actions as may be necessary to ensure that the City, Subrecipients, and Owners comply with the obligation to operate housing programs and Housing Developments in accordance with Federal and California law and comply with the other obligations set forth in this Agreement.

     8.   **City's Compliance**.  The City shall comply with the requirements of Section 504, the ADA, Section 11135, and other applicable nondiscrimination laws with respect to all aspects of its own housing-related programs, services, and activities, including administration and financing.

     9.   **Reporting of Activities to Ensure Compliance**.  Pursuant to its reporting obligations set out in Paragraph III.11, below, and elsewhere in this Agreement, the City shall report on the actions it takes to ensure its own compliance and to require and ensure its Subrecipients' and Owners' compliance with Section 504, the ADA, Section 11135, and the terms of this Agreement.

     10.   **Specific Commitments to Achieving Accessibility**.  This Agreement provides for the following:

     (a)   **Architectural Accessibility**.  The City shall cause Four Thousand (4,000) Housing Units ("Target Number of Accessible Units") to come into compliance with the architectural accessibility standards under Section 504, the ADA, and Section 11135 within ten (10) years

of the Effective Date.  At least Two Thousand Six Hundred and Fifty-Five (2,655) of such units must be Housing Units with Mobility Features.  In order to count a Housing Unit toward the Target Number of Accessible Units, the City must provide a Certification of Compliance with Accessibility Standards to the Monitor that the Housing Unit and the Housing Development meet the requirements of Accessibility Standards.

(b)     **Accessible Housing Unit Plan**.  Annual production schedules will be established pursuant to an Accessible Housing Unit Plan ("Plan"), recommending locations of accessible housing units, which will be agreed to by the Parties within twelve (12) months of the Effective Date.

i.      The Plan shall be developed by one or more experts, agreed to by the Parties and compensated by the City, in an amount not to exceed Six Hundred Thousand Dollars ($600,000), who will conduct accessibility surveys and otherwise advise the Parties on compliance with federal and state accessibility requirements, as set forth in Paragraph III.10(d), below.  The Plan shall provide for geographic distribution of accessible units throughout Los Angeles, and in a range of unit sizes, and shall maximize affordability and access to public transportation and other amenities.  Consistent with federal relocation and Reasonable Accommodation and Reasonable Modification requirements, the Plan shall provide that the City, when appropriate, temporarily relocate, or require Owners to temporarily relocate, existing tenants occupying units to be retrofitted, at Owner or City expense, and shall address potential temporary displacements of tenants.  The Parties agree that Plaintiffs shall be consulted in the event that changes must be made to the Accessible Housing Unit Plan.

*ILC, et al v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

(c) **Qualifications of Experts**: Each expert hired by the City to implement Paragraph III.10(b), above, shall: (1) be an architect; (2) have substantial experience in evaluating or assisting public entities in evaluating the accessibility of facilities under Section 504, the ADA, and California Building Code; (3) be knowledgeable in current federal and California accessibility standards; (4) have a minimum of three (3) years' experience in providing Section 504 and/or ADA services related to accessible facilities; and (5) be CASp certified.

(d) **Development of Accessible Housing Unit Plan**:  The experts identified in Paragraph III.10(c), above, shall assist the City in the following:

i.     Identifying which existing Housing Developments are in compliance or not in compliance with the Accessibility Standards.  To this end, the City shall provide to the experts those accessibility survey reports and related documentation previously prepared by the City's accessibility consultants and other consultants for the Parties. The experts' review of survey reports prepared by the City's accessibility consultant may include on-site reviews to determine the accuracy and sufficiency of the survey reports.  If the experts determine that existing survey reports are accurate and provide all of the information required to ensure compliance with the Accessibility Standards, the accessibility reports may be used for purposes of assessing the relevant Housing Development's compliance with the Accessibility Standards.  The experts may also rely on other accessibility surveys of any Housing Developments covered by this Agreement that they deem to be reliable. The City shall take steps to ensure that persons working on behalf of the City shall not waive, ignore, or otherwise fail to identify noncompliance with Accessibility Standards in Housing Developments.

ii.     Utilizing the information gathered to develop the Accessible Housing Unit Plan.

iii.     Assisting the City in developing protocols, assessment tools, checklists, and standards for ensuring accessibility and for issuance of Certifications of Compliance with Accessibility Standards.

iv.     Assisting the City to develop internal capacity, including the capacity of designated staff in HCID, the City Department on Disability, and the City Department of Building and Safety to ensure compliance by Subrecipients and Owners with applicable accessibility requirements, including the Accessibility Standards.

v.     Developing a quality assurance program that ensures the quality and consistency of work performed by City staff and agents pursuant to this Agreement, advising the City of issues identified through the quality assurance program, and making recommendations about how to address such performance problems (*e.g.*, additional training, extra oversight, limiting functions performed).

vi.     Providing training to the City staff and agents who will implement the accessibility provisions of this Agreement, including training for designated staff for HCID, the City Department on Disability, and the City Department of Building and Safety regarding the interpretation and application of the Accessibility Standards, conducting and documenting on-site accessibility surveys, and such other issues as the experts deem prudent and appropriate.

(e)     **Flexibility in Meeting Target Number of Accessible Units**.  Subject to the requirements of the Plan and Section 504, the City shall have flexibility to meet its annual and overall production schedules through a combination of new construction, substantial alteration, remediation of existing housing units, provision of Housing Units under the Enhanced

16

Sensory Unit Program, or certification that existing Housing Units meet federal and California accessibility standards.

(f) **Accessibility of Future Housing Developments**.  The City shall ensure that Housing Developments that are newly constructed or substantially altered after April 12, 2016, are designed, constructed, and maintained in full compliance with the Accessibility Standards in this Agreement through specialized review of plans and specifications and on-site compliance inspections throughout the design and construction process. With respect to any future new construction or future substantial alterations, the City shall require developers to construct at least 10% of units to comply with UFAS requirements for mobility accessibility and an additional 4% of units to comply with UFAS requirements for sensory accessibility, and to ensure that they are affordable for households with incomes at 30%, 50%, and 80% of area median income. The Parties agree that the City may count toward the Target Number of Accessible Units up to a total of 20% of Housing Units in a single Housing Development that meet UFAS requirements, provided that no more than 5% of such units be designated for sensory accessibility.

(g) **Accessibility in Existing Buildings to be Remediated**.  For purposes of meeting the Target Number of Accessible Units, the City may count a remediated unit to the extent the unit and the project's common areas meet the Accessibility Standards, and the unit and common areas are located on accessible routes.

(h) **Credit for Early Performance**.  The Parties agree that any units made accessible pursuant to the terms of this Agreement after April 12, 2016, and before the entry of Judgment by the District Court shall count towards the City's Target Number of Accessible Units.

(i)   **Enhanced Sensory Unit Program**.  The City will establish a program to provide auxiliary aids and services and enhanced accessibility features for individuals with hearing and vision disabilities who reside in existing Housing Developments.  The program will provide assistance to make additional structural features and assistive technology available that assure that people with sensory disabilities have equal access to City-assisted housing opportunities.  These Housing Units must, at a minimum, meet UFAS standards for Housing Units with Hearing/Vision features. The City may count no more than 200 such units during the Settlement Term toward the Target Number of Accessible Units.

(j)   **Ensuring Program Accessibility**.  The City shall adopt policies, procedures, and training to ensure that its affordable housing program complies with the program accessibility requirements of Section 504, the ADA, and Section 11135 and promotes maximum utilization of accessible units by people with disabilities needing the accessibility features, including provisions regarding Reasonable Accommodations, Reasonable Modifications, Effective Communication, Auxiliary Aids and Services, and Assistance Animals.

     i.   Within 180 days of the Effective Date, and in consultation with the Plaintiffs, the City will conduct a self-evaluation pursuant to Section 504 and the ADA, of the Housing + Community Investment Department and the Department of Building and Safety, and develop a transition plan to address accessibility deficiencies identified in the self-evaluation.

     ii.   Within 180 days of the Effective Date, and in consultation with the Plaintiffs, HCID will revise its effective communication policy to ensure that it complies with the requirements of Section 504, the ADA, and Section 11135.

(k) **Management Policies to Ensure Accessibility**.  To ensure maximum utilization of accessible units by people with disabilities needing the accessibility features, the City shall, within 60 days of the Effective Date, require all owners and managers of City-assisted housing to adopt the uniform marketing and leasing policies that are attached hereto as Exhibit C, and incorporated by reference into this Settlement Agreement.  These policies are the product of collaboration between the City and Plaintiffs, and the Parties are of the opinion that they comply with Section 504, the ADA, and Section 11135.  These policies provide for affirmative marketing directed at people with disabilities, uniform application, waiting list, and tenant selection practices (including unit assignment and transfer standards), effective communication with people with disabilities, assistance and support animals, the provision of reasonable modifications and reasonable accommodations, and grievance procedures. The City shall enforce those policies: (1) with respect to newly constructed or substantially altered buildings, from the time of construction or alteration through the end of the Settlement Term, and (2) with respect to existing buildings, from the date the uniform marketing and leasing policies are implemented through the end of the Settlement Term.  Thereafter, while the City may exercise continuing authority to impose such policies on buildings with remaining affordability covenants, the City's obligation to enforce such policies cannot be compelled through this Settlement Agreement.  .

(l) **Ensuring Compliance with Management Policies**.

i. The City shall monitor its Subrecipients and Owners and require that its Subrecipients and Owners comply with the applicable requirements of Section 504 and applicable HUD regulations, the ADA and applicable HUD regulations, California

19

Accessibility Standards, and this Agreement in designing, constructing, altering, operating, administering, and financing housing.  Failure or refusal of a Subrecipient or Owner to comply with the Accessibility Standards and applicable provisions of this Agreement may result in progressive steps by the City to compel compliance such as declaring an event of default under active loan agreements, suing for breach of loan or covenant agreements with demand for specific performance and damages, negative evaluations and reduction in rating factor points for future project consideration through existing contractor evaluation and contractor responsibility ordinances, or debarment proceedings or the filing of a complaint or referral to HUD for further enforcement actions.

ii.     Within 180 days of the Effective Date, the City shall, in consultation with Plaintiffs, develop and begin to carry out a monitoring, compliance, and enforcement plan to ensure that Owners and Property Management Agents of Covered Housing Developments comply with management policies to ensure accessibility.  That plan will include a Unit Utilization Plan based on unit utilization surveys and audits of occupancy, waiting lists, and transfer lists to assess the extent to which people with disabilities occupy accessible units or need or have requested accessible units; and that describes the steps the City will take to maximize appropriate utilization.  It will also require Owners and Project Management Agents to adopt corrective action plans to maximize the occupancy of accessible units by families that need accessibility features.

A.     Occupancy utilization surveys and audits shall identify, by unit number, bedroom size, and accessibility type: a) accessible units that are not occupied by a Person with a

20

1    Disability needing the accessibility features, and whether

2    those households have executed the required lease

3    addendum, and b) vacant accessible units.

4    B.    Transfer audits shall identify, by address, name, and desired

5    unit type and bedroom size, and requested accessibility

6    features, existing residents of Covered Housing

7    Developments to determine if any Persons with a Disability

8    desire or have previously requested a unit with accessibility

9    features, if they are on a transfer list for such a unit, and

10    what steps are being taken to meet their accessibility needs.

11    C.    Waiting list audits shall examine waiting lists for Covered

12    Housing Developments and, subject to a protective order to

13    be negotiated by the parties or secured through an

14    appropriate petition to the Court, identify by name and

15    application date any individuals on the list who are Persons

16    with Disabilities who desire a Housing Unit with

17    accessibility features, the nature of the features needed, and

18    the bedroom size, and what steps are being taken to meet

19    their accessibility needs.

20    iii.    The City shall issue a Certification of Adoption of

21    Housing Policies when it reasonably confirms that the Owner or

22    Property Management Agent of a Covered Housing Development has

23    adopted the Housing Policies for that Housing Development and

24    notified the tenants of the adoption.

25    (m)    **Internet-based Accessible Housing Registry ("Registry")**.  Within

26    270 days from the Effective Date, the City will, with input from the

27    Plaintiffs as to content, features, usability, and accessibility, develop an

28    accessible website listing all Housing Units in Covered Housing

Developments, including real-time availability of accessible units, lists of accessible features, numbers of bedrooms, rent information, and contact information for each housing development.  The website shall meet version 2.0 Levels AA of the "Web Content Accessibility Guidelines" published by the Web Accessibility Initiative (WAI) of the World Wide Web Consortium (W3C), or any subsequent version(s) that are published during the Settlement Term.  Documents posted on the Registry should conform to the W3C's Guidance on Applying WCAG 2.0 to Non-Web Information and Communications Technologies (WCAG2ICT) and be in formats that can be recognized and read by software commonly used by individuals who are blind or have low vision to read digital information.

i.      The City shall maintain the Registry for the entire Settlement Term, and information shall be kept current.  The City shall develop a mechanism for providing information and options equivalent to those on the Registry for Persons with Disabilities who do not have internet access or whose disabilities limit their ability to communicate electronically, including making information available in map format, written format and alternative formats through the Settlement Coordinator or designee.

ii.      The purposes of the Registry include: 1) allowing Persons with Disabilities to obtain detailed current information about accessible Housing Units and Housing Developments; 2) allowing People with Disabilities to use the Registry to sign up to be notified about accessible housing units that are available for rent, make application for such units, and be placed on waiting lists for such units; 3) ensuring that accessible Housing Units are occupied by people who need the accessible features; and 4) assisting Owners and

Property Management Agents in conducting targeted outreach to People with Disabilities.  The City will require Owners and Property Management Agents in Covered Housing Developments to post information about the Developments on the Registry and to use the applicant information provided through the Registry in conducting outreach and leasing accessible housing.  The City shall also post and maintain in an easily locatable place and accessible format (*i.e.*, HTML or Word – not PDF) on its main website a list of all Covered Housing Developments, which shall be maintained throughout the Term of the Agreement and updated on a quarterly basis, as needed.

(n)    **Training and Education**.  The City will develop and implement a curriculum to train City housing staff and owners and property managers of Covered Housing Developments about disability rights obligations in assisted housing under Section 504, the ADA, and the Fair Housing Act. The curriculum will also address implementation of the terms of the Agreement.  Trainings will be provided on a regular basis to new City staff and new property managers of assisted housing and current staff and employees will be required to attend refresher classes.  The Parties agree that Plaintiffs shall be consulted in the development of the training curriculum and materials within a reasonable time prior to any such training, and shall be invited to attend such training, either as participants or as presenters.

(o)    **Provision of Funding**.  The City shall provide an average of $20 million per year during the Settlement Term, which it estimates as the funding required to perform its obligations under the Agreement in accordance with the timeframes set out therein.

23

(p)     **Flexibility in Use of Funding**.  The City shall have discretion to use funds budgeted for the Agreement for the following purposes:

i.      Leveraging additional development funds to support new construction of affordable rental housing.

ii.     Assisting owners of Covered Housing Developments to achieve compliance with accessibility requirements of Section 504, the ADA, and Section 11135.

iii.    Assisting with structural modifications to dwelling units in Covered Housing Developments at the request of individual tenants or applicants.

iv.     Oversight and enforcement of architectural accessibility requirements and management policies in Covered Housing Developments.

v.      Development of the Internet-based Accessible Housing Registry.

vi.     Development and implementation of training and education programs.

vii.    Record keeping and reporting.

viii.   Hiring of experts and consultants to assist the City in carrying out its obligations under the Agreement.

11.    **Reporting Requirements**.  The Settlement Coordinator shall prepare a semi-annual report containing qualitative and quantitative data detailing the activities carried out under this Agreement for the preceding reporting period pursuant to Paragraphs III.12-13, below, to be provided to Plaintiffs' Counsel and the Monitor on or before June 30 and December 31 of each year beginning December 31, 2016.

12.   **Report Contents**. Reports referenced in Paragraph III.11, above, shall include, at a minimum, a detailed description of the following:

(a)   Compliance efforts which have been made since the last report with respect to each of the substantive terms of this Agreement, and the actions taken to ensure the City's own compliance and to require and ensure its Subrecipients' and Owners' compliance with Section 504, the ADA, Section 11135, and the terms of this Agreement.

(b)   Quarterly, annual, and overall progress in achieving the Target Number of Accessible Units and annual production schedules under the Accessible Housing Unit Plan, including information regarding geographic distribution of accessible units in a range of unit sizes; affordability and access to public transportation and other amenities; and the provision of temporary replacement housing for tenants displaced by remediation efforts, sufficient to evaluate compliance with the requirements of this Agreement and the Accessible Housing Plan in those areas.

(c)   Progress in completing unit utilization surveys, and audits of occupancy, waiting lists, and transfer lists, and progress on implementing corrective action plans to maximize occupancy of accessible units by Persons with Disabilities that need the accessibility feature.

(d)   Progress in ensuring that Housing Developments adopt the Housing Policies, and of monitoring and enforcement efforts to ensure compliance with the Housing Policies.

(e)   Progress in implementing disability rights training and education for City housing staff and for owners and property managers of City-assisted buildings.

(f)   Progress in the development and maintenance of the Internet-based Accessible Housing Registry and its use by Housing Developments and

25

1    housing applicants.

2    (g)    Compliance efforts which the City intends to take during the next

3           reporting period.

4    (h)    The Report shall also include:

5           i.    A list by address and unit number of all Housing

6    Developments and Housing Units which have received Certifications

7    of Compliance with Accessibility Standards and Certifications of

8    Adoption of Housing Policies since the last report.

9           ii.    Specific quantitative data as identified in Paragraph

10   III.13, below.

11          iii.    A list of the grievances or complaints that were received

12   by the City through the Grievance Procedure (including copies of any

13   written grievances or complaints) since the last report and the actions

14   taken in response, redacting any private, personal information

15   concerning residents of, or applicants for, Housing Units.  The City

16   shall make clear in the Report when any such information is redacted.

17   To the extent Plaintiffs' Counsel or the Monitor reasonably determine

18   after consultation with the City that such private information must be

19   reviewed in unredacted form in order to analyze the Report or assess

20   compliance with this Agreement, Plaintiffs' Counsel and the Monitor

21   may request that disclosure of such information be made pursuant to a

22   protective order, and the City shall provide such information pursuant

23   to a protective order to be negotiated by the Monitor and the parties or

24   secured through an appropriate petition to the Court.

25          iv.    The amount and sources of City funds expended since the

26   last report.

27

28

26

13. **Quantitative Data**. Quantitative data referenced in Paragraph III.12(h)ii, above, shall include the number of properties inspected; numbers/types of units under construction; number/types of Accessible Units completed; number of Housing Developments in/out of compliance with policy obligations; number/types of Accessible Units occupied by persons with disabilities who need the accessibility features; number/types of Accessible Units occupied by persons who do not need the accessibility features; number of persons with disabilities on waitlists and transfer lists for Housing Developments; number of Developments in compliance with Registry posting requirements; number of Housing Developments listed on the web-based registry; number of persons with disabilities on the web-based registry; number of requests for reasonable accommodations and reasonable modifications granted or denied; number of grievances filed with Owners and their resolution; number of grievances filed with the City and their resolution; and other data that the City deems relevant. The report shall be submitted to the Monitor pursuant to Paragraph III.11, above.

14. **Appointment of Settlement Coordinator ("Settlement Coordinator" or "Coordinator")**. Within 90 days of the Effective Date, the City shall hire a Settlement Coordinator and provide the individual's name and contact information to Plaintiffs' Counsel and the Monitor. The Settlement Coordinator will coordinate effective implementation of this Agreement, shall be retained throughout the term of this Agreement, and shall be directed and compensated by the City. The Settlement Coordinator will report directly to the General Manager of HCID concerning matters relating to this Agreement. The City shall commit sufficient resources, authority, and independence so that the Settlement Coordinator can successfully accomplish his or her responsibilities under this Agreement.

15. **ADA Coordinator.** The Settlement Coordinator position is in addition to, not a replacement for, the City's current Section 504/ADA Coordinator, who generally performs the functions set out in 24 C.F.R. § 8.53(a) and 28 C.F.R.

27

§ 35.107 for the City.  The Settlement Coordinator and the Section 504/ADA Coordinator shall coordinate as appropriate.

16.   **Qualifications of Settlement Coordinator**.  The initial Settlement Coordinator, and any Settlement Coordinator subsequently hired shall: (a) have substantial experience in evaluating or assisting public entities in evaluating the accessibility of facilities under Section 504 and the ADA; (b) be knowledgeable in current federal and California accessibility standards; and (c) have experience in coordinating and implementing complex projects.  It is highly desirable for the Settlement Coordinator to also have a minimum of three (3) years' experience in providing Section 504 and/or ADA services related to accessible facilities and be licensed either as an architect or as a registered civil engineer.

17.   **Responsibilities and Authority of the Settlement Coordinator**.

(a)   At all times during the term of the Agreement, the Settlement Coordinator shall have responsibility and authority to:

i.   Receive and respond to reasonable inquiries and complaints from Plaintiffs and others concerning accessibility barriers affecting Housing Developments, the Registry, and the City's Housing Programs.

ii.   Recommend the adoption or modification of the City's policies and procedures concerning accessibility barriers affecting Housing Units and Housing Developments.

iii.   Ensure the City's adoption of written policies and procedures concerning the maintenance of accessible features in Housing Units and Housing Developments.

iv.   Coordinate all compliance activities under this Agreement, including:

A.   Implementation of the provisions of this Agreement.

B.   Coordination of the activities of City personnel who

28

1  will implement this Agreement.

2     v.     Issue, or oversee the issuance of, Certifications of

3  Compliance with Accessibility Standards for Housing Units and

4  Housing Developments pursuant to Paragraph III.10(a), and

5  Certifications of Adoption of Housing Policies pursuant to Paragraph

6  III.10(l)iii.

7     vi.    Review, contribute to, and timely submit all reports

8  required by this Agreement, as well as any underlying documentation.

9     vii.   Consult, as the Settlement Coordinator deems

10  appropriate, with City personnel, contractors, or representatives to

11  obtain information concerning the City's compliance with the terms of

12  this Agreement.

13     viii.  Provide or oversee training identified in Paragraph

14  III.10(d).

15     ix.    Oversee the development and implementation of the

16  Registry identified in Paragraph III.10(m) - the Registry shall be made

17  available to the parties and the Civil Rights Monitor (i) in electronic

18  form and (ii) in written form through the office of the Settlement

19  Coordinator.

20     x.     Oversee the development and implementation of

21  assistance in financing remediation, as set out in Paragraphs III.10(a),

22  (b).

23     xi.    Conduct or oversee field spot checks of Covered Housing

24  Developments to confirm compliance with the physical accessibility

25  and policy provisions of this Agreement.

26     xii.   Adopt and carry out procedures under which the

27  Settlement Coordinator will accept, review, and resolve grievances or

28  complaints arising under this Agreement, including through the

grievance procedure set out in Paragraph III.19, below, from Plaintiffs, the disability community, residents in and applicants for tenancy at the Housing Developments Covered by this Agreement, and other organizations that advocate for persons with disabilities.

xiii.    Receive and respond to inquiries regarding the implementation of this Agreement by the City, Subrecipients, Owners, and Property Management Agents.

xiv.    Recommend, subject to consultation with the Plaintiffs, the adoption or modification of the City's Housing Policies.

xv.    Oversee the performance of the City, Subrecipients, Owners, and Property Management Agents regarding the accessibility of Housing Units and Housing Developments and the Housing Policy provisions of this Agreement to ensure that they do not waive, ignore, or otherwise fail to identify and address noncompliance with Federal fair housing and civil rights requirements or any requirements of this Settlement.

xvi.    Ensure the City's adoption of and compliance with written policies and procedures contemplated by this Agreement.

xvii.   Respond to Plaintiffs' or Plaintiffs' Counsel's requests for information and documents relating to any provisions of this Agreement.

(b)    The Settlement Coordinator may utilize staff and designees to carry out activities and obligations of the Settlement Coordinator, but the City shall require the Settlement Coordinator to retain the responsibility and the authority for performing Settlement Coordinator functions.

*ILC, et al v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

18.   **Settlement Coordinator Responsibilities for Registry.**  As part of developing the Accessible Housing Unit Plan, the Settlement Coordinator shall oversee the creation of a database to include the following information:

(a)   Identification by address and Owner of all Covered Housing Developments.

(b)   The Housing Developments and Units (identified by Unit number) that meet the Housing Accessibility Standards, pursuant to a Certification of Compliance by the City.

(c)   The date remediation or construction began and concluded on each of the existing Housing Developments and Housing Units.

(d)   The date a Certification of Compliance was issued by the City.

(e)   Which units are Accessible in each Housing Development, identifying separately and by unit number the Housing Units with Mobility Features and the Housing Units with Sensory Mobility Features.

19.   **Grievance and Complaint System.**  Within 30 days of the Effective Date, the City shall establish policies and procedures mutually acceptable to the parties for submission of grievances or complaints to, and responses by, the City concerning accessibility in housing and programs covered by this Agreement, including complaints about the City's implementation of its Housing Program and complaints about Owner or Management actions in Housing Units and Housing Developments covered by this Agreement, as well as complaints about the Internet Registry.  The grievance procedures shall comply with the requirements of 28 C.F.R. § 35.107, and shall at a minimum:

(a)   Describe the procedures and timelines for submitting a complaint and obtaining a response.

(b)   Provide for accessibility, effective communications, and reasonable accommodations in utilizing the procedures.

(c)   Identify staff responsible for investigating and resolving complaints.

31

(d)    Provide and describe a progressive set of sanctions that the City may use against Owners for policy noncompliance.

(e)    Include maintenance of a log of complaints and their resolution or outcome.

20.    **Plaintiffs' Rights With Respect to Testing**:  In order to further the Parties' intent that the Agreement will be successfully implemented, the Parties agree that Plaintiffs may at their discretion conduct tests in Housing Units and Housing Developments and otherwise monitor implementation to determine whether the terms of the Agreement are being followed. Where Plaintiffs may need to secure cooperation with Owners in order to conduct such tests, the City agrees not to interfere in Plaintiffs' efforts to gain such cooperation.  However, nothing contained herein shall constitute a guarantee by the City that Plaintiffs shall receive such cooperation from Owners, and the failure of Owners to cooperate with Plaintiffs shall not constitute a breach of this Agreement on the part of the City.  Should Plaintiffs discover any purported issues or problems with the implementation as a result of any tests conducted or monitoring, Plaintiffs will make best efforts to notify the City of the results.

21.    **Training regarding this Agreement to Supervisory Employees**: Within fifteen (15) days of the approval of this Agreement, the City shall train each of its employees having supervisory authority for any components of this Agreement on the requirements of this document.  Thereafter, the City shall provide such training to any newly hired employee with such authority within fifteen (15) days of hiring and to any employee newly given such authority within fifteen (15) days of conferring on that employee such authority.

*ILC, et al v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

# IV.   **MONITORING**

1.     **Court Appointment of Monitor**.  Within seventy-five (75) days of Effective Date, the Parties will ask the District Court to appoint a Monitor to ensure that this Agreement is implemented effectively and to assist the Court in monitoring the City's compliance with this Agreement.  The Parties shall jointly propose to the District Court one or more candidates to serve as a court-appointed Monitor.  The Monitor will assess the City's progress toward achieving the Target Number of Accessible Units and implementation of policies and procedures by reviewing plans, policies, procedures, expenditures, staffing, and production of accessible units, among other things.  The Monitor shall serve throughout the Settlement Term and shall report to the Court.  For the purposes of this Settlement Agreement, the Monitor's authority shall derive from the Court, not the Parties.

(a)     **Monitor Qualifications.**  The Monitor's qualifications shall include, but not be limited to the following: (1) familiarity with and experience in the monitoring and enforcement of disability rights laws; and (2) familiarity with and experience in the education and training of employees in (a) disability rights laws, and (b) the requirements of compliance with settlement agreements or court orders. Preference shall be given to an individual who is familiar with compliance with disability housing accessibility laws.

(b)     **Monitor Responsibility and Authority.**  The Monitor shall evaluate the City's compliance with the provisions of this Agreement to ensure full compliance with all of its terms.  The  Monitor shall have the obligation and authority to take steps to carry out this responsibility including but not limited to the obligation and authority to:

i.     Monitor, review, collect, evaluate, and verify written and electronic data and information on progress and completion of the Accessible Unit Housing Plan, accessibility of Housing Units and

33

Housing Developments, City Housing Program Accessibility, City monitoring of Owner compliance, and all other components of the Agreement

ii.  Conduct inspections, with appropriate notice to affected individuals, of selected Housing Units and Housing Developments as the Monitor deems appropriate, and measure, photograph, or otherwise document accessibility compliance.

iii.  Interview City staff, consultants, contractors, and agents as the Monitor deems appropriate.

iv.  Hire experts or staff as needed, within the budgetary limits in Paragraph III.10.(b), above, to assist in carrying out these responsibilities.

v.  Review and assess all reports prepared by the City as required by the terms and provisions of this Agreement, and prepare recommendations for additional action as needed.

vi.  Maintain records of the Monitoring team's activities and relevant documents.

vii.  Provide Counsel for Plaintiffs and the City any relevant information known to or available to the Monitor under any provision of this Agreement upon reasonable request.

viii.  Prepare a written semi-annual report for submission to Counsel for Plaintiffs and the City on or before June 30 and December 31 of each year, beginning December 31, 2016, which shall describe, at a minimum, the Monitor's assessment of the City's progress in complying with all of the provisions of this Agreement, and the Monitor's comments on Reports submitted by the City.  A copy will be filed with the Court. The parties shall meet and confer among themselves or with the Monitor to resolve any problems identified by the

34

Monitor or any of the parties.  If the parties cannot reach agreement, either party can request that the Monitor submit an additional report to the Court with recommendations for action, and shall file a motion with the Court for consideration of such recommendations or other requested relief.

           ix.     Meet and confer with Plaintiffs and the City, to consider suggestions for implementing the spirit and letter of the Agreement, and to clarify information contained in the Monitor's reports.

(c) **Records and Other Information Available to Monitor.**  For the duration of this Agreement, except to the extent that disclosure of information is prohibited by law or applicable privileges, the City shall provide the Monitor upon request information and records (or other computerized counterparts) sufficient to adequately monitor the City's compliance with all provisions of this Agreement and to complete the reporting described in Paragraphs III.9 and III.11, including but not limited to all records relating to implementation of the Accessible Housing Unit Plan, architectural accessibility compliance for existing and new Housing Developments (including surveys, plans, and architectural drawings), issuance of Certifications of Compliance with Accessibility Standards and Certifications of Adoption of Housing Policies, the City's program accessibility and ADA/504 self-evaluations, occupancy and utilization surveys and audits, reasonable accommodation and reasonable modification logs, grievances and complaints, progress in meeting Target Number, the Registry, training materials, and annual funding devoted to the program.  The City must make available to the Monitor any records relating to the implementation of any provision of this Agreement, including records submitted by or required to be maintained by Owners and Property Management Agents. The City shall make clear when any

35

1   such information or records are being withheld from the Monitor in

2   accordance with this section.  To the extent the Monitor reasonably

3   determines after consultation with the City that such information or

4   records must be reviewed in order for the Monitor to satisfy his or her

5   responsibilities under this Agreement or to the Court, the Monitor may

6   request that disclosure of such information or records be made pursuant

7   to a protective order, and the City shall provide such information

8   pursuant to a protective order to be negotiated by the Monitor and the

9   parties or secured through an appropriate petition to the Court.

10   (d)   **Meetings with Monitor**.

11            i.   Preliminary Meeting:  No later than ninety (90) days

12   following the commencement of employment by the Monitor, the

13   Monitor and counsel for all Parties shall attend a preliminary meeting at

14   a location designated by the Monitor. The purpose of the meeting shall

15   be for the City to describe the activities that have been and will be taken

16   with respect to the implementation of the Agreement and for the parties'

17   counsel to discuss any relevant issues concerning the implementation of

18   the Agreement.

19            ii.   Additional Meetings:  In addition to the preliminary

20   meeting, the Monitor shall hold at least one annual meeting with the City

21   and Plaintiffs to review progress.  The Monitor may, as he or she deems

22   appropriate, schedule other meetings and/or conference calls with the

23   Parties' counsel to discuss any relevant issues concerning the

24   implementation and enforcement of the Agreement.

25   (e)   **Cost of Monitor**:  The City shall bear the cost of the Monitor during the

26   Settlement Term, capped at the amounts specified below:

27            i.   Years 1-3: Eight Hundred Fifty Thousand Dollars

28   ($850,000) per year.

ii.     Years 4-6: Six Hundred Fifty Thousand Dollars ($650,000) per year.

iii.     Years 7-10: Three Hundred Seventy-Five Thousand Dollars ($375,000) per year.

(f)    **Monitoring Authority.**  The Monitor shall have the authority to hire others to assist him or her, including but not limited to the authority to hire one or more persons with technical expertise to assist in monitoring the implementation of the Accessible Housing Unit Plan and certification of accessible units, within the budgetary limits in Paragraph IV.1(e), above, to assist in carrying out this authority.

## V.    RECORD KEEPING AND REPORTING

1.    **Record Keeping and Reporting**.

(a)    During the Settlement Term, the City shall maintain all records necessary to verify compliance with the terms of this Agreement.  The City shall instruct Owners and Property Management Agencies to maintain all records regarding compliance with the terms of the Agreement.

(b)    Subject to the limitations cited in Paragraph IV.1.(c)., the City shall, upon reasonable request, make best efforts to provide a copy of any data and reports that it, its agents, Subrecipients, Owners, or Property Management Agents generate to comply with this Agreement, whether maintained electronically or otherwise, including but not limited to records identified in various provisions of this Agreement and documents that support the Reports required by this Agreement, to the Monitor or Plaintiffs' Counsel.

2.   **City's Duty to Retain Documents**.  The City shall maintain all documents and records provided to the Monitor as well as all documents and records maintained and/or generated by the City that pertain to the Agreement for a period of five (5) years.  For a period not to exceed six (6) months beyond the expiration of this Agreement, Plaintiffs' Counsel shall, upon request, be provided access to any of the records described in the Record-Keeping provisions of this Agreement.

## VI.   MUTUAL RELEASE OF CLAIMS

1.   Plaintiffs, for and in consideration of this Agreement, including any and all recitals, promises, covenants, and terms herein, for themselves (and for their executors, assigns, and successors, as well as their administrators, agents, and representatives acting in their official capacities on behalf of Plaintiffs) (collectively "Plaintiff Releasing Parties"), do hereby fully and finally remise, release, acquit, and forever discharge the City and, in their official capacities, its respective successors, directors, officers, employees, agents, its past, present and future departments (including HCID (formerly known as the Los Angeles Housing Department)), boards, commissions, predecessors, and successors-in-interest, (collectively "Defendant Released Entities") from any and all claims and demands of any and every kind, name, nature, or description, and from any rights, disputes, complaints, charges, actions and causes of action, suits, debts, injuries, reimbursements, contracts, covenants, liens, liabilities, losses, costs, expenses, obligations, and damages of any nature, kind, and description, whether asserted or unasserted, known or unknown, anticipated or unanticipated, suspected or unsuspected, or actual or contingent, in law or in equity, which the Plaintiff Releasing Parties now have against the Defendant Released Entities or any of the Defendant Released Entities, whether or not the same be now existent or known to the Plaintiff Releasing Parties, by reason of or arising out of the claims as more particularly alleged in this

38

Litigation and arising up until the date of Judgment, including but not limited to any claim or cause of action, including but not limited to injunctive, declaratory, or other non-monetary relief, however described, that the Plaintiff Releasing Parties asserted or could have asserted in this Litigation against the Defendant Released Entities, pertaining to accessibility under Section 504, the ADA, and Section 11135, and availability to people with disabilities of any and all of the multifamily housing funded, developed, or significantly assisted by the City at any time prior to this Agreement ("Released Claims").  Such Released Claims, however, shall not include any claims to enforce the terms of this Agreement, nor shall they include claims set forth in any other action filed between January 1, 2011 and March 31, 2011 against the Defendant Released Entities and currently pending in the United States District Court for the Central District of California.

2.   The City, for itself and its respective successors, directors, officers, employees, agents, their past, present and future departments (including HCID (formerly known as the Los Angeles Housing Department)), boards, commissions, predecessors, and successors-in-interest, (collectively "Defendant Releasing Parties"), for and in consideration of this Agreement including any and all recitals, promises, covenants, and terms herein, does hereby fully and finally remise, release, acquit, and forever discharge Plaintiffs (and their assigns, and successors, as well as their administrators, agents, and representatives acting in their official capacities on behalf of Plaintiffs) (collectively "Plaintiff Released Entities") from any and all claims and demands of any and every kind, name, nature, or description, and from any rights, disputes, complaints, charges, actions and causes of action, suits, debts, injuries, reimbursements, contracts, covenants, liens, liabilities, losses, costs, expenses, obligations, and damages of any nature, kind, and description, whether asserted or unasserted, known or unknown, anticipated or unanticipated, suspected or unsuspected, or actual or contingent, in law or in equity, which the City now has against the Plaintiff Released Entities, whether or not the same be now existent or

known to the City, by reason of or arising out of the claims as more particularly alleged in this Litigation and arising up until the date of Judgment, including but not limited to any claim or cause of action, including but not limited to injunctive, declaratory, or other non-monetary relief, however described, that the City asserted or could have asserted in the Action, pertaining to the accessibility under Section 504, the ADA, and Section 11135, and availability to people with disabilities of any and all of the multifamily housing funded, developed, or significantly assisted by the City at any time prior to this Agreement ("Released Claims").  Such Released Claims, however, shall not include any claims to enforce the terms of this Agreement.

      3.    <u>Waiver of Civil Code Section 1542</u>:  With respect to the release of claims by reason of or arising out of the claims as more particularly alleged in the this Litigation and arising up until the date of Judgment, as provided in Paragraphs VI.1 and VI.2, above, the Plaintiff Releasing Parties and the Defendant Releasing Parties waive and relinquish any and all rights and benefits afforded by California Civil Code Section 1542, and acknowledge and understand that the facts with respect to the Action and this Agreement may, after the date of execution of this Agreement, be discovered to be other than or different from the facts now known and believed to be true.  The Plaintiff Releasing Parties and the Defendant Releasing Parties knowingly accept and assume the risk of the facts being different, agree that this Agreement shall be and remain in all aspects effective and not subject to termination by virtue of any such difference in facts, understand and acknowledge the significance and consequences of such specific waiver of California Civil Code Section 1542, and expressly assume full responsibility for any losses or consequences that may be incurred by making such waiver.  The Plaintiff Releasing Parties and the Defendant Releasing Parties expressly understand that California Civil Code Section 1542 provides as follows:

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

4.     The Plaintiff Releasing Parties and the Defendant Releasing Parties, being aware of the foregoing code section, freely, voluntarily, and expressly waive to the fullest extent applicable any rights they may have thereunder.  The Plaintiff Releasing Parties and the Defendant Releasing Parties acknowledge that, in agreeing to the foregoing release, they have not relied on any inducements, promises, or representations by the Plaintiff Released Entities or the Defendant Released Entities, other than as expressly set forth in and this Agreement.  Such Released Claims, however, shall not include any claims to enforce the terms of this Agreement, nor shall they include claims set forth in any other action filed between January 1, 2011 and March 31, 2011 against the Defendant Released Entities and currently pending in the United States District Court for the Central District of California.

## VII.  **DISPUTE RESOLUTION**

1.     **Meet and Confer Obligation**.  If any Party believes that a dispute exists relating to any violation of or failure to perform any of the provisions of this Settlement Agreement, it shall notify the other Party in writing and describe the alleged violation or failure to perform with particularity.  The Parties shall meet and confer within ten (10) business days of receipt of such notice.  If they are unable to resolve their differences, they shall resort to mediation as described below.

2.     **Mediation.**  If the Parties are unable to resolve a dispute through the meet and confer process described above, the Parties shall mediate the dispute.  The Parties shall have fifteen (15) business days to jointly select a mediator. If the Parties

are unable to reach agreement on a mediator, each side may submit three (3) names of proposed mediators to the District Court and the District Court shall select the mediator. The mediation shall be conducted within thirty (30) days of the selection of the mediator, in the manner determined by the mediator, and the Parties shall engage in good faith efforts to resolve the dispute through such mediation.

3. **Resolution by the District Court.** If the Parties are unable to resolve a dispute through the mediation process described above, any Party may make a motion to the District Court to enforce the Agreement in order to resolve the dispute.

# VIII. COMPENSATION AND FEES

1. **Compensation to Plaintiffs**. The City agrees to pay Plaintiffs a total of Four Million, Five Hundred Thousand Dollars ($4,500,000) to resolve their claims for monetary damages. Payment shall be made no earlier than forty-five (45) days, and no later than sixty (60) days, from the Effective Date. Payment shall be made by wire transfer to Plaintiffs' Counsel, Relman, Dane & Colfax, PLLC, 1225 19th Street N.W., Suite 600, Washington, D.C. 20036-2456, for distribution to Plaintiffs.

2. **Attorneys' Fees**. The parties agree that attorneys' fees will be submitted to the Court for determination. Plaintiffs' Counsel shall submit a fee petition to the Court within forty-five (45) days of the Effective Date of this Agreement."

3. **Costs**. Within thirty (30) days of the Effective Date of this Agreement, Plaintiffs' Counsel shall supply to the City documentation of costs incurred by Plaintiffs' Counsel in this Litigation, in an amount not to exceed One Million Dollars ($1,000,000). Within forty-five (45) days of receipt of such documentation, the City agrees to reimburse Plaintiffs' Counsel for all such documented costs. Payment shall be made by wire transfer to Relman, Dane & Colfax, PLLC, 1225 19th Street N.W., Suite 600, Washington, D.C. 20036-2456, for distribution among Plaintiffs' Counsel.

4.    **Prospective Monitoring Fees and Costs for Plaintiffs' Counsel**:  In addition to the fees described in Paragraph VIII.2, the City shall pay to Plaintiffs' Counsel their reasonable and necessary monitoring fees and expenses during the Settlement Term not to exceed the following amounts, exclusive of any disputes resolved by the District Court:

(c)    Years 1-3: Two Hundred Fifty Thousand Dollars ($250,000) per year.

(d)    Years 4-6: One Hundred Fifty-Six Thousand Dollars ($156,000) per year.

(e)    Years 7-10: One Hundred Thirty-Five Thousand ($135,000) per year.

5.    Payment of fees, costs, and expenses for the monitoring work to be performed by Plaintiffs' Counsel shall be made as follows:

No later than sixty (60) days following the Effective Date, the City shall deposit Eighty-Three Thousand, Three Hundred and Thirty-Three Dollars and Thirty-Three Cents ($83,333.33) into each of three separate sub-accounts ("Monitoring Accounts"), for purposes of allocating funds for the payment of fees to counsel for each of the three respective Plaintiffs.  Such Monitoring Accounts are to be maintained with a national banking association designated by Plaintiffs' Counsel and approved by the Court.  Thereafter, during the Settlement Term, on each anniversary of the Effective Date, the City shall deposit into each such Monitoring Account one-third of the amount specified in that respective year in Paragraph VIII.4, above.

6.    Funds from the Monitoring Accounts shall be disbursed to Plaintiffs' Counsel no later than the first day of each calendar quarter during the Settlement Term in amounts reflecting (a) the number of hours of monitoring work performed during the previous three month period, multiplied by a reasonable hourly rate, and (b) costs and expenses incurred during the previous three month period.  No less than thirty (30) days prior to any such disbursal, Plaintiffs' Counsel shall submit to the City invoices for actual fees and expenses incurred on a quarterly basis,  together

with a signed declaration from Plaintiffs' Counsel attesting to the accuracy of such. In the event the parties cannot agree informally on the amount to be disbursed to Plaintiffs' Counsel from the Monitoring Accounts for a particular three month period, the matter shall be submitted to the Court for resolution. Fees shall be made payable to Relman, Dane & Colfax, PLLC, for distribution among Plaintiffs' Counsel.

## IX.   COURT'S RETENTION OF JURISDICTION

1.      The Parties agree, and the Parties intend that, the Judgment will provide that the District Court shall retain continuing jurisdiction to interpret and enforce the terms of this Agreement during the Settlement Term, and that the Judgment will incorporate the terms of this Settlement Agreement by reference. The Court thereafter shall retain jurisdiction to resolve any disputes that may arise during the Settlement Term. Only the Parties may seek to enforce the terms of the Agreement through the dispute resolution process provided for in Section VII, above. Three (3) months before the end of the Settlement Term, the City shall prepare a final report to the Monitor and Plaintiffs showing that it has fully complied with the provisions of this Settlement Agreement, and may move the Court for an Order terminating its jurisdiction of this matter as of a date following the Settlement Term, on the basis that all of its obligations under the Settlement Agreement have been fully discharged.

## X.   MISCELLANEOUS

1.      **Entire Agreement; Severability**. This Agreement constitutes the entire agreement between the City and Plaintiffs and supersedes all prior agreements, written or oral. Each provision and term of this Agreement shall be interpreted in such manner as to be valid and enforceable. In the event any provision or term of this Agreement is determined to be or is rendered invalid or

unenforceable, all other provisions and terms of this Agreement shall remain unaffected to the extent permitted by law.

2. **Modification of Settlement Agreement**.

(a)     This Settlement Agreement may only be modified or amended in writing, signed by all parties, that specifically states that its purpose is to amend or modify this Settlement Agreement.

(b)     All deadlines and dates for performance by the City under this Settlement Agreement may be extended or modified by written agreement between Plaintiffs and the City.

(c)     If the City should be delayed, interrupted, or prevented from performing any of its obligations under this Settlement Agreement and such delay, interruption, or prevention is due to fire, act of God, or other unforeseeable events, including, but not limited to any cause outside the reasonable control of the City, as the case may be, then the time for performance of the affected obligation of City may be extended, by written agreement of the Parties, for a period equivalent to the period of such delay, interruption, or prevention.

(d)     Any Party may file a written motion with the District Court for the purpose of modifying a term or provision of the Settlement Agreement.  Before filing a motion with the District Court, the moving Party must discuss the reasons for the proposed modification with all Parties for the purpose of determining whether there is agreement on the need for the modification.

3. **Claims Against CRA/LA**.  Nothing in this Agreement releases the Defendant CRA/LA, A Designated Local Authority, Successor to Community Redevelopment Agency of the City of Los Angeles ("CRA/LA"), from any claims that Plaintiffs have asserted against it in the Litigation or from any claims that the City may have against the CRA/LA.  Plaintiffs intend to continue to pursue all

1 pending claims against the CRA/LA in litigation.

2     4.    **Conditions Precedent.** The Parties agree that this Settlement

3 Agreement shall be conditioned upon, and shall be effective only upon, the

4 occurrence of each and every one of the following events:

5     (a)    The Settlement Agreement has been approved by the City Council and

6           the Mayor.

7     (b)    The Settlement Agreement has been fully executed by the Parties.

8     (c)    The Court has entered an Order substantially in the form attached as

9           Exhibit D.

10     5.    **Notice to the Parties**:  All notices required or permitted hereunder shall

11 be in writing and shall be served on the Parties at the addresses set forth below.  Any

12 such notices shall be:

13     (a)    Sent by overnight delivery using a nationally recognized overnight

14           courier, in which case notice shall be deemed delivered one (1) business

15           day after deposit with such courier; or

16     (b)    Personally delivered, in which case notice shall be deemed delivered

17           upon receipt by the Party to whom the notice was delivered.  As a

18           courtesy only, email may be used to provide a Party with notification

19           that a notice has been sent and may include a copy of the notice.  A

20           Party's address may be changed by written notice to the other Party;

21           provided that no notice of a change of address shall be effective until

22           receipt of such notice as provided for above.

23 To Plaintiffs:           Independent Living Center of Southern California

24                    c/o Norma Jean Vescovo, Chief Executive Officer
14407 Gilmore Street, #101

25                    Van Nuys, CA 91401
nvescovo@ilcsc.org

26                    Fair Housing Council of San Fernando Valley

27                    c/o Sharon Kinlaw, Executive Director
14621 Titus Street, Suite 100

28                    Panorama City, CA  91402
skinlaw@fairhousingcouncil.org

*ILC, et al v. City of Los Angeles, et al., Case No. 12-CV-551 FMO (PJWx)*
SETTLEMENT AGREEMENT AND RELEASE OF CLAIMS

Communities Actively Living Independent and Free
c/o Lillibeth Navarro, Executive Director
634 South Spring Street, Second Floor
Los Angeles, CA  90014
lnavarro@calif-ilc.org

With a copy to:

Michael Allen, Esq.
Relman, Dane & Colfax, PLLC
1225 19th Street NW, Suite 600
Washington, DC 20036
Telephone: (202) 728-1888
Facsimile: (202) 728-0848
Email:  mallen@relmanlaw.com

Autumn Elliott, Esq.
Disability Rights California
350  S. Bixel Ave., Suite 290
Los Angeles, CA 90017
Telephone: (213) 213-8000
Facsimile: (213) 213-8001
Autumn.Elliott@disabilityrightsca.org

To City of Los Angeles:

Miguel A. Santana
City Administrative Officer
1500 City Hall East
200 North Main St., 15th Floor
Los Angeles, CA  90012
Telephone: (213) 473-7534
Facsimile: (213) 473-7510
Miguel.Santana@lacity.org

Rushmore Cervantes
General Manager
Housing + Community Investment Department
1200 West 7th St., 9th Floor
Los Angeles, CA  90017
Telephone: (213) 808-8808
Facsimile:  (213) 808-8616
Rushmore.Cervantes@lacity.org

With a copy to:

James P. Clark
Chief Assistant City Attorney
800 City Hall East
200 North Main St., 8th Floor
Los Angeles, CA  90012
Telephone: (213) 978-8100
Facsimile: (213) 978-8312
James.P.Clark@lacity.org

Noreen S. Vincent
Senior Assistant City Attorney
800 City Hall East
200 North Main St., 9th Floor
Los Angeles, CA
Telephone: (213) 978-7730
Facsimile: (213) 978-7714
Noreen.Vincent @lacity.org

47

6.      **Opportunity to Consult with Counsel**:  The Parties represent that prior to signing this Settlement Agreement, they have read it, consulted with counsel of their choice, and each understood its terms and conditions. The Parties hereto accept this Settlement Agreement as their own free and voluntary act, without duress, and intend to be legally bound by it. This Settlement Agreement is made without reliance upon any statements or representations by the Parties or their representatives that are not contained herein.

7.      **Settlement Agreement Binding on Successors and Assigns**:  This Agreement shall be binding on, and enforceable by, the Parties, their employees, and their successors and assigns.

8.      **Titles**:  The titles used in this Settlement Agreement are non-substantive descriptions included solely for the Parties' ease of reference and shall not be construed to alter the substantive provisions of this Settlement Agreement.

9.      **Weekends and Holidays:**  If a reporting day or other deadline under this Agreement falls on a weekend or state or federal holiday, the report or other required action will be due on the first business day after the weekend or holiday.

10.     **Counterparts and Facsimiles**:  This Settlement Agreement may be executed in counterparts and facsimiles, all of which when taken together shall constitute a single instrument.

11.     **Parties Agree to Cooperate**:  The Parties agree to cooperate in submitting this Settlement Agreement to the Court for execution, and to cooperate and execute additional documents or take other actions necessary to perform their respective obligations under this Settlement Agreement.

12.     **Construction**:  This Settlement Agreement is the result of negotiations and joint drafting, undertaken in good faith and in that regard the rule of contractual construction that an ambiguous term shall be construed against the drafter shall not be employed.

1    Agreed to by the Parties, as evidenced by signatures below.

2

3    Dated:                                    _____
                                              Norma Vescovo, Chief Executive Officer
4                                             Independent Living Center of Southern
                                              California
5

6    Dated:                                    _____
                                              Sharon Kinlaw, Executive Director
7                                             Fair Housing Council of San Fernando Valley

8    Dated:                                    _____
                                              Lillibeth Navarro, Executive Director
9                                             Communities Actively Living Independent and
                                              Free
10

11
     Approved as to Form:
12   Dated: _____                   _____

13                                            John P. Relman
                                              Michael G. Allen
14                                            RELMAN, DANE & COLFAX PLLC
                                              1225 19th St. NW, Suite 600
15                                            Washington, D.C. 20036
                                              Telephone: (202) 728-1888
16                                            Facsimile: (202) 728-0848
                                              mallen@relmanlaw.com
17

18
                                              Autumn Elliott
19                                            DISABILITY RIGHTS CALIFORNIA
                                              350 S. Bixel Ave., Suite 290
20                                            Los Angeles, CA 90017
                                              Telephone: (213) 213-8000
21                                            Facsimile: (213) 213-8001
22                                            Autumn.Elliott@disabilityrightsca.org
23

24                                            Dara Schur
                                              DISABILITY RIGHTS CALIFORNIA
25                                            1330 Broadway, Suite 500
                                              Oakland, CA 94612
26                                            Telephone:  (510) 267-1200
                                              Facsimile:  (510) 267-1201
27                                            Dara.Schur@disabilityrightsca.org
28
                                              49

1

Maronel Barajas
DISABILITY RIGHTS LEGAL CENTER
Loyola Public Interest Law Center
256 S. Occidental Blvd., Suite B
Los Angeles, CA 90057
Telephone: (213) 736-1496
Facsimile: (213) 736-1428
Maronel.barajas@drlcenter.org

David Geffen
DAVID GEFFEN LAW FIRM
530 Wilshire Blvd., Ste. 205
Santa Monica, CA 90401
Telephone: (310) 434-1111
Facsimile: (310) 434-1115
Geffenlaw@aol.com

Counsel for Plaintiffs

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Dated: _____          _____
                                 Miguel A. Santana
                                 City Administrative Officer
                                 CITY OF LOS ANGELES

Approved as to Form:

Dated: _____          _____
                                 James P. Clark
                                 Chief Deputy City Attorney
                                 CITY OF LOS ANGELES

Attest:

Holly L. Wolcott, City Clerk
CITY OF LOS ANGELES

By:    _____

Date:  _____

Council File Number:  _____; Date of Approval:  _____

Said Agreement is Number _____ of City Contracts

## Exhibits

**Exhibit A**: List of Existing Covered Housing Developments, Excluding Units in Exhibit B.

**Exhibit B**: List of 22 CRA/LA Housing Developments Not Part of Agreement

**Exhibit C-1**: City of Los Angeles Fair Housing Policy in Regards to Disability Guidance and Requirements for Owners and Property Managers, May 12, 2016

**Exhibit C-2**: Tenant Handbook of Rental Occupancy Policies Regarding Disability for [Housing Development], May 12, 2016

**Exhibit D:**  Proposed Judgment

52

# EXHIBIT

# A

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 1 | 1990 | DUANE HEIGHTS | 2271 W DUANE ST CA 90039 | 14 | 1 | 1 | 2 |
| 2 | 1990 | WATSON TERRACE I | 6128 S 11th Ave, CA 90043 | 12 | 1 | 1 | 2 |
| 3 | 1991 | CENTRAL COURT APARTMENTS | 1316 E 21st St , Los Angeles CA, 90011 | 7 | 1 | 1 | 2 |
| 4 | 1992 | 41ST STREET APARTMENTS | 1410 E 41st St, CA 90011 | 12 | 1 | 1 | 2 |
| 5 | 1992 | FAME MANOR | 3210 W Adams Blve, Los Angeles, CA 90018 | 56 | 3 | 2 | 5 |
| 6 | 1992 | HOPE WEST APTS. | 1231-1237 West Blvd, Los Angeles, CA 90019 | 17 | 1 | 1 | 2 |
| 7 | 1992 | LAS BRISAS | 200 N Bixel St, Los Angeles, CA 90026 | 30 | 2 | 1 | 3 |
| 8 | 1992 | ONE WILKINS PLACE | 1066 E 47th St, Los Angeles, CA 90011 | 66 | 4 | 2 | 6 |
| 9 | 1992 | PARTHENIA COURT | 14825-14833 Parthenia St, Van Nuys, CA 91402 | 25 | 2 | 1 | 3 |
| 10 | 1992 | PROJECT INDEPENDENCE | 13274 N Dronefield Ave, Sylmar, CA 91342 | 26 | 2 | 1 | 3 |
| 11 | 1992 | RALPH BUNCHE VILLAS | 915 E 50th St , Los Angeles CA, 90011 | 6 | 1 | 1 | 2 |
| 12 | 1992 | STRATHERN PARK EAST | 11047 W Strathern St, Sun Valley, CA 91352 | 25 | 2 | 1 | 3 |
| 13 | 1992 | TABOR COURTS | 345-363 Fourth Ave, Venice 90291 | 25 | 2 | 1 | 3 |
| 14 | 1992 | WITMER CITY LIGHTS | 319 S WITMER ST CA 90017 | 16 | 1 | 1 | 2 |
| 15 | 1993 | CRESCENT VILLAGE (aka Crescent Arms Apartments) | 1709 W 8th St , Los Angeles CA, 90017 | 112 | 6 | 3 | 9 |
| 16 | 1993 | DEAF COMMUNITY MULT. CENTER | 2222 La Verne Ave, Los Angeles CA 90041 | 14 | 1 | 1 | 2 |
| 17 | 1993 | NORBO HOTEL DEVELOPMENT CORP | NO RBO HOTEL 526 E. SIXTH STREET , LOS ANGELES CA, 90021 | 58 | 3 | 2 | 5 |
| 18 | 1993 | ARGYLE ARMS (WERNER ILLING HOUSE) | 1924 N Argyle Ave, Hollywood, CA 90068 | 21 | 2 | 1 | 3 |
| 19 | 1993 | BEVERLY CITY LIGHTS | 107 S Carondelet St, Los Angeles, CA 90057 | 40 | 2 | 1 | 3 |
| 20 | 1993 | ENRIQUEZ, ISRAEL/BELEN -- ARGYLE ARMS | 1924 Argyle Ave , Hollywood CA, 90068 | 21 | 2 | 1 | 3 |
| 21 | 1993 | LAS PALOMAS HOTEL | 2203 E 1st St, Los Angeles, CA 90033 | 62 | 4 | 2 | 6 |
| 22 | 1993 | MAIN STREET APTS. | 7317 S Main St , Los Angeles CA, 90003 | 30 | 2 | 1 | 3 |
| 23 | 1993 | MANILA TERRACE | 2328 W Temple St , Los Angeles CA, 90026 | 30 | 2 | 1 | 3 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 24 | 1993 | MARINA APTS. | 722 S Coronado St  , Los Angeles CA, 90057 | 64 | 4 | 2 | 6 |
| 25 | 1993 | MERCEDES APTS. | 727 S Carondelet St  , Los Angeles CA, 90057 | 47 | 3 | 1 | 4 |
| 26 | 1993 | PARKER HOTEL | 725 S Witmer St, Los Angeles, CA 90017 | 32 | 2 | 1 | 3 |
| 27 | 1993 | SOMERVILLE I & II | 4219 S Central Ave  , Los Angeles CA, 90011 | 41 | 3 | 1 | 4 |
| 28 | 1993 | TEMPLE-EDGEWARE APTS | 1272 W Temple St  , Los Angeles CA, 90026 | 108 | 6 | 3 | 9 |
| 29 | 1993 | VINELAND PLACE - (HCDBG) | 7843 N VINELAND AVE CA 91352 | 18 | 1 | 1 | 2 |
| 30 | 1994 | HARBOUR COMMUNITY HOUSING | 12157 N San Fernando Rd, CA 91342 | 38 | 2 | 1 | 3 |
| 31 | 1994 | Paradise Arms | 5200 S Broadway  Los Angeles CA 90003 | 43 | 3 | 1 | 4 |
| 32 | 1994 | 43RD STREET APTS. | 1211 E 43rd St, Los Angeles, CA 90011 | 5 | 1 | 1 | 2 |
| 33 | 1994 | 509 S. UNION DRIVE | 509 S Union Dr, CA 90017 | 26 | 2 | 1 | 3 |
| 34 | 1994 | 8001 RESEDA BOULEVARD | 8001 N Reseda Blvd, CA 91335 | 56 | 3 | 2 | 5 |
| 35 | 1994 | 8727 ORION AVE. | 8727 N Orion Ave, North Hills, CA 91343 | 10 | 1 | 1 | 2 |
| 36 | 1994 | 8735 ORION AVE. | 8735 N Orion Ave, North Hills, CA 91343 | 10 | 1 | 1 | 2 |
| 37 | 1994 | ADAMS CONGRESS APTS. | 1775-1807 W Adams Blvd, Los Angeles, CA 90018 | 46 | 3 | 1 | 4 |
| 38 | 1994 | APPIAN WAY APTS. | 1536 N Serrano Ave, CA 90027 | 42 | 3 | 1 | 4 |
| 39 | 1994 | ASHWOOD COURT | 19119/19201 Nordhoff St, Northridge, CA 91324 | 72 | 4 | 2 | 6 |
| 40 | 1994 | BARNSDALL COURT | 1626 N NORMANDIE AVE  Los Angeles, CA 90027 | 38 | 2 | 1 | 3 |
| 41 | 1994 | CAMBRIA APARTMENTS | 738 S Union Ave  , Los Angeles, CA, 90017 | 40 | 2 | 1 | 3 |
| 42 | 1994 | CONNECTION HOUSE/FOSTER YOUTH CONN | 213 SEVERANCE STREET  , LOS ANGELES CA, 90007 | 16 | 1 | 1 | 2 |
| 43 | 1994 | CORAL WOOD APTS. | 8025 N RESEDA BLVD CA 91335 | 106 | 6 | 3 | 9 |
| 44 | 1994 | CORRIDOR PROJECT | 3507 W Stocker St, Los Angeles, CA 90008 | 44 | 3 | 1 | 4 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|----|----|
| 45 | 1994 | DELANO II | 14722 W Delano St, CA 91411 | 9 | 1 | 1 | 2 |
| 46 | 1994 | H.O.M.E. | 1600 S. Hayworth St.  Los Angeles CA 90035 | 4 | 1 | 1 | 2 |
| 47 | 1994 | HAVEN HILLS TRAN HSNG | 21101 W Saticoy St, Canoga Park, CA 91305 | 26 | 2 | 1 | 3 |
| 48 | 1994 | LA TOWNHOMES | 2557 S Bronson Ave, CA 90018 | 7 | 1 | 1 | 2 |
| 49 | 1994 | LINN HOUSE/WESTSIDE HOSPICE/AIDS HEALTH | 1001 N Martel Ave  , West Hollywood CA, 90046 | 25 | 2 | 1 | 3 |
| 50 | 1994 | MEMORY PARK APARTMENTS | 8750-8810 Memory Park Ave, North Hills, CA 91343 | 53 | 3 | 2 | 5 |
| 51 | 1994 | MIRACLE MILE | 402-404 S Cochran Ave, Los Angeles, CA 90036 | 28 | 2 | 1 | 3 |
| 52 | 1994 | NOBLE PINES | 21611 W Saticoy St, CA 91304 | 68 | 4 | 2 | 6 |
| 53 | 1994 | NORDHOFF STREET APARTMENTS | 15543 W Nordhoff St, CA 91343 | 38 | 2 | 1 | 3 |
| 54 | 1994 | NORMANDIE APTS AKA BARNSDALL COURTS | 423 S. Westmoreland AVE CA 90020 | 54 | 3 | 2 | 5 |
| 55 | 1994 | ORANGEWOOD COURT APTS | 5050 Sepulveda Blvd., Sherman Oaks | 92 | 5 | 2 | 7 |
| 56 | 1994 | ORION VILLAS | 8852 N Orion Ave, CA 91343 | 10 | 1 | 1 | 2 |
| 57 | 1994 | OROZCO VILLAS | 8920 N Orion Ave, North Hills, CA 91343 | 40 | 2 | 1 | 3 |
| 58 | 1994 | OXNARD VILLA | 14045 W Oxnard St, CA 91401 | 40 | 2 | 1 | 3 |
| 59 | 1994 | REGENCY 50 | 14540 Blythe St  , Panorama City CA, 91402 | 50 | 3 | 1 | 4 |
| 60 | 1994 | RESEDA VILLAGE | 7939 N Reseda Blvd, 91335 | 42 | 3 | 1 | 4 |
| 61 | 1994 | ROSCOE APTS. | 20234 W Roscoe Blvd, CA 91306 | 25 | 2 | 1 | 3 |
| 62 | 1994 | SYCAMORE VILLAGE | 523 S Rampart Blvd, CA 90057 | 30 | 2 | 1 | 3 |
| 63 | 1994 | THE WORLD CHRISTIAN TRN. CTR | 1608 W 38th Pl  , Los Angeles CA, 90062 | 33 | 2 | 1 | 3 |
| 64 | 1994 | TOLTON / MONTCLAIR COURT | 4208 W 28th St/ 4200 Montclair, Los Angeles, CA 90016 | 16 | 1 | 1 | 2 |
| 65 | 1994 | TOLTON COURT | 2806 S West Blvd, CA 90016 | 10 | 1 | 1 | 2 |
| 66 | 1994 | VILLAGE CHOICE I & II | 16124 W TUPPER ST CA 91343 | 14 | 1 | 1 | 2 |
| 67 | 1994 | WHITE OAK APTS. | 9205 WHITE OAK AVE | 80 | 4 | 2 | 6 |
| 68 | 1995 | FAME WEST 25TH STREET | 1940 W 25th St, CA 90018 | 12 | 1 | 1 | 2 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 69 | 1995 | ST. ANDREWS BUNGALOW COURT | 1514-1544 St Andrews PL, Los Angeles, CA 90028 | 16 | 1 | 1 | 2 |
| 70 | 1995 | 2010 CHARITON | 2010 Chariton St, Los Angeles, CA 90017 | 18 | 1 | 1 | 2 |
| 71 | 1995 | 20258 ROSCOE DEV LLC | 20258 W Roscoe Blvd, Ca 91306 | 34 | 2 | 1 | 3 |
| 72 | 1995 | 54TH STREET APTS. | 2117-2119 W 54th St, Los Angeles, CA 90062 | 22 | 2 | 1 | 3 |
| 73 | 1995 | ALABAMA I-III | 7440 Alabama Ave, Canoga Park, CA 91303 | 42 | 3 | 1 | 4 |
| 74 | 1995 | ANGELINA APARTMENTS | 1300 Angelina St , Los Angeles CA, 90026 | 82 | 5 | 2 | 7 |
| 75 | 1995 | ARGYLE COURT | 1938 N Argyle Ave, Los Angeles, CA 90068 | 24 | 2 | 1 | 3 |
| 76 | 1995 | ARMINTA SQUARE | 11050 Arminta St, Sun Valley, CA 91352 | 46 | 3 | 1 | 4 |
| 77 | 1995 | ASIAN PACIFIC TRANS HSNG | DV | 8 | 1 | 1 | 2 |
| 78 | 1995 | ASTORIA PLACE TOWNHOMES | 13230 N Bromont Ave, CA 91342 | 18 | 1 | 1 | 2 |
| 79 | 1995 | BROADWAY VILLAGE | 9413 S Spring St , Los Angeles CA, 90003 | 41 | 3 | 1 | 4 |
| 80 | 1995 | CALIFORNIA HOTEL | 1134-1146 S Pacific Ave, los Angeles, CA 90731 | 40 | 2 | 1 | 3 |
| 81 | 1995 | CANAAN GARDENS | 641 E 27th St, Los Angeles, CA 90011 | 7 | 1 | 1 | 2 |
| 82 | 1995 | CHILDREN'S SHELTER | 252 S RAMPART BLVD CA 90057 | 15 | 1 | 1 | 2 |
| 83 | 1995 | EVERGREEN VILLAGE APARTMENTS | 420 N Evergreen Ave, Los Angeles, CA 90063 | 54 | 3 | 2 | 5 |
| 84 | 1995 | FIGUEROA COURTS APTS/ACOF | 9128-9144 S Figueroa St, Los Angeles, CA 90003 | 40 | 2 | 1 | 3 |
| 85 | 1995 | GOWER STREET APTS. | 1140 N GOWER ST CA 90038 | 55 | 3 | 2 | 5 |
| 86 | 1995 | GRAMERCY COURT | 3317 W Washington Blvd , Los Angeles CA, 90018 | 16 | 1 | 1 | 2 |
| 87 | 1995 | HARBOR GATEWAY HOMES | 1418 W 218TH ST CA 90501 | 12 | 1 | 1 | 2 |
| 88 | 1995 | HAYWARD MANOR APTS. | 206 W 6th St, CA 90014 | 525 | 27 | 11 | 38 |
| 89 | 1995 | HYDE PARK PLACE APARTMENTS / CEDC | 6309 S 10th Ave, Los Angeles, CA 90043 | 29 | 2 | 1 | 3 |
| 90 | 1995 | MARIPOSA APTS. | 1641 N Mariposa Ave, Los Angeles, CA 90027 | 32 | 2 | 1 | 3 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 91 | 1995 | MISSION PLAZA APARTMENT | 2218-2258 N Parkside Ave, Los Angeles, CA 90031 | 132 | 7 | 3 | 10 |
| 92 | 1995 | MT. MORIAH SENIOR VILLA/MORIAH SEN HSNG | 4302 S Figueroa St, Los Angeles, CA 90037 | 20 | 1 | 1 | 2 |
| 93 | 1995 | NEW DIRECTIONS REGIONAL CENTER | 11301 Wilshire Blvd, Los Angeles, CA 90073 | 156 | 8 | 4 | 12 |
| 94 | 1995 | NEW HOPE - STA. MONICA | 1637 Appian Way, Santa Monica, CA 90401 | 25 | 2 | 1 | 3 |
| 95 | 1995 | OAKWOOD APTS. | 15454 W Sherman Way, CA 91406 | 390 | 20 | 8 | 28 |
| 96 | 1995 | Olympic Plaza | 2605-2627 Olympic Blvd, Los Angeles, CA 90023 | 88 | 5 | 2 | 7 |
| 97 | 1995 | PARKVIEW APTS. | 622 S Alvarado St , Los Angeles CA, 90057 | 198 | 10 | 4 | 14 |
| 98 | 1995 | PAZ VILLAS | 14643 W Blythe St, Van Nuys, CA 91402 | 14 | 1 | 1 | 2 |
| 99 | 1995 | PENNY LANE - 15256 ACRE STREET | 15256-15260 Acre St, North Hills, CA 91343 | 6 | 1 | 1 | 2 |
| 100 | 1995 | PLAZA VERMONT/CEDC | 960 W 62nd Pl, CA 90044 | 79 | 4 | 2 | 6 |
| 101 | 1995 | Roberta Stephens Villas I & II | 5161 Huntington DR CA 90032 | 63 | 4 | 2 | 6 |
| 102 | 1995 | ROSSMORE HOTEL | 905 E 6th St, Los Angeles, CA 90013 | 60 | 3 | 2 | 5 |
| 103 | 1995 | SHARP MANOR | 10601 S BROADWAY CA 90003 | 15 | 1 | 1 | 2 |
| 104 | 1995 | TELACU POINTE/TELACU HOUSING - L A INC | 3100 N FLETCHER DR CA 90065 | 84 | 5 | 2 | 7 |
| 105 | 1995 | TRANSITION HOUSE | 543 S. CROCKER ST | 130 | 7 | 3 | 10 |
| 106 | 1995 | VALLEY VILLAGE SENIOR APTS | 1211 Chandler Blvd, Los Angeles, CA 91607 | 188 | 10 | 4 | 14 |
| 107 | 1995 | VICTORIA MANOR APTS. | 6503 S Victoria Ave, CA 90043 | 10 | 1 | 1 | 2 |
| 108 | 1995 | VILLA PALOMA | DOMESTIC VIOLENCE UN-DISCLOSED SITE , SAN PEDRO CA, 90731 | 12 | 1 | 1 | 2 |
| 109 | 1995 | WASHINGTON COURT APTS | 1717 E 103rd St , Los Angeles, CA, 90002 | 30 | 2 | 1 | 3 |
| 110 | 1995 | WHITSETT AVENUE PROJECT | 6446,6448,6450 WHITSETT AVE, NORTH HOLLYWOOD, CA 91606 | 6 | 1 | 1 | 2 |
| 111 | 1996 | RAINBOW HOUSE | DV | 14 | 1 | 1 | 2 |
| 112 | 1996 | BLYTHE STREET APARTMENTS | 14601 Blythe St , Van Nuys CA, 91402 | 32 | 2 | 1 | 3 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 113 | 1996 | BRYSON FAMILY APTS. | 2701 W Wilshire Blvd, Los Angeles, CA 90057 | 81 | 5 | 2 | 7 |
| 114 | 1996 | CASANOVA GARDENS/CHINATOWN SERVICE CENTER | 433 W Casanova St, Los Angeles, CA 90012 | 27 | 2 | 1 | 3 |
| 115 | 1996 | CENTURY APTS. | 2742 LanFranco ST CA 90033 | 8 | 1 | 1 | 2 |
| 116 | 1996 | DENKER HOUSE | 20902 S Denker Ave, San Pedro, CA 90501 | 6 | 1 | 1 | 2 |
| 117 | 1996 | EL CORAZON | 7006 ALABAMA & 21429 HART STREET , CANOGA PARK CA, 91303 | 60 | 3 | 2 | 5 |
| 118 | 1996 | FEDORA APTS. | 836 FEDORA ST | 23 | 2 | 1 | 3 |
| 119 | 1996 | FIGUEROA OAKS | 10210 S Figueroa St , Los Angeles CA, 90003 | 32 | 2 | 1 | 3 |
| 120 | 1996 | FIGUEROA SENIOR HOUSING | 5503 S Figueroa St , Los Angeles CA, 90037 | 66 | 4 | 2 | 6 |
| 121 | 1996 | FLOWER HOUSE | DV | 10 | 1 | 1 | 2 |
| 122 | 1996 | GARCIA (JR.), DOLORES M. | 2912 9th Ave , Los Angeles CA, 90018 | 11 | 1 | 1 | 2 |
| 123 | 1996 | HALIFAX HOTEL | 6376 Yucca St , Los Angeles CA, 90028 | 46 | 3 | 1 | 4 |
| 124 | 1996 | HARDEMION, JOHN C | 3913 Hillcrest Dr , Los Angeles CA, 90008 | 29 | 2 | 1 | 3 |
| 125 | 1996 | HARMONY II | 5239 Harmony Ave , North Hollywood CA, 91601 | 14 | 1 | 1 | 2 |
| 126 | 1996 | HART ALABAMA | 7006 N Alabama Ave/ 21429 W Hart St, CA 91303 | 12 | 1 | 1 | 2 |
| 127 | 1996 | HHH HOUSING & COMMUNITY CTR. | | 24 | 2 | 1 | 3 |
| 128 | 1996 | HOPE COTTAGE (DV) | DV | 3 | 1 | 1 | 2 |
| 129 | 1996 | JENESSE CENTER, INC.-PROJ #2-LAHD | DV | 9 | 1 | 1 | 2 |
| 130 | 1996 | KENMORE APARTMENTS | 1726 N Kenmore Ave, Los Angeles, CA 90027 | 21 | 2 | 1 | 3 |
| 131 | 1996 | NEW HARBOR VISTA | 410-450 Wilmington Blvd, CA 90744 | 132 | 7 | 3 | 10 |
| 132 | 1996 | NEW HOPE - SILVER LAKE | 2301 W Brier Ace, CA 90039 | 14 | 1 | 1 | 2 |
| 133 | 1996 | NORMANDIE SENIOR APARTMENTS | 6301 S Normandie Ave , Los Angeles CA, 90044 | 75 | 4 | 2 | 6 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|----|----|
| 134 | 1996 | PALMS COURT | 3819-3821 MOTOR AVE  , LOS ANGELES CA, 90066 | 20 | 1 | 1 | 2 |
| 135 | 1996 | PENNY LANE - 15260 RAYEN | 15260 W Rayen St, Sepulveda, CA 91343 | 6 | 1 | 1 | 2 |
| 136 | 1996 | PICO-GRAMERCY FAMILY HOUSING | 1303 S Gramercy Pl  , Los Angeles CA, 90019 | 49 | 3 | 1 | 4 |
| 137 | 1996 | STEEL PLAZA | 287 S UNION AVE CA 90026 | 66 | 4 | 2 | 6 |
| 138 | 1996 | TELACU LAS FLORES | 12793 W Mercer St, CA 91331 | 75 | 4 | 2 | 6 |
| 139 | 1996 | TEMPLE/ROBINSON | TEMPLE/ROBINSON  , LOS ANGELES CA, 90026 | 50 | 3 | 1 | 4 |
| 140 | 1996 | TRANSITIONAL SHELTER | DV - CONFIDENTIAL SITE  , LOS ANGELES CA, 90036 | 5 | 1 | 1 | 2 |
| 141 | 1996 | TRES PALMAS | 269 Loma Dr  , Los Angeles CA, 90026 | 19 | 1 | 1 | 2 |
| 142 | 1996 | VANOWEN GARDENS | 11754 Vanowen St  , North Hollywood CA, 91605 | 15 | 1 | 1 | 2 |
| 143 | 1996 | WEST "A" HOMES | 4126 S Vermont Ave  , Los Angeles CA, 90037 | 44 | 3 | 1 | 4 |
| 144 | 1996 | WESTLAKE APTS. | 514 S WESTLAKE AVE CA 90057 | 14 | 1 | 1 | 2 |
| 145 | 1997 | NEW HOPE (Courtyard Apartments) - SAN PEDRO | 1124  S Palos Verdes St, San Pedro CA 90732 | 10 | 1 | 1 | 2 |
| 146 | 1997 | AVENIDA TERRACE | 6122 11th Ave/ 3939 Ursula Ave, Los Angeles, CA 90049 | 8 | 1 | 1 | 2 |
| 147 | 1997 | BALDWIN/WATSON TERRACE II | 3939 Ursula Ave  , Los Angeles CA, 90008 | 83 | 5 | 2 | 7 |
| 148 | 1997 | BENTON GREEN APTS. | 528 N Benton Way  , Los Angeles CA, 90026 | 38 | 2 | 1 | 3 |
| 149 | 1997 | CASTLEWOOD TERRACE | 16920 Chatsworth St  , Granada Hills CA, 91344 | 68 | 4 | 2 | 6 |
| 150 | 1997 | GEORGE MCDONALD COURT | 1802,1806-26 E 92ND ST, LOS ANGELES, CA 90002 | 61 | 4 | 2 | 6 |
| 151 | 1997 | GREATER BETHANY | 851 W 81st St  , Los Angeles CA, 90044 | 8 | 1 | 1 | 2 |
| 152 | 1997 | GWEN BOLDEN MANOR | 1302 E 41st St  , Los Angeles CA, 90011 | 24 | 2 | 1 | 3 |
| 153 | 1997 | LOS ALTOS APARTMENTS | 4161 Wilshire Blvd. | 67 | 4 | 2 | 6 |
| 154 | 1997 | SILVERLAKE COURTYRD APTS/PROJ NEW HOPE | 2301 Brier Ave  , Los Angeles CA, 90039 | 14 | 1 | 1 | 2 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 155 | 1997 | SYCAMORE PARK APARTMENTS | 250 S Avenue 50  , Highland Park CA, 90042 | 59 | 3 | 2 | 5 |
| 156 | 1997 | UNIVERSITY PARK APARTMENTS | 1221 W 29th St, Los Angeles, CA 90007 | 20 | 1 | 1 | 2 |
| 157 | 1997 | VISTA NUEVA | 124 S La Fayette Park Pl  , Los Angeles CA, 90057 | 30 | 2 | 1 | 3 |
| 158 | 1998 | AVALON TERRACE / NICOLET APARTMENTS | 451 E 120th St, Los Angeles, CA 90061/4027 Nicolet Ave, Los Angeles, CA 90008 | 38 | 2 | 1 | 3 |
| 159 | 1998 | BANDERA SENIOR HOUSING | 1826 E 92nd St  , Los Angeles CA, 90002 | 61 | 4 | 2 | 6 |
| 160 | 1998 | COURTYARD APTS. | 908 & 912 NEW HAMPSHIRE BLVD | 15 | 1 | 1 | 2 |
| 161 | 1998 | FOUNDATION FOR QUALITY HOUSING | 7970 Woodman Ave  , Panorama City CA, 91402 | 142 | 8 | 3 | 11 |
| 162 | 1998 | HILLVIEW VILLAGE | 12408 Van Nuys Blvd  , Pacoima CA, 91331 | 50 | 3 | 1 | 4 |
| 163 | 1998 | JENESSE-SITE A (PALMYRA AVE) | DV | 20 | 1 | 1 | 2 |
| 164 | 1998 | JENESSE-SITE B (NICOLET AVE) | DV | 12 | 1 | 1 | 2 |
| 165 | 1998 | LA MIRADA APARTMENTS | 5653 La Mirada Ave  , Los Angeles CA, 90038 | 30 | 2 | 1 | 3 |
| 166 | 1998 | LAKEVIEW MANOR | 11681 W Foothill Blvd, CA 91342 | 49 | 3 | 1 | 4 |
| 167 | 1998 | L'CANNON CLUB APTS. | 9700 Laurel Canyon Blvd. | 80 | 4 | 2 | 6 |
| 168 | 1998 | NEW HOPE SENIOR VILLA | 5140 S Central Ave  , Los Angeles CA, 90011 | 47 | 3 | 1 | 4 |
| 169 | 1998 | STOCKER APARTMENTS | 3507 Stocker St  , Los Angeles CA, 90008 | 12 | 1 | 1 | 2 |
| 170 | 1998 | WATTS DV CTR - SITE A | DOMESTIC VIOLENCE SITE  , LOS ANGELES CA, 90002 | 20 | 1 | 1 | 2 |
| 171 | 1999 | HOOVER SENIOR HOUSING | 6212 S Hoover St  , Los Angeles CA, 90044 | 38 | 2 | 1 | 3 |
| 172 | 1999 | Hope Village | 1031 S Hope Street  Los Angeles CA 90015 | 66 | 4 | 2 | 6 |
| 173 | 1999 | ALEGRIA | 2737 W Sunset Blvd  , Los Angeles CA, 90026 | 45 | 3 | 1 | 4 |
| 174 | 1999 | APTAKER, STEVE/LAURIE | 729 S Union Ave  , Los Angeles CA, 90017 | 140 | 7 | 3 | 10 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 175 | 1999 | ART SHARE LOS ANGELES/CHIP HUNTER | 801 E 4th Pl  , Los Angeles CA, 90013 | 30 | 2 | 1 | 3 |
| 176 | 1999 | CENTRAL CITY APARTMENTS | 746 S Lake St  , Los Angeles CA, 90057 | 63 | 4 | 2 | 6 |
| 177 | 1999 | DEWEY HOTEL | 721 S Main St  , Los Angeles CA, 90014 | 43 | 3 | 1 | 4 |
| 178 | 1999 | ECHO PARK SENIOR HOUSING | 1727 Morton Ave  , Los Angeles CA, 90026 | 41 | 3 | 1 | 4 |
| 179 | 1999 | GUNTHARP, WOODROW Y/ETHEL A | 915 S Carondelet St  , Los Angeles CA, 90006 | 48 | 3 | 1 | 4 |
| 180 | 1999 | JENESSE-5TH AVENUE SHELTER | DV | 6 | 1 | 1 | 2 |
| 181 | 1999 | LARKIN, PATRICK F | 2117 Vallejo St, Los Angeles, CA 90031 |  | 0 | 0 | 0 |
| 182 | 1999 | MAKARA, JOHN | 854-860 S NORMANDIE & 3149-3151 1/2 W 9TH ST.  , LOS ANGELES CA, 90005 | 8 | 1 | 1 | 2 |
| 183 | 1999 | MARIPOSA APTS. | 511 S Mariposa Ave  , Los Angeles CA, 90020 | 24 | 2 | 1 | 3 |
| 184 | 1999 | NOBLE SENIOR HOUSING | 15100 Moorpark St  , Sherman Oaks CA, 91403 | 85 | 5 | 2 | 7 |
| 185 | 1999 | OLYMPIC/HOPE | 1031 S Hope St  , Los Angeles CA, 90015 | 66 | 4 | 2 | 6 |
| 186 | 1999 | PARK LANE FAMILY HOUSING | 4630 W Martin Luther King Jr Blvd  , Los Angeles CA, 90016 | 117 | 6 | 3 | 9 |
| 187 | 1999 | RENOVATION/EXPANSION |  | 15 | 1 | 1 | 2 |
| 188 | 1999 | Richard N. Hogan Manor | 5500 S Figueroa St  , Los Angeles CA, 90037 | 51 | 3 | 2 | 5 |
| 189 | 1999 | S.T.A.R. HOUSE D.V -LAHD | DV - CONFIDENTIAL SITE  , LOS ANGELES CA, 90028 | 7 | 1 | 1 | 2 |
| 190 | 1999 | SAFE HOUSE (DV) | DV | 16 | 1 | 1 | 2 |
| 191 | 1999 | SAMMY DAVIS JR. PROJECT | 340 S Reno St  , Los Angeles CA, 90057 | 46 | 3 | 1 | 4 |
| 192 | 1999 | SENDEROS APARTMENTS | 2141 Estrella Ave  , Los Angeles CA, 90007 | 12 | 1 | 1 | 2 |
| 193 | 1999 | SOUTHERN HOTEL | 406 E 5th St  , Los Angeles CA, 90013 | 55 | 3 | 2 | 5 |
| 194 | 1999 | WASHINGTON COURT FAMILY HSNG | 1717 E 103rd St  , Los Angeles CA, 90002 | 102 | 6 | 3 | 9 |
| 195 | 1999 | WOMENS VILLAGE/HOMELESS NO MORE (PHS II) | 1650 Rockwood St  , Los Angeles CA, 90026 | 62 | 4 | 2 | 6 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 196 | 2000 | CASA RAMPART (CRA) | 401 & 512 S. Rampart Boulevard  Los Angeles CA 90057 | 117 | 6 | 3 | 9 |
| 197 | 2000 | COLORADO TERRACE | 2455 W COLORADO BLVD 1-77 CA 90041 | 154 | 8 | 4 | 12 |
| 198 | 2000 | EUGENE HOTEL | 560 Stanford Ave  , Los Angeles CA, 90013 | 44 | 3 | 1 | 4 |
| 199 | 2000 | AMISTAD APARTMENTS | 1953 Estrella Ave  , Los Angeles CA, 90007 | 23 | 2 | 1 | 3 |
| 200 | 2000 | ANGEL STEP INN | DV | 8 | 1 | 1 | 2 |
| 201 | 2000 | COLONIA CORONA APARTMENTS | 13034 Sherman Way  , North Hollywood CA, 91605 | 100 | 5 | 2 | 7 |
| 202 | 2000 | CORVALAN, LISA | 11411 Collins St  , North Hollywood CA, 91601 | 8 | 1 | 1 | 2 |
| 203 | 2000 | EL CENTRO LORETTO APARTMENTS | 1021 Hoover St. | 76 | 4 | 2 | 6 |
| 204 | 2000 | EUGENE THOMAS MANOR | 2226 S Western Ave  , Los Angeles CA, 90018 | 38 | 2 | 1 | 3 |
| 205 | 2000 | GLENMARY KINDER CARE APARTMENTS | 4733 N Figueroa St  , Los Angeles CA, 90042 | 9 | 1 | 1 | 2 |
| 206 | 2000 | HAROLD WAY APARTMENTS | 1541 N Western Ave  , Hollywood CA, 90027 | 51 | 3 | 2 | 5 |
| 207 | 2000 | HIGHLAND VILLAGE PARTNERS, L.P. | 245 S Avenue 50  , Los Angeles CA, 90042 | 91 | 5 | 2 | 7 |
| 208 | 2000 | LEIVA, ARMANDO L. & HILDA Y. | 627 Echandia St  , Los Angeles CA, 90033 | 6 | 1 | 1 | 2 |
| 209 | 2000 | LIME HOUSE | 1800 W Martin Luther King Jr Blvd  , Los Angeles CA, 90062 | 34 | 2 | 1 | 3 |
| 210 | 2000 | MEERA TOWNHOMES | 740 Valencia St  , Los Angeles CA, 90017 | 21 | 2 | 1 | 3 |
| 211 | 2000 | PARTOVI, BRUCE & FARAMARZ | 260 S Avenue 50, CA 90042 | | 0 | 0 | 0 |
| 212 | 2000 | PLAZA DE LEON | 630 S Alvarado St  , Los Angeles CA, 90057 | 20 | 1 | 1 | 2 |
| 213 | 2000 | RIVERS HOTEL | 1226 E 7th St  , Los Angeles CA, 90021 | 75 | 4 | 2 | 6 |
| 214 | 2000 | ROCK VIEW APARTMENTS | 1139 Colorado Blvd  , Los Angeles CA, 90041 | 42 | 3 | 1 | 4 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 215 | 2000 | SANTA CRUZ TERRACE | 201 N Beacon St  , San Pedro CA, 90731 | 48 | 3 | 1 | 4 |
| 216 | 2000 | SONYA GARDENS | 719 W 70th St  , Los Angeles CA, 90044 | 60 | 3 | 2 | 5 |
| 217 | 2000 | TOWNE SQUARE APARTMENTS, L.P. | 11620 Towne Ave  , Los Angeles CA, 90061 | 51 | 3 | 2 | 5 |
| 218 | 2000 | VICTORY GARDENS | 13436 Victory Blvd  , Van Nuys CA, 91401 | 15 | 1 | 1 | 2 |
| 219 | 2000 | VINTAGE CROSSING SENIOR APARTMENTS | 6830 Jordan Ave  , Canoga Park CA, 91303 | 161 | 9 | 4 | 13 |
| 220 | 2000 | WEST ANGELES VILLAS | 6030 Crenshaw Blvd  , Los Angeles CA, 90043 | 150 | 8 | 3 | 11 |
| 221 | 2000 | WEST VALLEY COMMUNITY DEVELOPMENT CORP. (aka W. Valley Bungalow Ct. for Seniors) | 21503 Valerio St  , Canoga Park CA, 91303 | 8 | 1 | 1 | 2 |
| 222 | 2000 | WESTMINSTER SENIOR APTS. | 3405 Arlington Ave  , Los Angeles CA, 90018 | 56 | 3 | 2 | 5 |
| 223 | 2000 | WILLOW TREE VILLAGE | 11960 FOOTHILL BLVD., LOS ANGELES, CA 91331 | 49 | 3 | 1 | 4 |
| 224 | 2001 | BROADWAY PLAZA APTS. | 901 South Broadway | 82 | 5 | 2 | 7 |
| 225 | 2001 | TIERRA DEL SOL | 7505 Canoga Ave  , Canoga Park CA, 91303 | 119 | 6 | 3 | 9 |
| 226 | 2001 | AVALON PLACE | 10803 Avalon Blvd  , Los Angeles CA, 90061 | 152 | 8 | 4 | 12 |
| 227 | 2001 | BROWNSTONE HOTEL | 425 E 5th St  , Los Angeles CA, 90013 | 49 | 3 | 1 | 4 |
| 228 | 2001 | Castellar Apartments | 625 N Hill St, Los Angeles | 101 | 6 | 3 | 9 |
| 229 | 2001 | CORNERSTONE APARTMENTS | 14128 Calvert St  , Van Nuys CA, 91401 | 36 | 2 | 1 | 3 |
| 230 | 2001 | DISCOVERING HORIZONS | 8903 N Balboa Blvd, Northridge, CA 91325 | 14 | 1 | 1 | 2 |
| 231 | 2001 | HELMS MANOR | 3704 Military Ave  , Los Angeles CA, 90034 | 5 | 1 | 1 | 2 |
| 232 | 2001 | HILLTOP COLONY | 323 West 3rd ST CA 90731 | 113 | 6 | 3 | 9 |
| 233 | 2001 | HISTORIC BARBIZON HOTEL | 1927 W 6th St  , Los Angeles CA, 90057 | 51 | 3 | 2 | 5 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 234 | 2001 | INNES HEIGHTS APTS. | 1243, 1245, 1247-51 INNES AVE. , LOS ANGELES CA, 90026 | 19 | 1 | 1 | 2 |
| 235 | 2001 | KOSUMOSU TRANSITIONAL HOUSING PROJECT | CONFIDENTIAL , LOS ANGELES CA, 90013 | 8 | 1 | 1 | 2 |
| 236 | 2001 | ML SHEPARD MANOR SENIOR HOUSING | 2330 Santa Ana S , Los Angeles CA, 90059 | 90 | 5 | 2 | 7 |
| 237 | 2001 | NORTH HOLLYWOOD ACCESSIBLE APARTMENTS | 12145 Burbank Blvd , North Hollywood CA, 91607 | 13 | 1 | 1 | 2 |
| 238 | 2001 | OLIVE MANOR SR. APARTMENTS | 13155 Bromont Ave , Sylmar CA, 91342 | 81 | 5 | 2 | 7 |
| 239 | 2001 | REYNA (TRUSTEE), GUADALUPE | 1814 Workman St , Los Angeles CA, 90031 | 8 | 1 | 1 | 2 |
| 240 | 2001 | SKYLINE VILLAGE | 420 Lucas Ave , Los Angeles CA, 90017 | 73 | 4 | 2 | 6 |
| 241 | 2001 | VENICE SENIOR HOUSING | 151 Ocean Front Walk Apt 187 , Venice CA, 90291 | 64 | 4 | 2 | 6 |
| 242 | 2001 | VICTORY INVESTMENT CO., LLC | 19134 Victory Blvd, Tarzana CA, 91335 | 26 | 2 | 1 | 3 |
| 243 | 2002 | ASBURY APARTMENTS | 2501 W 6th St , Los Angeles CA, 90057 | 97 | 5 | 2 | 7 |
| 244 | 2002 | CASTLEWOOD TERRACE II | 16930 Chatsworth St , Granada Hills CA, 91344 | 182 | 10 | 4 | 14 |
| 245 | 2002 | COLUMBUS TRANSITIONAL HOUSING | 15257 Acre St , North Hills CA, 91343 | 8 | 1 | 1 | 2 |
| 246 | 2002 | COMMUNITY ENHANCEMENT CORPORATION | 2517 Boulder St , Los Angeles CA, 90033 | 5 | 1 | 1 | 2 |
| 247 | 2002 | COURT STREET APTS. | 1301 W COURT ST CA 90026 | 24 | 2 | 1 | 3 |
| 248 | 2002 | CURTIS JOHNSON APTS. | 897 W.VERNON ST; 866 W. 42ND PL; , LOS ANGELES CA, 90037 | 48 | 3 | 1 | 4 |
| 249 | 2002 | EADS APARTMENTS | 421 S Bixel St , Los Angeles CA, 90017 | 36 | 2 | 1 | 3 |
| 250 | 2002 | FAR EAST BUILDING | 347 E 1st St , Los Angeles CA, 90012 | 16 | 1 | 1 | 2 |
| 251 | 2002 | FIESTA HOUSE | 6639 Darby Ave , Reseda CA, 91335 | 50 | 3 | 1 | 4 |
| 252 | 2002 | HARVARD YARD/GLENMARY SENIOR APARTMENTS | 8711 S Harvard Blvd , Los Angeles CA, 90047 | 216 | 11 | 5 | 16 |
| 253 | 2002 | HISTORIC HOLLYWOOD HILLVIEW LLC | 6531 Hollywood Blvd, Los Angeles, CA 90028 | 54 | 3 | 2 | 5 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|----|----|
| 254 | 2002 | LA BREA | 3443 S La Brea Ave  , Los Angeles CA, 90016 | 185 | 10 | 4 | 14 |
| 255 | 2002 | LAKEVIEW TERRACE SILVERCREST | 11850 Foothill Blvd  , Lake View Terrace CA, 91342 | 73 | 4 | 2 | 6 |
| 256 | 2002 | NEW TERMINAL HOTEL | 901 E 7th St, CA 90021 | 44 | 3 | 1 | 4 |
| 257 | 2002 | OLIVARES PLEASANT CENTER | 1208 Pleasant Ave  , Los Angeles CA, 90033 | 12 | 1 | 1 | 2 |
| 258 | 2002 | RESEDA HORIZONS | 17831 San Jose St  , Granada Hills CA, 91344 | 6 | 1 | 1 | 2 |
| 259 | 2002 | SANTOS PLAZA APTS. | 1608 W 36th Pl  , Los Angeles CA, 90018 | 37 | 2 | 1 | 3 |
| 260 | 2002 | SLOAN, PATRICE M. HINES | 4747-1449 W 35th Pl, Los Angeles, CA 90018 | 5 | 1 | 1 | 2 |
| 261 | 2002 | ST. GEORGE HOTEL | 115 E 3rd St  , Los Angeles CA, 90013 | 86 | 5 | 2 | 7 |
| 262 | 2002 | TERRE ONE | 5270 Avalon Blvd  , Los Angeles CA, 90011 | 15 | 1 | 1 | 2 |
| 263 | 2002 | TIDES SENIOR APARTMENTS | 623 S Rampart Blvd  , Los Angeles CA, 90057 | 36 | 2 | 1 | 3 |
| 264 | 2002 | TRI-CITY APARTMENTS | VARIOUS LOCATIONS  , LOS ANGELES CA, 90041 | 142 | 8 | 3 | 11 |
| 265 | 2002 | VICTOR CLOTHING/LIVE WORK LOFT | 240 S Broadway  , Los Angeles CA, 90012 | 37 | 2 | 1 | 3 |
| 266 | 2002 | WATTS DV CENTER - SITE B (NICOLET) | DV SITE  , LOS ANGELES CA, 90002 | | 0 | 0 | 0 |
| 267 | 2002 | YANKEE HOTEL | 501 E 7th St  , Los Angeles CA, 90014 | 80 | 4 | 2 | 6 |
| 268 | 2003 | PICO GRAMERCY | 3201 W Pico Blvd  , Los Angeles CA, 90019 | 71 | 4 | 2 | 6 |
| 269 | 2003 | ALLESANDRO ST. APTS., (ANGELENO COURT) | 1934 Allesandro St  , Los Angeles CA, 90039 | 18 | 1 | 1 | 2 |
| 270 | 2003 | APPLE TREE VILLAGE | 9229 Sepulveda Blvd  , North Hills CA, 91343 | 125 | 7 | 3 | 10 |
| 271 | 2003 | BROADWAY VILLAGE I APARTMENTS | 7800 S Broadway  , Los Angeles CA, 90003 | 16 | 1 | 1 | 2 |
| 272 | 2003 | CHANCELLOR I | 3191 W 7th St  , Los Angeles CA, 90005 | 101 | 6 | 3 | 9 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 273 | 2003 | GARCIA, ALVARO A. AND RAQUEL | 1016 Echo Park Ave  , Los Angeles CA, 90026 | 9 | 1 | 1 | 2 |
| 274 | 2003 | HELENKAMP, MARION J. | 2649 S Redondo Blvd  , Los Angeles CA, 90016 | 8 | 1 | 1 | 2 |
| 275 | 2003 | HFL VAN NUYS APARTMENTS | 13457 W Van Owen St, Los Angeles, CA 91405 | 15 | 1 | 1 | 2 |
| 276 | 2003 | IMPERIAL HIGHWAY APARTMENTS | 1651 E Imperial Hwy  , Los Angeles CA, 90059 | 14 | 1 | 1 | 2 |
| 277 | 2003 | JENESSE CENTER, INC | 4045 Nicolet Ave  , Los Angeles CA, 90008 | 12 | 1 | 1 | 2 |
| 278 | 2003 | LORENA TERRACE | 611 S Lorena St  , Los Angeles CA, 90023 | 49 | 3 | 1 | 4 |
| 279 | 2003 | MANSI TOWN HOMES | 4520 S Figueroa St, Los Angeles, CA 90037 | 21 | 2 | 1 | 3 |
| 280 | 2003 | VERMONT CITY LIGHTS APARTMENTS | 1011 W 42nd Pl  , Los Angeles CA, 90037 | 31 | 2 | 1 | 3 |
| 281 | 2004 | AFTON PLACE SENIOR APARTMENTS | 6230 Afton Pl  , Los Angeles CA, 90028 | 71 | 4 | 2 | 6 |
| 282 | 2004 | ARDMORE CITY LIGHTS | 747 S Ardmore Ave  , Los Angeles CA, 90005 | 48 | 3 | 1 | 4 |
| 283 | 2004 | ASTORIA VILLAGE | 14211 Astoria St  , Sylmar CA, 91342 | 6 | 1 | 1 | 2 |
| 284 | 2004 | BALDWIN HOUSING ASSOCIATES LP | 4070 Ursula Ave  , Los Angeles CA, 90008 | 59 | 3 | 2 | 5 |
| 285 | 2004 | HARBOR CITY LIGHTS | 523 W 127th St  , Los Angeles CA, 90044 | 56 | 3 | 2 | 5 |
| 286 | 2004 | INGRAM PRESERVATION PROPERTIES | 234 N Lake St  , Los Angeles CA, 90026 | 140 | 7 | 3 | 10 |
| 287 | 2004 | LAGUNA SENIOR APARTMENTS | 4201 W Sunset Blvd  , Los Angeles CA, 90029 | 64 | 4 | 2 | 6 |
| 288 | 2004 | LAS BRISAS | 8760 S Main St  , Los Angeles CA, 90003 | 66 | 4 | 2 | 6 |
| 289 | 2004 | MAIN STREET VISTAS | 5950 S. Main St., Los Angeles CA 90003 | 49 | 3 | 1 | 4 |
| 290 | 2004 | MAGNOLIA CITY LIGHTS | 2885 Leeward Ave  , Los Angeles CA, 90005 | 54 | 3 | 2 | 5 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 291 | 2004 | MIRAMAR CITY LIGHTS PROJECT | 1417 W 3rd St  , Los Angeles CA, 90017 | 49 | 3 | 1 | 4 |
| 292 | 2004 | MT. ZION TOWERS SENIOR APARTMENTS | 4827 S Central Ave  , Los Angeles CA, 90011 | 118 | 6 | 3 | 9 |
| 293 | 2004 | PICO NEW HAMPSHIRE APARTMENTS | 1308 S New Hampshire Ave  , Los Angeles CA, 90006 | 30 | 2 | 1 | 3 |
| 294 | 2004 | RAINBOW APARTMENTS | 635 S San Pedro St  , Los Angeles CA, 90014 | 89 | 5 | 2 | 7 |
| 295 | 2004 | SATICOY GARDENS | 14649 Saticoy St  , Van Nuys CA, 91405 | 30 | 2 | 1 | 3 |
| 296 | 2004 | SHERATON TOWN HOUSE | 2961 Wilshire Blvd  , Los Angeles CA, 90010 | 142 | 8 | 3 | 11 |
| 297 | 2004 | ST. ANNE'S TRANSITIONAL | 155 N Occidental Blvd  , Los Angeles CA, 90026 | 40 | 2 | 1 | 3 |
| 298 | 2005 | CENTRAL VILLAGE | 2000 S Central Ave  , Los Angeles CA, 90011 | 85 | 5 | 2 | 7 |
| 299 | 2005 | COLUMBUS PERMANENT HOUSING | 8900 Columbus Ave  , North Hills CA, 91343 | 6 | 1 | 1 | 2 |
| 300 | 2005 | PALM VILLAGE SENIOR APARTMENTS | 9034 Laurel Canyon Blvd  , Sun Valley CA, 91352 | 60 | 3 | 2 | 5 |
| 301 | 2005 | EMERALD TERRACE APARTMENTS | 279 Emerald St  , Los Angeles CA, 90026 | 85 | 5 | 2 | 7 |
| 302 | 2005 | FIGUEROA PLACE APARTMENTS | 1320 W Sunset Blvd  , Los Angeles CA, 90026 | 32 | 2 | 1 | 3 |
| 303 | 2005 | FLORES DEL VALLE | 222 N Avenue 23  , Los Angeles CA, 90031 | 146 | 8 | 3 | 11 |
| 304 | 2005 | PARTHENIA STREET SENIOR HOUSING | 19455 Parthenia St  , Northridge CA, 91324 | 77 | 4 | 2 | 6 |
| 305 | 2005 | PENNY LANE - 15258 GRESHAM ST. | 15258 W Gresgam St  , CA 91343 | 6 | 1 | 1 | 2 |
| 306 | 2005 | PISGAH VILLAGE | 6000 Echo St  , Los Angeles CA, 90042 | 47 | 3 | 1 | 4 |
| 307 | 2005 | ROYALS APARTMENTS | 717-721 W. EL SEGUNDO BLVD  , LOS ANGELES CA, 90061 | 115 | 6 | 3 | 9 |
| 308 | 2005 | TEMPLE VILLAS | 1417 W Temple St  , Los Angeles CA, 90026 | 52 | 3 | 2 | 5 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 309 | 2005 | TOLIVER, PATRICIA A. | 228 W 111th Pl  , Los Angeles CA, 90061 | 6 | 1 | 1 | 2 |
| 310 | 2005 | WATERLOO HEIGHTS APARTMENT | 1011 Waterloo St  , Los Angeles CA, 90026 | 18 | 1 | 1 | 2 |
| 311 | 2005 | WOODLAND TERRACE | 1532-1538 W. NORDHOFF STREET  , LOS ANGELES CA, 91343 | 31 | 2 | 1 | 3 |
| 312 | 2006 | BRONSON COURTS | 1227 N Bronson Ave  , Los Angeles CA, 90038 | 32 | 2 | 1 | 3 |
| 313 | 2006 | CARONDELET COURT APARTMENT HOMES | 816 S Carondelet St  , Los Angeles CA, 90057 | 33 | 2 | 1 | 3 |
| 314 | 2006 | CHARLES COBB APARTMENTS | 521 S San Pedro St  , Los Angeles CA, 90013 | 76 | 4 | 2 | 6 |
| 315 | 2006 | El Dorado Family Apts. | 12129 El Dorado Ave. | 60 | 3 | 2 | 5 |
| 316 | 2006 | HART VILLAGE | 6941 Owensmouth Ave  , Canoga Park CA, 91303 | 47 | 3 | 1 | 4 |
| 317 | 2006 | IVY TERRACE FKA THREE COURTYARDS | 13751 Sherman Way  , Van Nuys CA, 91405 | 52 | 3 | 2 | 5 |
| 318 | 2006 | MORGAN PLACE SENIOR APARTMENTS | 7301 Crenshaw Blvd  , Los Angeles CA, 90043 | 55 | 3 | 2 | 5 |
| 319 | 2006 | OSBORNE FAMILY APARTMENTS (aka Osborne Gardens (CRA) | 12360 Osborne St  , Pacoima CA, 91331 | 51 | 3 | 2 | 5 |
| 320 | 2006 | ABBEY APARTMENTS | 625 S San Pedro St  , Los Angeles CA, 90014 | 115 | 6 | 3 | 9 |
| 321 | 2006 | ALEGRIA APARTMENTS | 801 W 23rd St  , Los Angeles CA, 90007 | 15 | 1 | 1 | 2 |
| 322 | 2006 | CAMINO AL ORO | 330 W Avenue 26  , Los Angeles CA, 90031 | 102 | 6 | 3 | 9 |
| 323 | 2006 | CASA DE ANGELES | 4904 S Figueroa St  , Los Angeles CA, 90037 | 49 | 3 | 1 | 4 |
| 324 | 2006 | CLINTON FAMILY APARTMENTS | 2114 Clinton St  , Los Angeles CA, 90026 | 36 | 2 | 1 | 3 |
| 325 | 2006 | CORONITA FAMILY APARTMENTS | 204 Lucas Ave  , Los Angeles CA, 90026 | 21 | 2 | 1 | 3 |
| 326 | 2006 | HARVARD HEIGHTS | 950 S Harvard Blvd  , Los Angeles CA, 90006 | 47 | 3 | 1 | 4 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|----|----|
| 327 | 2006 | HFL VANOWEN APARTMENTS | 14419 Vanowen St , Van Nuys CA, 91405 | 25 | 2 | 1 | 3 |
| 328 | 2006 | JAMES WOOD APARTMENTS | 1322 AND 1405 JAMES WOOD BLVD. , LOS ANGELES CA, 90015 | 61 | 4 | 2 | 6 |
| 329 | 2006 | LYNDON HOTEL, THE | 413 E 7th St , Los Angeles CA, 90014 | 53 | 3 | 2 | 5 |
| 330 | 2006 | MANITOU VISTAS | 3414 Manitou Ave , Los Angeles CA, 90031 | 48 | 3 | 1 | 4 |
| 331 | 2006 | MANITOU VISTAS II | 3416 E Manitou Ave, Los Angeles, CA 90031 | 21 | 2 | 1 | 3 |
| 332 | 2006 | MARIPOSA PLACE APTS | 5030 Santa Monica Blvd , Los Angeles CA, 90029 | 58 | 3 | 2 | 5 |
| 333 | 2006 | MIMMIM TOWNHOMES | 5417 S Figueroa St , Los Angeles CA, 90037 | 21 | 2 | 1 | 3 |
| 334 | 2006 | NEW DANA STRAND TOWNHOMES | 425 N Wilmington Blvd , Wilmington CA, 90744 | 116 | 6 | 3 | 9 |
| 335 | 2006 | PANORAMA VIEW APARTMENTS | 9222 N Van Nuys Blvd, CA 91402 | 87 | 5 | 2 | 7 |
| 336 | 2006 | SECOND AVENUE PRESERVATIONS | 1309 2nd Ave , Los Angeles CA, 90019 | 20 | 1 | 1 | 2 |
| 337 | 2006 | SICHEL FAMILY APARTMENTS | 1805 Sichel St , Los Angeles CA, 90031 | 37 | 2 | 1 | 3 |
| 338 | 2006 | ST. ANDREWS ARMS APTS | 1511 S ST ANDREWS PL 1-43 CA 90019 | 43 | 3 | 1 | 4 |
| 339 | 2006 | STEVENSON MANOR | 1230 Cole Ave , Los Angeles CA, 90038 | 61 | 4 | 2 | 6 |
| 340 | 2006 | TESORO DEL VALLE | 2301 Humboldt St , Los Angeles CA, 90031 | 121 | 7 | 3 | 10 |
| 341 | 2006 | THE MEDITERRANEAN | 1800 W Temple St , Los Angeles CA, 90026 | 26 | 2 | 1 | 3 |
| 342 | 2006 | UNION POINT APARTMENTS | 420 Union Dr Apt 426 , Los Angeles CA, 90017 | 21 | 2 | 1 | 3 |
| 343 | 2006 | VILLAS DEL LAGO | 456 S Lake St , Los Angeles CA, 90057 | 74 | 4 | 2 | 6 |
| 344 | 2006 | VILLAS LAS AMERICAS | 9618 Van Nuys Blvd , Panorama City CA, 91402 | 55 | 3 | 2 | 5 |
| 345 | 2006 | WITMER HEIGHTS APARTMENT HOMES | 116 Witmer St , Los Angeles CA, 90026 | 49 | 3 | 1 | 4 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 346 | 2007 | 29th Street Crossings | 814 E 29th Street  Los Angeles CA 90037 | 34 | 2 | 1 | 3 |
| 347 | 2007 | ADAMS & CENTRAL MIXED USE DEVELOPMENT | 1011 E Adams Blvd  , Los Angeles CA, 90011 | 80 | 4 | 2 | 6 |
| 348 | 2007 | Ardmore Apartments | 959 S Ardmore Avenue  Los Angeles CA 90004 | 48 | 3 | 1 | 4 |
| 349 | 2007 | ASTURIAS SENIOR APARTMENTS | 1640 S Sepulveda Blvd  , Los Angeles CA, 90025 | 69 | 4 | 2 | 6 |
| 350 | 2007 | BONNIE BRAE APARTMENT HOMES | 501 S Bonnie Brae St  , Los Angeles CA, 90057 | 53 | 3 | 2 | 5 |
| 351 | 2007 | CANTABRIA SENIOR APARTMENTS | 9640 Van Nuys Blvd  , Panorama City CA, 91402 | 81 | 5 | 2 | 7 |
| 352 | 2007 | MACARTHUR PARK METRO APTS PHASE A | 1901 W 7th St  , Los Angeles CA, 90057 | 90 | 5 | 2 | 7 |
| 353 | 2007 | ORION GARDENS APARTMENTS | 8947 Orion Ave  , North Hills CA, 91343 | 32 | 2 | 1 | 3 |
| 354 | 2007 | RITTENHOUSE SQUARE | 3300 S Central Ave  , Los Angeles CA, 90011 | 100 | 5 | 2 | 7 |
| 355 | 2007 | SEVEN MAPLES SENIOR APARTMENTS | 2530 W 7th St  , Los Angeles CA, 90057 | 57 | 3 | 2 | 5 |
| 356 | 2007 | The Hobart / aka HOBART HEIGHTS APT. HOMES | 924 S Hobart Blvd, Los Angeles, CA 90006 | 49 | 3 | 1 | 4 |
| 357 | 2007 | 36TH & BROADWAY APTS | 153 E 36th St 4775 S. Broadway , Los Angeles CA, 90011 | 27 | 2 | 1 | 3 |
| 358 | 2007 | BONNIE BRAE VILLAGE APARTMENTS | 200 S Bonnie Brae St  , Los Angeles CA, 90057 | 93 | 5 | 2 | 7 |
| 359 | 2007 | HARVARD CIRCLE | 952 N Harvard Blvd  , Los Angeles CA, 90029 | 40 | 2 | 1 | 3 |
| 360 | 2007 | JAMES M. WOOD | 506 San Julian St  , Los Angeles CA, 90013 | 53 | 3 | 2 | 5 |
| 361 | 2007 | MCCOY PLAZA | 9305 Firth Blvd  , Los Angeles CA, 90002 | 128 | 7 | 3 | 10 |
| 362 | 2007 | NEW CARVER APARTMENTS | 325 W 17th St  , Los Angeles CA, 90015 | 97 | 5 | 2 | 7 |
| 363 | 2007 | PICO/VETERAN SENIOR HOUSING PROJECT | 10961 W Pico Blvd  , Los Angeles CA, 90064 | 46 | 3 | 1 | 4 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 364 | 2007 | RAYEN APARTMENTS | 15320 Rayen St  , North Hills CA, 91343 | 49 | 3 | 1 | 4 |
| 365 | 2007 | ROSA PARKS VILLAS | 2507 S Bronson Ave  , Los Angeles CA, 90018 | 60 | 3 | 2 | 5 |
| 366 | 2007 | ROSEWOOD GARDENS | 502 N Berendo St  , Los Angeles CA, 90004 | 54 | 3 | 2 | 5 |
| 367 | 2007 | TOBERMAN VILLAGE | 201 N. PALOS VERDES STREET  , LOS ANGELES CA, 90731 | 49 | 3 | 1 | 4 |
| 368 | 2007 | TRES LOMAS GARDEN APARTMENTS | 4343 Toland Way  , Los Angeles CA, 90041 | 46 | 3 | 1 | 4 |
| 369 | 2007 | TWO WORLDS APARTMENTS | 809 W 23rd St 1306 S. Westlake Avenue , Los Angeles CA, 90007 | 96 | 5 | 2 | 7 |
| 370 | 2008 | ANDALUCIA SENIOR APARTMENTS | 8101 Sepulveda Blvd  , Panorama City CA, 91402 | 94 | 5 | 2 | 7 |
| 371 | 2008 | DOWNTOWN WOMEN'S CENTER | 434 S San Pedro St  , Los Angeles CA, 90013 | 139 | 7 | 3 | 10 |
| 372 | 2008 | RENATO APARTMENTS | 527 San Julian St  , Los Angeles CA, 90013 | 96 | 5 | 2 | 7 |
| 373 | *2008* | Whittier Apartments | 3551-3565 E Whittier Blvd  Los Angeles CA 90023 | 59 | 3 | 2 | 5 |
| 374 | 2008 | COLUMBUS SQUARE APARTMENTS | 8557 Columbus Ave  , North Hills CA, 91343 | 64 | 4 | 2 | 6 |
| 375 | 2008 | MacArthur Park Metro (B) | 678 So. Alvarado St. | 82 | 5 | 2 | 7 |
| 376 | 2008 | MAGNOLIA ON LAKE | 201 S Lake St Apt 207  , Los Angeles CA, 90057 | 46 | 3 | 1 | 4 |
| 377 | 2008 | MAYA TOWN HOMES | 12005 S Broadway  , Los Angeles CA, 90061 | 21 | 2 | 1 | 3 |
| 378 | 2008 | MENLO PARK | 831 W 70th St  , Los Angeles CA, 90044 | 49 | 3 | 1 | 4 |
| 379 | 2008 | MIRAMAR VILLAGE | 240 S Westlake Ave  , Los Angeles CA, 90057 | 114 | 6 | 3 | 9 |
| 380 | 2008 | MY TOWN HOMES | 12015 S Figueroa St  , Los Angeles CA, 90061 | 21 | 2 | 1 | 3 |
| 381 | 2008 | PROFESSIONAL HOUSING & DEVELOPMENT APTS. | 1020 S Kingsley Dr 1401 S. Arlington Avenue 1810 S. Magnolia Avenue, Los Angeles CA, 90006 | 83 | 5 | 2 | 7 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 382 | 2008 | SWANSEA PARK SENIOR APARTMENTS | 1015 N Kingsley Dr  , Los Angeles CA, 90029 | 82 | 5 | 2 | 7 |
| 383 | 2008 | VENDOME PALMS APARTMENTS | 975 N Vendome St  , Los Angeles CA, 90026 | 36 | 2 | 1 | 3 |
| 384 | 2009 | New Genesis Apartments | 452 S. Main Street  Los Angeles CA 90013 | 106 | 6 | 3 | 9 |
| 385 | 2009 | STOVALL VILLAS | 535 W 41st St  , Los Angeles CA, 90037 | 32 | 2 | 1 | 3 |
| 386 | 2009 | CROSSINGS AT NORTH HILLS | 9311 N Sepulveda Blvd, CA 91343 | 38 | 2 | 1 | 3 |
| 387 | 2009 | MAPLE TREE/CORONEL VILLAGE | 935 S Boyle Ave  , Los Angeles CA, 90023 | 48 | 3 | 1 | 4 |
| 388 | 2010 | 28th Street YMCA | 1006 E. 28th Street  Los Angeles CA 90011 | 49 | 3 | 1 | 4 |
| 389 | 2010 | Boyle Hotel Apartments | 101 N Boyle Ave  , Los Angeles CA, 90033 | 51 | 3 | 2 | 5 |
| 390 | 2010 | Chinatown Metro Apartments | 808 N NORTH SPRING ST  LOS ANGELES, CA 90012 | 123 | 7 | 3 | 10 |
| 391 | 2010 | CUATRO VIENTOS | 5331 Huntington Dr N 5310-5322 Almont , Los Angeles CA, 90032 | 25 | 2 | 1 | 3 |
| 392 | 2010 | Juanita Villas aka LA KRETZ VILLAS | 335 N Juanita Ave  , Los Angeles CA, 90004 | 49 | 3 | 1 | 4 |
| 393 | 2010 | Las Margaritas | 115 N Soto St 319 N. Cummings St. , Los Angeles CA, 90033 | 42 | 3 | 1 | 4 |
| 394 | 2010 | Montecito Terrace | 14653 Blythe St 14726-28 Blythe St , Panorama City CA, 91402 | 98 | 5 | 2 | 7 |
| 395 | 2010 | Sherman Village | 18900 Sherman Way  , Reseda CA, 91335 | 73 | 4 | 2 | 6 |
| 396 | 2010 | The Crossings at North Hills | 9311 Sepulveda Blvd  , North Hills CA, 91343 | 38 | 2 | 1 | 3 |
| 397 | 2010 | DANA STRAND SENIOR APARTMENTS | 410 Hawaiian Ave  , Wilmington CA, 90744 | 100 | 5 | 2 | 7 |
| 398 | 2010 | GLASSELL PARK COMMUNITY HOUSING | 3000 Verdugo Rd  , Los Angeles CA, 90065 | 50 | 3 | 1 | 4 |
| 399 | 2010 | GLENOAKS GARDENS | 8925 Glenoaks Blvd  , Sun Valley CA, 91352 | 61 | 4 | 2 | 6 |
| 400 | 2010 | Linda Vista Nurses Building | 610 S ST LOUIS ST CA 90023 | 23 | 2 | 1 | 3 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 401 | 2010 | MILAN TOWN HOMES | 10006 S Broadway  , Los Angeles CA, 90003 | 16 | 1 | 1 | 2 |
| 402 | 2010 | NEW GENESIS | 1317 E 7th St  , Los Angeles CA, 90021 | 30 | 2 | 1 | 3 |
| 403 | 2010 | Willis Avenue Apartments | 8904 Willis Ave  , Panorama City CA, 91402 | 42 | 3 | 1 | 4 |
| 404 | 2011 | 5555 HOLLYWOOD | 5555 Hollywood Blvd  , Los Angeles CA, 90028 | 120 | 6 | 3 | 9 |
| 405 | 2011 | Dunbar Village | Multi | 83 | 5 | 2 | 7 |
| 406 | 2011 | Figueroa Senior Housing | 7621 S FIGUEROA ST 1-11  LOS ANGELES, CA 90044 | 35 | 2 | 1 | 3 |
| 407 | 2011 | GATEWAYS  APARTMENTS | 505 S San Pedro St  , Los Angeles CA, 90013 | 108 | 6 | 3 | 9 |
| 408 | 2011 | La Coruna Senior Apartments | 15301 Lanark St  , Van Nuys CA, 91406 | 87 | 5 | 2 | 7 |
| 409 | 2011 | MENLO FAMILY HOUSING | 1230 Menlo Ave  , Los Angeles CA, 90006 | 60 | 3 | 2 | 5 |
| 410 | 2011 | Normandie Terrace | 540 S Normandie Ave  , Los Angeles CA, 90020 | 66 | 4 | 2 | 6 |
| 411 | 2011 | STEP UP ON VINE | 1057 N VINE ST  LOS ANGELES, CA 90038 | 34 | 2 | 1 | 3 |
| 412 | 2011 | Vermont Avenue Apartments | 4925 S Vermont Ave  , Los Angeles CA, 90037 | 49 | 3 | 1 | 4 |
| 413 | 2011 | Yale Street Family Housing | 715 Yale St  , Los Angeles CA, 90012 | 60 | 3 | 2 | 5 |
| 414 | 2011 | Del Rey Square Senior Housing | 11904 Culver Blvd  , Los Angeles CA, 90066 | 124 | 7 | 3 | 10 |
| 415 | 2011 | NOHO SENIOR VILLAS | 5525 Klump Ave  , North Hollywood CA, 91601 | 49 | 3 | 1 | 4 |
| 416 | 2011 | Osborne Place Apartments | 12230 Osborne Pl  , Pacoima CA, 91331 | 64 | 4 | 2 | 6 |
| 417 | 2011 | Star Apartments | 640 E 6th St  , Los Angeles CA, 90021 | 102 | 6 | 3 | 9 |
| 418 | 2011 | Sunrise Apartments | 5111 S Main St  , Los Angeles CA, 90037 | 46 | 3 | 1 | 4 |
| 419 | 2012 | Jefferson Boulevard and Fifth Avenue Apartments | 2401 W Jefferson Blvd  , Los Angeles CA, 90018 | 40 | 2 | 1 | 3 |
| 420 | 2012 | JEFFERSON PARK TERRACE aka Mercy Housing Calwest | 3011 S Western Ave  , Los Angeles CA, 90018 | 60 | 3 | 2 | 5 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|----|----|
| 421 | 2012 | New Hampshire Family Housing | 1037 S NEW HAMPSHIRE AVE CA 90006 | 52 | 3 | 2 | 5 |
| 422 | 2012 | ROSSLYN HOTEL / TMBC-12-118785 | 112 W 5th St  , Los Angeles CA, 90013 | 264 | 14 | 6 | 20 |
| 423 | 2012 | The Gordon | 1555 Gordon St  , Los Angeles CA, 90028 | 21 | 2 | 1 | 3 |
| 424 | 2012 | TOBIAS TERRACE | 9247 Van Nuys Blvd  , Panorama City CA, 91402 | 56 | 3 | 2 | 5 |
| 425 | 2012 | BESWICK SENIOR APARTMENTS | 3533 Beswick St  , Los Angeles CA, 90023 | 33 | 2 | 1 | 3 |
| 426 | 2012 | Figueroa Apartments | 5216 S Figueroa St  , Los Angeles CA, 90037 | 19 | 1 | 1 | 2 |
| 427 | 2012 | LA PRO II | 10311 S Western Ave  , Los Angeles CA, 90047 | 63 | 4 | 2 | 6 |
| 428 | 2012 | NEW PERSHING APARTMENTS | 108 E 5th St 502 S. Main Street , Los Angeles CA, 90013 | 69 | 4 | 2 | 6 |
| 429 | 2012 | ONE SANTA  FE | 100 S Santa Fe Ave  , Los Angeles CA, 90012 | 438 | 22 | 9 | 31 |
| 430 | 2012 | Osborne Street Apartments | 12041 Osborne St  , Sylmar CA, 91342 | 60 | 3 | 2 | 5 |
| 431 | 2012 | PWC Family Housing | 153 Glendale Blvd  , Los Angeles CA, 90026 | 45 | 3 | 1 | 4 |
| 432 | 2012 | Taylor Yard Apartments | 1545 N San Fernando Rd  , Los Angeles CA, 90065 | 68 | 4 | 2 | 6 |
| 433 | 2012 | THE SERRANO | 595 S Serrano Ave  , Los Angeles CA, 90020 | 44 | 3 | 1 | 4 |
| 434 | 2012 | The Whittier | 3551 Whittier Blvd  , Los Angeles CA, 90023 | 60 | 3 | 2 | 5 |
| 435 | 2013 | BROADWAY VILLAS | 9413 S Spring St  , Los Angeles CA, 90003 | 49 | 3 | 1 | 4 |
| 436 | 2013 | DAY STREET APARTMENTS / TMBC-12-118770 | 7639 Day St 7639-7653 W Day Street , Tujunga CA, 91042 | 46 | 3 | 1 | 4 |
| 437 | 2013 | EAGLE VISTA / TM00-12-118878 | 4258 Eagle Rock Blvd  , Los Angeles CA, 90065 | 56 | 3 | 2 | 5 |
| 438 | 2013 | MICHAEL'S VILLAGE | 7160 W Sunset Blvd 1442 N Formosa Ave , Los Angeles CA, 90046 | 24 | 2 | 1 | 3 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|-----------|---------------|---------|---------|----------|-----|-------|
| 439 | 2013 | MOONLIGHT VILLAS | 12381 Osborne St  , Pacoima CA, 91331 | 27 | 2 | 1 | 3 |
| 440 | 2013 | Navy Village | 1556  West Palos Verdes Drive North  , Los Angeles CA, 90732 | 74 | 4 | 2 | 6 |
| 441 | 2013 | RIO VISTA APARTMENTS / TMBC-12-118780 | 1515 N San Fernando Rd  , Los Angeles CA, 90065 | 87 | 5 | 2 | 7 |
| 442 | 2013 | ROLLAND CURTIS APARTMENTS | 1077 W 38TH ST CA 90037 | 48 | 3 | 1 | 4 |
| 443 | 2013 | Sherman Way Apartments | 532 North San Benito ST CA 90033 | 30 | 2 | 1 | 3 |
| 444 | 2013 | Taylor Yard Master Association | 1311 N SAN FERNANDO ROAD A-C CA 90031 | 108 | 6 | 3 | 9 |
| 445 | 2013 | The Six (Formerly Carondelet Apartments) | 811 S CARONDELET ST CA 90057 | 52 | 3 | 2 | 5 |
| 446 | 2013 | Young Burlington | 820 S Burlington Ave  , Los Angeles CA, 90057 | 21 | 2 | 1 | 3 |
| 447 | 2014 | Blossom Plaza | 900 N Broadway  , Los Angeles CA, 90012 | 54 | 3 | 2 | 5 |
| 448 | 2014 | LDK SENIOR APARTMENTS | 900 Crenshaw Blvd  , Los Angeles CA, 90019 | 67 | 4 | 2 | 6 |
| 449 | 2014 | RIVERWALK AT RESEDA | 18425 Kittridge St  , Reseda CA, 91335 | 77 | 4 | 2 | 6 |
| 450 | 2014 | Arlington Square | MULTI | 48 | 3 | 1 | 4 |
| 451 | 2014 | Beverly & Lucas | 1416 W BEVERLY BLVD CA 90026 | 125 | 7 | 3 | 10 |
| 452 | 2014 | Beverly Terrace | 3314 W BEVERLY BLVD CA 90004 | 40 | 2 | 1 | 3 |
| 453 | 2014 | EASTLAKE / ALTURA WALK | 2516 Eastlake Ave 3211-3213 1/2 Altura Walk , Los Angeles CA, 90031 | 5 | 1 | 1 | 2 |
| 454 | 2014 | Highland Park Transit Village | MULTI | 60 | 3 | 2 | 5 |
| 455 | 2014 | King 1101 | 1107 W MARTIN LUTHER KING JR BLVD CA 90037 | 26 | 2 | 1 | 3 |
| 456 | 2014 | Knob Hill Apartments | 2043 E 4th St  , Los Angeles CA, 90033 | 39 | 2 | 1 | 3 |
| 457 | 2014 | Linda Vista Apartments (Phase II) | 610 S St Louis St  , Los Angeles CA, 90023 | 97 | 5 | 2 | 7 |
| 458 | 2014 | Marmion Way Apartments | 3500 N MARMION WAY CA 90065 | 49 | 3 | 1 | 4 |
| 459 | 2014 | MIRAGE TOWN HOMES | 5221 S WESTERN AVE CA 90062 | 21 | 2 | 1 | 3 |
| 460 | 2014 | Paloma Terrace | 5000 S MAIN ST CA 90011 | 59 | 3 | 2 | 5 |
| 461 | 2014 | Panama Apartments | 403 E 5TH ST CA 90013 | 72 | 4 | 2 | 6 |
| 462 | 2014 | PATH Metro Villas | 335 N WESTMORELAND AVE CA 90004 | 72 | 4 | 2 | 6 |
| 463 | 2014 | SAGE PARK | 1302 W 177th St  , Gardena CA, 90248 | 90 | 5 | 2 | 7 |

City Properties Receiving Federal Funds

| # | Plan Year | Activity Name | Address | # Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 464 | 2014 | Santa Cecilia Apartments | 1750 E 1ST ST CA 90033 | 79 | 4 | 2 | 6 |
| 465 | 2014 | South West View Apartments | 3023 1/2 S WEST VIEW ST CA 90016 | 64 | 4 | 2 | 6 |
| 466 | 2014 | Taylor Yard Senior Housing | 1231 N SAN FERNANDO ROAD CA 90031 | 108 | 6 | 3 | 9 |
| 467 | 2014 | The Campus at L.A. Family Housing | 7843 N LANKERSHIM BLVD CA 91605 | 50 | 3 | 1 | 4 |
| 468 | 2014 | THE PASEO AT CALIFORNIAN | 1907 W 6th St  , Los Angeles CA, 90057 | 53 | 3 | 2 | 5 |
| 469 | 2014 | VERMONT VILLAS | 16304 S Vermont Ave  , Gardena CA, 90247 | 79 | 4 | 2 | 6 |
| 470 | 2014 | Washington 722 TOD | 722 E WASHINGTON BLVD CA 90011 | 55 | 3 | 2 | 5 |
| 471 | 2014 | West Villas | 6570 1/2 S WEST BLVD CA 90043 | 49 | 3 | 1 | 4 |
| 472 | 2014 | WINNETKA SENIOR APARTMENTS | 20750 Sherman Way  , Winnetka CA, 91306 | 95 | 5 | 2 | 7 |
| | | Subtotal- Federal Funds | 472 | 25,292 | 1,490 | 747 | 2,237 |
| | | Subtotal- City Bonds | 126 | 11,962 | 658 | 291 | 949 |
| | | Subtotal - CRA | 131 | 9,719 | 543 | 265 | 808 |
| | | Total - All Projects | 729 | 46,973 | 2,691 | 1,303 | 3,994 |

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 1 | 2/2/93 | Baldwin Villas Plaza (202) | 3939 Marlton Ave | 202 | 11 | 5 | 16 |
| 2 | 2/2/93 | Buckingham Apts (83) | 3939 Marlton | 83 | 5 | 2 | 7 |
| 3 | 2/2/93 | Ethel Arnold Bradley (81) - (Casden Acquired) | 7850 Normandie | 81 | 5 | 2 | 7 |
| 4 | 2/2/93 | Lankershim Arms (56) | 7620-28 Lankershim | 56 | 3 | 2 | 5 |
| 5 | 10/1/93 | Imogene Coop. Housing (16) | 716 Imogene | 16 | 1 | 1 | 2 |
| 6 | 10/1/93 | Beth Am Manor (49) | 1073 South La Cienega | 49 | 3 | 1 | 4 |
| 7 | 10/1/93 | Bonita Ranch (48) | 14320 Foothill | 48 | 3 | 1 | 4 |
| 8 | 10/1/93 | Glenoaks Townhomes (48) | 14164 Foothill | 48 | 3 | 1 | 4 |
| 9 | 12/1/93 | Diane Apts | Scattered Sites | 61 | 4 | 2 | 6 |
| 10 | 12/29/93 | #1, Seven Palms | 12831 San Fernando Rd., Sylmar | 68 | 4 | 2 | 6 |
| 11 | 12/29/93 | #10 | 6925 Haskell Ave., Van Nuys | 26 | 2 | 1 | 3 |
| 12 | 12/29/93 | #11 | 15040 Moorpark St., Sherman Oaks | 24 | 2 | 1 | 3 |
| 13 | 12/29/93 | #12 | 8808 Darby Ave., Northridge | 40 | 2 | 1 | 3 |
| 14 | 12/29/93 | #17 | 6228 Futlon Ave., Van Nuys | 30 | 2 | 1 | 3 |
| 15 | 12/29/93 | #19, Excalibur Apartments | 6645 Woodman Aveneue, Van Nuys | 46 | 3 | 1 | 4 |
| 16 | 12/29/93 | #21 | 6650 Whitsett Ave., North | 24 | 2 | 1 | 3 |
| 17 | 12/29/93 | #22 | 14255 Tyler St., Sylmar | 18 | 1 | 1 | 2 |
| 18 | 12/29/93 | #24 | 12767 San Fernando Rd., Sylmar | 24 | 2 | 1 | 3 |
| 19 | 12/29/93 | #25 | 18356-60 Napa St., Northridge | 16 | 1 | 1 | 2 |
| 20 | 12/29/93 | #26 | 14259 Burbank Blvd., Van Nuys | 6 | 1 | 1 | 2 |

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 21 | 12/29/93 | #3, Superior Place | 17810 Superior St., Northridge | 44 | 3 | 1 | 4 |
| 22 | 12/29/93 | #30, Panorama Continental | 8437 Cedros Ave., Panorama City | 60 | 3 | 2 | 5 |
| 23 | 12/29/93 | #35 | 9225 Topanga Canyon, Chatsworth | 24 | 2 | 1 | 3 |
| 24 | 12/29/93 | #38, The Saticoy Villas | 20316 Saticoy St., Canoga Park | 45 | 3 | 1 | 4 |
| 25 | 12/29/93 | #44 | 6959 Woodman Ave., Van Nuys | 16 | 1 | 1 | 2 |
| 26 | 12/29/93 | #6, Sherway Villa | 17808 Sherman Way, Reseda | 100 | 5 | 2 | 7 |
| 27 | 12/29/93 | #8 | 7915 Vineland Ave., Sun Valley | 30 | 2 | 1 | 3 |
| 28 | 12/1/94 | Mahal Apartments | 744 S. Catalina (6 locations) | 242 | 13 | 5 | 18 |
| 29 | 12/1/94 | Halstead Landmark Apts. | 18402 Halstead St., Northridge | 56 | 3 | 2 | 5 |
| 30 | 12/1/94 | Owens Royale | 7628 Owensmouth Ave., Canoga Park | 24 | 2 | 1 | 3 |
| 31 | 12/1/94 | Saticoy Terraces | 21523 Saticoy St., Canoga Park | 20 | 1 | 1 | 2 |
| 32 | 12/1/94 | Tarragon Realty Investors Inc. | 1170 S Norton Ave., LA | 56 | 3 | 2 | 5 |
| 33 | 12/1/94 | Vanowen Plaza | 20711 Vanowen, Canoga Park | 49 | 3 | 1 | 4 |
| 34 | 6/1/95 | Canby Court | 8757 Canby Ave., Northridge | 60 | 3 | 2 | 5 |
| 35 | 6/1/95 | Citronia Apartments | 18550 Citronia St., Northridge | 78 | 4 | 2 | 6 |
| 36 | 6/1/95 | Park Merridy | 17819 Merridy St., Northridge | 131 | 7 | 3 | 10 |
| 37 | 6/1/95 | Tarzana Terraces | 18601 Hatteras St., Tarzana | 193 | 10 | 4 | 14 |
| 38 | 10/1/95 | Darby Villas | 6727 Darby Ave., Reseda | 47 | 3 | 1 | 4 |

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 39 | 10/1/95 | Natick Place | 4701 Natick Ave., Sherman Oaks | 122 | 7 | 3 | 10 |
| 40 | 10/1/95 | Oliveview Garden Apts. | 14500 Olive View Dr. | 98 | 5 | 2 | 7 |
| 41 | 10/1/95 | Saticoy Villas | 20358 Saticoy St., Canoga Park | 44 | 3 | 1 | 4 |
| 42 | 10/1/95 | Sherman Oaks Garden/Villa | 5415-5425 Sepulveda, Sherman Oaks | 76 | 4 | 2 | 6 |
| 43 | 10/1/95 | Sophia Ridge Apts | 9601-9261 Reseda Blvd., Northridge | 112 | 6 | 3 | 9 |
| 44 | 10/1/95 | Woodbridge Park Apts. | 11220 Moorpark St | 77 | 4 | 2 | 6 |
| 45 | 12/1/95 | House LA III/Village Pointe | 17171 Roscoe Blvd., Northridge | 268 | 14 | 6 | 20 |
| 46 | 10/1/96 | 14757 Sherman Way | 14757 Sherman Way, Van Nuys | 84 | 5 | 2 | 7 |
| 47 | 10/1/96 | Fountain Terrace | 8601-8607 Balboa Blvd | 40 | 2 | 1 | 3 |
| 48 | 10/1/96 | Kittridge Park Villas | 18303 Kittridge St., Reseda | 39 | 2 | 1 | 3 |
| 49 | 10/1/96 | The New Yorker | 13951 Moorpark St., Sherman Oaks | 34 | 2 | 1 | 3 |
| 50 | 10/1/96 | Villa Vincennes | 18411 Vincennes St., Northridge | 57 | 3 | 2 | 5 |
| 51 | 1/1/97 | Arleta Park | 14104 Van Nuys Blvd | 24 | 2 | 1 | 3 |
| 52 | 1/1/97 | Cunningham Village | 2300 S. Victoria | 35 | 2 | 1 | 3 |
| 53 | 1/1/97 | Wadsworth Park | 43rd and Wadsworth Ave. | 21 | 2 | 1 | 3 |
| 54 | 5/1/97 | Ridgecroft Apts | 9555 Reseda, Northridge | 158 | 8 | 4 | 12 |
| 55 | 7/31/97 | House LA V -- 523 S. Rampart Blvd. | 523 S. Rampart Blvd. (30 units) | 30 | 2 | 1 | 3 |
| 56 | 7/31/97 | Mission Village Terrace Apts | 4001 Mission Rd., El Sereno | 84 | 5 | 2 | 7 |
| 57 | 2/24/99 | Western/Carlton Apts (REFND 1994 B, 1995 B, 1996 A) | 5437 Carlton Way, Los Feliz | 61 | 4 | 2 | 6 |

KH 338673

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 58 | 6/1/99 | Alegria Apts | 1953 Estrella | 12 | 1 | 1 | 2 |
| 59 | 6/2/99 | Baldwin Village Apts | 3939 Ursula Ave, 4729 Tacana St., 4040 Nicolet Ave., 3919 Nicolet Ave.,  6122 11th Ave. | 147 | 8 | 3 | 11 |
| 60 | 6/1/99 | Fountain Park Apts at Playa Vista, Phases I & II | 13141 Fountain Park Drive, Playa Vista | 705 | 36 | 15 | 51 |
| 61 | 6/1/99 | Preservation I ProjectJPM | 1051 W. 42nd Pl., 300 E. 51st St., 2647 Halldale Ave., 1758 W. 49th St., 3012 Halldale Ave. | 175 | 9 | 4 | 13 |
| 62 | 6/1/99 | Preservation II ProjectJPM | 1225 W. 36th St. | 109 | 6 | 3 | 9 |
| 63 | 6/1/99 | Preservation III ProjectJPM | 1122 W. 37th Dr. | 48 | 3 | 1 | 4 |
| 64 | 6/1/99 | Preservation IV ProjectJPM | 1045 W. 18th St. | 30 | 2 | 1 | 3 |
| 65 | 6/1/99 | Preservation V ProjectJPM | 1038 S. Ardmore St. | 124 | 7 | 3 | 10 |
| 66 | 6/9/00 | Flourishing Meadows | 1016 W. 83rd Street | 86 | 5 | 2 | 7 |
| 67 | 8/16/00 | University Gardens (FNMA's Forward) - 5,684,230 total | 1200-1270 Jefferson Blvd. | 113 | 6 | 3 | 9 |
| 68 | 9/14/00 | Watts/Athens Preservation XVII - RFND 1994 A&B | 2010 Chariton St., 623 W. 92nd St., 1371 W. Vernon St., 503 W. 70th St., 538, 602, 717 W. 81st St., 5270 Avalon, 310 W. 102nd, 10207, 10213, 10217 & 10220 S. Broadway | 72 | 4 | 2 | 6 |

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 69 | 8/2/01 | Cesar Chavez Garden (Cathay Bank's Private Placement) | 555 Cesar Chavez Blvd. | 47 | 3 | 1 | 4 |
| 70 | 8/13/01 | Park Plaza W. Sr. Apts ProjeJPM, TE Bonds (FHA) | Corner of Vanowen & Whitsett | 184 | 10 | 4 | 14 |
| 71 | 11/29/01 | Projects in Curtis Johnson Apts issue | 866 W 42nd St., 1213 W 39th St., 897-903 W Vernon St., 727 W 47th St. | 37 | 2 | 1 | 3 |
| 72 | 11/29/01 | TriCity Housing, (Inc. Refund 1997-C: $7,165,000) | 10803 Avalon Blvd., 511-517 Mariposa St., 1139-1145 Colorado Blvd. | 148 | 8 | 3 | 11 |
| 73 | 11/30/01 | San Regis Apts (Bellagio), Tax Exempt Bonds | 15434-15460 Sherman Way | 390 | 20 | 8 | 28 |
| 74 | 12/6/01 | Broadway Plaza Apts. Tax Exempt Bonds (2003D Refunding) | 901 South Broadway | 82 | 5 | 2 | 7 |
| 75 | 12/6/01 | San Lucas Apts, Tax Exempt Bonds | 1221 West 7th St. | 196 | 10 | 4 | 14 |
| 76 | 12/14/01 | Verde del Oriente Preservation ProjeJPM, TE Bonds | 323-349 W 3rd St. | 113 | 6 | 3 | 9 |
| 77 | 4/15/02 | Fountain Park Project | 13151-75 Fountain Park Dr. | 296 | 15 | 6 | 21 |
| 78 | 4/15/02 | Project in Fountian Park Issue | 5389-99 Playa Vista Dr. | 168 | 9 | 4 | 13 |
| 79 | 12/23/02 | LA Preservation 78 | Scattered Sites | 78 | 4 | 2 | 6 |
| 80 | 7/28/04 | Project in Witmer Preservation Issue | 1501 Miramar St. | 90 | 5 | 2 | 7 |
| 81 | 7/28/04 | Witmer Preservation | 201 to 231 Witmer St. | 238 | 12 | 5 | 17 |
| 82 | 3/11/05 | Broadway Village II ($5,573,000) & 2005A Amend. $1,200,000 | 5101 S. Broadway | 50 | 3 | 1 | 4 |

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 83 | 4/29/05 | Hartford Ave. | 440-458 Hartford Ave | 66 | 4 | 2 | 6 |
| 84 | 7/27/05 | Laguna Sr. Apts. | 4201 W. Sunset Blvd | 64 | 4 | 2 | 6 |
| 85 | 7/27/05 | Project in Laguna Sr Apt Issue | 1193 Myra Ave. | 18 | 1 | 1 | 2 |
| 86 | 12/28/05 | Lexington A & B Apts | 3035 Sierra St., 634 N. Kingsley Dr., 1141 N. Westmoreland Ave., 4612 Lexington Ave. 4829 Lexington Ave., 2521 S. Juliet St., 1531 W. Adams Blvd., 7219 S. San Pedro St. 2607 S. Mansfield Ave., 10607 Kalmia St., 1835 W. 25th St., 1317 E. 23rd St. 1145 24th St., 1386 E. 20th St., 1151 E. 20th St. | 205 | 11 | 5 | 16 |
| 87 | 12/31/05 | Leeward A & B Apts., including Turner towers Apartments | 10915 S. Figueroa St., 1134 w. 17th St., 230 w. 88th   Pl., 2818 Leeward Ave., 5426 Sierra Vista Ave., 10510 Avalon Blvd., 10634 S. Central Ave., 10648 S. Central Ave., 1144 E. 92nd St., 1206 E. 105th St., 8318 S. Main St., 1130 West Blvd., 1811 & 1815 W. 36th Pl., 2809 West Blvd., 2828 West Blvd., 3918 La Salle Ave., 14722 Lemoli Ave. Gardena | 232 | 12 | 5 | 17 |
| 88 | 4/24/06 | Projects in Central City Issue | 1810 W. 12th St., 1321 W. 9th St. | 29 | 2 | 1 | 3 |

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 89 | 5/3/06 | Windward A&B | 2131 S. Hoover, 1514 W. 20th, 621 W 81st, 4817 - 25 1/2 Saturn, 2815 West Blvd., 1253 W. 39th, 3881 Denker, 2730 S Normandie, 3922 W 27th, 710 W 30th, 111 W 99th, 120 W 78th, 219 E 87th Pl., 2210 La Salle, 621 W 84th,  636 E 108th, 651 E 108th, 7512-24 S San Pedro | 180 | 9 | 4 | 13 |
| 90 | 7/31/06 | Concord A&B | 1348 Ingraham, 522 S. Union, 743 S. Carondelet, 1801 N. Alexandria, 1350 S Bonnie Brae, 1546 W 11th Pl., 2674 W James Wood, 3030 San Marino | 190 | 10 | 4 | 14 |
| 91 | 10/27/06 | Abbey Apts. | 618 S San Julian, 625-633 S. San Pedro | 144 | 8 | 3 | 11 |
| 92 | 12/19/06 | Stevenson Manor | 1230 N. Cole Ave | 61 | 4 | 2 | 6 |
| 93 | 4/6/07 | Central Village | 2000 S. Central Ave | 85 | 5 | 2 | 7 |
| 94 | 4/6/07 | Morgan | 7301-7315 S. Crenshaw Blvd | 55 | 3 | 2 | 5 |
| 95 | 4/28/07 | Queen Apts | 2620 Orchard Ave., 445-451 S Lucas Ave., 516 S Union Ave., 5217 W Marathon St. | 96 | 5 | 2 | 7 |
| 96 | 7/18/07 | HDR Preservation Proj | 2375 Scarff St., 2714 Orchard Ave., 1063 W. 39th Place, 1040 W. 43rd St., 1733 W. 58th St., 111 S. Ave. 63, 2747 Newell, 811 N. Heliotrope Drive | 97 | 5 | 2 | 7 |
| 97 | 12/1/07 | Colorado Terrace (see MF 2002H) | 2455 Colorado Blvd. | 70 | 4 | 2 | 6 |
| 98 | 12/20/07 | Harbor Tower | 340 South Mesa | 180 | 9 | 4 | 13 |

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 99 | 12/20/07 | MacArthur Park Tower | 450 Grand View St. | 183 | 10 | 4 | 14 |
| 100 | 4/4/08 | Burns Manor | 8155 Foothill Blvd., Sunland, CA  91040 | 82 | 5 | 2 | 7 |
| 101 | 4/9/09 | Academy Hall | 12010 S. Vermont Ave., Los Angeles, CA 90044 | 46 | 3 | 1 | 4 |
| 102 | 7/9/10 | Toberman | 142 W Santa Cruz St | 49 | 3 | 1 | 4 |
| 103 | 6/23/11 | Canby Woods Housing | 7238 Canby Ave | 98 | 5 | 2 | 7 |
| 104 | 8/24/11 | Figueroa Senior Hsg | 7621 S Figueroa | 35 | 2 | 1 | 3 |
| 105 | 3/23/12 | Vineland Senior Hsg | 4900 Vineland Avenue | 82 | 5 | 2 | 7 |
| 106 | 5/15/12 | Vista Angelina | 418 N. East Edgeware Road | 108 | 6 | 3 | 9 |
| 107 | 9/19/12 | Fickett Towers | 14801 Sherman Way | 198 | 10 | 4 | 14 |
| 108 | 10/23/12 | Oakridge Family Homes | 15455 Glenoaks Blvd | 60 | 3 | 2 | 5 |
| 109 | 12/19/12 | Parcel M- Grand Ave | 225 S Grand Ave | 271 | 14 | 6 | 20 |
| 110 | 12/19/12 | Seven Palms | 12831 San Fernando Rd | 65 | 4 | 2 | 6 |
| 111 | 3/8/13 | Hamlin Estate Apts | 11735 Hamlin St | 30 | 2 | 1 | 3 |
| 112 | 6/7/13 | Freeman Villas | 12295 Westmoreland | 41 | 3 | 1 | 4 |
| 113 | 6/13/13 | Banning Villas | 1100 N. Banning Blvd | 90 | 5 | 2 | 7 |
| 114 | 8/15/13 | Harbor Village | 981 Harbor Village Drive | 400 | 20 | 8 | 28 |
| 115 | 9/25/13 | Vistas Seniors | 15211 Sherman Way | 84 | 5 | 2 | 7 |
| 116 | 9/25/13 | West Valley Towers | 14650 W. Sherman Way | 97 | 5 | 2 | 7 |
| 117 | 9/30/13 | Silverlake | 3740 Evans St. | 88 | 5 | 2 | 7 |
| 118 | 11/21/13 | Hollywoodland | 1206 &1222 N Gower St., 977 N Wilton Pl., 5155 &5169 W Marathon St., 1438 N Gordon St. | 83 | 5 | 2 | 7 |
| 119 | 12/11/13 | Wyandotte | 14630 Wyandotte St. | 88 | 5 | 2 | 7 |
| 120 | 6/18/14 | Laurel Village | 9700 N Laurel Canyon Blvd | 80 | 4 | 2 | 6 |
| 121 | 8/1/14 | Juanita Tate | 4827 S Central Ave | 118 | 6 | 3 | 9 |
| 122 | 8/1/14 | Park Plaza | 960 W 62nd Pl | 79 | 4 | 2 | 6 |
| 123 | 10/23/14 | Berendos | 226 &235 S Berendo St | 72 | 4 | 2 | 6 |

City Bond Financed Properties

| # | Issue Date | Project | Address | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 124 | 10/23/14 | Central Ave Village Square | 1060 E 53rd St | 45 | 3 | 1 | 4 |
| 125 | 12/30/14 | Roberta Stephens | 1035-1113 E 27th St | 40 | 2 | 1 | 3 |
| 126 | | Hazeltine | 7250 Hazeltine Ave | 35 | 2 | 1 | 3 |
| | | | Total | 11,962 | 658 | 291 | 949 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 1 | 1/1/1978 | Angeles Plaza I | 245-255 S. Hill Street, Los Angeles CA 90012 | 761 | 39 | 16 | 55 |
| 2 | 1/1/1980 | Van Nuys Apartments | 210 W. 7th St., Los Angeles CA 90014 | 299 | 15 | 6 | 21 |
| 3 | 5/5/1981 | Angeles Plaza II | 200 Olive St., Los Angeles CA 90012 | 332 | 17 | 7 | 24 |
| 4 | 1/1/1985 | Montecito Apartments | 6650 Franklin Ave, Los Angeles CA 90028 | 118 | 6 | 3 | 9 |
| 5 | 5/7/1985 | Young Apartments | 1621 Grand Ave., Los Angeles, CA 90015 | 66 | 4 | 2 | 6 |
| 6 | 1/1/1986 | Metropolitan (Skyline) | 950 S. Flower, Los Angeles CA 90010 | 270 | 14 | 6 | 20 |
| 7 | 9/24/1987 | Russ Hotel | 517-523 S. San Julian Street, Los Angeles, CA 90013 | 16 | 1 | 1 | 2 |
| 8 | 8/31/1990 | Village Acquisition II | 20422 Parthenia Street, Los Angeles, CA 91306 | 12 | 1 | 1 | 2 |
| 9 | 9/7/1990 | Village Acquisiton 3 Baird | 6542 Baird Avenue, Los Angeles, CA 91335 | 6 | 1 | 1 | 2 |
| 10 | 9/17/1990 | Village Acquistion 3 Archwd | 23801 Archwood Street, Los Angeles, CA 91307 | 6 | 1 | 1 | 2 |
| 11 | 6/28/1991 | Casa Loma Apartments | 379 Loma Drive, #1, Los Angeles, CA 90017 | 110 | 6 | 3 | 9 |
| 12 | 8/2/1991 | Pershing Hotel/New Pershing Apts. | 500 South Main Street, Los Angeles, CA 90013 | 67 | 4 | 2 | 6 |
| 13 | 8/10/1991 | Central Avenue Villa Apts. | 4051 South Central Avenue, Los Angeles, CA 90011 | 20 | 1 | 1 | 2 |
| 14 | 1/1/1992 | 11th Avenue Apartments | 6720 11th Avenue, Los Angeles, CA 90043 | 22 | 2 | 1 | 3 |
| 15 | 6/1/1992 | Tuelyn Terrace | 1250 S. Western Avenue  Los Angeles CA 90006 | 90 | 5 | 2 | 7 |
| 16 | 6/12/1992 | Produce Hotel | 676 Central Avenue  Los Angeles CA 90015 | 110 | 6 | 3 | 9 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 17 | 6/15/1992 | Arlington Rodeo Apartments | 3804 S. Arlington Avenue  Los Angeles CA 90018 | 29 | 2 | 1 | 3 |
| 18 | 6/30/1992 | Florence Avenue Villas | 908-916 W Florence Ave., Los Angeles CA  90044 | 20 | 1 | 1 | 2 |
| 19 | 7/20/1992 | Casa Gloria | 1440-52 Temple Street  Los Angeles CA 90026 | 46 | 3 | 1 | 4 |
| 20 | 7/27/1992 | Valley Village Condos | 8624 De Soto Ave. # 124 & 134  Los Angeles CA 91304 | 6 | 1 | 1 | 2 |
| 21 | 9/15/1992 | Florence Crittenton Center | 234 East Avenue 33  Los Angeles CA 90031 | 58 | 3 | 2 | 5 |
| 22 | 9/16/1992 | 3804 Wisconsin Apartments | 3804 Wisconsin Street  Los Angeles CA 90037 | 11 | 1 | 1 | 2 |
| 23 | 10/13/1992 | Kraemer Apartments | 1232 S Lake St., Los Angeles CA 90006 | 17 | 1 | 1 | 2 |
| 24 | 10/15/1992 | Great Expectations | 17026 Rinaldi Avenue  Granada Hills CA 91335 | 12 | 1 | 1 | 2 |
| 25 | 11/20/1992 | New Opportunities For Living | 9205 Valjean Street  Los Angeles  CA | 6 | 1 | 1 | 2 |
| 26 | 11/20/1992 | New Opportunities For Living | 16102 Acre Street  Los Angeles CA 90028 | 6 | 1 | 1 | 2 |
| 27 | 11/20/1992 | P.A.T.H. Servicenter | 2346 Cotner Avenue  Los Angeles CA 90064 | 30 | 2 | 1 | 3 |
| 28 | 2/1/1993 | Harmony St. Partnership James Jackson | 5316-20 Harmony Ave., North Hollywood CA 91601 | 18 | 1 | 1 | 2 |
| 29 | 3/30/1993 | La Brea/Franklin Apartments | 1801 La Brea Avenue  Los Angeles CA 90046 | 40 | 2 | 1 | 3 |
| 30 | 6/1/1993 | Central Avenue Village Square | 5301-5321 S. Central Avenue  Los Angeles CA 90011 | 45 | 3 | 1 | 4 |
| 31 | 6/1/1993 | Courtland Hotel | 520 S Wall Street  Los Angeles CA 90013 | 97 | 5 | 2 | 7 |
| 32 | 6/1/1993 | Villa Esperanza | 255 E 28th Street  Los Angeles CA 90011 | 82 | 5 | 2 | 7 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 33 | 6/23/1993 | Crescent Court Apartments | 1400-1435 12th Street  Los Angeles CA 90015 | 32 | 2 | 1 | 3 |
| 34 | 6/30/1993 | Marion Hotel | 642 S. Crocker Street  Los Angeles CA 90021 | 46 | 3 | 1 | 4 |
| 35 | 6/30/1993 | Senator Hotel | 729 S Main Street  Los Angeles CA 90014 | 99 | 5 | 2 | 7 |
| 36 | 7/15/1993 | Ballona Villa | 5026 W Slauson Ave., Los Angeles CA 90066 | 10 | 1 | 1 | 2 |
| 37 | 7/15/1993 | Berendo Street Apartments | 226 S. Berendo Street  Los Angeles CA 90010 | 48 | 3 | 1 | 4 |
| 38 | 7/15/1993 | Carlton Apartments | 5425 Carlton Way  Hollywood CA 90027 | 24 | 2 | 1 | 3 |
| 39 | 7/21/1993 | Weldon Hotel | 507 E. Maple Avenue  Los Angeles CA | 58 | 3 | 2 | 5 |
| 40 | 7/23/1993 | Elmer Investment Group (5519 Elmer Ave) | 5519 Elmer Ave., NH, CA  91601 | 12 | 1 | 1 | 2 |
| 41 | 8/4/1993 | Navy Street Apartments | 102 Navy Street  Venice CA 90291 | 14 | 1 | 1 | 2 |
| 42 | 8/13/1993 | L.A. Gay & Lesbian Center | 1625 N. Schrader Blvd.  Hollywood CA 90028 | 24 | 2 | 1 | 3 |
| 43 | 9/1/1993 | Carter House Apartments | 449 W. 78th Street  Los Angeles CA 90003 | 21 | 2 | 1 | 3 |
| 44 | 9/1/1993 | Yorkshire Hotel | 710-712-1/2 Broadway, Los Angeles CA 90014 | 98 | 5 | 2 | 7 |
| 45 | 10/1/1993 | Arirang Senior Housing | 1725 N. Whitley Avenue  Los Angeles CA 90028 | 74 | 4 | 2 | 6 |
| 46 | 10/11/1993 | Fame Gardens | 3730 West 27th Street  Los Angeles CA 90018 | 81 | 5 | 2 | 7 |
| 47 | 10/14/1993 | Grand Central Square Project | N. 1/2 Blk.: Hill/3rd/b'dway  Los Angeles  CA  90013 | 121 | 7 | 3 | 10 |
| 48 | 11/23/1993 | Hollywood El Centro Apartments | 6211 Delongpre Avenue  Los Angeles CA 90028 | 88 | 5 | 2 | 7 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 49 | 12/27/1993 | Colden Oaks Apartments | 203 N. Colden Avenue  Los Angeles CA 90003 | 38 | 2 | 1 | 3 |
| 50 | 1/3/1994 | Edward Hotel | 713 E. 5th Street  Los Angeles CA 90013 | 47 | 3 | 1 | 4 |
| 51 | 6/16/1994 | Fumbah Manor | 832-838 S. Lake Street  Los Angeles CA 90006 | 16 | 1 | 1 | 2 |
| 52 | 6/21/1994 | La Villa Mariposa | 345 S Columbia Ave.  Los Angeles CA 90017 | 115 | 6 | 3 | 9 |
| 53 | 6/23/1994 | Adams-Western | 2635 S Western Avenue  Los Angeles CA 90018 | 52 | 3 | 2 | 5 |
| 54 | 6/27/1994 | 1732 W. 24th Street Property | 1732 W. 24th Street  Los Angeles CA 90007 | 12 | 1 | 1 | 2 |
| 55 | 8/1/1994 | Filipino Service Group | 135 N Park View St., Los Angeles, CA 90057 | 20 | 1 | 1 | 2 |
| 56 | 8/1/1994 | Telacu Vistas Del Sol | 4900 Via Marisol  Los Angeles CA 90015 | 100 | 5 | 2 | 7 |
| 57 | 9/1/1994 | Villa Del Pueblo | 1441 S. Hope Street  Los Angeles CA 90014 | 81 | 5 | 2 | 7 |
| 58 | 9/26/1994 | Hotel Cortez ( La Posada) | 375 S. Columbia Avenue  Los Angeles CA 90017 | 60 | 3 | 2 | 5 |
| 59 | 9/30/1994 | Liberty Village | 22439 Marlin Place  Los Angeles CA 91307 | 6 | 1 | 1 | 2 |
| 60 | 10/1/1994 | Budlong Avenue Apartments | 2727 S Budlong Avenue  Los Angeles CA 90007 | 12 | 1 | 1 | 2 |
| 61 | 11/1/1994 | Casa Carondelet | 130 S Carondelet Street  Los Angeles CA 90057 | 18 | 1 | 1 | 2 |
| 62 | 12/1/1994 | Brynhurst Avenue Apartments | 6603 Brynhurst Avenue  Los Angeles CA | 8 | 1 | 1 | 2 |
| 63 | 12/1/1994 | Martha Bryant Manor Apartments | 8300 & 8327 S. Hoover St.  Los Angeles CA 90044 | 77 | 4 | 2 | 6 |
| 64 | 12/5/1994 | P & P Home For The Elderly | 1030 W 85th Street  Los Angeles CA 90044 | 106 | 6 | 3 | 9 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 65 | 4/20/1995 | Casa Heiwa | 231 E. Third Street  Los Angeles CA 90012 | 100 | 5 | 2 | 7 |
| 66 | 6/1/1995 | Gelt Properties | 5050 Tujunga Ave., NH, CA  90601 | 25 | 2 | 1 | 3 |
| 67 | 7/1/1995 | 1755 W Adams Blvd Property | 1755 W Adams Blvd  Los Angeles CA 90018 | 39 | 2 | 1 | 3 |
| 68 | 7/20/1995 | Viereck, Victor & Brenda | 5640 Bakman Avenue  Los Angeles CA 91601 | 7 | 1 | 1 | 2 |
| 69 | 9/28/1995 | Boyd Hotel | 224 S. Boyd St.  Los Angeles CA 90013 | 61 | 4 | 2 | 6 |
| 70 | 10/10/1995 | Rio Vista Village | 1310-1320 S. Rio Vista Avenue  Los Angeles CA 90023 | 75 | 4 | 2 | 6 |
| 71 | 12/1/1995 | Viereck, Victor & Brenda | 5653 Bakman Avenue  Los Angeles CA 91601 | 5 | 1 | 1 | 2 |
| 72 | 12/8/1995 | T M Chambers Manors | 2620 & 2645-53 Menlo Avenue  Los Angeles CA 90007 | 19 | 1 | 1 | 2 |
| 73 | 1/10/1996 | Los Angeles House Of Ruth | 605 N Cummings Street  Los Angeles CA 90033 | 24 | 2 | 1 | 3 |
| 74 | 1/10/1996 | Los Angeles House Of Ruth | 609 N Cummings Street  Los Angeles CA 90033 | 15 | 1 | 1 | 2 |
| 75 | 1/16/1996 | Villa Metropolitano | 1324-28 S Hope Street  Los Angeles CA 90015 | 53 | 3 | 2 | 5 |
| 76 | 2/16/1996 | Wilcox Apartments | 1805 N. Wilcox Avenue  Los Angeles CA  90028 | 23 | 2 | 1 | 3 |
| 77 | 6/1/1996 | Parkside Apartments | 900 S Grand Avenue  Los Angeles CA 90015 | 79 | 4 | 2 | 6 |
| 78 | 6/1/1996 | Twin Palms Apartments | 3044 Leeward Ave., Los Angles CA 90026 | 19 | 1 | 1 | 2 |
| 79 | 9/1/1996 | Hollywood Silvercrest | 5941 Hollywood Boulevard  Los Angeles CA 90028 | 99 | 5 | 2 | 7 |
| 80 | 10/1/1996 | Harmony Gardens | 5239 Harmony Ave., North Hollywood, CA 91601 | 14 | 1 | 1 | 2 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 81 | 11/30/1996 | Golden Years Senior Apartments | 11330 Otsego Street  North Hollywood CA 91601 | 91 | 5 | 2 | 7 |
| 82 | 4/17/1997 | Freedom House | 845 S. Lake Street  Los Angeles CA 90057 | 32 | 2 | 1 | 3 |
| 83 | 7/30/1997 | Palmer House Hotel | 538 S. Wall Street  Los Angeles CA 90013 | 67 | 4 | 2 | 6 |
| 84 | 8/1/1997 | Villa Flores Apartments | 1020 S Flower Street  Los Angeles CA 90015 | 75 | 4 | 2 | 6 |
| 85 | 10/1/1997 | HFL Garden Villa Homes | 5528-5532 Klump Avenue  North Hollywood CA 90601 | 25 | 2 | 1 | 3 |
| 86 | 11/1/1997 | Villa De Esperanza | 1401 S Hope Street  Los Angeles CA 90011 | 88 | 5 | 2 | 7 |
| 87 | 12/1/1997 | 1747 Normandie Avenue Apts. | 1747 N. Normandie Avenue  Los Angeles CA 90027 | 16 | 1 | 1 | 2 |
| 88 | 5/21/1998 | Edru & Associates | 1032 West 18th Street   90015 | 27 | 2 | 1 | 3 |
| 89 | 9/28/1998 | Adams, Eli & Barbara Ann | 3027 Brighton Avenue  Los Angeles CA  90018 | 26 | 2 | 1 | 3 |
| 90 | 10/27/1998 | Geilim, Gilbert & Violet | 1524-1528 1/2 W. 11th Place  Los Angeles  CA  90015 | 6 | 1 | 1 | 2 |
| 91 | 7/28/1999 | Thropay Rueben & Carol | 2110 Bonsallo Ave., Apts #1-#8 Los Angeles, CA  90007 | 8 | 1 | 1 | 2 |
| 92 | 7/31/2000 | Friedman, Morris & Shirley | 5519 Bonner Ave., Apts. #1-8  N. Hollywood  CA  91601 | 8 | 1 | 1 | 2 |
| 93 | 11/22/2000 | Irolo Senior Housing | 3315-29 W. 8th Street  Los Angeles CA 90005 | 47 | 3 | 1 | 4 |
| 94 | 7/19/2001 | Wisconsin lll Apartments | 3790 Wisconsin Street  Los Angeles CA 90007 | 26 | 2 | 1 | 3 |
| 95 | 2/20/2002 | Hollyview Apartment | 5411 Hollywood Blvd.  Hollywood CA 90027 | 100 | 5 | 2 | 7 |
| 96 | 12/1/2002 | Gas Company Lofts | 800-820 S Flower St., Los Angeles CA 90017 | 251 | 13 | 6 | 19 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 97 | 12/30/2002 | Metropolitan Lofts | 1050 S. Flower St., Los Angeles CA 90015 | 264 | 14 | 6 | 20 |
| 98 | 2/7/2003 | Klump | 5120 Klump Ave  North Hollywood CA 91607 | 26 | 2 | 1 | 3 |
| 99 | 11/3/2003 | Grand & Venice Apartments | 1500 S Grand Avenue  Los Angeles CA 90015 | 62 | 4 | 2 | 6 |
| 100 | 12/1/2003 | Views At 270 | 5445 W. Sunset Blvd.  Los Angeles CA 90027 | 56 | 3 | 2 | 5 |
| 101 | 5/1/2004 | Hikari Apartments | 375 E. 2nd St., Los Angeles, CA 90012 | 128 | 7 | 3 | 10 |
| 102 | 7/1/2004 | Bellevue Apartments | 1809 W 11th St., Los Angeles CA 90006 | 58 | 3 | 2 | 5 |
| 103 | 10/20/2004 | Broadway Village ll | 5101 S. Broadway  Los Angeles CA 90037 | 60 | 3 | 2 | 5 |
| 104 | 1/1/2005 | Wilshire Vermont Station Apartments | 648 S Vermont Ave., Los Angeles CA 90010 | 449 | 23 | 9 | 32 |
| 105 | 11/15/2005 | Jovenes, Inc. | 1320 Pleasant Ave  Los Angeles CA 90033 | 6 | 1 | 1 | 2 |
| 106 | 11/30/2005 | Villa Del Sol Apartments | 11971 Allegheny Street  Sun Valey CA 91352 | 103 | 6 | 3 | 9 |
| 107 | 1/1/2006 | Security Lofts | 510 S. Spring Street, Los Angeles, CA 90013 | 151 | 8 | 4 | 12 |
| 108 | 5/1/2006 | Pascual Reyes Apartments | 1413 W. Connecticut St.  Los Angeles CA 90015 | 13 | 1 | 1 | 2 |
| 109 | 11/15/2006 | Alexandria Hotel | 501 S Spring Street  Los Angeles CA 90013 | 463 | 24 | 10 | 34 |
| 110 | 1/1/2007 | Downtown Women's Center | 434 S. San Pedro St., Los Angeles, CA 90013 | 74 | 4 | 2 | 6 |
| 111 | 2/1/2007 | 1600 Vine (Hollywood and Vine) | 1600 N. Vine Street Los Angeles CA 90028 | 375 | 19 | 8 | 27 |
| 112 | 3/1/2007 | Bricker Building Housing | 1671 N Western Avenue  Los Angeles CA 90028 | 16 | 1 | 1 | 2 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 113 | 11/1/2007 | Rosslyn Lofts | 451 S Main Street  Los Angeles CA 90013 | 298 | 15 | 6 | 21 |
| 114 | 12/1/2008 | Alexandria House | 510 S Alexandria Ave  Los Angeles CA 90020 | 16 | 1 | 1 | 2 |
| 115 | 12/15/2008 | Hollywood Bungalow Court Apartments | 1721 N Kingsley Avenue  Hollywood CA 90027 | 42 | 3 | 1 | 4 |
| 116 | 10/1/2009 | Martin Luther King Apartments | 991 E Martin Luther King Jr Blvd  Los Angeles CA 90011 | 17 | 1 | 1 | 2 |
| 117 | 1/1/2010 | YWCA Job Corp. Urban Campus | 1016 S. Olive St., Los Angeles CA 90015 | 200 | 10 | 4 | 14 |
| 118 | 1/20/2010 | Bethany Senior Apartments | 8401 S Hoover  Los Angeles CA 90044 | 80 | 4 | 2 | 6 |
| 119 | 1/31/2010 | Coronel Apartments | 1600 N Serrano  Los Angeles CA 90000 | 54 | 3 | 2 | 5 |
| 120 | 3/1/2010 | Mosaic Apartments | 1521 W Pico Blvd  Los Angeles CA 90015 | 56 | 3 | 2 | 5 |
| 121 | 5/14/2010 | Seventh and Coronado Apartments | 2614 W 7th Street  Los Angeles CA 90057 | 68 | 4 | 2 | 6 |
| 122 | 7/1/2010 | Whittier Apartments | 3551-3565 E Whittier Blvd  Los Angeles CA 90023 | 59 | 3 | 2 | 5 |
| 123 | 11/1/2010 | Sunrise Apartments | 5111 S Main Street  Los Angeles CA 90037 | 46 | 3 | 1 | 4 |
| 124 | 11/1/2010 | T A Y Facility Housing | 4775 S Broadway  Los Angeles CA 90037 | 27 | 2 | 1 | 3 |
| 125 | 1/15/2011 | NoHo Senior Artists Colony | 10747 Magnolia Blvd  North Hollywood CA 91601 | 126 | 7 | 3 | 10 |
| 126 | 4/1/2011 | Gateways Transitional Housing | 440 N Hoover Street  Los Angeles CA 90026 | 18 | 1 | 1 | 2 |
| 127 | 6/1/2011 | Ecovillage | 117 Bimini Place  Los Angeles CA 90004 | 40 | 2 | 1 | 3 |

Properties Transferred from CRA
(No federal funds)

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 128 | 7/1/2011 | Canby Woods | 7238 Canby Avenue  Reseda CA 91335 | 98 | 5 | 2 | 7 |
| 129 | 12/1/2011 | Caroline Severance Manor | 2914 W 8th Street  Los Angeles CA 90005 | 85 | 5 | 2 | 7 |
| 130 | 12/1/2011 | Pacific Avenue Arts Colony | 339 S. Pacific Ave., San Pedro, CA 90731 | 49 | 3 | 1 | 4 |
| 131 | 1/1/2012 | Argyle Apartments | 1560-1600 N Western Ave/5446 W Carlton Way, Los Angeles CA 90027 | 40 | 2 | 1 | 3 |
| | | | Total units | 9,719 | 543 | 265 | 808 |

# EXHIBIT

# B

| # | Construction Start Date | Project Name | Property | Total Units | Mobility | HV | Total |
|---|---|---|---|---|---|---|---|
| 1 | 7/12/1998 | Heavenly Vision Seniors | 9400 S. Broadway | 46 | 3 | 1 | 4 |
| 2 | 8/15/1998 | Casa Verde | 1552 Schrader Blvd. | 30 | 2 | 1 | 3 |
| 3 | 12/20/1998 | Hope Manor | 1332 S. Hope Street | 75 | 4 | 2 | 6 |
| 4 | 2/3/1999 | Don Hotel Apartments | 105 E. "I" St. | 58 | 3 | 2 | 5 |
| 5 | 4/15/1999 | Western Carlton Apts. (aka Western-Carlton Phase I) | 5443 Carlton Way | 61 | 4 | 2 | 6 |
| 6 | 8/25/1999 | La Estrella Apartments | 1979 Estrella Ave. | 11 | 1 | 1 | 2 |
| 7 | 8/3/2000 | Eastside Village (Lillian Mobley) | 2250 East 111st | 78 | 4 | 2 | 6 |
| 8 | 11/3/2000 | Grandview 9 | 916-920 S. Park View St. | 62 | 4 | 2 | 6 |
| 9 | 6/1/2001 | Amistad Plaza | 6050-6130 South Western Avenue | 56 | 3 | 2 | 5 |
| 10 | 9/20/2001 | Paseo Del Sol | 417 North Soto St. | 7 | 1 | 1 | 2 |
| 11 | 4/1/2002 | Metro Hollywood Apts. (aka Hollywood Western Apts./Western-) | 5450 Hollywood Blvd. | 60 | 3 | 2 | 5 |
| 12 | 2/19/2003 | Buckingham Place Senior Housing | 4020-70 Buckingham Road | 70 | 4 | 2 | 6 |
| 13 | 6/1/2003 | Gallery at NoHo Commons (Phase I) | 5416 Fair Avenue | 438 | 22 | 9 | 31 |
| 14 | 6/27/2003 | Palomar Apartments | 5473 Santa Monica Blvd. | 26 | 2 | 1 | 3 |
| 15 | 8/15/2005 | Encore Hall (aka Triangle Square) | 1623 Vine Street | 104 | 6 | 3 | 9 |
| 16 | 9/1/2005 | Lofts at NoHo Commons (aka NoHo Commons-Phase II) | 11136 Chandler Blvd. | 292 | 15 | 6 | 21 |
| 17 | 10/1/2005 | Vermont Seniors | 3901-3925 S. Vermont Ave./1015 W. 39th Place | 140 | 7 | 3 | 10 |
| 18 | 10/21/2005 | Vista Monterey Senior Housing | 4647 Huntington Dr. North | 48 | 3 | 1 | 4 |
| 19 | 2/15/2006 | Yale Terrace Apartments | 716-734 S. Yale St. | 55 | 3 | 2 | 5 |
| 20 | 6/1/2007 | Imani Fe (East & West) | 10345 & 10408-10424 S. Central Ave. | 92 | 5 | 2 | 7 |
| 21 | 4/28/2010 | Villas at Gower | 1726 North Gower Street | 70 | 4 | 2 | 6 |
| 22 | 5/28/2010 | Ford Apartments (aka Ford Hotel) | 1000 E. 7th St. | 122 | 7 | 3 | 10 |
| | | | Total units | 2001 | 110 | 52 | 162 |

# Exhibit C-1

# City of Los Angeles Fair Housing Policy in Regards to Disability Guidance and Requirements for Owners and Property Managers, May 12, 2016

(*NOTE:  Appendices and Forms to Exhibit C-1 to be developed in consultation between the City and Plaintiffs within 30 days after the Effective Date of the Settlement*)

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

# TABLE OF CONTENTS

**PART ONE:  OVERVIEW** ...............................................................1

    1.1   City Commitment to Fair Housing ...............................................1

    1.2   Compliance with Policies Mandatory .........................................1

    1.3.  Information for Owners, Property Managers, Tenants and Applicants ...................................................................................2

    1.4   Applicable Laws..........................................................................2

    1.5   Disability Defined........................................................................3

**PART TWO:  OWNER OBLIGATIONS** .......................................4

    2.1   Summary of Requirements .........................................................4

    2.2   Designation of Responsible Individual .......................................7

    2.3   Property Management Plan (PMP) .............................................7

    2.4   Training ......................................................................................8

    2.5   Affirmative Marketing of Accessible Units .................................8

    2.6   Rental Office...............................................................................9

    2.7   Tenant Application Package and Other Written Materials.......10

    2.8   Initial Application Process and Waiting Lists ...........................12

    2.9   Filling Vacancies in Accessible Units ......................................13

    2.10  Requests for Transfers for Disability Related Reasons...........15

    2.11  Consideration of Requests for Accommodations/Modifications and Interactive Process ........17

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

2.12  Assistance Animals (including Service Animals) ..................... 17

2.13  Effective Communication ........................................... 17

2.14  Grievance Procedures and Notices of Rights ........................ 19

2.15  Records ........................................................... 20

2.16  Fair Housing Complaints or Lawsuits ............................... 22

2.17  Department on Disability – Information and Referral
       Resources ........................................................ 22

# PART ONE:  OVERVIEW

## 1.1    City Commitment to Fair Housing

The City of Los Angeles is strongly committed to affordable housing that is

a.  nondiscriminatory;

b.  fully accessible to people with disabilities; and

c.  in full compliance with fair housing and disability rights laws.

These Policies cover all Housing Developments that have received financing by, through, or in connection with a program administered by the City or the Community Redevelopment Agency of the City of Los Angles (CRA/LA).   This includes, but is not limited to: housing financed with HOME, CDBG or other City Affordable Housing Trust Fund monies; City or CRA/LA issued bonds; CRA/LA tax increment funds and also applies to Housing Developments with a ground lease of CRA/LA property.

All housing covered by these Policies must be constructed and operated in accordance with all applicable disability and fair housing laws.  Specific obligations are set forth below.

## 1.2    Compliance with Policies Mandatory

These Policies reflect the requirements of federal and state fair housing law as well as the City's policies pertaining to People with Disabilities living in housing supported by the City or the Community Redevelopment Agency of the City of Los Angeles or its successors.  They were developed to answer the questions of Owners, property managers, and tenants regarding the fair housing rights of People with Disabilities. Questions regarding these policies shall be directed to the City's Housing Accessibility Program.

Owners of Housing Developments are required to adopt and comply with these Policies and procedures.  The Policies are **mandatory** and supersede any existing conflicting policies or lease provisions.  Owners are also required to maintain specified records and report to the City regarding their implementation.

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

## 1.3.   Information for Owners, Property Managers, Tenants and Applicants

This document has been divided into three sections.  Part One provides an overview.  Part Two outlines Owner obligations in general.  The third part is a Tenant Handbook that discusses in detail how the Policies will be implemented in the Housing Development.  Therefore, the Tenant Handbook has been written so that Owners can insert the name of the Housing Development in place of the words [Housing Development].  This Tenant Handbook and Appendices must be provided to applicants for housing, new tenants moving into units, and current tenants on the anniversary of their tenancy.  **Owners and their agents are responsible for knowing and implementing all policies contained in Parts Two and the Tenant Handbook.**  These policies are designed to assist Owners and their agents to comply with federal and state nondiscrimination laws.

## 1.4   Applicable Laws

The following laws apply, as appropriate:

a. The federal Fair Housing Act (FHA), as amended by the Fair Housing Amendments Act of 1988[i];

b. Title II and Title III of the federal Americans with Disabilities Act (ADA), as amended by the Americans with Disabilities Amendment Act of 2008[ii];

c. Section 504 of the federal Rehabilitation Act of 1973 (§ 504)[iii];

d. California's Fair Employment and Housing Act (FEHA); [iv]

e. California's Unruh Civil Rights Act[v];

f. California's Disabled Persons Act,[vi].; and

g. California Government Code 11135[vii].

Other federal or state fair housing laws may apply in some circumstances.

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

## 1.5   Disability Defined

Both federal and state laws protect a person with a disability; this includes a person with a history of disability, and a person regarded as having a disability.  Where there are differences between federal and state law, the law providing the most protection to People with Disabilities will control. The definitions of disability in these policies are intended to ensure that everyone covered by either federal or state law is protected. Disability is determined without looking at mitigating factors (for example, you have a mobility disability even though you can walk with crutches).

"Disability" includes a mental or physical impairment that limits a major life activity.[viii]  Major life activities include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.  A major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

Disabilities include both physical and mental disabilities. Physical disabilities include, but are not limited to, partially or completely missing limbs, mobility disabilities requiring the use of a wheelchair, cerebral palsy, blindness, deafness, and chronic or episodic conditions such as HIV/AIDS, hepatitis, epilepsy, seizure disorder, diabetes, multiple sclerosis, and heart disease.  Mental disabilities include, but are not limited to, emotional or mental illness including, but not limited to: schizophrenia, and chronic or episodic conditions such as clinical depression, bipolar disorder, post-traumatic stress disorder, and obsessive compulsive disorder.  Covered disabilities also include cognitive or intellectual disability; developmental disabilities, organic brain syndrome; traumatic brain injuries, specific learning disorders; and autism spectrum disorders.  While disability does not include the <u>current</u> illegal use of a controlled substance, alcoholism and <u>past</u> drug addiction are defined as disabilities.

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

## PART TWO:  OWNER OBLIGATIONS

### 2.1    Summary of Requirements

Owners must comply with all fair housing obligations, and must follow all applicable laws including, but not limited to, those listed above.  Key obligations are summarized in this Section, along with cross references to more detailed provisions later in these Policies.

   a. <u>Nondiscrimination</u>.  Owners must not discriminate on any basis prohibited by law.  This includes *race*, *color*, *religion*, *sex*, gender, gender identity and expression, family status, *national origin*, marital status, ancestry, *age*, sexual orientation, *disability*, source of income, *genetic information*, arbitrary characteristics, or any other basis prohibited by law.  (Federal laws prohibit discrimination based on the categories written in *italics*; California laws prohibit discrimination based on all of these categories.)   See Sections 1.4.3.3, and Appendix 1, Definitions.

     <u>Reasonable Accommodations.</u>  In addition, Owners must provide reasonable accommodations in policies, practices and procedures to ensure that People with Disabilities, and households including People with Disabilities, are not discriminated against or excluded from housing or housing-related services based on disability.  See Sections 2.7(e) and (f), 2.10, 2.11, 2.15(c), 3.4, and 3.14. Additional guidance on reasonable accommodations may be found in the May 17, 2004 Joint Statement of HUD and the Department of Justice (DOJ) on Reasonable Accommodations under the Fair Housing Act, available online at http://www.hud.gov/offices/fheo/library/huddojstatement.pdf.

   b. <u>Reasonable Modifications.</u>  Owners must provide reasonable physical and structural modifications to existing facilities to ensure that People with Disabilities and their households are not discriminated against or excluded from housing or housing-related services based on disability.  See Sections 2.7(e) and (f), 2.10, 2.11, 2.15(c), 3.4, and 3.14(d).

Fair Housing Policy in Regard to Disability:

Guidance and Requirements for Owners and Property Managers

c. <u>Effective Communication</u>.  Owners must provide effective communication when necessary so as to ensure that communication with applicants and residents with vision, hearing, speech, or other communication disabilities is as effective as communication with people without disabilities. See Sections 2.13, 3.5, and 3.17.

d. <u>Service Animals</u>.  Owners must permit service dogs and other assistance animals in accordance with applicable laws.  See Sections 2.12, 3.15, and 3.16. Owners are encouraged to refer to HUD Notice FHEO 2013-01 (April 25, 2013)[ix], which explains the differences between these rights under federal law.

e. <u>Affirmative Marketing</u>.  Owners must conduct affirmative marketing to people with disabilities and take other steps to affirmatively further fair housing. See Sections 2.3, 2.5, 2.15, and 3.6.

f. <u>Accessible Units</u>.  Owners must ensure that their Housing Developments are accessible, and provide specific Housing Units with Mobility Features and Housing Units with Hearing/Vision Features, as required by law, the City and the Property Management Plan. See Sections 2.3 and 3.7.

g. <u>Waitlists, Transfers, and Vacancies</u>.  Owners must add to and maintain waitlists, fill vacancies, and provide unit transfers in a manner that ensures that people with disabilities who need accessibility features have a priority for Accessible Units.   See Sections 2.3, 2.8, 2.9, 2.10, 3.11, 3.12, and 3.13.

h. <u>Barriers to Access</u>.  Owners must not create barriers to accessibility (such as placing obstacles in accessible paths of travel or in accessible public bathrooms) or allow barriers to accessibility to occur due to neglect (such as failing to repair elevators in a reasonable time).  Owners must promptly remove barriers to access.  See Section 3.8.

i. <u>No Retaliation Against Tenants</u>.  Owners must not retaliate against any tenant, applicant, or associated person for exercising rights under

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

the law or this Policy, or for requesting that Owners comply with these Policies or any anti-discrimination law.  See Section 3.9.

j.  <u>Disability Considered Only In Relation To Certain Tenant Requests</u>. A tenant's or applicant's disability may *only* be considered in reference to the following:

    i.    requests for accessible units

    ii.    requests for reasonable accommodations and reasonable modifications

    iii.    requests for auxiliary aids and services, and communications in alternative formats

    iv.    occupancy in Housing Developments in which the eligibility for admissions is limited to people with disabilities or a specific disability, or

    v.    when the Housing Development utilizes a selection preference for People with Disabilities.

See Sections 3.10 and 3.14(h).

k.  <u>Disability Related Information</u>.  If the disability and need for the requested accommodation are not obvious, the Owner may request disability related information.  When this information is necessary, Owners must seek only enough information to ascertain whether the tenant or applicant meets the threshold requirement of having a disability and a disability-related need for whatever the tenant is requesting (i.e., an accommodation, modification, or accessible unit), but must refrain from inquiring about the nature or severity of the disability.  Additional information may only be requested if the information:

    i.    is necessary to verify that the tenant or applicant has a disability;

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

    ii.    describes the needed accommodation or modification; and/or

    iii.    shows the relationship between the person's disability and the need for the requested accommodation or modification, including a unit with specific accessibility features.  See Sections 3.10 and 3.14(h).

l.  <u>Confidentiality</u>.  Owners must keep confidential all medical and other information about the individual's disability.  If that information is retained by the Housing Development, it must be kept in locked files that are separate from general applicant or tenant files.

See Sections 3.10 and 3.14(h).

m. <u>Language Access.</u> Many people with disabilities are not native English speakers.  Therefore, Owners must provide information under these Policies in Spanish and other languages spoken by tenants in Housing Developments.

## 2.2   Designation of Responsible Individual

Owners must designate an experienced, senior property manager to coordinate the efforts to comply with the requirements of these Policies. The name, title and contact information of the individual will be posted in the office and available upon request to any individual. See Section 3.2 and Appendix 10, Contact Information.

## 2.3   Property Management Plan (PMP)

Each Owner created a Property Management Plan (PMP) that was approved by the City prior to lease-up.  Among other requirements, the PMP must:

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

i.     identify the number, types, and locations of Accessible Units;

ii.    describe the initial and subsequent tenant selection processes and affirmative marketing plan, and

iii.   reflect a commitment to affirmatively further the fair housing rights of tenants, including People with Disabilities.

Housing Developments whose PMPs do not meet the requirements of these Policies must update their PMPs to comply within 60 days of receipt of these Policies and send their PMPs to the City for approval.

## 2.4   Training

Property management staff, including managers, agents, and employees responsible for the operation or management of a Housing Development, must attend HCID training on the information contained in these Policies. New staff must receive an orientation to these policies within 60 days of hire and all staff must receive ongoing training in fair housing laws, including an annual refresher course.

## 2.5   Affirmative Marketing of Accessible Units

Owners must affirmatively market the Housing Development and the Accessible Units to people with disabilities, consistent with the updated Property Management Plan, provide basic information about fair housing law to applicants (as described below), and otherwise market the Housing Development to eligible persons in the City without regard to disability.

In order to maximize use of Accessible Units by people needing the features of the units, all Owners must take the following steps to ensure that potential applicants are informed of available units, encouraged to apply, and have an equal opportunity to rent units:

## Fair Housing Policy in Regard to Disability:

## Guidance and Requirements for Owners and Property Managers

a. <u>Outreach</u>.  Owners must conduct sufficient outreach to community organizations and other groups that serve People with Disabilities to ensure that Accessible Units are, to the maximum extent possible, occupied by those households who need the accessibility features of that unit.  Each Property Management Plan must describe how staff will conduct this outreach.  Outreach to these organizations must take place at initial lease up, when the wait list for a property is reopened after being closed, or when an Accessible Unit becomes available and there is no qualified household on any transfer or waiting list.  A list of organizations can be found on the HCIDLA's website (www.hcidla.lacity.org) and must be one of the sources used when undertaking affirmative marketing.  Owners must use the most up-to-date list available from the City.  Outreach activities must also include an e-blast to parties on the Housing.LACity.org website Outreach List when it becomes available.  All marketing materials must mention that there are Accessible Units for people with disabilities who need their accessible features.  Also, those materials must describe available units that are not fully accessible but have certain features that could be used by some People with Disabilities, such as units that are located on ground floors or floors served by elevators and have no steps.

b. <u>Website</u>.  Information about the Housing Development and all Accessible Units and their availability status must be accurately listed online at http://www.Housing.LAcity.org.  Owners must keep current the availability status of Accessible Units and the property management contact information listed on the website.  In addition, Owners must accurately and completely list the accessibility features of the Accessible Units, and any other units with accessible features.  Owners must also list vacant Conventional Units on the website.  Owners must place People with Disabilities on their waiting lists who apply via the website when that function becomes operational.

## 2.6  Rental Office

a. <u>HUD Poster</u>.  Every rental office must display a HUD Fair Housing Poster in the rental office.  The poster may be obtained through the

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

local HUD office or at
http://portal.hud.gov/hudportal/HUD?src=/program_offices/fair_housing_equal_opp/marketing.

b. <u>Notice</u>.   Every rental office will also display a Notice of Right to Reasonable Accommodation (Appendix 2, Notice that Reasonable Accommodations and Reasonable Physical Modifications are Available).

c. <u>State Fair Housing Poster</u>.  Every rental office will also display a State Fair Housing Poster in both English and in Spanish [DFEH 164H (Fair Housing Is the Law) and DFEH 164Hs (Spanish version). The posters and additional information are available from the California Department of Housing or Community Development or can be downloaded at
http://www.dfeh.ca.gov/Publications_Publications.htm.

## 2.7   Tenant Application Package and Other Written Materials

The Housing Development's tenant application package must contain a section where the applicant may indicate a request for an Accessible Unit with Mobility or Hearing/Vision features (see Sections 2.8, 2.14(e)(iii));

The Housing Development's tenant application package, tenant annual recertification cover pages, and all marketing materials must include the following:

a. A statement that the property has Accessible Units and/or units with accessible features (if accurate) and an explanation of how an interested person can inquire about particular features of the Accessible Units;

b. The Equal Housing Opportunity Logo (currently available at HUD's website at
http://portal.hud.gov/hudportal/HUD?src=/library/bookshelf11/hudgraphics/fheologo ), and the statement "This housing is offered without regard to race, color, religion, sex, gender, gender identity and expression, family status, national origin, marital status, ancestry,

## Fair Housing Policy in Regard to Disability:

## Guidance and Requirements for Owners and Property Managers

age, sexual orientation, disability, source of income, genetic information, arbitrary characteristics, or any other basis prohibited by law";

c. Marketing materials must not include any discriminatory remarks. Examples of discriminatory remarks include, but are not limited to, remarks such as "independent living" or "need to be able to live independently," which are discriminatory because they appear to exclude people who rely on supportive services, assistance, or aides. Housing Developments are not permitted to exclude people on the grounds that they utilize these services due to a disability;

d. Documents must contain the Universal Symbol of Accessibility and, if available, a TTY/TDD phone number.  Advertising must also include an email address which people can use to request an application, as well as other information about where the application may be obtained, a statement that people with disabilities have the right to ask for and receive reasonable accommodations in rules, policies, practices, or services (including in the application process), including the right to ask for communications in alternative formats, to ask for auxiliary aids and services, and to ask for reasonable physical modifications, as well as information on how to make such a request. (See subsection (f) below, "Notice of Right to Reasonable Accommodation/Modification," for specific details); and

e. A statement on the tenant application and tenant annual recertification cover pages that reasonable accommodations and modifications will be provided upon request.

f. Notice of Right to Reasonable Accommodation/ Modification. Owners must provide notice of the right to reasonable accommodations and modifications.  The following language is to be placed at the bottom of the first page of every rental application and re-certification packet in at least a 12-point, non-serif type:

"*A person with a disability may ask for:*

- *A change in rules (reasonable accommodation)*

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

- *A physical change to their apartment or shared areas in the building (reasonable modification)*
- *An accessible apartment*
- *Aids and services to help them communicate with us.*

*If you or anyone in your house has a disability and needs any of these things to live in our [Housing Development] and use our services then:*

*Contact [Housing Development] staff to fill out a form called a 'Reasonable Accommodation or Modification Form.'"*

See Appendix 2, Notice that Reasonable Accommodations and Reasonable Physical Modifications are Available.

## 2.8   Initial Application Process and Waiting Lists

Application forms must provide a section where people with disabilities who need the features of a mobility or hearing/vision unit can indicate their desire for such unit.  Using the process described in the Development's PMP for the tenanting of units, Owners must create two lists – one for conventional units and another for Accessible Units.  The names of people with disabilities who have identified the need for accessible units will be on both waiting lists so that applicants have the option of choosing a conventional unit should their name come up on that list before an Accessible Unit is available.

All waiting lists should clearly indicate which applicants have requested Accessible Units and what type of unit (Housing Unit with Mobility Features or Housing Unit with Hearing/Vision Features).  Tenants who need both mobility and hearing or vision features should be offered the option of being offered a Unit with Mobility Features; reasonable modifications can then be made to provide necessary hearing/vision features.

If initial application forms did not solicit information about disability-related requests for Accessible Units, Owners must contact all households already on their waiting lists to determine whether any household on the waiting

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

lists needs an Accessible Unit.  If so, they should be placed on the appropriate waiting list for Accessible Units.  Owners may require verification that the person needs the design features of that type of unit, prior to leasing an Accessible Unit.  Verification of disability should not be sought until such time as an Accessible Unit is available.

## 2.9   Filling Vacancies in Accessible Units

Owner must use suitable means to assure that information regarding the availability of Accessible Units reaches eligible People with Disabilities, and will take reasonable, nondiscriminatory steps to maximize the utilization of such units by eligible people whose disability requires the accessibility features of the particular unit.  When an Accessible Unit becomes vacant, Owner must:

a. First, offer the unit to a current occupant of the Housing Development who has requested and needs the features of an Accessible Unit;

b. Second, offer the unit to a current occupant of a Housing Development under common control who has requested and needs the features of an Accessible Unit;

c. Third, offer the unit to an eligible, qualified applicant on the Accessible Unit waiting list who needs the features of an Accessible Unit;

d. Fourth, make reasonable efforts to advertise the unit to qualified people who need its accessible features, including—

    i. listing the unit as vacant and available to people who need the accessible features at http://www.Housing.LACity.org,

    ii. distributing information about the accessible vacancy in accordance with the Owner's Property Management Plan,

    iii. distributing information to organizations that serve people with disabilities, and

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

      iv.       sending an e-blast to parties on the www.Housing.LACity.org website Outreach List.

In the event that more than one household has requested an Accessible Unit, Owners must offer the Unit to households in their order on the Waiting Lists within each category (mobility or hearing/vision).

If, after using the process identified above, there are no households who need the features of that Accessible Unit, then Owners must offer the unit to the next household on the Conventional Unit waiting list.  Should that household choose not to occupy the Accessible Unit, they will remain at the same position on the Conventional Waiting list.  If the household chooses to occupy the Accessible Unit, the tenant must sign a Lease Addendum in the form approved by HCID (Appendix 6, Lease Addendum re: Rental of Accessible Unit).  The Lease Addendum requires the household to move to the next available, **comparable**, Conventional Unit, when given legal notice by the Housing Development that there is an eligible applicant or existing resident with a disability who requires the accessibility features of that Unit.

For people who are required to vacate an Accessible Unit because it is needed by an individual with a disability, Owners must pay the costs of transferring to a comparable Conventional Unit, including new utility deposit(s), if required, and reasonable moving expenses.  These costs are eligible project expenses.

A household with a disability-related need for some, but not all, of the features of an Accessible Unit will not be required to sign a lease addendum stating they will move in the event that there is another household with an individual who could utilize more of the features of that unit.  However, that household may be offered a Conventional Unit with reasonable modifications provided by [Housing Development].  If that household voluntarily agrees to move to a Conventional Unit with reasonable modifications, then [Housing Development] must provide the same costs described above, as well as pay for reasonable accessibility modifications in the new Conventional Unit.  These costs are also eligible project expenses.

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

When there is not yet a transfer provision in the lease that meets the requirements of this Policy, Owners may offer Conventional Units as they become available, first to households occupying Accessible Units who do not need the accessible features of that unit, and then in order to others on the Development's waiting list.

See Sections 3.11, 3.12 and 3.13.


## 2.10  Requests for Transfers for Disability Related Reasons

Each year, Owners must notify tenants that, if someone in their households has or develops a disability and needs accessibility features that their unit does not provide, then they have the right to:

1. request a transfer to a unit that has accessible features; or

2. to request reasonable modifications to their units to make them more accessible.

As previously described under Section 2.9, Filling Vacancies in Accessible Units, Owners must pay the costs of moving tenants to their new units. These costs are eligible project expenses. Owner will not charge additional fees for a transfer to an Accessible Unit or require an increased security deposit, unless the unit being vacated has been damaged beyond reasonable wear and tear, in which case the costs of repairs may be deducted from the current security deposit and an itemized receipt for repairs presented to the tenant with a request to replenish the deposit.

Owners must not charge the tenant an increased rent beyond the level of the tenant's existing apartment, unless the tenant chooses a unit with an additional bedroom and/or there are no rental subsidies available for the new unit that would allow the household to remain at the same rent.  If the new unit has a higher rent, at least 30 days in advance Owners must notify the transferring tenant about the accessible features of the unit and the new rental amount.

## Fair Housing Policy in Regard to Disability:

## Guidance and Requirements for Owners and Property Managers

Tenants must have the opportunity to view the unit and have at least five days in which to decide whether to move there.

Owners must maintain a Transfer List of current tenant households having People with Disabilities who have requested a transfer to an Accessible Unit (or to a Conventional Unit with specific accessibility features).  The list will include tenants residing in Housing Developments under common control who request an Accessible Unit.  If a tenant waiting for a transfer to an Accessible Unit rejects the offer of an accessible unit, the tenant will remain at the same position on the Transfer List for the next available Accessible Unit.

When a Conventional Unit is expected to become vacant, Owners must offer that unit to the first household on the waiting list (based on any preferences applicable to the project), regardless of whether that applicant has requested an Accessible Unit.  If the applicant has indicated a disability-related need for an Accessible Unit, Owners must notify the applicant in writing that the unit is not accessible.  If the applicant prefers to wait for an Accessible Unit, the household will remain at their position on both the Conventional and Accessible waiting lists until accepting a housing unit that meets the household's needs.

An eligible family with a member who has a disability may choose to lease a Conventional Unit, if no Accessible Unit is available when the household reaches the top of the waiting list.  If requested, Owners must make physical alterations to the Conventional Unit as a reasonable modification, unless the alterations would result in an undue financial and administrative burden to the Housing Development.

The Housing Development may include some Conventional Units that contain accessibility features or may be accessible for other reasons.  Owners must provide information about these units' accessible features to tenants who have informed Owners that they have a disability-related need so that they can choose whether to place themselves on the Transfer List to lease those units.  For example, an individual may have difficulty climbing stairs.  A ground floor Conventional Unit may meet his or her needs, even though the unit does not otherwise meet all the standards of a

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

housing unit with mobility features.  However, no household is required to give up its Conventional Unit with accessibility features to accommodate a household that would like those features.  Tenants on the Transfer List for a Conventional Unit with accessible features will be given first choice in renting that Unit when it becomes vacant.

See Section 3.13.

### 2.11  Consideration of Requests for Accommodations/Modifications and Interactive Process

Upon receipt of request, Owners must grant reasonable accommodations/ reasonable modifications as set forth in Section 3.14.

### 2.12  Assistance Animals (including Service Animals)

A variety of state and federal laws provide tenants, prospective tenants with disabilities, and guests the right to have an assistance animal, pursuant to the reasonable accommodations policies and procedures set forth above. State and federal laws also give people with disabilities who visit or live in a housing development the right to be accompanied by a service animal, which is a specific kind of assistance animal. These rights and the Owner's obligations are addressed in Section 3.15 and 3.16.

### 2.13  Effective Communication

Owners must ensure that communications with applicants and tenants with disabilities are as effective as its communications with people without disabilities.  To meet this obligation, Owners must provide appropriate auxiliary aids and services to ensure that people with disabilities have an equal opportunity to participate in, and benefit from, their Housing Developments and services.  Owners must comply with the Guidance in

## Fair Housing Policy in Regard to Disability:

## Guidance and Requirements for Owners and Property Managers

the U.S. Department of Justice's ADA guidance on Effective Communication (http://www.ada.gov/effective-comm.htm).

Owners must provide, at their expense, auxiliary aids and services for effective communication with their residents and applicants, as well as employees.  These costs are eligible project expenses.

Owners must train all property management staff, including maintenance staff, in how to receive, and initiate, telephone calls to people who are deaf, hard of hearing, deaf-blind, or who have speech disabilities using a TTY or the Telecommunication Relay Services (TRS).  If Housing Development has a TTY, it must place and accept calls using the TTY.

Housing Development must accept telephone calls placed through relay services.  Staff who answer the telephone will treat relay calls just like other calls.  For further information regarding relay services, Owners may contact the California Public Utility Commission's Deaf and Disabled Telecommunications Program at http://ddtp.cpuc.ca.gov/relay.aspx . In the event an Owner does not have a separate TTY number, the phone number for contacting the development's management offices must be posted and TTY users should be directed to call 711 or use their preferred Video Relay Service (VRS) provider.  If requested by someone with a disability, Owners shall consider, as reasonable accommodations, email, text and/or fax communications.

PMPs must ensure that when possible and practical, auxiliary aids and services will be provided immediately on an as-needed basis, and "walk-in" requests for aids and services will be honored to the extent possible. However, there may be instances in which it is not possible to provide requested aids and services immediately, such as arranging for Braille materials or American Sign Language Interpreters.  Owners can request that people needing these services, where possible, make the request for auxiliary aids or service in advance of when needed.

Signage in management offices; or on applications, recertification forms, correspondence; or in telephonic voice mail greetings, automated telephonic menus; and other media used to communicate with the public

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

and with residents will include information about how to request auxiliary aids and services.

See Sections 3.5 and 3.17.

### 2.14  Grievance Procedures and Notices of Rights

a. Owners must adopt grievance or appeal procedures that incorporate appropriate due process standards and that provide for the prompt and equitable resolution of disability-related complaints.  See Section 3.18.

b. Owners must notify applicants and tenants about the Housing Development's grievance process and provide the name of a senior staff person to contact with respect to any grievance and update that information in a timely manner.  See Section 3.18 and Appendix 10, Contact Information.

c. Owners must also notify applicants and tenants about the right to use the City Housing Accessibility Program Complaint Process.  See Section 3.19.

d. Owners must take steps to notify applicants and residents that owners do not discriminate on the basis of disability, of applicants' and residents' rights as described in this Policy, and of their right to file complaints.  Notice of these rights must also supply the contact information for the person charged with overseeing the grievance process.   A copy of this policy, related forms, and the contact information must be provided to new tenants along with their lease, and to existing tenants at their annual recertification, and must be posted in the management office.

e. Additional methods of initial and continuing notification of rights and grievances procedures may include the posting of notices, placement of notices in recipients' publications, and distribution of memoranda or other written communications. Owners must ensure members of the population eligible to be served who have visual or hearing impairments are provided with the information necessary to

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

understand and access the housing. Methods for ensuring participation include, but are not limited to, qualified sign language and oral interpreters, readers, or the use of taped and Braille materials, as set out in the Sections on Effective Communication.

f.  These procedures supplement, and do not replace, any notice and grievance procedures required by HUD, any funding sources, or other applicable law.

g.  Notices of rights and the grievance process are in addition to [Housing Development's] obligation to engage in the interactive process with an individual who has requested a reasonable accommodation or modification.

h.  Applicants and tenants are not required to exhaust these grievance procedures before seeking other administrative or judicial relief that may be available.

See Section 3.18 and Section 3.19.

## 2.15 Records

a.  Owners must keep dated records and copies of all advertising flyers and notices related to their affirmative marketing efforts prior to lease-up, reopening of the waiting list, or prior to rental of an Accessible Unit to a household who does not need the accessibility features.

b.  Owners must keep copies of their original applicant pool information, dated waiting and transfer lists showing contact information, application dates, waiting list status, and related documents showing attempts to contact people on the waiting lists and dates people were provided a rental unit.

c.  Owners must keep logs and dated records of requests --

1.  for Accessible Units by tenants, tenants in Housing Developments under common control, and applicants, and the outcomes of those requests; See Sections 3.7, 3.11, 3.12 and 3.13.

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

2. for any Accessible Units *not* rented to a person who needs the accessible features, an explanation of all steps taken to attempt to rent the unit to a household with a person who needs the accessible features. See Sections 2.9 and 3.12.

3. of all reasonable accommodation requests, reasonable modification requests, and requests to transfer to a more accessible unit.  At a minimum, logs must contain, the following information:

   i. Name of requestor and current address, phone number or unit number;

   ii. Description of the request;

   iii. Whether the request is for an Accessible Unit and which type (e.g. unit with mobility or hearing/vision features, ground floor unit, a different unit for other accommodation reasons, or other pertinent information);

   iv. Size of unit requested (e.g. Studio, 1, 2, or 3 Bedroom Unit), *if relevant to the request*;

   v. Date of request;

   vi. Current status of the request;

   vii. Whether the accommodation was approved or denied and date of determination;

   viii. If request was denied, reason for denial;

   ix. Date notice given to requestor of approval or denial;

   x. Anticipated implementation date for completion of the accommodation/modification;

   xi. Date accommodation or modification was provided or completed; and

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

      i.  Pending and final appeals/grievances of denied or delayed reasonable accommodation requests, including the date of the appeal, the date of the final decision, and the final outcome.

d.  Logs must be updated monthly.  Although the logs have been described as separate documents, they could be contained in a master spreadsheet.

e.  All information involving reasonable accommodation and modification requests must be kept confidential, separate from the tenant's file, and will only be shared on a need-to-know basis or as required by these Policies or by law. The tenant files shall reflect the outcomes of any reasonable accommodation or modification requests.

f.  Copies of the log must be provided to the City on a quarterly basis in accordance with City instructions no later than the tenth day of the month following each quarter of the calendar year.

g.  All records in this Section must be retained until August 1, 2026 or for 5 years, whichever is later.

## 2.16  Fair Housing Complaints or Lawsuits

Owners must immediately inform HCID in writing if a tenant or an applicant files a fair housing complaint or lawsuit against them with an external agency or organization.

## 2.17  Department on Disability – Information and Referral Resources

Information about the rights of people with disabilities, and about securing the provision of auxiliary aids from service providers, may be requested by calling th**e City of Los Angeles' Department on Disability at (213) 202-2748 Voice or (213) 202-3452 TTY.**

## 2.18  No Retaliation

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

Owners/Housing Developments must not retaliate against any tenant, applicant, or associated person for exercising rights under the law or this Policy, or for requesting that the Housing Development comply with these Policies or any anti-discrimination law.

**Fair Housing Policy in Regard to Disability:**

**Guidance and Requirements for Owners and Property Managers**

## 2.19  Information to be Provided Prior to the Retrofit of Units in Housing Development

Some Housing Developments may not currently have fully accessible housing units, common areas, and/or sites.  If that is the case, then HCIDLA will require that the projects be retrofitted and will work with Owners to ensure that this takes place in a timely manner.  The following must be provided to and approved by HCIDLA, in addition to the Owner obtaining approval of the retrofit scope of work, cost estimate, and construction schedule.

a. A description of the process used to choose units to be retrofitted to demonstrate that these choices were made on a fair and objective basis and will result in a fair distribution of units taking into account bedroom size, amenities, and other important considerations.  If vacant units are to be chosen for retrofit, the back-up plan if there are not a sufficient number of vacant units to complete the retrofit within the approved timeframe must be disclosed to HCID.

b. A Tenant Relocation Plan for any temporary or permanent relocation that ensures that low-income tenants do not have to pay the cost of relocation and accommodates tenants with disabilities.

c. Affirmative Marketing and Tenant Transfer Plans to ensure that people who need the features of the accessible units will occupy the units.

d. A copy of the Lease Addendum to be signed by tenants occupying accessible units who do not require the accessible features of those units.

---

[i] Federal Fair Housing Act, as amended by the Federal Fair Housing Amendments Act, 42 U.S.C. §3601 *et seq.* See also federal regulations at 24 C.F.R. Part 100 *et seq.*,

## Fair Housing Policy in Regard to Disability:

## Guidance and Requirements for Owners and Property Managers

---

especially 24 C.F.R. §§ 100.200-205 on "Prohibition Against Discrimination Because of Handicap."

ii  Americans with Disabilities Act, as amended by the Americans with Disabilities Amendments Act of 1988, 42 U.S.C. § 12101 *et seq.* See also Title II regulations (State and local governments) at 28 CFR Part 35 and Title III regulations (public accommodations) at 28 CFR Part 36.

iii Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. See also federal regulations regarding "Nondiscrimination Based on Handicap in Federally Assisted Programs and Activities of the Department of Housing and Urban Development" at 24 C.F.R. Part 8.

iv California's Fair Employment and Housing Act, California Government Code § 12900 *et seq.*

v Unruh Civil Rights Act, California Civil Code §§ 51 *et seq.*

vi California's Disabled Persons Act, Civil Code Section 54 *et seq.*

vii California Government Code Section 11135 *et seq.*

viii California law is more protective of people with disabilities than federal law. Cal. Fair Employment and Housing Act (FEHA), Gov. Code 12926(j) and (m).  Federal law references disabilities that "substantially limit" rather than "limit" activities.  However, federal recent interpretations of the phrase "substantially limit," following the ADA Amendments Act, make it very similar to the California definition.  Therefore, we use the term "limit" in these policies, not "substantially limit."

ix A copy of HUD's April 25, 2013 FHEO Notice is available online at http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&sqi=2&ved=0CC kQFjAA&url=http%3A%2F%2Fportal.hud.gov%2Fhudportal%2Fdocuments%2Fhuddoc %3Fid%3Dservanimals_ntcfheo2013-01.pdf&ei=XSFwUrKVIsWtigL56YGQCQ&usg=AFQjCNHTG-hUZ58NUWDwfUWRJ8tBeC32ww&bvm=bv.55617003,d.cGE

**Exhibit C-2**

# Tenant Handbook of Rental Occupancy Policies Regarding Disability for [Housing Development], May 12, 2016

(*NOTE:  Appendices and Forms to Exhibit C-2 to be developed in consultation between the City and Plaintiffs within 30 days after the Effective Date of the Settlement*)

# Table of Contents

**GENERAL PRINCIPLES** .................................................................. 1

    3.1   Commitment to Fair Housing ..................................................... 1

    3.2   Responsible Individual ............................................................. 1

    3.3   Non-Discrimination ................................................................. 1

    3.4   Reasonable Accommodations and Modifications ...................... 2

    3.5   Effective Communication ......................................................... 2

    3.6   Affirmative Marketing ............................................................. 2

    3.7   Accessible Units .................................................................... 2

    3.8   Barriers to Access ................................................................. 2

    3.9   No Retaliation ....................................................................... 3

    3.10  Use of Disability-Related Information ........................................ 3

**SPECIFIC ACTIVITIES** ................................................................... 3

    3.11  Waiting Lists ......................................................................... 3

    3.12  Filling Vacancies in Accessible Units ....................................... 4

    3.13  Requests for Transfers for Disability Related Reasons ............. 6

    3.14  Reasonable Accommodations and Modifications ...................... 7

    3.15  Assistance Animals (including Service Animals) ..................... 15

    3.16  Guidelines For All Assistance Animals, Including Service Dogs, Living in the Development ............................................. 19

    3.17  Policy on Effective Communication ........................................ 20

3.18   Appeal and Grievance Procedures ......................................... 22

3.19   Department on Disability - Information and Referral Resources ............................................................................ 24

**TENANT HANDBOOK OF RENTAL OCCUPANCY POLICIES REGARDING DISABILITY FOR [HOUSING DEVELOPMENT]**

**(NOTE:  This section is the attachment to hand out to Tenants, along with Appendices.)**

**(*NOTE:  Appendices and Forms to Exhibit C-2 to be developed in consultation between the City and Plaintiffs within 30 days after the Effective Date of the Settlement.*)**

## GENERAL PRINCIPLES

This Tenant Handbook includes information about the rights of tenants and applicants with disabilities at [Housing Development].  Additional information is in Appendix 9, Resource Guide for Owners, Tenants, and Applicants.  Definitions of technical terms are in Appendix 1, Definitions.

### 3.1   Commitment to Fair Housing

[Housing Development] is strongly committed to providing housing that is:

  a. nondiscriminatory;
  b. fully accessible to people with disabilities; and
  c. in full compliance with fair housing and disability rights laws.

### 3.2   Responsible Individual

[Housing Development] has designated an individual to coordinate efforts related to disability.  The name, title and contact information is listed in Appendix 10 – Contact Information.  It is also posted in the office and available upon request.

### 3.3   Non-Discrimination

[Housing Development] will not discriminate on any basis prohibited by law. This includes *race*, *color*, *religion*, *sex*, gender, gender identity and expression, family status, *national origin*, marital status, ancestry, *age*, sexual orientation, *disability*, source of income, *genetic information*, arbitrary characteristics, or any other basis prohibited by law. (Federal laws

prohibit discrimination based on the categories written *in italics*; California laws prohibit discrimination based on all of these categories.)

## 3.4   Reasonable Accommodations and Modifications

[Housing Development] will provide reasonable accommodations in policies, practices and procedures and reasonable modifications to existing facilities to ensure that people with disabilities, and households that include people with disabilities, are not discriminated against or excluded from housing or housing-related services based on disability.  Service dogs and other assistance animals will be permitted in accordance with applicable laws.  These are discussed in greater detail later on in these Policies.  See Section 3.14.

## 3.5   Effective Communication

[Housing Development] will provide effective communication when necessary so as to ensure that communication with applicants and residents with vision, hearing, speech, communication, or other disabilities is as effective as communication with people without disabilities.   See Section 3.17.

## 3.6   Affirmative Marketing

[Housing Development] will conduct affirmative marketing to people with disabilities and take other steps to affirmatively further fair housing.

## 3.7   Accessible Units

[Housing Development] includes [INSERT NUMBERS] of designated Housing Units with Mobility Features and [INSERT NUMBERS] of designated Housing Units with specific Hearing/Vision features.  Other units may also have certain accessible features.

## 3.8   Barriers to Access

[Housing Development] will not create new barriers to accessibility (such as placing obstacles in accessible paths of travel or in accessible public bathrooms) or allow barriers to accessibility to occur due to neglect (such as failing to repair elevators in a reasonable time).  [Housing Development] will promptly remove barriers to access.

### 3.9    No Retaliation

[Housing Development] will not retaliate against any tenant, applicant, or associated person for exercising rights under the law or this Policy, or for requesting that [Housing Development] comply with these Policies or any anti-discrimination law.

### 3.10   Use of Disability-Related Information

[Housing Development] will only assess applicants for housing occupancy using non-discriminatory eligibility criteria.  Disability may only be considered in reference to:

   a. Requests for Accessible Units;
   b. Requests for reasonable accommodations and modifications;
   c. Requests for auxiliary aids and services, and communications in alternative formats;
   d. Occupancy in properties where the eligibility for admissions is limited to people with disabilities; and
   e. Occupancy in properties that utilize a selection preference for People with Disabilities.

In general, when information about disability is necessary, [Housing Development] will limit its inquiries to what is necessary to establish eligibility or a specific accommodation.  [Housing Development] may not inquire about the nature or severity of the disability.

[Housing Development] will keep confidential all medical and other information about the individual's disability.  If that information is retained by the Development, it is required to be kept in locked files that are separate from general applicant or tenant files.

### <u>SPECIFIC ACTIVITIES</u>

### 3.11   Waiting Lists

[Housing Development] maintains waiting lists for Conventional Units and for Accessible Units.  Any tenant Household who desires the features of an Accessible Unit can request to be listed on both the Conventional and Accessible Units waiting lists.  Households with People with Disabilities who need the features of the Accessible Units are given priority for those

Units in accordance with their order on the Accessible Unit list.  Applicants with disabilities who need the accessible features of the Accessible Units will be listed on both the Conventional and Accessible Units' Waiting Lists so that they can choose either an Accessible Unit or a Conventional Unit if one becomes available before the other.  Should a tenant Household with an individual with a disability choose not to move into a Conventional Unit when one becomes available, that Household can retain its position on both waiting lists until the appropriate unit becomes available.

Admissions and transfers to the Accessible Units will be handled as set out in Section 3.12 and 3.13 below. [Housing Development] will verify eligibility for the Accessible Units at the time those Units become available for rent.

## 3.12  Filling Vacancies in Accessible Units

[Housing Development] agrees to use suitable means to assure that information regarding the availability of Accessible Units reaches eligible People with Disabilities in the City of Los Angeles, and will take reasonable, nondiscriminatory steps to maximize the utilization of such units by eligible people whose disability requires the accessibility features of the particular unit.  To this end, [Housing Development] will take the following steps when an Accessible Unit becomes vacant:

a. First, we will offer the unit to a current occupant of [Housing Development] who has requested and needs the features of an Accessible Unit;
b. Second, we will offer the unit to a current occupant of a Housing Development under common control who has requested and needs the features of an Accessible Unit;
c. Third, we will offer the unit to an eligible, qualified applicant on the waiting list who needs the features of an Accessible Unit;
d. Fourth, we will make reasonable efforts to advertise the unit to qualified people who need the accessible features, including listing it as available to people who need the accessible features at http://www.Housing.LACity.org,  distributing the information about the accessible vacancy in accord with the Owner's Property Management Plan, distributing it to the most recent list from HCID of organizations that serve people with disabilities, and sending an e-blast to parties on the Housing.LACity.org website Outreach List.

e.  Within each of the above categories, in the event that more than one household has requested an Accessible Unit, we will offer the Unit to households in their order on the Waiting Lists within each category.

f.  If, after using the process identified above, there are no households identified who need the features of that Accessible Unit, then we will offer the unit to the next household on the Conventional Unit waiting list.  Should the tenant choose not to occupy the unit, they will remain in the same position on the Conventional Waiting list.  If the tenant chooses to occupy the Unit, the tenant must sign a Lease Addendum in the form approved by HCID (Appendix 6, Lease Addendum re: Rental of Accessible Unit).  The Lease Addendum requires the household to move to the next available, comparable, Conventional unit, when given legal notice by [Housing Development] that there is an eligible applicant or existing resident with a disability who requires the accessibility features of the unit.

When tenants are required to vacate an Accessible Unit because it is needed by an individual with a disability, Owners will pay the costs of their move to a comparable Conventional Unit, including new utility deposit(s), if required, and reasonable moving expenses.  These costs are eligible project expenses.  [Housing Development] will not charge additional fees for a transfer or require an increased security deposit.  However, if the Unit being vacated has been damaged, repairs will be paid from the existing security deposit; the difference between the balance remaining and the security deposit requirements of [Housing Development] will be charged to the tenant.

A household with a disability-related need for some, but not all, of the features of an Accessible Unit will not be required to sign a lease addendum stating they will move in the event that there is another household with an individual who could utilize more of the features of that unit.

However, if a household occupying an Accessible Unit only needs certain accessibility features, that household may be offered a Conventional Unit with reasonable modifications provided by [Housing Development].  If that household voluntarily agrees to move to a Conventional Unit with reasonable modifications, then [Housing Development] must provide the same costs described above, as well

as pay for reasonable accessibility modifications in the new Conventional Unit.

When there is not yet a Lease Addendum provision in the lease that meets the requirements of this Policy, Owners may offer Conventional Units as they become available, first to households occupying Accessible Units who do not need the accessible features of that unit, and then in order to others on [Housing Development]'s waiting list.

## 3.13  Requests for Transfers for Disability Related Reasons

[Housing Development] maintains a Transfer Waiting List for Accessible Units.  Any tenant household with an individual with a disability may request such a transfer at any time by filling out a Transfer Request Form or Request for Preference.  See Appendix 7, Request for Preference for More Accessible Unit.

Annually, [Housing Development] will notify tenants of the right to request a transfer to a unit that has accessible features or to request reasonable modifications to their units to make them more accessible if someone in their household has or develops a disability and needs accessibility features that their unit does not have.  If the tenant desires, the household will be put on the transfer waiting list for the next Accessible Unit.

When **transferring** a tenant to an Accessible Unit, we will offer to pay the costs of moving the tenant to the new unit.  These costs include new utility deposit(s) required by the utility company; reasonable modifications; and reasonable moving expenses.  These costs are eligible project expenses.

We will not charge additional fees for a transfer to an Accessible Unit or require an increased security deposit.

[Housing Development] will not charge the tenant an increased rent beyond the level of the tenant's existing apartment, unless the tenant chooses a unit with an additional bedroom and/or there are no rental subsidies are available for the new unit that would allow the household to remain at the same rent.  If the new unit has a higher rent, we will notify the transferring tenant of the new rental amount at least 30 days in advance of the tenant signing the lease for the new unit. The tenant is free to choose not to move into that unit.

Page | 6

[Housing Development] will maintain a Transfer List of current tenants with disabilities who have requested a transfer to an Accessible Unit.  The list will include tenants residing in Housing Developments under common control. Tenants living in [Housing Development] have priority over other tenant households who live in developments under common control of Owner.   In situations in which a person waiting for a transfer to an Accessible Unit rejects an offer for a unit that meets their needs, the applicant will remain in the same position on the Transfer List for the next Accessible Unit.

When a Conventional Unit is expected to become vacant, [Housing Development] will offer that unit to the first household on the Conventional waiting list (based on any preferences applicable to the project), regardless of whether that applicant has requested an Accessible Unit.  If this applicant has indicated a disability-related need for an Accessible Unit, we will notify the applicant in writing that the unit is not accessible.  If the applicant prefers to wait for an Accessible Unit, the household will remain at the top of the Conventional list and will be offered an Accessible Unit that matches all of his or her specified needs/eligibility in the order in which they are on the Accessible Waiting List.

An eligible family with a member who has a disability may choose to lease a Conventional Unit, if no Accessible Unit is available when the household reaches the top of either waiting list.  If requested, [Housing Development] will make physical alterations to the Conventional Unit as a reasonable modification, unless the alterations would result in an undue financial and administrative burden to [Housing Development].

Because some Conventional Units may contain accessibility features or may be accessible for other reasons, [Housing Development] will provide information about these units' features to people who have indicated a disability-related need so that they can choose whether they want to lease those units. For example, an individual may have difficulty climbing stairs; a ground floor Conventional Unit may meet his or her needs, even though the unit does not otherwise meet all the standards of a housing unit with mobility features.

## 3.14  Reasonable Accommodations and Modifications

[Housing Development] will make reasonable changes to policies, practices and procedures (reasonable accommodations) as well as reasonable structural modifications (reasonable modifications) to existing housing units and other facilities in [Housing Development] to ensure that People with Disabilities, and households including People with Disabilities, have full and equal access to housing covered by this Policy.

a.  What are Reasonable Accommodations?

Reasonable accommodations are changes, modifications, exceptions, alterations, or adaptations in rules, policies, practices, programs, or activities that may be necessary to:

    i.   provide a person with a disability an equal opportunity to use and enjoy a dwelling, including public and common use areas of a development,
    ii.   participate in, or benefit from, a program, service or activity; or
    iii.   avoid discrimination against a person with a disability.

Reasonable accommodations may include, but are not limited to:

    i.   Allowing an assistance animal in a "no-pets" building;
    ii.   Allowing payment of rent on a date other than the first of the month if necessary due to the date the tenant receives disability income;
    iii.   Granting a reserved parking space closer to the person's unit;
    iv.   Providing additional accessible or assigned parking where required accessible parking is not sufficient to meet the needs of tenants and applicants;
    v.   Accepting references from professional caregivers and others when landlord references are not available for a person moving from a nursing home or other places that serve people with disabilities;
    vi.   Transferring a tenant in a non-elevator building who has problems walking up or down stairs to a ground floor unit with no or very few stairs; and
    vii.   Requesting that [Housing Development] notify another individual in addition to the tenant or applicant when any concerns arise.  See Appendix 8, Supplemental and Optional Contact Information for Applicants and Tenants.

b.  When Can I Ask for a Reasonable Accommodation?

A person with a disability may request a reasonable accommodation at any time during the application process, tenancy period or eviction process.

c.  What Are the Grounds for Reasonable Accommodation Requests To Be Granted or Denied?

[Housing Development] will provide reasonable accommodations when there is a relationship or nexus between the disability and the requested accommodation and the accommodation will assist in affording equal opportunity to use and enjoy the housing or tenant services.  [Housing Development] will pay for any costs associated with providing a reasonable accommodation.  We will not charge a tenant for providing a reasonable accommodation.

We will only deny requests if:

     i.   there is no disability-related need for the accommodation;
    ii.   the request will result in an undue administrative or financial burden on [Housing Development] considering all resources available to the Owner; or
   iii.   the request will fundamentally alter the nature of [Housing Development's] program.

The fact that the request may result in some expense to [Housing Development] is not, in and of itself, an undue administrative or financial burden.  A fundamental alteration to the nature of the program exists when a tenant requests something completely different from what  [Housing Development] usually offers, for example, if a tenant seeks to have the [Housing Development] pay for supportive services that are not a feature of [Housing Development's] housing program.

d.  What Are Reasonable Modifications?

A reasonable modification is a structural change made to existing premises, occupied or to be occupied by a person with a disability, in order to:

i.   provide a person with a disability an equal opportunity to use and enjoy a dwelling, including public and common use areas of a housing development;

ii.   allow the person to participate in, or benefit from, a program, service or activity; or

iii.   avoid discrimination against a person with a disability.

Reasonable modifications may include structural changes to interiors and exteriors of dwellings and to common and public use areas. Examples of reasonable modifications include adding a ramp to make a primary entrance accessible for persons using wheelchairs or altering a walkway to provide access to a public or common use area. [Housing Development] will pay for reasonable modifications as long as it does not pose a fundamental alteration or undue financial and administrative burden.

Common reasonable modifications may include, but are not limited to:

i.   Wheelchair ramp;

ii.   Grab bars in the shower or bathroom;

iii.   Roll-in shower;

iv.   Visual alerting systems and flashing lights for persons who are deaf or hard of hearing;

v.   Adjusting counter heights for people who use wheelchairs; and

vi.   Braille buttons in the elevators.

Many of these items will already be provided in Accessible Housing Units, but [Housing Development] will also provide them as reasonable modifications in Conventional Units unless they create an undue burden. The existence of the requisite number of Accessible Housing Units *does not eliminate the need to provide reasonable modifications in other units.*

e.  What Is the Interactive Process?

When [Housing Development] believes there is an undue burden or a fundamental alteration, we will engage in a discussion with the individual with a disability to determine if there is an alternative accommodation or modification that will meet the person's needs.  This is referred to as the interactive process, and is required before a denial can be made.  This process often results in a mutually satisfactory accommodation or modification that is effective in meeting the person's disability-related need.

People with disabilities typically have the most accurate knowledge about the functional limitations posed by their disability.  An individual is not obligated to accept an alternative accommodation or modification suggested by [Housing Development] if s/he believes it will not meet the need and the preferred accommodation or modification is reasonable. [Housing Development] will not force an individual with a disability to accept an accommodation or modification that he or she does not find acceptable.

Any determination that a requested accommodation or modification poses an undue financial or administrative burden or results in a fundamental alteration will be made on a case-by-case basis after the interactive process has been undertaken.  Decisions about undue financial and administrative burdens will take into account such factors as the nature and cost of an accommodation, the financial resources of the Owner, the benefits that the accommodation or modification would provide to the requestor, and the availability of alternative, less expensive accommodations or modifications that would effectively meet the requestor's disability-related needs.  Merely doing something in a different manner usually does not constitute an undue administrative burden.  For example, a tenant with an intellectual disability may need a specific reminder from the property manager each month that the rent is due, and that does not constitute an undue administrative burden.

    f.  How Do I Make a Request for a Reasonable Accommodation or Modification?

        i.  You can ask for and fill out a form.  Return the form to the Office.  See Appendix 3, Reasonable Accommodation or Reasonable Modification Request Form.

        ii.  Or, you, or someone acting on your behalf, can ask a staff person for an accommodation.  An individual does not need to use the phrase "reasonable accommodation" or "reasonable modification" to initiate a request.  Any oral or written statement made to [Housing Development] indicating that the person is seeking a change in a policy or practice, or an alteration to a unit or physical feature of a development due to a disability, will be treated as a request for a reasonable accommodation or modification, and [Housing Development] will provide the individual with a Reasonable Accommodation/Modification Request Form to complete.

iii.  [Housing Development] will make request forms available in alternate formats upon request (refer to Sections 3.5 and 3.17 on Effective Communication);

iv.  [Housing Development] will provide help to you in completing the form, if you ask for it or someone asks for it on your behalf. See Appendix 4, Documentation of Oral Request for Reasonable Accommodation or Reasonable Modification.

g.  What Happens When I Ask for an Accommodation or Modification?

i.  The person from [Housing Development] will mark the written request with the date of submission, enter into a log, and give a copy of the request to the person making the request; and

ii.  [Housing Development] will promptly process requests for reasonable accommodations and modifications.

h.  Will I Automatically Get My Accommodation or Modification?

When a disability, or the need for a specific accommodation, is not obvious, [Housing Development] may request verification of the existence of the disability; that the accommodation or modification requested is necessary due to disability (that there is a connection between the functional limitations of the disability and the requested accommodation/ modification) and that the accommodation is necessary for the household to have equal use and enjoyment of a dwelling.  Any reliable third party with relevant information may provide the verification.  It need not be a doctor, medical provider or professional.  [Housing Development] will not inquire into the specifics of the disability (such as the diagnosis) or the severity of the disability beyond these inquiries, and will not request medical records.

i.  [Housing Development] will keep any personal, disability related or medical information gathered during the reasonable accommodation or modification process confidential. This information will be maintained in files separate from the person's tenant file.  [Housing Development] will share information about the requested accommodation only with staff members who specifically need to know for purposes of managing the [Housing Development], or as required by these policies, or as legally required;

    ii.   [Housing Development] will ask in writing if it needs any additional information to process the request (unless otherwise requested);

    iii.  [Housing Development] will document all attempts to verify the existence of disability and the need for requested accommodation, and update the tenant of progress in a timely manner.

i.  Processing Requests for Accommodations/Modifications

[Housing Development] will look at the following things when deciding whether to grant your request:

    i.   Does the person making the request, or his/her household member, have a disability?

    ii.  Is there a clear nexus, or relationship, between the functional limitations of the disability and the accommodation or modification requested?

If the answer to the above questions is yes, [Housing Development] will grant the request, except as set out in the next section.

j.  When Can [Housing Development] Deny a Request for Accommodations or Modifications?

[Housing Development] will only deny a request if:

    i.   There is no disability;

    ii.  There is no nexus (relationship) between the disability and the request.  For example, if a person who uses a wheelchair but who does not have a vision disability requested materials in Braille, the individual might not be able to show a nexus (relationship) between his or her mobility disability and the request for Braille materials;

    iii. After engaging in an interactive process to determine whether alternative accommodations or modifications would serve the needs of the person with a disability, [Housing Development] determines that granting the request would pose an undue burden on [Housing Development]; or

    iv. After engaging in an interactive process to determine whether alternative accommodations or modifications would serve the

needs of the person with a disability, [Housing Development] determines that granting the request would fundamentally alter the nature of the [Housing Development's] program.

[Housing Development] will evaluate these considerations on a case-by-case basis.  The question [Housing Development] will ask is: "Could we offer this particular accommodation right now given our current obligations and resources?"  A reasonable accommodation/modification is made based on a specific request; therefore, [Housing Development] will not consider whether they could offer this accommodation to everyone who might possibly ask for it.

k.  Decisions to Approve or Deny Requests

[Housing Development will make a decision to approve or deny a specific request in writing as soon as possible, but no later than 30 days after all information pertinent to the need for the accommodation or modification has been received.  See Appendix 5, Approval or Denial of Reasonable Accommodation or Reasonable Modification Request.

Once a reasonable accommodation or modification agreement is reached that is agreeable to both parties, [Housing Development] will note the agreement in the tenant's records.  An accommodation should be put into effect as soon as practicable.  A modification must be undertaken and completed in a timely manner.

Notice of approval for a modification must state clearly when the work for the modification is expected to commence, as well as the time frame for completion.

If [Housing Development] makes a decision to deny a request for a reasonable accommodation or modification, it will put the decision in writing, and will clearly state the reason for the decision.  A decision to deny a request for reasonable accommodation or modification will be made in writing by senior property management staff who will document the reasons for approval of the decision to deny the request.  The notice of denial will provide information about how to initiate an appeal/grievance. See Appendix 5, Approval or Denial of Reasonable Accommodation or Reasonable Modification Request.

If a reasonable modification request is granted, and the subsequent construction would be such that the tenant requires relocation for a limited period of time, [Housing Development] will provide temporary relocation. This is an eligible project expense.

### 3.15  Assistance Animals (including Service Animals)

a.  The Laws that Apply

A variety of state and federal laws provide tenants, prospective tenants with disabilities, and tenant's guests the right to have an **assistance animal**, pursuant to the reasonable accommodations policies and procedures set forth above.  State and federal laws also give people with disabilities who visit or live in a housing development the right to be accompanied by a **service animal,** which is a specific kind of assistance animal. These rights are discussed separately, below.

b.  What are Assistance Animals?

An assistance animal is not a pet.  It is an animal that works, provides assistance, or performs tasks for the benefit of a person with a disability, or provides emotional support that alleviates one or more identified symptoms or effects of a person's disability.  Examples of functions that assistance animals may perform include guiding people who are blind or have low vision, alerting people who are deaf or hard of hearing to sounds, providing personal protection from environmental hazards or rescue assistance, pulling a wheelchair, fetching items, alerting persons to impending seizures, or providing emotional support to persons with disabilities. Assistance animals that provide emotional support and are not specifically trained to do a task are often referred to as "emotional support animals." They may include dogs or other animals.

c.  What are Service Animals?

A service animal is a specific type of Assistance Animal.  Generally, it is a *dog* that has been trained to do work or perform a specific task for a person with a physical, sensory, psychiatric, intellectual or other disability.  Service dogs are trained to take specific action when needed to assist the person with a disability.  Service dogs provide a wide variety of assistance.  They may guide people who are deaf or blind, may fetch items for an individual in a wheelchair, may alert a person with diabetes when blood sugar is low,

may alert a person with depression to take medication, may take specific actions to help someone with an impending anxiety attack or with Post-Traumatic Stress Disorder, or may detect the onset of a seizure in a person with epilepsy and help keep the individual safe during the seizure.  We will refer to service animals in these Policies as "service dogs" for clarity. (In addition to dogs, service animal may also include a miniature horse meeting certain criteria, under a special provision of the law.)

People may have more than one service dog or assistance animal.  For example, a person with a seizure disorder and a visual disability may use one service dog to assist them in navigation and another that is trained as a seizure alert dog.

There is no legal requirement for service dogs to be visibly identified or to have documentation.  Service dogs are not required to wear a vest, ID tag, or special harness. There is no requirement that a service dog have completed a formal training program.  A service dog may have been trained by its owner. A service dog may still be in training.

   d.  When are Service Dogs Allowed?

[Housing Development] permits service dogs in all areas.  Tenants and their guests are allowed to have service dogs in their apartments, and in all public areas of the [Housing Development], even in buildings with "no pets" policies.

[Housing Development] will not demand verification of disability or need for the service dog, and will not inquire as to the nature or extent of the individual's disability.  [Housing Development] will only ask two questions to determine whether a dog is a service animal:

   i.   Is this a service dog that is required because of a disability?
   ii.  What work or tasks has the service dog been trained to perform?

No other inquiry into the disability will be conducted and the service dog will be permitted even without documentation of the disability/need for the animal from a third party.

If the animal is not a dog, or if it does not perform a specific task, then the animal may still be an assistance animal, and permitted as a reasonable accommodation with proper verification (see below).

[Housing Development] will not ask for any documentation about the dog or require that the dog demonstrate its task.

[Housing Development] will not deny access to a service dog unless:

    i.   the dog is out of control and its handler does not take effective steps to control it;

    ii.   the dog is not housebroken (i.e. trained so that, absent illness or accident, the dog controls its waste elimination); or

    iii.   the animal poses a direct threat to the health or safety of others that cannot be eliminated or reduced to an acceptable level by a reasonable accommodation to other policies, practices and procedures.  A determination that a service animal poses a direct threat must be based on an objective, individualized assessment of the specific service animal's actual conduct — not on fears, stereotypes, or generalizations about that type of animal.

If the animal is not admitted due to one of these circumstances, the individual with a disability can still be admitted to the Development without the animal.

### e. When Are Assistance Animals Other than Service Dogs Allowed?

While service dogs are allowed by right, emotional support animals that do not perform specific tasks but provide support by their mere presence may be allowed as a Reasonable Accommodation.  It is important to distinguish between psychiatric service dogs who perform a specific task, and support animals.

[Housing Development] will evaluate a request from a person with a disability for a reasonable accommodation to keep or be accompanied by an assistance animal (other than a service dog described above) using the same procedures and general principles that apply to all reasonable accommodation requests (see Sections 2.11, 3.4 and 3.14).  After receiving the request, [Housing Development] will consider:

    i.  Does the person seeking to have the animal have a disability?
   ii.  Does the person making the request have a disability-related need for an assistance animal?  In other words, does the animal work, provide assistance, perform tasks or services for the benefit of the individual, or provide emotional support that alleviates one or more of the identified symptoms or effects of their disability?

If the answers to questions (1) and (2) are "yes," [Housing Development] will modify or provide an exception to a "no pets" rule or policy to permit a person with a disability to have an assistance animal(s), in all areas of the premises unless doing so would:

     i.  impose an undue financial and administrative burden;
    ii.  would fundamentally alter the nature of the housing development's services;
   iii.  the specific assistance animal in question poses a direct threat to the health or safety of others that cannot be reduced or eliminated by another reasonable accommodation; or
   iv.  the specific assistance animal in question would cause substantial physical damage to the property of others that cannot be reduced or eliminated by another reasonable accommodation.

In making a determination regarding a reasonable accommodation request for an assistance animal, [Housing Development] will comply with all requirements regarding reasonable accommodations in Sections 3.4 and 3.14.

    f.  Putting It Together

When a tenant, applicant or visitor seeks to access a [Housing Development] with an assistance animal, [Housing Development] will first:

     i.  ask whether the animal is a service dog (or miniature horse) required because of a disability and if so,
    ii.  Ask what work or tasks the dog has been trained to perform.

If the answer to question 1 is yes, and the dog has been trained to perform work or a task, the animal must be permitted to accompany the person to

all areas where persons are normally permitted to go, unless (1) the animal is out of control and its handler does not take effective action to control it; (2) the animal is not housebroken; or (3) the animal poses a direct threat to the health or safety of others that cannot be eliminated or reduced to an acceptable level by a reasonable modification to other policies, practices, or procedures.

If the dog does not meet the service dog test, or if the animal is not a dog, then [Housing Development] will evaluate the request for an assistance animal according to its usual reasonable accommodation policies and Section 3.14 above.

## 3.16  Guidelines for All Assistance Animals, Including Service Dogs, Living in the Development

For *all* assistance animals, including service dogs, [Housing Development] will apply the following guidelines:

a.  [Housing Development] will not charge additional fees or deposits to an individual with a disability for using an assistance animal.  Tenants can be held liable for any damage or injury the animal actually causes.

b.  [Housing Development] will not exclude specific breeds of animal or species, nor set limits on size or weight.  However, an animal may be excluded if the specific animal in question poses a direct threat to the health or safety of others, or would cause substantial damage to the property of others, and if the situation cannot be reduced or eliminated by reasonable accommodation.

c.  A determination that an assistance animal poses a direct threat will be based on an individualized assessment of the specific animal's actual conduct – not on fears, stereotypes or generalizations.

d.  [Housing Development] will allow the assistance animal to accompany the individual with a disability to all areas of the facility where members of the public are allowed to go, including laundry rooms, recreational areas, offices and dining areas.  Animals, including dogs, may normally be excluded from pools if required by public health rules, but must be allowed on the pool decks and surrounding areas.  There may be specific instances where a

reasonable accommodation allowing a dog in the pool will need to be considered.

e. The individual with the assistance animal is held responsible for the proper disposal of animal waste. Our policies may require that all waste and cat litter be disposed of in a proper manner.  [Housing Development] will allow residents who are unable to comply with these requirements personally to make arrangements for help, such as through family, friends or assistants.

f. The individual with the disability has the responsibility to care for and supervise the assistance animal, including toileting, feeding, grooming, and veterinary care.

g. The individual with the disability must retain full control of the animal at all times.  This means that when an assistance animal is in common areas, it is either under control on a leash, in a carrier, or otherwise under the control of its owner or handler.  Some service animal tasks cannot be completed while on a leash, such as picking up an item at a distance so the animal must be under voice control. When in the presence of others, the animal is expected to be well-behaved.

h. In the event that an owner or handler fails or is unable to exercise proper control of an assistance animal in a common area, [Housing Development] may ask the person to remove the animal from the immediate area. Continual barking in a quiet place may not be appropriate unless it is the task the dog is trained to perform.  If a dog barks just once or barks because someone has provoked it, that does not mean the dog is out of control.

## 3.17  Policy on Effective Communication

a. Overview

[Housing Development] will ensure that communications with applicants and tenants with disabilities are as effective as its communications with people without disabilities.  To meet this obligation, [Housing Development] will provide appropriate auxiliary aids and services to ensure that People with Disabilities have an equal opportunity to participate in, and benefit from, their Housing Development and services provided.

[Housing Development] will provide, **at its expense**, auxiliary aids and services for effective communication with its residents, applicants, and

employees.  People will not be asked or required to provide and/or pay for their own interpreters.  A person with a disability may request a specific type of auxiliary aid or service as his or her preferred method of communication.

   b.  Provision of Auxiliary Aids and Services

Auxiliary aids and services may include, but are not limited to:

     i. Qualified sign language interpreters on-site or through video remote interpreting (VRI) services; note takers; real-time computer-aided transcription services (CART); written materials; exchange of written notes; assistive listening device systems; or other effective methods of making aurally delivered information available to people who are deaf or hard of hearing;

     ii. Qualified readers; taped texts; audio recordings; Brailled materials and displays; screen reader software, magnification software, optical readers on computers available for viewing by applicants or residents; large print materials; accessible electronic and information technology formats for documents supplied by e-mail or on a disc; transcribing non-readable PDF and other digital formats into formats that can be read by screen-readers; or other effective methods of making visually delivered materials available to people who are blind or have low vision;

     iii. Speech-to-Speech relay phone service, or Visually Assisted Speech-to-Speech relay phone service through Skype, for people with speech disabilities;

     iv. Providing oral explanations and assistance in completing forms for people with cognitive or other disabilities.

[Housing Development] will provide, upon request from people who are blind, have low vision, or have cognitive disabilities, forms, notices, and other information in alternative formats, including in response to requests to automatically receive in a requested alternate format all print materials distributed, posted, or made available to applicants and residents.

In determining which auxiliary aids and services to provide, [Housing Development] will give primary consideration to the requests of the individual with a disability unless doing so would result in an undue

financial and administrative burden.  The preferred choice must be honored unless it can be shown that:

    i.   another equally effective means of communication is available;
   ii.   the use of the means chosen would result in a fundamental alteration in the service, program or activity; or
  iii.   the use of the means chosen would result in an undue financial burden to the [Housing Development].

Auxiliary aids and services will be provided in such a way as to protect the privacy and independence of the individual with a disability.

Adult family and friends will not be required or used to interpret, except in an emergency or at the choice of the individual in short, informal interactions that do not involve matters related to admission or occupancy. Children will not be used except in an emergency involving an imminent threat to the safety or welfare of an individual or the public where there is no interpreter available.

When possible and practical, auxiliary aids and services will be provided immediately on an as needed basis, and "walk-in" requests for aids and services will be honored to the extent possible.  However, there may be instances in which it is not possible to provide requested aids and services immediately, such as arranging for Braille materials or American Sign Language Interpreters.  People needing these services should, where possible, make the request for auxiliary aids or services in advance of when needed.

Owners must provide every tenant an opportunity to identify a third person to assist with communications and support and must use HUD Form HUD-92006 (5/09) or an equivalent form to identify such people.  See Appendix 8, HUD Notice of Supplemental and Optional Contact Information for Applicants and Tenants.

## 3.18  Appeal and Grievance Procedures

### [Housing Development will use the following grievance procedures:

a. [Housing Development] will provide timely written notice to an applicant or tenant of any denial of, partial denial of, or delay in responding to any disability related request, including but not limited

to, requests for auxiliary aids and services, reasonable accommodations, reasonable modifications, transfers to Accessible Units, or placement on waiting lists for Accessible Units.  [Housing Development] will also notify an applicant or tenant if she or he is removed from a transfer or waiting list, or of other adverse determination concerning any disability related request or eligibility for a disability preference.

b. The notice will be in the form included in Appendix 5, Approval or Denial of Reasonable Accommodation or Reasonable Modification Request, and will include:

    i.   The name, title, and contact information of an individual who they can contact in regard to the action and the grievance procedure;

    ii.   A description of the action;

    iii.   The reasons for the action with enough specificity to allow the individual to prepare an informed rebuttal;

    iv.   Information about how the tenant or applicant can view and copy his or her file and any records related to the adverse action;

    v.   The availability of a meeting with a manager or other supervisory individual not involved in the decision on the action;

    vi.   The time deadlines and process for requesting the meeting in (iv);

    vii.   The availability of reasonable accommodations and effective communication assistance as needed in exercising the rights in the notice; and

    viii.   The location and contact information of the local legal services agency, and at least one local fair housing or disability rights organization.

    ix.   The availability of a grievance procedure through the City of Los Angeles.

c. [Housing Development] will provide the notice sufficiently in advance of any applicable deadline or adverse action.

d. [Housing Development's] grievance procedures include:

    i.   The availability of a meeting to contest the action.  The meeting will be with a manager or other supervisory individual not involved in the decision on the action;

     ii.    The availability of reasonable accommodations and effective communication assistance as needed to participate in the meeting;

    iii.    The right to view and copy the file and any records related to the adverse action;

    iv.    The right to present evidence and witnesses at the meeting;

    v.    The right to be represented or accompanied by a person of his or her choice at the meeting; and

    vi.    The right to receive a written decision within five (5) business days of the outcome of the meeting that states the reason for the decision and the evidence relied on in making the decision.

e. These procedures supplement and do not replace any notice and grievance procedures required by HUD, any funding sources, or other applicable law.

f. The right to notice and the grievance process are in addition to [Housing Development's] obligation to engage in the interactive process with an individual who has requested a reasonable accommodation or modification.

g. Applicants and tenants are not be required to exhaust these grievance procedures before seeking other administrative or judicial relief that may be available.

## 3.19 Department on Disability - Information and Referral Resources

a. Information about the rights of people with disabilities, and about securing the provision of auxiliary aids from service providers may be requested by calling the City of Los Angeles' Department on Disability at (213) 202-2748 Voice or (213) 202-3452 TTY.

b. To file a grievance or complaint with the City of Los Angeles, contact [*contact info to be asserted by City before finalization of Policies*]

c. Appendix 9, Resource Guide for Owners, Tenants, and Applicants, contains resources on disability discrimination that may be of interest.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al.* ) ) ) Plaintiffs, ) ) vs. ) ) ) CITY OF LOS ANGELES, ) CALIFORNIA, *et al.* ) ) ) Defendants. ) ) | CASE NO.:  CV 12-0551  FMO (PJWx) **[PROPOSED] JUDGMENT PURSUANT TO  SETTLEMENT AGREEMENT BY AND BETWEEN CITY OF LOS ANGELES AND PLAINTIFFS** |

1

*Independent Living Center of Southern California, et al v. City of Los Angeles, et al., Case No. CV 12-0551 SJO (PJWx)*

[PROPOSED] JUDGMENT

WHEREAS, the City of Los Angeles, a defendant in this action (the "City") and the Independent Living Center of Southern California ("ILCSC"), the Fair Housing Council of the San Fernando Valley ("FHC") and Communities Actively Living Independent and Free ("CALIF") (collectively referred to herein as "Plaintiffs") have entered into a Settlement Agreement and Release of Claims, attached as Exhibit 1, which fully resolves claims asserted by Plaintiffs against the City; and

WHEREAS, the Court has jurisdiction over the subject matter of this action, the Plaintiffs, the City, and the Settlement Agreement; and

WHEREAS, upon consideration, the Court finds the Settlement Agreement to be fair, reasonable, and adequate.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:

1.     For the purposes of this Judgment, the Court adopts the terms and definitions set forth in the Settlement Agreement, and all terms of the Settlement Agreement are incorporated herein by reference.

2.     Plaintiffs' attorneys' fees will be submitted to the Court for determination.  Plaintiffs' Counsel shall submit a fee petition to the Court within forty-five (45) days of the date of the latest signature on the Settlement Agreement.

3.     This Judgment Pursuant to Settlement completely resolves this civil action between Plaintiffs and the City of Los Angeles but does not resolve this action between Plaintiffs and other defendants, including the CRA/LA, a Designated Local Authority, Successor the Community Redevelop Agency of the City of Los Angeles.

4.     In accordance with the terms of the Settlement Agreement, this Court reserves exclusive and continuing jurisdiction to interpret and enforce the terms of the Settlement Agreement during the Settlement Term, and to resolve any disputes that may arise during the Settlement Term.

*Independent Living Center of Southern California, et al v. City of Los Angeles, et al., Case No. CV 12-0551 SJO (PJWx)*

[PROPOSED] JUDGMENT

5.     The court determines that there is no reason to delay entry of this Judgment Pursuant to Settlement Agreement By and Between the City of Los Angeles and Plaintiffs.

**IT IS SO ORDERED and ADJUDGED**

Dated: _____                    _____

                                      The Hon. Fernando M. Olguin
                                      UNITED STATES DISTRICT JUDGE

3

*Independent Living Center of Southern California, et al v. City of Los Angeles, et al., Case No. CV 12-0551 SJO (PJWx)*

[PROPOSED] JUDGMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# Exhibit 1

**Settlement Agreement and Release of Claims**

# EXHIBIT

# B

**Plaintiffs have sought to file this exhibit for *in camera* review.**

# EXHIBIT

# C

**Plaintiffs have sought leave to file this exhibit under seal.**

# EXHIBIT

# D







# Expert Report

*Independent Living Center of Southern California, et al.*
*v.*
*City of Los Angeles, et al.*

Case No. 12-cv-00551-FMO (C.D. Cal.)





March 24, 2016

**Bill Hecker, AIA**
*Accessibility Consultant*

Member American Institute of Architects
Alabama Architect - 3339
Colorado Architect - 202381
Georgia Architect - 7309
Louisiana Architect - 6717

3568 Hampshire Drive
Birmingham, AL 35223
(205) 298-1900 office

(205) 298-1900 fax
(205) 907-8155 cell
Bill@HeckerDesign.info

**Got Access?**

# TABLE OF CONTENTS

I.      Introduction ................................................................................................ 1

II.     Qualifications ............................................................................................. 2

III.    Documents and Information Reviewed/Relied On in Preparation For This Report ................ 7

IV.     General Methodology ............................................................................... 19

   A.   Accessibility Requirements ................................................................ 19

      1.   Section 504 ................................................................................. 19

      2.   The Americans With Disabilities Act ........................................ 21

      3.   Discussion ................................................................................... 23

      4.   California Government Code Section 11135 .............................. 25

      5.   Standards Applicable to This Review ........................................ 26

      6.   California Building Code ............................................................ 26

   B.   Procedural History/Background Provided by Counsel ....................... 29

   C.   Assigned Accessibility Analyses ....................................................... 31

V.      Review of Developments for Accessibility ............................................. 35

   A.   ADAAG Consulting Services Site Inspection Report Reviews .......... 35

      1.   Introduction ............................................................................... 35

      2.   ADAAG Report Review Methodology ...................................... 36

      3.   ADAAG Report Review Conclusions ........................................ 37

   B.   Randomized Measurement Reviews .................................................. 48

      1.   Introduction ............................................................................... 48

      2.   Randomized Measurement Review Methodology ...................... 48

      3.   Randomized Measurement Review Conclusions ........................ 55

i

4.      Additional Measurement Reviews.................................................................. 59

C.   Randomized Plan Reviews ................................................................................. 60

1.      Introduction ................................................................................................. 60

2.      Randomized Plan Review Methodology ..................................................... 60

3.      Randomized Plan Review Conclusions........................................................ 63

4.      Additional Plan Reviews ............................................................................. 72

D.   Plan Review for Post-Filing Developments........................................................ 74

E.   Review of Five Developments for Compliance With the California Building Code ............ 75

A.   Conclusions by Funding and Type of Construction ........................................... 78

1.      Federally-Funded New Construction............................................................ 78

2.      Non-Federally-Funded New Construction ................................................... 79

3.      Federally-Funded Rehabilitations................................................................ 80

4.      Non-Federally-Funded Rehabilitations ....................................................... 81

5.      All New Construction................................................................................... 82

6.      All Rehabilitations........................................................................................ 83

7.      All Federally-Funded Developments............................................................ 84

8.      All Non-Federally-Funded Developments ................................................... 85

9.      All Developments in CRA Housing Portfolio.............................................. 86

B.   Summary Conclusions ........................................................................................ 86

## I.      Introduction

I have been engaged by Plaintiffs' counsel to conduct an analysis of whether multifamily apartment housing developments ("developments") assisted by Defendants—the City of Los Angeles ("City") and the now-dissolved Community Redevelopment Agency for the City of Los Angeles ("CRA")—are accessible to individuals with disabilities under the applicable federal accessibility standards, including Section 504 of the Rehabilitation Act of 1973 ("Section 504") and Title II of the Americans with Disabilities Act (the "ADA"). As described in further detail below, my analysis included: (1) accessibility analysis of ADAAG reports conducted by the City's consultant(s); (2) accessibility analysis of as-built conditions including measurements and photographs for a randomly generated sample of developments at issue in this litigation; and (3) accessibility analysis of as-approved conditions by conducting plan reviews for a randomly generated sample of developments at issue in this litigation that received occupancy approval by the Los Angeles Department of Building and Safety ("LADBS").

I have been compensated as follows: I was paid $500 for each analysis of the accessibility of an individual development, including review of ADAAG reports, other site inspections, and plan reviews. Early in this case, I was paid $250 per hour and my assistant Frank Colby was paid $200 per hour to conduct on-site reviews and prepare accessibility reports for five developments. For trial preparation and other additional work, my hourly rate for all tasks other than testimony is $250 per hour, plus reimbursable expenses. For testimony at deposition and trial, my fee is $350 per hour, plus reimbursable expenses. No portion of these fees was or is dependent on the nature of my findings or on the outcome of the case.

## II.      Qualifications

I am an architect who is certified by the National Council of Architectural Registration Boards for reciprocity in the various states and I am licensed to practice architecture in Alabama, Colorado, Louisiana, and Georgia. I have a Bachelor of Architecture degree from Louisiana State University. I have more than twenty-five years of experience working in the area of accessible design and have learned from the first generation of accessibility specialists who broke new ground with the implementation of early federal accessibility laws (i.e., The Architectural Barriers Act of 1968 and the Rehabilitation Act of 1973).

I am not an attorney and do not offer any legal opinions, but as an experienced accessibility consultant I do offer extensive technical assistance related to rules and regulations associated with the accessibility provisions of federal, state and local laws. I have been judicially recognized as having "extensive experience in the field of [Americans with Disabilities Act] compliance sufficient to qualify . . . as an expert in this field." *United States v. AMC Entm't, Inc.*, 245 F. Supp. 2d 1094, 1096 (C.D. Cal. 2003) (order granting government's motion for partial summary judgment). Additionally, in November 2014, District Court Judge Saundra Armstrong stated the following in the case, *Ivana Kirola, et al. v. City & County of San Francisco, et al.*, Case No. C 07-3685 SBA (N. D. Cal. Nov. 26, 2014) (unpublished findings of fact and conclusions of law):

- "The Court finds Hecker, who serves as a consultant to the DOJ in ADA enforcement actions, to be a credible witness and credits his testimony accordingly." *Id.* at 26:15-16.

- "Hecker, a licensed architect, was received by the Court as an expert in architecture and disability access." *Id.* at 41:12-13.

- "The Court finds Hecker, the City's access expert, to be credible, and finds the City's

2

priorities for curb ramp installation, as set forth in the Curb Ramp and Sidewalk Transition Plan, to be consistent with the priorities and recommendations established by the DOJ." *Id.* at 46:1-4.

- "The Court is likewise persuaded by Hecker, who provided testimony regarding program access to the City's library program and RecPark programs." *Id.* at 55:1-2.

I served as a member of the Public Rights of Way Accessibility Advisory Committee to the United States Access Board and helped to draft specific recommendations that have been used as the basis for proposed Americans with Disabilities Act Accessibility Guidelines for public rights-of-ways. I have served as the "Task Group" leader on ADA issues for the American Institute of Architects' building codes and standards committee. I also have ongoing dialogues with organizations, such as the American Institute of Architects and the National Council on Independent Living, during comment periods for the proposed new ADA and Architectural Barriers Act accessibility guidelines.

I devote my entire professional practice to questions of architectural accessibility. This interest began in 1981, when a teenager with Spina Bifida saw a public demonstration of my martial arts troupe and asked if we might teach him self-defense. During the ensuing five years that I helped to adapt the kung fu forms for him and other wheelchair users, I came to understand for the first time the unique challenges those who use wheelchairs face in everyday activities. This experience influenced my architectural studies to the extent that I participated in a design competition for the 1983 International Summer Special Olympics and was one of a few architectural students on the winning team selected by the Special Olympics officials because of our creative mixture of accessibility and functionality.

3

After the Americans with Disabilities Act passed and while I was working at Evan Terry Associates, Inc., I authored the *Americans with Disabilities Act Facilities Compliance Workbook,* a seminal publication which is the most comprehensive book on ADA facility compliance available. This book was later reorganized and condensed for use by non-design professionals and sold through John Wiley & Sons publishing as *Americans with Disabilities Act Facilities Compliance: A Practical Guide*. I have also authored articles for national publications, including *How Will the Americans with Disabilities Act Affect You?* for the American School & University Journal and *Architect Offers Advice on Conducting ADA Site Evaluations* for the Thompson Publishing Group ADA Compliance Guide Monthly Bulletin.

During the process of researching for these books and articles, I interviewed many people with disabilities and government officials tasked with the development of the ADA Accessibility Guidelines and other federal accessibility guidelines. I worked closely with Mr. Ron Mace, FAIA, a nationally recognized accessibility specialist and a pioneer in the field of architectural accessibility. I am an "Instructor" in the Office of Executive Education at the Harvard University Graduate School of Design in Cambridge, MA and have developed and conducted more than 100 training seminars in 26 states, the Caribbean, Guam, and Australia. I have trained architects, builders, and building owners on the accessibility requirements of the ADA, Fair Housing Amendments Act, Architectural Barriers Act, and the Rehabilitation Act of 1973, including accessibility seminars specifically tailored for architects and engineers at the following locations: the American Institute of Architects national convention in Chicago; the Construction Specifications Institute in Birmingham, AL; Einhorn, Yafee, Prescott Architects ADA Seminar in Albany, NY; Hawaii Architectural Access Board Seminar in Honolulu, HI; Kurt/Voit/Geuest Architects in Dallas, TX; Woolpert Consultants in Dayton, OH and Hilton Head, SC; RTKL Architects in Baltimore, MD and Washington, DC; AEC

4

Systems National Conference in Anaheim, CA; Gulf States AIA Regional Convention in Bay Point, FL; the Institute of Transportation Engineers Convention in Melbourne, Australia; and, the Western Region American Institute of Architects Convention in Reno, NV. I have also provided in-house training on accessibility issues to law firms, including the following: Powell, Tally, Frederic Law Firm of Birmingham, AL; Serote Permut Law Firm of Birmingham, AL; and the Law Offices of Jackson/Lewis of New York, NY.

I have had both governmental and private clients. I have been hired to advise the Architect of the Capitol on accessibility issues related to the proposed underground addition to the Capitol Building in Washington, DC, as well as exterior accessibility circulation around Capitol Square. I have advised major US companies on accessible design issues, including: IBM, Rockwell International, Wal-Mart, Winn Dixie Grocery Stores, and Ruby Tuesday Restaurants. My opinion has been sought by governmental and university clients, including the United States Department of Justice, the Department of Housing and Urban Development, the Illinois Attorney General's Disability Rights Bureau, the City and County of Honolulu, George Washington University, University of Florida, MARTA-Metro Atlanta Regional Transit Authority, Duke University, and the University of California system. Architects and engineers from around the country seek my opinions on accessibility issues and ask me to advise them on specific project design concerns.

I have reviewed plans for and done accessibility evaluations of many apartment complexes and other types of facilities, including: condominiums, hotels, retail stores, transportation stations, homes, hospitals, office buildings, restaurants, nursing homes, and senior citizen centers to name a few. I have analyzed many complex site and building accessibility problems and designed solutions for those problems which properly balance the sometimes conflicting needs of various disability

5

groups. I have been on panels where experts debated and discussed the finer points of accessible design and answered impromptu audience questions.

For more than thirty years, I've had the chance to teach and work with many persons with disabilities who have shared with me direct life experiences and challenges. I have moved beyond an academic understanding of accessibility to a real life, hands-on appreciation for the practical difficulties encountered by people with disabilities, such as: the difficulties facing manual wheelchairs when encountering steep slopes and cross slopes; how someone who has braces on his legs that lock his ankle in an "L-shape" can easily trip on open stair risers; the difficulties of draining a urine bag in a public restroom urinal without having the urine back-flow into the catheter tube; the problems encountered in keeping a wheelchair from rolling away before sliding out of a car's front seat into it; and the difficulties associated with making tight 180 degree turns, wheelies, and going through doors in a wheelchair without scraping the skin off your knuckles.

The combination of my professional education, the lessons learned from my mentors, the 30+ years of one-on-one relationships with individuals who have disabilities, the extensive professional research conducted during the process of writing two seminal accessibility books, the experience gained in surveying more than 500 buildings and thousands of pages of architectural plans for accessibility make up, in general, the basis for my opinions on how buildings and facilities can be made accessible for people with disabilities. Additionally, the opinions stated herein are based upon my knowledge, training and experience, and have been rendered within a reasonable degree of professional certainty.

In addition to the qualifications mentioned above that make up the basis of my opinions, I have attached as Exhibit 1 my *curriculum vitae*, which includes all my project experience and workshop instruction on accessibility issues, as well as a list of publications I have contributed to

6

and/or authored within the last ten years. It also includes all of the other cases I have testified in at

trial and/or deposition within the past five years.

III.    **Documents and Information Reviewed/Relied On in Preparation For This Report**

      1.     ADAAG reports for the following developments:

- 36th & Broadway Apartments (TAY Facility Housing)

- Adams and Central

- Afton Place (Minami Apartments; Minomi Apartments)

- Amistad Plaza

- Andalucia Senior Apartments

- Ardmore Apartments (The Ardmore)

- Asturias Senior Apartments

- Bonnie Brae Apartment Homes

- Boyle Hotel Apartments

- Broadway Plaza Apartments

- Bronson Court

- Buckingham Place Senior Housing

- Cantabria Senior Citizen Apartments

- Carondelet Court Partners, L.P.

- Casa Rampart

- Casa Verde

- Charles Cobb

- Colorado Terrace Senior Apartments

- Columbus Permanent Housing (Penny Lane Centers; Columbus Permanente)

- Columbus Square

- Crossings at 29th Street

- Crossings at North Hills

- Cuatro Vientos

- Decro Osborne Apartments (Osborne Place; Osborne Family; Osborne Gardens)

- Don Senior Apartments (Don Hotel Apartments; Don Carlos Apartments; Hotel Senior)

- Downtown Women's Center (Renaissance Building)

- Dunbar Village

- Eastside Village (Lillian Mobley)

- El Dorado Apartments

- Encore Hall (Triangle Square)

- Eugene Hotel

- FAME West 25th (FAME Western)

- Far East Building

- Gallery at NoHo Commons

- Grandview 9

- Hart Village Apartments (Owensmouth Apartments)

- Heavenly Vision Seniors

- Hobart Heights Apartments (The Hobart)

- Hoover Senior (Hoover Seniors Apartments)

- Hope Manor

8

- Imani Fe East & West

- Ivy Terrace (Three Courtyards)

- Juanita Villas (Juanita SRO; La Kretz Villas)

- La Coruna

- La Estrella Apartments

- Las Margaritas

- Lofts at NoHo Commons (NoHo Commons Phase II)

- Main Street Vistas

- Menlo Family Housing

- Menlo Park

- Metro Hollywood Apartments (Hollywood Western Apartments; Western Carlton Phase II)

- Montecito Terraces (Montecito Terraces Senior Apartments)

- Morgan Place Senior Apartments

- Normandie Terrace

- Orion Gardens Apartments (Decro Orion)

- Palm Village Senior Citizens

- Palomar Apartments

- Paseo Del Sol (Soto Apartments)

- Pico Gramercy Housing

- Professional Housing & Development

- Rainbow Apartments

- Renato Apartments

9

- Rittenhouse

- Rosa Parks Villas

- Seven Maples Senior Apartments

- Stovall Villa

- Sunrise

- Terre One

- Tierra Del Sol

- Toberman Village

- Two Worlds

- Union Point

- Vermont Avenue

- Vermont Seniors

- Villas at Gower

- Villas Del Lago

- Villas Las Americas

- Vista Monterey Senior Housing

- Washington Court (Washington Village)

- Western Carlton Apartments (Carlton Court Apartments)

- Woodland Terrace

- Yale Terrace Apartments

2.    Architectural plans for the following developments:

- 1600 Vine (Hollywood & Vine Mixed Use)

- 28th Street YMCA (28th Street Apartments)

- 36th & Broadway Apartments (TAY Facility Housing)

- 3804 Wisconsin Apartments (Henderson Homes)

- 3839 Wisconsin Apartments II (Robinson Villas)

- Academy Village (Lincoln Academy Village)

- Adams and Central

- Adams West

- Afton Place (Minami Apartments; Minomi Apartments)

- Andalucia Senior Apartments

- Argyle Apartments

- Arminta Square (Reseda Ranch)

- Asturias Senior Apartments

- Bellevue Apartments

- Bonnie Brae Apartment Homes

- Boyle Hotel Apartments

- Bricker

- Broadway Villas

- Bronson Court

- Cantabria Senior Citizen Apartments

- Carlton Apartments

- Carlton Hotel

- Caroline Severance

11

- Carondelet Court Partners, L.P.

- Carter House

- Casa Carondelet

- Casa Del Sol

- Casa Esperanza

- Casa Gloria

- Central Avenue Village Apartments; Central Village Apartments

- Central Avenue Village Square

- Charles Cobb

- Chinatown Metro

- Clark Residence Ltd. Partnership

- Colden Oaks

- Colorado Terrace Senior Apartments

- Columbus Permanent Housing (Penny Lane Centers; Columbus Permanente)

- Courtland Hotel

- Crescent Arms (Fremont Building; Crescent Village)

- Crossings at 29th Street

- Cuatro Vientos

- Decro Osborne Apartments (Osborne Place; Osborne Family; Osborne Gardens)

- Downtown Women's Center (Renaissance Building)

- Edward Hotel

- El Dorado Apartments

- Eleventh Avenue Apartments

- FAME Gardens

- Far East Building

- Florence Avenue Villas

- Ford Apartments (Ford Hotel)

- Fumbah Manor

- Gateways Apartments

- Golden Years Senior Apartments

- Gordon

- Harmony Gardens (Harmony II)

- Harmony Gate

- Harmony Place Apartments (Harmony Plaza)

- Hart Village (Owensmouth Apartments)

- Haskell Hotel

- Hobart Heights Apartments (The Hobart)

- Hollyview Apartments

- Hollywood Bungalow Court

- Hollywood El Centro Apartments

- Imani Fe East & West

- Irolo Senior Housing

- Juanita Villas (Juanita SRO; La Kretz Villas)

- La Brea (Franklin Apartments)

13

- La Jolla Hotel (Liberty Village)

- La Villa Mariposa

- Las Americas Hotel

- Las Casitas Apartments

- Las Margaritas

- Leonide Hotel

- Magnolia Villas

- Menlo Park

- Metro Hollywood Apartments (Hollywood Western Apartments; Western Carlton Phase II)

- Metropolitan Lofts (Met Lofts)

- Montecito Apartments

- Montecito Terraces (Montecito Terraces Senior Apartments)

- Morgan Place Senior Apartments

- New Hampshire Apartments

- New Hampshire Family Apartments

- NoHo Senior Villas (HFL Garden Villa Homes)

- Osborne Street (Osborne Apartments)

- P & P Home for the Elderly

- Pacific Avenue Arts Colony

- Palmer Hotel (Palmer House)

- Paradise Arms

- Parkside Apartments (Eexcel Apartments)

14

- Pascual Reyes Apartments

- Paseo Del Sol (Soto Apartments)

- Pico Union Plaza

- Produce Hotel

- Professional Housing & Development

- Renato Apartments

- Riverwalk at Reseda (Kittridge Family)

- Roberta Stephens Villas

- Rosslyn Hotel

- Rosslyn Lofts (Frontier Hotel)

- San Pedro Firm Building

- Security Lofts Building

- Serrano (The Serrano)

- Seventh & Coronado Apartments (Emerald Star)

- Silvercrest Hollywood Residence (Hollywood Silvercrest)

- St. Andrews Bungalow Court

- Stovall Villa

- Strong Residence

- Sunflower Norton Apartments

- Sunrise

- Telacu Senior Manor - L.A.

- Telacu Vistas (Monterey Hills; Telacu Vistas Del Sol)

15

- Tobias Terrace

- Vermont Avenue

- Views at 270 (Sunset Western)

- Villa Del Pueblo Apartments

- Villa Esperanza

- Villa Flores (1010 Senior Housing Corp.)

- Villa Metropolitano

- Villas at Gower

- Villas Del Lago

- Ward Villas

- Washington Court (Washington Village)

- Watson Terrace II

- Weldon Hotel

- Westminster Park Plaza

- Whittier

- Wilcox Apartments

- Woodland Terrace

3. Measurements and photographs provided by Creative Design Associates for the following developments:

- 1600 Vine (Hollywood & Vine Mixed Use)

- Adams West

- Carlton Hotel

16

- Casa Del Sol

- Courtland Hotel

- Florence Avenue Villas

- Haskell Hotel

- Hollywood Bungalow Court

- La Jolla Hotel (Liberty Village)

- Magnolia Villas

- Menlo Park

- Metropolitan Lofts (Met Lofts)

- Montecito Terraces (Montecito Terraces Senior Apartments)

- Palmer Hotel (Palmer House)

- Produce Hotel

- Villa Esperanza

- Woodland Terrace

4. The following statutes, regulations, and related guidance:

- The Rehabilitation Act of 1973.

- 28 CFR part 41 - Coordinating regulations for Section 504 of the Rehabilitation Act issued by the Department of Justice.

- 28 CFR part 8 – Housing and Urban Development regulations for Section 504 of the Rehabilitation Act.

- Uniform Federal Accessibility Standards.

- UFAS Retrofit Manual – April 1991 by Barriers Free Environments, Inc for US

17

Architectural and Transportation Barriers Compliance Board – Washington, DC, *available at* https://ia600807.us.archive.org/27/items/retrofitmanualde00unit/retrofitmanualde00unit.pdf.

- Americans with Disabilities Act of 1990

- 28 C.F.R. part 35 – ADA Title II regulations issued by the Department of Justice.

- 28 C.F.R. part 36 – ADA Title III regulations issued by the Department of Justice.

- 1991 ADA Standards for Accessible Design.

- 2010 ADA Standards for Accessible Design.

- Federal Rule of Civil Procedure 26.

- ADA Title II Action Guide by Adaptive Environments, Inc.

- Inspection methodology developed during the site inspections and reports I conducted with Frank Colby at: 1) Buckingham Senior Apartments; 2) Grandview 9 Apartments; 3) Broadway Village II Apartments; 4) Case Verde Apartments; and 5) Amistad Apartments (described further below).

- Letter of April 9, 2013 from Beth Pepper, Attorney, Housing and Civil Enforcement Section, Civil Rights Section, Department of Justice to John H. Catlin and Douglas A. Mohnke of LCM Architects re: *United States v. Post Properties, Inc., et al.*, Case No. 10-1866 (RJL) (D.D.C.).

- California Government Code Section 11135 website, *available at* http://www.rehab.cahwnet.gov/DisabilityAccessInfo/CA-Gov-Code-Sec-11135-11138.html.

18

- California Building Code and/or California Division of State Architect Access Compliance Reference Manuals for the following years: 1987; 1989; 1994; 1999; 2001; 2004; 2007; 2010; 2013.

5. The following additional documents:

- The Second Amended Complaint.

- Information provided by counsel on funding, type of construction, developments selected based on statistician's randomizations, and construction start date for developments.

- Information and technical assistance from the US Department of Justice website at www.ADA.gov.

- California Health and Safety Code § 19850 regarding plan retention.

## IV. General Methodology

### A. Accessibility Requirements

#### 1. Section 504

The federal government has a long history of passing laws that assist people with disabilities in navigating the built environment more effectively. In 1973, the Rehabilitation Act was signed into law and as I understand it, Section 504 (often referred to as simply 504) of this act states that "[n]o otherwise qualified handicapped individual in the United States…shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." While each federal agency sets its own regulations regarding compliance with Section 504, for housing or residential programs all federal agencies defer to the regulations published by the Department of Housing and Urban Development ("HUD").

19

HUD's regulations, 24 C.F.R. § 8.22 and 24 C.F.R. § 8.32, specify that recipients of federal financial assistance from HUD ("recipients") must comply with the accessibility provisions of the Uniform Federal Accessibility Standards ("UFAS"). As a practicing architect and accessibility consultant, I have had to become familiar with these technical standards so that I could apply them to my analyses of whether recipients have complied with their obligations under Section 504. These standards have been in force since July 1988, and broadly available to recipients, architects and other design professionals. Below are relevant excerpts from these HUD Section 504 regulations:

**§ 8.22 New construction—housing facilities.**
(a) New multifamily housing projects . . . shall be designed and constructed to be readily accessible to and usable by individuals with handicaps.
(b) Subject to paragraph (c) of this section, a minimum of five percent of the total dwelling units or at least one unit in a multifamily housing project, whichever is greater, shall be made accessible for persons with mobility impairments. A unit that is on an accessible route and is adaptable and otherwise in compliance with the standards set forth in § 8.32 is accessible for purposes of this section. An additional two percent of the units (but not less than one unit) in such a project shall be accessible for persons with hearing or vision impairments.

**§ 8.32 Accessibility standards.**
(a) Effective as of July 11, 1988, design, construction, or alteration of buildings in conformance with sections 3–8 of the Uniform Federal Accessibility Standards (UFAS) shall be deemed to comply with the requirements of §§ 8.21, 8.22, 8.23, and 8.25 with respect to those buildings. Departures from particular technical and scoping requirements of the UFAS by the use of other methods are permitted where substantially equivalent or greater access to and usability of the building is provided. . . . .
(b) For purposes of this section, section 4.1.6(1)(g) of UFAS shall be interpreted to exempt from the requirements of UFAS only mechanical rooms and other spaces that, because of their intended use, will not require accessibility to the public or beneficiaries or result in the employment or residence therein of individuals with physical handicaps.
(c) This section does not require recipients to make building alterations that have little likelihood of being accomplished without removing or altering a load-bearing structural member.
(d) For purposes of this section, section 4.1.4(11) of UFAS may not be used to waive or lower the minimum of five percent accessible units required by § 8.22(b) or to apply the minimum only to projects of 15 or more dwelling units.

20

(e) Except as otherwise provided in this paragraph, the provisions of §§ 8.21(a) and (b), 8.22 (a) and (b), 8.23, 8.25(a) (1) and (2), and 8.29 shall apply to facilities that are designed, constructed or altered after July 11, 1988. If the design of a facility was commenced before July 11, 1988, the provisions shall be followed to the maximum extent practicable, as determined by the Department. For purposes of this paragraph, the date a facility is constructed or altered shall be deemed to be the date bids for the construction or alteration of the facility are solicited. For purposes of the Urban Development Action Grant (UDAG) program, the provisions shall apply to the construction or alteration of facilities that are funded under applications submitted after July 11, 1988. If the UDAG application was submitted before July 11, 1988, the provisions shall apply, to the maximum extent practicable, as determined by the Department.

In broad terms, these regulations require new construction after July 11, 1988 to provide a heightened level of accessibility as described by UFAS, which exceeds the obligations imposed by most state and local accessibility requirements, including those in the California Building Code ("CBC"). From my own experience with these standards and my interactions with people with disabilities, I have come to understand that people with serious mobility, vision, and hearing impairments are likely to require this heightened level of accessibility in order to be able to live in and enjoy the benefits of rental housing.

## 2.      The Americans With Disabilities Act

In 1990, President George H.W. Bush signed the Americans with Disabilities Act (ADA) into law. The ADA is a comprehensive and sweeping disability rights law. The accessibility provisions that apply to state and local government entities, such as the City of Los Angeles, are codified in the ADA Title II regulations. Originally published in 1991 and revised in 2010, these regulations, as I understand them, define the specific facility compliance requirements for housing projects and programs. They also stipulate that government entities are not allowed to enter into contractual agreements with other entities that provide services or programs (i.e., develop housing projects) on behalf of the government entity and discriminate against qualified individuals with

21

disabilities by, among other things, not allowing them to "participate in or benefit from the aid, benefit, or service" that is equal to that "afforded others." 28 C.F.R. §35.130(b)(1). In other words, in the context of this litigation, these regulations prohibit the City and CRA from contracting with or financially assisting developers, owners, and managers of multifamily rental properties that are built or operated in a manner that does not comply with the accessibility requirements of the ADA.

The ADA regulations that went into effect in 1992 required that "[e]ach facility or part of a facility constructed by, on behalf of, or for the use of a public entity shall be designed and constructed in such manner that the facility or part of the facility is readily accessible to and usable by individuals with disabilities, if the construction was commenced after January 26, 1992." 28 C.F.R. § 35.151. It identified UFAS and the 1991 ADA Standards (without the elevator exception) as accessibility standards. However, because the 1991 ADA Standards did not specifically address architectural accessibility requirement for residential facilities and UFAS does, myself and others in the field rely on UFAS[1] for residential facility compliance analysis. Thus, in practice and in this report, the provisions of UFAS for ADA compliance apply to multifamily residential developments where construction began prior to 2010.

In 2010, the Department of Justice adopted new accessibility standards for residential developments ("2010 ADA Standards"). The regulations allowed developers the choice to use either UFAS or 2010 ADA Standards for projects where construction began between September 15, 2010

---

[1] The 1991 ADA Title II regulations allowed the use of the 1991 ADA Standards (without the elevator exemption) as an alternate accessibility standard to UFAS, but the 1991 ADA Standards did not include accessibility provisions for residential dwelling projects.

22

and March 15, 2012, but mandated the use of the 2010 ADA Standards for projects constructed after March 15, 2012. 28 C.F.R. § 35.151(c).

In an attempt to harmonize the accessible design provisions applicable to residential facilities under both ADA and Section 504, HUD published a deeming notice on May 23, 2014. *See* 79 Fed. Reg. 29671. This notice allows entities that receive federal financial assistance to use the 2010 ADA Standards (with minor modifications) as an alternative to UFAS, the specified accessibility standard under HUD's regulations for Section 504 of the Rehabilitation Act.

### 3.    Discussion

The facility compliance requirements of Section 504 and the ADA are not difficult to understand. They both divide these requirements into three categories, each of which has relevance to what the City and CRA must do with respect to the multifamily housing developments that are the subject of this litigation:

- **New Construction** requirements (discussed above);

- **Alterations** requirements; and,

- **Existing Facility** accessibility requirements (i.e., "program accessibility" for state and local governmental entities).

Under Section 504 and to the maximum extent feasible, virtually all covered properties undergoing renovation must comply with the same UFAS technical requirements that are applicable to new construction.[2] Public entities like the City and CRA must now also comply with the alteration provisions set forth in the 2010 ADA Standards.[3]

_____

[2] This is set forth in HUD Regulation 24 C.F.R. § 8.23:
     **Alterations of existing housing facilities.**

Some of the projects reviewed in this matter were alterations projects subject to the 2010 ADA provisions listed above and were analyzed based on those requirements with the recognition that strict compliance is tempered by the "maximum extent feasible" language of the regulations. I did not have access to adequate cost information necessary to properly analyze the "path of travel" obligations, so no opinions were offered regarding that provision of the ADA regulations.

---

(a) Substantial alteration. If alterations are undertaken to a project (including a public housing project as required by § 8.25(a)(2)) that has 15 or more units and the cost of the alterations is 75 percent or more of the replacement cost of the completed facility, then the provisions of § 8.22 shall apply.

(b) Other alterations. (1) Subject to paragraph (b)(2) of this section, alterations to dwelling units in a multifamily housing project (including public housing) shall, to the maximum extent feasible, be made to be readily accessible to and usable by individuals with handicaps. If alterations of single elements or spaces of a dwelling unit, when considered together, amount to an alteration of a dwelling unit, the entire dwelling unit shall be made accessible. Once five percent of the dwelling units in a project are readily accessible to and usable by individuals with mobility impairments, then no additional elements of dwelling units, or entire dwelling units, are required to be accessible under this paragraph. Alterations to common areas or parts of facilities that affect accessibility of existing housing facilities shall, to the maximum extent feasible, be made to be accessible to and usable by individuals with handicaps. For purposes of this paragraph, the phrase to the maximum extent feasible shall not be interpreted as requiring that a recipient (including a PHA) make a dwelling unit, common area, facility or element thereof accessible if doing so would impose undue financial and administrative burdens on the operation of the multifamily housing project.

[3] 28 C.F.R. § 35.151 provides:

(b) Alterations.

(1) Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities, if the alteration was commenced after January 26, 1992.

(2) The path of travel requirements of § 35.151(b)(4) shall apply only to alterations undertaken solely for purposes other than to meet the program accessibility requirements of § 35.150.

24

Another HUD regulation (24 C.F.R. § 8.20) for Section 504 states the following with regards to accessibility and the requirements of federal financial assistance recipients to ensure newly constructed and altered facilities are accessible and that existing facilities housing such programs or activities meet the "program accessibility" provisions:

> **§ 8.20 General requirement concerning program accessibility.**
> Except as otherwise provided in §§ 8.21(c)(1), 8.24(a), 8.25, and 8.31, no qualified individual with handicaps shall, because a recipient's facilities are inaccessible to or unusable by individuals with handicaps, be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination under any program or activity that receives Federal financial assistance.

The applicability of this "program accessibility" requirement is discussed in greater detail in the Expert Report of John L. Wodatch.

### 4.    California Government Code Section 11135

California Government Code Section 11135 provides that:

> (a) No person in the State of California shall, on the basis of race, national origin, ethnic group identification, religion, age, sex, sexual orientation, color, genetic information, or disability . . . be unlawfully subjected to discrimination under[] any program or activity that is conducted, operated, or administrated by the state or by any state agency, is funded directly by the state, or receives any financial assistance from the state.

Compliance with California state law is explicitly linked to compliance with the ADA, as Section 11135(b) essentially adopts certain ADA statutory provisions related to basic non-discrimination provisions for people with disabilities:

> (b) With respect to discrimination on the basis of disability, programs and activities subject to subdivision (a) shall meet the protections and prohibitions contained in Section 202 of the federal Americans with Disabilities Act of 1990 (42 U.S.C. § 12132), and the federal rules and regulations adopted in implementation thereof, except that if the laws of this state prescribe stronger protections and prohibitions, the programs and activities subject to subdivision (a) shall be subject to the stronger protections and prohibitions.

25

As I understand it, the reference to the ADA Title II regulations includes the provisions associated with accessibility in newly constructed, altered, and existing facilities, and would be applicable to the residential projects that are the subject of this litigation. Thus, compliance with Section 11135 means compliance with UFAS and, after March 15, 2012, the ADA Standards as described in the chart below.

### 5.      Standards Applicable to This Review

For the purposes of my accessibility review of new construction and alteration projects in this matter, I based my accessibility evaluations related to Section 504, the ADA, and Section 11135 on the following accessibility standards depending on the date of the plans and/or the development's construction start date:

| Date | Section 504 Standard | ADA Standard | 11135 Standard |
|:---:|:---:|:---:|:---:|
| On or after July 11, 1998 but before January 26, 1992 | UFAS | n/a | n/a |
| On or after January 26, 1992 but before January 1, 1993 | UFAS | UFAS | n/a |
| On or after January 1, 1993 but before March 15, 2012 | UFAS | UFAS | UFAS |
| On or after March 15, 2012[4] | UFAS | 2010 ADA Standards | 2010 ADA Standards |

### 6.      California Building Code

I have been informed that City agencies claim to have evaluated many of the developments in this litigation for compliance with the accessibility requirements of the California Building Code (CBC), rather than the federal accessibility standards. Based upon my knowledge and experience

---

[4] Again, as noted above, the ADA regulations allowed developers the choice of using either UFAS or 2010 ADA Standards for projects where construction began between September 15, 2010 and March 15, 2012, but mandated the use of the 2010 ADA Standards for projects constructed after March 15, 2012. 28 C.F.R. § 35.151(c).

with these standards, I have concluded that the CBC provides significantly less accessibility than does UFAS. UFAS requires that certain dwelling units in a development be made fully accessible to individuals with disabilities; the CBC, much like the Fair Housing Act, requires that dwelling units be made adaptable but not accessible. As a consequence, multifamily developments meeting CBC requirements may fail to offer the level of accessibility needed by people with serious mobility, vision and hearing impairments. There are certain things that are required by both federal accessibility standards and the CBC[5]–for example, newly constructed ramp slopes are limited to 8.3% maximum, in accessible dwelling units removable base cabinets are allowed under sinks and lavatories, accessible parking spaces and associated access aisles are limited in slope to 2%, and accessible counters are limited to a maximum height of only 34". However, there are also some significant differences. I have listed below a few examples of how the requirements for federally accessible dwelling units are more stringent than the requirements set forth in the CBC:

> 1. A 60" turning space is required in all accessible rooms in UFAS dwelling units so wheelchair users can turn around in each room; there is no such provision for CBC 11A covered units.[6]
>
> 2. Patio doors under UFAS must not have more than a ¾" high threshold for sliding exterior doors and no more than a ½" high threshold for other patio doors; the CBC allows a 4" level change at exterior patio doors.[7]
>
> 3. In UFAS dwelling units, the toilet in the accessible bathroom must be centered 18" from the side wall; the CBC lacks any location specification for toilets.[8]

---

[5] The CBC is updated every three years. For purposes of this comparison, I will look at CBC Chap. 11A 1999-2001 version that was applicable for many of the residential projects reviewed in this matter.

[6] UFAS § 4.34.2(2).

[7] UFAS §§ 4.34.2(6); 4.13.8; CBC 1120A.2.4 Exception 4.

[8] UFAS § 4.34.2(12) & 4.34.5; CBC 1109A.3.

4. In UFAS dwelling units, door-maneuvering clearances required for wheelchair users to approach and open the doors are larger and more extensive than those required by the CBC.[9]

5. In UFAS dwelling units, the closet rod/shelf must be within a maximum 54" height so that it is within the reach range of an individual in a wheelchair reach range; the CBC has no such provision.[10]

6. In UFAS dwelling units, there must be Consumer Information provided within the unit to alert residents of adaptability provisions and installation instructions for things like removable base cabinets at sinks or the future installation of grab bars at a toilet; the CBC does not require such information to be made provided in dwelling units.[11]

7. In UFAS dwelling units, a 3 feet by 3 feet transfer shower or a 30" minimum width and 60" minimum length roll-in shower must be provided; the CBC allows a hybrid transfer/roll-in shower that is 42 inches wide by 48 inches long which would not meet the more traditional UFAS shower configurations.[12]

8. In UFAS dwelling units, a minimum 80" head height must be provided along accessible routes so visually-impaired residents or visitors are less likely to hit their head; the CBC has no such allowance for visually-impaired users.[13]

9. In UFAS dwelling units, an in-tub seat must be provided for bathtubs; no such provision is found in the CBC.[14]

10. In UFAS dwelling units, an accessible shower wand on a hose in accessible tubs and accessible showers must be provided; fixed shower heads are specifically allowable under the CBC.[15]

11. In UFAS dwelling units, doors may not swing into the clear floor space of any fixture; the CBC allows doors to swing into the clear floor space of bathroom fixtures if there is a 30" x 48" space outside the swing of the door.[16]

---

[9] UFAS §§ 4.34.2(6); 4.13.6; CBC 1109A.1, 1120A2.4.2.
[10] UFAS §§ 4.34.2(8); 4.25.
[11] UFAS § 4.34.4.
[12] UFAS § 4.34.5.5(1); CBC Fig. 11A-91.
[13] UFAS §§ 4.34.2(3); 4.3.5.
[14] UFAS § 4.34.5.4(2)
[15] UFAS §§ 4.34.5.4(5); 4.34.5.5(5); CBC Table 1009A.2-1 and 1109A.2-2.
[16] UFAS § 4.34.5.1; CBC Table 1009A.2-1 and 1109A.2-2.

12. In UFAS dwelling units, all passage doors must allow a minimum of 32" clear passage width; the CBC allows 34" wide doors (offering a 32" "nominal clear space") regardless of the clear passage width resulting.[17]

My colleague, Glenn Dea, has evaluated many of the developments for compliance with the CBC. As noted in his Expert Report and below in Section V.E., notwithstanding review by LADBS and issuance of certificates of occupancy, there is substantial noncompliance with CBC accessibility requirements in developments that are the subject of this litigation.

### B.    Procedural History/Background Provided by Counsel

Counsel represented the following to me as background for my analysis: This case concerns the CRA Housing Portfolio ("Portfolio"), which is made up of approximately 253 multifamily apartment housing developments ("developments") that received some form of financial or other assistance from Defendants.[18] All of these developments should have been built in compliance with the accessibility provisions set forth in one or more of the following statutes: Section 504 of the Rehabilitation Act of 1973 ("Section 504"), Title II of the Americans with Disabilities Act (the "ADA"), and/or Section 11135 of the California Government Code ("Section 11135"), and accompanying regulations.

All three of these statutory schemes required Defendants to evaluate the accessibility of these developments as a whole. Thus, it is appropriate to look at the accessible units or lack thereof at all

---

[17] UFAS §§ 4.34.2(6); 4.13.5; CBC 1109A.1 Exception.

[18] The Portfolio consists of multifamily housing developments containing five or more dwelling units that received assistance from the Community Redevelopment Agency (CRA) or its successor the CRA/LA, a Designated Local Authority. The Portfolio does not include single family homes or homeless shelters or transitional housing unless there are five or more dwelling units. Assistance from the CRA or CRA/LA includes any grant, loan, bond financing, land, rent subsidy, or reduction or any other arrangement in the form of funds, real property, or any interest in or use of such property. Assistance from the CRA or CRA/LA does not include density bonuses.

253 of these developments together to evaluate Defendants' compliance with their Portfolio-wide obligations.

In addition, to ensure that similarly-situated developments were evaluated together, the Portfolio was also divided into four categories.[19] Some developments were direct recipients of federal funding and thus had additional, independent obligations to comply with Section 504 beyond their responsibility to ensure accessibility throughout the entire housing program. In addition, some developments received assistance to engage in the construction of a new multifamily housing complex, while other developments received assistance to rehabilitate an existing structure. Thus, the four categories were:

1.  Federally-Funded New Construction[20]

2.  Non-Federally-Funded New Construction

3.  Federally-Funded Rehabilitations

4.  Non-Federally-Funded Rehabilitations

Because the Portfolio is too large to independently inspect and examine, Plaintiffs used a process of randomization to evaluate the Portfolio. *See* Statistician's Expert Report. Based on

---

[19] In addition, ten developments in the Portfolio were subjected to individualized review as opposed to being included in the randomizations. The loan agreements for these developments were signed after the Complaint was filed in this lawsuit on January 13, 2012. Thus, because Defendants might have conducted themselves differently after they were put on notice as to the issues raised in this lawsuit, and in an abundance of caution, those developments were considered on an individual basis. These developments are referred to as the "Post-Filing Developments" and are discussed further below at Section V.D.

[20] Four federally-funded developments contained elements of both new construction and rehabilitation of existing elements: 28th Street YMCA/28th Street Apartments, 1006 E. 28th Street, Las Margaritas, 115 N. Soto Street, Chinatown Metro, 808-810 Spring Street, and Ford Apartments/Ford Hotel, 1000 E. 7th Street. They were placed in both applicable categories. These developments have been starred throughout this report for reference.

information available to them at the time, Plaintiffs' counsel created a list of federally-funded new construction and non-federally-funded new construction in 2014 and provided them for randomization. In July of 2015, the City of Los Angeles's production of electronically stored information contained spreadsheets that identified a large number of additional developments that were part of the Portfolio, including additional new construction projects. To ensure that those developments were included in the Portfolio and the randomization, Plaintiffs' counsel created a list of newly-identified federally-funded new constructions and newly-identified non-federally funded new constructions. At that time, Plaintiffs' counsel also created a full list of all federally-funded rehabilitation developments and all non-federally-funded rehabilitation developments. Thus, there were six lists that were provided for randomization.

Each of those six lists was randomized twice so that two independent reviews could be performed: randomized plan review and randomized measurement review. The randomizations assigned each development on the list a random number. The list could then be sorted from smallest to largest number, and a random sample could be selected by going down the list in order.

Plaintiffs also received measurements and photographs taken by third party consultants performing on-site accessibility inspections for the Defendant City of Los Angeles ("ADAAG Reports"). *See* Order of July 17, 2015 (ECF No. 458). ADAAG Reports were produced for 82 of the developments in the Portfolio.

### C.    Assigned Accessibility Analyses

Plaintiffs' counsel retained me to perform three different accessibility analyses. First, I reviewed all of the ADAAG reports provided to see if the measurements and photographs taken by Defendants' consultants at developments in the Portfolio demonstrated compliance or lack of compliance with the applicable federal accessibility standards. My review process and findings for

31

these reports are discussed further at Section V.A. below.

Second, I reviewed measurements and photographs taken during on-site inspections for compliance with applicable federal accessibility standards. The developments reviewed were assigned by Plaintiffs' counsel in accordance with the six randomized lists created for randomized measurement review. The majority of the measurements and photographs were taken in inspections conducted by Creative Design Associates under the supervision of Glenn Dea, AIA, ICC, CASp. The remaining measurements and photographs were either taken by me and my team or consultants retained by the City of Los Angeles. My review process and findings for these reports are discussed further at Sections V.A., V.B., and V.E.

Third, I reviewed copies of blueprints and/or architectural drawings ("building plans") for compliance with applicable federal accessibility standards. The developments for which I received building plans were assigned to me by Plaintiffs' counsel in accordance with the six randomized lists created for randomized plan review.[21] My plan review process and findings for these reports are discussed further below at Section V.C.

For purposes of this report, I was asked to assign a "pass" or a "fail" assessment for each development I reviewed, using the applicable accessibility standards. Technically, in new and altered residential facilities the determination of non-compliance (or a "fail") would occur where there is any deviation from the specific applicable new construction or alteration provisions of UFAS or the ADA Standards. However, in this report I have employed a less rigorous standard of "meaningful accessibility," under which a development "fails" only if the violations found are of a type or

32

frequency that would prevent someone with a disability from being able to use important portions of their dwelling unit and/or common-use facilities. Doing so ensures that minor deviations or purely technical noncompliance does not cause a development to "fail" in the absence of actual barriers to accessibility. Some examples of violations that, in my experience, demonstrate a lack of meaningful accessibility are: no room in the accessible dwelling unit bathroom such that an individual using a wheelchair cannot enter the bathroom and close the door behind them; insufficient clear floor space in front of the sink in the bathroom or kitchen to allow a forward approach in a wheelchair so an individual can wash their hands or their dishes; doorways that are not wide enough for an individual in a manual wheelchair to maneuver without scraping the knuckles on their hands on the door frames as they pass; stairs or steps that make it difficult or impossible for wheelchair users to enter a space; and lack of lowered kitchen counters or cabinets in accessible dwelling units. Thus, I used my professional judgment to review developments for an overall level of "meaningful accessibility," and then determined whether the development "passed" or "failed."

This approach is in accord with that used by the Department of Justice. *See* Letter of April 9, 2013 from Beth Pepper, Attorney, Housing and Civil Enforcement Section, Civil Rights Section, Department of Justice to John H. Catlin and Douglas A. Mohnke of LCM Architects re: *United States v. Post Properties, Inc., et al.*, Case No. 10-1866 (RJL) (D.D.C.)., attached as Exhibit 2. The U.S. Department of Justice stated in that letter that the reason for instructing their expert witness to edit his findings using what I refer to as "acceptable deviations" or "additional noted violations" was "to streamline the presentation of the issues in the case" and "to narrow the issues for litigation."

---

[21] I also performed plan reviews for the Post-Filing Developments and for a handful of developments where additional information revealed that the development had been placed in the wrong category

The acceptable deviations defined in the DOJ letter are divided into slope measurements and dimensional measurements using a tape measure. Regarding slope measurements, the federal accessibility standards categorize them into either running slopes or cross slopes. Running slopes are the slope or angle of the walking surface in the direction of pedestrian travel. UFAS and 2010 ADA Standards both specify that walking surfaces with a slope from level (0%) to 5% is accessible without ramp features. DOJ instructed their expert to accept deviations in running slope up to 1% so only walkways with running slopes beyond 6% would be cited in litigation. For running slopes between 5% - 8.3%, UFAS requires specific ramp features such as: accessible handrails on each side (if the ramp run rise is above 6"), edge protection to keep wheelchair users from accidently falling off the sides, and the availability of 60" long level landings at the top, bottom and where ramps change direction or rise more than 30" in height. For ramp running slopes, DOJ litigated those that were above 9%.

For vertical or horizontal dimensions identified in the federal accessibility standards, the DOJ acceptable deviations were dependent on the specific dimension required in the federal accessibility standards. For dimensions specified in the standards as 1½" to 3", the acceptable deviation was ½" in the DOJ letter. For dimensions specified in the standards as 3" to 96", the acceptable deviation was 1". An example of the smaller dimension is the distance required of ramp handrails off the adjacent wall surface, which is specified in UFAS as 1½". The DOJ acceptable deviation was ½", so the acceptable measurements would be 1" to 2". An example of specified dimensions between 3" and 96" is associated with the centerline distance between the toilet and the adjacent wall, which is required to be 18" per UFAS, but the DOJ acceptable deviation was 1", so my litigation opinion

for randomization. See Section V.C.

34

regarding the accessibility placement of a toilet in an accessible toilet stall is between 17" and 19"—beyond that is an accessibility violation.

Another DOJ acceptable deviation applies to a very common accessibility barrier, the cross slope along accessible routes. Basically, cross slopes are the angle of the pavement as measured perpendicular to the dominant direction of pedestrian traffic and are also associated with the limit of the slope at door stoops, as well as accessible parking space/access aisles. The UFAS and ADA Standards limit cross slopes to 2% maximum, but as with running slopes, the DOJ has established a 1% acceptable deviation in their letter. Following their lead, I will not cite violations for these slopes unless they exceed 3.0%.

In sum, while smaller violations have been noted to demonstrate the widespread failure to comply with the appropriate accessibility standards, my determination of whether a development "passed" or "failed" is based on an assessment of "meaningful accessibility," by which I mean whether violations of a type or frequency exist at the development that significantly impede the ability of an individual with disabilities from being able to use important portions of their dwelling unit and/or common-use facilities.

## V.    Review of Developments for Accessibility

### A.    ADAAG Consulting Services Site Inspection Report Reviews

#### 1.    Introduction

Plaintiffs received ADAAG Reports in discovery, which contained measurements and photographs taken by third party consultants ADAAG Consulting Services, who performed on-site accessibility inspections for Defendant City of Los Angeles for 82 of the developments in the Portfolio.

35

I was provided with the 83 ADAAG Reports that corresponded to the 82 developments in the Portfolio for my review. Each ADAAG report, as received, contained a development name and address, and listed a series of measurements taken and, if applicable, corresponding photograph(s).

## 2.    ADAAG Report Review Methodology

It is my understanding, based on the measurements documented in these reports, that ADAAG Consulting Services inspected multi-family residential projects included in this litigation to document ADA, Section 504, CBC, and Fair Housing Act (FHA) accessibility barriers. The Court allowed Plaintiffs to obtain the redacted ADAAG Consulting Services reports of requested residential complexes that included the following categories of information:

- Site name & address;

- Whether the accessibility measurement was for an element in the building or on the site;

- The floor level upon which the measured accessibility element was located;

- The dwelling unit number, if applicable;

- The dwelling unit type (e.g., 2 bedroom/1 bath unit type);

- The room or area where the measured accessibility element was located;

- The physical measurement associated with the accessibility element (e.g., closet rod 66" AFF (which stands for "above finish floor")); and,

- The photograph number of the measured accessibility element (digital inspection photos were also provided by ADAAG Consulting Services).

I reviewed these redacted inspection reports and using a "mark-up" feature in the Adobe Acrobat computer program was able to document UFAS and/or ADA accessibility violations based on the measurements and photographs we received. My findings are listed in the ADAAG

36

spreadsheets as "mark-up" boxes situated next to the original ADAAG Consulting Services measurements. Each of my "mark-up" boxes (colored red) includes the citation for the particular UFAS and/or ADA accessibility provision that sets a standard that the measured feature did not comply with, as well as the measurement that would be appropriate for that particular feature.

### 3. ADAAG Report Review Conclusions

I reviewed 83 ADAAG Reports that corresponded to 82 developments. All 83 of those reports included violations of the federal accessibility standards sufficient to justify a "fail," which translates to a lack of meaningful accessibility of the development to a person with disabilities.

Again, in new and altered residential facilities, the determination of non-compliance (or a "fail") is a standard where any deviation from the specific applicable new construction or alteration provisions of UFAS or the ADA Standards is evidence that the facility in question does not comply with the rules and regulations. However, as discussed above, I decided to use a standard of "meaningful accessibility." Thus, a development "fails" only if the violations found are of a type or frequency that would prevent someone with a disability from being able to use important portions of their dwelling unit and/or common-use facilities. Applying these standards, all 82 of 82 developments "failed," or 100% "failed."

Attached as Exhibit 3 is a summary chart that describes the specific number of federal accessibility standard violations identified at each development, the number of dwelling unit entry and path of travel[22] violations, the number of dwelling unit bathroom violations, the number of dwelling unit kitchen violations, the number of other violations in the dwelling unit, the number of

violations in the development common use and public use areas and facilities, and the number of accessible route violations.

Common accessibility violations found in the site inspection measurement reviews prepared by ADAAG Consulting Services include, but are not limited to: accessible parking space violations affecting the disabled residents ability to transfer from the vehicle to their wheelchairs; inaccessible door maneuvering clearances in dwelling units and along approach routes which make it difficult for wheelchair users to effectively approach and operate doors and gates; door thresholds that were too high or lacked the necessary beveled edges in a manner that could eject a wheelchair user; steep slopes and cross slopes that could tip wheelchair users backwards or off the path; many wall or ceiling mounted elements that were not cane detectable and could injure blind or visually impaired residents or guests; lack of accessible door hardware that is easier for those with limited grasping ability to operate; steps or inaccessible abrupt level changes along routes that are required to be accessible for wheelchair users; lack of wheelchair maneuvering clearance required in kitchens and bathrooms; and, narrow doors that might lead to scraped knuckles for wheelchair users.

The chart below identifies each development for which an ADAAG Report was received and reviewed for compliance with federal accessibility standards,[23] the file name of the original ADAAG Report(s), whether the development received federal funding directly, the construction type (new construction or rehabilitation), the coverage based on construction start date, the Exhibit to this

---

[22] The use of the phrase "path of travel" in this context is not associated with the provisions of the ADA Title II regulations (28 C.F.R. §35.151(b)(2)) for alteration projects, but simply relates to the approach route to the facility from site arrival points.
[23] The analysis of these ADAAG reports for compliance with the California Building Code can be found in the Expert Report of Glenn Dea.

Report at which my detailed report can be found, and the result of my evaluation.[24] All 82

developments are subject to Section 504, ADA, and Section 11135. 64 of these developments are

federally-funded new construction projects, one is a non-federally funded new construction project,

16 are federally-funded rehabilitation projects, and one is a federally-funded project that contains

both new construction and rehabilitation elements.

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| 36th & Broadway Apartments (TAY Facility Housing) | 4775 South Broadway.pdf | 4777 S. Broadway; 4775 S. Broadway | Yes | New | 504, ADA, 11135 | 4 | Fail |
| Adams and Central | Adams & Central.pdf | 1011 E. Adams Boulevard | Yes | New | 504, ADA, 11135 | 5 | Fail |
| Afton Place (Minami Apartments; Minomi Apartments) | Afton Place Apartments.pdf | 6230-6231 Afton Place | Yes | New | 504, ADA, 11135 | 6 | Fail |
| Amistad Plaza | Amistad Plaza.pdf | 6050-6130 S. Western Avenue | Yes | New | 504, ADA, 11135 | 7 | Fail |
| Andalucia Senior Apartments | Andalucia Senior Apartments.pdf | 15305 Lanark Street | Yes | New | 504, ADA, 11135 | 8 | Fail |
| Ardmore Apartments (The Ardmore) | Ardmore Apartments.pdf | 959 S. Ardmore Avenue | Yes | Rehab | 504, ADA, 11135 | 9 | Fail |

---

[24] The existence of direct federal funding, the construction type, and the construction start date were all provided by Plaintiffs' counsel.

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Asturias Senior Apartments | Asturias Senior Apartments.pdf | 9628 Van Nuys Boulevard | Yes | Rehab | 504, ADA, 11135 | 10 | Fail |
| Bonnie Brae Apartment Homes | Bonnie Brae Apartments.pdf | 501 S. Bonnie Brae Street; 505 S. Bonnie Brae Street | Yes | New | 504, ADA, 11135 | 11 | Fail |
| Boyle Hotel Apartments | Boyle Hotel LP.pdf | 101-105 N. Boyle Avenue; 1781-1785 E. 1st Street | Yes | New | 504, ADA, 11135 | 12 | Fail |
| Broadway Plaza Apartments | Broadway Plaza (Blackstone).pdf | 901 S. Broadway | Yes | New | 504, ADA, 11135 | 13 | Fail |
| Bronson Court | Bronson Court.pdf | 1227-1239 N. Bronson Avenue | Yes | New | 504, ADA, 11135 | 14 | Fail |
| Buckingham Place Senior Housing (Buckingham Senior Apartments) | Buckingham Senior Apartments.pdf | 4020-4070 Buckingham Road | Yes | Rehab | 504, ADA, 11135 | 15 | Fail |
| Cantabria Senior Citizen Apartments | Cantabria Senior Apartments.pdf | 9640 N. Van Nuys Boulevard; 9628 Van Nuys Boulevard | Yes | New | 504, ADA, 11135 | 16 | Fail |
| Carondelet Court Partners, L.P. | Carondelet Court Apartments.pdf | 812 & 816 S. Carondelet | Yes | New | 504, ADA, 11135 | 17 | Fail |

40

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Casa Rampart | Casa Rampart - 401.pdf | 401 S. Rampart Boulevard; 512 S. Rampart Boulevard | Yes | New | 504, ADA, 11135 | 18 | Fail |
| Casa Verde | Casa Verde Apartments.pdf | 1552 Schrader Boulevard | Yes | Rehab | 504, ADA, 11135 | 19 | Fail |
| Charles Cobb | Charles Cobb.pdf | 521 S. San Pedro Street | Yes | Rehab | 504, ADA, 11135 | 20 | Fail |
| Colorado Terrace Senior Apartments | Colorado Terrace.pdf | 2455 Colorado Boulevard | Yes | New | 504, ADA, 11135 | 21 | Fail |
| Columbus Permanent Housing (Penny Lane Centers; Columbus Permanente) | Columbus Permanente.pdf | 8900-8906 Columbus Avenue | Yes | New | 504, ADA, 11135 | 22 | Fail |
| Columbus Square | Columbus Square.pdf | 8557-8613 Columbus Avenue | Yes | New | 504, ADA, 11135 | 23 | Fail |
| Crossings at 29th Street | The Crossing on 29th Street.pdf | 814 E. 29th Street; 818, 828, 838 E. 29th Street | Yes | New | 504, ADA, 11135 | 24 | Fail |
| Crossings at North Hills | Crossings at North Hills.pdf | 9311-9345 Sepulveda Boulevard | Yes | Rehab | 504, ADA, 11135 | 25 | Fail |
| Cuatro Vientos | Cuatro Vientos.pdf | 5331 E. Huntington Drive | Yes | Rehab | 504, ADA, 11135 | 26 | Fail |

41

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Decro Osborne Apartments (Osborne Place; Osborne Family; Osborne Gardens) | Osborne Gardens.pdf | 12360 Osborne Street | Yes | Rehab | 504, ADA, 11135 | 27 | Fail |
| Don Senior Apartments (Don Hotel Apartments; Don Carlos Apartments; Hotel Senior | Hotel Senior Apartment (AKA Don Hotel).pdf | 105 E. I Street | Yes | New | 504, ADA, 11135 | 28 | Fail |
| Downtown Women's Center (Renaissance Building) | Downtown Women's Center.pdf | 501 E. Fifth Street; 434 S. San Pedro Street | Yes | New | 504, ADA, 11135 | 29 | Fail |
| Dunbar Village | Dunbar Village.pdf | 4201 S. Central Avenue | Yes | New | 504, ADA, 11135 | 30 | Fail |
| Eastside Village (Lillian Mobley) | Eastside Village Apartments.pdf | 2250 E. 111st | Yes | Rehab | 504, ADA, 11135 | 31 | Fail |
| El Dorado Apartments | El Dorado.pdf | 12129 El Dorado Avenue | Yes | New | 504, ADA, 11135 | 32 | Fail |
| Encore Hall (Triangle Square) | Encore Hall.pdf | 1602 Ivar Avenue | Yes | Rehab | 504, ADA, 11135 | 33 | Fail |
| Eugene Hotel | Eugene Hotel.pdf | 560 S. Stanford Avenue | Yes | New | 504, ADA, 11135 | 34 | Fail |
| FAME West 25th (FAME Western) | FAME WeStreetpdf | 1940 W. 25th Street | Yes | New | 504, ADA, 11135 | 35 | Fail |

42

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Far East Building | Far East Building.pdf | 347-353 E. First Street | Yes | New | 504, ADA, 11135 | 36 | Fail |
| Gallery at NoHo Commons | Gallery at NoHo Commons.pdf | 5416 Fair Avenue | Yes | New | 504, ADA, 11135 | 37 | Fail |
| Grandview 9 | Grandview Nine Apartments.pdf | 916-920 S. Park View Street; 2300 W. 9th Street | Yes | New | 504, ADA, 11135 | 38 | Fail |
| Hart Village (Owensmouth Apartments) | Hart Village Apartments.pdf | 6941 Owensmouth Avenue; 6927 N. Owensmouth Avenue | Yes | New | 504, ADA, 11135 | 39 | Fail |
| Heavenly Vision Seniors | Heavenly Vision Senior Housing.pdf | 9426 S. Broadway; 9500 S. Broadway | Yes | Rehab | 504, ADA, 11135 | 40 | Fail |
| Hobart Heights Apartments (The Hobart) | Hobart Heights.pdf | 924 S. Hobart Boulevard | Yes | New | 504, ADA, 11135 | 41 | Fail |
| Hoover Senior (Hoover Seniors Apartments) | Hoover Seniors Apartments.pdf | 6212 S. Hoover Street | Yes | New | 504, ADA, 11135 | 42 | Fail |
| Hope Manor | Hope Manor.pdf | 1332 S. Hope Street | Yes | New | 504, ADA, 11135 | 43 | Fail |
| Imani Fe East & West | Imani Fe East.pdf; Imani Fe West.pdf | 10424 S. Central Avenue | Yes | New | 504, ADA, 11135 | 44 | Fail |
| Ivy Terrace (Three Courtyards) | Ivy Terrace.pdf | 13751 Sherman Way | Yes | Rehab | 504, ADA, 11135 | 45 | Fail |

43

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Juanita Villas (Juanita SRO; La Kretz Villas) | La Kretz Villas.pdf | 335 N. Juanita Avenue | Yes | New and Rehab | 504, ADA, 11135 | 46 | Fail |
| La Coruna | La Coruna Senior Apartments.pdf | 15301 Lanark Street; 8107 N. Sepulveda Boulevard | Yes | New | 504, ADA, 11135 | 47 | Fail |
| La Estrella Apartments | La Estrella.pdf | 1979 Estrella Avenue | No | New | 504, ADA, 11135 | 48 | Fail |
| Las Margaritas* | Las Magaritas.pdf | 115 & 137 N. Soto Street | Yes | New and Rehab | 504, ADA, 11135 | 49 | Fail |
| Lofts @ NoHo Commons (NoHo Commons Phase II) | The Lofts as NoHo Commons.pdf | 11136 Chandler Boulevard; 11135 W. Weddington Street | Yes | New | 504, ADA, 11135 | 50 | Fail |
| Main Street Vistas | Main Street Vistas.pdf | 5950 S. Main Street | Yes | New | 504, ADA, 11135 | 51 | Fail |
| Menlo Family Housing | Menlo Family Apartments.pdf | 1230-1240 Menlo Avenue | Yes | New | 504, ADA, 11135 | 52 | Fail |
| Menlo Park | Menlo Park Apartments.pdf | 831 W. 70th Street | Yes | New | 504, ADA, 11135 | 53 | Fail |
| Metro Hollywood Apartments (Hollywood Western Apartments; Western Carlton Phase II) | Metro Hollywood Phase II.pdf | 5450 Hollywood Boulevard | Yes | New | 504, ADA, 11135 | 54 | Fail |

44

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Montecito Terraces (Montecito Terraces Senior Apartments) | Montecito Terraces Senior Apartments.pdf | 14653-14661 W. Blythe Street | Yes | New | 504, ADA, 11135 | 55 | Fail |
| Morgan Place Senior Apartments | Morgan Place Apartments.pdf | 7301 S. Crenshaw Boulevard | Yes | New | 504, ADA, 11135 | 56 | Fail |
| Normandie Terrace | Normandie Terrace.pdf | 541 S. Mariposa Avenue; 540 S. Normandie Avenue | Yes | New | 504, ADA, 11135 | 57 | Fail |
| Orion Gardens Apartments (Decro Orion) | Orion Gardens.pdf | 8955 Orion Avenue (8947 Orion Avenue) | Yes | Rehab | 504, ADA, 11135 | 58 | Fail |
| Palm Village Senior Citizens | Palm Village.pdf | 9040 Laurel Canyon Boulevard; 9034 Laurel Canyon | Yes | New | 504, ADA, 11135 | 59 | Fail |
| Palomar Apartments | Palomar Apartments.pdf | 5473 Santa Monica Boulevard | Yes | New | 504, ADA, 11135 | 60 | Fail |
| Paseo Del Sol (Soto Apartments) | Paseo Del Sol.pdf | 417 N. Soto Street | Yes | New | 504, ADA, 11135 | 61 | Fail |
| Pico Gramercy Housing | Pico Gramercy.pdf | 1244 S. Gramercy Place; 3201 W. Pico; 3215 S. Gramercy | Yes | New | 504, ADA, 11135 | 62 | Fail |
| Professional Housing & Development | Professional Housing Development.pdf | 1020 S. Kingsley Drive | Yes | New | 504, ADA, 11135 | 63 | Fail |

45

| Development Name | Report Name(s) | Address | Direct Fed. Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Rainbow Apartments | Rainbow Apartments.pdf | 635 S. San Pedro; 643 S. San Pedro | Yes | New | 504, ADA, 11135 | 64 | Fail |
| Renato Apartments | Renato Apartments.pdf | 531 S. San Julian Street | Yes | New | 504, ADA, 11135 | 65 | Fail |
| Rittenhouse | Ritten House.pdf | 3300-3320 S. Central Avenue | Yes | New | 504, ADA, 11135 | 66 | Fail |
| Rosa Parks Villas | Rosa Parks Villas.pdf | 2440 S. Crenshaw Boulevard; 2507 S. Bronson Avenue | Yes | New | 504, ADA, 11135 | 67 | Fail |
| Seven Maples Senior Apartments | Seven Maples.pdf | 2618-2630 W. 7th Street (2530 W. 7th Street) | Yes | New | 504, ADA, 11135 | 68 | Fail |
| Stovall Villa | Stoval Villas.pdf | 535 W. 41st Street | Yes | New | 504, ADA, 11135 | 69 | Fail |
| Sunrise | Sunrise Apartments.pdf | 5111-5125 S. Main Street | Yes | New | 504, ADA, 11135 | 70 | Fail |
| Terre One | Terre One.pdf | 5270 S. Avalon | Yes | Rehab | 504, ADA, 11135 | 71 | Fail |
| Tierra Del Sol | Tierra Del Sol.pdf | 7500 Alabama Avenue | Yes | New | 504, ADA, 11135 | 72 | Fail |
| Toberman Village | Toberman Village.pdf | 142 W. Santa Cruz Street | Yes | New | 504, ADA, 11135 | 73 | Fail |
| Two Worlds | Two Worlds Apartments.pdf | 809 23rd Street; 1306 S. Westlake Avenue | Yes | New | 504, ADA, 11135 | 74 | Fail |
| Union Point | Union Point - 420 Union Drivepdf | 420-426 Union Drive | Yes | New | 504, ADA, 11135 | 75 | Fail |

46

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Vermont Avenue | Vermont Avenue Apartments - 4915 S. Vermont Avenue.pdf | 4915 S. Vermont Avenue; 4925 S. Vermont Avenue | Yes | New | 504, ADA, 11135 | 76 | Fail |
| Vermont Seniors | Vermont Senior Housing.pdf | 3901-3925 S. Vermont Avenue; 1015 W. 39th Place | Yes | New | 504, ADA, 11135 | 77 | Fail |
| Villas at Gower | Villas at Gower Apts.pdf | 1720 & 1726 N. Gower Street | Yes | New | 504, ADA, 11135 | 78 | Fail |
| Villas Del Lago | Villas del Lago.pdf | 456-472 S. Lake Street | Yes | New | 504, ADA, 11135 | 79 | Fail |
| Villas Las Americas | Villas Las Americas LP Fund.pdf | 9618 N. Van Nuys Boulevard | Yes | New | 504, ADA, 11135 | 80 | Fail |
| Vista Monterey Senior Housing | Vista Monterrey.pdf | 4647 Huntington Drive N.; 4651 Huntington Drive N. | Yes | New | 504, ADA, 11135 | 81 | Fail |
| Washington Court (Washington Village) | Washington Court.pdf | 1717 E. 103rd Street | Yes | New | 504, ADA, 11135 | 82 | Fail |
| Western Carlton Apartments (Carlton Court Apartments) | Metro Hollywood Phase I.pdf | 5443 Carlton Way | Yes | New | 504, ADA, 11135 | 83 | Fail |
| Woodland Terrace | Woodland Terrace Apartments.pdf | 15532 Nordhoff Street | Yes | New | 504, ADA, 11135 | 84 | Fail |

47

| Development Name | Report Name(s) | Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|---|
| Yale Terrace Apartments | Yale Terrace.pdf | 716-734 Yale Street | Yes | New | 504, ADA, 11135 | 85 | Fail |

**B.     Randomized Measurement Reviews**

**1.     Introduction**

Measurement reviews consist of an experienced accessibility consultant visiting a development to document the as-built conditions at the facility associated with all of the elements required to be accessible by the appropriate accessibility standards and the analysis of the resulting measurements and photographs for compliance with applicable accessibility standards.

**2.     Randomized Measurement Review Methodology**

As described above, the Portfolio was separated into four categories based on funding and type of construction (new construction or rehabilitation). These categories were subject to two independent randomizations by a statistician, one for randomized measurement review and one for randomized plan review.

After those categories were randomized, the first developments in each group were selected for measurement review. I was provided with the list of developments to review – I had no control over what developments were selected for my review.

There were three sources for the measurements used to perform this measurement review. First, I personally performed five on-site inspections reviewing for federal accessibility and CBC compliance in 2013. If a development that I had surveyed as part of those inspections was randomly

48

selected for measurement review, I relied on my earlier inspection.[25] Second, I relied on measurements and photographs taken by Creative Design Associates under the supervision of Glenn Dea, AIA, ICC, CASp. *See* Expert Report of Glenn Dea. As discussed further below, I consulted with Mr. Dea to ensure that he inspected the developments in a way that would capture all of the relevant measurements for federal law compliance.

Third, Defendant City of Los Angeles produced a set of measurements and photographs taken by its consultant in the course of performing on-site inspections at a number of developments (the ADAAG Reports discussed above). Once those were produced to Plaintiffs' counsel and after CDA completed an initial set of contracted site inspections, I relied on those measurements and photographs for any development that came up as part of the randomized measurement review instead of a duplicate site inspection. I reviewed the ADAAG Reports using the methodology discussed in Section V.A, above, for the relevant development to ascertain whether that development complied with the applicable federal accessibility standard.[26]

I worked closely with Mr. Dea throughout this analysis. It was imperative to team up with a local architecture firm in the Los Angeles area that had accessibility knowledge and experience to conduct the bulk of the facility inspections for this matter. Of the California design firms I contacted, CDA had the best accessibility credentials and were able to meet the required schedule as well as my

_____

[25] The three developments that came up in the randomization for which I had already performed a site inspection were Buckingham Place Senior Housing, 4020-70 Buckingham Road, and Grandview 9, 916-920 South Park View Street, both of which were federally-funded new constructions, and Broadway Village II, 5101 South Broadway, which was a non-federally-funded new construction.
[26] I relied on ADAAG Reports to analyze 36th & Broadway Apartments, 4777 S. Broadway; 4775 S. Broadway, Broadway Plaza Apartments, 901 S. Broadway, Casa Rampart, 401 S. Rampart Boulevard, Eugene Hotel, 560 S. Stanford Avenue, Main Street Vistas, 5950 S. Main Street, Renato Apartments, 527-531 S. San Julian, and Two Worlds, 809 23rd Street; 1306 S. Westlake Avenue.

49

strict facility evaluation criteria. Architect and CDA principal, Glenn Dea was the team leader for these facility inspections. He has extensive knowledge and experience in both federal and state (California) accessibility requirements, was one of the first California Certified Accessibility Specialists (CASp) and even worked as a consultant accessibility compliance plan reviewer for the California Division of State Architect (DSA). His detailed qualifications and rates paid are provided in a separate report, but suffice it to say, he was a perfect match for the inspection task I directed his team to perform.

I gave detailed instructions to Mr. Dea and his team related to the specific UFAS, ADA and CBC accessibility compliance review. As the basis for my instructions to the CDA team, I provided the detailed methodology that I had used when I conducted five accessibility inspections early in this litigation with my assistant, Mr. Frank Colby. A sample of the methodology is offered below:

**Facility Compliance Methodology.** Measurements were taken (with associated digital photographs documenting exact measurement locations, conditions and findings) during the on-site survey of site arrival points, project approach routes, common-use facilities, dwelling unit approach routes, and dwelling unit interiors. These measurements were analyzed based on the following accessibility standards or codes (including the associated reference standards):

- 2010 ADA Standards applicable based on Title II "program accessibility" regulations (28 C.F.R. § 35.149; 28 C.F.R. § 35.150)

- California Building Code (from DSA's Calf. Access Compliance Reference Manual dated 1999) Chapter 11A of Title 24 Calf. Code of Regulations

- Section 504 of Rehabilitation Act, HUD regulations 28 C.F.R. part 8, and Uniform Federal Accessibility Standards (UFAS)

50

A representative sample (at least one) of the designated accessible units was selected by property management for detail analysis. Other standard dwelling units in the complex (one of each unit type) were also offered by the property management to aid in understanding the classes of units offered and to aid in the analysis of the California Building Code (CBC) accessibility provisions.

**Number of Accessible Units.** The number of designated accessible dwelling units in a project were compared to the required number associated with the ADA, CBC and 504 requirements. HUD 504 regulations and the 2010 ADA Standards require 5% of the total number of units in new construction to be designed to accommodate mobility impaired residents; and an additional 2% of the units in the building to be designed to accommodate those with hearing or vision impairments by means of auxiliary visual fire/smoke alarms, audible/visual doorbell system and wide-angle peepholes. As the U.S. Department of Justice states at 28 C.F.R. § 35.150(b)(2)(ii), scoping and technical requirements for residential dwelling units were not included in the 1991 ADA Standards therefore there is no "safe harbor" related to ADA compliance in existing residential facilities. ADA Title II regulations (28 C.F.R. § 35.149) state that with the exception of limitations defined in 28 C.F.R. § 35.150, the City of Los Angeles (City) must ensure "no qualified individual with a disability shall, *because a public entity's facilities are inaccessible to or unusable by individuals with disabilities*, be excluded from participation in, or be denied the benefits of the services, programs, or activities of a public entity" (emphasis added). The CBC 1102A.1 defines "Covered Multifamily Dwellings" as "all dwelling units in buildings consisting of three or more privately funded dwelling units if such buildings have one or more elevator."

My instructions to Mr. Dea and his inspection team detailed the scope and methodology, along with the applicable accessibility standards upon which to base the inspection measurements

that I required to allow me to opine whether or not the defendants in this matter met the facility compliance requirements of those applicable standards.

The individual site inspection reports with measurements taken by the CDA Team were then divided into three major categories of information: a) Project Data Summary Sheet; b) Common & Public Use Area Issues; and, c) Dwelling Unit Issues. The individual reports include the following Project Data information, if available:

- Name of facility

- Date(s) of surveys

- Type (or description) of facility

- Relevant year of construction/alteration

- Identification of areas accessed by the public

- Exterior common areas

- Accessible parking provided

- Elevator provided

- Total number of dwelling units

- Quantity of each type of unit (by number of bedrooms; units with kitchens; units with bathrooms)

- Quantity of dwelling units designated as accessible with accessible mobility features

- Quantity of dwelling units designated as accessible with accessible communication features

- If consumer information per UFAS is offered to prospective renters

- Additional information

52

This information is important to my analysis of a development's accessibility requirements. For example, there are different accessibility requirements for multi-story projects with and without an elevator. There are also different, higher standards for shared kitchens and bathrooms (such as those in Single Room Occupancy [SRO] hotel-like residential properties), and the private bathrooms and kitchens found in more typical accessible apartment units. The year of construction and/or alteration is used to determine what standard is applicable, as discussed above. *See* Section IV.A.5. Some projects included residential parking that triggers the need for accessible resident parking, but other projects did not offer parking at all. Thus, all of this information is relevant to what standards were applied to a particular development.

In particular, the total number of dwelling units is important, because one must calculate the number of dwelling units that are required to accommodate mobility impaired individuals (i.e., 5% accessible units per UFAS 4.34) and the appropriate number (i.e., 2%) of dwelling units designed to accommodate those with hearing or vision impairments per HUD regulations and ADA regulations. Both HUD's Section 504 regulations at 24 C.F.R. § 8.26[27] require that, "to the maximum extent feasible," accessible dwelling units "… be distributed throughout projects and sites and shall be available in a sufficient range of sizes and amenities so that a qualified individual with handicaps' choice of living arrangements is, as a whole, comparable to that of other persons eligible for housing assistance under the same program."

If there were units designated as accessible for people with mobility and/or hearing or vision impairments, these units were selected as sample units to inspect by the teams taking accessibility

measurements. If there were no units designated as accessible for people with mobility and/or hearing or vision impairments, the inspectors would measure a representative sample of the unit types provided by the residential management representative. The inspectors were also directed to inquire of the residential management representative whether or not certain information about "adaptable" features (e.g., removable kitchen sink base cabinets, removable base cabinets under required 30" wide kitchen work surfaces, adjustable countertop heights in the kitchen, availability of grab bars at toilets, etc.) was provided to residents as required by UFAS 4.34.4.

The format for the survey inspection charts in each report is also divided into a number of useful categories necessary to fully understand the nature of the existing facility conditions and why they are violations of a particular UFAS or CBC accessibility standard. These survey inspection reports include the following column headings:

- Area (common-use areas, dwelling units, approaches to dwelling units, site features)

- General Location (e.g., community room, Dwelling Unit 256, etc.)

- Type of Condition (e.g., light switch, counter, door, etc.)

- Specific Location (e.g., work surface, lavatory, tub, toilet, etc.)

- Pictures (corresponding numbers of the digital photos taken during inspections)

- Existing Condition (description of the element and measurement taken, such as toilet at 15")

- UFAS Violations (brief description of UFAS requirement for element and applicable citation, with measurements that fall within the DOJ's definition of tolerances starred)

---

[27] These HUD Section 504 regulations are also cited by the 2010 ADA Standards at 233.2 as the basis for the required 5% minimum number of accessible dwelling units and the 2% of units required

- If applicable, 2010 ADA Standards Violations (brief description of ADA requirement for element and applicable citation, with measurements that fall within the DOJ's definition of tolerances starred)

- CBC Violation (brief description of CBC requirement for element and applicable citation)

The most substantive information in these survey inspection charts is the identification of UFAS, ADA and CBC accessibility violations and the appropriate standards citation upon which the findings of violation are based.

### 3.   Randomized Measurement Review Conclusions

I performed measurement review on 39 developments. All 39 of those reports included violations of the federal accessibility standards sufficient to justify a "fail," which translates to a lack of meaningful accessibility of the development to a person with disabilities.

Again, in new and altered residential facilities the determination of non-compliance (or a "fail") is a standard where any deviation from the specific applicable new construction or alteration provisions of UFAS or the ADA Standards is evidence that the facility in question does not comply with the rules and regulations. However, as discussed above, I decided to use a standard of "meaningful accessibility." Thus, a development "fails" only if the violations found are of a type or frequency that would prevent someone with a disability from being able to use important portions of their dwelling unit and/or common-use facilities. Applying these standards, all 39 of 39 developments "failed," or, 100% "failed." My understanding is that a statistician will provide

---

to be provided for people with hearing or vision impairments.

statistical conclusions regarding the inaccessibility of the portfolio of developments in the case based on the randomized sample that I reviewed in this analysis.

Attached as Exhibit 86 is a summary chart that describes the specific number of significant federal accessibility standard violations identified at each development, the additional number of federal accessibility standard violations identified, the number of dwelling unit entry and path of travel violations, the number of dwelling unit bathroom violations, the number of dwelling unit kitchen violations, the number of other violations in the dwelling unit, the number of violations in the development common use and public use areas and facilities, and the number of accessible route violations.

Common accessibility violations found in these site inspection measurement reviews include, but are not limited to: accessible parking space violations affecting the ability of residents with disabilities to transfer from a vehicle to a wheelchair; inaccessible door maneuvering clearances in dwelling units and along approach routes which make it difficult for wheelchair users to effectively approach and operate doors and gates; door thresholds that were too high (or lacked the necessary beveled edges), such that a wheelchair user may not be able to surmount the threshold or may risk being thrown from the wheelchair; steep running slopes and cross slopes that could tip wheelchair users backward or off the path; many wall or ceiling mounted elements that were not cane detectable and could injure blind or visually impaired residents or guests; lack of accessible door hardware that is easier for those with limited grasping ability to operate; steps or inaccessible abrupt level changes along routes that impede passage by wheelchair users; lack of wheelchair maneuvering clearance required in kitchens and bathrooms; and, narrow doors that could prevent passage of a wheelchair, or result in a wheelchair user scraping his or her knuckles on the door frame.

The chart below identifies each development for which a randomized measurement review was performed to assess compliance with federal accessibility standards,[28] the address of the development, whether the development received federal funding directly, the construction type (new construction or rehabilitation), the coverage based on construction start date, the Exhibit to this Report at which my detailed report can be found, and the result of my evaluation.

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| 1600 Vine (Hollywood & Vine Mixed Use) | 1600 N. Vine; 1600-1616 Vine Street | No | New | 504, ADA, 11135 | 87 | Fail |
| 36th & Broadway Apartments (TAY Facility Housing) | 4777 S. Broadway; 4775 S. Broadway | Yes | Rehab | 504, ADA, 11135 | 4 | Fail |
| 3790 Wisconsin Street Partners (akaWisconsin III) | 3790 Wisconsin Street | No | New | 504, ADA, 11135 | 88 | Fail |
| Adams West | 2635 S. Western Avenue | No | New | 504, ADA, 11135 | 89 | Fail |
| Alexandria Hotel | 501 S. Spring Street | No | Rehab | 504, ADA, 11135 | 90 | Fail |
| Ardmore Apartments (The Ardmore) | 959 S. Ardmore Avenue | Yes | New | 504, ADA, 11135 | 91 | Fail |
| Broadway Plaza Apartments | 901 S. Broadway | Yes | Rehab | 504, ADA, 11135 | 13 | Fail |
| Broadway Village II | 5101 S. Broadway | No | New | 504, ADA, 11135 | 92 | Fail |
| Buckingham Place Senior Housing | 4020-4070 Buckingham Road | Yes | New | 504, ADA, 11135 | 93 | Fail |
| Carlton Hotel | 534 Wall Street | No | Rehab | 504 only | 94 | Fail |
| Casa Del Sol | 1308 Lyman Place; 4563 Fountain Avenue | No | Rehab | 504 only | 95 | Fail |

---

[28] The analysis of these site inspection reports for compliance with the California Building Code can be found in the Expert Report of Glenn Dea.

57

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Casa Rampart | 401 S. Rampart Boulevard; 512 S. Rampart Boulevard | Yes | Rehab | 504, ADA, 11135 | 18 | Fail |
| Courtland Hotel | 520 S. Wall Street | No | New | 504, ADA, 11135 | 96 | Fail |
| Dunning Apartments | 5552 Carlton Way | No | New | 504 only | 97 | Fail |
| Edru & Associates | 1032 West 18th Street | No | Rehab | 504 and ADA | 98 | Fail |
| Eugene Hotel | 560 S. Stanford Avenue | Yes | Rehab | 504, ADA, 11135 | 34 | Fail |
| FAME Housing (Adams Senior Gardens 2) | 1755 W. Adams Boulevard | No | Rehab | 504, ADA, 11135 | 99 | Fail |
| Florence Avenue Villas | 910 W. Florence Avenue | No | New | 504 and ADA | 100 | Fail |
| Grandview 9 | 916-920 S. Park View Street; 2300 W. 9th Street | Yes | New | 504, ADA, 11135 | 101 | Fail |
| Haskell Hotel | 528 S. Wall Street | No | New | 504, ADA, 11135 | 102 | Fail |
| Heavenly Vision Seniors | 9426 S. Broadway; 9500 S. Broadway | Yes | New | 504, ADA, 11135 | 103 | Fail |
| Hollywood Bungalow Court | 1516 N. Serrano Avenue | No | Rehab | 504, ADA, 11135 | 104 | Fail |
| Ivy Terrace (Three Courtyards) | 13751 Sherman Way | Yes | New | 504, ADA, 11135 | 105 | Fail |
| La Jolla Hotel (Liberty Village) | 721 E. 6th Street | No | Rehab | 504 only | 106 | Fail |
| Magnolia Villas | 5250 Harmony Avenue | No | New | 504 only | 107 | Fail |
| Main Street Vistas | 5950 S. Main Street | No | New | 504, ADA, 11135 | 51 | Fail |
| Menlo Park | 831 W. 70th Street | Yes | New | 504, ADA, 11135 | 108 | Fail |
| Metropolitan Lofts (Met Lofts) | 1050 S. Flower Street; 1058 S. Flower Street | No | New | 504, ADA, 11135 | 109 | Fail |

58

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Montecito Terraces (Montecito Terraces Senior Apartments) | 14653-14661 W. Blythe Street | Yes | New | 504, ADA, 11135 | 110 | Fail |
| NoHo Senior Artist Colony | 10747 Magnolia Boulevard | No | New | 504, ADA, 11135 | 111 | Fail |
| Palmer Hotel (Palmer House) | 538 S. Wall Street | No | Rehab | 504, ADA, 11135 | 112 | Fail |
| Produce Hotel | 676 S. Central Avenue | No | Rehab | 504 and ADA | 113 | Fail |
| Renato Apartments | 531 S. San Julian Street | Yes | New | 504, ADA, 11135 | 65 | Fail |
| Simone Hotel (San Julian Hotel) | 520 S. San Julian Street | No | Rehab | 504 only | 114 | Fail |
| Star | 240 E. Sixth Avenue | Yes | New | 504, ADA, 11135 | 115 | Fail |
| Strathern Park | 11111 Strathern Street | No | New | 504 only | 116 | Fail |
| Two Worlds | 809 23rd Street; 1306 S. Westlake Avenue | Yes | Rehab | 504, ADA, 11135 | 74 | Fail |
| Villa Esperanza | 255 E. 28th Street | No | New | 504, ADA, 11135 | 117 | Fail |
| Woodland Terrace | 15532 Nordhoff Street | Yes | New | 504, ADA, 11135 | 118 | Fail |

## 4. Additional Measurement Reviews

In addition to the randomized measurement review, I conducted two site inspections early in the litigation.

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Num. | Result |
|---|---|---|---|---|---|---|
| Amistad Plaza | 6050-6130 S. Western Avenue | Yes | New | 504, ADA, 11135 | 119 | Fail |
| Casa Verde | 1552 Schrader Boulevard | Yes | New | 504, ADA, 11135 | 120 | Fail |

59

Attached as Exhibit 121 is a summary chart that describes the specific number of significant federal accessibility standard violations identified at each of these developments, the additional number of federal accessibility standard violations identified, the number of dwelling unit entry and path of travel violations, the number of dwelling unit bathroom violations, the number of dwelling unit kitchen violations, the number of other violations in the dwelling unit, the number of violations in the development common use and public use areas and facilities, and the number of accessible route violations.

### C.    Randomized Plan Reviews

#### 1.    Introduction

For purposes of accessibility analysis, a plan review is a detailed analysis of the information provided on the building plans compared with the accessibility requirements of the federal standards or building code provisions applying to accessibility. Given my architectural education and extensive work experience, I am well versed in identifying the potential accessibility barriers evident in the architect's or engineer's building plans. Working from the more global concerns to the smaller details, the plan review began with an analysis of the number of dwelling units provided in the project and a comparison with the minimum number of accessible units required by the appropriate accessibility standards. Next, the review focused on the approach and entrance areas, parking and general circulation issues, followed by common-use amenity evaluations and dwelling unit accessibility issues. Lastly, a review of door schedules and building details allowed for the review of common accessibility elements along accessible routes and common elements in accessible spaces.

#### 2.    Randomized Plan Review Methodology

As described above, the randomized categories were subject to two independent randomizations by a statistician, one for randomized measurement review and one for randomized

60

plan review. Plaintiffs' counsel provided me with building plans for developments for which I was to perform randomized plan review according to the randomized lists. I had no control over what developments were selected or which developments I reviewed.

For purposes of plan review, Plaintiffs sought to obtain the final blueprints or final architectural drawings approved by LADBS for all developments in the Portfolio. I understand LADBS has an obligation to maintain official copies "of the plans of every building, during the life of the building, for which the department issued a building permit." Cal. Health & Safety Code § 19850. Despite that obligation, however, there were a number of developments for which LADBS did not have either any building plans at all or complete sets of building plans. In order to obtain copies of the missing building plans, Plaintiffs' counsel then sought building plans from the owners of developments for which building plans were missing or incomplete. [29]

Depending on the nature of the accessibility violations found in the plan review, the project design would "fail" if we found at least three or four substantive examples of accessibility violations of UFAS and/or ADA standards. Examples of substantive accessibility violations include: failure to provide any UFAS or ADA accessible dwelling units, failure to provide a wheelchair turning space in every room in the accessible dwelling unit or unit that should have been accessible, doors swinging into the clear floor space of bathroom fixtures, lack of accessible kitchen sinks or

---

[29] Some of these owners represented that they had no copies of the plans or blueprints for the developments at issue. Thus, if LADBS did not properly maintain plans as required and the owner represented there were no plans, a plan review became impossible. When one of those developments was selected by the randomized list, it was skipped and I went on to the next development on the list. However, a measurement review was conducted for such development to ensure there was some analysis of the development's accessibility. Both "skipped" properties, Alexandria Hotel and Edru & Associates, was found to be inaccessible during randomized measurement review. *See* Section V.B.3.

associated work surfaces, lack of the required number of accessible parking spaces, stairs or steps along required approach routes, etc.

Frank Colby of Colby Design[30] assisted me in my randomized plan review. While Mr. Colby and I are both solo practitioners, we work together as colleagues do in larger offices, and we have worked together for decades. Thus, delegating plan reviews to Mr. Colby under my supervision was akin to having an associate within my office to assist with underlying reviews. I instructed Mr. Colby to use the accessibility plan review process I had been using for this matter. Then, based on his initial notations regarding the accessibility of the building plans he reviewed, I decided if the identified examples of accessibility barriers resulted in a "pass" or "fail" under the meaningful accessibility test described above.

The format of the plan review reports is divided into two general sections: 1) general project information; and, 2) detailed excerpts from the actual building plans with a description of the accessibility violations. The general project information includes the name of the project, the address of the project, the name of the architect or design firm who developed the plans, the date of the building plans along with any noted revisions, the number of dwelling units proposed in the project, the number of required accessible dwelling units based on UFAS or ADA Standards, whether the project includes an elevator, and if available the description of the accessibility standards cited on the plans.

---

[30] Mr. Colby is a licensed architect in Louisiana, Alabama, Kentucky, Texas and Colorado with 15 years experience working as an accessibility consultant. He has been involved in numerous Fair Housing Act, ADA and Section 504 investigations/law suits brought by the U.S. Department of Justice.

The second part includes at least three or four specific examples of accessibility violations. Each example begins with a reference to the building plans sheet from which the excerpted diagram or drawing was captured. These "snapshots" of the actual drawings allow for a clear understanding of the nature of each condition cited as an accessibility violation and offer context for those who are not familiar with the particular portion of the facility in question. There is a short narrative that describes the specific accessibility violation and a corresponding description of the accessible conditions required by either UFAS or ADA Standards. Finally, there is a citation for each of the accessibility violations associated with either UFAS or the ADA Standards. Occasionally, a single drawing excerpt will be used as the basis of describing more than one accessibility barrier or violation, in those situations each violation is accompanied by the citation from the appropriate accessibility standard.

### 3.   Randomized Plan Review Conclusions

In sum, I performed 98 randomized plan reviews. All 98 of these reviews demonstrated non-compliance with the requirements of federal accessibility standards sufficient to justify a "fail," which translates to a lack of meaningful accessibility of the development for a person with disabilities. Again, in new and altered residential facilities the determination of non-compliance (or a "fail") is a standard where any deviation from the specific applicable new construction or alteration provisions of UFAS or the ADA Standards is evidence that the facility in question does not comply with the rules and regulations. However, as discussed above, I decided to use a standard of "meaningful accessibility." Thus, a development "fails" only if the violations found are of a type or frequency that would prevent someone with a disability from being able to use important portions of their dwelling unit and/or common-use facilities. Applying these standards, all 98 of 98 developments "failed," or, 100% "failed." My understanding is that a statistician will provide

63

statistical conclusions regarding the inaccessibility of the portfolio of developments in the case based on the randomized sample that I reviewed in this analysis.

Attached as Exhibit 122 is a summary chart that describes the name of the development for which I reviewed plans, the address of that development, the number of units, and whether the development "passed" or "failed."

Common accessibility violations found in these plan reviews include, but are not limited to: accessible parking space violations affecting the ability of residents with disabilities to transfer from a vehicle to a wheelchair; inaccessible door maneuvering clearances in dwelling units and along approach routes which make it difficult for wheelchair users to effectively approach and operate doors and gates; door thresholds that were too high (or lacked the necessary beveled edges), such that a wheelchair user may not be able to surmount the threshold or may risk being thrown from the wheelchair; steep running slopes and cross slopes that could tip wheelchair users backward or off the path; many wall or ceiling mounted elements that were not cane detectable and could injure blind or visually impaired residents or guests; lack of accessible door hardware that is easier for those with limited grasping ability to operate; steps or inaccessible abrupt level changes along routes that impede passage by wheelchair users; lack of wheelchair maneuvering clearance required in kitchens and bathrooms; and, narrow doors that could prevent passage of a wheelchair, or result in a wheelchair user scraping his or her knuckles on the door frame.

The chart below identifies each development for which a randomized plan review was performed to assess compliance with federal accessibility standards, the address of the development, whether the development received federal funding directly, the construction type (new construction or rehabilitation), the coverage based on construction start date, the Exhibit to this Report at which my detailed report can be found, and the result of my evaluation.

64

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| 1600 Vine (Hollywood & Vine Mixed Use) | 1600 N. Vine; 1600-1616 Vine Street | No | New | 504, ADA, 11135 | 123 | Fail |
| 28th Street YMCA (28th Street Apartments)* | 1006 E. 28th Street | Yes | New and Rehab | 504, ADA, 11135 | 124 | Fail |
| 36th & Broadway Apartments (TAY Facility Housing) | 4777 S. Broadway; 4775 S. Broadway; 161 E. 36th Street | Yes | Rehab | 504, ADA, 11135 | 125 | Fail |
| 3804 Wisconsin Apartments (Henderson Homes) | 3804 Wisconsin Street | No | New | 504 and ADA | 126 | Fail |
| 3839 Wisconsin Apartments II (Robinson Villas) | 3839-3845 Wisconsin Street | No | New | 504 only | 127 | Fail |
| Academy Village (Lincoln Academy Village) | 5225 Blakeslee Avenue | No | New | 504 only | 128 | Fail |
| Afton Place (Minami Apartments; Minomi Apartments) | 6230-6231 Afton Place | Yes | Rehab | 504, ADA, 11135 | 129 | Fail |
| Andalucia Senior Apartments | 15305 Lanark Street | Yes | New | 504, ADA, 11135 | 130 | Fail |
| Argyle Apartments | 1560-1600 N. Western; 5446 W. Carlton Way | No | New | 504, ADA, 11135 | 131 | Fail |
| Arminta Square (Reseda Ranch) | 11050 Arminta Street | Yes | Rehab | 504, ADA, 11135 | 132 | Fail |
| Bellevue Apartments | 1809 W. 11th Street | No | Rehab | 504, ADA, 11135 | 133 | Fail |
| Boyle Hotel Apartments | 101-105 N. Boyle Avenue; 1781-1785 E. 1st Street | Yes | Rehab | 504, ADA, 11135 | 134 | Fail |
| Bricker | 1671 N. Western Avenue; 1669 Western Avenue | No | Rehab | 504, ADA, 11135 | 135 | Fail |

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Bronson Court | 1227-1239 N. Bronson Avenue | Yes | New | 504, ADA, 11135 | 136 | Fail |
| Carlton Apartments | 5417-5425 Carlton Way | No | New | 504, ADA, 11135 | 137 | Fail |
| Carlton Hotel | 534 Wall Street | No | Rehab | 504 only | 138 | Fail |
| Carter House | 449 W. 78th St | No | New | 504, ADA, 11135 | 139 | Fail |
| Casa Carondelet | 130 S. Carondelet Street | No | New | 504, ADA, 11135 | 140 | Fail |
| Casa Del Sol | 1308 Lyman Place; 4563 Fountain Avenue | No | Rehab | 504 only | 141 | Fail |
| Casa Esperanza | 206 E. 23rd Street | No | New | 504 only | 142 | Fail |
| Casa Gloria | 1440-1452 Temple Street | No | New | 504 and ADA | 143 | Fail |
| Central Avenue Village Square | 5301-5321 S. Central Avenue; 1052-1060 E. 53rd Street | No | New | 504, ADA, 11135 | 144 | Fail |
| Charles Cobb | 521 S. San Pedro Street | Yes | New | 504, ADA, 11135 | 145 | Fail |
| Chinatown Metro* | 808-810 Spring Street | Yes | New and Rehab | 504, ADA, 11135 | 146 | Fail |
| Clark Residence Ltd. Partnership | 306 S. Loma Drive | No | Rehab | 504 only | 147 | Fail |
| Colden Oaks | 9550 S. Broadway; 225 W. Colden Avenue | No | New | 504, ADA, 11135 | 148 | Fail |
| Colorado Terrace Senior Apartments | 2455 Colorado Boulevard | Yes | New | 504, ADA, 11135 | 149 | Fail |
| Courtland Hotel | 520 S. Wall Street | No | New | 504, ADA, 11135 | 150 | Fail |

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Crescent Arms (Fremont Building; Crescent Village) | 1709 W. 8th Street | Yes | Rehab | 504, ADA, 11135 | 151 | Fail |
| Crossings at 29th Street | 814 E. 29th Street; 818, 828, 838 E. 29th Street | Yes | New | 504, ADA, 11135 | 152 | Fail |
| Cuatro Vientos | 5331 E. Huntington Drive | Yes | New | 504, ADA, 11135 | 153 | Fail |
| Decro Osborne Apartments (Osborne Place; Osborne Family; Osborne Gardens) | 12360 Osborne Street | Yes | New | 504, ADA, 11135 | 154 | Fail |
| Downtown Women's Center (Renaissance Building) | 501 E. Fifth Street; 434 S. San Pedro Street | Yes | Rehab | 504, ADA, 11135 | 155 | Fail |
| Edward Hotel | 713-715 E. Fifth Street | No | Rehab | 504, ADA, 11135 | 156 | Fail |
| Eleventh Avenue Apartments | 6720 Eleventh Avenue | No | New | 504 only | 157 | Fail |
| FAME Gardens | 3730 W. 27th Street | No | New | 504, ADA, 11135 | 158 | Fail |
| Florence Avenue Villas | 908-916 W. Florence Avenue | No | New | 504 and ADA | 159 | Fail |
| Ford Apartments (Ford Hotel)* | 1000 E. 7th Street | Yes | New and Rehab | 504, ADA, 11135 | 160 | Fail |
| Fumbah Manor | 832-838 S. Lake Street | No | New | 504, ADA, 11135 | 161 | Fail |
| Gateways Apartments | 505 S. San Pedro Street | Yes | New | 504, ADA, 11135 | 162 | Fail |
| Golden Years Senior Apartments | 11330 Otsego Street | No | New | 504, ADA, 11135 | 163 | Fail |

67

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Harmony Gardens (Harmony II) | 5239 Harmony Avenue | Yes | New | 504, ADA, 11135 | 164 | Fail |
| Harmony Gate | 5218, 5220 & 5234 Harmony Avenue | No | New | 504 only | 165 | Fail |
| Harmony Place Apartments (Harmony Plaza) | 5321 Harmony Avenue | No | New | 504 only | 166 | Fail |
| Haskell Hotel | 528 S. Wall Street | No | New | 504 only | 167 | Fail |
| Hollyview Apartments | 5411 Hollywood Boulevard | No | New | 504, ADA, 11135 | 168 | Fail |
| Hollywood Bungalow Court | 1516 N. Serrano Avenue | No | Rehab | 504, ADA, 11135 | 169 | Fail |
| Hollywood El Centro Apartments | 6211 De Longpre Avenue; 6225-6229 De Longpre Avenue | No | Rehab | 504, ADA, 11135 | 170 | Fail |
| Irolo Senior Housing | 3315-3329 W. 8th Street | No | New | 504, ADA, 11135 | 171 | Fail |
| La Brea (Franklin Apartments) | 1801 N. La Brea Avenue | No | New | 504, ADA, 11135 | 173 | Fail |
| Juanita Villas (Juanita SRO; La Kretz Villas) | 335-339 N. Juanita Avenue | Yes | New | 504, ADA, 11135 | 172 | Fail |
| La Villa Mariposa | 345 S. Columbia Avenue | No | New | 504, ADA, 11135 | 174 | Fail |
| Las Americas Hotel | 1205-1207 E. 6th Street; 1201 E. 6th Street | No | Rehab | 504 only | 175 | Fail |
| Las Casitas Apartments | 21503 Valerio Street | No | Rehab | 504, ADA, 11135 | 176 | Fail |
| Magnolia Villas | 5250 Harmony Avenue | No | New | 504 only | 177 | Fail |
| Menlo Park | 831 W. 70th Street | Yes | New | 504, ADA, 11135 | 178 | Fail |

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Metropolitan Lofts (Met Lofts) | 1050 S. Flower Street; 1058 S. Flower Street | No | New | 504, ADA, 11135 | 179 | Fail |
| Montecito Apartments | 6650 Franklin Avenue | No | Rehab | 504, ADA, 11135 | 180 | Fail |
| New Hampshire Family Apartments | 1037-1053 S. New Hampshire | Yes | New | 504, ADA, 11135 | 181 | Fail |
| NoHo Senior Villas (HFL Garden Villa Homes) | 5526-5532 Klump Avenue | Yes | New | 504, ADA, 11135 | 182 | Fail |
| P & P Home For The Elderly | 1030 W. 85th Street | No | New | 504, ADA, 11135 | 183 | Fail |
| Palmer Hotel (Palmer House) | 538 S. Wall Street | No | Rehab | 504, ADA, 11135 | 184 | Fail |
| Paradise Arms | 5200 S. Broadway | Yes | New | 504, ADA, 11135 | 185 | Fail |
| Parkside Apartments (Eexcel Apartments) | 900 S. Grand Avenue | No | New | 504, ADA, 11135 | 186 | Fail |
| Pascual Reyes Apartments | 1413 Connecticut Street; 1025 Albany Street | No | New | 504, ADA, 11135 | 187 | Fail |
| Paseo Del Sol (Soto Apartments) | 417 N. Soto Street | Yes | Rehab | 504, ADA, 11135 | 188 | Fail |
| Pico Union Plaza | 1111-1141 W. 17th Street; 1620-1632 S. Burlington Avenue | No | New | 504 only | 189 | Fail |
| Produce Hotel | 676 S. Central Avenue | No | Rehab | 504 and ADA | 190 | Fail |
| Professional Housing & Development | 1020 S. Kingsley Drive | Yes | New | 504, ADA, 11135 | 191 | Fail |
| Renato Apartments | 531 S. San Julian Street | Yes | New | 504, ADA, 11135 | 192 | Fail |

69

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Roberta Stephens Villas | 2624 S. Central Avenue; 1035 E.27th Street | No | New | 504 only | 193 | Fail |
| Rosslyn Lofts (Frontier Hotel) | 451 S. Main Street | No | Rehab | 504, ADA, 11135 | 194 | Fail |
| San Pedro Firm Building | 108-116 N. San Pedro Street | No | Rehab | 504 only | 195 | Fail |
| Security Lofts Building | 510 S. Spring Street | No | Rehab | 504, ADA, 11135 | 196 | Fail |
| Seventh & Coronado Apartments (Emerald Star) | 2614 W. 7th Street | No | New | 504, ADA, 11135 | 197 | Fail |
| Silvercrest Hollywood Residence (Hollywood Silvercrest) | 5940 Carlos Avenue | No | New | 504, ADA, 11135 | 198 | Fail |
| St. Andrews Bungalow Court | 1514-1544 N. St. Andrews Place | Yes | Rehab | 504, ADA, 11135 | 199 | Fail |
| Stovall Villa | 535 W. 41st Street | Yes | New | 504, ADA, 11135 | 200 | Fail |
| Strong Residence | 826 S. Coronado Street | No | Rehab | 504 only | 201 | Fail |
| Sunflower Norton Apartments | 1242 S. Norton Avenue | No | New | 504 only | 202 | Fail |
| Sunrise | 5111-5125 S. Main Street | Yes | New | 504, ADA, 11135 | 203 | Fail |
| Telacu Senior Manor - L.A. | 1033 S. Hope Street | No | New | 504 only | 204 | Fail |
| Telacu Vistas (Monterey Hills; Telacu Vistas Del Sol) | 4900 Via Marisol | No | New | 504, ADA, 11135 | 205 | Fail |

70

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Vermont Avenue | 4915 S. Vermont Avenue; 4925 S. Vermont Avenue | Yes | New | 504, ADA, 11135 | 206 | Fail |
| Views at 270 (Sunset Western) | 5445-5451 W. Sunset Boulevard | No | New | 504, ADA, 11135 | 207 | Fail |
| Villa Del Pueblo Apartments | 1441 S. Hope Street | No | New | 504, ADA, 11135 | 208 | Fail |
| Villa Esperanza | 255 E. 28th Street | No | New | 504, ADA, 11135 | 209 | Fail |
| Villa Flores (1010 Senior Housing Corp.) | 1020 S. Flower Street; 1010 S. Flower Street | No | New | 504, ADA, 11135 | 210 | Fail |
| Villa Metropolitano | 1324-1328 S. Hope Street | No | Rehab | 504, ADA, 11135 | 211 | Fail |
| Villas at Gower | 1720, 1726 N. Gower Street | Yes | New | 504, ADA, 11135 | 212 | Fail |
| Villas Del Lago | 456-472 S. Lake Street | Yes | New | 504, ADA, 11135 | 213 | Fail |
| Ward Villas | 1177 W. Adams Boulevard | No | New | 504 only | 214 | Fail |
| Washington Court (Washington Village) | 1717 E. 103rd Street | Yes | New | 504, ADA, 11135 | 215 | Fail |
| Watson Terrace II | 6128 11th Avenue | Yes | New | 504 only | 216 | Fail |
| Weldon Hotel | 507 Maple Avenue | No | Rehab | 504, ADA, 11135 | 217 | Fail |
| Westminster Park Plaza | 9400 Maie Avenue | No | New | 504 only | 218 | Fail |
| Wilcox Apartments | 1805 N. Wilcox Avenue | No | Rehab | 504, ADA, 11135 | 219 | Fail |
| Woodland Terrace | 15532 Nordhoff Street | Yes | New | 504, ADA, 11135 | 220 | Fail |

71

### 4.  Additional Plan Reviews

In addition to the randomized plan review, additional plan reviews were performed.

First, two plan reviews were performed for developments that were moved from one categorization to another based on information acquired after the Portfolio was randomized.

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Canby Woods | 7238-7248 Canby Avenue | No | New | 504, ADA, 11135 | 221 | Fail |
| Navy Blue Apartments (Navy Street Apartments) | 102 Navy Street | No | New | 504, ADA, 11135 | 222 | Fail |

Second, twenty additional non-randomized plan reviews were conducted as a result of administrative error on my part.

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Adams and Central | 1011 Adams Boulevard | Yes | New | 504, ADA, 11135 | 223 | Fail |
| Adams West | 2635 S. Western Avenue | No | New | 504, ADA, 11135 | 224 | Fail |
| Asturias Senior Apartments | 9628 Van Nuys Boulevard | Yes | New | 504, ADA, 11135 | 225 | Fail |
| Bonnie Brae Apartment Homes | 501 S. Bonnie Brae Street; 505 S. Bonnie Brae Street | Yes | New | 504, ADA, 11135 | 226 | Fail |
| Cantabria Senior Citizen Apartments | 9640 N. Van Nuys Boulevard; 9628 Van Nuys Boulevard | Yes | New | 504, ADA, 11135 | 227 | Fail |
| Carondelet Court Partners, L.P. | 812 & 816 S. Carondelet Street | Yes | New | 504, ADA, 11135 | 228 | Fail |

72

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Central Avenue Village Apartments.; Central Village Apartments | 2000 S. Central Avenue | Yes | New | 504, ADA, 11135 | 229 | Fail |
| Columbus Permanent Housing (Penny Lane Centers; Columbus Permanente) | 8900-8906 Columbus Avenue | Yes | Rehab | 504, ADA, 11135 | 230 | Fail |
| El Dorado Apartments | 12129 El Dorado Avenue | Yes | New | 504, ADA, 11135 | 231 | Fail |
| Far East Building | 347-353 E. First Street | Yes | Rehab | 504, ADA, 11135 | 232 | Fail |
| Hart Village (Owensmouth Apartments) | 6941 Owensmouth Avenue; 6927 N. Owensmouth Avenue | Yes | New | 504, ADA, 11135 | 233 | Fail |
| Hobart Heights Apartments (The Hobart) | 924 S. Hobart Boulevard | Yes | New | 504, ADA, 11135 | 234 | Fail |
| Imani Fe East & West | 10424 S. Central Avenue | Yes | New | 504, ADA, 11135 | 235 | Fail |
| La Jolla Hotel (Liberty Village) | 721 E. 6th Street | No | Rehab | 504 only | 236 | Fail |
| Las Margaritas* | 115 & 117 N. Soto Street | Yes | New and Rehab | 504, ADA, 11135 | 237 | Fail |
| Leonide Hotel | 512-516 S. Main Street | No | Rehab | 504 only | 238 | Fail |
| Metro Hollywood Apartments (Hollywood Western Apartments; Western Carlton Phase II) | 5450 Hollywood Boulevard | Yes | New | 504, ADA, 11135 | 239 | Fail |

73

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Montecito Terraces (Montecito Terraces Senior Apartments) | 14653-14661 W. Blythe Street | Yes | New | 504, ADA, 11135 | 240 | Fail |
| Morgan Place Senior Apartments | 7301 S. Crenshaw Boulevard | Yes | New | 504, ADA, 11135 | 241 | Fail |
| New Hampshire Apartments | 625 N. New Hampshire Avenue | No | New | 504 only | 242 | Fail |

Thus, 22 of 22 developments (100%) analyzed as part of non-randomized plan review also "failed." Attached as Exhibit 121 is a summary chart that includes the name of each of these developments, the address of that development, the number of units, and whether the development "passed" or "failed."

**D.      Plan Review for Post-Filing Developments**

Ten developments in the Portfolio were subjected to individualized review instead of inclusion in the randomizations. The loan agreements for these developments were signed after the Complaint was filed in this lawsuit on January 13, 2012. Because Defendants might have conducted themselves differently after they were put on notice as to the issues raised in this lawsuit, plans for each of these developments were reviewed instead of including the developments in the randomizations.

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Broadway Villas | 9413-9501 S. Spring Street | Yes | New | 504, ADA, 11135 | 243 | Fail |
| Caroline Severance | 2914 & 2936 W. Eighth Street | No | New | 504, ADA, 11135 | 244 | Fail |

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Coverage | Exhibit Number | Result |
|---|---|---|---|---|---|---|
| Gordon | 1555 N. Gordon Street | Yes | New | 504, ADA, 11135 | 245 | Fail |
| Osborne Street (Osborne Apartments) | 12041 W. Osborne Street | Yes | New | 504, ADA, 11135 | 246 | Fail |
| Pacific Avenue Arts Colony[31] | 339 Pacific Avenue; 305 Pacific Avenue | No | New | 504, ADA, 11135 | 247 | Fail |
| Riverwalk at Reseda (Kittridge Family) | 18425 W. Kittridge Street | Yes | New | 504, ADA, 11135 | 248 | Fail |
| Rosslyn Hotel | 112 W. Fifth Street | Yes | Rehab | 504, ADA, 11135 | 249 | Fail |
| Serrano (The Serrano) | 975-983 S. Serrano Avenue | Yes | New | 504, ADA, 11135 | 250 | Fail |
| Tobias Terrace | 9247 N. Van Nuys Boulevard | Yes | New | 504, ADA, 11135 | 251 | Fail |
| Whittier | 3555 E. Whittier Boulevard | Yes | New | 504, ADA, 11135 | 252 | Fail |

Thus, 10 of 10 post-filing developments (100%) analyzed as part of non-randomized plan review also "failed." Attached as Exhibit 121 is a summary chart that includes the name of each of these developments, the address of that development, the number of units, and whether the development "passed" or "failed."

**E.     Review of Five Developments for Compliance With the California Building Code**

In July 2013, Mr. Colby and I personally conducted site inspections for the following five

---

[31] The plans for Pacific Avenue Arts Colony were the only plans I saw in all of my plan reviews that mentioned the UFAS standard.

75

developments in this matter: 1) Buckingham Senior Apartments; 2) Grandview 9 Apartments; 3) Broadway Village II Apartments; 4) Casa Verde Apartments; and, 5) Amistad Apartments.

Measurements were taken (with associated digital photographs documenting exact measurement locations, conditions and findings) during the on-site survey of site arrival points, project approach routes, common-use facilities, dwelling unit approach routes, and dwelling unit interiors. These measurements were analyzed based on the following accessibility standards or codes (including the associated reference standards):

- 2010 ADA Standards applicable based on Title II program accessibility regulations (28 CFR 35.149; 28 CFR 35.150)
- California Building Code Chapter 11A of Title 24 California Code of Regulations (code versions noted in the detailed reports)
- Section 504 of Rehabilitation Act, HUD regulations 24 CFR Part 8, and Uniform Federal Accessibility Standards (UFAS)

A representative sample (at least one) of the designated accessible units was selected by property management for detail analysis. Other standard dwelling units in the complex (one of each unit type) were also identified by the property management to aid in understanding the classes of units offered and to aid in the analysis of the CBC accessibility provisions.

CBC 1102A.1 defines "Covered Multifamily Dwellings" as "all dwelling units in buildings consisting of three or more privately funded dwelling units if such buildings have one or more elevator." As each of these five complexes all had at least one elevator, all of the dwelling units in each are covered by the accessibility/adaptability provisions of the CBC and are required to be on an accessible route from site arrival points.

I found that each of the five developments had significant accessibility violations of the CBC.

76

The reports were divided into four different sections dealing with the following: 1) Project Approach Issues, 2) Common-Use Facility Issues, 3) Dwelling Unit Approach Issues, and 4) Dwelling Unit Issues.

Common CBC violations included: accessible parking space violations affecting the ability of residents with disabilities to transfer from a vehicle to a wheelchair; inaccessible door maneuvering clearances in dwelling units and along approach routes which make it difficult for wheelchair users to effectively approach and operate doors and gates; door thresholds that were too high (or lacked the necessary beveled edges), such that a wheelchair user may not be able to surmount the threshold or may risk being thrown from the wheelchair; steep running slopes and cross slopes that could tip wheelchair users backward or off the path; many wall or ceiling mounted elements that were not cane detectable and could injure blind or visually impaired residents or guests; lack of accessible door hardware that is easier for those with limited grasping ability to operate; steps or inaccessible abrupt level changes along routes that impede passage by wheelchair users; lack of wheelchair maneuvering clearance required in kitchens and bathrooms; and, narrow doors that could prevent passage of a wheelchair, or result in a wheelchair user scraping his or her knuckles on the door frame.

In sum, I performed CBC analysis on five complete developments. All five of these reviews demonstrated non-compliance with the requirements of the CBC accessibility standards sufficient to justify a "fail," which translates to a lack of meaningful accessibility of the development for a person with disabilities. Thus, five of five developments "failed," or 100%.

## IV.   Conclusions

### A.   Conclusions by Funding and Type of Construction

#### 1.   Federally-Funded New Construction

##### a.   Section 504

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 96 |  |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 83 | 83 |
| ADAAG Report Review | 65 | 65 |
| Randomized Measurement Review | 10 | 10 |
| Randomized Plan Review | 27 | 27 |
| Non-Randomized Measurement or Plan Review | 23 | 23 |

##### b.   ADA

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 95 |  |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 82 | 82 |
| ADAAG Report Review | 65 | 65 |
| Randomized Measurement Review | 10 | 10 |
| Randomized Plan Review | 26 | 26 |
| Non-Randomized Measurement or Plan Review | 23 | 23 |

##### c.   Section 11135

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 95 |  |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 82 | 82 |
| ADAAG Report Review | 65 | 65 |
| Randomized Measurement Review | 10 | 10 |
| Randomized Plan Review | 26 | 26 |
| Non-Randomized Measurement or Plan Review | 23 | 23 |

2.      **Non-Federally-Funded New Construction**

    a.      **Section 504**

| | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 83 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 55 | 55 |
| ADAAG Report Review | 1 | 1 |
| Randomized Measurement Review | 14 | 14 |
| Randomized Plan Review | 43 | 43 |
| Non-Randomized Measurement or Plan Review | 6 | 6 |

    b.      **ADA**

| | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 57 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 38 | 38 |
| ADAAG Report Review | 1 | 1 |
| Randomized Measurement Review | 10 | 10 |
| Randomized Plan Review | 29 | 29 |
| Non-Randomized Measurement or Plan Review | 5 | 5 |

    c.      **Section 11135**

| | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 52 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 35 | 35 |
| ADAAG Report Review | 1 | 1 |
| Randomized Measurement Review | 9 | 9 |
| Randomized Plan Review | 26 | 26 |
| Non-Randomized Measurement or Plan Review | 5 | 5 |

### 3.  Federally-Funded Rehabilitations

#### a.  Section 504

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 27 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 24 | 24 |
| ADAAG Report Review | 17 | 17 |
| Randomized Measurement Review | 5 | 5 |
| Randomized Plan Review | 11 | 11 |
| Non-Randomized Measurement or Plan Review | 4 | 4 |

#### b.  ADA

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 27 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 24 | 24 |
| ADAAG Report Review | 17 | 17 |
| Randomized Measurement Review | 5 | 5 |
| Randomized Plan Review | 11 | 11 |
| Non-Randomized Measurement or Plan Review | 4 | 4 |

#### c.  Section 11135

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 27 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 24 | 24 |
| ADAAG Report Review | 17 | 17 |
| Randomized Measurement Review | 5 | 5 |
| Randomized Plan Review | 11 | 11 |
| Non-Randomized Measurement or Plan Review | 4 | 4 |

### 4.   Non-Federally-Funded Rehabilitations

        a.      **Section 504**

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 52 |  |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 26 | 26 |
| ADAAG Report Review | 0 | 0 |
| Randomized Measurement Review | 10 | 10 |
| Randomized Plan Review | 20 | 20 |
| Non-Randomized Measurement or Plan Review | 2 | 2 |

        b.      **ADA**

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 34 |  |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 17 | 17 |
| ADAAG Report Review | 0 | 0 |
| Randomized Measurement Review | 6 | 6 |
| Randomized Plan Review | 14 | 14 |
| Non-Randomized Measurement or Plan Review | 0 | 0 |

        c.      **Section 11135**

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 30 |  |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 15 | 15 |
| ADAAG Report Review | 0 | 0 |
| Randomized Measurement Review | 4 | 4 |
| Randomized Plan Review | 13 | 13 |
| Non-Randomized Measurement or Plan Review | 0 | 0 |

## 5.   All New Construction

### a.   Section 504

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 180 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 138 | 138 |
| ADAAG Report Review | 66 | 66 |
| Randomized Measurement Review | 24 | 24 |
| Randomized Plan Review | 70 | 70 |
| Non-Randomized Measurement or Plan Review | 29 | 29 |

### b.   ADA

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 152 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 119 | 119 |
| ADAAG Report Review | 66 | 66 |
| Randomized Measurement Review | 20 | 20 |
| Randomized Plan Review | 55 | 55 |
| Non-Randomized Measurement or Plan Review | 28 | 28 |

### c.   Section 11135

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 147 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 117 | 117 |
| ADAAG Report Review | 66 | 66 |
| Randomized Measurement Review | 19 | 19 |
| Randomized Plan Review | 52 | 52 |
| Non-Randomized Measurement or Plan Review | 28 | 28 |

### 6.  All Rehabilitations

#### a.  Section 504

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 78 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 50 | 50 |
| ADAAG Report Review | 17 | 17 |
| Randomized Measurement Review | 15 | 15 |
| Randomized Plan Review | 31 | 31 |
| Non-Randomized Measurement or Plan Review | 6 | 6 |

#### b.  ADA

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 61 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 41 | 41 |
| ADAAG Report Review | 17 | 17 |
| Randomized Measurement Review | 11 | 11 |
| Randomized Plan Review | 25 | 25 |
| Non-Randomized Measurement or Plan Review | 4 | 4 |

#### c.  Section 11135

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 57 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 39 | 39 |
| ADAAG Report Review | 17 | 17 |
| Randomized Measurement Review | 9 | 9 |
| Randomized Plan Review | 24 | 24 |
| Non-Randomized Measurement or Plan Review | 4 | 4 |

### 7. All Federally-Funded Developments

#### a. Section 504

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 119 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 103 | 103 |
| ADAAG Report Review | 81 | 81 |
| Randomized Measurement Review | 15 | 15 |
| Randomized Plan Review | 35 | 35 |
| Non-Randomized Measurement or Plan Review | 26 | 26 |

#### b. ADA

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 118 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 102 | 102 |
| ADAAG Report Review | 81 | 81 |
| Randomized Measurement Review | 15 | 15 |
| Randomized Plan Review | 34 | 34 |
| Non-Randomized Measurement or Plan Review | 26 | 26 |

#### c. Section 11135

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 118 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 102 | 102 |
| ADAAG Report Review | 81 | 81 |
| Randomized Measurement Review | 15 | 15 |
| Randomized Plan Review | 34 | 34 |
| Non-Randomized Measurement or Plan Review | 26 | 26 |

## 8. All Non-Federally-Funded Developments

### a. Section 504

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 134 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 81 | 81 |
| ADAAG Report Review | 1 | 1 |
| Randomized Measurement Review | 24 | 24 |
| Randomized Plan Review | 57 | 57 |
| Non-Randomized Measurement or Plan Review | 8 | 8 |

### b. ADA

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 91 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 55 | 55 |
| ADAAG Report Review | 1 | 1 |
| Randomized Measurement Review | 16 | 16 |
| Randomized Plan Review | 43 | 43 |
| Non-Randomized Measurement or Plan Review | 5 | 5 |

### c. Section 11135

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 83 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 50 | 50 |
| ADAAG Report Review | 1 | 1 |
| Randomized Measurement Review | 13 | 13 |
| Randomized Plan Review | 39 | 39 |
| Non-Randomized Measurement or Plan Review | 5 | 5 |

### 9.   All Developments in CRA Housing Portfolio

#### a.      Section 504

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 253 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 184 | 184 |
| ADAAG Report Review | 82 | 82 |
| Randomized Measurement Review | 39 | 39 |
| Randomized Plan Review | 98 | 98 |
| Non-Randomized Measurement or Plan Review | 34 | 34 |

#### b.      ADA

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 209 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 157 | 157 |
| ADAAG Report Review | 82 | 82 |
| Randomized Measurement Review | 31 | 31 |
| Randomized Plan Review | 77 | 77 |
| Non-Randomized Measurement or Plan Review | 31 | 31 |

#### c.      Section 11135

|  | Number | Fails |
|---|---|---|
| Federally-Funded New Construction Developments Subject to Section 504 | 200 | |
| Developments Reviewed (ADAAG Report, Randomized or Non-Randomized Measurement or Plan Review) | 152 | 152 |
| ADAAG Report Review | 82 | 82 |
| Randomized Measurement Review | 28 | 28 |
| Randomized Plan Review | 73 | 73 |
| Non-Randomized Measurement or Plan Review | 31 | 31 |

## B.     Summary Conclusions

After an extensive accessibility review of the developments identified in this report and based

on personal site inspections, reviews of measurements and photographs taken by others at site

inspections, and reviews of building plans for projects listed above, it is my professional opinion that there is overwhelming evidence to support the conclusion that every one of the multifamily residential projects I evaluated has "failed" to comply with federal accessibility standards (UFAS and/or ADA Standards) and California Government Code Section 11135.

   As stated above, a development "fails" only if the violations found are of a type or frequency that would prevent someone with a disability from being able to use important portions of their dwelling unit and/or common-use facilities. Some examples of violations that, in my experience, demonstrate a lack of meaningful accessibility are: inadequate maneuvering space in the bathroom such that an individual using a wheelchair cannot enter the bathroom and close the door behind them; insufficient clear floor space in front of the sink in the bathroom or kitchen to allow a forward approach in a wheelchair so an individual can wash their hands or their dishes; doorways that are not wide enough for an individual in a manual wheelchair to maneuver without scraping the knuckles on their hands on the door frames as they pass; stairs or steps that make it difficult or impossible for wheelchair users to enter or approach the accessible dwelling unit; lack of lowered kitchen counters or cabinets in accessible dwelling units so wheelchair users can easily use the counter and reach items stored in the cabinets; accessible parking space violations affecting the disabled residents' ability to transfer from the vehicle to their wheelchairs; inaccessible door maneuvering clearances in dwelling units and along approach routes which make it difficult for wheelchair users to effectively approach and operate doors and gates; door thresholds that are too high or lack the necessary beveled edges in a manner that could eject a wheelchair user rolling over them; steep slopes and cross slopes that could tip wheelchair users backwards or off the path; many wall or ceiling mounted elements that were not cane detectable and could injure blind or visually impaired residents or guests; lack of accessible door hardware

87

that is easier for those with limited grasping ability to operate; steps or inaccessible abrupt level changes along approach routes that are required to be accessible for wheelchair users; and, the lack of wheelchair maneuvering clearance required for usability in kitchens and bathrooms. I saw significant violations such as these at every development, and, using my professional judgment to review developments for an overall level of "meaningful accessibility," determined whether the development "passed" or "failed."

In the exhibits attached to this report, I have chronicled hundreds of specific instances of federal and state accessibility violations. Every single project "failed" the accessibility review and none of the developments provide "meaningful accessibility." Based on my review of building plans for developments constructed prior to the filing of the Complaint in this litigation, it is evident that the architects for those residential projects may have *intended* for their work to be accessible per the CBC (though I understand the report of Glenn Dea will detail widespread CBC violations), but I saw no mention of UFAS or Section 504 compliance in those plans. For the plans prepared after the date of the Complaint, there was a single references to federal accessibility, but the plans still "failed" to meet the federal accessibility standards.

The magnitude and frequency of the accessibility violations I observed throughout the Portfolio are some of the most serious I have seen in my twenty-five-plus years as an accessibility specialist. It appears that there was a total failure to design and construct the developments in the Portfolio in compliance with federal accessibility requirements. In conclusion, it is my professional opinion that the design and construction of these residential projects failed to provide people with disabilities "meaningful access" to the multifamily housing developments I inspected as required by Section 504 of the Rehabilitation Act, the Americans with Disabilities Act, and California Government Code Section 11135.

88



_____     _____
**Bill Hecker, AIA – Accessibility Consultant**                        **Date**

# EXHIBIT

# E

## Expert Report of Glenn Dea

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-cv-00551-FMO (C.D. Calif.)*

I.        **Background and Qualifications**

My name is Glenn Dea. I am a licensed California architect. In 2008, I became one of California's first Certified Access Specialists (CASp), based on experience and testing criteria administered by the California Division of the State Architect (DSA). CASp certification means I have completed experience and testing criteria covering knowledge of review, inspection, and advocacy of universal design requirements, specified training, and testing on standards governing access to buildings for persons with disabilities. I am certified by the International Code Council (ICC) as an Accessibility Inspector/Plans Examiner. This means I have completed ICC-administered testing criteria covering inspection and plan review for accessibility of structures. I am also an instructor on the topic of accessibility in association with my employer, Creative Design Associates, Inc., which is registered by the American Institute of Architects (AIA) as an AIA Continuing Education System (CES) approved provider. This means that my firm has been approved by AIA/CES to provide continuing education in accordance with the guidelines administered by the AIA. According to the AIA, states with mandatory continuing education (MCE) requirements recognize AIA/CES as a primary source of continuing education for licensed architects. I have provided accessibility training to licensed architects and engineers, public agencies, and professional organizations, including a 5-hour course addressing the continuing education requirement for California architects.

I am currently the Vice President of Creative Design Associates, Inc., based in the City of Industry, California. I have been employed in the architecture and construction industry for 27 years and have served in a variety of capacities including project architect, project manager,

construction specifier, preservation consultant, and accessibility specialist.

For the last 15 years, my practice has focused on compliance with the Americans with Disabilities Act (ADA) and California accessibility standards, ADA Transition Plan services, and accessible design. From 2004 to 2011, I reviewed over $900 million of construction as a consultant access compliance plan reviewer to California's DSA, Los Angeles Basin Region Office.

Since 2014, as a consultant to the International Sign Association, I have served as an alternate delegate to the ICC/ANSI Committee on Accessible and Usable Buildings and Facilities, contributing to the creation of the 2015 Edition of the "American National Standards Institute's (ANSI) A117.1 Accessibility Standard. The ICC/ANSI A117.1 standard is developed by a committee of approximately 50 individuals and organizations representing associations of persons with disabilities, government agencies, rehabilitation professionals, design professionals, builders, and manufacturers. The standard is adopted by building code jurisdictions throughout the United States.

My present work includes ADA consulting services on behalf of the North Orange County Community College District, Long Beach Community College District, Citrus Community College District, South Orange County Community College District, California State University-San Marcos, the City of Anaheim, the City of Long Beach, the City of Rancho Palos Verdes, and the County of San Bernardino.

I also provide technical assistance to attorneys and other clients to assist in the resolution of lawsuits, complaints, and claims related to State and Federal access laws.

In addition to the qualifications mentioned above that make up the basis of my opinions, I have attached as Exhibit 1 my *curriculum vitae*, which includes my education, professional

registrations, trainings, affiliations, and descriptions of particularly relevant experiences.

As reflected in that document, I have been retained as an expert witness in approximately twenty cases over the last ten years. The only time I have testified as an expert at trial or deposition in the last four years was this past January 29, 2016, when I provided expert testimony at trial in *Route 66 CPA's LLC v. Glendora Courtyard LLC,* Case No. KC063544 (Cal. Sup. Ct.). I have no publications in the last ten years.

The opinions stated herein are based upon my knowledge, training and experience, and have been rendered within a reasonable degree of professional certainty, consistent with professional skill and care.

From 2008 to 2010, in association with staff from the firm, Black, O'Dowd & Associates, Inc. (BOA), I assisted the County of San Bernardino to develop a series of accessibility inspection checklists covering selected accessibility requirements of the ADA Accessibility Guidelines and the California Building Code:

- County of San Bernardino - ADA & CBC New Project Checklist, Exterior Areas – 2009 Edition

- County of San Bernardino - ADA & CBC New Project Checklist, Interior Areas – 2009 Edition

I have not authored publications other than these checklists during the previous 10 years.

## II.    Assignment and Compensation

I have been engaged by Plaintiffs' counsel to conduct an analysis of whether multifamily apartment housing developments (developments) are accessible to individuals with disabilities under the applicable accessibility standards of the California Building Code (CBC). As described in further detail below, my analysis included both: (1) CBC accessibility analysis of reports

conducted by the City's consultant(s) (ADAAG Consultants), and (2) CBC accessibility analysis of on-site measurements and photographs conducted by my firm Creative Design Associates, Inc. (CDA).

In addition to my expert opinion on CBC accessibility, CDA was engaged by Plaintiffs' counsel to collect on-site measurements and photographs for the purpose of gathering the information needed for both CBC accessibility review by CDA and federal accessibility review by Bill Hecker.

CDA is being compensated in the present matter as follows. For individual CBC analysis of an ADAAG Report, CDA is being paid $125 for each development. CDA is being paid my hourly rate of $240/hour for my time preparing this report and other tasks relating to this matter, excluding testimony. My hourly rate for testimony is $290/hour.

With respect to on-site measurements and photographs, CDA is being compensated $162,836 for 32 developments.[1] This compensation includes preparation, on-site measurements and photographs, and CBC analysis.

Fees for CDA's services are not contingent in any manner on the outcome of this litigation.

## III.  Documents and Facts Relied on for this Report

I have relied on the following documents and information in my preparation of this report:

---

[1] Three developments that were inspected are not included in this report. These were removed by counsel because after the inspections were complete, one was found not to be a development at issue in this case, one was assigned individual review because the loan agreement for its construction/rehabilitation was signed after this litigation commenced, and one was incorrectly included twice in the randomizations.

1. Selected, applicable editions of the California Building Code, including:

   - 1985 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 1982 Uniform Building Code (UBC)), including Chapters 5, 12, 33, 51 and 71

   - 1989 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 1988 Uniform Building Code (UBC)), including Chapters 5, 12, 33, 51 and 71

   - 1992 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 1991 Uniform Building Code (UBC)) , including Chapters 5, 12, 33, 51 and 71

   - 1994 State Accessibility Amendments to the 1991 Uniform Building Code (UBC), including Chapters 5, 12, 33, 51 and 71

   - 1995 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 1994 Uniform Building Code (UBC)), including Chapters 10, 11A and 11B

   - 1998 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 1997 Uniform Building Code (UBC)), including Chapters 10, 11A and 11B

   - 2001 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 1997 Uniform Building Code (UBC)), including Chapters 10, 11A and 11B

   - 2007 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 2006 International Building Code (IBC)), including Chapters 10, 11A and 11B

   - 2010 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 2009 International Building Code (IBC)), including Chapters 10, 11A and 11B

   - 2013 California Building Code (CBC), Part 2, Title 24, CCR (Based on the 2012 International Building Code (IBC)), including Chapters 10, 11A and 11B

   - Code Organization of California access standards into the CBC, commencing with

the 1982 edition and followed in subsequent triennial editions of the CBC, until

the 1995 CBC:

| Chapter 5 | Classification of All Buildings by Use or Occupancy and General Requirements for All Occupancies |
|---|---|
| Chapter 12 | Requirements for Group R Occupancies |
| Chapter 33 | Exits |
| Chapter 51 | Elevators, Dumbwaiters, Escalators, and Moving Walks |
| State Chapter 71 | Site Development Requirements for Handicapped Accessibility |
| State Chapter 72 | Protective Signaling Systems |

- Code Organization of California access standards into the CBC, commencing with

    the 1995 edition and followed in subsequent triennial editions of the CBC:

| Chapter 9 | Fire Protection Systems |
|---|---|
| Chapter 10 | Means of Egress |
| Chapter 11A | Housing Accessibility |
| Chapter 11B | Accessibility to Public Buildings, Public Accommodations, Commercial Buildings, and Publicly Funded Housing |

2.  Architectural plans provided by counsel for the following developments:

- 1600 Vine (Hollywood & Vine Mixed Use)

- Adams West

- Alexandria Hotel

- Carlton Hotel

- Dunning Apartments

- FAME Housing (Adams Senior Gardens 2)

- Haskell Hotel

- Heavenly Vision Seniors

- Hollywood Bungalow Court

- Magnolia Villas

Page 6 of 33

- Menlo Park

- Metropolitan Lofts

- Montecito Terraces (Montecito Terraces Senior Apartments)

- Palmer Hotel (Palmer House)

- Produce Hotel

- Renato Apartments

- Simone Hotel (San Julian Hotel)

- Star

- Strathern Park

- Villa Esperanza

3. ADAAG Reports and accompanying federal accessibility reports by Bill Hecker for

   the following developments:

   - 36th & Broadway (TAY Facility Housing)

   - Adams and Central

   - Afton Place (Minami Apartments; Minomi Apartments)

   - Amistad Plaza

   - Andalucia Senior Apartments

   - Ardmore Apartments (The Ardmore)

   - Asturias Senior Apartments

   - Bonnie Brae Apartment Homes

   - Boyle Hotel Apartments

   - Broadway Plaza Apartments

- Bronson Court

- Buckingham Place Senior Housing

- Cantabria Senior Citizen Apartments

- Carondelet Court Partners, L.P.

- Casa Rampart

- Casa Verde

- Charles Cobb

- Colorado Terrace Senior Apartments

- Columbus Permanent Housing (Penny Lane Centers; Columbus Permanente)

- Columbus Square

- Crossings at 29th Street

- Crossings at North Hills

- Cuatro Vientos

- Decro Osborne Apartments (Osborne Place; Osborne Family; Osborne Gardens)

- Don Senior Apartments (Don Hotel Apartments; Don Carlos Apartments; Hotel Senior)

- Downtown Women's Center (Renaissance Building)

- Dunbar Village

- Eastside Village (Lillian Mobley)

- El Dorado Apartments

- Encore Hall (Triangle Square)

- Eugene Hotel

- FAME West 25th (FAME Western)

- Far East Building

- Gallery at NoHo Commons

- Grandview 9

- Hart Village Apartments (Owensmouth Apartments)

- Heavenly Vision Seniors

- Hobart Heights Apartments (The Hobart)

- Hoover Senior (Hoover Senior Apartments)

- Hope Manor

- Imani Fe East & West

- Ivy Terrace (Three Courtyards)

- Juanita Villas (Juanita SRO; La Kretz Villas)

- La Coruna

- La Estrella Apartments

- Las Margaritas

- Lofts at NoHo Commons (NoHo Commons Phase II)

- Main Street Vistas

- Menlo Family Housing

- Menlo Park

- Metro Hollywood Apartments (Hollywood Western Apartments; Western Carlton Phase II)

- Montecito Terraces (Montecito Terraces Senior Apartments)

- Morgan Place Senior Apartments

- Normandie Terrace

- Orion Gardens Apartments (Decro Orion)

- Palm Village Senior Citizens

- Palomar Apartments

- Paseo Del Sol (Soto Apartments)

- Pico Gramercy Housing

- Professional Housing & Development

- Rainbow Apartments

- Renato Apartments

- Rittenhouse

- Rosa Parks Villas

- Seven Maples Senior Apartments

- Stovall Villa

- Sunrise

- Terre One

- Tierra Del Sol

- Toberman Village

- Two Worlds

- Union Point

- Vermont Avenue

- Vermont Seniors

- Villas at Gower

- Villas Del Lago

- Villas Las Americas

- Vista Monterey Senior Housing

- Washington Court (Washington Village)

- Western Carlton Apartments (Carlton Court Apartments)

- Woodland Terrace

- Yale Terrace Apartments

4. Measurements and photographs taken by CDA for the following developments:

- 1600 Vine (Hollywood & Vine Mixed Use)

- 3790 Wisconsin Street Partners (Wisconsin III)

- Adams West

- Alexandria Hotel

- Ardmore Apartments (The Ardmore)

- Carlton Hotel

- Casa Del Sol

- Courtland Hotel

- Dunning Apartments

- Edru & Associates

- FAME Housing (Adams Senior Gardens 2)

- Florence Avenue Villas

- Haskell Hotel

- Heavenly Vision Seniors

- Hollywood Bungalow Court

- Ivy Terrace (Three Courtyards)

- La Jolla Hotel (Liberty Village)

- Magnolia Villas

- Menlo Park

- Metropolitan Lofts

- Montecito Terraces (Montecito Terraces Senior Apartments)

- NoHo Senior Artist Colony

- Palmer Hotel (Palmer House)

- Produce Hotel

- Simone Hotel (San Julian Hotel)

- Star

- Strathern Park

- Villa Esperanza

- Woodland Terrace

5. The following additional documents:

- List of specific construction start dates provided by counsel, to determine the correct version of the California Building Code for ADAAG Report reviews.

6. For the purposes of evaluating CDA's measurements and photographs for compliance with federal and California accessibility laws, I reviewed the following additional documents:

- Fair Housing Act Design Manual: A Manual to Assist Designers and Builders in Meeting the Accessibility Requirements of The Fair Housing Act, by Barrier Free Environments, Inc., revised April 1998.

- A117.1-1986, Buildings and Facilities: Providing Accessibility and Usability for Physically Handicapped People, by ANSI, Inc., dated February 5, 1986.

- Development Inspection Checklist, by Texas Department of Housing & Community Affairs, dated March 2008.

- Housing Accessibility Checklist: Based on Chapter 11A of the 2010 California Building Code, by Department of Housing and Community Development Division of Codes and Standards, State Housing Law Program, dated November 1, 2010.

- DSA/AC Check List 22: Residential Use Areas, by the California Division of the State Architect (DSA) and Office of Universal Design (OUD), dated March 1, 2005.

- A New Horizon, Accessible/Adaptable Apartments for the Physically Disabled, by Department of Housing and Community Development, revised July 1989.

- Rebuttal Report of Plaintiffs' Expert Opinions, Case No. C07-3685 SBA, United States District Court, Northern District of California, by Bill Hecker, AIA, dated February 15, 2010.

## IV.    California Building Code Accessibility Requirements

California state regulations set specific accessibility requirements which apply to buildings and facilities covered by the access statutes. These accessibility regulations are found in the California Building Standards Code (Title 24) and include the California Building Code

(CBC), Title 24, Part 2, Volume 1, Accessibility Chapters 11A, 11B, and 11C (and parts of Chapter 10). Organization of California access standards into the CBC, Accessibility Chapters 11A, 11B, and 11C (and parts of Chapter 10) commenced with the 1995 edition and has been followed in subsequent triennial editions of the CBC.

Prior to the 1995 CBC, California access standards applicable to multifamily apartment housing developments were found in Chapters 5, 12, 33, 51, and 71 as reflected in the 1994 State Accessibility Amendments to the 1991 Uniform Building Code (UBC), and earlier editions of the CBC, commencing with the 1982 California Title 24 State Amendments to the 1979 UBC. These amendments were developed by the DSA, Access Compliance Section, in 1982, eight years prior to the adoption of the ADA.

The 2001 CBC, which became effective November 1, 2002, contained several changes in the state's accessibility standards from the 1998 edition. For example, accessibility requirements were moved from the California Plumbing Code to CBC Accessibility Chapters 11A and 11B in an effort to consolidate accessibility provisions into one location. Similarly, accessibility requirements associated with electrical switches, controls, and outlets, especially dimensional criteria, were moved from the California Electrical Code to CBC Accessibility Chapters 11A and 11B. For these reasons, some plumbing fixture-related citations in my CBC analysis may instead reference accessibility provisions found in the California Plumbing Code (CPC) for editions of the CPC prior to 2001, and electrical device-related citations may instead reference accessibility provisions found in the California Electrical Code (CEC), as then applicable.

Accessibility regulations from the California Building Standards Code reflect the State's on-going effort to provide a single code which would meet all of the accessibility requirements of the original California Building Standards Code. Generally, California accessibility standards

Page 14 of 33

applicable to multifamily apartment housing developments are found in Chapter 11A of the CBC. Chapter 11A and earlier versions of California housing accessibility standards reflect code development by the California Department of Housing and Community Development (HCD) in conjunction with the California Department of Rehabilitation (DOR). HCD has stated that Chapter 11A is primarily based upon the ANSI A117.1-1986 Standard. While some provisions of Chapter 11A require a higher level of accessibility than the ANSI A117.1-1986 Standard, Chapter 11A's adaptability/accessibility provisions are not as robust as those under the ADA, and generally mirror the modest design and construction requirements of the Fair Housing Act applicable to all covered units:

- Accessible Entrance on an Accessible Route,

- Accessible Public and Common-Use Areas,

- Usable Doors,

- Accessible Route Into and Through the Dwelling Unit,

- Accessible Light Switches, Electrical Outlets, Thermostats, and Environmental Controls,

- Reinforced Walls in Bathrooms, and

- Usable Kitchens and Bathrooms.

**V.      Review of Developments for California Building Code Accessibility**

**A. ADAAG Report CBC Reviews**

**1. Introduction**

I conducted a review of 82 developments for which the City of Los Angeles provided ADAAG Reports for the purposes of determining whether the developments were accessible or inaccessible under the California Building Code. My assignment related only to accessibility

Page 15 of 33

under California law. Bill Hecker is submitting a separate Expert Report that analyzes accessibility and inaccessibility under federal accessibility requirements.

### 2.   ADAAG Report CBC Review Methodology

As described above, there are several requirements of federal accessibility law that overlap with accessibility requirements under the California Building Code. As such, instead of conducting a duplicative review of all measurements and photographs contained in the ADAAG Reports, my analysis focused only on determining whether the violations of federal accessibility law identified in Bill Hecker's review of the ADAAG Reports also constituted violations of the accessibility requirements of the California Building Code. This analysis included reviewing the ADAAG Report federal analyses by Bill Hecker and the applicable CBC provisions. Because the CBC also contains additional or different requirements than federal accessibility law, I did not identify and list every CBC violation in a development—I simply verified whether significant violations of the CBC existed at that development. While a comprehensive assessment of each property may have resulted in a longer list of CBC violations at each, I am confident in my conclusion that even the limited subset of CBC violations I noted at the properties mentioned in this report render those properties inaccessible to people with disabilities based on the CBC accessibility standards.

Attached as Exhibit 2 is a list of violations of federal accessibility requirements identified by Bill Hecker at each development that also violate the applicable California Building Code. The first column contains the development name, the second column identifies the number of the photograph that shows the condition being evaluated, the third column contains the year of the version of the California Building Code used to evaluate that development, the fourth column contains the federal accessibility standard identified by Bill Hecker as violated by the condition

Page 16 of 33

being evaluated, the fifth column contains the section of the California Building Code violated by the condition being evaluated, and the sixth column contains additional information that relates to the condition being evaluated.

### 3.  ADAAG Report CBC Review Conclusions

I found significant violations of the California Building Code at all 82 of the developments for which I received and reviewed ADAAG Reports. I reached the following opinions with respect to my analysis of the ADAAG Reports:

1.      In a preliminary analysis, I identified over 500 location-specific conditions in the ADAAG Reports that do not comply with applicable accessibility provisions of the California Building Code.

2.      Many conditions I identified have the potential to significantly impact the usability of the dwelling unit or development for persons with disabilities. For example, in over 30 instances, the ADAAG Reports contained clear floor space or dimensional placement conditions related to bathrooms that do not meet the criteria prescribed by the CBC, and therefore impede the use of bathrooms by people who use wheelchairs or other mobility devices. Such access is important because if a wheelchair user cannot get into and use the toilet, shower, or sink, that unit is effectively unusable by that person. Similarly, the California Building Code has required that clothing rods be mounted a maximum of 54" above the finish floor surface for a side approach. In over 80 instances, the ADAAG Reports showed mounting heights for this element that exceed the maximum height permitted by the CBC, often by a significant margin. The ADAAG Reports also contained conditions related to bathrooms and required clear floor space or fixture location. Additional conditions I identified include minor deviations from specified scoping and technical requirements of the CBC.

Page 17 of 33

The chart below identifies each development for which an ADAAG Report was reviewed for compliance with the California Building Code. The chart contains the development name, the file name of the ADAAG Report(s), the corresponding address, whether the development received federal funds directly (as provided by counsel), and the construction type (new construction or rehabilitation) (as provided by counsel). All of the properties had violations of the federal accessibility standards that also violated the applicable California Building Code.

| Development Name | Report Name(s) | Address | Fed. Fund. | Constr. Type |
|---|---|---|---|---|
| 36th & Broadway Apartments (TAY Facility Housing) | 4775 South Broadway.pdf | 4777 S. Broadway; 4775 S. Broadway | Yes | New |
| Adams and Central | Adams & Central.pdf | 1011 Adams Boulevard | Yes | New |
| Afton Place (Minami Apartments; Minomi Apartments) | Afton Place Apartments.pdf | 6230-31 Afton Place | Yes | New |
| Amistad Plaza | Amistad Plaza.pdf | 6050-6130 S. Western Avenue | Yes | New |
| Andalucia Senior Apartments | Andalucia Senior Apartments.pdf | 15305 Lanark Street | Yes | New |
| Ardmore Apartments (The Ardmore) | Ardmore Apartments.pdf | 959 S. Ardmore Avenue | Yes | Rehab |
| Asturias Senior Apartments | Asturias Senior Apartments.pdf | 9628 Van Nuys Boulevard | Yes | Rehab |
| Bonnie Brae Apartment Homes | Bonnie Brae Apartments.pdf | 501 S. Bonnie Brae; 505 S. Bonnie Brae | Yes | New |
| Boyle Hotel Apartments | Boyle Hotel LP.pdf | 101-105 N. Boyle Avenue; 1781-1785 E. 1st Street | Yes | New |
| Broadway Plaza Apartments | Broadway Plaza (Blackstone).pdf | 901 S. Broadway | Yes | New |
| Bronson Court | Bronson Court.pdf | 1227-39 N. Bronson Avenue | Yes | New |

| Development Name | Report Name(s) | Address | Fed. Fund. | Constr. Type |
|---|---|---|---|---|
| Buckingham Place Senior Housing | Buckingham Senior Apartments.pdf | 4020-70 Buckingham Road | Yes | Rehab |
| Cantabria Senior Citizen Apartments | Cantabria Senior Apartments.pdf | 9640 N. Van Nuys Boulevard; 9628 Van Nuys Boulevard | Yes | New |
| Carondelet Court Partners, L.P. | Carondelet Court Apartments.pdf | 812 S. Carondelet Street; 816 S. Carondelet Street | Yes | New |
| Casa Rampart | Casa Rampart - 401.pdf | 401 S. Rampart Boulevard; 512 S. Rampart Boulevard | Yes | New |
| Casa Verde | Casa Verde Apartments.pdf | 1552 Schrader Boulevard | Yes | Rehab |
| Charles Cobb | Charles Cobb.pdf | 521 S. San Pedro Street | Yes | Rehab |
| Colorado Terrace Senior Apartments | Colorado Terrace.pdf | 2455 Colorado Boulevard | Yes | New |
| Columbus Permanent Housing (Penny Lane Centers; Columbus Permanente) | Columbus Permanente.pdf | 8900-06 Columbus Avenue | Yes | New |
| Columbus Square | Columbus Square.pdf | 8557-8613 Columbus Avenue | Yes | New |
| Crossings at 29th Street | The Crossing on 29th Street.pdf | 814 E. 29th Street; 818 E. 29th Street; 828 E. 29th Street; 838 E. 29th Street | Yes | New |
| Crossings at North Hills | Crossings at North Hills.pdf | 9311-45 Sepulveda Boulevard | Yes | Rehab |
| Cuatro Vientos | Cuatro Vientos.pdf | 5331 E. Huntington Drive | Yes | Rehab |
| Decro Osborne Apartments (Osborne Place) | Osborne Gardens.pdf | 12360 Osborne Street | Yes | Rehab |

| Development Name | Report Name(s) | Address | Fed. Fund. | Constr. Type |
|---|---|---|---|---|
| Don Senior Apartments (Don Hotel Apartments) | Hotel Senior Apartment (AKA Don Hotel).pdf | 105 E. I Street | Yes | New |
| Downtown Women's Center (Renaissance Building) | Downtown Women's Center.pdf | 501 E. Fifth Street; 434 S. San Pedro Street | Yes | New |
| Dunbar Village | Dunbar Village.pdf | 4201 S. Central Avenue | Yes | New |
| Eastside Village (Lillian Mobley) | Eastside Village Apartments.pdf | 2250 E. 111 Street | Yes | Rehab |
| El Dorado Apartments | El Dorado.pdf | 12129 El Dorado Avenue | Yes | New |
| Encore Hall (Triangle Square) | Encore Hall.pdf | 1602 Ivar Avenue | Yes | Rehab |
| Eugene Hotel | Eugene Hotel.pdf | 560 S. Stanford Avenue | Yes | New |
| FAME West 25th (FAME Western) | FAME WeStreetpdf | 1940 W. 25th Street | Yes | New |
| Far East Building | Far East Building.pdf | 347-353 E. First Street | Yes | New |
| Gallery at NoHo Commons | Gallery at NoHo Commons.pdf | 5416 Fair Avenue | Yes | New |
| Grandview 9 | Grandview Nine Apartments.pdf | 916-920 S. Park View Street; 2300 W. 9th Street | Yes | New |
| Hart Village (Owensmouth Apartments) | Hart Village Apartments.pdf | 6941 Owensmouth Avenue; 6927 Owensmouth Avenue | Yes | New |
| Heavenly Vision Seniors | Heavenly Vision Senior Housing.pdf | 9426 S. Broadway; 9500 S. Broadway | Yes | Rehab |
| Hobart Heights Apartments (The Hobart) | Hobart Heights.pdf | 924 S. Hobart Boulevard | Yes | New |
| Hoover Senior (Hoover Seniors Apartments) | Hoover Seniors Apartments.pdf | 6212 S. Hoover Street | Yes | New |
| Hope Manor | Hope Manor.pdf | 1332 S. Hope Street | Yes | New |
| Imani Fe East & West | Imani Fe EaStreetpdf; Imani Fe WeStreetpdf | 10424 S. Central Avenue | Yes | New |

| Development Name | Report Name(s) | Address | Fed. Fund. | Constr. Type |
|---|---|---|---|---|
| Ivy Terrace (Three Courtyards) | Ivy Terrace.pdf | 13751 Sherman Way | Yes | Rehab |
| Juanita Villas (Juanita SRO; La Kretz Villas) | La Kretz Villas.pdf | 335 N. Juanita Avenue | Yes | New and Rehab |
| La Coruna | La Coruna Senior Apartments.pdf | 15301 Lanark Street; 8107 N. Sepulveda Boulevard | Yes | New |
| La Estrella Apartments | La Estrella.pdf | 1979 Estrella Avenue | No | New |
| Las Margaritas[2] | Las Magaritas.pdf | 115 N. Soto Street; 137 N. Soto Street | Yes | New and Rehab |
| Lofts at NoHo Commons (NoHo Commons Phase II) | The Lofts as NoHo Commons.pdf | 11136 Chandler Boulevard; 11135 W. Weddington Street | Yes | New |
| Main Street Vistas | Main Street Vistas.pdf | 5950 S. Main Street | Yes | New |
| Menlo Family Housing | Menlo Family Apartments.pdf | 1230-1240 Menlo Avenue | Yes | New |
| Menlo Park | Menlo Park Apartments.pdf | 831 W. 70th Street | Yes | New |
| Metro Hollywood Apartments (Hollywood Western Apartments; Western Carlton Phase II) | Metro Hollywood Phase II.pdf | 5450 Hollywood Boulevard | Yes | New |
| Montecito Terraces (Montecito Terraces Senior Apartments) | Montecito Terraces Senior Apartments.pdf | 14653-14661 W. Blythe Street | Yes | New |
| Morgan Place Senior Apartments | Morgan Place Apartments.pdf | 7301 S. Crenshaw Boulevard | Yes | New |

---

[2] Four federally-funded developments contained elements of both new construction and rehabilitation of existing elements: 28th Street YMCA/28th Street Apartments, 1006 E. 28th Street, Las Margaritas, 115 N. Soto Street, Chinatown Metro, 808-810 Spring Street, and Ford Apartments/Ford Hotel, 1000 E. 7th Street. They were placed in both applicable categories. These developments have been starred throughout this report for reference.

| Development Name | Report Name(s) | Address | Fed. Fund. | Constr. Type |
|---|---|---|---|---|
| Normandie Terrace | Normandie Terrace.pdf | 541 S. Mariposa Avenue; 540 S. Normandie Avenue | Yes | New |
| Orion Gardens Apartments (Decro Orion) | Orion Gardens.pdf | 8955 Orion Avenue; 8947 Orion Avenue | Yes | Rehab |
| Palm Village Senior Citizens | Palm Village.pdf | 9040 Laurel Canyon Boulevard; 9034 Laurel Canyon | Yes | New |
| Palomar Apartments | Palomar Apartments.pdf | 5473 Santa Monica Boulevard | Yes | New |
| Paseo Del Sol (Soto Apartments) | Paseo Del Sol.pdf | 417 N. Soto Street | Yes | New |
| Pico Gramercy Housing | Pico Gramercy.pdf | 1244 S. Gramercy Place; 3201 W. Pico Boulevard; 3215 S. Gramercy Place | Yes | New |
| Professional Housing & Development | Professional Housing Development.pdf | 1020 S. Kingsley Drive | Yes | New |
| Rainbow Apartments | Rainbow Apartments.pdf | 635 S. San Pedro Street; 643 S. San Pedro Street | Yes | New |
| Renato Apartments | Renato Apartments.pdf | 531 S. San Julian Street | Yes | New |
| Rittenhouse | Ritten House.pdf | 3300-3320 S. Central Avenue | Yes | New |
| Rosa Parks Villas | Rosa Parks Villas.pdf | 2440 S. Crenshaw Boulevard; 2507 S. Bronson Avenue | Yes | New |
| Seven Maples Senior Apartments | Seven Maples.pdf | 2618-30 W. 7th Street; 2530 W. 7th Street | Yes | New |
| Stovall Villa | Stoval Villas.pdf | 535 W. 41st Street | Yes | New |
| Sunrise | Sunrise Apartments.pdf | 5111-5125 S. Main Street | Yes | New |

| **Development Name** | **Report Name(s)** | **Address** | **Fed. Fund.** | **Constr. Type** |
|---|---|---|---|---|
| Terre One | Terre One.pdf | 5270 S. Avalon Boulevard | Yes | Rehab |
| Tierra Del Sol | Tierra Del Sol.pdf | 7500 Alabama Avenue | Yes | New |
| Toberman Village | Toberman Village.pdf | 142 W. Santa Cruz Street | Yes | New |
| Two Worlds | Two Worlds Apartments.pdf | 809 23rd Street; 1306 S. Westlake | Yes | New |
| Union Point | Union Point - 420 Union Drivepdf | 420-26 Union Drive | Yes | New |
| Vermont Avenue | Vermont Avenue Apartments - 4915 S. Vermont Avenue.pdf | 4915 S. Vermont Avenue; 4925 S. Vermont Avenue | Yes | New |
| Vermont Seniors | Vermont Senior Housing.pdf | 3901-3925 S. Vermont Avenue; 1015 W. 39th Place | Yes | New |
| Villas at Gower | Villas at Gower Apts.pdf | 1720 N. Gower Street; 1726 N. Gower Street | Yes | New |
| Villas Del Lago | Villas del Lago.pdf | 456-472 S. Lake Street | Yes | New |
| Villas Las Americas | Villas Las Americas LP Fund.pdf | 9618 N. Van Nuys Boulevard | Yes | New |
| Vista Monterey Senior Housing | Vista Monterrey.pdf | 4647 Huntington Drive N.; 4651 Huntington Drive N. | Yes | New |
| Washington Court (Washington Village) | Washington Court.pdf | 1717 E. 103rd Street | Yes | New |
| Western Carlton Apartments (Carlton Court Apartments) | Metro Hollywood Phase I.pdf | 5443 Carlton Way | Yes | New |
| Woodland Terrace | Woodland Terrace Apartments.pdf | 15532 Nordhoff Street | Yes | New |
| Yale Terrace Apartments | Yale Terrace.pdf | 716-734 Yale Street | Yes | New |

B.      **Randomized Measurement CBC Reviews**

I conducted a review of measurements and photographs of 36 developments, most of
which I or CDA colleagues (under my supervision) visited and assessed personally. The list of
developments was provided to me by counsel after being randomly chosen among the
developments at issue in the litigation in the categories of: federally-funded new construction;
non-federally funded new construction; federally-funded rehabilitations, non-federally funded-
rehabilitations. A detailed description of these four sub-sets is found in the Expert Report of Bill
Hecker.

Again, my assignment related only to accessibility under California law. Bill Hecker is
submitting a separate Expert Report that analyzes accessibility and inaccessibility under federal
accessibility requirements.

1.      **Randomized Measurement CBC Review Methodology**

I used the following methodology to conduct my on-site inspections:

**Facility Compliance Methodology.** CDA conducted on-site inspections of 29 properties,
covering site arrival points, project approach routes, common-use facilities, dwelling unit
approach routes, and dwelling unit interiors. Following a protocol as summarized below, I
supervised teams of inspectors who observed, measured, recorded, and photographed
measurements of built conditions at the subject properties:

1.   Request from on-site property representatives the following information:

- Age of the facility (year built if available);

- History of improvements (dates of alterations if available);

- Identification of areas accessed by the public;

- Number of floors and confirmation of the existence of an elevator;

- Total number of dwelling units with a unit count for each unit type (one-bedroom, two-bedroom, three-bedroom, etc.);

- Number of dwelling units that are designated as accessible with accessible mobility features;

- Number of dwelling units that are designated as accessible with accessible communication features; and

- An electronic copy or hard copy of Consumer Information regarding the existence of adaptable features provided in each adaptable dwelling unit per the Uniform Federal Accessibility Standards (UFAS), Sec. 4.34.4.

2. Document the individuals present at the on-site survey, including representatives of CDA (Consultant to Counsel for the Plaintiffs), property representatives, the City of Los Angeles, Counsel for the Defendants, and other parties who accompany or observe CDA inspection teams.

3. Obtain field measurements (with associated digital photographs documenting specific measurement locations, conditions and findings) during the on-site survey of site arrival points, project approach routes, common-use facilities, dwelling unit approach routes, and dwelling unit interiors. Document the number of on-site parking spaces at each on-site parking lot and the number of parking spaces designated as accessible at each lot.

4. In addition to the public and common-use areas, survey and obtain field measurements of the following:

- For units that are not designated as accessible: a sampling of units of each unit type, e.g. two one-bedroom units, two two-bedroom units, etc.;

- For units that are designated as accessible: a sampling of each unit type that is designated as accessible, e.g. one one-bedroom accessible, one two-bedroom accessible, etc.; and

- For designated accessible units with accessible communication features: a sampling of each unit type with such features, e.g. one one-bedroom with accessible communication features, etc. Examples of accessible communication features include strobe lights for doorbells and visual fire alarms.

The primary source of measurements for the randomized measurement CBC review was site inspections by my firm, CDA, of the developments that came up as part of the random samples. Attached to this report as Exhibits 3-34 are spreadsheets with detailed information regarding the site inspections conducted by CDA. In each report, the first tab includes information about the development CDA inspected, including the name, the type of development, the number of units, and details regarding designated accessible units and parking spaces. The second tab includes measurements or observations of possible violations CDA inspectors observed in the common and public use areas and accessible routes. The third tab identifies measurements or observations of possible violations CDA inspectors observed in the representative sampling of dwelling units. In determining accessibility under the CBC for these developments, I reviewed and analyzed this data. My analyses can be found in the last column of the second and third tabs.

As noted above, prior to the randomization, Bill Hecker conducted five site inspections. Three of these developments came up as part of the randomized review. Because Bill Hecker conducted an analysis for both federal accessibility and CBC analysis as part of his site review, I relied on Bill Hecker's determination that the three developments he assessed did not comply

with the California Building Code, as discussed further in his Expert Report.[3]

Defendant City of Los Angeles produced a set of measurements and photographs taken by its consultant in the course of performing on-site inspections at a number of developments (the ADAAG Reports discussed above). After CDA was contracted to conduct an initial set of site inspections and once the ADAAG reports were produced to Plaintiffs' counsel, I relied on those measurements and photographs for any property that came up as part of the randomized measurement review instead of conducting a duplicate site inspection. When neither I nor Mr. Hecker had conducted a site inspection, I reviewed any available ADAAG Reports, using the methodology discussed above, for the relevant development to ascertain whether that development complied with the CBC.[4]

### 2.   Randomized Measurement CBC Review Conclusions

39 developments were identified for measurement review, pursuant to a randomization procedure identified by a statistician. As indicated above, three (3) of these were assessed by Bill Hecker for compliance with the California Building Code. Of the 36 that I evaluated, all 36 developments "failed" my accessibility review under the California Building Code. I reached the following opinions with respect to my analysis of the randomized measurement reviews:

-------------------

[3] The three developments that came up in the randomization for which Bill Hecker had already performed a site inspection were Buckingham Place Senior Housing, 4020-70 Buckingham Road, and Grandview 9, 916-920 South Park View Street, both of which were federally-funded new constructions, and Broadway Village II, 5101 South Broadway, which was a non-federally funded new construction.

[4] I relied on ADAAG Reports to analyze 36th & Broadway Apartments, 4777 S. Broadway; 4775 S. Broadway, Broadway Plaza Apartments, 901 S. Broadway, Casa Rampart, 401 S. Rampart Boulevard, Eugene Hotel, 560 S. Stanford Avenue, Main Street Vistas, 5950 S. Main Street, Renato Apartments, 527-531 S. San Julian, and Two Worlds, 809 23rd Street; 1306 S. Westlake Avenue.

1.   Based on measurements and observations reported by CDA inspectors, I have identified in this analysis over 4,000 location-specific conditions that do not comply with applicable accessibility provisions of the California Building Code.

2.   Many conditions have the potential to significantly impact the usability of the subject multifamily dwellings and accessibility of common area elements for persons with disabilities.

3.   A few examples of conditions that I found in a number of units that significantly impact the accessibility of a development for individuals with disabilities include the following:

First, I encountered several violations related to making kitchens usable to individuals with disabilities. The 2001 California Building Code, Chapter 11A sets forth the requirements for countertops:

**1133A.4 Countertops.** Kitchen countertops shall comply with this section and shall be provided with the following (see Section 1133A.4.1 for repositionable countertop requirements):
1. A minimum linear length of 30 inches (762 mm) of countertop shall be provided for the kitchen sink installation.
2. A minimum linear length of 30 inches (762 mm) of countertop shall be provided for a work surface.
3. The sink and work surface may be a single integral unit a minimum of 60 inches (1524 mm) in length, or be separate components.
**EXCEPTION:** Two 15-inch (381 mm) minimum width breadboards may be provided in lieu of the required 30 inches (762 mm) of countertop work surface.

**1133A.4.1 Repositionable Countertops.** Repositionable countertops shall be provided in a minimum of five percent of the covered multifamily dwelling units. Repositionable countertops shall comply with the following:
1. The kitchen sink and work surface space required by 1133A.4 shall be designed to enable repositioning to a minimum height of 28 inches (711 mm).
2. Base cabinets directly under the kitchen sink and work surface shall be removable to provide clearance for a wheelchair.
3. The sides of adjacent cabinets and the back wall, which may become exposed to moisture or food handling when a countertop is lowered, shall be constructed of durable, nonabsorbent materials appropriate for such uses.
4. Finished flooring shall be extended to the wall beneath the sink and work

surface.
**EXCEPTION:**
1. Stone, cultured stone and tiled countertops may be used without meeting the repositioning requirements.
2. Two 15-inch (381 mm) minimum width breadboards may be provided in lieu of the required 30 inches (762 mm) of countertop work surface.

In over 136 instances, even accounting for exceptions to the CBC's repositioning requirements (only five percent of dwelling units are required to comply; stone, cultured stone and tiled countertops are exempt; two 15" breadboards may be used in lieu of 30" work surface), CDA inspectors identified kitchen countertops that had not been provided with appropriate countertops. This means that a critical adaptability/accessibility provision related to usable kitchens has not been included at numerous dwelling units.

Second, federal and California accessibility standards require doors at exit passageways, exit discharge, and exit stairways to be identified by compliant tactile signs. The 2010 ADA Standards state in Advisory 216.4.1 Exit Doors: "An exit passageway is a horizontal exit component that is separated from the interior spaces of the building by fire-resistance-rated construction and that leads to the exit discharge or public way. The exit discharge is that portion of an egress system between the termination of an exit and a public way." The CBC also requires tactile signage.[5] I have identified in this analysis over 49 location-specific conditions where such signs required by the CBC were not installed. From my observations at many of the subject properties, there were numerous instances where visual overhead exit signs were installed as

_____

[5] *See, e.g.*, 2001 CBC (1003.2.8.6.1, item 1) (requiring tactile/Braille exit sign with the word "EXIT" mounted on the wall adjacent to the latch side of the door next to grade-level exterior exit door); 2010 CBC (1011.3, item 4) (requiring exit access door from an interior room or area that is required to have a visual exit sign visual exit sign to also be identified by a tactile exit sign with the words, "EXIT ROUTE").

required by Chapter 10 of the CBC but were not accompanied by the required tactile sign. This means that a critical communication feature related to safety has been made available to and accessible to persons who are visual readers and not to persons who rely on tactile signage for wayfinding.

Third, at over 139 location-specific conditions, Braille characters on signs, including visual/tactile dwelling unit identification signs, do not follow the required dot spacing for California Braille. The CBC requires that Braille characters be spaced in a very specific way,[6] and California Braille is significantly different from ADA Braille.[7]

As the extent of CDA on-site inspections included only a sampling of units, it is reasonable to expect that when Braille characters on visual/tactile identification signs at dwelling unit entrances are found not to follow the required dot spacing for California Braille, this finding will be typical for numerous other units, including hundreds of units at the largest developments where this specific finding is reported. I base this opinion partly on my nearly 15 years of experience of inspecting signage and wayfinding installations for compliance with federal and California accessibility standards.

These are just examples of some serious, widespread violations that I observed in the course of my randomized measurement review. Below is a summary chart that lists the names

---

[6] The 1998, 2001, 2007, and 2010 versions of the CBC require that Braille characters on signs are spaced with 2/10" between cells, measured center to center from the second column of dots in the first cell to the first column of dots in the second cell. 1998 CBC 1117B.5.2; 2001 CBC 1143A.9; 2007 CBC 1143A.9; 2010 CBC 1143A.9. The 2013 CBC requires that Braille characters on signs are spaced with 3/10" between cells, measured center to center between corresponding dots in adjacent cells. 2013 CBC 1143A.7.1.
[7] *See* Department of General Services, Division of the State Architect, Braille Tactile Signage, *available at* http://www.dgs.ca.gov/dsa/Programs/progAccess/braille.aspx (last visited March 24, 2016).

and addresses of the developments included in the Randomized Measurement Review (with stars

next to the developments evaluated and found noncompliant by Mr. Hecker), the categorizations

of the developments as provided by counsel, the source of the measurements and photographs

relied on, and the exhibit number to this Report with the individual analysis of each development.

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Exhibit Number |
|---|---|---|---|---|
| 1600 Vine (Hollywood & Vine Mixed Use) | 1600-1616 Vine Street | No | New | 3 |
| 36th & Broadway (TAY Facility Housing) | 4777 S. Broadway; 4775 S. Broadway | Yes | Rehab | 2 |
| 3790 Wisconsin Street Partners (Wisconsin III) | 3790 Wisconsin Street | No | New | 4 |
| Adams West | 2635 S. Western Avenue | No | New | 5 |
| Alexandria Hotel | 501 S. Spring Street | No | Rehab | 6 |
| Ardmore Apartments (The Ardmore) | 959 S. Ardmore Avenue | Yes | New | 7 |
| Broadway Plaza Apartments | 901 S. Broadway | Yes | Rehab | 2 |
| Broadway Village II* | 5101 S. Broadway | No | New | 8 |
| Buckingham Place Senior Housing* | 4020-70 Buckingham Road | Yes | New | 9 |
| Carlton Hotel | 534 Wall Street | No | Rehab | 10 |
| Casa Del Sol | 1308 Lyman Place; 4563 Fountain Avenue | No | Rehab | 11 |
| Casa Rampart | 401 S. Rampart Boulevard | Yes | Rehab | 2 |
| Courtland Hotel | 520 S. Wall Street | No | New | 12 |
| Dunning Apartments | 5552 Carlton Way | No | New | 13 |
| Edru & Associates | 1032 W. 18th Street | No | Rehab | 14 |
| Eugene Hotel | 560 S. Stanford Avenue | Yes | Rehab | 2 |
| FAME Housing (Adams Senior Gardens 2) | 1755 W. Adams Boulevard | No | Rehab | 15 |

| Development Name | Development Address | Direct Fed. Fund. | Constr. Type | Exhibit Number |
|---|---|---|---|---|
| Florence Avenue Villas | 908-916 W. Florence Avenue | No | New | 16 |
| Grandview 9* | 916-920 S. Park View Street | Yes | New | 17 |
| Haskell Hotel | 528 S. Wall Street | No | New | 18 |
| Heavenly Vision Seniors | 9400 S. Broadway | Yes | New | 19 |
| Hollywood Bungalow Court | 1544 N. Serrano Avenue; 1721 N. Kingsley; 1516 N. Serrano Avenue | No | Rehab | 20 |
| Ivy Terrace (Three Courtyards Apartments) | 13751 Sherman Way | Yes | New | 21 |
| La Jolla Hotel (Liberty Village) | 721 E. 6th Street | No | Rehab | 22 |
| Magnolia Villas | 5238-5250 Harmony Avenue | No | New | 23 |
| Main Street Vistas | 5950 S. Main Street | No | New | 2 |
| Menlo Park | 831 W. 70th Street | Yes | New | 24 |
| Metropolitan Lofts | 1050 S. Flower Street | No | New | 25 |
| Montecito Terraces (Montecito Terraces Senior Apartments) | 14653-14661 W. Blythe Street | Yes | New | 26 |
| NoHo Senior Artist Colony | 10747 Magnolia Boulevard | No | New | 27 |
| Palmer Hotel (Palmer House) | 538 S. Wall Street | No | Rehab | 28 |
| Produce Hotel | 676 S. Central Avenue | No | Rehab | 29 |
| Renato Apartments | 527-531 S. San Julian Street | Yes | New | 2 |
| Simone Hotel (San Julian Hotel) | 520 S. San Julian Street | No | Rehab | 30 |
| Star | 240 E. Sixth Avenue | Yes | New | 31 |
| Strathern Park | 11111 Strathern Street | No | New | 32 |
| Two Worlds | 809 23rd Street; 1306 S. Westlake Avenue | Yes | Rehab | 2 |
| Villa Esperanza | 255 E. 28th Street | No | New | 33 |
| Woodland Terrace | 15532 Nordhoff Street | Yes | New | 34 |

In sum, 39 of 39 developments (100%) reviewed as part of randomized measurement review for compliance with the CBC failed.

## VI.   Conclusions

I have reached the following opinions with respect to my CBC accessibility analyses of ADAAG Reports and measurements and observations from site inspections conducted by CDA inspectors:

1.  I have identified hundreds of location-specific conditions that do not comply with applicable accessibility provisions of the California Building Code.

2.   Hundreds of conditions I have identified have the potential to significantly impact the usability of the dwelling units and the accessibility of the common area elements for persons with disabilities.

3.  These findings cover the broad range of developments referenced in this report, including both small and large properties and developments that were constructed within the past 5 years as well as those constructed more than 20 years ago.

In sum, all developments that were the subject of this report have "failed" to meet the accessibility provisions of the California Building Code. The extent of facility and usability noncompliance that is documented in this report is broad and among the most remarkable I have observed in 15 years of accessibility consulting on behalf of private and public entities.


Glenn Dea

MARCH 29, 2016
Date

Page 33 of 33

# EXHIBIT

# F

# Expert Report of Allan Parnell

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.*, Case No. 12-cv-00551-FMO (PJWx)

## I.      Qualifications

My name is Allan McMillan Parnell. A copy of my *curriculum vitae* accompanies this report as Exhibit 1.

I am Vice President and Research Director of the Cedar Grove Institute for Sustainable Communities, a not-for-profit research organization that specializes in demographic and policy analyses with a focus on community development, discrimination in housing policies, and issues of social equity, including analysis of disparities in access to public infrastructure.  I am also Senior Fellow at the Frank Hawkins Kenan Institute on Private Enterprise at the University of North Carolina at Chapel Hill and President of McMillan and Moss Research, Inc.

I received a Ph.D. in sociology with a specialization in demography from the University of North Carolina at Chapel Hill in 1987.  During my career, I have conducted and published research on a range of issues, taught at the graduate and undergraduate levels, consulted on demographic analysis, and worked as an expert in cases on housing discrimination and spatial disparities. I have been a Research Associate on the Committee on Population at the National Academy of Sciences, on the faculty in the Sociology Department at Duke University, a Senior Fellow at the Duke Center for Demographic Studies, and a Research Associate at the Carolina Population Center at the University of North Carolina at Chapel Hill. I have been the Principal Investigator on peer-reviewed grants from the National Institute of Child Health and Human Development (NICHD) and the National Institute on Aging (NIA).

## II.      Hourly Rate

For work related to preparing this report and for all other work other than testimony, my fee is $225 per hour plus reimbursable expenses. For testimony at deposition and trial, my fee is $325 per hour plus reimbursable expenses. No portion of these fees was or is dependent on the nature of my findings or on the outcome of the case.

## III.      Documents and Information Reviewed/Relied On in Preparation for This Report

1. 2014 American Community Survey, Tables B18131, B18102, B18103, and B18105. www.factfinder.census.gov.

2. 2010 American Community Survey, Tables B18102, B18103, and B18105. www.factfinder.census.gov.

3. American Community Survey, www.census.gov/people/disability/methodology/acs.html (last visited March 11, 2016).

4. H. Stephen Kaye, *Disability rates for working-age adults and for the elderly have stabilized, but trends for each mean different results for costs*, 32 Health Affairs 127, 127-134 and Appendix (2013).

5. *National Historical Geographic Information System: Version 2.0*. Minneapolis, MN: University of Minnesota 2011. https://data2.nhgis.org/main (last visited March 11, 2016).

6. 1990 Census, Table STF3:P41, www.socialexplorer.com/ (last visited March 14, 2016).

7. 2000 Census, Table SF1: PCT17, www.socialexplorer.com/ (last visited March 14, 2016).

8. Your Guide for the 1990 U.S. Census Form, www.census.gov/prod/1/90dec/cph4/appdxe.pdf (last visited March 22, 2016).

9. United States Census 2000, www.census.gov/dmd/www/pdf/d02p.pdf (last visited March 22, 2016).

## IV.      Report

## Scope of this Report

I report the number of non-institutionalized adults in the City of Los Angeles (Los Angeles) with ambulatory, vision or hearing disabilities in 2014 and 2010.  I then estimate the

number of non-institutionalized adults in Los Angeles with ambulatory, vision or hearing disabilities in 1990 and 2000.[1]  I also report the number of people with such disabilities in 2014 who have incomes at or below 100% of the federal poverty level and at or below 150% of the federal poverty level.

In performing my work in this matter, I have used modes of analysis, information sources, and standards of care comparable to those used in professional and scholarly research, and I have applied theories, models, concepts, reasoning, and assumptions that command general acceptance among my professional peers. Subject to the information made available to date, the opinions stated herein are based upon my knowledge, training, and experience, and have been rendered within a reasonable degree of professional certainty.

**Assessment**

The 2014 American Community Survey (ACS) shows that 217,249 non-institutionalized adults in Los Angeles had an ambulatory disability, 79,410 non-institutionalized adults in Los Angeles had a vision disability, and 91,874 non-institutionalized adults in Los Angeles had a hearing disability.[2]  The 2010 ACS shows that 195,606 non-institutionalized adults in Los Angeles had an ambulatory disability, 67,838 non-institutionalized adults in Los Angeles had a vision disability, and 79,825 non-institutionalized adults in Los Angeles had a hearing disability.[3]

This report reviews these numbers and estimates the number of adults ages 18 and older in Los Angeles with an ambulatory disability, a vision disability or a hearing disability for 1990

---

[1] Throughout this report, adult refers to non-institutionalized adults ages 18 or older.
[2] *See* 2014 American Community Survey, Tables B18102, B18103, and B18105. www.factfinder.census.gov.
[3] *See* 2010 American Community Survey, Tables B18102, B18103, and B18105. www.factfinder.census.gov.

and 2000.  The numbers of adults with these disabilities are calculated using 2014 American

Community Survey data for Los Angeles, and Census data from 1990 and 2000 for the number

of residents ages 18-64 and 65 and older, adjusting for changes over time in the percentages of

adults with these disabilities.


*2014 and 2010 American Community Survey Estimates of Disabled Populations in Los Angeles*

The American Community Survey, an annual survey conducted by the Census Bureau,

measures ambulatory, vision, hearing and other disabilities for the non-institutionalized

population. The ACS defines ambulatory difficulty as "having serious difficulty walking or

climbing stairs."[4]  The ACS defines vision difficulty as "blind or having serious difficulty seeing,

even when wearing glasses."[5]  The ACS defines hearing difficulty as "deaf or having serious

difficulty hearing."[6]  These measures have been consistent since the 2008 ACS.[7]

Table 1 shows the total number of adults in Los Angeles with an ambulatory disability, a

vision disability, or a hearing disability in 2014 and for ages 18-34, ages 35-64, ages 65-74, and

for ages 75 and older. [8]   The percentages of Los Angeles residents with any of these disabilities

are higher in the older age groups.  For example, the percentage reporting an ambulatory

disability is 0.9% for ages 18-34 compared to 38.9% for ages 75 and older.  For purposes of this

analysis, I combine the age ranges identified above into two categories: working age (18-64) and

senior (65+), and these categories are used in the estimates for 1990 and 2000 shown in the next

---

[4] American Community Survey, www.census.gov/people/disability/methodology/acs.html (last visited March 11, 2016).
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] 2014 American Community Survey, B18102, B18103, and B18105.

4

section.

In 2014, 95,794 working-age adults (3.7%) and 121,455 seniors (27.3%) in Los Angeles reported an ambulatory disability.  40,906 working-age adults (1.6%) and 38,513 seniors (2.2%) in Los Angeles reported a vision disability.  31,761 working-age adults (1.2%) and 60,113 seniors (13.5%) in Los Angeles reported a hearing disability.  Therefore, overall, 217,249 (7.1%) residents ages 18 and older in the City of Los Angeles had an ambulatory disability, 79,419 (1.8%) had a vision disability, and 91,874 (3.0%) had a hearing disability.

Table 2 shows the same information in Table 1 for 2010.[9]  In 2010, 87,473 working-age adults (3.5%) and 108,133 seniors (28.3%) in Los Angeles reported an ambulatory disability.  35,935 working-age adults (1.4%) and 31,903 seniors (8.3%) in Los Angeles reported a vision disability.  28,794 working-age adults (1.1%) and 51,031 seniors (13.3%) in Los Angeles reported a hearing disability.  Therefore, overall, 195,606 (6.8%) residents ages 18 and older in the City of Los Angeles had an ambulatory disability, 67,838 (2.3%) had a vision disability, and 79,825 (2.8%) had a hearing disability.

*Census Bureau Disability Data Prior to 2008*

Information on disability was collected in the "long-form" samples for both the 1990 and 2000 Censuses.  In 1990, information on functional limits was collected.  Respondents were asked if a health condition lasting more than six months prevented them from working, going outside the home for activities like visiting the doctor, or taking care of one's needs, including "getting around inside the house."[10]  In 2000, individuals answering for each household in the

---

[9] 2010 American Community Survey, Tables B18102, B18103, and B18105.
[10] Your Guide for the 1990 U.S. Census Form, www.census.gov/prod/1/90dec/cph4/appdxe.pdf (page E-14) (last visited March 22, 2016).

5

sample were asked about sensory impairment (vision and hearing disability combined) and physical disability, which was defined as "[a] condition that substantially limits one or more basic physical activities such as walking, climbing stairs, reaching, lifting, or carrying."[11] Reports on disabilities defined in this broad manner were readily available from the Census Bureau.  While information on disabilities was defined in these terms, there is no comparable representative data specifically for ambulatory, vision or hearing disabilities in Los Angeles prior to 2008 when the ACS began using its current set of disability questions.

*Estimating the Number of Adults with Disabilities in 1990 and 2000*

In a *Health Affairs* article published in 2013, Dr. H. Stephen Kaye estimated national disability rates for adults, including rates of mobility impairment, vision impairment and hearing impairment.  He also determined if there were statistically significant trends in these rates of disabilities among the adult population.[12]  In this analysis, Dr. Kaye used the Census Bureaus' Survey of Income and Program Participation (SIPP), a national survey which used a consistent set of questions on disability in selected years between 1984 and 2010.  I relied on Dr. Kaye's estimated trends to calculate the number of disabled residents in Los Angeles in 1990 and 2000.

To estimate the number of adults in Los Angeles in 1990 and 2000 with ambulatory, vision or hearing disabilities, I use the 2014 percentages (shown in Table 1) for working-age adults (18-64) and seniors (65+) with data for these two age groups in Los Angeles from the 1990 and 2000 Censuses.  Dr. Kaye estimated rates and trends for these same two age groups. Where Dr. Kaye found a statistically significant trend, I adjust the disability rates using his

---

[11] United States Census 2000, www.census.gov/dmd/www/pdf/d02p.pdf (last visited March 22, 2016).
[12] H. Stephen Kaye, *Disability rates for working-age adults and for the elderly have stabilized, but trends for each mean different results for costs*, 32 Health Affairs 127, 127-134 and Appendix (2013).

6

estimates.

Table 3 shows the adult populations ages 18-64 and 65 and older from the 1990 and 2000

Censuses.  The non-institutionalized populations are calculated by subtracting the

institutionalized population in each age group from the total population in each age group.[13]  In

1990, there were 2,589,620 non-institutionalized adults in Los Angeles.  In 2000, there were

2,684,857 non-institutionalized adults in Los Angeles.  The 2014 ACS estimates 3,046,033 non-

institutionalized adults in Los Angeles.  Note that seniors account for a larger percentage of

adults in 2014 as baby boomers age into that group.


*Adults with an Ambulatory Disability in 1990 and 2000*

Dr. Kaye estimates national rates of mobility impairment in adults using the SIPP

definition of mobility impairment as difficulty in walking one-quarter mile or lifting and carrying

ten pounds, and the SIPP definition of more severe mobility impairment as the inability to

perform either of these activities.[14]  SIPP's more severe mobility impairment corresponds with

the ACS measure of ambulatory disability and is thus used in the estimates.

Table 4 shows the estimated number of adults in Los Angeles with an ambulatory

disability in 1990 and 2000.  Dr. Kaye found no significant trend in mobility impairment

(ambulatory disability) for working-age adults (ages 18-64).[15]  Therefore, I use 3.7% of working-

age adults (the 2014 ACS percentage) to estimate the numbers with ambulatory disability in both

---

[13] 1990 and 2000 age data for Los Angeles are from the Minnesota Population Center. National Historical
Geographic Information System: Version 2.0. Minneapolis, MN: University of Minnesota 2011.
https://data2.nhgis.org/main (last visited March 11, 2016). The 1990 institutionalized population is from the 1990
Census, Table STF3:P41, www.socialexplorer.com/ (last visited March 14, 2016). The 2000 institutionalized
population is from the 2000 Census, Table SF1: PCT17, www.socialexplorer.com/ (last visited March 14, 2016).
[14] For a more complete description of this SIPP measure, *see* Kaye, *supra* note 6, at Appendix p. 2.
[15] *Id.* at Appendix Exhibit 1.

1990 and 2000.  The rate of seniors with an ambulatory disability in the 2014 ACS is 27.3% (see Table 1), and I begin my estimate for seniors with this rate.  Dr. Kaye found a statistically significant decline in the rate with more severe mobility impairment for those ages 65 and older. Between 1984 and 2010, Dr. Kaye estimates an annual decline of 0.47%.[16]  I use this annual rate of change to adjust the number of seniors with an ambulatory disability for both 1990 and 2000. In 1990, there were an estimated 184,864 adults in Los Angeles with an ambulatory disability. In 2000, there were an estimated 183,238 adults in Los Angeles with an ambulatory disability.

*Adults with a Vision Disability in 1990 and 2000*

The SIPP defines vision impairment as difficulty seeing newspaper print, and more severe mobility impairment as the inability to see or if the person being interviewed volunteers that they are blind.[17]  SIPP's more severe vision impairment corresponds with the ACS measure of vision disability and is used in the estimates.

Dr. Kaye found no statistically significant trend from 1984 to 2010 in vision impairment for working-age adults (ages 18-64).[18]  Therefore, I use 1.6% of working-age adults (the 2014 ACS percentage shown in Table 1) to estimate the numbers with ambulatory disability in both 1990 and 2000.  For seniors, I begin with the 2014 ACS rate of 2.2% of seniors with a vision disability.  Dr. Kaye found a statistically significant decline over time in the rate of more severe vision impairment for those ages 65 and older.  Between 1984 and 2010, Dr. Kaye estimates an annual decline of 2.5%.[19]  I use this annual rate of change to adjust the number of seniors with a vision disability for both 1990 and 2000.  These results are shown in Table 5.  Thus, in 1990,

---

[16] *Id.*
[17] For a more complete description of this SIPP measure, *see id.* at Appendix p. 3.
[18]  *Id.* at Appendix Exhibit 1.
[19] *Id.*

there were an estimated 49,324 adults in Los Angeles with a vision disability.  In 2000, there

were 47,430 non-institutionalized adults in Los Angeles with a vision disability.

*Adults with a Hearing Disability in 1990 and 2000*

The SIPP defines hearing impairment as difficulty hearing normal conversation, and

more severe mobility impairment as the inability to hear.[20]  SIPP's more severe hearing

impairment corresponds with the ACS measure of hearing disability and is used in the estimates.

Dr. Kaye found no significant trend in hearing impairment for working-age adults (ages

18-64) between 1990 and 2010.[21]  Therefore, I use 1.2% of working-age adults (see Table 1) to

estimate the numbers with ambulatory disability in both 1990 and 2000.  I begin with a rate of

3.4% of seniors with a hearing disability.  Dr. Kaye found a significant decline in the rate of

seniors with more severe hearing impairment.  Dr. Kaye estimates an annual decline of 2.07% in

seniors with a hearing impairment between 1990 and 2010.[22]  I use this annual rate of change to

adjust the number of seniors with a hearing disability for both 1990 and 2000.  These results are

shown in Table 6.  In 1990, there were an estimated 45,533 adults in Los Angeles with a hearing

disability.  In 2000, there were an estimated 43,717 adults in Los Angeles with a hearing

disability.

*2014 Poverty and Disability*

In 2014, adults in Los Angeles who have an ambulatory disability, a vision disability, or a

hearing disability are more likely to have incomes below the federal poverty level and incomes

---

[20] For a more complete description of this SIPP measure, *see id.* at Appendix p. 3.
[21]  *Id.* at Appendix Exhibit 1.
[22] *Id.*

9

below 150% of the federal poverty level than those with no disability.  As shown in Table 7, 28.8% (62,527) of adults with an ambulatory disability live below the federal poverty level, and 45.3% (98,314) of adults with an ambulatory disability live below 150% of the federal poverty level.  By comparison, 18.2% of adults in Los Angeles without a disability live below the federal poverty level, and 29.8% without a disability live below 150% of the federal poverty level. Further, 20.1% (15,944) of adults with a vision disability and 24.3% (22,356) of adults with a hearing disability live below the federal poverty level.  40.2% (31,888) of adults with a vision disability and 39.2% (36,020) of adults with a hearing disability live below 150% of the federal poverty level.

To determine if the differences of the proportions of those with one of these disabilities in poverty or below 150% of poverty relative to those with no disability are statistically significant, I use the Z-test for two proportions, the standard statistical test to address this type of question. The differences in the proportions of those with ambulatory, vision or hearing disabilities living in poverty or below 150% of poverty are significantly different from the comparison group with no disability.  All of these differences are statistically significant at the .01 level.   A description of the Z-test and the calculator I use for the Z-test in this analysis is at:

www.socscistatistics.com/tests/ztest/

**Conclusions**

The 2014 American Community Survey shows that 217,249 non-institutionalized adults in Los Angeles had an ambulatory disability, 79,410 non-institutionalized adults in Los Angeles had a vision disability, and 91,874 non-institutionalized adults in Los Angeles had a hearing disability.  The 2010 American Community Survey shows that 195,606 non-institutionalized

10

adults in Los Angeles had an ambulatory disability, 67,838 non-institutionalized adults in Los

Angeles had a vision disability, and 79,825 non-institutionalized adults in Los Angeles had a

hearing disability.  For 1990, I estimate that there were 184,864 adults with an ambulatory

disability, 49,324 adults with a vision disability, and 45,533 adults with a hearing disability.  For

2000, I estimate that there were 183,238 adults with an ambulatory disability, 47,857 adults with

a vision disability, and 43,717 adults with a hearing disability.

     The ACS information for these disabilities has been available since 2008.  The Census

Bureau published information on physical limitations and sensory limitations from the 2000

Census.  The Census Bureau published information on functional limitations from the 1990

Census.  While the measures of disability are not directly comparable prior to 2008, all of this

information on disabilities since 1990 is public and readily available.

     In 2014, non-institutionalized residents of Los Angeles with an ambulatory disability, a

vision disability or a hearing disability are all significantly more likely to live in poverty or

below 150% of poverty that those with no disability.  Therefore, those with one of these

disabilities are more likely to need affordable housing in Los Angeles than those with no

disability.

**Table 1:  Number and Percentage of Adult Residents in Los Angeles with Ambulatory Disability, Vision Disability, or Hearing Disability, 2014 American Community Survey**

|  | Ambulatory | Vision | Hearing |
|---|---|---|---|
| **18-34 years** | 10,306 | 7,931 | 5,830 |
|  | 0.9% | 0.7% | 0.5% |
|  |  |  |  |
| **35-64 years** | 85,488 | 32,975 | 25,931 |
|  | 5.7% | 2.2% | 1.7% |
|  |  |  |  |
| **65-74 years** | 45,421 | 12,949 | 16,698 |
|  | 18.2% | 5.2% | 6.7% |
|  |  |  |  |
| **75 + years** | 76,034 | 25,564 | 43,415 |
|  | 38.9% | 13.1% | 22.2% |
|  |  |  |  |
| **18-64 years** | 95,794 | 40,906 | 31,761 |
|  | 3.7% | 1.6% | 1.2% |
|  |  |  |  |
| **65+ years** | 121,455 | 38,513 | 60,113 |
|  | 27.3% | 2.2% | 13.5% |
|  |  |  |  |
| **Total** | 217,249 | 79,419 | 91,874 |
|  | 7.1% | 1.8% | 3.0% |

Source: 2014 American Community Survey, Tables B18102, B18103, and B18105.

Note that adult refers to those ages 18 and older.

12

**Table 2:  Number and Percentage of Adult Residents in Los Angeles with Ambulatory Disability, Vision Disability, or Hearing Disability, 2010 American Community Survey**

|  | Ambulatory | Vision | Hearing |
|---|---|---|---|
| **18-34 years** | 10,973 | 7,535 | 6,230 |
|  | 1.0% | 0.7% | 0.6% |
|  |  |  |  |
| **35-64 years** | 76,500 | 28,400 | 22,564 |
|  | 5.3% | 2.0% | 1.6% |
|  |  |  |  |
| **65-74 years** | 42,068 | 10,313 | 15,495 |
|  | 19.8% | 4.9% | 7.3% |
|  |  |  |  |
| **75 + years** | 66,065 | 21,590 | 35,536 |
|  | 38.8% | 12.7% | 20.9% |
|  |  |  |  |
| **18-64 years** | 87,473 | 35,935 | 28,794 |
|  | 3.5% | 1.4% | 1.1% |
|  |  |  |  |
| **65+ years** | 108,133 | 31,903 | 51,031 |
|  | 28.3% | 8.3% | 13.3% |
|  |  |  |  |
| **Total** | 195,606 | 67,838 | 79,825 |
|  | 6.8% | 2.3% | 2.8% |

Source:  2010 American Community Survey, Tables B18102, B18103, and B18105.

Note that adult refers to those ages 18 and older.

**Table 3:  Non-Institutionalized Adult Populations, Los Angeles, 1990, 2000 and 2014**

|                    | 1990      | 2000      | 2014      |
|--------------------|-----------|-----------|-----------|
| **18-64 Years**    | 2,257,994 | 2,320,042 | 2,601,134 |
|                    | 87.2%     | 87.1%     | 85.4%     |
|                    |           |           |           |
| **65 years and older** | 331,626 | 353,647 | 444,899 |
|                    | 12.8%     | 12.9%     | 14.6%     |
|                    |           |           |           |
| **Total**          | 2,589,620 | 2,684,857 | 3,046,033 |

Sources:  *National Historical Geographic Information System: Version 2.0* (1990 and 2000 age data); 1990 Census,
Table STF3:P41 (base population in 1990); 2000 Census, Table SF1: PCT17 (base population in 2000); 2014
American Community Survey (institutionalized population in 2014 and 2014 age data).

**Table 4: Non-Institutionalized Adults with Ambulatory Disability, Los Angeles, 1990 and 2000**

|                        | 1990    | 2000    |
|------------------------|---------|---------|
| **18-64 years**        | 83,546  | 85,842  |
|                        |         |         |
| **65 years and older** | 90,534  | 96,546  |
|                        |         |         |
| **Total**              | 184,864 | 183,238 |

Source: 1990 Census, Table STF3:P41 (base population in 1990); 2000 Census, Table SF1: PCT17 (base population
in 2000); 2014 American Community Survey (ambulatory disability rates).

**Table 5: Non-Institutionalized Adults with Vision Disability, Los Angeles, 1990 and 2000**

|                        | 1990   | 2000   |
|------------------------|--------|--------|
| **18-64 years**        | 36,128 | 37,121 |
|                        |        |        |
| **65 years and older** | 13,196 | 10,736 |
|                        |        |        |
| **Total**              | 49,324 | 47,857 |

Source:  1990 Census, Table STF3:P41 (base population in 1990); 2000 Census, Table SF1: PCT17 (base
population in 2000); 2014 American Community Survey (vision disability rates).

**Table 6: Non-Institutionalized Adults with Hearing Disability, Los Angeles, 1990 and 2000**

|                        | 1990   | 2000   |
|------------------------|--------|--------|
| **18-64 years**        | 27,096 | 28,074 |
|                        |        |        |
| **65 years and older** | 18,437 | 15,643 |
|                        |        |        |
| **Total**              | 45,533 | 43,717 |

Source:  1990 Census Table STF3:P41 (base population in 1990); 2000 Census Table SF1: PCT17 (base population
in 2000); 2014 American Community Survey (hearing disability rates).

**Table 7:  Disability and Poverty Among Non-Institutionalized Adults, Los Angeles, 2014**

|  | Ambulatory | Vision | Hearing | No Disability |
|---|---|---|---|---|
| **Below Poverty** | 62,527 | 15,944 | 22,356 | 482,690 |
|  | (28.8%) | (20.1%) | (24.3%) | (18.2%) |
| Z Score | 63.05 | 6.11 | 22.98 |  |
|  |  |  |  |  |
| **Below 150% of Poverty** | 98,314 | 31,888 | 36,020 | 790,105 |
|  | (45.3%) | (40.2%) | (39.2%) | (29.8%) |
| Z Score | 98.65 | 39.66 | 38.00 |  |

Source:  2014 American Community Survey, Table B18131.

Two-tailed Z-test. All differences are statistically significant at p<.01.

15

_____
Allan M. Parnell, Ph.D.

March 23, 2016

# EXHIBIT

# G

# Expert Report of Bernard R. Siskin, Ph.D.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al., Case No. 12-cv-00551-FMO (C.D. Calif.)*

## I.      Background and Qualifications

My name is Dr. Bernard Siskin. I am currently the president of BLDS, LLC, a statistical consulting firm that specializes in the application of statistics in law, particularly in the area of analyzing data for statistical evidence of discrimination. I have testified for both plaintiffs and defendants in more than 200 cases, many of which were large class actions. In addition to discrimination studies, I have conducted statistical studies and have testified in commercial and environmental cases involving statistical issues.

I received my B.S. degree in Mathematics from the University of Pittsburgh and a Ph.D. in Statistics from the University of Pennsylvania. For many years, I taught statistics at Temple University and served as Chairman of the Department of Statistics. I am also the author of many articles and textbooks on statistics and quantitative techniques including *Elementary Business Statistics, Encyclopedia of Management* and *Quantitative Techniques for Business Decisions.* I continue to write and lecture extensively on the use of statistics in litigation.

I have served as a statistical consultant to the U.S. Department of Justice, the Equal Employment Opportunity Commission, the U.S. Department of Labor, the Federal Bureau of Investigation, the Central Intelligence Agency, the Environmental Protection Agency, the National Aeronautics and Space Administration, Consumer Financial Protection Bureau (CFPB), OFCCP, Fannie Mae (the Federal National Mortgage Association), and Freddie Mac (the Federal Home Loan Mortgage Corporation), as well as numerous other federal, state and city agencies, and Fortune Five Hundred corporations. I have also frequently been appointed by federal judges

as a neutral expert to aid the court in statistical issues and I was the statistical consultant to the Third Circuit Court of Appeals Task Force on Equal Treatment in the Courts.

In addition to the qualifications mentioned above that make up the basis of my opinions, I have attached as Exhibit 1 my *curriculum vitae*, which includes a list of publications I have contributed to and/or authored within the last ten years. Attached as Exhibit 2 is a list of all of the cases for which I have testified as an expert within the past four.

## II.      Assignment and Compensation

Plaintiffs' counsel has requested that I determine, based on appropriate statistical methodology, the best estimate and the lower bound with 97.5% confidence of the percentage of multifamily apartment housing developments ("developments") in the CRA Housing Portfolio ("Portfolio") that would "fail" a test of architectural accessibility based on random samples of developments that "passed" or "failed" either plan review or measurement review. Specifically, I conducted such analyses for plan reviews and measurement reviews performed on randomly-selected samples from four categorizations (federally funded new constructions, non-federally funded new constructions, federally funded rehabilitations, and non-federally-funded rehabilitations), for the combination of "All Federal" (which combines federally-funded new constructions and federally-funded rehabilitations), and for the entire Portfolio of developments subject to three laws (Section 504 of the Rehabilitation Act, Title II of the Americans with Disabilities Act, and Section 11135 of the California Government Code).

I am being compensated at my normal hourly rate for all tasks and testimony of $735 per hour. I have also had staff assist me in the preparation of the results discussed below. No portion of these fees was or is dependent on the nature of my findings or on the outcome of the case.

### III.    Documents and Information Reviewed and Relied On in Preparation For This Report

Plaintiffs' counsel provided me with two spreadsheets that reflect the Portfolio, which consists of approximately 253 developments that received some form of financial or other assistance from Defendants the City of Los Angeles ("City") and the Community Redevelopment Agency of Los Angeles ("CRA") (collectively, "Defendants"). These spreadsheets are attached as Exhibit 3 and 4, respectively. The Portfolio has been divided into six lists. Each list contains eleven pieces of information for each development: 1) development name(s); 2) development address; 3) number of dwelling units at the development; 4) whether the development received direct federal funding; 5) whether the development was a new construction or a rehabilitation; 6) a random number between 0 and 1 that was generated for each development, one for plan review and one for measurement review, to be used for selection of developments in the respective samples; 7) whether the development's construction start date is on or after July 11, 1998 such that it should have been built in compliance with Section 504 of the Rehabilitation Act of 1973 ("Section 504"); 8) whether the development's construction start date is on or after January 26, 1992 such that should have been built in compliance with Title II of the Americans with Disabilities Act (the "ADA"); 9) whether the development's construction start date is on or after January 1, 1993 such that it should have been built in compliance with Section 11135 of the California Government Code ("Section 11135"); 10) the results of any randomized plan or measurement review; and 11) additional notes.

The six different lists in each spreadsheet reflect a division of the Portfolio into four categorizations based on two factors: whether the development received direct federal funding, and whether the development was a new construction or rehabilitation of an existing structure.

The six lists are: 1) an early list of federally-funded new constructions; 2) an early list of non-federally-funded new constructions; 3) an additional list of federally-funded new constructions; 4) an additional list of non-federally-funded new constructions; 5) a list of federally-funded rehabilitations; and 6) a list of non-federally funded rehabilitations.

Based on the representations of counsel, I understand that the only difference between the developments in the "early" lists and the "additional" lists for new construction developments is the date the information about the developments was produced in discovery. Both contain developments with the same range of sizes and construction start dates.[1] Based on Plaintiffs' counsel's representations, along with the results of the statistics I calculated that showed that the average age and average size of the early and late developments were statistically indistinguishable, I assumed that there was no difference between the properties on the early and additional lists except for the dates they were identified in this litigation, and thus I treated each of these lists as if they were random samples from a single categorization.[2]

The six lists were randomized twice, once to create a randomized list for plan review and again to create an independent randomized list for measurement review. This was done according to standard statistical methodology using a random number generator which generates a random number between zero and one so that every number has the same chance of being selected as any

---

[1] For example, the developments in the early list of federally-funded new constructions ranged in size from 21 dwelling units to 438 dwelling units; the developments on the additional list of federally-funded new constructions ranged from 10 dwelling units to 438 dwelling units. Only one development on the early list of federally-funded new constructions began construction prior to 1992; similarly, only one development on the additional list of federally-funded new constructions began construction prior to 1992.

[2] For simplicity, I assume the likelihood of a development being in either list (early or additional) is independent of whether a development would fail inspection. Given this assumption, which there is no reason to believe is incorrect, the samples can, for analytical purposes, be treated as random samples.

another. Counsel for Plaintiffs was supplied information showing the lower bound on the estimate of failures for each categorization, assuming different distributions of failures and different sample sizes in the categorization. Plaintiffs' counsel then determined a sample size which they concluded would yield a sufficiently precise estimate. The lists were sorted by the development's random number, which led to a random ordering of the developments. Counsel then started at the top of the list and selected developments until they had chosen the total number of developments they had decided to sample from each categorization.[3] This is a standard statistical methodology which leads to a random sampling of the developments, and allows one to validly produce an unbiased estimate of the failure rate in each categorization and to determine the accuracy of that estimate. The architectural accessibility experts hired by

---

[3] Based on review of additional documents or information received in discovery, Plaintiffs removed certain developments from the randomized lists after the random numbers were generated. Eighteen developments were removed from the randomizations because they were not appropriately considered part of the Portfolio at all and were removed from the case entirely. Two developments were removed because Plaintiffs could not obtain direct evidence of whether or not they were appropriately considered part of the Portfolio.

Seven developments had been placed in the wrong categorization during the randomizations. Five were moved from their incorrect categorization into their proper categorization, while the remaining two incorrectly categorized developments were removed from the randomized portfolio and subjected to individualized review.

An additional five developments in the Portfolio were removed from the randomizations because the loan agreements for their construction or rehabilitation were signed after the Complaint was filed in this lawsuit. Because Defendants might have conducted themselves differently after they were put on notice as to the issues raised in this lawsuit, these developments were removed from the randomizations and subjected to individual review.

When a development was selected for randomized review that had been removed from the randomization for any of the reasons above, Plaintiffs went to the next development in the randomized sample list.

Finally, there were also two developments that were randomly selected for plan review for which plans were not available (Alexandria Hotel and Edru & Associates); for these properties, Plaintiffs went to the next developments in the list and confirmed that independent evidence (measurement review) also indicated that these properties were not compliant with federal and state accessibility laws.

Plaintiffs then conducted plan and measurement reviews of the selected developments and determined a "pass" or "fail" for each development reviewed.

Based on the results of the reviews, I calculated point estimates and 97.5% "confidence intervals" as defined below. These calculations are based on the developments in each categorization, the number of developments sampled from each of those categorizations, and the results of the sampling.

## IV.   Methodology

In performing my work in this matter, I have used standard statistical techniques, and standards of care comparable to those used in professional and scholarly research, and I have applied theories, models, concepts, reasoning, and assumptions that command general acceptance among my professional peers. Subject to the information made available to date, I hold the opinions I present in this report to a reasonable degree of scientific certainty.

Statistical sampling, such as the methodology performed here, is a standard practice in statistics that allows one to make inferences about populations of data where it is infeasible to measure the results for the entire population. Here, only the developments randomly selected were reviewed. It is assumed that the statistical measures of the sample that are drawn are representative of the population as a whole. The key for this to be accurate is that each development in the population has an equal chance to be selected.[4]

The methodology that the Plaintiffs chose to use here follows common and rigorous practice. Specifically, the value of the random number assigned to each development was entirely

---

[4] Choosing developments with equal probability is a generalized statement: there are types of samples where the likelihood of a particular observation being chosen is given greater or lesser weight because of their importance in their effect on the population. The reasons for doing so are myriad, but are not applicable to this case.

independent of the attributes of that development. For example, whether the development had many units or few units had no influence on the value of the random number assigned.

Since the sample is only a subset of the full population, there is some likelihood that the sample is not a perfect representation of the population. However, as long as there is an equal likelihood of any member of the population being chosen in the sample, then the statistician is able to provide a measure of the accuracy of the sample's prediction. Knowing the accuracy of the sample's prediction allows the user of the results to judge whether the results of the sample are accurate enough to rely upon. The measure of accuracy is known as a "confidence interval." A confidence interval represents the range which would contain the true value of the variable being estimated if the whole population were studied, with the stated level of confidence. In the case of the analyses for this litigation, we first disclose our single best estimate of the number of failures in the population (the "point estimate"). This estimate is the percentage of the sample that fails. If 80% of the sample fails, then our best estimate of the percent of the population that will fail is 80%. If, on the other hand, 100% of every sampled observation failed accessibility review (which occurred in every sample discussed herein) then our point estimate, or our best estimate of the percent of population failures, is 100%.

Using the hypothetical example above, if the architectural accessibility experts found that 80% of the sample developments failed, and assuming that the population was 100 and the sample size was 20, then our best estimate of the percent of the population that failed is 80%, but we are 95% sure that at least 59% would fail and at most 93% would fail.

For the results reported here, Plaintiffs requested that I use a one-tail 97.5% confidence interval. Typically, one would use a 95% confidence interval within the context of litigation (with 2.5% in the upper tail and 2.5% in the lower tail). However, since all of the developments

Page 7 of 20

sampled failed inspection, and there is no possibility that the population could exceed 100% failure rate, there was no point in evaluating an upper tail. Plaintiffs then had to choose between using a standard 95% confidence interval with all 5% in the lower tail, and a more conservative 97.5% confidence interval with 2.5% in the lower tail. The latter is more conservative for the following reason: in a similar hypothetical example using a one-tailed 95% confidence interval where 100% of the sampled developments failed accessibility review, we would say that we have 95% confidence that the entire population's failure rate is at least 80%. If, on the other hand, we were to use a one-tailed 97.5% confidence interval where 100% of the sampled developments failed accessibility review, it would suggest that the entire population's failure rate is at least 75%. Thus, the 97.5% one-tail lower boundary will be lower than the 95% one-tail confidence interval. Plaintiffs selected a more conservative confidence interval, which may imply that fewer developments would fail to meet the federal accessibility requirements - a result which is more favorable to the defendant.

        The statistical methodology used here to calculate the probabilities is a hypergeometric distribution. This produces the exact probability and the exact confidence interval where the sample and population have the same characteristics.[5] Specifically, the hypergeometric distribution requires a fixed population (*i.e.*, the total number of elements in the population is known), which applies here because there are only a limited number of developments at issue. It also requires that the sample was chosen "without replacement," which means that a given

_____

[5] For smaller samples, an exact test, which does not rely on approximations, can be used. For larger samples, technical limitations prevent the use of an exact test. In general, one would prefer an exact test, but where such a test is difficult or infeasible due to computational limitations, approximation methodologies are reasonably accurate and generally used.

development could only be chosen once.[6]

I had my staff run exact hypergeometric calculations for each of the four categorizations (federally funded new constructions, non-federally funded new constructions, federally funded rehabilitations, and non-federally funded rehabilitations), for each of the three statutes at issue (Section 504, the ADA, and Section 11135).[7] These were run separately for developments that received plan reviews, and those that received measurement reviews. The results of these analyses are attached as two exhibits: Exhibit 5 shows the best estimates and 97.5% confidence intervals based on the plan reviews that were completed; Exhibit 6 shows the best estimates and 97.5% confidence intervals based on the measurement reviews that were completed. I provide an extensive discussion of these results in Section V, below.

After calculating each categorization independently, I then calculated combinations of several of the results for each of the three statutes at issue. First, I merged and showed results that combined all the federally funded developments (new construction and rehabilitations). Second, I combined the federally funded categorizations with the non-federally funded categorizations (both new construction and rehabilitations) to calculate a single fail rate for all of the

_____

[6] The other option for sampling is known as "with replacement," which means that a development could be chosen multiple times for the sample, effectively giving the results of a development chosen more than once more weight on the results than a development that is only chosen once.

[7] For the cases where two lists were supplied for a single categorization, I assumed that the two lists (the "early" and "additional" lists) were, in effect, random samples from the full categorization. I then had my staff run an exact hypergeometric test for each entire categorization. These are the results reported for those categorizations.

When combining the results for these categorizations with other categorizations, I made a similar simplifying assumption: I treated the combination of these lists as a single population from which a single randomized sample was taken. This makes the calculation combining across multiple categorizations significantly easier to perform. This methodology has only a minimal impact on the calculations combined over the various categorizations.

developments at issue.

When combining the results of the various categorizations, I treated each categorization as being statistically independent of all other categorizations (which they are). Computationally, this means that I first calculated the probability of each possible outcome occurring within each categorization. I then merged all of the categorizations, creating a list of all possible outcomes across all categorizations. Next, I calculated the probability of each of these outcomes occurring by multiplying the individual group's probabilities across all categorizations. Finally, I ordered those probabilities by likelihood of those outcomes occurring and then identified the outcome at the 97.5th percentile.

## V.      Conclusions

### A.      Conclusions for All Developments in the Portfolio

#### 1.      All Developments Subject to Section 504

The total population of all developments (including new and rehabilitation construction and both federally funded and non-federally funded developments) subject to Section 504 is 245.

Of these 245 developments, 98 were sampled for plan review and 100% (98 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 245 developments subject to Section 504 were inspected, 100% would fail and I am 97.5% confident that at least 93.1% (or 228 developments) would fail.

Of these 245 developments, 39 were sampled for measurement review and 100% (39 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 245 developments subject to Section 504 were inspected, 100% would fail and I am 97.5% confident that at least 82.4% (or 202 developments) would fail.

### 2.     All Developments Subject to the ADA

The total population of all developments (including new and rehabilitation construction and both federally funded and non-federally funded developments) subject to the ADA is 201.

Of these 201 developments, 77 were sampled for plan review and 100% (77 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 201 developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 91.5% (or 184 developments) would fail.

Of these 201 developments, 31 were sampled for measurement review and 100% (31 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 201 developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 79.1% (or 159 developments) would fail.

### 3.     All Developments Subject to Section 11135

The total population of all developments (including new and rehabilitation construction and both federally funded and non-federally funded developments) subject to Section 11135 is 192.

Of these 192 developments, 73 were sampled for plan review and 100% (73 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 192 developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 91.7% (or 176 developments) would fail.

Of these 192 developments, 28 were sampled for measurement review and 100% (28 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 192 developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 77.6% (or 149 developments) would fail.

B.     **Conclusions for All Federally-Funded Developments in the Portfolio**

1.     **All Federally-Funded Developments Subject to Section 504**

The total population of federally-funded developments (including new and rehabilitation construction) subject to Section 504 is 115.

Of these 115 developments, 35 were sampled for plan review and 100% (35 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 115 federally-funded developments subject to Section 504 were inspected, 100% would fail and I am 97.5% confident that at least 88.7% (or 102 developments) would fail.

Of these 115 developments, 15 were sampled for measurement review and 100% (15 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 115 federally-funded developments subject to Section 504 were inspected, 100% would fail and I am 97.5% confident that at least 73% (or 84 developments) would fail.

2.     **All Federally-Funded Developments Subject to the ADA**

The total population of federally-funded developments (including new and rehabilitation construction) subject to the ADA is 113.

Of these 113 developments, 34 were sampled for plan review and 100% (34 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 113 federally-funded developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 88.5% (or 100 developments) would fail.

Of these 113 developments, 15 were sampled for measurement review and 100% (15 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 113 federally-funded developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 73.5% (or 83 developments) would fail.

### 3.     All Federally-Funded Developments Subject to Section 11135

The total population of federally-funded developments (including new and rehabilitation construction) subject to Section 11135 is 113.

Of these 113 developments, 34 were sampled for plan review and 100% (34 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 113 federally-funded developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 88.5% (or 100 developments) would fail.

Of these 113 developments, 15 were sampled for measurement review and 100% (15 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 113 federally-funded developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 73.5% (or 83 developments) would fail.

### C.     Conclusions for Specific Categorizations in the Portfolio

### 1.     Federally Funded New Construction Developments Subject to Section 504

The total population of federally funded new construction developments subject to Section 504 is 89.

Of these 89 developments, 25 were sampled for plan review and 100% (25 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 89 federally funded new construction developments subject to Section 504 were inspected, 100% would fail and I am 97.5% confident that at least 87.6% (or 78 developments) would fail.

Of these 89 developments, 10 were sampled for measurement review and 100% (10 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 89 federally funded new construction developments subject to Section 504 were

inspected, 100% would fail and I am at least 97.5% confident that 68.5% (or 61 developments) would fail.

###   2.   Non-Federally-Funded New Construction Developments Subject to Section 504

The total population of non-federally-funded new construction developments subject to Section 504 is 79.

Of these 79 developments, 43 were sampled for plan review and 100% (43 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 79 non-federally-funded new construction developments subject to Section 504 were inspected, 100% would fail and I am 97.5% confident that at least 93.7% (or 74 developments) would fail.

Of these 79 developments, 14 were sampled for measurement review and 100% (14 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 79 non-federally-funded new construction developments subject to Section 504 were inspected, 100% would fail and I am at least 97.5% confident that 78.5% (or 62 developments) would fail.

###   3.   Federally Funded Rehabilitation Developments Subject to Section 504

The total population of federally funded rehabilitation developments subject to Section 504 is 26.

Of these 26 developments, 10 were sampled for plan review and 100% (10 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 26 federally funded rehabilitation developments subject to Section 504 were inspected, 100% would fail and I am 97.5% confident that at least 73.1% (or 19 developments) would fail.

Of these 26 developments, 5 were sampled for measurement review and 100% (5

developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 26 federally funded rehabilitation developments subject to Section 504 were inspected, 100% would fail and I am at least 97.5% confident that 50% (or 13 developments) would fail.

      **4.**      **Non-Federally-Funded Rehabilitation Developments Subject to Section 504**

The total population of non-federally-funded rehabilitation developments subject to Section 504 is 51.

Of these 51 developments, 20 were sampled for plan review and 100% (20 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 51 non-federally-funded rehabilitation developments subject to Section 504 were inspected, 100% would fail and I am 97.5% confident that at least 86.3% (or 44 developments) would fail.

Of these 51 developments, 10 were sampled for measurement review and 100% (10 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 51 non-federally-funded rehabilitation developments subject to Section 504 were inspected, 100% would fail and I am at least 97.5% confident that 70.6 % (or 36 developments) would fail.

      **5.**      **Federally Funded New Construction Developments Subject to the ADA**

The total population of federally funded new construction developments subject to the ADA is 87.

Of these 87 developments, 24 were sampled for plan review and 100% (24 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 87 federally funded new construction developments subject to the ADA were inspected, 100% would fail and

I am 97.5% confident that at least 87.4% (or 76 developments) would fail.

Of these 87 developments, 10 were sampled for measurement review and 100% (10 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 87 federally funded new construction developments subject to the ADA were inspected, 100% would fail and I am at least 97.5% confident that 70.1% (or 61 developments) would fail.

### 6.   Non-Federally-Funded New Construction Developments Subject to the ADA

The total population of non-federally-funded new construction developments subject to the ADA is 53.

Of these 53 developments, 29 were sampled for plan review and 100% (29 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 53 non-federally-funded new construction developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 90.6% (or 48 developments) would fail.

Of these 53 developments, 10 were sampled for measurement review and 100% (10 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 53 non-federally-funded new construction developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 71.7% (or 38 developments) would fail.

### 7.   Federally Funded Rehabilitation Developments Subject to the ADA

The total population of federally funded rehabilitation developments subject to the ADA is 26.

Of these 26 developments, 10 were sampled for plan review and 100% (10 developments)

failed. Based on the plan review conducted, my best statistical estimate is that if all 26 federally funded rehabilitation developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 73.1% (or 19 developments) would fail.

Of these 26 developments, 5 were sampled for measurement review and 100% (5 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 26 federally funded rehabilitation developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 50% (or 13 developments) would fail.

**8.     Non-Federally-Funded Rehabilitation Developments Subject to the ADA**

The total population of non-federally-funded rehabilitation developments subject to the ADA is 35.

Of these 35 developments, 14 were sampled for plan review and 100% (14 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 35 non-federally-funded rehabilitation developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 80% (or 28 developments) would fail.

Of these 35 developments, 6 were sampled for measurement review and 100% (6 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 35 non-federally-funded rehabilitation developments subject to the ADA were inspected, 100% would fail and I am 97.5% confident that at least 57.1 % (or 20 developments) would fail.

**9.     Federally Funded New Construction Developments Subject to Section 11135**

The total population of federally funded new construction developments subject to Section 11135 is 87.

Of these 87 developments, 24 were sampled for plan review and 100% (24 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 87 federally funded new construction developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 87.4% (or 76 developments) would fail.

Of these 87 developments, 10 were sampled for measurement review and 100% (10 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 87 federally funded new construction developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 70.1% (or 61 developments) would fail.

### 10.    Non-Federally-Funded New Construction Developments Subject to Section 11135

The total population of non-federally-funded new construction developments subject to Section 11135 is 48.

Of these 48 developments, 26 were sampled for plan review and 100% (26 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 48 non-federally-funded new construction developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 89.6% (or 43 developments) would fail.

Of these 48 developments, 9 were sampled for measurement review and 100% (9 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 48 non-federally-funded new construction developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 68.8% (or 33 developments) would fail.

**11.     Federally Funded Rehabilitation Developments Subject to Section 11135**

The total population of federally funded rehabilitation developments subject to Section 11135 is 26.

Of these 26 developments, 10 were sampled for plan review and 100% (10 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 26 federally funded rehabilitation developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 73.1% (or 19 developments) would fail.

Of these 26 developments, 5 were sampled for measurement review and 100% (5 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 26 federally funded rehabilitation developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 50% (or 13 developments) would fail.

**12.     Non-Federally-Funded Rehabilitation Developments Subject to Section 11135**

The total population of non-federally-funded rehabilitation developments subject to Section 11135 is 31.

Of these 31 developments, 13 were sampled for plan review and 100% (13 developments) failed. Based on the plan review conducted, my best statistical estimate is that if all 31 non-federally-funded rehabilitation developments subject to Section 11135 were inspected, 100% would fail and I am 97.5% confident that at least 77.4% (or 24 developments) would fail.

Of these 31 developments, 4 were sampled for measurement review and 100% (4 developments) failed. Based on the measurement review conducted, my best statistical estimate is that if all 31 non-federally-funded rehabilitation developments subject to Section 11135 were

inspected, 100% would fail and I am 97.5% confident that at least 41.9% (or 13 developments) would fail.

### D.      Summary Conclusions/Implications

In summary, the samples chosen from the various lists were valid random samples and all developments whose plans or measurements were reviewed failed those accessibility reviews. Based on the plan reviews completed, I am 97.5% percent confident that if all the developments were subject to a plan review, at least 93.1% would fail of those developments covered by Section 504, at least 91.5% would fail of those developments covered by the ADA, and at least 91.7% would fail of those developments covered by Section 11135. In addition, my best estimate is that all developments would fail if subjected to plan review.

Similarly, based on the measurement reviews completed, I am 97.5% percent confident that if all the developments were subjected to a measurement review, at least 82.4% would fail of those developments covered by Section 504, at least 79.1% would fail of those developments covered by the ADA; and at least 77.6% would fail of those developments covered by Section 11135. In addition, my best estimate is that all developments would fail if subjected to a measurement review.


_____                    _____

Bernard Siskin                                                                      April 7, 2016

\                                                                                              Date