UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al*,<br><br>　　　　　Plaintiffs,<br><br>　　vs.<br><br>CITY OF LOS ANGELES, CALIFORNIA, *et al.*<br><br>　　　　　Defendants | ) Case No.: 12-cv-00551 FMO (PJWx)<br>)<br>)<br>)<br>) **MONITOR'S SEMI-ANNUAL**<br>) **REPORT FOR REPORTING PERIOD**<br>) **JANUARY 1, 2020 THROUGH JUNE**<br>) **30, 2020**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

# Table of Contents

I.     Introduction and Executive Summary ....................................................... 1

II.    CSA Requirements ............................................................................ 4

  A. AcHP Staffing............................................................................. 4

  B. Progress Toward the Target of 4,000 Accessible Units ............................ 8

  C. The Replacement of LCM and Next Steps Toward 4,000 Units ............... 11

  D. Comprehensive Database ................................................................ 14

  E. Adoption of CSA Policies by Covered Housing Developments............................ 16

  F. Training of Covered Housing Development Personnel .......................... 23

  G. Monitoring, Compliance and Enforcement Plan Audits ....................... 26

  H. Internet Housing Registry................................................................ 30

  I. LAHSA (Coordinated Entry System)................................................. 33

  J. Grievance and Complaint System ..................................................... 38

  K. Self-Evaluation/Transition Plan and Effective Communications ..................... 42

  L. Enhanced Sensory Program in Existing Developments ......................... 44

III.   Conclusion ................................................................................... 45

i

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period January 1, 2020 Through June 31, 2020**

## I.     Introduction and Executive Summary

This is the Monitor's Third Report.[1] It is the first to report on the progress of implementation by the Parties after the Court's December 19, 2019 Order Re: Further Proceedings ("December Order"), ECF No. 663, and the first to report on the Monitor's efforts to resolve disputes and expedite implementation rather than have dispute resolution default to the Court. Instead of making recommendations, this Reports describes the Monitor's dispute resolution and decisions as well as proposed next steps.

The Monitor's general assessment is that the implementation of the Corrected Settlement Agreement ("CSA") is closer to being back on track than ever before with the substantial increase in Accessible Housing Program ("AcHP") staffing and the Parties' agreement to replace the City's Architectural Accessibility Expert. The Monitor expects these changes will make possible the production of accessible housing units once the pandemic ends and proper surveying for certification of accessible units can resume. The reporting period has been eventful as the City has turned its focus to grappling with hard realities of implementation in the difficult times of the pandemic. Implementation results have been mixed to date; future Reports will address how well the City is on its way.

Because AcHP's chronic understaffing has largely precluded any effective implementation of the CSA, the Monitor has begun his other Reports with documenting the need for more staffing. The Court's December Order ordered steps to obtain more staffing. *Id.* at 2. As set forth below in Section II.A, this Report describes the City's

---

[1] The initial Report, Monitor's Semi-Annual Report for Reporting Period of September 5, 2016, through December 31, 2018 ("Initial Monitor's Report"), ECF No. 631, was submitted February 15, 2019. The second Report, Monitor's Semi-Annual Report for Reporting Period of January 1, 2019, through June 31, 2019 ("Second Monitor's Report"), ECF No. 634, was submitted August 15, 2019. The Monitor did not submit the Report scheduled for February 2020 because of the need to prepare several documents for Court concerning the early part of this year, notably the Status Conference Report implementing the Court's December Order. *See* Status Conf. Rep., ECF No. 671.

1

doubling of authorized staffing from 39 to 78 employees and the onset of hiring despite the pandemic and City-wide hiring freeze hiring that AcHP recognizes as legally mandated. While the total number of employees is noticeably up, the City is rushing to create a management team and leadership team, particularly for the Monitoring, Education and Compliance Program, which deals with implementation of the many CSA policies and programs that deal with treatment of applicants and tenants outside of construction and retrofitting.

Sections II.B. and II.C. of this report discuss the related issues of the City's failure to produce certified accessible housing and replacing the existing Architectural Accessibility Expert, LCM Architects ("LCM").

Generally, the current pandemic and the ensuing restrictions have had a negative impact on the City's production of housing because surveying could not be conducted to certify accessible units in occupied units and because of the absence of unoccupied new construction that could be surveyed. The City produced zero certified units of housing with accessible features in the January-June 2020 reporting period. The Parties, instead, have focused on preparatory work identifying and expediting productive projects to push when the pandemic permits.

The effect of the pandemic on housing production was to aggravate what turned out to be preexisting problems with the surveying of accessible units for certification. The chief reason the City was unable to produce housing was that the City's Architectural Accessibility Expert, LCM, proved unable to follow the Court's instruction, and to use appropriate accessibility survey standards and survey protocols. In mid-April of this year, the Monitor, with Plaintiffs' and HUD's support, directed the City to replace LCM with Evan Terry Associates ("ETA"), a more experienced architectural firm with a sophisticated, online survey system. (While the Court's December Order had directed that the Parties and the Monitor consider replacing LCM, *see id.* at 2, the Monitor at that time did not believe he had enough information to do so.)

2

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

The City did not immediately agree to replace LCM with ETA, and negotiations between the City and ETA dragged on for three months without closure. Finally, on June 29, the Monitor issued a decision directing the City to finish its negotiations with ETA and replace LCM, Decision Re: Architectural Accessibility Expert, Attachment A hereto. In response, the City initially questioned the Monitor's authority to issue the Decision and declined to implement it.

HCIDLA's newly appointed General Manager Ann Sewill, however, reversed the City's position on July 8, agreeing to replace LCM with ETA and to move to finish contract negotiations with ETA. The City has proposed bringing ETA on in a temporary capacity followed by a sole source contract that the Parties and the Monitor have agreed to. The Monitor believes that ETA, with its superior surveying ability, greater capacity and online accessibility, will expedite future production of accessible units.

The Parties and the Monitor agreed that they would concentrate during the pandemic on implementing CSA programs that generally could be accomplished with remote access, without physical contact, and through creating further online programs, such as training. As a result, the Monitor has focused his efforts, including issuing Decisions, on expediting programs such as the Comprehensive Database, adoption of CSA policies by covered housing developments, training of covered housing development personnel, Monitoring Compliance and Enforcement ("MCE") Plan Audits, the Internet Housing Registry, and the Coordinated Entry System ("CES) operated by Los Angeles Homeless Services Authority ("LAHSA"). *See*, respectively, *infra* Sections II.D.-I. The results have been mixed to date but the Monitor expects that this reflects growing pains and that implementation will improve as AcHP hires up, improves its management team and gains more experience. If implementation does improve markedly in these areas, implementation will be on track.

This Report also discusses three programs that the Monitor intends to devote more attention and staff to in order to assess and resolve disputes with Plaintiffs in the next

3

reporting period: the Grievance and Complaint System, the Self-Evaluation/Transition Plan and Effective Communication and the Enhanced Sensory Program in Existing Developments. *See*, respectively, *infra*, Sections II.J.-L.

The Monitor takes note of the fact that HCIDLA's new General Manager Ann Sewill has had a very positive impact in her very brief tenure, particularly on the selection of ETA and MCE Plan auditing issues.

## II.    CSA Requirements

### A.    AcHP Staffing

The CSA requires that the City shall provide "sufficient resources" so that the Settlement Coordinator can successfully accomplish her responsibilities. *See* CSA III.14 at 27, ECF No. 608-1.

#### i.    Background

The Initial Monitor's Report identified AcHP's chronic understaffing as a key reason for extended delays in the implementation of the CSA. *Id.* at 6-7, ECF No. 631 (AcHP "was initially unfunded by the City and has been effectively underfunded on a chronic basis since" and "[t]he City's difficulties in timely implementation of infrastructure set the stage for the . . . situation of inadequate and delayed implementation of substantive CSA provisions."); *see also id.* at 19.

AcHP's actual staffing increased from 2.3 employees at the end of 2016; to 12.5 employees at the end of 2017; 20.5 at the end of 2018; and 31.5 by mid-2019. *See* AcHP Q1 2020 Staffing Rep., App. 2. Actual strength was a fraction of authorized strength from 2017 on (13.2 out of 35 positions were filled at the end of 2017; 20.5 out of 35 positions were filled at the end of 2018; and 31.5 out of 39 positions were filled at the end of 2019).

The Monitor criticized the AcHP for being understrength, for not conducting a functional analysis to determine its true personnel needs, and for not having a staffing

4

plan at a time when the City was rolling out major new programs with more to follow. Second Monitor's Rep. at 4-12, ECF No. 634. The Report concluded that the failure to engage in such efforts was a factor showing that CSA implementation was not yet on track. *Id.* at 12.

The Court's December Order instructed the Parties and the Monitor to discuss the development of a needs assessment and staffing plan. *Id.* at 2, ECF No. 663.

### ii. Analysis

Following discussions between HCIDLA's then Executive Officer Laura Guglielmo and the Monitor, HCIDLA immediately increased the authorized strength of AcHP and proposed to the City Council to double AcHP's authorized staffing from 39 positions to 82 positions by June 2022 and to increase contracting authority. *See* Status Conf. Rep. at 32-33, ECF No. 671.[2] AcHP's Q1 2020 Staffing Report shows that in the first quarter of 2020, authorized staffing increased from 39 to 58 (a 48 percent increase) and actual staffing increased from 31.5 to 45.5 employees (a 44 percent increase). App. 2. The City stated in a meeting on April 2 that, as of that date, it anticipated it would be able to maintain the expansion of authorized positions and contracting authority because AcHP's mission is legally mandated. Most recently, the City reports that the City Council increased AcHP's authorized strength further under the FY 2020-21 Budget by over 20 additional slots for a total of 78 authorized positions. Accessible Housing Program Semi-Annual Rep. for Jan. to June 2020 ("AcHP Semi-Annual Rep. for Jan. to June 2020") at 2, App. 5.

With respect to hiring, the City made progress increasing staff before it imposed a

---

[2] Although the Court ordered development of a needs assessment and staffing plan, the City did not prepare the kind of needs assessment ordered by the Court. *See* December Order at 2, ECF No. 663. Because the staffing plan proposed by the City was reasonable and could be approved speedily, the Monitor accepted the staffing plan subject to future modification if it proved inadequate.

hiring and contracting freeze on a citywide basis in mid-March in response to the pandemic. The freeze initially prevented AcHP from filling all of the increased number of positions that HCIDLA had obtained authorization to fill. As of March 31, the end of the first 2020 Quarter, AcHP reported net total additional staff of 19 mostly low-level employees: one Senior Management Analyst, 16 Management Assistants and two Administrative Clerks. *See id*. at 1, App. 4.

While the authorized staffing increases are impressive, the increases in actual staff have been concentrated in lower level Management Assistant jobs rather than managerial, supervisory, and professional level Management Analyst jobs. It is too early to tell if these increases are adequate in light of the impact of the pandemic and government restrictions on personal contacts that have limited current implementation work to largely online activities and, importantly, the anticipated sharply increased level of policy monitoring and compliance work that AcHP will face once the pandemic ends with deferred implementation and more programs coming on line. A countervailing factor, discussed below, operating to mitigate AcHP's increasing workload is the City's decision to have the MCE Plan Audit Expert staff auditing rather than use AcHP staff. *See infra* Section II.G(ii).

Recent data show AcHP's staffing needs remain challenging. AcHP has two main parts: the Monitoring, Education and Compliance Program; and the Retrofit Construction Program. The first deals with implementation of the MCE Plan, the Comprehensive Database, the Internet Registry, policy adoption by covered housing developments, training, the Grievance and Complaints System, and the Enhanced Sensory Program, all programs that are likely to see increasing levels of work in the near future and continuing through the end of the Settlement term in 2026.

Leadership of the Monitoring, Education and Compliance Program, however, is severely understaffed. The Settlement Coordinator/Housing Director, who heads the AcHP, has four direct reports in this area who lead teams. All four team leadership

6

positions are either vacant or led by lower-level employees. The Data Gathering, Analysis and Website Management team is led by a Management Analyst in lieu of a Senior Management Analyst. Senior Management Analyst leadership positions are vacant in the Grievance and Enhanced Sensory Program teams with professional level Management Analysts serving as team leaders/supervisors. The leadership position in the External and Internal Training and Consistency team, a Senior Project Coordinator, is vacant with a Management Analyst serving as the team leader/supervisor. The Senior Management leadership slot is vacant in the Administrative Support team with no designated leader. In addition, the predominant position in these teams is the junior-level Analyst Assistant rather than Management Analyst. *See* AcHP Org. Chart, App. 26.

The Retrofit Program, which monitors construction, substantial rehabilitation, and retrofit work does not have leadership challenges of such magnitude, although it too needs more professional level vacancies filled as the Retrofit Construction Program faces major construction survey work from new construction and retrofitting as well as clearing survey work that needs to be redone.

AcHP may face challenges in converting authorized staff numbers into actual staff, a persistent problem in the past. AcHp reports that:

> Effective March 19, 2020 and due to the COVID pandemic, the City of Los Angeles entered into a hiring freeze. However, AcHP was identified as a legally mandated program which has allowed for us to successfully unfreeze some of our positions. AcHP is still required to go through the process of requesting positions to be unfrozen in order to hire and fill the vacant positions. The process to unfreeze a position requires Mayor and City Council approval. After the freeze, AcHP was able to hire 2 additional Management Analysts.

> AcHP has made the request to fill all vacant positions in the classification of Management Analyst, Senior Management Analyst, Administrative Clerk. The RCS II and RCS II [sic] positions were also requested to be filled.

7

AcHP Semi-Annual Rep. for Jan. to June 2020 at 2, App. 5; *see* email from Tricia Keane to Bill Lann Lee, August 7, 2020, App. 28.

### iii.  Assessment and Next Steps

AcHP is correct in recognizing its need for high level and professional level employees through hiring and transfers. It should be noted that, aside from near-term pandemic-related challenges, AcHP faces continuing attrition and lack of available civil service lists for higher level jobs. The extent to which AcHP can actually hire staff, particularly in the Monitoring, Education and Compliance Program leadership and professional level positions, will need to be seen.

While AcHP's construction side may be staffed in a more balanced way, the workforce profile on the policy implementation side of AcHP especially requires continued monitoring by the Parties, the Monitor and the Court and perhaps further intervention by the Court. To that end, the Monitor has proposed discussion of staffing issues at the Parties' Monthly Meeting at the end of August and on a continuing basis thereafter.

### B.    Progress Toward the Target of 4,000 Accessible Units

The City has yet to produce any certified accessible units toward the CSA's target of 4,000 accessible units.

### i.  Background

The Initial Monitor's Report found that: "After almost two and a half years under the CSA, the City has not been able to certify any units as accessible because of AcHP's understaffing, the slow start to implementation and late appointment of the City's accessibility architect LCM." *Id.* at 39, ECF No. 631. The Second Monitor's Report found that: "[T]he City has certified no units as complying with accessibility laws as of June 30, 2019" and that the City expected to issue a sizable number of certificates in 2019-20. *Id.* at 31, ECF No. 634.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

Pursuant to the Court's December Order, ECF No. 663, the Parties agreed that "[b]eginning January 1, 2020 the City shall certify 572 accessible units per calendar year . . . until it reaches 4,000 certified accessible units" and that the City shall provide the Monitor quarterly status reports of certifications. The Parties disagreed on whether quarterly production deadlines should also be instituted with the Monitor agreeing with the ILCSC/CALIF Plaintiffs that quarterly deadlines should be set. Status Conf. Rep. at 2, ECF No. 671.

The CSA calls for an Accessible Housing Unit Plan ("AHUP") that will set annual production schedules and recommend locations for accessible housing units. CSA III.10(b), ECF No. 608-1. The AHUP was finalized on March 15, 2019. Second Monitor's Rep. at App. 640, ECF No. 634-2. Although production schedules and scoring sheets have been created and discussed since that time, no new units have been certified and no existing units have been retrofitted.

**ii. Analysis**

The Monitor's Supplemental Report dated April 15, 2020 reported on the effects of pandemic restrictions: "The City has suspended inspections of occupied housing developments, including substantial rehabilitation projects, to protect residents and City staff. As a result, no retrofit work will be performed until it is safe to begin work. LCM has not surveyed any properties since early March and surveys will not resume surveys during the pandemic." *Id.* at 3, ECF No. 679. While the City anticipated that it would be able to continue inspections of unoccupied new developments currently in construction, it turned out that there were very few such units that were correctly surveyed. The City anticipated that new construction would slow down during the pandemic. *Id.* at 3-4 ("Although the State of California and the City have exempted construction of affordable housing as an essential activity, the City anticipates that construction work by developers will nevertheless slow down during the pandemic."). Hiring of contractors was also affected adversely. *Id.* at 3 ("Hiring of additional contractors is currently on hold because

9

the City Council will not be approving contracts beyond those pertaining to emergency matters. The City, however, was able to approve and issue award letters to four general contractors so that it will be able to go forward with bid walks with multiple contractors when pandemic restrictions end.").

As a result, the City anticipated that it would not meet any 2020 annual or quarterly deadlines in the AHUP. *Id.* at 4. The City has reported no certified accessible units produced in 2020 either before or after the onset of the pandemic, suggesting that the pandemic was an aggravating circumstance on top of the failure of LCM and the City to use appropriate accessibility protocols and standards for certification surveys, as discussed below. *See infra* at Section II.C.

### iii.  Assessment and Action Items

The Parties stated that the City could go forward with work to prepare for new construction and retrofitting after the pandemic ends:

> The City will also continue to review and approve Accessibility Design Review Reports and stamp plans for clearance prior to issuance of permits for new construction.

*Id.* at 4. In addition:

> The AHUP Working Group can finalize the production schedule and prepare scopes of work and cost estimates for occupied properties to be retrofitted in the future. AcHP can also develop scopes of work in preparation for retrofit bid walks for older housing developments on the May 2019 approved annual production schedule that do not require that FHA requirements be met. The City will also continue to work to prepare a scope of work as planned for RFP for relocation specialists.

*Id.* at 4.

During the pandemic, the Monitor does not believe that the Parties had other options to achieve progress toward the target of 4,000 accessible housing units besides

10

the preparatory measures outlined above and, most importantly, the replacement of LCM Architects as the City's Architectural Accessibility Expert discussed in the next Section.

## C.    The Replacement of LCM and Next Steps Toward 4,000 Units

The CSA calls for an Architectural Accessibility Expert to survey covered housing developments, develop assessment tools and other means of ensuring accessibility, assist the City to develop internal capacity to ensure accessibility, develop a quality assurance program, train City staff and agents to implement the CSA, and address other issues as the Expert deems prudent and appropriate. CSA III.10(d), ECF No. 608-1. These roles are integral to the City's ability to construct and retrofit units in a timely fashion and to produce the 4,000 certified accessible units the CSA requires. On June 29, the Monitor issued a Decision, Monitor's Decision Re: Architectural Accessibility Expert, concerning the replacement of LCM Architects with another firm, as discussed below.

Like the Comprehensive Database and the Internet Registry, the replacement of LCM can be accomplished notwithstanding the pandemic both because much of the process can be handled remotely online, and because surveys of unoccupied buildings can be conducted during the pandemic with proper safety measures.

### i.   Background

The City, with the concurrence of Plaintiffs, selected LCM as the CSA Accessibility Expert in June 2018, a year later than required by the CSA. The Monitor's earlier Reports documented substantial problems with LCM's work. At the December 12, 2019 hearing, the Court expressed dissatisfaction with LCM's work based on its delay, reliance on incorrect survey standards, and failure to provide measurements and documentary photographs. *See* Tr. of Dec. 12, 2019 Mot. Hearing ("Dec. 12, 2019 Tr.") at 16-17, 20. The Court requested that the Parties consider replacing LCM and ordered that, if retained, LCM should report to the Monitor. *Id*. at 14, 22.

The Parties decided to give LCM a chance to improve its performance and,

11

because LCM would be reporting to the Monitor, the latter did not object. Status Conf. Rep. at 9, ECF No. 671. That Report also noted that the Parties agreed that the Monitor should "[c]oordinate with HUD to provide consistency in the implementation of the [CSA] and the VCA . . . ." *Id*. at 7. The Monitor, therefore, has coordinated with HUD since December 2019 in assessing the work of LCM, which serves as the Neutral Accessibility Consultant, a function similar to the CSA's Architectural Expert in the Voluntary Settlement Agreement ("VCA") between HUD and the City.

Unfortunately, LCM's work continued to fall short. Having lost confidence in LCM, the Monitor, supported by HUD, informed the City in mid-April that LCM should be replaced by ETA.

ETA is a highly respected architectural accessibility firm with 30 years of experience, including experience with both the Monitor as a neutral and with HUD as opposing expert. ETA has a sophisticated electronic survey and data management system that includes identification, analysis, remediation planning, and process management. Surveyors work on portable devices (tablets, laptops) in the field that contain required measurements and a large database of proposed solutions that can be selected on the spot. Survey measurements are entered directly into ETA's database, an efficient process that is easily shared for review by the Parties and the Monitor.

The ETA system, in the opinion of the Monitor and HUD, is superior to LCM's paper-based system: ETA's online system contains thousands of potential architectural barriers and solutions, developed over decades of accessibility surveys and consulting. Surveyors enter photographic documentation and quantitative measurement data directly into the database in the field. The time between survey and report will be much shorter than was the case with LCM. ETA's online system will be available to the Parties and the Monitor in real time, showing architectural barriers, photographs, and solutions. ETA's system can also interface with the City's data management system. ETA's survey system includes questions relevant to compliance with all versions of applicable accessibility

12

standards.

The City responded initially that it shared the Monitor's concerns about LCM and the reputation of ETA. When the City did not complete its negotiations with ETA for two and a half months, the Monitor issued the Decision Re: Architectural Accessibility Expert, Attachment A hereto, directing that the City cease negotiating with LCM and complete its negotiations with ETA. The City initially objected to the Decision, refusing to comply.

On July 14, the City, through HCIDLA's General Manager Ann Sewill, reversed its position and agreed to replace LCM with ETA.

**ii.  Assessment and Action Items**.

Since the July 14 meeting, the City and ETA have had several productive meetings and the Monitor is optimistic that the survey process and production of accessible units will be able to get back on track. Specifically, the City and ETA are in the process of negotiating the Scope of Work that will guide ETA's work assisting the City in complying with the CSA.

ETA's survey system will provide dynamic checklists for use at each stage of the review and survey process for new construction and for the surveys of existing facilities, superseding the need for the parties, the Monitor, and HUD to edit and agree on revisions to the existing LCM checklists. Similarly, a survey protocol will be an integral part of the ETA Scope of Work currently under development and will supersede the protocol attached as Exhibit A to the January 28, 2020 Status Conference Report, ECF No. 671.

The City has expressed the goal of working with ETA to get the production of accessible units back on schedule, a goal the Monitor shares and applauds. To ensure this goal, the City must promptly take the following steps:

1. Conclude its negotiations with ETA and enter a contract to conduct required surveys;

2. Work with ETA to craft and sign a Scope of Work that will ensure compliance

13

with the CSA going forward and will address housing units previously surveyed by LCM using unacceptable standards and protocols;

3. Gather and share the information necessary to prioritize unoccupied newly constructed developments facing funding or other deadlines;

4. Create a system to ensure that ETA promptly receives the information it needs to prepare for each survey, for example, plan documents, previous surveys, and other related/requested information;

5. Conclude contracts to retrofit prioritized existing facilities and begin retrofitting; and

6. Interview and retain appropriate relocation specialists in order to implement the retrofit process where tenant move-out and move-in will be required to effect required retrofitting.

### D.   Comprehensive Database

#### i.   Background

The Initial Monitor's Report designated as a top priority that AcHP create an electronic database that would track and integrate the various categories of data relevant to the CSA. *Id.* at 11, ECF No. 631.

The Second Monitor's Report documented continuing concerns about the development of the database, including that, according to the City's own documented timelines for the development of the database, estimated completion dates kept slipping. *Id.* at 17, ECF No. 634.

#### ii.   Analysis

The Court addressed the database in the December Order, requiring the Parties and the Monitor to discuss "how data will be collected into a comprehensive database to reliably inform the [C]ourt and Monitor regarding compliance," "so that the [C]ourt and the Monitor have sufficient information to ensure that the City is complying with the

14

[C]ourt's order." *Id.* at 2, 4 (discussing datapoints), ECF No. 663.

Pursuant to this order, the Parties and the Monitor met and submitted a Status Conference Report on January 28, 2020, which addressed the timeline and capabilities of the database. *See* ECF No. 671. Although the City expressed concern about being able to obtain all data points, some of which it said were outside of its control, it did agree on the capabilities of the database. Specifically, the City agreed that by July 31, 2020, it would have in place a "fully operational" comprehensive database that would track, and tie together, all required data points. *See id.* at 20-21, App. 10. The Monitor also made clear that, with respect to data points outside of its control, the City should promptly commence making "good faith, vigorous efforts to obtain any data points not currently in its possession . . . ." *Id.* at 22.

In April 2020, the Monitor met with the City to determine the impact, if any, of the pandemic on the development of the database. *See* Monitor's Suppl. Rep., ECF No. 679. The City revised its estimated completion date from July to December 2020. The Monitor's database expert had independently determined that the City was substantially behind schedule, and that it was "unclear how much [of this delay was] attributable to pandemic restrictions." *Id.* at 3.

Since the April report, the Monitor has continued to review the City's progress on developing the comprehensive database. This has included bi-weekly telephone calls among the Monitor's database expert, the ILCSC/CALIF Plaintiffs' database expert, and the City. In addition, the City continues to provide timelines setting forth the estimated completion dates of various tasks related to the database.

### iii.  Assessment and Next Steps

The Monitor remains concerned that the City will not meet its revised December 31, 2020 estimated completion date. For example, work on the reporting functionality of the database – which is essential to allowing the Court and the Monitor to determine whether the City is in compliance – will not even commence until September.

15

The next release of the database is slated for September 21, 2020. Reviewing this version of the database will allow the Monitor's database expert to have a more concrete basis for analyzing whether the database is on track to be completed by December 31, 2020.

As the Monitor has stated repeatedly in past reports, completion of the comprehensive database is absolutely essential to implementation of the CSA and should have been completed long ago. The Monitor wants to make clear that if the comprehensive database is not completed by December 31, 2020, the Monitor intends to recommend that daily sanctions be imposed by the Court. As the Monitor has previously informed the City, "completion means: [t]hat the comprehensive database can be used at the point of completion to produce compliance reports." Email from Bill Lann Lee to Sharon Lowe, July 8, 2020, App. 30. The comprehensive database, in short, is complete when it can be used to generate compliance reports, its intended purpose.

The Monitor recognizes that in light of the pandemic, it may be more difficult for the City to obtain data outside of its control. However, this does not prevent the City from – as the Monitor instructed in January – making "good faith, vigorous efforts to obtain" this data. If the completed database is missing required data, and the City asserts that this data are outside of its control, the Monitor, in assessing whether to recommend daily sanctions, will focus heavily on evidence that such efforts were actually made.

## E.    Adoption of CSA Policies by Covered Housing Developments

To "ensure maximum utilization of accessible units by people with disabilities," the CSA directed the City to "require all owners and managers of City-assisted housing to adopt the uniform marketing and leasing policies," which "provide for affirmative marketing directed at people with disabilities, uniform application, waiting list, and tenant selection practices (including unit assignment and transfer standards), effective communications with people with disabilities, assistance and support animals, the

16

provision of reasonable modifications and reasonable accommodations, and grievance procedures." CSA III.10(k), ECF No. 608-1.

### i. Background

AcHP has had difficulty obtaining compliance by owners and property management agents of basic reporting requirements. A year ago, the August 2019 Monitor's Report reported that:

> The proportion of developments acknowledging receipt and submitting acknowledgments of receipt by tenants increased from approximately 1/3 at the end of 2018 to 445 or over half in May 2019 . . . The number of developments to whom AcHP has issued Certificates of Adoption of Housing Policies has increased from 47 or six percent to 121 or 15 percent.

Second Monitor's Rep. at 41, ECF No. 634.

The Parties agreed to deadlines for adoption and distribution of policies in January. *See* Status Conf. Rep, at 16; ECF No. 671:

> City shall notify and require all existing Covered Properties to submit a Self-Certification Under Penalty of Perjury of Adoption of the Revised Policies and Distribution of Revised Policies (or an updated HUD equivalent), and an Acknowledgment of Receipt by Tenants, to the City no later than March 31, 2020. No later than April 30, 2020, the City shall: 1) issue a confirmation for each covered property confirming that it has submitted complete acknowledgements; and 2) initiate and take meaningful progressive sanctions as described in Amended Agreement III.10(l)(i) and Sections III.B and III.C of the MCE Plan against all Covered Properties that have failed to submit acknowledgements by that date.

The Status Conference Report also required active monitoring of covered properties, including that "[t]he City shall have completed initial reviews and reports, and issued Certifications of Adoption of Housing Policies, on one quarter of the covered properties by June 30, 2020." *Id.* at 17.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

The Status Conference Report also detailed requirements for the City to provide a notice to existing covered properties by February 29, 2020 to update their Property Management Plan ("PMP") and submit it for review by the City for review and approval within 60 days of the property's adoption of revised policies. *Id.* at 18. The City was required to conduct a review of the proposed updated PMP within 30 days, either granting preliminary approval or requiring corrective modifications; and any corrective modifications had to be submitted back to the City within seven days. *Id.* at 18-19. All existing properties were required to submit an updated PMP or related required documents, such as wait lists, or to conduct outreach as required; if properties failed to do so, the City was required to promptly initiate and take meaningful progressive sanctions as prescribed by the MCE Plan. *Id.* at 19. The City was required to provide the Monitor no later than June 30, 2020 a list of properties for whom the initial quarterly review has not been completed and describe efforts taken by the City to secure compliance at each such property. *Id.* Following the City's approval of proposed updated PMP, properties should conduct future outreach utilizing prescribed procedures in the updated PMP and other sources. *Id.* at 18-19.

### ii.  Analysis

AcHP reported that in the January-June time frame, 457 out of 857 covered developments submitted Self-Certification/Adoption of Revised Policies forms and 407 covered developments submitted Distribution of Revised Policies forms to residents. AcHP Monitoring Activities During COVID-19 Pandemic (March 19, 2020 thru June 30, 2020) at item 3(f), App. 34. AcHP, however, did not report how many of these developments met the March 31 deadline. Compared to the January-June 2019 period, there was a slight increase in submission of Self-Certification/Adoption of Revised Policies forms and a drop in the Distribution of Revised Policies forms to residents.

With the imposition of deadlines in January 2020, a larger staff for monitoring compliance, and the countervailing burden of pandemic restrictions and the inability to

18

conduct in-person monitoring, AcHP was unable to substantially increase the number of owners and property management agents submitting basic policy adoption information much beyond what it had accomplished the year before. The City is not close to 100 percent adoption.

The City, moreover, assumed two undertakings with interim deadlines in the Status Conference Report for the January-June, 2020 period. First, the City agreed to require owners and property management agents to submit Self-Certification Under Penalty of Perjury of Adoption of the Revised Policies and Distribution of Revised Policies to the City no later than March 31, 2020. Status Conf. Rep. at 16, ECF No. 671. Second, the City undertook that: "[n]o later than April 30, 2020, the City shall provide to the Monitor a list of properties that have not submitted the required self-certification and acknowledgement and shall describe the efforts taken by the City to secure compliance at each such property." *Id.* The City did not provide information about the submission of owner and property management agent adoption of policies forms and distribution of policies to tenants forms by March 31 or provide the list to the Monitor by the April 30 deadline.

No reason appears to justify the City's failure to meet these deadlines during the pandemic. The City, however, on its own, suspended distribution of the revised policies by property management agents to tenants. As the ILCSC/CALIF Plaintiffs point out, there was no reason acknowledgments could not be distributed and returned by mail or by dropping them off at the tenant's unit or the development's management office.[3]

---

[3] "There is no reason why the acknowledgments cannot be safely distributed and returned to the management offices by mail or by dropping them off at tenants' units and the management offices. In most instances, there is no need for personal contact to obtain these acknowledgements, and this obligation should be immediately reinstated. To the extent acknowledgments cannot be obtained from some households without personal contact, those individuals can be identified and the situation explained in the submission of the acknowledgment to the City, for follow up at a later date. The significant delays in

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

The City states that:

> Throughout this reporting period, AcHP policy analysts have been undertaking follow-up communications with developments to submit and comply with the multiple policy compliance requirements set forth in the MCE Plan, and are continuing to do so. The City has utilized the background clearance check as an enforcement tool to achieve compliance from developments requesting additional funding or refinancing approval from the City.

AcHP Semi-Annual Rep. for Jan. to June 2020 at 15, App. 18. While providing useful general information, these statements do not "describe the efforts taken by the City to secure compliance" at each of the 400 properties that failed to submit a Self-Certification/Adoption of Revised Policies form and to distribute policies to tenants. These statements are also not helpful in determining whether the City's actions as to each non-performing development were adequate or, alternatively, what further compliance or enforcement actions the City should conduct with respect to non-performing owners and property management agents.

As to Certificates of Adoption of Policies, AcHP reported that it issued 127 Certificates in the January-June 2020 period. *Id.* Little has changed from the 121 certificates reportedly issued in the January-June 2019 period. Second Monitor's Rep. at App. 354, ECF No. 634. The City thus failed to meet the requirement to issue "Certifications of Adoption of Housing Policies, for one quarter of the covered properties by June 30, 2020" or 214 out of 857 properties. *See* Status Conf. Rep. at 17, ECF No. 671.[4]

_____

meeting the adoption, acknowledgment, and reporting deadlines cannot be blamed on the coronavirus." Revised Resp. of ILCSC and CALIF to Monitor's Request for Input on Aug. 2020 Semi-Annual Rep. ("ILCSC/CALIF Revised Resp.") at 19, App. 55.

[4] The ILCSC/CALIF Plaintiffs raise issues with the lack of clarity, completeness and consistency of quarterly compliance reporting in the 533 first quarter and 517 second quarter Quarterly Report Packets received by the City. *See* AcHP Semi-Annual Rep. for

20

With respect to the PMP, the City provided a cursory summary without any discussion of compliance with deadlines. *See* AcHP Semi-Annual Rep. for Jan. to June 2020 at 20, App. 23. The ILCSC/CALIF Plaintiffs objected that:

> Approval of the updated Property Management Plans are significantly behind schedule. Pursuant to the Agreements, the City reports that on February 28, 2020, it notified all existing properties that they must update the PMPs no later than May 4, 2020 . . . The City was then required to have reviewed and approved all of the PMPs no later than May 31, 2020 . . . However, the City reports that as of the end of July 23, 2020, only 416 proposed PMP revisions have been submitted by Developments, and only 2 or 3 have been approved and another 2 have preliminary approval . . . Note, the numbers vary from one tab to another, and we do not know the difference between preliminary approval and final approval noted in the reports.)

ILCSC/CALIF Revised Resp. at 27, 27 n.8, App. 63.

> Furthermore, the City agreed that no later than June 30, 2020, it would provide the Monitor with a list of properties that do not have an approved PMP and that describes the efforts taken by the City to secure compliance at each such development . . . We have not received such a report, but at the 7/28/20 meeting [the City] agreed . . . to provide the required list to the Monitor and Plaintiffs by August 10.

*Id*. at 28, App. 63.

### iii.  Assessment and Next Steps

The results of the City's efforts to increase adoption of CSA policies by covered housing developments as required by the MCE Plan and the Status Conference Report,

---

Jan. to June 2020 at 19, App. 22 and ILCSC/CALIF Revised Resp. at 26-27, App. 62-63. The Parties should meet and confer about these issues in the MCE Plan Working Group.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

ECF No. 671, have been disappointing. As the ILCSC/CALIF Plaintiffs put it:

> The City continues to fall far short of its goals and obligations regarding adoption of the policies by 100% of existing covered developments, a goal that was supposed to be met in the first year of the CSA but was extended to April 30, 2020 . . . The City's written report of 469 properties complying means that the remaining almost 400 properties, almost half of the covered developments, have not even acknowledged that they have adopted the policies, let alone distributed them to tenants . . . This means that nearly four years into the settlement, we have no confirmation that tenants in hundreds of developments have been advised of their rights under the CSA.

ILCSC/CALIF Revised Resp. at 18, App. 54.

The original design of the CSA envisioned an integrated, coordinated set of related programs rolled out in an orderly way. Outreach and training for owners and property managers, however, were rolled out by AcHP much earlier than MCE Plan with its focus on monitoring and possible enforcement. The rudimentary counts were a workaround in the absence of MCE Plan monitoring mechanisms. Now that the MCE Plan and the ability of AcHP to conduct monitoring is enhanced by the jump in staffing, the kind of programmatic balance the CSA originally contemplated with respect to obtaining compliance with the Uniform Marketing and Leasing Policies is now within reach. But not if the City does not live up to the above obligations and deadlines.

The City shall comply with its Self-Certification Under Penalty of Perjury of Adoption of the Revised Policies and Distribution of Revised Policies and Monitor, Certification of Adoption and PMP obligations and deadlines set forth in the Status Conference Report. The Parties should meet and confer about setting revised deadlines.

The Monitor will consider whether to recommend monetary sanctions to the Court for breach of the above obligations and deadlines in light of the pandemic and other factors. The Parties should meet and confer about a briefing schedule.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

The City shall comply with the above obligations and deadlines in the future.

**F.    Training of Covered Housing Development Personnel**

**i.    Background**

The CSA provides that:

The City will develop and implement a curriculum to train City housing staff and owners and property managers of Covered Housing Developments about disability rights obligations in assisted housing . . . [and] implementation of [the CSA]. Trainings will be provided on a regular basis . . . [and] Plaintiffs shall be consulted in the development of the curriculum and materials . . . and shall be invited to attend such training . . . .

CSA III.10(n), ECF No. 608-1.

The Parties agreed to specific deadlines set forth in the January 28 Status Conference Report, ECF No. 671, for training. These deadlines and the City's degree of compliance are described below.

**ii. Analysis**

The first set of deadlines concerned the City's communications with owners and property management agents who had not participated in training:

By January 10th, the City will send a communication to all remaining properties (those who have not responded at all) requiring . . . all owners and Property Management Agents, as defined in the MCE Plan dated 8/16/19, to be trained by March 31, 2020, and notifying them that City will take additional steps to remedy noncompliance. City to provide a report to the Monitor by April 30, 2020, and quarterly thereafter, listing all noncompliant properties and describing City efforts to secure compliance at each listed property. The existing training curriculum will be used (with revisions to the policies as required by HUD so long as the revisions do not extend the deadline.)

Status Conf. Rep. at 13, ECF No. 671. The City has not reported its compliance with

23

training. The ILCSC/CALIF Plaintiffs point out that the City ceased in-person training because of the pandemic on March 13 and notified owners and property management agents that it was resuming online webinar training on May 15. ILCSC/CALIF Revised Resp. at 20, App. 56. However, the City made no submissions 60 days after March 31, on May 31, or 60 days after April 30, on June 30. As discussed below, the City produced an Excel spreadsheet on July 23 later listing all the housing developments – rather than noncompliant developments to whom a notice had been sent—and whether they comply with training requirements for designated positions. The City listed only 40 percent of all the developments as complying with training requirements in January-June 2020 and the City offered no description of its efforts to secure compliance. *See infra.*

The second set of deadlines provides that: "All owners and Property Management Agents, as defined in the MCE Plan dated August 16, 2019, in new construction /substantial rehabilitation to be trained prior to lease up or hiring, whichever occurs first." Status Conf. Rep. at 13, ECF No. 671. The City also did not report on these trainings, although it is unclear if any lease ups occurred in this period, which the City should have reported if none occurred.

A third provision requires that "[t]he City shall report quarterly to the Monitor beginning on April 30, 2020 and quarterly thereafter, with a list of all noncompliant properties and properties without full compliance by each designated staff for the preceding quarter, and describe the City efforts to secure compliance at each listed property." *Id*. Designated staff members include the Designated Owner Representative, ADA Coordinator, Grievance Coordinator, Regional Manager, and Property On-Site Manager.

Again, the City did not report this designated staff information to the Monitor by April 30. Instead, three months later, the City produced an Excel spreadsheet entitled "Training Compliance Report 7.23.20", as an attachment to the January-June 2020 Semi-Annual Report, App. 71-118. The Report listed a total of 847 housing developments of

24

which 60 percent (513 developments) showed noncompliant training in one or more designated staff positions. Nor did the spreadsheet contain the required information concerning any description of City efforts to secure compliance for any of the 513 properties.

A fourth set of deadlines requires that new property management agents complete the initial training within 30 days of hire or selection and that all remaining property management agents be trained by May 31, 2020. *Id.* at 14. The City has neither reported new agents completing initial training within 30 days of hire nor the training of all remaining agents by May 31.

Instead of reporting what was agreed to in the Status Conference Report, the City reported 821 total number of owners or property management agents taking Fair Housing Training courses and, after the pandemic hit, webinars and 620 owners and property management agents taking the Policy Compliance Review Training courses in the January-June period. AcHP Semi-Annual Rep. for Jan. to June 2020 at 18-19, App. 21-22. While these numbers are large, they do not mitigate or refute that 60 percent of the housing developments were noncompliant in training in this period nor that the City has not made any effort to describe efforts to deal with the noncompliant developments. The Monitor believes this is a fundamental error.

The City also failed to report any information about training provided to City housing staff as required by CSA III.12(a), ECF No. 608-1.

### iii.  Assessment and Next Steps

Even allowing for additional time to set up online training, the City failed to comply with its training reporting obligations and deadlines under the Status Conference Report (ECF No. 671), failed to make requisite reports to the Monitor, and failed to comply with the purpose of the reporting and deadlines to ensure that 100 percent of covered housing developments comply with training requirements.

Two years ago, the City identified as barriers to compliance with Uniform

25

Marketing and Leasing Policies that "owners and managers are unaware even of whether their developments have accessible units and who is occupying such units" and that "property manager[s] have high turnover rate." *See* Initial Monitor's Rep. at 83, ECF No. 631. The failure of the City to move the needle for compliance with training requirements suggests that such barriers may persist despite the requirements of the MCE Plan and Status Conference Report.

The City should comply forthwith and completely with the training and reporting obligations and deadlines set forth in the Status Conference Report, explained above, for the obligations and deadlines it has missed. The Parties should meet and confer about setting revised deadlines.

The City should comply with its training and reporting obligations and deadlines in future quarters. The Parties should meet and confer about setting revised deadlines.

### G.    Monitoring, Compliance and Enforcement Plan Audits

The CSA requires that: "The City shall monitor its . . . Owners and [require them to] comply with the applicable requirements" in operating and administering housing. *Id.* III.10(l)(i), ECF No. 608-1. "[T]he City shall, in consultation with Plaintiffs, develop and begin to carry out a monitoring, compliance and enforcement plan to ensure that Owners and Property Management Agents . . . comply with management policies to ensure accessibility" within 180 days of the effective date of the CSA, September 5, 2016. *Id.* III.10(l)(ii). The date for the City to develop and to begin carrying out the MCE Plan expired over three years ago on March 4, 2017.

### i.    Background

The City first adopted an MCE Plan in Summer 2019, a little over two years late. The Plan, however, carved out a provision on compliance audits for later inclusion. Decl. of Sharon Lowe in Supp. of Def. City of Los Angeles' Opp'n to Pls. ILCSC and CALIF's Mot. to Enforce at 4, 9, ECF No. 649. The Court's December Order required that the

26

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

parties and the Monitor address "how and when audits will be performed." *Id.* at 2, ECF No. 663.

The Monitor has previously reported that: "Auditing is the most consequential of the outstanding MCE issues because it will fill the long-standing information gap about actual compliance with policies by property management agents and owners." Monitor's Suppl. Rep. at 7, ECF No. 679. In the absence of compliance auditing, the City has largely relied on self-reporting by a portion of owners who state that they have adopted and comply with CSA policies to ensure accessibility and training of owners and property management agents, both imperfect ways to assess compliance by housing developments. *See supra* at Sections E. & F.

**ii. Analysis**

On April 15, 2020, the Monitor issued his Decision: MCE Plan Audit Protocol ("Orig. Dec."), Attach. A to Monitor's Suppl. Rep., ECF No. 679, calling for the retention of an independent expert ("Expert") to audit the implementation of the MCE Plan. This audit will include interviews of applicants and tenants as well the owners and property management agents who operate the housing developments. *See id.* at 6. A portion of the audits to be conducted by the independent Expert will be triggered by actions of owners or property managers of covered housing developments in, for instance, failing to undergo training in the policies; failing to use the Registry for applications; or the actions of AcHP in monitoring, addressing, remediating or taking enforcement actions in the event of such failures. In addition to these "triggered" audits, another portion of the audits will be surveys of representative samples of housing developments chosen randomly to address systemic issues with respect to housing developments and AcHP monitoring, and the need to modify policies and practices. *See generally id.*

The Monitor issued the Original Decision that the MCE Plan audit should be performed by an independent Expert conducting audits under the supervision of the

27

Monitor. Orig. Dec. at 1-2, ECF No. 679. As required by the Court's December Order, ECF No. 663, the Original Decision also provided a timeline for the Expert to propose an Annual Audit Plan by October 31, 2020 for review and comment by the City and Plaintiffs' input, for obtaining approval of the Monitor by January 1, 2021, and for auditing to begin in calendar year 2021. Orig. Dec. at 8, ECF No. 679.

In response, the City agreed with the Original Decision that the audit and survey work should be performed by an independent Expert but proposed broadening the scope of the Expert's work by having the Expert's staff conduct the audits rather than City staff. The Monitor accepted the City's expansion of the scope of the Expert's duties. With respect to the timeline, the City neither objected to the timeline nor disputed its reasonableness.

The Monitor held further proceedings and issued a Supplemental Decision on MCE Plan Audit Protocol on June 29, 2020 after disputes about the timeline emerged. Attach. A to Not.: Monitor's Submission of Suppl. Dec. on MCE Plan Audit Protocol ("Suppl. Dec,"), ECF No. 682. In order to permit enough time for preparation of the annual plan by October 31, 2020, the ILCSC/CALIF Plaintiffs estimated that the Expert would have to be selected by July 1 or four months before the submission of an annual plan. The City, in its response, did not acknowledge the timeline or respond to the question of when the Expert needed to be in place under the Decision. Instead the City set forth a schedule for the hiring of the Expert by competitive bidding by April 1, 2021 as required by local ordinances. *Id.* at 3.

### iii. Assessment and Next Steps

The Monitor rejected the City's reliance on the competitive bid process to frustrate the CSA's vindication of federal rights because, under the Supremacy Clause of the Constitution, federal rights are superior to conflicting local ordinances and vindication of federal rights overrides conflicting local laws. U.S. Const. art. IV, para. 2; *see also* Suppl. Dec. at 5 (citing cases).

The Monitor also noted that the reason that the Court requested a timeline for implementation of auditing and that the Original Decision made sure to specify a timeline is the many delays that have stymied implementation of the CSA thus far. It is four years since the CSA specified that the MCE Plan should be adopted and that activities to carry it out were to begin.

In the absence of compliance auditing, neither the City, the Plaintiffs, nor the Monitor knows in a systemic way which of the 850 covered housing developments are or are not actually complying with CSA policies, and what enforcement actions need to be taken to make sure that applicants and residents with disabilities are receiving the benefits of the CSA's marketing, leasing, access to common areas, reasonable accommodations, and other policy guarantees. Time is of the essence to put in place an auditing program for compliance because the Court and the Monitor are in the dark on whether covered developments are complying with CSA requirements designed to benefit individuals with disabilities.

After the Monitor issued the Supplemental Decision, the City questioned the authority of the Monitor to issue a Decision overriding the City's competitive bid ordinance and declined to implement it. Plaintiffs and the Monitor requested an opportunity to meet and confer before bringing the matter to the Court for resolution. HCIDLA's General Manager Ann Sewill attended the session where she proposed invoking her authority to use a pre-approved list of potential Expert bidders to expedite selection of an Expert by October 31, 2020. The Monitor agreed to the proposal because the Expert could restructure the annual audit plan to begin with audits triggered by the actions of owners and property managers in January 2021 and begin audits consisting of surveys of representative samples of housing developments chosen randomly later in the year. The Parties and the Monitor have agreed on a scope of work on an expedited selection process and are waiting for final approval by the City.

Assuming that all goes well with the compromise resolution of the MCE Plan

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

auditing, an Expert would be in place by the end of October and would begin working on implementing the preparation of the Annual Audit Plan and other steps necessary to implement the Original and Supplemental MCE Plan Audit Decisions so that the timely auditing will go forward. If the compromise does not hold, Plaintiffs and the Monitor would seek to enforce the two Decisions before the Court.[5]

## H.   Internet Housing Registry

### i.   Background

The CSA required that an Internet Housing Registry be developed and implemented by September 2017 so that applicants for housing with accessibility features could apply for housing in an accessible and convenient way that AcHP could monitor. The Registry, however, was not developed until 2019. Without the Registry, units with accessible features have been marketed and leased to applicants by owners and property management agents largely without AcHP participation or the monitoring that the CSA contemplates. *See* Initial Monitor's Rep. at 56, 70, ECF No. 631. The City's current monitoring of accessible unit housing shows that fully 47 percent of the households occupying units with accessibility features on an aggregate basis do not include persons with disabilities. *See* AcHP 2020 Q. 1 (Jan-Mar) Data for 614 Prop. Sites ("2020 Q1 Prop. Rep."), App. 121.

AcHP launched the Registry and began accepting applications for units with accessible features at 303 of the 850 covered housing developments through the Registry on July 31, 2019. Prior to launch, the Monitor's design accessibility and usability expert, Knowbility, worked with the City on identifying online accessibility and usability errors on Registry webpages and conducted testing and retesting. These units had not yet been

---

[5] The Monitor discusses several City filings concerning self-reporting of CSA policies and training of housing development personnel required by the MCE Plan and the Status Conference Report *supra* at Sections, II.E Adoption of CSA Policies by Covered Developments and II.F Training of Covered Housing Development Personnel.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

1  retrofitted or certified and were not yet ready for occupancy. *See* Second Monitor's Rep,

2  at 37-38, ECF No. 634.

3       At the end of February, the Monitor flagged that the City had prepared a critical

4  summary report based on its experience with the first set of applications by people with

5  disabilities for accessible units, "provid[ing] concrete information for considering how

6  the application process can be improved." Monitor's Suppl. to Jan. 28, 2020 Status Conf.

7  Rep. and Request to Schedule Status Conf. for Apr. 2, 2020 ("Feb. Suppl.") at 6, ECF

8  No. 676.

9      **ii. Analysis**

10      Following its summary report, the City made some changes to the Registry, but not

11 to the design of its three-part process for people with disabilities to apply for housing

12 units with accessibility features. The ILCSC/CALIF Plaintiffs, on the other hand,

13 proposed a design change to eliminate as confusing one of the three steps as well as

14 related changes. Like the comprehensive database and the MCE Plan Audit, the online

15 Registry is a program that pandemic restrictions did not prevent the Parties from working

16 on remotely. The Monitor, however, was concerned that the Parties' resolution of this

17 design was being delayed unnecessarily.

18      For the reasons set forth in the Monitor's April 15, 2020 Decision on Internet

19 Registry Design, the Monitor concluded that the ILCSC/CALIF Plaintiffs were correct

20 that the second pre-application step in the Registry's three-step application process

21 should be eliminated and that an applicant could choose to enter information on the initial

22 expression of interest step on the Registry site so that the Registry could match them

23 automatically with housing units for which they are eligible or rule them out for Housing

24 Developments for which they are ineligible. *See* Attach. B to Monitor's Suppl. Rep.

25 ("Registry Design Dec."), ECF No. 679. Applicants should also, as the ILCSC/CALIF

26 Plaintiffs proposed, be permitted to submit applications online through the Registry.

27      The Registry Design Decision is based on an undisputed factual record, the City's

28

<center>31</center>

summary report as interpreted by the ILCSC/CALIF Plaintiffs and the Monitor's online design accessibility and usability expert Knowbility. The Monitor noted particularly the City's finding that a presumably large, sophisticated property management company found the three-step application process confusing, which Knowbility characterized as "an indisputable indicator that users with disabilities found the process *very* confusing." *See id.* at 4.

The Monitor expected that resolving this fundamental design issue would permit the Parties to reach agreement on other Registry implementation issues in the same way that resolution of an important legal issue would. To that end, the Monitor requested that Knowbility work with the Parties and the Monitor to develop a timeline and work plan and work with the Parties to resolve remaining Registry issues during the present pandemic period and after.

The Monitor and Knowbility have met with the Parties several times and provided the City with input and comments on the redesign, as have the ILCSC/CALIF Plaintiffs. On July 8, Knowbility also provided the City with an accessibility and usability assessment of the redesigned AcHP online pages, identifying 40 accessibility and usability errors, in an effort to expedite the City's rollout of the redesigned Online Registry. The City has scheduled a demonstration of the redesigned Registry on August 13. The City has set a deadline of September 21 for the redesigned Registry to be completed and usable.

AcHp reports that 471 covered housing developments, or a little over half of all covered developments, registered as users of the Registry by June 30, suggesting that the City has a long way to go before signing up all covered housing developments. *See* AcHP Semi-Annual Rep. Jan. to June 2020 at 14, App. 17. In that period, 7,566 applicants had registered as well in this period. *See id*. The total of potential applicants is unknown.

### iii.  Assessment and Next Steps

Knowbility will conduct periodic testing of Registry webpages and the Monitor

32

will monitor the performance of the Registry as it is updated and any disputes between the Parties that may arise. The Monitor will also review, in particular, the City's efforts to increase usage of the Internet Registry by covered housing developments and applicants as well as monitor coordination of the Coordinated Entry System and the Registry to fill accessible units for homeless persons with disabilities. *See infra*.

## I.    LAHSA (Coordinated Entry System)

### i.    Background

The Monitor's earlier Reports have noted that much of the housing covered by the CSA is federally supported supportive housing for individuals who are chronically homeless. This housing is currently filled through the CES operated by LAHSA, a joint City/County entity. LAHSA "connect[s] homeless individuals and households to housing, utilizing" the CES a matching program:

> When LAHSA is informed by a [CSA-]covered property that a[n accessible] unit is available, LAHSA provides the name of the first qualified tenant for said unit as provided by CES. The property then confirms that the individual meets the qualifications of the unit and fills the unit.

City's Resp. to Monitor's Request to the Parties for Information Regarding LAHSA ("City's Response") item (a), App. 122.

Prior to March 2018, LAHSA had no procedures for identifying homeless individuals who needed accessibility units in CSA-covered housing developments. After March 1, 2018, LAHSA added two questions to the Basic Intake form to identify, from the self-reported response of the individual and the observations of the staff case worker, whether the individual needed "a mobility unit," "a hearing/vision unit," or "a mobility and hearing/vision unit." City's Update and Resp. to Monitor's LAHSA Remedial Objectives and Information Requested ("City's Revised Resp.") at 1, App. 125. LAHSA has never studied homeless individuals who need units with disability features and has no

33

information on where they are placed after matching. *Id.* at 5-6.

The ILCSC/CALIF Plaintiffs have expressed concerns that LAHSA's CES matching program has failed to identify homeless individuals who need accessible housing units and that homeless persons who do not need accessibility features have been placed in many supportive housing units with accessibility features. *See* ILCSC/CALIF Revised Resp. at 15, App. 51. LAHSA states that it has no information about these issues. *See* City's Revised Resp. at 5, App. 129. The problem may well be substantial. AcHP's monitoring of 4,046 accessible units through March 2020 shows that fully 47 percent or 1,901 units were occupied by individuals who did not need accessibility features. *See* 2020 Q1 Prop. Rep., App. 120.

The Parties have a legal dispute. The City argues that LAHSA is not a party to the underlying legal action or to the CSA and therefore that the CSA does not apply to LAHSA's CES matching program. *See* City's Resp., App. 122-23. The City argues further that it bears no responsibility for ensuring that LAHSA's matching complies with the CSA because LAHSA is by law a separate entity although it is a joint City and County authority. *Id.* The City does not dispute that it has responsibilities under the CSA to ensure that owners and property managers comply with the CSA. *Id.*

The ILCSC/CALIF Plaintiffs take the position that it is unnecessary at this juncture for LAHSA to be a party to the CSA because the terms of the CSA itself make the City responsible for LAHSA's failure to comply with the CSA. ILCSC/CALIF Revised Resp. at 17, App. 53. First, LAHSA is a "subrecipient" of federal and other funds from the City and is therefore subject to the CSA's requirements for filling accessible units. *See, e.g.*, CSA II.12, 15, 21, 30; III.7, 10(d)(iv), ECF No. 608-1. Second, LAHSA is an "assign" of the City subject to the CSA's requirements for filling accessible units. *See, e.g., id.* II.21; X.7. On either ground, the City is responsible for correcting LAHSA's failure to comply with the CSA.

**ii. Analysis**

34

On August 12, 2020, the Monitor issued the Monitor's Decision on LAHSA, attached as Attachment B hereto. The Decision finds that LAHSA was both a Subrecipient and an assign under the CSA. The CSA states that: "'Subrecipient' means and refers to any public or private agency, institution, organization or other entity or person to which Federal financial assistance or financial assistance from or through the City is extended." *Id.* II.30. The undisputed record of City budget documents shows that LAHSA receives federal and other funds from the City for homeless services, including operation of CES and that LAHSA is, therefore, a Subrecipient of the City. The CSA also provides that, "This Agreement shall be binding on . . . the Parties . . . and their . . . assigns." *Id.* X.7. The term "assign" is not defined by the CSA. It is usually understood that an assign is the recipient of a transfer of an interest, property or money. The budget documents showing that LAHSA is a Subrecipient of the City also show that it is an assign of the City. The City is therefore responsible for LAHSA's CES matching program.

The CSA also shows that homeless individuals are not restricted to CES to obtain units with accessibility features in CSA-covered housing developments. They are eligible to seek such housing through the CSA's Internet Registry. The CSA is clear that Subrecipients, such as LAHSA, are obligated to comply with the CSA's Housing Registry to permit:

> Persons with Disabilities to obtain detailed current information about accessible Housing Units and Housing Developments; . . . [and] to use the Registry to sign up to be notified about accessible housing units that are available for rent, make application for such units, and be placed on waiting lists for such units.

*Id.* III.10(m)(ii).

The term "Housing Development" used by the CSA to describe the Registry in the foregoing provision is defined to include housing "operated [or] administered . . . by [the City's] Subrecipients . . . ." *Id.* II.15; II.12. LAHSA argues that its CES marching

activities stop at the water's edge because LAHSA has no operational role in the placement process with one exception. The City, however, concedes that the homeless individual that LAHSA matches to the housing development's accessible unit is the individual placed in the unit by the owner or property management agent effectively making LAHSA the decision-maker for tenant selection or placement for supportive housing. *See* City's Resp. item (a), App. 122.

The CSA is also clear that the City may compel compliance by LAHSA. The City argues generally that it is powerless to compel compliance by LAHSA. *See* City's Resp., App. 122-23. The CSA says otherwise. The CSA mandates that the City "shall" monitor its Subrecipients, "shall" take remedial action to ensure Subrecipient compliance, and "shall" compel compliance by a Subrecipient with the terms of the CSA without any exception for the CES matching or the Internet Registry. CSA III.7 & 10(1), ECF No. 608-1. The same reasoning for a Subrecipient should equally apply to LAHSA as the City's assign.

Currently, the City has made no provision for homeless individuals seeking accessible units under the Registry notwithstanding that the CSA provides for filling accessible units through the Registry. Instead, the City has delegated to LAHSA the sole responsibility for identifying persons to be placed in accessible supportive housing through CES matching ignoring the direction of the CSA that the Registry be used to fill accessible housing in covered housing developments.

If CES matching were a clearly superior process, it could be argued that the City should continue with LAHSA and CES. It is not. In light of the black box nature of the CES system, it would appear that the Registry is likelier to result in more accurate decision-making. Using the Registry would also obviate the need for LAHSA to provide an application process under the Registry in addition to CES matching. Using the Registry also may diminish the need for the City to monitor and audit LAHSA's operation of the CES system. The City is already obliged to monitor and audit the

36

operation of the Registry. The key inquiry is likely to be whether the City is able to provide services such as ready access to the assistance of a housing advocate because the homeless status of these individuals is likely to necessitate the provision of such services This is a factual question that the City and Plaintiffs need to address in the first instance.

### iii. Assessment and Next Steps

The LAHSA Decision provides the following relief.

Within ten days, the City, with input from the Plaintiffs, shall propose a joint implementation plan for implementing this Decision for adoption by the Monitor. The Parties should consult LAHSA in preparing joint or separate plans. If the Parties agree on the need to continue with LAHSA's CES matching, they should include provisions that the City shall:

Ensure that homeless individuals who need accessible housing have a full and effective opportunity to obtain accessible housing under CES;

Ensure that LAHSA's identification of homeless individuals who need accessible housing for matching is accurate;

Provide an avenue for homeless individuals who need accessible housing to apply for housing under the Interne Registry; and

Provide for information exchange, training, monitoring and auditing so that that LAHSA's process for identifying homeless individuals who need accessible housing complies with the CSA.

If the Parties agree on the need to use the Registry to fill accessible units in covered housing developments, they should include provisions that the City should:

Ensure that homeless individuals who need accessible housing have a full and effective opportunity to obtain accessible housing through the Internet Registry;

Provide that homeless individuals who need accessible housing under the Internet Registry have appropriate services such as ready access to the assistance of housing advocates;

37

Coordinate the transition from LAHSA CES matching to the use of the Internet Registry;

Determine the roles of LAHSA and AcHP under the Internet Registry; and

Provide for such additional information exchange, training, monitoring, auditing as may be required.

If the Parties are unable to submit a joint implementation plan, the Parties shall submit within 14 days separate implementation plans for adoption by the Monitor.

The Monitor, in any event, will continue to monitor the provision of accessible housing under the CES program and/or the CSA Internet Registry.

## J.    Grievance and Complaint System

In this Section on the Grievance and Complaint System as well as the following Self-Evaluation/Transition Plan and Effective Communications and Enhanced Sensory Program in Existing Development Sections, Plaintiffs raise issues that the Monitor plans to assess and determine if intervention would be helpful to the Parties.

### i.    Background

The CSA required that the City establish a Grievance and Complaint System in October 2016, 30 days after the CSA's Effective Date. *Id.* III.19, ECF 608-1. After a sprint by the Parties at the end of 2018, an online Grievance and Complaint System was launched in January 2019. At the request of the Monitor, the ILCSC/CALIF Plaintiffs and the City submitted a joint report in March 2019 that the Parties had agreed on the substance of both the City Grievance Policies and Procedures, and the City Grievance Form Instructions and Form and on the separate grievance policies and procedures which each Covered Property is required to implement. Second Monitor's Rep. at 45-46, ECF No. 634.

The Court's December Order required the parties discuss "the development and implementation of a grievance and complaint system to be overseen by the Monitor." *Id.*

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*

at 2, ECF No. 663. On February 14, the Monitor sent the City and Plaintiffs a lengthy report that Knowbility prepared concerning errors in the technical accessibility and usability of the online complaint and grievance system website, with fixes identified for an interactive correction process. *See* Monitor's Suppl. Rep. at 10-11, ECF No. 679.

The City reported that their systems staff has made many of the corrections but without making sure the fixes were correctly performed by engaging in an interactive correction process with Knowbility, retesting by Knowbility or getting input from Plaintiffs. At the Monitor's request, the City contacted Knowbility for review and retesting. At the end of April, Knowbility sent the systems team an analysis of its findings on the accessibility re-test. *Id*.

### ii. Analysis

The City reported on the number of grievances filed, closed, opened, and appealed along with a documentary chart.

The ILCSC/CALIF Plaintiffs responded that Knowbility's report needed to be followed up and that the City's Report was seriously deficient, comments that the Monitor quotes at length because they raise serious concerns that merit immediate attention:

> ILCSC and CALIF are concerned about the results of Knowbility's April 28, 2020 report that, upon re-testing, a number of accessibility barriers still remained on HCIS's Grievance Process and the errors and oversights regarding PDF's cited in Knowbility's prior report had not been remediated.

> The City's reporting on its handling of grievances also raises significant concerns. Grievances are a critical component of enforcement. The City has provided 2 documents, a Grievance Summary Report_2019 thru 5-2020 (a chart entitled HCIDLA AcHP Program Grievance Between 1/1/2020 and 7/31/2020) ("Grievance Summary Report") and a set of tables, including a 2019 Grievance Summary, a 1st Quarter 2020 AcHP Grievance Summary, and a table entitled

39

"May/June 2020 Grievances Filed." None of these documents meet the reporting requirements of CSA Section III.12(h)(iii), which requires that: "The Report shall include . . . A list of the grievances or complaints that were received by the City through the Grievance Procedure (including copies of any written grievances or complaints) since the last report and the actions taken in response, redacting any private, personal information concerning residents of, or applicants for, Housing Units." None of the reports filed by the City comply with these requirements. CSA Section III.13 also requires the number of grievances filed with the City and their resolution. We have never received actual copies of documents. We have no information for January through April of the nature of the grievances or the resolution. For the 11 properties for which there is some information for May and June, there do not appear to be appropriate referrals.

The Grievance Summary Report includes a total number (52) grievance filed with the City, but provides no analytical or descriptive information about the nature of any individual grievance or its resolution, merely noting "open" or closed" and a cryptic "referral to agent." The column labeled "grievance description" appears to have language taken verbatim from complaints with no analysis (one was still in Spanish with no translation). Only 11 of the 52 grievances were included in the charts that did have some additional information.

These charts leave us greatly concerned that there is not uniform, meaningful handling of grievances. While some staff may be doing an effective job, it's difficult to ascertain that from the information provided. It does appear that it is taking a very long time to resolve most grievances, and it is clear that the staff handling grievances need significant additional training. For example, some grievances are rejected due to the fact that they are not covered properties, but referrals are not being made to appropriate and critical resources, including DFEH, HUD, DRC, Plaintiff Organizations, or legal services organizations, even when

40

evictions are imminent or when disabled/elderly tenants do not have a working elevator or have other serious access issues. We did not see a single referral to any of these organizations, including for a 92 year-old whose landlord has repeatedly failed to install a railing or ramp to enable him to navigate the three stairs to the building (unclear if it was a covered property). At least one covered property (GR20-0014) filed a grievance regarding an inoperable elevator for an individual on the 3rd floor who uses a wheel chair, opened in January, with no actions or resolution reported other than "in progress."

The City also reports on grievances filed with Owners in the 2020 Quarter 1 Data Table, which provides very little data other than total numbers of grievances to Owners filed, approved, and denied. There is no analysis of the grievance data relating to Owners' handling of grievances, such as whether the City determined that any of the grievances were improperly denied, whether some properties have multiple grievances, or whether there are any trends in grievance. We do not know if the City is even reviewing grievances to Owners other than recording a few data points.

ILCSC/CALIF Revised Resp. at 31-33, App. 67-69.

### iii.  Assessment and Next Steps

A year ago, the Monitor reported that:

An effective, functioning grievance system is a fundamental safeguard for individuals and a possible indication that systemic issues are present. Its absence in 2016-18 was a hallmark of the shortcomings of CSA implementation. *See* Initial Report at 84 [ECF 631] . . . ("A grievance system is a basic safeguard for applicants and tenants with disabilities. The very late development of the system has also deprived the Parties of a failsafe mechanism for assessing how well implementation is going. It is therefore important that the system be properly implemented.").

41

1    Second Monitor's Rep. at 46, ECF No. 634.

2        As indicated above, the Parties and the Monitor have not adequately monitored the

3    operation of the Grievance and Complaints System with all the other parts of the CSA

4    also requiring attention. A year ago, the Monitor planned to convene a review with the

5    Parties to critically analyze the operation, staffing, accessibility and usability of the

6    System, but did not. With the City's agreement last month to an additional Monitor staff

7    member to monitor the System and other activities, the Monitor's review will now go

8    forward.

9    **K.    Self-Evaluation/Transition Plan and Effective Communications**

10        The self-evaluation and transition plan and effective communications requirements

11    of the CSA concern dealing with accessibility deficiencies.

12        The first deals with the HCIDLA's responsibility as a federal funding recipient to

13    conduct a self-evaluation and develop a transition plan to address accessibility

14    deficiencies identified in the self- evaluation. The second provision deals with revisions

15    to the effective communications policy of AcHP and its parent City Department,

16    HCIDLA. A year ago, the Monitor reported only "limited progress" of these programs.

17    *See* Second Monitor's Rep. at 48-50, ECF No. 634. The parties have agreed to go slow

18    with developing a self-evaluation and transition plan, but did agree on an effective

19    communications policy which is being implemented. *See id.*

20        With respect to the self-evaluation/transition plan, the City stated it had nothing to

21    report. AcHP Semi-Annual Rep. For Jan. to June 2020 at 20, App. 23. As to the effective

22    communications, the City reported that:

23        The implementation of the City's effective communication policy is ongoing to

24        ensure accessibility of documents, HCIDLA and AcHP websites and the

25        Accessible Housing Registry. In addition, compliance and provision of effective

26        communication through and on affirmative marketing, application, tenant

27

28                                    42

interactions and materials is monitored and required by policy analysts of the developments.

*Id.* The City also reported that it was developing a training video to provide covered developments with training for their staff that interact with applicants and tenants. *See id.*

The ILCSC/CALIF Plaintiffs were critical of how little the City has done to conduct a Self-Evaluation or to adopt a Transition Plan, but ultimately agreed with the City that the program had a low priority:

> 1.      Highlights/Challenges: The City has taken no meaningful steps to conduct a Self-Evaluation or to adopt a Transition Plan with respect to the agencies touching on the availability of accessible housing in Covered Housing Developments. Counsel for ILCSC and CALIF proposed a scope of work necessary for the City to issue a Request for Proposals in June 2019 and revised it in August 2019, but has had no response from the City since then.

> 2.      Priorities and Initiatives: Low Priority. While a Self-Evaluation and Transition Plan would help the City identify the structural and programmatic barriers still faced by Angelenos with disabilities who are seeking accessible affordable housing, ILCSC and CALIF reluctantly agree that the City should concentrate its efforts on the High and Medium Priority items in this submission, and defer the development of the Self-Evaluation and Transition Plan.

ILCSC/CALIF Revised Resp. at 31, App. 67. The ILCSC/CALIF Plaintiffs did express concern about the implementation of Effective Communication in light of "the continuing accessibility barriers that remain on the City's webpages":

> ILCSC and CALIF are concerned about the City's ability to provide effective communications to people with disabilities given the continuing accessibility barriers that remain on the City's webpages, even after significant training and testing by Knowbility. We are concerned that reporting on effective communications is not being appropriately monitored or recorded, which may

43

relate to the confusing forms that are unresolved. We find it hard to believe that only 3 requests for effective communications have been made in over 850 properties since the effective date of the CSA. Of those 3, only 1 shows a resolution.

ILCSC/CALIF Revised Resp. at 33, App. 69.

Because of the potential impact of both the self-evaluation/transition plan and the effective communications on tenants and applicants, the Monitor will assign staff and Knowbility to check on the propriety of the low priority accorded development and implementation activities concerning these programs. As discussed above, the Monitor's design accessibility and usability expert Knowbility has played a key role in ensuring that websites such as the online Registry and the Grievance and Complaint System are accessible and usable to persons with disabilities, providing expertise the City apparently does not itself possess.

In the past the Parties have assigned a low priority and the City has few resources to these programs, but with the increase in AcHP's staffing, that low priority should be reconsidered given the importance of the accessibility and usability to tenants and applicants these programs are supposed to promote.

## L. Enhanced Sensory Program in Existing Developments

The Parties and the Court approved the incorporation of the Enhanced Sensory Program set forth in the VCA to replace the more limited comparable program in the CSA III.(10)(i), ECF No. 608-1. *See* Dec. 12, 2019 Tr. at 29-32, and Status Conf. Rep. at 26-35, ECF No. 671. The Parties have no disputes about the Enhanced Sensory Program for new/substantially rehabilitated developments involving incentives for innovative accessibility features. The Enhanced Accessibility Program for existing developments is still under development and has not been approved by HUD. The City submitted a draft proposal to HUD that was the subject of substantial comments by HUD and the

44

ILCSC/CALIF Plaintiffs.

According to the ILCSC/CALIF Plaintiffs, they and the City have disputes concerning "the lack of involvement by people in the blind/low vision and deaf/hard of hearing communities in the development of the program and on the proposed advisory board" and the scope of the program beyond what is already required as a reasonable accommodation "such as actively seeking out providers for appropriate accessible unit technology and appliances and providing funds for such items for existing tenants." ILCSC/CALIF Revised Resp. at 11-12, App. 47-48.

The Monitor, who the Parties agreed should both resolve disputes between the Parties and coordinate with HUD, will look into these disputes to see if the Monitor can help resolve them. *See* Status Conf. Rep. at 6-7, 33-34, ECF No. 671.

## III.  Conclusion

The Monitor believes that the City's efforts to increase AcHP staffing despite the pandemic and the City's fiscal difficulties and the replacement of LCM with ETA are promising developments. LCM's surveying problems and the pandemic have caused the null production of certified units to continue but it appears that that that drought may well end with the end of the pandemic if all goes as planned.

On other issues such as the Comprehensive Database, MCE Plan audits, and the Internet Registry in addition to increased staffing and the selection of ETA as Architectural Accessibility Expert, positive developments in the next reporting period might mean that implementation will soon be on track. On the other hand, the City's failure to comply with its MCE Plan and Status Conference Report (ECF No. 671) obligations and deadlines with respect to adoption of CSA policies by covered housing developments and training of covered development personnel are setbacks as would be the case if the City failed to meet its extended December 31, 2020 deadline for the completion of the Comprehensive Database so that it can at last be used for compliance

45

reporting.

Finally, the Monitor flags for the Court's attention that the City initially disputed the Monitor's authority to issue decisions resolving disputes. At a hearing on December 12, 2019, this Court confirmed the Monitor's authority to resolve disputes between the parties, subject to appeal to this Court. Rep.'s Tr. of Procs., Mot. Hearing at 22 (Dec. 12, 2019); *see also* Order re: Further Proceedings, ECF 663, at 3 ("The court intends to give more discretion and authority to the Monitor to resolve any disputes between the parties."); Status Conference Rep., ECF 671, at 34 ("The parties and the Monitor agree to give the Monitor authority and discretion to resolve any dispute between the parties or when any action by a party or the parties does not assure compliance with the Amended Agreement."). This question almost came to a head when the City disputed the Monitor's authority to issue decisions addressing the MCE Plan Audits and the Architectural Accessibility Expert, but was precluded when the City's new General Manager began working with the Monitor to resolve these issues. That said, in order to streamline resolution of future disputes, the Monitor respectfully requests that the Court reaffirm his authority to issue decisions, which decisions are binding on the Parties unless appealed.[6]

Dated: August 12, 2020                    Respectfully submitted,


                                          /s/ Bill Lann Lee_____

                                          BILL LANN LEE

                                          *Court Monitor*

---

[6] For example, it would be helpful to clarify that:  If a Party objects to or disagrees with a Monitor's decision, that Party may appeal to the Court and seek a stay within five working days of a Monitor's decision. If the Party does not appeal, the decision shall be final. If the Party does not seek a stay, the decision shall go into effect pending appeal. The seeking a stay does not  preclude the Court from later levying monetary sanctions.

46

# ATTACHMENT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al.*<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, CALIFORNIA, *et al.*<br><br>Defendants | Case No.: 12-cv-00551 FMO (PJWx)<br><br>**MONITOR'S DECISION RE: ARCHITECTURAL ACCESSIBILITY EXPERT** |

This Decision concerns the Architectural Accessibility Expert ("Architectural Expert") that the Corrected Settlement Agreement ("CSA"), ECF 608, requires to "conduct accessibility surveys and otherwise advise the Parties on compliance with federal and state accessibility requirements. . . ." *Id.* ¶ III.10(b). The present Architectural Expert, LCM Architects, was selected by Defendant City of Los Angeles ("City") with input from the Plaintiffs. In December 2019, the Court determined that LCM should report to and take direction from the Monitor. Rep.'s Tr. of Procs., Mot. Hearing at 14, 21 (Dec. 12, 2019) ("Tr.") (on file with author). As a result, the Monitor has been able to closely assess LCM's work.

For the reasons discussed in greater detail below, the Monitor has lost confidence in LCM's ability to perform the work of the Expert in this large case.

On April 14, 2020, the Monitor, supported by the United States Department of Housing and Urban Development ("HUD"), requested that the City consider replacing LCM with another architectural firm, Evan Terry Associates ("ETA"), to serve as the Accessibility Expert. Plaintiffs Independent Living Center of Southern California ("ILCSC") and Communities Actively Living Independent and Free ("CALIF") also support replacing LCM with ETA. At that time, the Monitor inquired into the status of any contract between the City and LCM and learned that a draft amendment was under consideration. As of March 27, 2020, the agreement had not been executed; neither the City nor LCM has informed the Monitor that a contract has been signed.

1

The City's initial response to the Monitor's recommendation of ETA was positive and the City and ETA began contract negotiations. On April 24, 2020, the City sent ETA its boilerplate contract as well as the draft scope of work that had been proposed to LCM. The parties exchanged drafts, but it is the Monitor's understanding that no contract has been finalized; indeed it appears that the City has not been in contact with ETA for the last month.

For the reasons set forth in this Decision, the Monitor concludes that the City should cease negotiations with LCM and, by July 10, 2020, complete its contractual negotiations with ETA as the new Accessibility Expert under the CSA.

**Background**

The CSA calls for the Architectural Expert to survey covered housing developments, develop assessment tools and other means of ensuring accessibility, assist the City to develop internal capacity to ensure accessibility, develop a quality assurance program, train City staff and agents to implement the CSA, and address other issues as the Expert deems prudent and appropriate. CSA ¶ III(10)(d). These roles are integral to the City's ability to construct and retrofit units in a timely fashion and to produce the 4,000 certified accessible units the CSA requires.

2

*Independent Living Center of Southern California v. City of Los Angeles, Case No. 12-cv-00551-FMO (PJWx)*
Monitor's Decision Re: Architectural Accessibility Expert

The Monitor documented substantial problems with LCM's work in his earlier Reports.[1] The Court, in the December 12, 2019 hearing, expressed dissatisfaction with LCM based on its delay, reliance on standards that deviated from required standards, and failure to identify and properly document accessibility barriers. *See* Tr. at 16-17, 20. As a result, the Court ordered the Parties to consider whether to replace LCM, *id.* at 19, and ordered that the Accessibility Expert henceforth report to the Monitor, *id*. at 14, 22.

The Parties decided to give LCM a chance to improve its performance and, in light of the fact that LCM would be reporting to the Monitor, the latter did not object. Status Conf. Rep. at 9, Jan. 28, 2020, ECF 671. That Report also noted that the parties agreed that the Monitor should "[c]oordinate with HUD to provide consistency in the implementation of the [CSA] and the VCA . . .." *Id*. at 7. The Monitor, therefore, has coordinated with HUD since December 2019 in assessing the work of LCM, which serves as the Neutral Accessibility Consultant, a function similar to the CSA's Architectural Expert in the Voluntary Settlement Agreement ("VCA") between HUD and the City.

---

[1] *See, e.g.*, Monitor's Semi-Annual Rep. for Rep. Period of Sept. 5, 2016, through Dec. 31, 2018 at 45-50, Feb. 15, 2019, ECF 631; Monitor's Semi-Annual Rep. for Rep. Period of Jan. 1, 2019, through June 31, 2019 at 20, Aug. 15, 2019, ECF 634; Monitor's Suppl. Rep. at 11-14, Dec. 3, 2019, ECF 659.

If the Parties decided to replace LCM and could not agree on the replacement, the Court stated that he would require each Party to submit names of experts to "the monitor who will select the accessibility expert." Tr. at 34.

## A. LCM's Performance

The Monitor can report that LCM's work has improved somewhat but not very much. The Monitor instructed LCM to record all survey measurements and to take photographs that would document measurements and permit review by the Monitor or the Parties of LCM's findings. The forms LCM used to conduct its recent surveys, however, continue to ask yes/no questions despite the instruction to record quantitative measurements that could be readily reviewed. While LCM has started to take more photographs, the photographs in LCM's hard copy reports continue to be inadequate to document accessibility barriers and conditions. The thousands of unlabeled photographs that LCM has provided in support are virtually useless. LCM has a history of long delays – averaging three months – between survey and report. LCM continues to record its survey results on paper and has no system for tracking these results in a database. The Monitor's architectural expert has reviewed LCM's surveys conducted after the Court's hearing and found that there continue to be deficiencies in the quality of LCM's surveys.[2]

_____

[2] Recent Monitor and HUD documents detail these concerns. *See* Monitor's Memos dated May 29, 2020 and June 19, 2020; Letter from Lynn Grosso to Rushmore D. Cervantes at 1-3, June 15, 2020.  Both documents are incorporated herein by reference.

4

In addition, the Monitor developed a survey protocol with HUD's input, ECF 671, Ex. A, to which the City, Plaintiffs, and HUD later provided mark-ups to address the numerous deficiencies in LCM's survey forms. Were the Parties to move forward with LCM, there would be a significant delay to reform LCM's survey protocol and forms. Even then the question would remain how to address the housing developments LCM surveyed using the improper standards noted by the Court and without reference to the standards required in the VCA.

In short, the Monitor who the Court directed to supervise LCM's work has lost confidence in the ability of LCM to perform the role of the CSA Architectural Expert. HUD and the ILCSC and CALIF Plaintiffs join in the Monitor's above assessment. The City has advised the Monitor that it shares many of these concerns about LCM, particularly with respect to LCM's capacity to serve as the Architectural Expert in such a large case involving over 850 covered housing developments and the long delays between surveys and reports.

The Monitor has informed LCM that it should be replaced. The Monitor therefore directs the City to cease negotiations with LCM to renew its contract as the Architectural Expert under the CSA.

## B. Evan Terry Associates

On April 14, 2020, the Monitor, with HUD's support, proposed that LCM be replaced by ETA. That is, the two entities to whom LCM reported in the CSA and VCA

5

proposed to the City that ETA replace LCM. This proposal was based on ETA's excellent reputation, its sophisticated survey system, and the Monitor's and HUD's first-hand experience with ETA's work in other cases. The Monitor has previously informed the Parties that another firm would also be acceptable if it had equivalent or better capacity to conduct the necessary surveys; properly gather, report and share data; and restart the survey process promptly. In the over two months since, no Party has proposed an alternative to ETA.

Evan Terry Associates is a well-respected accessibility compliance firm with almost thirty years of experience surveying for compliance with the accessibility standards of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.* ("ADA"), and the Rehabilitation Act, 29 U.S.C. § 794. ETA has a sophisticated electronic survey and data management system that includes identification, analysis, remediation planning, and process management. Surveyors work on portable devices (tablets, laptops) in the field that contain required measurements and a large database of proposed solutions that can be selected on the spot. Survey measurements are entered directly into ETA's database, an efficient process that is easily shared for review.

ETA's system has a number of features that make it superior to LCM for this project:

1. ETA's system contains thousands of potential architectural barriers and solutions, developed over decades of accessibility surveys and consulting.

6

2. Surveyors enter quantitative measurement data directly into the database in the field.

3. The time between survey and report would much shorter than is currently the case – often a day or two rather than three months – and survey to report time, including main office review, would be less than 1:1.

4. ETA's online system will be available to the City, Plaintiffs, HUD, and the Monitor in real time, showing architectural barriers, photographs, and solutions. Crucially, ETA's system can interface with the City's Construction Module, providing high-quality survey questions and solutions as part of an overall construction tracking system.

5. ETA's survey system includes questions relevant to compliance with all versions of the ADA Standards, *see* 42 U.S.C. § 12186(b), and Title 24, Chapter 11B of the California Building Code ("CBC"). In preparation for this project, ETA has updated its system to include questions relevant to compliance with the Uniform Federal Accessibility Standards ("UFAS"), 41 C.F.R. pt. 101-19.6, App. A, the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, CBC Title 24, Chapter 11A, and other standard relevant to enforcement of the CSA. While ETA does not have significant experience with the FHA, the Monitor and HUD believe that that is not a significant factor given that FHA standards overlap with ADA and Rehabilitation

7

Act standards and that ETA has spent the past ten weeks incorporating FHA standards into their system. The Monitor, HUD, and the Parties can readily review these and other standards online.

6. ETA has demonstrated capacity, having conducted dozens of survey projects involving thousands of, for example, health care facilities, convenience stores, and other retail and government facilities. Their recent large-scale project for the Los Angeles Unified School District and other earlier projects of similar scale in California give them both experience with the CBC and capacity to staff up for surveys in Los Angeles.

7. ETA can begin conducting surveys of new construction in July 2020.

Since the Monitor first proposed ETA as a replacement for LCM, the City, HUD, Plaintiffs, and the Monitor have spoken with ETA and with each other on this topic repeatedly. The Monitor has received positive feedback from all parties concerning ETA. However, during the ensuing two and a half months, the City has failed to conclude a contract with ETA, thus delaying the progress of surveys and certification of required accessible housing. The qualities of ETA's survey system, the absence of a viable alternative, and the lack of progress toward concluding a contract with ETA have prompted the present Monitor's Decision.

8

The Monitor understands that the City is currently working with database consultants 3Di to incorporate a survey component into the City's current project management workflow system. This Construction Module will permit the City to track housing projects from the plan stage all the way through certification; it is part of the larger comprehensive database system necessary for the Online Registry and other tasks required by the CSA and VCA. 3Di is working to develop – as part of the Construction Module – a mobile application that surveyors can use in the field to record inspection and survey results. At this time, the mobile application relies on the LCM survey forms, thus importing the shortcomings described above. While the City has indicated that it is open to modifications of those forms from Plaintiffs, the Monitor, and HUD, as noted above, this process would be lengthy and would still not result in a database that tracks quantitative measurements. It would also not be ready to use in the field – even in this limited form – until early next year. It is thus not a viable solution to replace LCM.

ETA's survey system is compatible with the Construction Module, that is, it can interface with that project management tracking system to provide the survey questions and database fields necessary to track the data gathered in the field. ETA can thus provide a platform to "[a]ssist[] the City to develop internal capacity," *see* CSA ¶ III(10)(d)(iv), to ensure compliance going forward. Because ETA's system is compatible with the Construction Module, contains more sophisticated questions and solutions, and will be

9

ready for use in this project in July, its use in conjunction with the Construction Module is a superior solution to the use of that Module alone, even with the mobile application.

In a letter dated June 12, 2020, the City raised several objections to replacing LCM with ETA. Letter from James P. Clark, Chief Deputy City Attorney, to Bill Lann Lee, Monitor (June 12, 2020) ("June 12 Letter") (on file with author). The Monitor responded to these objections on June 19, 2020. Memorandum from Bill Lann Lee, Monitor, to Los Angeles City Attorney (June 19, 2020) (on file with author). The objections and the Monitor's responses are set forth here:

1. ETA's experience with multifamily housing. ETA has now put in place UFAS and CBC 11B questions and will have finished creating survey questions relevant to the Fair Housing Act Guidelines, ANSI A117.1-1986, and CBC 11A by the end of June. As soon as ETA concludes a contract with the City, they will be prepared to enlist trained contractors to staff the project as well as an outside expert in Fair Housing Act standards. HUD, which is responsible for enforcement of the FHA, both with respect to the City through the VCA and in general, *see, e.g.* 42 U.S.C. § 3608(a), has stated, "[b]ased on our review of ETA's system, we anticipate that we would be able to quickly engage with ETA and the Monitor to help ensure that those updates are completed in a manner that does not cause unnecessary delay."

2. Time delays. ETA will be prepared to start using their survey system in the field in July. The City has provided the Monitor with a list of projects that will be ready for

10

a final pre-occupancy inspection in the second and third quarters of this year. Once the City provides necessary plan documents to ETA, they can start preparing. In contrast, as noted above, the City's Construction Module would not be ready for surveyors to use in the field until first quarter 2021.

3.  ETA's relationship with Eric McSwain. The City objected that the Monitor's expert, Eric McSwain, had a conflict of interest based on his relationship with ETA. While Mr. McSwain has previously subcontracted with ETA – most recently in 2017 – he has no current contractual or financial relationship with ETA. Crucially, Mr. McSwain does not stand to gain from ETA's contract with the City. Under California law, a conflict of interest in circumstances similar to these requires – as one of the elements – "a cognizable financial interest in [the] contract." *Lexin v. Superior Court*, 47 Cal. 4th 1050, 1074 (2010), *as modified* (Apr. 22, 2010). A past relationship, moreover, does not create a conflict of interest. *See, e.g., Jay v. Rock*, No. C068400, 2019 WL 2448239, at *47 (Cal. Ct. App. June 12, 2019), *as modified on denial of reh'g* (July 11, 2019) (holding that the fact that daughter of awardee of airport services contract worked for the city attorney's office and reviewed prior contracts did not create a conflict of interest). There is no conflict between the City's retention of ETA as the Accessibility Expert and the Monitor's retention of Mr. McSwain to advise on these issues.

11

The City also requested that the Monitor "commence discussions with HUD to obtain interim relief for the City from" a specific provision of the VCA based on the City's assertion that the transition from LCM to ETA would take time. June 12 Letter at 2. As explained above, both the Monitor and HUD were prepared to initiate the transition from LCM to ETA two and a half months ago, so any delay is squarely due to the City's inaction. That said, the Monitor is willing to discuss with HUD the most expedient way of complying with the VCA.

The City has presented no further objections to the Monitor.

**Conclusion**

Based on the above, the Monitor instructs the City to cease negotiations with LCM and complete its contractual negotiations with ETA.

Specifically, the City should execute a contract with ETA by July 10, 2020 so that all parties can prepare for ETA to begin conducting surveys, including the following steps:

The City and ETA, with input and review from the Plaintiffs, the Monitor and – if it desires – HUD shall immediately begin drafting a scope of work – or adapting LCM's scope of work – to ensure ETA can adequately assist the City in complying with the accessibility requirements of the CSA. The scope of work shall be completed by July 10, 2020.

12

The Parties and the Monitor shall also meet and confer concerning any tolerance guidelines, protocols, and a method of tracking questions and answers that arise during the survey process.

The City has provided the Monitor with a list of projects that will be ready for a final pre-occupancy inspection in the second and third quarters. Within one week of execution of the contract and scope of work, the City shall provide ETA with the documents necessary to prepare to survey these developments.

The Monitor will instruct ETA to work with the City to incorporate its survey system and data gathered into the Construction Module in a fashion that makes best use of the strengths of both systems.

Respectfully Submitted,

/s/ Bill Lann Lee

Bill Lann Lee

June 29, 2020

13

# ATTACHMENT B

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al*, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, CALIFORNIA, *et al.* <br><br> Defendants | Case No.: 12-cv-00551 FMO (PJWx) <br><br> **MONITOR'S DECISION ON LAHSA** |

1

### 1. Issues Presented

2

The Los Angeles Homeless Services Authority ("LAHSA") is a joint authority of

3

the City of Los Angeles and the County of Los Angeles and is not a party to the

4

Corrected Settlement Agreement ("CSA"). The issues presented concern how accessible

5

housing units are provided for homeless individuals with disabilities are provided in

6

housing developments covered by the CSA. The three issues are (1) whether LAHSA's

7

identification of homeless individuals with disabilities who need housing units with

8

accessibility features in CSA-covered housing developments for homeless individuals

9

and families, known as "supportive housing," is subject to the CSA; (2) whether the City

10

has an obligation to ensure that LAHSA's matching program complies with the CSA and

11

(3) whether LAHSA's current program should continue in light of the direction of the

12

CSA that homeless individuals who need accessible housing should be permitted to seek

13

housing under the Internet Registry. While the first two questions have been briefed by

14

the Parties, the third one has not but necessarily arises from the terms of the CSA and is

15

required to resolve the first two questions.

16

The Plaintiffs' and City's prior efforts to address these concerns with LAHSA on a

17

voluntary basis have been unsuccessful and consumed substantial time. *See* Monitor's

18

Suppl. Rep. at 24, ECF No. 659; Monitor's Suppl. to Jan. 28, 2020 Status Conf. Rep. and

19

Request to Schedule Status Conf. for Apr. 2, 2020 at 7-8, ECF No. 676. In March, the

20

Monitor nevertheless agreed to the City's request to provide an earlier draft of the

21

Decision to see if the impasse with LAHSA and the City could be resolved before the

22

issuance of the instant Decision. The City requested that the Monitor provide the City

23

with an outline of relief. Because of the paucity of information about LAHSA's

24

identification of homeless individuals with disabilities for matching to accessible units in

25

covered developments, the Monitor provided broad outlines of general relief along with

26

requests for information to better frame relief to ensure that homeless individuals who

27

28

1

need accessible supportive housing are provided an opportunity to obtain them. On July 2, 2020, the City provided the Monitor with a document that reported no informal resolution and provided available factual information about how LAHSA identified homeless individuals with disabilities to be matched to accessible units.

Having given the City a further opportunity to resolve the matter, the Monitor is going forward with his Decision. Threshold legal issues divide the parties. Resolution of these legal issues turn on the interpretation of CSA's terms and undisputed facts. They are ripe for the Monitor to decide and the Decision may assist the parties in resolving their differences.

As explained below, the Monitor finds first that LAHSA's matching activities are subject to the CSA because LAHSA is a "Subrecipient" of federal and other funds from the City and as an "assign" of the City under the CSA. Second, the Monitor also finds that the City is responsible for LAHSA's matching activities. As a "Subrecipient" and an assign of the City, the City is responsible for monitoring LAHSA to ensure that the matching program complies with the CSA.

Third, the CSA provides that LAHSA as a Subrecipient of the City is independently obliged to comply with the Internet Registry program to provide supportive housing to homeless individuals who need accessibility feature. The CSA specifically makes Subrecipients, such as LAHSA, subject to the CSA's Internet Registry and its provisions for applying for and filling vacancies. Thus, homeless persons with disabilities may seek supportive housing through the CSA's Registry.

As discussed below, the City, with input from the Plaintiffs must decide whether it is appropriate as a factual matter to continue delegating the task of identifying homeless individuals for accessible units through CES matching to LAHSA in light of the CSA's direction that homeless individuals who need accessible housing units may seek housing through the Registry.

## 2. Background

2

Currently, homeless persons who need accessibility features identified by LAHSA are placed in units with accessibility features in CSA-covered housing developments through Coordinated Entry System ("CES") matching. Under CES matching, LAHSA provides covered development owners or property management agents with the names of homeless individuals that LAHSA has identified to be matched to units with mobility and/or sensory accessibility features. *See* City's Update and Resp. to Monitor's LAHSA Remedial Objectives and Info. Requested, App. 5-12. LAHSA relies on regional case workers at outside Service Planning Areas to interview and fill out a CES Survey Part 1 Basic Intake, VI-SPDAT form to identify and rate the acuity of the need of homeless individuals for permanent housing. *See id*.

Prior to March 2018, LAHSA did not identify homeless individuals who needed accessibility units in CSA-covered housing developments. After March 1, 2018, LAHSA added two questions to the Basic Intake form to identify, from the self-reported response of the individual and the observations of the staff case worker, whether the individual needed  "a mobility unit," "a hearing/vision unit," or "a mobility and hearing/vision unit." LAHSA provides a webinar to train caseworkers and provide them guidance on the accessibility questions. LAHSA apparently has not studied or prepared reports concerning individuals who need accessible housing or how long LAHSA takes to provide housing, although LAHSA is willing to perform such studies in the future. *See id*.

It is unknown how LAHSA arrives at an overall acuity rating of need for housing, if the disability status is a factor in the individual's acuity rating, or how the answers to the two accessibility questions are processed. LAHSA maintains data in a Homeless Management Information System ("HMIS"). LAHSA does not share data with the City but is willing to do so. *See id*.

Overall, the City has little knowledge of how LAHSA identifies homeless individuals for CES matching and has made no effort to work with LAHSA to coordinate CES matching with its Internet Registry processes, essentially treating CES as an

3

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*
**Monitor's Decision on LAHSA**

exception to the CSA. LAHSA did not identify homeless individuals who needed accessible units prior to March 1, 2018 and has not studied the effectiveness of its processes for identifying homeless individuals who need accessible housing since then, although LAHSA has expressed some level of interest in working with the City. *See id.*

Plaintiffs have expressed concerns that LAHSA's CES matching program has failed to identify homeless individuals who need accessible housing units and that homeless persons who do not need accessibility features have been placed in many supportive housing units with accessibility features. LAHSA states that it has no information about these issues. It is clear that LAHSA has been including information about homeless individuals' need for accessible unit only since early 2018 and there is no indication that LAHSA has systematically updated information for the pre-2018 period or studied how individuals have been identified for accessible housing after 2018.

## 3. The Parties' Positions

The City argues that LAHSA is not a party to the underlying ILCSC legal action or to the CSA and therefore that the CSA does not apply to LAHSA's CES matching program. The City argues further that it bears no responsibility for ensuring that LAHSA's matching complies with the CSA because LAHSA is by law a separate entity although it is a joint City and County authority.  *See* City's Resp. to Monitor's Request to the Parties for Info. Regarding LAHSA ("City's Response") at 1, App. 2.

Plaintiffs take the position that it is unnecessary for LAHSA to be a party to the CSA because the terms of the CSA itself make the City responsible for LAHSA's failure to comply with the CSA. *See* Mem. from Michael Allen, et al. to Bill Lann Lee, et al. (March 31, 2020), App 14-17. First, LAHSA is a "Subrecipient" of federal and other funds from the City and is therefore subject to the CSA's requirements for filling accessible units. *See, e.g.*, CSA ¶¶ II.12, 15, 21, 30; III.7, 10(d)(4). Second, LAHSA is an "assign" of the City subject to the CSA's requirements for filling accessible units. *See,*

4

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*
**Monitor's Decision on LAHSA**

*e.g.*, *id.* ¶¶ II.21; X.7. On either ground, the City is responsible for correcting LAHSA's failure to comply with the CSA.

As discussed below, the CSA provides that Subrecipients such as LAHSA are obliged to use the Internet Registry to fill accessible housing units in supportive housing.

### 4. Analysis

For the reasons below, the Monitor agrees with Plaintiffs.

### a. CSA Provisions on Subrecipients

The CSA states that: "'Subrecipient' means and refers to any public or private agency, institution, organization or other entity or person to which Federal financial assistance or financial assistance from or through the City is extended." CSA ¶ II.30.

The undisputed record establishes that LAHSA is a Subrecipient as defined in the CSA. The City's Budget for 2019-20 ("Budget") shows that LAHSA is an entity to which the City has extended federal or other financial assistance. The Budget lists $35,471,307 in appropriations from the City to LAHSA, many of which are federal program funds. *See* Budget (May 29, 2020) at R-129-32, https://lacontroller.org/wp-content/uploads/2019/09/BUDGET-2019-20.pdf.  LAHSA falls within the definition of "any public . . . agency, institution, organization or other entity . . . to which Federal financial assistance or financial assistance from or through the City is extended," and is therefore a Subrecipient as the term is used by the CSA. The City does not address whether LAHSA is a Subrecipient of the City, but argues that LAHSA is not subject to the CSA because it is not a party. *See* City's Resp. at 1, App. 2.

LAHSA's CES matching program is covered by the federal statutes that authorize the relief provided by the CSA. The statutes authorizing the relief provided by the CSA prohibit discrimination by a "program or activity" of a local government entity that receives federal financial assistance. Paragraph III.2 of the CSA relies on 29 U.S.C. § 794a and 42 U.S.C. § 12132 as bases for granting relief. The former is the remedial provision of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, which prohibits

5

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*
**Monitor's Decision on LAHSA**

disability discrimination by "any program or activity receiving Federal financial assistance;" the latter is part of Title II of the Americans with Disabilities Act, which prohibits such discrimination by "services, programs, or activities of a public entity." The terms "program or activity" are broadly construed to mean "all of the operations of . . . each such . . . agency (and each [such] . . . local government entity) . . . to which the assistance is extended, in the case of assistance to a State or local government." *See* 29 U.S.C. § 794(b)(1); *see also Barden v. City of Sacramento*, 292 F.3d 1073, 1076 (9th Cir. 2002) ("constru[ing] 'the ADA's broad language [as] bring[ing] within its scope "anything a public entity does."").

LAHSA's CES matching program is encompassed within "all the operations" of a program or activity. LAHSA argues that its CES matching stops at the water's edge because LAHSA has no operational role in the placement process. The City, however, concedes that the homeless individual that LAHSA matches to the housing development's accessible unit is the individual placed in the unit by the owner or property management agent effectively making LAHSA the decision-maker for tenant selection or placement for supportive housing.[1] Moreover, the Budget includes specific appropriations to LAHSA for CES matching. *See* Budget at R-129-30 (*e.g.*, appropriations for CES so that homeless persons "may be rapidly connected to the most appropriate housing") (CES Regional Coordination appropriation).

The City is responsible for monitoring LAHSA's CES matching in order to ensure compliance with the CSA, notably that homeless individuals who LAHSA has determined need accessible housing are in in fact persons with disabilities and that persons with disabilities in fact receive units with the accessibility features they need.

---

[1] The City argues that only Housing Development owners select applicants to housing units even though the City's description of the matching process shows that owners cannot deviate from LAHSA's matching decisions. *See* City's Resp. at 1, App. 2. Matching is effectively a selection.

(The CSA, of course, also contains Internet Registry provisions providing for filling accessible units through an application and lottery system, discussed below. *See infra*.) The City has essentially delegated to LAHSA the responsibility for selecting persons to place in accessible supportive housing through CES matching without ensuring that its Subrecipient has complied with the CSA.

The City argues generally that it is powerless to compel compliance by LAHSA. *See* City's Response at 1. The CSA says otherwise. The CSA mandates that the City "shall" monitor its Subrecipients, "shall" take remedial action to ensure Subrecipient compliance, and "shall" compel compliance by a Subrecipient with the terms of the CSA without any exception for the CES matching or the Internet Registry:

> The City shall also take the actions set forth in this Agreement and such other actions as may be necessary to ensure . . . Subrecipients . . . comply with the obligation to operate housing programs and Housing Developments . . . and comply with the other obligations set forth in this Agreement.

CSA ¶ III.7.

> The City shall monitor its Subrecipients . . . and require that its Subrecipients . . . comply with applicable requirements of . . . this Agreement in . . . administering. . . housing. Failure or refusal of a Subrecipient . . . to comply with . . . applicable provisions of this Agreement may result in progressive steps by the City to compel compliance."

CSA ¶ III.10(l).

Nor are homeless individuals restricted to CES matching; the CSA is clear that they may avail themselves of housing for which they are eligible through the Internet Registry. The CSA is clear that Subrecipients, such as LAHSA, are obligated to comply with the CSA's Internet Registry to permit

> Persons with Disabilities to obtain detailed current information about accessible Housing Units and Housing Developments; . . . [and] to use the Registry to sign up

7

to be notified about accessible housing units that are available for rent, make application for such units, and be placed on waiting lists for such units. CSA ¶ III.10(m)(ii). The term "Housing Development" used by the CSA to describe the Registry in the foregoing provision is defined to include housing "operated [or] administered . . . by [the City's] Subrecipients." CSA ¶¶ II.15; II.12. *See also* CSA ¶ III.10(k) (policies that "provide for affirmative marketing directed at people with disabilities, uniform application, waiting list, and tenant selection practices (including unit selection, assignment and transfer standards)"). Thus, the City must ensure that homeless individuals who have disabilities may seek accessible housing under the Internet Registry.

Currently, the City has made no provision for homeless individuals seeking accessible units under the Registry notwithstanding that the CSA provides for filling accessible units through the Registry. Instead, the City has delegated to LAHSA the sole responsibility for identifying persons to be placed in accessible supportive housing through CES matching ignoring the direction of the CSA that the Registry be used to fill accessible housing in covered housing developments.

If CES matching were a clearly superior process, it could be argued that the City should continue with LAHSA and CES. It is not. In light of the black box nature of the CES system, it would appear that the Registry is likelier to result in more accurate decision-making. Using the Registry would also obviate the need for LAHSA to provide an application process under the Registry in addition to CES matching. Using the Registry also may diminish the need for the City to monitor and audit LAHSA's operation of the CES system. The City is already obliged to monitor and audit the operation of the Registry. The key inquiry is likely to be whether the City is able to provide services such as ready access to the assistance of a housing advocate because the homeless status of these individuals is likely to necessitate the provision of such services.

**b. CSA Provision on Obligations Binding on an Assign**

8

The CSA also provides that, "[t]his Agreement shall be binding on . . . the Parties . . . and their . . . assigns." CSA ¶ X.7. The term "assign" is not defined by the CSA. It is usually understood that an assign is the recipient of a transfer of an interest, property or money. Black's Law Dictionary, for instance, defines assignment as "[t]he act by which one person transfers to another, or causes to vest in that other, the whole of the right, interest or property which he has in realty or personalty." *What is Assignment?* BLACK'S LAW DICTIONARY FREE ONLINE LEGAL DICTIONARY (2d ed.) https://thelawdictionary.org/assignment/.

The City's 2019-20 Budget shows that the City transferred over $35 million to LAHSA, including funding of LAHSA's CES match program. *See* Budget at R-129-32 & 129-30. As a result of the undisputed factual record that the City has transferred funds to LAHSA, including specific funds for the CES match program, the Monitor determines that LAHSA is an assign of the City.[2]

As an assign of the City, the City is obliged to ensure that homeless individuals who need accessible housing are in in fact persons with disabilities and that persons with disabilities in fact receive units with the accessibility features they need. As noted above, with respect to LAHSA as a Subrecipient, the City has essentially delegated to LAHSA the responsibility for selecting persons to place in accessible supportive housing through CES matching without ensuring that its assign has complied with the CSA.

**5. Conclusion**

The City, with input from the Plaintiffs, should decide if it should permit the continued use of LAHSA's CES matching or follow the requirements of the CSA to permit homeless individuals who need accessible housing to seek such housing units under the Registry. The Monitor has expressed his view based on the existing record that

---

[2] The Monitor's Reports have discussed the issue of whether Plaintiffs could join LAHSA to the ILCSC case. That issue need not be reached in light of the decision on LAHSA as a Subrecipient and an assign.

9

the City should follow the requirements of the CSA and that the CES system appears to be flawed and would require additional monitoring by the City. As noted above, the key inquiry is likely to be whether the City is able to provide services such as ready access to assistance of a housing advocate because the homeless status of these individuals is likely to necessitate such services. This is a factual question that the City and Plaintiffs need to address in the first instance.

Within ten days, the City, with input from the Plaintiffs, shall propose a joint implementation plan for implementing this Decision for adoption by the Monitor. The Parties should consult LAHSA in preparing joint or separate plans. If the Parties agree on the need to continue with LAHSA's CES matching, they should include provisions that the City shall:

Ensure that homeless individuals who need accessible housing have a full and effective opportunity to obtain accessible housing under CES;

Ensure that LAHSA's identification of homeless individuals who need accessible housing for matching is accurate;

Provide an avenue for homeless individuals who need accessible housing to apply for housing under the Internet Registry; and

Provide for information exchange, training, monitoring, and auditing so that that LAHSA's process for identifying homeless individuals who need accessible housing complies with the CSA.

If the Parties agree on the need to use the Registry to fill accessible units in covered housing developments, they should include provisions that the City should:

Ensure that homeless individuals who need accessible housing have a full and effective opportunity to obtain accessible housing through the Internet Registry;

Provide that homeless individuals who need accessible housing under the Internet Registry have appropriate services such as ready access to the assistance of housing advocates;

10

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*
**Monitor's Decision on LAHSA**

Coordinate the transition from LAHSA CES matching to the use of the Internet Registry;

Determine the roles of LAHSA and AcHP under the Internet Registry; and

Provide for such additional information exchange, training, monitoring, auditing as may be required.

If the Parties are unable to submit a joint implementation plan, the Parties shall submit within 14 days separate implementation plans for adoption by the Monitor.

August 12, 2020                    /s/ Bill Lann Lee

                                   Bill Lann Lee

                                   Court Monitor

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 2:12-cv-00551-PJWx*
**Monitor's Decision on LAHSA**

# City's Response to Monitor's Request to the Parties for Information Regarding LAHSA

# ("City's Response")

## CITY'S RESPONSE TO MONITOR'S REQUEST TO THE PARTIES FOR INFORMATION REGARDING LAHSA

In the Monitor's Supplement to January 28, 2020 Status Conference Report, the Monitor requested information from the parties regarding LAHSA. Below are the City's responses to the Monitor's inquiries.

(a) whether the City's position is that LAHSA should be following CSA requirements in filling accessible units;

The City's position is that LAHSA is not a party to the CSA and is not subject to the requirements of the CSA. The obligations of the CSA relate to the City and owners of covered properties; LAHSA is neither. Notwithstanding, if LAHSA were subject to the CSA, LAHSA still does not fill accessible units, and thus, CSA requirements for filling accessible units would not apply. Units are filled by property owners either directly or through their property management agents. LAHSA's role related to these units is to connect homeless individuals and households to housing, utilizing the Coordinated Entry System (CES). CES connects the highest need, most vulnerable persons in the community to available housing. When LAHSA is informed by a covered property that a unit is available, LAHSA provides the name of the first qualified tenant for said unit as provided by CES. The property then confirms that the individual meets the qualifications of the unit and fills the unit. It is the property owners' responsibility, not LAHSA, to fill an available accessible unit with a person who needs the features of the unit.

(b) whether and how LAHSA is following CSA requirements for filling accessible units;

As discussed above, the CSA requirements for filling accessible units are not applicable to LAHSA.

(c) whether and how LAHSA is not following CSA requirements in filling accessible units;

As discussed above, the CSA requirements for filling accessible units are not applicable to LAHSA.

(d) whether the City has knowledge of whether the persons chosen for CES accessible units need the accessibility features and what that knowledge is;

Through the City's monitoring of covered properties the City is able to monitor and ensure that accessible units are filled with people who need the features of the units.

Through the PMP review and approval process and monitoring of the lease-up, the CES accessible units are identified and the contact information for CES matcher(s) for the development is included on the property information/contacts on the registry and on the marketing flyer. CES accessible units, as all other accessible units, are monitored to ensure that these are filled by persons with

**Appendix 2**

disabilities who require the features.  LAHSA, VA, and County Mental Health utilize the CES or a similar system to fill their respective restricted units. Also, for existing developments vacancies are first filled through the accessible unit transfer list and then through the CES process.

(e) the specific efforts the City has made with LAHSA to obtain LAHSA's voluntarily compliance with the requirements of the CSA, including identifying LAHSA officials the City has contacted in this respect, and providing copies of any documents;

LAHSA is not a party to the CSA and is not subject to the requirements of the CSA.  The obligations of the CSA relate to the City and owners of covered properties; LAHSA is neither. Notwithstanding, LAHSA has voluntarily worked with the City to take steps to address concerns raised by the plaintiffs regarding CES units. These efforts involved meetings between LAHSA, the City and plaintiffs to discuss concerns and steps that could be taken to address.

(f) whether it would be appropriate to join LAHSA as a necessary party or take other action to bring LAHSA under the CSA.

The City notes that LAHSA is a separate and distinct legal entity from the City, is not a part of the municipal entity, and is not affiliated with HCID. The Mayor and City Council do not have the authority to obligate LAHSA to this or any other Settlement Agreement with a third party. The City also questions whether LAHSA can be legally added, at this stage, as a "necessary party" to the CSA. LAHSA was not a party to the underlying litigation or a participant in the negotiations leading up to the CSA, nor is there any indication that Plaintiffs ever contemplated either.  However, to the extent that the Court Monitor believes that the Court possesses the legal authority to join LAHSA as a necessary party to the CSA in order to "achieve complete relief in this case," the City believes that, similarly, all owners and property management companies related to the entirety of the Covered Properties should also be joined.

**Appendix 3**

# City's Update and Response to Monitor's LAHSA Remedial Objectives and Information Requested

## CITY'S UPDATE AND RESPONSE TO MONITOR'S LAHSA REMEDIAL OBJECTIVES AND INFORMATION REQUESTED

On April 27, 2020, the Monitor provided the City with a document identifying seven remedial objectives relating to LAHSA and requesting information for each. The City advised the Monitor that it would review and discuss the document with LAHSA and begin gathering the requested information. The City has shared the Monitor's request with LAHSA and held a discussion with their legal counsel to discuss the requested items. Below please find the information that was shared with the City on each of the items. Additionally, please find below the information requested from the City.

*1. LAHSA should have in place for Service Planning Area ("SPA") caseworkers who identify individuals who need mobility features or sensory vision/hearing features available in Coordinated Entry System ("CES") housing units (a) an effective process, (b) clearly articulated criteria for identifying such individuals, (c) guidelines for applying the criteria, (d) record keeping adequate to develop waiting lists of persons eligible for housing with mobility features and for housing with sensory vision/hearing features, (e) training and development of written materials for the use of caseworkers, and (f) summaries of the preceding set forth for easy reference in the caseworker's manual used for interviewing clients.*

   *Necessary information:*

   *a. Describe the process used by LAHSA and/or each SPA to identify individuals who need mobility or sensory visual/hearing features, any changes in the process over time, the date changes were made, and reasons changes were made.*

- LAHSA has informed the City that it has guidance, which is available on its website, https://www.lahsa.org/documents?id=1804-interim-guidance-matching-participants-with-disabilities-to-fully-accessible-units.pdf, for the process used for filling mobility and hearing/vision units. This guidance became effective March 1, 2018.

- LAHSA has informed the City that Individuals are presented with a survey, made up of the Vulnerability Index Service Prioritization Decision Assistance Tool (VI-SPDAT) and program intake questions. The survey includes questions to capture if an individual needs an accessible unit and the type of unit needed, the question directed towards the individuals taking the survey can be found at number 38. The survey can be found on LAHSA's website, https://www.lahsa.org/documents?id=1306-form-1306-ces-survey-for-individuals-survey-packet.pdf. Question 38 asks:

   38. Question for Participant: Some housing units have disability related features that make it easier for people with certain disabilities to live in that housing. If you or anyone in your household are to be placed in housing, would you need: ☐ Yes: a mobility unit, ☐ Yes: a hearing/vision unit, ☐ Yes: a mobility and hearing/vision unit, ☐ No

   *b. Describe the articulated criteria used by LAHSA and/or each SPA to identify such individuals, any changes over time, the date changes were made, and reasons changes were made.*

- LAHSA has informed the City that the criteria is contained within the survey given to individuals. As it relates to the need for accessible housing, the survey asks the following question:

**Appebdix 5**

38. Question for Participant: Some housing units have disability related features that make it easier for people with certain disabilities to live in that housing. If you or anyone in your household are to be placed in housing, would you need: ☐ Yes: a mobility unit, ☐ Yes: a hearing/vision unit, ☐ Yes: a mobility and hearing/vision unit, ☐ No

- LAHSA has informed the City that Property owners also fill out a questionnaire when a unit becomes available, requires them to indicate if the available units is a mobility or hearing/vision unit.

   *c. Describe the articulated criteria used by LAHSA and/or each SPA to identify the relative need for housing, including vulnerability index*

- LAHSA has informed the City that the criteria is contained with the survey given to individuals. The survey measures acuity levels, any changes over time, the date changes were made, and reasons changes were made. The survey can be found on LAHSA's website, https://www.lahsa.org/documents?id=1306-form-1306-ces-survey-for-individuals-survey-packet.pdf.

   *d. Describe the guidelines for applying the criteria used by LAHSA and/or each SPA to identify such individuals, any changes over time, the date changes were made, and reasons changes were made.*

- LAHSA has informed the City that it has guidance, which is available on its website, https://www.lahsa.org/documents?id=1804-interim-guidance-matching-participants-with-disabilities-to-fully-accessible-units.pdf, for the process used for filling mobility and hearing/vision units. This guidance became effective March 1, 2018.

   *e. Describe the record keeping system used by LAHSA and each SPA to identify such individuals, any changes over time, the date changes were made and reasons changes were made.*

- LAHSA has informed the City that all data is kept in the Homeless Management Information System (HMIS). Anytime something is updated in the client's profile, it is date stamped.

   *f. Describe the training and development of written materials for the use of caseworkers provided by LAHSA and each SPA to identify such individuals, any changes over time, the date changes were made and reasons changes were made.*

- LAHSA has informed the City that it has guidance, which is available on its website, https://www.lahsa.org/documents?id=1804-interim-guidance-matching-participants-with-disabilities-to-fully-accessible-units.pdf, for the process used for filling mobility and hearing/vision units. This guidance became effective March 1, 2018.

- LAHSA has informed the City that it provides trainings, including online trainings for HMIS assessments, information on matching individuals with appropriate units, and a webinar on the guidance. The webinar is available on its website, https://lahsa.configio.com/pd/41/hmis-basic-navigation-online?cid=445&returncom=productlist&source=search.

   *g. Provide portions of the caseworker's manual used for interviewing clients used by LAHSA and each SPA that address any of the preceding matters, any changes over time, the date changes were made and reasons changes were made.*

- LAHSA has informed the City that it has guidance, which is available on its website, https://www.lahsa.org/documents?id=1804-interim-guidance-matching-participants-with-disabilities-to-fully-accessible-units.pdf, for the process used for filling mobility and hearing/vision units. This guidance became effective March 1, 2018.

- LAHSA has informed the City that it provides trainings, including online trainings for HIMS assessments, information on matching individuals with appropriate units, and a webinar on the guidance. The webinar is available on its website, https://lahsa.configio.com/pd/41/hmis-basic-navigation-online?cid=445&returncom=productlist&source=search.

    h. *Provide copies of any reports or studies, including by SPAs to LAHSA or by LAHSA to SPAs, concerning individuals who need mobility or sensory visual/hearing features in CES housing since January 2018.*

- LAHSA has informed the City that it is unable to provide reports at this time, but should be able to in the future.

2. *Where individuals have not been screened by caseworkers for need for housing with mobility or sensory vision/hearing features, for example, in the pre-February 2018 period, LAHSA should identify options to do so and should take immediate action to identify such individuals and match them with housing units with mobility or sensory vision/hearing features.*

- LAHSA has informed the City that it is constantly updating HMIS portfolio on clients. Anytime an individual comes in contact, they update their information to reflect changed circumstances, including need for accessible units.

- LAHSA has informed the City that the population is constantly changing and situations are changing, so they are always trying to update client information.

3. *LAHSA and SPAs should develop and maintain waiting lists of individuals eligible for mobility or sensory vision/hearing units in order of need for housing.*

    *Necessary information:*

    a. *Provide any studies of time required by LAHSA or each SPA (1) to provide CES housing; and (2) to fill CES housing units with mobility and sensory visual/hearing features.*

- LAHSA has informed the City that it is unable to provide reports at this time, but should be able to in the future.

- LAHSA has informed the City that filling units is based on the availability of the market. The system tracks all available units and when an accessible unit becomes available, it is filled.

    b. *Describe any use of waiting lists by LAHSA and/or each SPA.*

- LAHSA has informed the City that it has a waiting list of individuals eligible in the form of a community queue.

**Appendix 7**

- LAHSA has informed the City that after the survey, individuals receive a score based on the factors provided and inputted into the system. (based on all criteria, funding they qualify for, etc.)

- LAHSA has informed the City that, when an accessible unit becomes available, the individual with the highest score that qualifies based on criteria of the unit as well as a need for the accessible features is referred.

4. *AcHP should provide information identifying – by SPA or other demarcated area to expedite matching by LAHSA – CES units expected to become available with mobility and sensory vision/hearing features by type of features, project name, project code or identification number, funding sources and restrictions and bedroom size.*

   *Necessary information:*

   a. *Describe what information and the source of such information LAHSA and each SPA have relied on to identify mobility and sensory visual/hearing features in CES housing, any changes over time, the dates of any change, and reasons for the change.*

- LAHSA has informed the City that information about what units are available are self-reported by the properties, including the type of accessible unit. LAHSA started asking for this information on February 21, 2018.

- LAHSA has informed the City that if an individual is referred to a property that needed an accessible unit and the unit isn't as purported, the individual can decline to take the unit and return to the list, they do not lose their place in line.

   b. *Describe what information AcHP has provided LAHSA or SPAs, and whether it was timely provided, identifying mobility and sensory visual/hearing feature in CES housing.*

- LAHSA has informed the City that they do not receive any information.

   [REMAINDER OF RESPONSE TO 4.B. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- LAHSA receives list of properties from HCIDLA of new developments at the stage of closing of construction loan and/or notice to proceed.  This is approximately two (2) years prior to development completion and commencement of lease up.

- In addition, AcHP requires all covered housing developments, including those with CES units to list the development on the Accessible Housing Registry.  The development provides both property and unit information as follows:  Accessibility Type, Bedroom, Affordability Level Rental Subsidy, and other Accessibility Features.  In addition, the development is listed as either CES or Combo and the LAHSA matcher (service provider) contact information is also provided in addition to the development's contact information. LAHSA, its service providers and/or matchers can narrow their search on the Accessible Housing Registry to CES and Combo developments by clicking on the tab "More Search Options" and then clicking on either or both boxes "CES only" or "CES Combo".

5.  *LAHSA and AcHP should identify (a) all units with mobility or sensory vision/hearing features in CES housing developments and (b) all individuals who need units with mobility or sensory vision/hearing features. To the extent individuals who do not need units with mobility or sensory vision/hearing features occupy such units, LAHSA and AcHP should develop options for relocating such individuals and making accessible units in suitable developments available for those who need them. To the extent individuals who need mobility or sensory vision/hearing features are living in units without such features, LAHSA and AcHP should develop options for relocating such individuals to units with such features in suitable developments and do so expeditiously. LAHSA and AcHP should identify adaptable units and units that are not fully accessible, such as units with no stairs.*

    *Necessary information:*

    a.  *Describe whether LAHSA or AcHP is aware of or has studied individuals who do not need units with mobility and sensory visual/hearing features in CES housing unit but currently occupy such accessible units, how many such individuals were identified, and identify what actions they have taken provide appropriate housing.*

-  LAHSA has informed the City that it has no information available that would answer this question. LAHSA is not an enforcement agency and CES is just a listing. Additionally, some units pre-date the CES system. Not everyone uses the CES system, some units pre-date the CES system and some agencies place individuals without using CES.

    [REMAINDER OF RESPONSE TO 5.A. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

-  Through LAHSA's CES, matchers provide developments with a list of eligible tenants and assists with tenant matching. AcHP plays a monitoring of compliance and enforcement role. The Property Owner/Manager are responsible for actually filling their units with persons who need the features and for addressing tenant requests for reasonable accommodations/modifications, transfers, etc.

-  Not all permanently supported housing developments or special needs housing utilize LAHSA's CES referral process. The CES is subject to HUD requirements. Other referral placement services are utilized by owners/property management of these developments such as the Veterans Administration, Los Angeles County Department of Mental Health, California Department of Disability Services, and similar systems.

-  Depending on the funding sources, CES units are restricted by affordability levels and program funding sources as well as accessibility type and unit size. These restrictions have an impact on the placement and availability of the accessible CES units. As stated above, through review of the quarterly reports, and the unit utilization occupancy survey submitted by owners/property management, AcHP is able to identify which accessible CES units are occupied by persons without disabilities. For those accessible CES units that are occupied by persons who do not need the features, a lease addendum is required to be executed.

    b.  *Describe whether LAHSA or AcHP is aware of or has studied individuals who need units with mobility and sensory visual/hearing features are living in CES housing units without such features, how many such individuals were identified, and what actions they have taken to provide appropriate housing.*

-  LAHSA has informed the City that it has no information available that would answer this question. When an individual who needs accessible features is in a unit that does not have the

features of the unit, they can request a transfer directly from the property. If LAHSA became aware of this, they would inform the owner.

[REMAINDER OF RESPONSE TO 5.B. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- Through AcHP's monitoring, compliance, and enforcement responsibilities under the CSA, AcHP requires owners/property management of developments, including those with CES units, to submit completed utilization occupancy survey and quarterly reports. The data collected identifies vacant accessible units and occupancy by tenants/persons with disabilities in the development in an accessible unit by type (mobility or hearing/vision) or a conventional unit, and whether they have requested an accessible unit transfer and/or a reasonable accommodation to address an accessibility need. AcHP policy analyst conduct follow-up inquiries on tenant selection of the vacant accessible units, to ensure that individuals with disabilities are placed in those units. In addition, AcHP policy analyst ensures tenants on accessible unit transfer lists are provided reasonable accommodations to meet their accessibility needs in the interim.

   c. *Describe whether LAHSA or AcHP is aware of or studied adaptable units and units that are not fully accessible, such as units with no stairs in housing developments with CES units.*

- LAHSA has informed the City that information is self-reported, no studies done by LAHSA.

[REMAINDER OF RESPONSE TO 5.C. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- The City does not own or manage the covered housing developments. AcHP monitors compliance and enforcement of the City's Fair Housing Policies Related to Disabilities as required by the CSA. Through the Accessible Housing Registry, AcHP provides for owners/property management to select "other" accessible features on the Unit information for the property listing. These are not mandatory fields. The "other features" that can be selected are:

   o Street Level
   o No entry Stairs
   o No Stairs within the unit
   o Entry level bedroom
   o Entry level bathroom
   o Entry level kitchen
   o Grab bars in bathroom.

6. *AcHP and LAHSA should coordinate their databases and cross-check information about units with mobility and sensory visual/hearing features, individuals eligible for housing filled through the CES process, and other relevant information.*

   *Necessary information:*

   a. *Describe any coordination to date of AcHP and LAHSA databases.*

- LAHSA has informed the City that there has been no coordination to date. LAHSA reports a willingness to coordinate and share data.

   [REMAINDER OF RESPONSE TO 6.A. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- Through the Accessible Housing Registry, applicants and housing advocates, including LAHSA Matchers (Service Providers) can search for developments by CES status. The Accessible Housing Registry provides the contact information for the CES matcher for developments with CES or Combo status and provides a link to the SPA directory.

   *b.   Describe any cross-checking of information to date in LAHSA and AcHP databases.*

- LAHSA has informed the City that there is no cross-checking to date. LAHSA reports a willingness to share data.

   [REMAINDER OF RESPONSE TO 6.B. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- AcHP does not have access to LAHSA's database nor does AcHP share our database with LAHSA. LAHSA is a separate legal joint powers authority.

*7.   LAHSA and AcHP should identify barriers to matching or placing individuals who need mobility or sensory vision/hearing features in CES housing units and develop options to overcome these barriers.*

   *Necessary information:*

   *a.   Describe any efforts LAHSA or AcHP has made to identify barriers to matching individuals who need mobility or sensory vision/hearing features in CES housing.*

- LAHSA has informed the City that it has identified barriers related to the funding sources of projects. The funding for the project often has restrictions on the individuals who can occupy the units. For example, you could have funding that requires only families occupy the unit, additional funding that requires a veteran occupy the unit, income restrictions on the tenant, and an accessible unit. In this situation, you would need to find a family that makes under a certain amount of money, with a member of the household being a veteran, and an individual who needs the accessible unit. Because of these funding restrictions, it can be difficult to find people that meet every criteria.

   [REMAINDER OF RESPONSE TO 7.A. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- AcHP monitors compliance and initiates enforcement activities for non-compliance against the owner/property management for the development. AcHP policy analyst monitoring responsibilities of new developments are conducted throughout the initial lease up process of CES or Combo developments to ensure that the accessible units are occupied by persons with disabilities who require the accessible features of the unit.

- Through the PMP review and approval process and monitoring of tenant lease up process, AcHP has observed the following:

**Appendix 11**

o  In some instances, there appears to be confusion, miscommunications, or misunderstandings by owner/property management of LAHSA's procedures for referral placement of potential applicants, and vice versa by LAHSA's matchers (service providers) of the development's lease up requirements.

o  Over-burdening of the CES accessible units by multiple program restrictions that can result in a barrier to lease up of accessible units by persons with disabilities who need the accessible features.

b.  *Describe any efforts AcHP or LAHSA have made to develop options to overcome such barriers.*

-  LAHSA attends bidders conferences to explain CES and encourage applicants to not 'layer' funding into units in such a way that limits the system's ability to match people to the units. LAHSA encourages applicants to reach out to them directly to receive feedback on their applications regarding funding mixed funding sources in their buildings.

   [REMAINDER OF RESPONSE TO 7.B. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

-  AcHP provides training on City's fair housing policy related to disabilities and policy compliance review training sessions for property owners and property management.  AcHP has encouraged and offered to LAHSA for their staff and matchers/service providers to attend these training sessions.

-  Through AcHP's monitoring and PMP review, AcHP highlights the need for developments to not overburden CES accessible units with multiple program restrictions.

# Memorandum from Michael Allen, et al., to Bill Lann Lee, et al. (March 31, 2020)

# M E M O R A N D U M

TO:          Bill Lann Lee, Tim Fox, Amy Robertson

FROM:        Michael Allen, Dara Schur, Autumn Elliott and Kali Schellenberg (on behalf of ILCSC and CALIF)

RE:          Obligations of Los Angeles Homeless Services Authority and Coordinated Entry System Under the Corrected Settlement Agreement (CSA)

DATE:        March 31, 2020

_____

In response to the requests of the Monitor, we provide the following analysis.

**The Coordinated Entry System Controls Access to a Substantial Number of Accessible Units in Covered Developments**

After the City entered into the CSA, substantial funds became available, pursuant to Proposition HHH, to it to develop new units of permanent supportive housing) for homeless individuals, many of whom have mental or physical disabilities.  https://hcidla.lacity.org/prop-hhh.  The City has turned over tenant outreach and selection for HHH and other PSH units in Covered Developments to the Coordinated Entry System ("CES") operated by the Los Angeles Homeless Services Authority ("LAHSA").[1]

CES is designed to "coordinate providers' efforts, create a real-time list of individuals experiencing homelessness in our communities, and [as] a means to quickly and efficiently match people to available housing resources and services that best fit their needs." https://www.lahsa.org/ces/about.  Pursuant to the CSA, developments constructed or rehabilitated after April 2016 with HHH funds must ensure that 10% of units in each building meet the Accessibility Requirements for mobility units and 4% must meet such requirements for sensory units.  As a practical matter, therefore, CES has ended up being a "matching service" for a thousand or more accessible units in Covered Developments.[2]

In its responses to the Monitor of March 13, 2020 and August 9, 2019 (previously provided in ILCSC/CALIF supplemental responses to the Monitor on March 20, 2020), the City indicated that the CES units—whether accessible or not—are "restricted."  In other words, by virtue of a commitment related to funding for specific developments, only people who qualify pursuant to CES selection criteria may occupy those units.

_____

[1] Federal regulations require local jurisdictions to establish a "centralized or coordinated assessment system, generally known as a Coordinated Entry System, to prioritize homeless assistance resources for those most in need."  24 CFR Part 578.

[2] The absence of a comprehensive database at HCID and HCID's failure to coordinate information with CES means that ILCSC and CALIF do not know the precise number of units implicated.

**Appendix 14**

Because the accessible CES-restricted units must be reserved for CES-eligible applicants who need the accessibility features, LAHSA must make a preliminary determination of their eligibility for such units. Whether the ultimate lease negotiation and verification of eligibility is carried out by the development's owner or not, the City and LAHSA must adopt appropriate measures to ensure that LAHSA does not refer CES-eligible applicants to accessible CES-restricted units unless they need those features. Whether pursuant to its role as recipient, agent, successor or assign of the City, or pursuant to its own independent obligations under federal law, LAHSA must comply with these obligations (or the City must itself adopt policies and practices to ensure that every CES-restricted unit is filled in compliance with the CSA.)

Both the City and LAHSA are obligated to track the accessible unit data (regardless of who actually does the work)– identifying units, features, eligible individuals in LAHSA's system who need accessible units, and data confirming that the accessible units have been rented to individuals who need the features, and not to others. While these units are listed on the Registry, applicants must apply through a local nonprofit that is coordinating with LAHSA in order to be added to the CES system, which is the only way they can get a CES-designated unit. To date, the City and LAHSA have not worked together to ensure that the Registry and CES database system can coordinate with one another. That is why it is imperative that HCID work with LAHSA to establish a viable database and system for monitoring this so it can ensure at the front end that the units are being appropriately filled. See additional steps the City should be taking on the attached document from April 24, 2019, in which the City disclaims any responsibility or ability to address key issues. All of these tasks are obligations of the City to do directly or through LAHSA.

### Identification of Accessible Units in the CES System

Further, as we have emphasized time and again in previous submissions, the City and LAHSA must coordinate closely to ensure that the CES-restricted units that are identified as "accessible" actually meet the Accessibility Requirements in the CSA. At present, since there are no certified units, the City and LAHSA appear to be relying on owner self-certification to identify units with any accessibility features. That haphazard approach is insufficient under the CSA, and is particularly so when it comes to the accessibility needs of the chronically homeless individuals with high "vulnerability index" scores that are prioritized through CES.

### LAHSA is a "Subrecipient" of City Funds

The CSA clearly provides that the City shall comply with federal and State nondiscrimination laws "with respect to all aspects of its own housing-related programs, services, and activities, including administration and financing," CSA, ¶ III.8, and makes clear that the "failure of the City to secure the cooperation of any Subrecipient … shall not excuse the City's obligation…." CSA, ¶ III.7. *See also,* CSA, ¶ III.10(l)(1) ("**Ensuring Compliance with Management Policies**. The City shall monitor its Subrecipients and Owners and require that its Subrecipients and Owners comply with the applicable requirements of Section 504 and applicable HUD regulations, the ADA and applicable HUD regulations, California Accessibility Standards, and this Agreement in designing, constructing, altering, operating, administering, and financing housing.")

**Appendix 15**

Pursuant to ¶ II.30 of the CSA:

"Subrecipient" means and refers to any public or private agency, institution, organization, or other entity or person *to which Federal financial assistance or financial assistance from or through the City is extended*. A Subrecipient also means a non-Federal entity that receives a sub-award from a passthrough entity to carry out part of a Federal program; but does not include an individual that is a beneficiary of such program. *A Subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency*. 24 C.F.R. §200.93. (emphasis supplied)

As demonstrated below, because LAHSA receives Federal and other financial assistance from or through the City—and also apparently receives "other Federal awards directly from a Federal awarding agency"—it is clearly a Subrecipient as the CSA defines that term.

LAHSA describes itself in litigation as a "public joint powers entity (City and County of Los Angeles), which receives and administers federal grants for its homeless from the U.S. Department of Housing and Urban Development (HUD)."[3] Its own website indicates that LAHSA "coordinates and manages $400 million annually in federal, state, county, and city funds for programs providing shelter, housing, and services to people experiencing homelessness." https://www.lahsa.org/news?article=567-state-funding-includes-new-investments-in-homelessness (last visited Mar. 30, 2020).

Since its establishment in 1993 as a "Joint Powers Authority," LAHSA has effectively controlled all or most of the federal allocations of "Continuum of Care" funding appropriated by Congress for the City and for the County of Los Angeles.[4]  While we have been unable to locate the original 1993 Joint Exercise of Powers Agreement, we have found a 2001 revised and restated agreement outlining LAHSA's relationship with the City (including its annual receipt of City general funds and the annual allocation of federal funding for homelessness programs).  *See* Joint Exercise of Powers Agreement between County of Los Angeles, City of Los Angeles, "Continuing the Los Angeles Homeless Services Authority," Feb. 28, 2001 (at p. 10), *available at* http://file.lacounty.gov/SDSInter/bos/supdocs/116113.pdf, Exhibit A ("LAHSA Agreement").

---

[3] LOS ANGELES HOMELESS SERVICES AUTHORITY, a Public Non-Profit Corporation, Plaintiff, v. BLUE COLLAR CONNECTION, INC., a California Private Non-Profit Corporation, Rolina Brown, an Individual, Jim Mcbeth, an Individual, Cheryl Meyers, an Individual and Does 1 Through 100, Inclusive, Defendants., 2002 WL 32788042 (Cal.Superior), *From* https://1.next.westlaw.com/Document/I4abafa456a6111d9aa2e8abcfac83d3a/View/FullText.html?originationContext=typeAhead&transitionType=Default&contextData=(sc.Default)>

[4] A recent Los Angeles Times article says that, at its creation in 1993, LAHSA "was given limited powers and an even more limited mission of stopping the city and county from bickering over federal dollars for homeless housing and services." L.A. Times, L.A. officials are reportedly getting serious about overhauling this core homeless services agency, Mar. 2, 2020, *available at* https://www.latimes.com/homeless-housing/story/2020-03-02/homeless-authority-los-angeles-restructure (last visited Mar. 30, 2020).

**Appendix 16**

The LAHSA Agreement recites that the City is obligated to contribute at least $1,166,570 for Fiscal Year 2000-01.  *Id.* at Section 11 (a).  On information and belief, the City contributed funds to LAHSA in each subsequent year.  In Fiscal Year 2016-17, for instance, LAHSA's Chief Finance Officer told advocates that LAHSA was "a pass-through entity…. We receive funds from the City, County, and the federal government."  City of Los Angeles,, Department of Neighborhood Empowerment, "Budget Advocates Get Rundown on Budget from L.A. Homeless Service Authority, *available at* https://empowerla.org/budget-advocates-get-rundown-on-budget-from-l-a-homeless-service-authority/.  That year, the City itself identified a total of $50,838,698 of funding earmarked for LAHSA.  The City Administrative Officer's Fiscal Year 2016-17 Proposed Homeless Budget, *available at* http://cao.lacity.org/Homeless/Proposed_Budget-Homelessness.pdf.  In Fiscal Year 2019-20, the City provided $35,471,307 to LAHSA.  Budget Summary FY 2019-2020, *available at* http://cao.lacity.org/budget19-20/2019-20Budget_Summary.pdf

## LAHSA is an Agent, Successor or Assign of the City Under the CSA

Unquestionably, LAHSA acts as the City's agent, successor or assign, CSA, ¶ X.7, and is therefore bound to operate CES in a manner required by the CSA.  The City intends to count the units developed with HHH funding toward the Target Number of Accessible Units.  With respect to all other such units, the City has devolved onto Owners the obligation for outreach, application-taking and tenant selection in conformance with the obligations under the CSA.  With respect to the CES units, the City has interposed LAHSA, and restricted access to CES units meeting the Accessibility Requirements to the CES process.

## Apart from Its Status as a Subrecipient (or Agent) of the City, LAHSA is Independently Required to Comply with the Federal and State Civil Rights Laws Implicated in the CSA

As a recipient of federal funds, LAHSA is independently bound by Section 504 of the Rehabilitation Act.  Because it is offering programs or services in conjunction with the City and the County, it is also obliged to comply with the Americans with Disabilities Act.  In addition, HUD regulations controlling the Continuum of Care program (CES) provide: "Accessibility and integrative housing and services for persons with disabilities. Recipients and subrecipients must comply with the accessibility requirements of the Fair Housing Act (24 CFR part 100), Section 504 of the Rehabilitation Act of 1973 (24 CFR part 8), and Titles II and III of the Americans with Disabilities Act, as applicable (28 CFR parts 35 and 36)."  24 CFR § 578.93.  See also 24 C.F.R. section 8.2 (24 C.F.R. Part 8 applies to all recipients of HUD assistance), 24 C.F.R. section 5.105 (civil rights laws apply to all HUD programs.)

An Operational Agreement governing administration binds LAHSA to "comply with all applicable Federal, State, and local laws, regulations, ordinances, directives, guidelines, policies and procedures."  Operational Agreement, Section VI.C (at pp. 5-6), available at *available at* http://file.lacounty.gov/SDSInter/bos/supdocs/116113.pdf.

## Conclusion

The City and LAHSA are independently and jointly responsible for complying with the obligations of the CSA.

**Appendix 17**

# APPENDIX TO MONITOR'S SEMIANNUAL REPORT FOR REPORTING PERIOD JANUARY 1, 2020 THROUGH JUNE 30, 2020

# AcHP Q1 2020 Staffing Report

**Appendix 1**

| Functional Area | | April 2016 to 9/5/16 | 9/6/16 to 12/31/16 | 1/1/17 - 3/31/17 | 4/1/17-6/30/17 | 7/1/17 - 9/30/17 | 10/1/17 -12/31/17 | 1/1/18 - 3/31/18 | 4/1/18 - 6/30/18 | 7/1/18 - 9/30/18 | 10/1/18 - 12/31/18 | 1/1/19-3/31/19 | 4/1/19-6/30/19 | 7/1/19-9/30/19 | 10/1/19-12/31/19 | 1/1/20-3/31/20 | Comments |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Settlement Coordinator | Authorized Staff | 0 | 0 | 1 | 1 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | Includes Administrative support; Executive Officer acted as Settlement |
| | Actual Staff (avg) | 0.2 | 0.3 | 0.3 | 0.3 | 0.3 | 0.5 | 1.2 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 2.5 | 2.5 | 2.5 | |
| Rental Policies Section | Authorized Staff | 0 | 0 | 9 | 9 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 16 | 33 | Includes Administative support. |
| | Actual Staff (avg) | 1 | 1 | 2 | 3 | 4 | 8 | 8 | 7 | 6 | 10 | 11 | 10 | 11 | 12 | 26 | |
| Retrofit Construction Section | Authorized Staff | 0 | 0 | 5 | 5 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 12 | 15 | 16 | |
| | Actual Staff (avg) | 0.5 | 1 | 1 | 2 | 2 | 2 | 2 | 3 | 4 | 5 | 9 | 9 | 11 | 13 | 12 | |
| Quality Assurance/Data and Reporting | Authorized Staff | 0 | 0 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 3 | |
| | Actual Staff (avg) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 3 | |
| Contract Admin | Authorized Staff | 0 | 0 | 0 | 0 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | 2 | Not included in AcHP org Chart. Assigned to Contracts & Procurement |
| | Actual Staff (avg) | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 2 | 2 | 2 | 2 | 1 | 1 | 1 | 1 | |
| Accounting | Authorized Staff | 0 | 0 | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |
| | Actual Staff (avg) | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | |
| Legal Support | Authorized Staff | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | Refers to City Attorney support to implement |
| | Actual Staff (avg) | n/a | n/a | n/a | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | |
| Total AcHP | Total Authorized Staff | 0 | 0 | 18 | 18 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 35 | 39 | 39 | 58 | |
| | Total Actual Staff (avg) | 0.7 | 2.3 | 3.3 | 7.3 | 8.3 | 12.5 | 13.2 | 14.5 | 15.5 | 20.5 | 25.5 | 25.5 | 28.5 | 31.5 | 45.5 | |
| | As Needed Part-time Staff | | | | | | | | | | | | | | 3 | 3 | |
| | TOTAL | | | | | | | | | | | | | | 34.5 | 48.5 | |

**Appendix 2**

# Accessible Housing Program Semi-Annual Report for January to June 2020

## ("AcHP Semi-Annual Report")



ACCESSIBLE HOUSING PROGRAM
SEMI-ANNUAL REPORT
FOR
JANUARY TO JUNE 2020

Pursuant to Corrected Settlement Agreement (CSA) (*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al.*) §III. ¶ 9 and ¶11, the following constitutes the Settlement Coordinator's semi-annual report for the reporting period from January 2020 to June 2020. (III. ¶¶ 12-13).

**A. CSA § III. ¶ 12(a) – Progress on City's compliance efforts which have been made since the last report with respect to substantive terms of the CSA and the actions taken to ensure the City's own compliance and to require and ensure its Subrecipients' and Owners' compliance with Section 504, the ADA, Section 11135, and the terms of the CSA.**

At the request of the Court Monitor, the semi-annual report for this reporting period is being provided ahead of the September 30, 2020 due date to assist the Court Monitor with his preparation of the August Report to the Court.

During this report period, the Settlement Coordinator submitted bi-monthly and quarterly update reports to the Court Monitor and Plaintiffs. Upon the advice and request of the Court Monitor, the format of this semi-annual report has been modified to address CSA requirements in the order as requested by the Court Monitor.

**B. CSA Infrastructure Requirements:**
**1. AcHP staffing**

During this period, City undertook steps to increase AcHP staffing to enable compliance with the increased policy monitoring requirements set forth in the Monitoring, Compliance and Enforcement Plan (MCEP) and with the accessibility compliance tasks relating to the retrofit of surveyed existing developments requiring remediation of identified barriers and to ensuring new developments and substantial rehabilitation developments are constructed in compliance with current applicable accessibility standards. On March 6, 2020, AcHP received 19 sub-authority positions to fill, consisting of 2 Administrative Clerks, 16 Management Analysts, and 1 Senior Management Analyst. Additionally, as part of the

**Appendix 4**

Fiscal Year 20-21 budget, AcHP received 23 positions consisting of 1 Rehabilitation Construction Specialist (RCS) III, 2 RCS II, 1 RCSI, 17 Management Analysts, and 2 Senior Management Analysts.

With the allocation of the 42 above-mentioned positions, the AcHP staffing increased to a total of 78 authorized positions consisting of the following:
- 1- Director of Housing
- 1- Senior Management Analyst II
- 6- Senior Management Analyst I
- 48- Management Analyst
- 1- Senior Project Coordinator
- 4- Rehabilitation Construction Specialist I
- 8- Rehabilitation Construction Specialist II
- 2- Rehabilitation Construction Specialist III
- 5- Senior Administrative Clerks
- 2- Administrative Clerks

During the month of March, AcHP hired 16 Management Assistants In lieu of Management Analysts and 2 administrative clerks; however, 1 Management Assistant and 1 administrative clerk have since left AcHP.  Effective March 19, 2020 and due to the COVID pandemic, the City of Los Angeles entered into a hiring freeze.   However, AcHP was identified as a legally mandated program which has allowed for us to successfully unfreeze some of our positions.  AcHP is still required to go through the process of requesting positions to be unfrozen in order to hire and fill the vacant positions.  The process to unfreeze a position requires Mayor and City Council approval.   After the freeze, AcHP was able to hire 2 additional Management Analysts.

AcHP has made the request to fill all vacant positions in the classifications of Management Analyst, Senior Management Analyst, Administrative Clerk.  The RCS II and RCS II positions were also requested to be filled.  Furthermore, HCIDLA requested for 1 of the RCS II positions to be filled as an exempt authority.   This position was originally approved as a non-exempt civil service authority. However, AcHP has determined that, due to the specialized skills needed and our preference to fill the position with an individual who is a certified CASp to perform the duties required of this position, the use of an exempt authority would be more appropriate.

During this period Court Monitor also met with the City on May 14, 2020, to learn more on how the Settlement Coordinator was assigning and utilizing senior staff in supervisory roles

**Appendix 5**

to assist with the performance of the multiple functions required to ensure compliance with the CSA.

## 2.  Monthly Meetings and Working Group Meetings

During this period, the court monitor scheduled and convened meet and confer sessions with City and Plaintiffs to address the specific outstanding issues set forth in the December 19, 2019 court order.  These were held on the following dates: January 9 and 16, 2020 and February 10, 20, 2020.

Pursuant to the March 27, 2020 court order for a supplemental report by April 15, 2020 on the impact of the Pandemic on City's obligations under the CSA, the court monitor held a meet and confer conference call on April 2, 2020.

Monthly meetings were held on February 11 and May 26.  The Registry and MCEP working group meetings scheduled for March 17, 2020 were canceled due to the COVID-19 Pandemic.  Registry working group meetings were held on May 29, June 4, and June 18, 2020.  The AHUP working group met on February 11, April 24, and June 4, 2020.  On May 26, 2020, the MCEP working group met on the audit proposal.

As previously expressed in the July to December 2019 semi-annual report, the multiplicity of these meetings in a single month requires substantial time for preparation and hours spent in the meetings, which impacts the settlement coordinator's ability and availability to focus on the overall operations and promotion of the program's multiple functions, services, benefits to the housing needs of the disability community.   In addition, as meetings are now being conducted virtually, recorded, and sent to all immediately following the meetings enables all to be informed and hopefully lead to focused discussions on progress, achievements, and program benefits and outreach to members of the disability community citywide.

## 3.     Development of the Comprehensive Database

The Court Monitor convened a meet and confer session on January 9, 2020 with the City, Plaintiffs, HCIDLA systems team, 3Di, and the court monitor's expert to discuss the development progress and required functions of the comprehensive database to provide court monitor and plaintiffs access and ability to generate reports to conduct monitoring of City's compliance with the CSA.  The database would be integrated to HCID's other systems, provide the required data points, report requirements, provide read access to court monitor and plaintiffs, and the delivery of a fully operational system.  Throughout this report period, City's systems team have met bi-weekly with plaintiffs and court monitor's

experts and informed them on the development of the database. The systems team also meets with Knowbility, the Court Monitor's accessibility and usability expert.

While continuing to perform ongoing monitoring responsibilities, several AcHP policy and retrofit staff were dedicated to participate in weekly meetings with the Systems and 3Di team on the development of the multiple modules that will comprise the integrated database system. To streamline and efficiently conduct the extensive policy monitoring, compliance, and enforcement requirements set forth in the MCEP, the following enhancements have been included in the database:

- Online Property Management Plan (PMP) – The developments will be able to prepare and submit the PMP online from the Owner/Property Manager dashboard. This will enable the data to be captured into the database
- Online Quarterly Reports – The Quarterly Reports will be submitted online. All wait lists and logs will be kept electronically and the Owner/Property Manager will be able to access their Quarterly Reports including the previous submittals on their dashboard. All AU applications submitted through the AAHR will automatically be added to the development's AU wait list.
- Policy Compliance Module – AcHP staff will be able to send Policy Review Reports, maintain compliance checklist online, and send follow up email using this module.
- Grievance Module – Milestones, appeals, and report enhancements
- Training Module – Reports and email notification enhancements

The development of the construction and project management modules comprises three phases and encompasses project and site workflows by construction type: retrofit, new construction, and rehabilitation. Extensive progress occurred during this period enabling demo presentations of the construction module project and site inspection features to HCIDLA Housing Development Bureau senior staff, HUD, Court Monitor, and ETA. The construction compliance module will enable inspection tracking for each construction type, ensure consistency of application of accessibility standard from initial design review and plan check through construction completion by AcHP staff to verification inspection by the NAC. It will also provide for project management of retrofit construction projects, including cost estimate and bid package functions, and provides outside user access by the NAC, City's general contractors, architects, and relocation consultants.

In compliance with the VCA, a new Affordable and Accessible Housing Registry (AAHR) is also being developed to include affordable and accessible units. The GoLive launch date for the AAHR is September 21, 2020 The following enhanced applicant application features will be operational with the AAHR launch date.
- New workflow for Lottery application – The registered and ready to apply application status has been removed.
- Subscription email feature – All registered applicants and housing advocates will receive email notifications when new listings are added, when properties are open

for Application, and when conventional wait lists are open.  The users can choose to opt out of any of these notifications.
- Additional Questions for Applicants – The application will include additional questions that will assist Owners/Property Managers with the applicant's qualification review.
- Rental Application link – The developments will be able to upload their printable rental application on the property listing page.

As of June 25, 2020, AcHP systems team commenced UAT (user testing) of the Affordable and Accessible Housing Registry (AAHR).

AcHP and Systems staff will coordinate the scheduling of a demo presentation of the AAHR for the Court Monitor, Plaintiffs, Knowbility, plaintiffs and court monitor's experts.  For those who cannot participate in the demo presentation, the link to the recording of the presentation will be provided.  Systems staff will also provide the instructions and access for all to conduct UAT (user testing).

After the GoLive launch of the AAHR, additional feedback from the various user stakeholders will provide the basis for further improvements to this new housing search tool to be included in subsequent enhancement releases.

4.   **Accessibility Protocols, Standards and Surveys**

At the commencement of this reporting period, the "next steps" actions agreed upon at the November 19 and 20, 2019 meetings with City, HUD, LCM, and Plaintiffs Bill Hecker to be conducted and completed by LCM were pending.  The desk audit review of the approximate 200 site surveys by LCM was to evaluate the accessibility standards applied to identify those surveyed properties that would require re-surveys to determine compliance or non-compliance with FHA standards and/or which may only require revisions to the survey reports.

Pursuant to the December 19, 2019 court order, LCM was to report directly to the Court Monitor. The Settlement Coordinator informed LCM of the order of the court.

In addition to conducting the desk audit review, LCM was to revise and submit revised checklists for review and approval by the Court Monitor and HUD.  City and Plaintiffs' expert submitted comments and revisions to LCM's revised checklists.  City repeated its request to HUD, Court Monitor, and LCM for the types of checklists needed by City to ensure consistency and quality control throughout the development process.  Checklists were needed for the accessibility design review and plan approval process and for each type of inspection throughout the construction process.  These checklists are critical to the

**Appendix 8**

development construction compliance and project management modules, which are integrated components of the comprehensive database.

On January 24, 2020, the Court Monitor and HUD shared with the City and Plaintiffs the updated protocol to City and Plaintiffs for review and comment. City again raised concerns as to the increased time that each site survey would require under the proposed protocols and the necessity for survey reports by LCM and future NACs to be within a short turnaround from the date of the site survey.  For new construction and substantial rehabilitation developments in construction, the scheduling of the NAC survey and timely issuance of survey reports at the end of the construction process is pivotal to ensure the tenanting and occupancy of the development and to not jeopardize the development meeting financing requirements.

A joint site survey by HUD, Court Monitor's team, Plaintiff's expert, LCM and the City was scheduled and conducted on March 10, 2020 at a new development in construction.  Due to the increasing concerns relating to the spread of COVID-19, the second site survey scheduled for March 11, 2020 at existing and occupied developments was cancelled.

Throughout this reporting period, the Court Monitor and HUD had ongoing discussions with LCM on the survey protocols, survey reports, checklists, verification of compliance for certification of the applicable standards, and the utilization of tolerances/specifications. City was not a party to these discussions.  Commencing in April 2020, the Court Monitor approached the City to consider the retention of Evan Terry and Associates (ETA) as a replacement of LCM.  City agreed to meet with ETA to explore this possibility.

Key areas for evaluation and consideration in retaining a replacement for LCM include ensuring multi-family housing experience and/or the ability to augment a team or expertise with such experience if not currently available in-house, ensuring there are not any potential conflicts of interest with sub-consultants, ensuring sufficient staffing capacity, including locally based staff, to provide services needed. The City has been and continues to work closely with ETA to ensure that all potential areas of evaluation are sufficiently addressed.

Commencing in mid-March 2020, LCM suspended travel to Los Angeles due to the Covid-19 Pandemic.  This resulted in suspension of verification inspection surveys by LCM to not only developments previously surveyed and issued minor corrections, but also to new and substantial rehabilitation developments in construction that were nearing completion in the construction process and required final NAC verification inspection to

**Appendix 9**

enable occupancy and tenanting by the City's most vulnerable residents during the Pandemic crisis.

City undertook steps to facilitate tenant occupancy of these developments.  City conducted ongoing communications with HUD, developed and submitted to HUD the Pandemic Interim TCO Occupancy Verification Procedures to enable developments to move forward to ensure that occupancy of tenants could move forward and that the development's financing was not jeopardized.

To date, the City has not received the results of the desk audit that LCM was to perform. Both the Court Monitor and HUD have expressed to City positions of no confidence in LCM. The need to finalize the protocols, develop the required checklists, determine the content and format of survey reports, and finalize the verification of accessibility and certification form are the highest priority as the continued non-resolution has multiple adverse impacts.

The most obvious adverse impacts have been to the retrofit program implementation and to the City's ability to move forward with achieving the target accessibility units required under the CSA and VCA.  Impacts also exist to the property and unit data listing for developments on the Registry and on the development of the integrated comprehensive database's construction compliance and project management module and the policy compliance module.

AcHP has moved forward to develop the format for checklists and reports for utilization for the inspection types during construction of new construction, substantial rehabilitation, and retrofit of existing developments based on the UFAS Checklist that was provided to the City by HUD.  City will need to incorporate the requirements for Section 504, FHA (including a specified Safe Harbor), 2010 ADA, and California Building Code.  AcHP requires checklists for Design Review, Rough Inspection, Progress Inspection, and Final Inspection for new construction, rehabilitation projects, and retrofit projects. When all checklists and inspection report formats are approved by the Court Monitor and HUD, HCID systems staff will integrate the approved checklists into the construction module of the comprehensive database.

While it is not yet determined by the Court Monitor, HUD, Plaintiffs, and the City as to whether re-survey all of the approximately 200 properties already surveyed by LCM will be required, it is understood by all concerned that reports will need to be amended and previously surveyed sites will probably be re-surveyed.

**Appendix 10**

5.    **Funding**

On January 27, 2020, the City Council approved and Mayor concurred to provide additional funding to support the Chief Expert Accessibility Consultant services, enhancements to the Accessible Housing Program website, and additional staffing needs to meet the demands of the CSA and VCA.  A total of $2,352,103 was appropriated to cover the cost for the above-mentioned services through the end of the fiscal year 19-20.  The $2,352,103 were allocated as follows:

| Activity Type | Amount |
|---|---|
| Systems Upgrade | $ 822,304 |
| Technical Services- Chief Expert Accessibility Consultant | $ 1,261,215 |
| Additional Staffing | $ 268,584 |
| Total | $ 2,352,103 |

The additional funding for systems was needed to comply with the VCA requirement of allowing housing developments in the City not covered by said Agreement to post information about their properties on this website within 360 days.  This website will give persons with disabilities a single, reliable place to look for affordable and accessible rental housing.   The funding allocated for systems will also ensure that HCIDLA's entire website will be fully accessible to the highest current standard throughout the 10-year term of the VCA. HCIDLA has spent considerable efforts to ensure that the Accessible Housing Program website and all of its documents meet this very high accessibility standard, but funding to bring the entire Department's website into compliance was not contemplated prior to the execution of the VCA.

The funding for the Chief Expert Accessibility consultant services also needed to be increased because the VCA requires a more detailed documentation survey, different standards for surveying, and an accelerated surveying schedule. The VCA requires a "Neutral Accessibility Consultant" or "NAC" to perform all of the expert accessibility consultant duties required under the CSA, with several additional responsibilities.  Further, the accessibility standards to be used differ from those identified in the CSA and include compliance with the Fair Housing Act for developments constructed after 1991.

**Appendix 11**

These differences create a significant hurdle for the City to ensure compliance with both the VCA and the CSA and utilize a single set of accessibility standards to hold our developers and contractors to. Additionally, the VCA requires verification of compliance with the Fair Housing Act for applicable properties. The Fair Housing Act applies to properties first occupied after March 1, 1991. This means that in addition to the required number of fully accessible units, the City must survey additional units of each type (i.e. floorplan). Because most affordable housing developments include multiple floor plans for each bedroom size, it is anticipated that the total number of units to be surveyed will increase by more than 20%, tripling the number of units inspected at each property. Finally, the VCA requires that the NAC complete all surveys of existing properties within three years of execution of the VCA.

To address the additional staffing required to meet the survey requirements of the VCA and CSA, HCIDLA anticipates that the amount of overtime worked will increase to 6 hours per week and $124,584 was requested to cover the cost of overtime. In addition, to address the increased workload to launch the Accessible Housing Web Registry, in June 2019, HCIDLA assigned four As-Needed Administrative Clerks to help update and upload the property information. Therefore, HCIDLA requested funding totaling $144,000 in the Salaries As-Needed account to continue to fund four As-Needed Administrative Clerks through June 30, 2020. Since the increase in workload required to implement the VCA is not temporary, HCIDLA will request position authority and funding for full time Administrative Clerks through the 2020-21 Proposed Budget process.

On April 7, 2020, the Council approved forthwith granting authority to HCIDLA to award a contract to the following four (4) contractors - ARO Construction, Emac Construction, Inc., Omega Contractors, Inc., and Sarahang Construction - to perform licensed general contractor services, which include, but are not limited to, demolition, abatement, and retrofit work for compliance with accessibility standards of acceptable quality in accordance with all federal, state, and local requirements. The funding amount for these contracts was set at $6,000,000 each, however, specific funding was not allocated because the anticipated contractual expenditures for the general contractors for fiscal year 2019-20 and 2020-2021 were supported in the Adopted Budget.

## 6.    AcHP Semi-Annual Reporting

Settlement Coordinator addressed this item in the Semi-Annual Report for the prior period from July to December 2019, which essentially was a statement of the multiple reports that the Settlement Coordinator is required to submit under the CSA and at the direction of the Court Monitor, and in the capacity of the VCA Administrator those that are required under

the VCA to HUD.  During this period and in great appreciation to the assistance and innovative collaboration of the AcHP staff and their creation of a data tracking process that will eventually transfer over into the comprehensive database has helped to streamline my reports.

## C. Substantive CSA Requirements

1.   **Progress Toward Target Number of 4000a Accessible Units**

   a.   A total of **76 accessible units have been surveyed and recommended for certification by LCM in 7 developments** as follows:  4 are substantial rehabilitation; 3 are new construction. All are pending finalization of the verification and certification form. See attached <u>Table 1: Certified Developments Pending Issuance of Verification and Certification Form</u>.

   b.   There are **23** new developments on schedule for completion by December 2020 consisting of **295 accessible units**.  Of these, 7 new construction developments have been completed and are only pending final verification for certification by the NAC.  All 7 have been previously surveyed by LCM, issued corrections, and AcHP has verified completion of the corrections prior to allowing lease up and occupancy.  Due to the COVID-19 Pandemic, LCM has suspended travel to Los Angeles and thus final NAC site verification inspections have been suspended. Final verification inspection of 1 of the 7 developments, Jerome Elder Place Senior Apts. was conducted by Court Monitor's expert, Eric McSwain.  **There are a total of 112 accessible units in these 7 developments that are currently ready for final verification for certification.**  See attached <u>Table 2: 2020 New Construction Production Status</u>.

   c.   Upon the resolution of the format of the verification/recommendation for certification of accessibility compliance and City's certification by the Court Monitor and HUD, a total of **188 accessible units can be certified in 14 new and substantial rehabilitation developments as listed in Tables 1 and 2**. City had proposed that the VCA verification and certification form be modified in order that a single form could be utilized for both the CSA and VCA.  It is City's understanding that HUD did not agree to this modified form.  City then requests two separate certification forms be issued to a development and that the Court Monitor finalize a NAC verification/recommendation and certification form for use under the CSA.

---

**Appendix 13**

    **d.** There are **6** substantial rehabilitation developments on schedule for completion by December 2020 consisting of 11 sites with **60 accessible units**. See attached <u>Table 3: 2020 Substantial Rehabilitation Production Status</u>.

    **e.** During this reporting period, LCM conducted accessibility site surveys of 12 new and substantial rehabilitation developments that were in construction. See <u>Table 4:  2020 LCM Surveyed Sites</u>.

## 2.  Accessible Housing Unit Plan

During this reporting period, the AHUP working group met on February 11, April 24 and June 4, 2020.   AcHP had transmitted the documents to the Court Monitor and AHUP working group members on December 11, 2019.  At the February 11, 2020 AHUP working group, paper handouts were distributed that included a list of 2019 LCM completed site surveys with a breakdown of which survey reports had been received and required corrections and/or reports had not been received.

Discussion occurred as to the impact of the differences between the CSA and VCA accessibility standards and the impact on the Tier 1 approved retrofit priority retrofit projects selected by the AHUP working group on May 7, 2019.  Also included were the LCM 2020 surveyed properties for which LCM reports had been received and highlighted by prioritized category for AHUP working group members to score.  The documents also included the new and substantial construction developments in construction that would also be part of the 2020Annual Production Schedule.  AcHP also identified developments as to which were non-FHA and FHA, which would likely result in the need for resurvey of those that were FHA developments.

Prior to the COVID-19 Pandemic impact of suspension of inspections of occupied developments, AcHP had completed bid walks with City's general contractor of Panama Hotel Apartments, Leaster Apartments, St. James Apartments, Rosslyn Hotel, and Chinatown Metro.  Through the bid walks, AcHP learned of changed field site conditions at Rosslyn Hotel and Chinatown Metro, which removed these two developments as they would require tenant relocation.  Also, during this period, AcHP proceeded with the preparation of scopes of work and cost estimates in preparation of bid packages, and increased the total number of general contractors from one to five.  Recommendations for selection of architects was completed during this reporting period and transmittal to City Council for approval will occur in the next reporting period.

---

**Appendix 14**

No action was taken at the meeting to allow for working group members to review and regroup at the next AHUP meeting.  Electronic copies of the handouts were sent to AHUP working group members on February 12, 2020.  Follow-up AHUP working group meetings were held on April 24, 2020, May 12, and June 4, 2020.  Revision to the lists to separate the retrofit, new construction, and substantial rehabilitation developments into separate tab sheets was requested at the April 24 2020 meeting and provided to members in advance of the May 12, 2020 meeting.  Plaintiffs' counsel for ILCSC and CALIF was unable to attend the May 12, 2020 meeting.  AcHP presented the revised documents.  No action was taken and a follow-up meeting was held on June 4, 2020.  No action was again taken and all were requested to submit their scoring prior to the next meeting.

3.    **Enhanced Sensory Program in Existing Developments**

Pursuant to the timeline set forth in the VCA, City's proposal for the development and implementation of the Enhanced Sensory Program was submitted to HUD at the end of January 2020 and shared with Plaintiffs and Court Monitor.  On April 22, 2020, City received HUD's comments along with their technical guidance.  These were also shared with Plaintiffs and Court Monitor.

On June 24, 2020, City received from Plaintiffs' counsel for ILCSC and CALIF, the comments that they had submitted to HUD and list of organizations that serve persons with sensory disabilities.  AcHP has reviewed the comments from both HUD and Plaintiffs' counsel, HUD's technical guidance, and also has obtained collaborative input from City's Department of Disability and City's Disability Commission.  Accordingly, AcHP is in the process of revising the proposal and will be submitting it and proposed next steps to Plaintiffs, Court Monitor, and HUD for review and further input.

During the next report period, AcHP will be focusing on the development of a community outreach toolbox to facilitate the active involvement and input from the disability community and organizations that advocate and serve the target community with sensory disabilities and formation of a working group to collaborate and contribute to the development of the Enhanced Sensory Program in existing developments.

Due to COVID-19 Pandemic and other reasons tied to the State, the Notice of Funding Availability (NOFA) regulations were delayed.  HCID has not held a competitive funding round since late 2018, wherein both 2019 and 2020 projects funding awards were made.  So this will be HCID's first competitive funding since the execution of the VCA.  HCID is in

**Appendix 15**

the process of revising the regulations for the AHMP (Affordable Housing Major Projects) for 2021 projects.

HCID is currently targeting submission to the City Council for review and approval in September 2020 with a mid- to late October 2020 release.  This is an aggressive timeline given the City Council's approval process.  However, it is lined up with projects that will be seeking funding in the March 2021 and July 2021 TCAC rounds.  The NOFA regulations will include the requirements of VCA Paragraph 30 and Appendix 5 and have been included in the draft.

4.    **Internet Accessible Housing Registry**

During this report period, three new construction developments were posted on the Accessible Housing Registry in the "Open" category and applications submitted through the Registry were included in the lottery tenant selection process for those developments.  The table below summarizes the registry applications submitted through the Registry for each development.

| Property Name | Application Start Date | Application End Date | Applied during Open Application | Applied for Wait List after Application End Date | Total Application |
|---|---|---|---|---|---|
| Path Metro Villas Phase II Buildings B and C | 1/13/2020 | 2/04/2020 | 151 | 17 | 168 |
| Florence Mills | 4/15/2020 | 6/15/2020 | 1897 | 6 | 1,903 |
| Pico Robertson Senior Community Apartments | 6/12/2020 | ETA 7/20/20 | 87 | | 87 |
| Total | | | 2,135 | 23 | 2,158 |

**Appendix 16**

This Table provides the summary of applications as of June 30, 2020 that have been submitted through the Registry by accessible unit type for the following development categories – "Wait List" and "In-Development".

| Housing Registry Status | Mobility Unit | Hearing/Vision Unit | Total |
|---|---|---|---|
| Wait List | 5,263 | 676 | 5,939 |
| In-Development | 680 | 116 | 796 |
| Total | 5,943 | 792 | **6,735** |

The Registry not only enable applicants with disabilities and housing advocates who are assisting applicants with disabilities to submit an application and be included in the lottery tenant selection process for developments in the "Open" status and for an accessible unit wait list, but it also provides a pool of applicants with disabilities to whom the covered housing developments can affirmatively market and outreach to when they have been unable to identify qualified applicants on their wait lists (Section 2.9 of the Fair Housing Policy Related to Disability). During this reporting period, there were two developments that sent email notifications of availability of vacancy to qualified applicants who were registered with the Registry.

- Ybarra Village – for (6) 1-bedroom vacant Mobility Unit – 1,674 registered applicants on the Registry received vacancy email notification on 4/24/2020.
- Rittenhouse Square – for (1) 1-bedroom vacant Hearing/Vision Unit – 260 registered applicants on the Registry received vacancy email notification on 5/7/2020.

During this period, there were a total of 8,102 active registered users Please see the summary of registered accounts total for each Account Category.

| Account Category | Registered Accounts Total |
|---|---|
| Housing Advocate | 65 |
| Owner/PM | 471 |
| Applicants | 7,566 |
| Total | **8,102** |

**Appendix 17**

5. **Coordinated Entry System**

In the Monitor's Supplement to January 28, 2020 Status Conference Report, the Monitor requested information from the parties regarding LAHSA, and City submitted responses to the six (6) inquiries raised by the Court Monitor as to whether the CSA's obligations applied to LAHSA and the coordinate entry system (CES) referral and placement process.

On April 27, 2020, the Court Monitor provided the City with a document identifying seven remedial objectives relating to LAHSA and requesting information for each. The City advised the Court Monitor that it would review and discuss the document with LAHSA and gather the requested information. The City shared the Court Monitor's request with LAHSA and held a discussion with their legal counsel to discuss the requested items and submitted the information that was shared with the City by LAHSA on each of the items and the information that the Court Monitor requested from the City.  See attached <u>City's Update and Response to Monitor's LAHSA Remedial Objectives and Information Requested</u>.

The referral and placement of applicants through the CES process is a shared concern by all stakeholders and is a challenge that will require collaborative input from all stakeholders.

6. **Adoption of Uniform Marketing and Leasing Policies by Owners and Property Managers**

During this reporting period the revised City's policies including input by Plaintiffs and consisting of the Fair Housing Policies Related to Disability: Guidance and Requirements for Owners and Managers; Tenant Handbook:  Rental Occupancy Policy Relating to Disabilities; Appendices 1 through 9 was finalized and approved by HUD effective January 21, 2020.  Pursuant to the requirements of the VCA and the January 28, 2020 Court Monitor's report to the Court, notifications to all covered housing developments was sent to distribute the policies to the tenants of their developments, to execute and return the Self-Certification of the revised Policies by March 5, 2020.

As of June 30, 2020, 457 properties have submitted Self-Certifications of Adoption of the Policies, and 407 distributed the policies and submitted acknowledgements of receipt by tenants.  Throughout this reporting period, AcHP policy analysts have been undertaking follow-up communications with developments to submit and comply with the multiple policy compliance requirements set forth in the MCE Plan, and are continuing to do so.  The City has utilized the background clearance check as an enforcement tool to achieve compliance from developments requesting additional funding or refinancing approval from the City.  A

**Appendix 18**

total of 127 developments are pending issuance of certification for policy adoption and compliance with the CSA-VCA revised policies.  See attached <u>Policy Certification and Compliance Status Report as of June 30, 2020</u>.

### 7.  Training of Owners and Property Managers

Due to the COVID-19, City's in-person Fair Housing Training sessions were suspended on March 13, 2020 and notifications sent to all enrollees for the scheduled March 2020 training sessions.  Between April and May, AcHP undertook steps to transition, learn, and develop online training utilizing the GoToWebinar format.   AcHP, with the support and assistance of the Office of the Mayor, received technical assistance from City's IT department, Personnel, and HCID's System staff and was able to kick-off the first GoToWebinar training on May 26 and 27, 2020.  Many lessons were learned and corrective steps implemented to improve and reduce the impact on Cap staff resources.

a. **Fair Housing Training -** Fair housing policy related to disability training for owners and property managers is ongoing. Training sessions were scheduled with up to two sessions per month. Updating of training materials and development of refresher training materials were put on hold as a result of the execution of the VCA.  Pursuant to the VCA the training materials were submitted to HUD for review.  Fair Housing Policy training materials and the policy compliance procedures training were revised to address the additional policy requirements set forth in the VCA.

   At the direction of the Court Monitor, these were shared with Court Monitor and Plaintiffs on an ongoing basis with each revised version exchanged between HUD and City.  The review, comment, and revision process of the training materials has not yet been finalized.  On June 24, 2020, City received Plaintiffs' comments on the revised training materials.  City is finalizing the revisions to the training materials in response to HUD's April 22, 2020 comments and to Plaintiffs' June 24, 2020 comments.  City will submit these revisions to HUD, Court Monitor and Plaintiffs shortly.

   Fair Housing Related to Disability for Owners and Property Manager training sessions are scheduled for July 30th, August 13th, and August 27th, 2020.

   <u>Fair Housing Training Implementation – Pre-COVID-19 Pandemic Stay Safer at Home Orders</u>

**Appendix 19**

| Training Date | Attendees |
|---|---|
| January 24, 2020 | 28 |
| January 30, 2020 | 80 |
| February 7, 2020 | 80 |
| February 27, 2020 | 94 |
| March 6, 2020 | 95 |
| March 12, 2020 | 82 |
| **Total** | **459** |

Housing Webinar Training Implementation – During COVID-19 Pandemic Telecommuting operations

| Training Date | Attendees |
|---|---|
| May 26 & 27, 2020 | 262 |
| June 23, 2020 | 100 |
| **Total** | **362** |

**b. Policy Compliance Review -** Policy Compliance Review sessions for the City's revised Rental Occupancy Policies Related to Disability are an ongoing training for owners and property managers on the mandatory policy compliance requirements outlined in both the CSA and VCA for all Covered Housing Developments. Review sessions are scheduled with up to two sessions per month. Updating and development of training materials were put on hold as a result of the execution of the VCA.  Pursuant to the VCA, the training materials were submitted to HUD for review.  Policy Compliance Review training materials and procedures were revised to address the additional policy requirements set forth in the VCA.  Pursuant to the direction of the Court Monitor, these were shared with Court Monitor and Plaintiffs.

Policy Compliance Review Session in the next report period is scheduled for August 19th, 2020.

**Appendix 20**

Policy Compliance Review Training Implementation – Pre-COVID-19 Pandemic Stay Safer at Home Orders.

| Training Date | Attendees |
|---|---|
| January 24, 2020 | 28 |
| January 30, 2020 | 80 |
| February 7, 2020 | 80 |
| February 27, 2020 | 94 |
| March 6, 2020 | 95 |
| **Total** | **377** |

Policy Compliance Review Webinar Training Implementation – During COVID-19 Pandemic Telecommuting operation

| Training Date | Attendees |
|---|---|
| May 19, 2020 | 58 |
| June 4, 2020 | 84 |
| June 24, 2020 | 101 |
| **Total** | **243** |

To date attendance by development roles as required by Monitoring, Compliance, and Enforcement Plan (MCEP) per CSA at Fair Housing Policy Training.  There are currently 847 Covered Housing Developments (approximately 110 are in pre-construction and construction phases).

Note that if the owners/designated representative, property managers, ADA Coordinators, Grievance Coordinators, and Regional Managers do not link themselves to the property, then compliance for that property will not be recorded. The totals per category represent those that have registered and linked themselves to a specific covered property.

**Appendix 21**

- 535 Owners
- 614 Property Managers
- 478 ADA Coordinators
- 439 Grievance Coordinators
- 496 Regional Coordinators

Also, the ADA Coordinator and Grievance Coordinator can be the same individual. See attached Training Compliance Report as of June 30, 2020.

8. **Monitoring Compliance and Enforcement Plan, including AcHP Monitoring and Audits**
   a. **Monitoring and Compliance Activities Under CSA and VCA**
      i. **Accessible Unit Wait List Audit -** Pursuant to ¶43 of the Voluntary Compliance Agreement (VCA) between the City of Los Angeles (City) and the U.S. Department of Housing and Urban Development (HUD), in the next reporting period, the City will launch an audit of all Covered Housing Developments' Accessible Unit Waiting Lists. The Accessible Housing Program (AcHP) will be actively reviewing Accessible Unit Waiting Lists that are submitted as part of the Q2 Quarterly Report Packet for 2020. All Covered Housing Developments are also required to submit their Conventional Waitlists as well. Policy Analysts are currently examining both Wait Lists and comparing the applicants listed in order to confirm that those applicants that requested an accessible unit have secured a spot on both Wait Lists in the correct order to ensure an equal opportunity for all to receive a unit that meets their specific needs.

      ii. **Accessible Unit Transfer Audit -** Pursuant to ¶42 of the VCA between the City and HUD, the City has launched an audit of all Covered Housing Developments' Accessible Unit Transfer Waiting Lists. At this time, the Accessible Housing Program (AcHP) has concluded its data collection of 346 Covered Housing Developments that have submitted both the Utilization Survey of Occupancy and the Q1 Quarterly Report Packet, and is in continued communication with the Covered Housing Developments to address any outstanding issues regarding the reported Accessible Unit Transfer and Reasonable Accommodation requests.

      iii. **Quarterly Review -** To date, AcHP has received 533 Q1 Quarterly Report Packets submitted by Covered Housing Developments. The Q2 Quarterly Report is due by 7/10/2020. As part of our ongoing monitoring of compliance, policy analysts carefully review the data within the Quarterly Report Packets in search

**Appendix 22**

of any inconsistencies that may trigger the need for further investigation and potential site audit of a development. Typical red flags can range from the omission of aggregate data from one quarter to the next, improper practice of Fair Housing policies, such as listing a unit as vacant when there are several qualified applicants available on their Accessible Unit Transfer List. Such inconsistencies are initially addressed at the property management level, with the issuance of corrective actions and investigations via interactive communication into whether these errors are to be considered accidental data entry mistypes, or whether there are underlying issues with the implementation of Fair Housing laws and Rental Occupancy Policies at the development. Disciplinary actions for the latter begin with a site audit, and can be escalated as necessary pursuant to ¶55 of the VCA, and ¶III of the CSA.

iv.   **Property Management Plan Review -** The Accessible Housing Program revised the Property Management Plan (PMP) template in February 2020 to incorporate the requirements outlined in the VCA. All Covered Housing Developments were notified of this change, and the requirement to update their PMPs utilizing the new template on February 28, 2020. As of June 30, 2020, 374 Covered Housing Developments have updated their PMPs to the revised template. Policy analysts are currently reviewing the data as well as all supporting documents submitted with the PMPs for accuracy and compliance of all policies included by the developments with the required guidelines of the revised Rental Occupancy Policies. This is an interactive process which involves the revision of any conflicting development policies, such as the vacancy policy, objective selection criteria, tenant selection process, grievance procedures, and rental application package. Review of the PMPs is prioritized for all new developments currently in construction scheduled to undergo initial lease up within the next 120 days, developments scheduled for major rehabilitation that are utilizing relocation plans, and then the remaining existing Covered Housing Developments in the order of submission.

## 9.  Self-Evaluation/Transition Plan

There is nothing to report during this period.

## 10. Effective Communications

**Appendix 23**

The implementation of the City's effective communication policy is ongoing to ensure accessibility of documents, HCIDLA and AcHP websites and the Accessible Housing Registry.  In addition, compliance and provision of effective communication through and on affirmative marketing, application, tenant interactions and materials is monitored and required by policy analysts of the developments.  See also Enhanced Sensory Unit Program above.

To ensure compliance with compliance with the CSA and VCA's requirements relating to ensuring effective communication and the provision of auxiliary aids and services to applicants and tenants by covered housing developments, City will be undertaking steps to develop an effective communication training video (YouTube) to provide to developments for the training of all staff that interact with applicants and tenants.

## 11. Grievance and Complaint System

Attached is the list of grievances or complaints that were received by HCID during this reporting period through the Grievance Procedure.  Status of grievances and actions have been provided in the monthly reports. The integrated database development includes enhancements to the grievance module including a list of categories, appeal procedure.

**Appendix 24**

# AcHP Organization Chart



610 ACCESSIBLE HOUSING PROGRAM

NOTE: Substitute positions are temporary authorities that are approved through June 30, 2020. Effective July 1, 2020, these substitute positions will be replaced by resolution position authorities in the new Fiscal Year 2020-2021 Budget.

**Appendix 26**

# Email from Tricia Keane to Bill Lee,

# August 7, 2020

**Ana Diaz**

| | |
|---|---|
| **From:** | Bill Lann Lee |
| **Sent:** | Tuesday, August 11, 2020 3:09 PM |
| **To:** | Ana Diaz |
| **Cc:** | Amy Robertson |
| **Subject:** | FW: FW: 1st Qtr 2020 AcHP Staffing Status |
| **Attachments:** | Q30_2nd QTR 2020 Staffing Report thru 06302020.pdf |

This page 5 email to Bill. Correct date is 8/7

**From:** Tricia Keane <tricia.keane@lacity.org>
**Sent:** Friday, August 7, 2020 3:34 PM
**To:** Bill Lann Lee <blee@creeclaw.org>
**Cc:** Yono Hong <yono.hong@lacity.org>
**Subject:** Re: FW: 1st Qtr 2020 AcHP Staffing Status

Hi Bill,

Attached is the table you normally receive with the numbers updated through 06.30.2020.

I'd also like to mention a couple highlights. Since April, we have filled 2 Management Analyst positions and 1 Senior Admin Clerk. The new employees start on August 16, 2020.

We are also moving forward to fill the remaining vacancies on the AcHP team. Despite the citywide hiring freeze resulting from the $500 million shortfall due to COVID-19, AcHP has the opportunity to get relief because of the critical nature of the accessibility work. As a result, right now we have three positions that we are authorized to fill, and we started the process to fill those positions earlier this week. We expect that we'll be able to interview and make offers for those positions within the next few weeks.

We are also securing approval to unfreeze the rest of the vacancies in AcHP - mostly on the monitoring, education, and compliance team - to fill on an emergency basis. We will keep you updated as that progresses.

Please let me know if you have any questions or need additional information.

All the best,
Tricia



**Tricia Keane | Executive Officer**
**Housing + Community Investment Department**
1200 West 7th Street, 9th Floor, Los Angeles, CA 90017
O: 213.808.8405

1
**Appendix 28**

# Email from Bill Lee to Sharon Lowe,

# July 8, 2020

**Ana Diaz**

| | |
|---|---|
| **From:** | Bill Lann Lee |
| **Sent:** | Tuesday, August 11, 2020 3:18 PM |
| **To:** | Ana Diaz |
| **Cc:** | Amy Robertson |
| **Subject:** | FW: ILCSC, Comprehensive Database Issues |

Page 8 email from BLL to Sharon

**From:** Bill Lann Lee
**Sent:** Wednesday, July 8, 2020 4:32 PM
**To:** sharon.lowe@lacity.org; Jeffery Elder <jeffery.elder@lacity.org>
**Cc:** Amy Robertson <arobertson@creeclaw.org>; Tim Fox <tfox@creeclaw.org>
**Subject:** ILCSC, Comprehensive Database Issues

Sharon,

I wanted to clarify two issues regarding the comprehensive database and other projects.

First, I understand that the completion date for the comprehensive database is the end of December 31, 2020 and not July 2021 as I thought I had been told earlier by AcHP management. I am glad that the completion date has not been pushed back. However, I did want to make clear what completion means: That the comprehensive database can be used at the point of completion to produce compliance reports. See Order Re Further Proceedings 2 (December 19, 2019) ("data will be collected into a comprehensive database to reliably inform the Court and the Monitor regarding compliance with " the CSA.).

Second, I understand that AcHP follows the practice of adding extra time to or extending due dates for projects when the Monitor or his experts make comments as end users for improving the product. Examples are the database and the Registry. I believe this practice is erroneous as the comments of the Monitor or the input of the Plaintiffs should be figured into the original setting of deadlines. Under the structure of the CSA, the Monitor is supposed to review and comment and the Plaintiffs are entitled to provide input. So AcHP should reasonably anticipate such comments or input. I understand that the City has concerns about micromanagement; if you believe that any comments or input have shaded into micromanagement, you should take it up with me and I will look into it."

BIll

# AcHP Monitoring Activities During COVID-19 Pandemic (March 19, 2020 - June 30, 2020)

| | AcHP Monitoring Activities During COVID-19 PANDEMIC<br>(March 19, 2020 thru June 30, 2020) |
|---|---|
| **1** | **Fair Housing Training Implementation** |
| a. | Pre-COVID-19 Pandemic Stay Safer at Home Orders , 5 Training sessions conducted with a total of 431 attendees. |
| b. | During COVID-19 Pandemic Telecommuting operations, AcHP with the support of the Mayor's office, City's ITA, Department of Disability, Personnel Departments, HCIDLA's Systems Team, and our Fair Housing Policy Trainers, AcHP worked on the development and implementation of online training webinar. |
| c. | AcHP and Fair Housing Trainer shared the webinar polling questions, training PowerPoint presentation and met with D.Schur for ILCSC and CALIF and with Sharon Kinlaw, Sandra Couch and Mary Scott Knoll and received suggestions for revisions to the polling questions and answers and update to categories covered under California Fair Housing Law. |
| d. | On May 26 and 27, 2020 and June 23,2020, AcHP held  online Fair Housing Training Webinars.  A total of  244 participants attended plus 3 plaintiff representatives. |
| e. | The  initial webinar was held on 2 days due to scheduling availability of the GoToWebinar. Staff and trainers conducted assessment of lessons learned and next steps.  Extensive staff time was diverted to address pre-registration issues that arose due to multiple issues relating to failure of participants to follow  instructions; staff tracking of GoToWebinar registration for both days to ensure that attendees participated in both sessions; staff tracking of AcHP training module enrollment to ensure capture of   training compliance and certificate issuance through AcHP database; additional staff post-analytics and verification of compliance based on actual attendance. |
| f. | The 2nd  webinar was a one-day session to a targeted list of developments; implementation of registration through AcHP online training portal with link to GoToWebinar registration.  Decision  was made to conduct a single day training in order to fully assess pros and cons of 2-day versus 1 day webinar training.  The one-day session had a reduced impact on staff resources, less registration confusion, and less technical glitches. |
| g. | To date attendance by  development roles as  required by Monitoring, Compliance, and Enforcement Plan (MCEP) per CSA at Fair Housing Policy Training.  There are currently  847 Covered Housing Developments ( approximately 110 are in pre-construction and construction phases).  Note that if the owners/designated representative, property managers, ADA Coordinators, Grievance Coordinators, and Regional Managers do not link themselves to the property, then compliance for that property will not be recorded.  The totals per category represent those that have registered and linked themselves to a specific covered property.  Also, the ADA Coordinator and Grievance Coordinator can be the same individual. |
| | ◦ 535 Owners |
| | ◦ 613 Property managers |
| | ◦ 476 ADA Coordinators |
| | ◦ 439 Grievance Coordinators |
| | ◦ 493 Regional Managers |
| h. | Transmittal to Council and CAO Report for contract amendment to Fair Housing |

**Appendix 32**

| | AcHP Monitoring Activities During COVID-19 PANDEMIC (March 19, 2020 thru June 30, 2020) |
|---|---|
| 2 | **Notifications to Developments of Ongoing Policy Monitoring and Compliance Requirements (Notifications listed reflect all sent in 2020 as deadlines and extensions for submittal may have occurred after March 19, 2020.** |
| a. | 1/1/2020 Notification of Due Date for Mandatory 4th Quarterly Report |
| b. | 1/6/2020 Notification of Failure to Comply With Mandatory Requirements: 1. Register and update Property Contact Information on AcHP Website at accesshousingla.org; 2. Affirmative marketing listing of property and accessible unit information on Accessible Housing Registry; 3. Mandatory Annual Fair Housing Policies Training; 4. Submittal of Acknowledgement of Receipt of VCA; 5. Completion of Utilization of Survey of Occupancy; 6. Submittal of all waiting lists. |
| c. | 2/5/2020 VCA Notification of Revised Policies, Distribution, Posting & Self-Certification Requirements |
| d. | 2/21/2020 Notification to Comply with Mandatory Annual Training Requirement applicable to  Development's Designated Owner Representative;;On-Site Property Manager; Regional/Compliance Manager; ADA/Accessibility Coordinator (must be senior staff); and Grievance Coordinator (must be senior staff, can be same individual as the ADA/Accessibility Coordinator) and deadlines for compliance. |
| e. | 2/28/2020 Notification to Submit Updated Property Management Plan within 60 days of Adoption of Revised Policies and no later than May 4, 2020 |
| f. | 3/13/2020 COVID-19 PANDEMIC CRISIS - Notification to Training Enrollees of Cancellation of March 2020 Training |
| g. | 3/31/2020 COVID-19 PANDEMIC CRISIS - Continuation of AcHP Policy Compliance Monitoring &  Reminder of 1st Quarterly Report Due Date. |
| h. | 4/6/2020 Accessible Unit Transfer Request Audit Follow-up Notification |
| i. | 4/7/2020 COVID-19 Eviction Moratorium Notification and of Continuing Obligation to Comply with Fair Housing Laws and the City's Rental Occupancy Policies and of City's continuance to monitor and enforce these obligations. |
| j. | 5/15/2020 COVID-19 PANDEMIC CRISIS – Accessible Housing Program (AcHP) Mandatory Annual Fair Housing Training Resumes Online via GoToWebinar –  2-Part Session on May 26 and May 27, 2020 |
| 3 | **Policy Monitoring Activities** |
| a. |  Receipt, review analysis, cross-checking, and follow-up corrections issued relating to 2019 4th Quarterly Reports -416 property sites submitted - completed |
| b. | Receipt, review, summary analysis, cross-checking, and follow-up corrections issued relating to VCA Utilization Unit Occupancy Survey Results - 461 property sites submitted - summary analysis completed; 253 submitted conventional wait lists |
| c. | Conducted Accessible Unit Transfer Audit, follow-up communications and corrections issued relating to cross-check of VCA Utilization Unit Occupancy Survey Results and 2019 4th Quarterly Report - review of follow-up responses in progress |

**Appendix 33**

| | AcHP Monitoring Activities During COVID-19 PANDEMIC (March 19, 2020 thru June 30, 2020) |
|---|---|
| d. | Receipt, review analysis, cross-checking, and follow-up corrections issued relating to 2020 1st Quarterly Reports -614 property sites submitted - (to date 470 AU Transfer Lists; 467 AU Waiting Lists) |
| e. | 374 Update Property Management Plans (PMP) received and currently under review; 143 issued corrections; 84 corrections received and under review. |
| f. | Self-Certification/Adoption of Revised Policies - 457 property sites submitted ; Distribution of Revised Policies to residents (suspended due to COVID-19) - 407 property sites submitted |
| g. | Assistance Animal Fee Refund Log and Issuances of Refunds - 495 submitted logs and 13 also refunded fees |
| h. | Online Webinar Policy Compliance Review Sessions held - May 19, June 4, and June 24, 2020 - total of 239 attendees. |
| i. | Coordination with HCIDLA Contracts, procurement & Accounting, Controller's Office, and Chief Administrative Office (CAO) re: expediting process for procurement of Auditor Expert; Preparation of Draft Auditor Expert Request for Bids (RFB). |
| 4 | Background Clearance Checks - Required for Developments seeking financial assistance, refinancing, TCAC support from Department. Effective ongoing tool to enforce compliance with both policy and physical accessibility compliance. 49 requests from Asset Managements by Developer/Project Name |
| a. | 33 Completed Background checks consisting of 311 projects. Includes initial and follow-ups. : New Economics for Women (17) , TSA (20), Mercy (8), TPC (2), Westlake Mercy House (6), Skid Row Housing Trust (22), Decro/Daylight (10), Western Community Housing (42), LINC (5), LAHP (16), Amcal (17), Klein Financial (3), HCHC (32), CRCD (11), Bridge (2), LAFH (15), Affordable Housing CDC (10), Affirmed (6), Abode (22), Abbey Road (7), 1010 Development(33), 841 Banning (5). |
| 5 | **Database Development** |
| a. | Standing weekly meetings with Systems, 3Di, HCID Occupancy Monitoring Unit on Affordable and Accessible Housing Registry (AAHR); enabling online search for accessible housing in non-AcHP developments and online search of all affordable housing developments in the City. |
| b. | Standing and as-needed meeting with Systems and 3Di on policy compliance module enhancements - quarterly reports, PMP, compliance review, certification |
| c. | Training and grievance module enhancements |
| d. | Construction Module Development - Standing weekly and as-needed meetings with Systems and 3Di - CASp design and plan review and approval process; NAC and AcHP inspection process for new construction, substantial rehabilitation, and retrofit projects; scope of work, cost estimate, bid and relocation process for retrofit projects; compliance monitoring matrix. |
| e. | AAHR Update Schedule: 1. AAHR launch date delayed to 9/21/20; 2. 6/29/2020 UAT introduction meeting for HCIDLA AcHP Policy and Occupancy Monitoring Staff; 3. UAT on AAHR, Policy Module, Grievance Module, and Training Module; 4. Production of AAHR, Online PMP, and QRT Report - 9/21/20; Production of Construction Module and Reporting Module - Dec. 2020 |

**Appendix 34**

| | AcHP Monitoring Activities During COVID-19 PANDEMIC (March 19, 2020 thru June 30, 2020) | |
|---|---|---|
| **6** | **Notifications to Developments of Accessibility Monitoring Protocols and Procedures** | |
| a. | Los Angeles Housing + Community Investment Department's Accessible Housing Program (HCIDLA AcHP) Plan Stamping Protocols with COVID-19 Precautionary Safety Guidelines | |
| b. | AcHP Inspection Form and Safety protocols for Inspection of Unoccupied Developments in Construction during COVID-19 Pandemic | |
| c. | AcHP Clearance in LADBS ACOS (Automated Certificate of Occupancy System) prior to issuance of TCO. | |
| d. | AcHP Interim COVID-19 Pandemic TCO & Occupancy Verification Procedures | |
| **7** | **AcHP Retrofit Unit Accessibility Monitoring Activities** | |
| a. | CASp Design Report & Plan Review, Issuance of Corrections, and Approval of Report and Plans | |
| b. | Rough, Progress, and Pre-Final Inspections and Accessibility Compliance Reports of 26 developments since COVID-19 Pandemic Stay Safer at Home Order | |
| d. | Update to Draft AHUP Scoring Sheet and Proposed 2020 Annual Production Schedule | |
| e. | Execution of contracts with general contractors and architects for implementation of AcHP Retrofit Program | |
| f. | Finalizing negotiations; preparation of scope of services, and Council Motion for sole source contract with CAS Inc. (Glenn Dea's Team) for NAC services | |
| g. | Ongoing discussions with Court Monitor and HUD re: retention of ETA for NAC services | |
| **8** | **Grievance Investigations, Appeals, Responses and Referrals to Inquiries not covered by AcHP** | |
| a. | 24 Grievances were filed; 20 were closed; 4 are open | |
| b. | 1 Grievance Appeal was filed; Determination was upheld with a modification. | |

**Appendix 35**

# Revised Response of ILCSC and CALIF to Monitor's Request for Input on August 2020 Semi-Annual Report

## ("ILCSC/CALIF Revised Resp.")

## Revised Response of ILCSC and CALIF to
## Monitor's Request for Input on August 2020 Semi-Annual Report

August 3, 2020

I.    **Introduction**

As the Parties prepare to observe the fourth anniversary of the settlement in early September, the results are disappointing.  The roots of the City's performance issues pre-date the Covid-19 limitations imposed in March 2020, and lie in lack of management capacity, insufficient staffing, the failure to collect and analyze critical data, and resistance to constructive input from the Plaintiffs and the Court Monitor.  As a result—seven months after ILCSC and CALIF brought their concerns to Judge Olguin in the form of a motion to enforce the Corrected Settlement Agreement ("CSA")—there is still not a single unit certified as meeting the CSA's Accessibility Standards, hundreds of Covered Developments have not implemented the CSA's policy requirements and hundreds more have only partially implemented them, Angelenos with disabilities cannot use the Registry to research and apply for the entire inventory of Accessible Housing Units, and no apparent progress has been made on the Enhanced Sensory Program.

ILCSC and CALIF fully appreciate that the Covid pandemic has hit hard in Los Angeles.  They responded to invitations from Judge Olguin and the Court Monitor to identify activities the City could continue to undertake, and those that would have to be suspended in the interest of public health, and these were reported by the Monitor.  Monitor's Supplemental Report, April 15, 2020, ECF Doc. 679.

If the City is serious about getting the CSA "back on track," it is essential that it establish—and actually meet—deadlines for performance, consistent with Judge Olguin's expressed view that such deadlines (and accompanying sanctions for noncompliance) are "necessary to keep [the CSA] implemented [and] to ensure that the City complies with the consent decree…." Transcript, at 34.

**Appendix 37**

ILCSC and CALIF are not opposed to negotiating revised deadlines to reflect the impact of Covid limitations, where they have actually delayed some tasks, but these revised deadlines must be honored.  And the City must accelerate its efforts on tasks not delayed by Covid, such as the inspection and certification of empty units, enforcement activities to ensure owners had complied with CSA policy requirements, timely development of a functional Registry and comprehensive database and ensuring that the Coordinated Entry System was being run in compliance with the CSA.    At this point, the best path forward is to request that Judge Olguin enter an "amended consent decree," *id.* at 38, and that the Monitor establish a CSA Calendar to track (and enforce) the City's compliance with its obligations.

## II.    CSA Infrastructure Requirements

### A.    Staffing for Accessible Housing Program ("AcHP")

**1.    Highlights.**  The City has increased staffing to 46, an increase over prior years.  Q30_2d Qtr 2020 Staffing Report ("Staffing Report").  Through retention of experts,[1] the City will enhance its ability to comply with the requirements of the Corrected Settlement Agreement ("CSA").  The City has moved to replacement of LCM with ETA.

2.    **Challenges:** The City had three challenges in the last six months impacting hiring.  The first was the COVID 19 pandemic.  The second was the loss of 2 senior staff: Rushmore Cervantes and Laura Guglielmo**.**  The third was the inadequate performance of LCM, the architectural expert.

---

[1] As outlined below, the City has agreed to retain Evan Terry Associates ("ETA") to replace LCM as the City's architectural expert, and will use an expedited process to retain an Audit Expert to assess owner/manager compliance with the CSA's policy requirements.

In January 2020, the City "propose[d] to more than double AcHP's present complement of 39" and to "share the final functional analysis and final staffing plans with the parties and the Monitor when the City takes final action on HCID's request for increased staffing and funding to meet the requirements of the Court's tentative order."  January 28, 2020 Status Conference Report, ECF Doc. 671 ("Status Conference Report"), at 32.  During a meeting in late 2019, Laura Guglielmo suggested that HCID's request to the City Council was for authorized AcHP staffing of 90.

In responding to the Covid-19 limitations, the City was successful in moving its staff to remote operations, and in hiring and training some new staff.  However, the City is still significantly below capacity and below where it promised to be by this point. The City currently has authorized staff of 78, but only 46 on board. Staffing Report. Accessible Housing Semi-Annual Report January to July 2020 at Section (B)(1) ("July 2020 Semi-Annual Report")[2]. (We note the City reports average actual staff, not the current number of staff, the notes are not clear in the staffing report, and no total number or average number of current staff is provided in the Semi-Annual Report ). The lack of sufficient staff is a significant factor in the delays and failures to meet deadlines which are noted below, particularly on the policy front.  The City has now hired and brought on board Ann Sewill, HCID Dpt. Manager (a role she had some years ago), and Tricia Keane, Executive Officer (transferring from the Planning Dpt.).  Both of these staff are highly experienced and are intimately familiar with the City, so we are optimistic they will hit the ground running.  They have expressed their commitment to practical solutions for achieving success, which we appreciate.

---

[2] The pagination in the document is incorrect (every page is numbered 21), so we cite to section numbers instead.)

**Appendix 39**

**3.    Priorities and Initiatives**:  High Priority. A high priority for the City should be hiring a full complement of authorized staff, as well as getting ETA and the Audit Expert on board, as quickly as possible. It should also be a priority to develop a joint staffing needs assessment and staffing plan as indicated by the Court.  Order Re: Further Proceedings, ECF Doc. 663 ("December 2019 Order"), at 2; Transcript at lines 7-12; Status Conference Report at 35-36.  While the City apparently has performed a functional needs assessment and prepared a staffing plan, neither the approved assessment nor the approved plan has been shared with Plaintiffs, even though approval was anticipated by March 1, 2020.  Status Conference Report at 35, lines 24-27; and 36, lines 6-8.  A joint vision of staffing needs and plans will help us set hiring goals and deadlines consistent with a delayed City process due to Covid, and help us reach our joint goals.

We are grateful for Ann Sewill's efforts to expedite the hiring of ETA and the Audit expert, which we think are very important steps that demonstrate good will and a commitment to success.

**B.    Monthly Meetings and Working Group Meetings**

1.    **Highlights/Challenges:**  These meetings have been held intermittently in the past 6 months, but are important components of making progress in implementation.  As the Court noted, it expects cooperation among the parties because is important for effectuating the CSA. December 12, 2019 hearing transcript ("Transcript"), at 8-9.  When they operate well, both the monthly and working group meetings are excellent forums for resolving disputed issues, clarifying misunderstandings, and setting joint goals and objectives. While COVID prevents in-person meetings for the immediate future, the parties have now moved to telephonic and videoconference meetings, which should continue.

**Appendix 40**

2.    **Priorities and Initiatives: Medium Priority.**  We recommend that the meetings continue, but with more structure.  We are pleased with the commitments the City made during the monthly meeting on July 28, 2020.  These meetings work best when the parties share relevant materials at least a week in advance, as well as collaborate and developing agendas for the meetings that identify decisions that need to be made so discussions can be focused (particularly for the monthly meetings).  It would be helpful for the City to be more proactive and collaborative in developing meaningful agendas about areas that need resolution.  The meetings should not be used for reporting that can be done by email in advance (other than updates of late-breaking information).  We also recommend that each meeting include a written record of decisions, deadlines, and task assignments reached during the meeting.  We also recommend that meetings occur by Zoom or similar platforms that allow the parties to see each other, to share documents on the screen, and that include a chat function.

**C.    Development of the Comprehensive Database**

**1.    Highlights/Challenges:**  Notwithstanding clear instructions from the Court—at the December 12, 2019 hearing, Transcript, at 35-36 and in the December 2019 Order, at 2-3— and its own commitment in the January 28, 2020 Status Conference Report, at 24, line 10, the City has failed to complete development of a comprehensive database by July 31, 2020. (While no order or revised consent decree has yet been issued by the Court, the parties have agreed to treat the agreed sections of the Status Conference Report as operative.)[3]  A June 25, 2020, status report from 3Di unilaterally moves "production deployment" to September 21, 2020, and suggests that the version to be released for use by the Monitor and Plaintiffs will lack important reporting functionality

---

[3] Although the Court has not yet issued a revised Consent Decree or Judgment, the City has repeatedly said it would comply with the agreed upon deadlines as reported by the Monitor in the Status Conference Report.

concerning physical accessibility of units and policy compliance.

By combining discussion of the "comprehensive database" and the Registry, the July 2020 Semi-Annual Report conceals the fact that the database will not be ready any time soon, even if the new version of the Registry is slated for public release on September 21, 2020. In late July, ILCSC and CALIF learned from their database expert that the City and its contractor would not even begin development of the database's "reporting modules" until October 2020, and that it would not be complete until at least December 31, 2020. AcHP-Timeline_2020-07-29, at p. 1, Row 16. By failing altogether to report this fact, the July 2020 Semi-Annual Report and the accompanying AcHP COVID-19 Pandemic Monitoring Activities Report ("Updated Monitoring Report 7/23/20") may have left the impression that the database will be ready much sooner. If the City delivers as projected, it will have been more than a year from Judge Olguin's clear direction that the Monitor set a deadline for completion of the database (with "a daily sanction … for the City's failure to complete the database"). Transcript, 36:17-22)

**2.      Priorities and Initiatives: High Priority.** Despite warnings that "a daily sanction shall be imposed for the City's failure to complete the database," Tr. at 35; *see also* Status Conference Report, at 22, the City has shown insufficient time urgency in terms of developing the comprehensive database. More concerning, however, is the fact that there is little evidence that it will contain the capabilities the City agreed to in the Status Conference Report, which provided:

> The database must be able to tie together all relevant data points, and have complete data integration with other relevant Housing Department data systems, including HIMS and the Registry. The City will make the database available on a read-only basis to the Monitor and Plaintiffs' counsel, and will maintain the database and all records and data necessary to verify compliance with the agreement throughout the term of the agreement.

Status Conference Report at 25, lines 4-7. The comprehensive database is the linchpin of the City's accountability for

**Appendix 42**

implementation of the CSA.  Without it, the Plaintiffs, the Monitor and the Court are unable accurately to assess any of the City's claims of compliance.  Furthermore, given the City's defiance of previous instructions concerning the database, we recommend that the Monitor assess a daily monetary sanction against the City until the City delivers a comprehensive database with the capabilities described above.

**D.    Accessibility Protocols, Standards and Surveys**

**1.    Highlights/Challenges:**  The City's decision to discharge LCM Architects and to retain Evan Terry Associates ("ETA") and others capable of timely surveying existing, pre-settlement Covered Housing Developments and those newly constructed or rehabilitated post-settlement is a welcome development in terms of being able to move forward with the application of appropriate and electronic accessibility protocols, standards and surveys.  The ETA approach should drastically reduce the time necessary for production of accessibility reports and dramatically increase the transparency of the process by permitting the Monitor and Plaintiffs to have real-time access to survey results and recommendations.  While the limitations imposed by Covid-19 restrictions will likely make surveys of occupied units difficult for the near future, there is no reason that newly developed/substantially rehabilitated developments, and unoccupied units and common areas in existing developments cannot be surveyed immediately.  There may also be a way to develop a plan to survey occupied units, with appropriate social distancing and sanitation.

**2.    Priorities and Initiatives: Low Priority.**  Inasmuch as ETA has already incorporated into its surveying system the relevant accessibility requirements associated with the Fair Housing Act, the Uniform Federal Accessibility Requirements and Chapters 11A and 11B of the California Building Code, it should not be necessary to expend many resources in further development of protocols, standards and surveys.

**E.    Funding**

**Appendix 43**

**1.     Highlights/Challenges:** In its early July 2020 quarterly submission to the Monitor, the City reports having spent approximately $6.1 million in FY20 administrative costs, $42 million in new construction or substantial rehabilitation costs (although that amount is reported for FY 19/20), and nothing in retrofitting costs.  Notwithstanding these expenditures, and nearly four years after the Effective Date of the Settlement, there are still precisely ZERO units certified as meeting the Accessibility Standards set out in the CSA.

**2.     Priorities and Initiatives: Low Priority**.  ILCSC and CALIF have never put any stock in the City's expenditure rate, because the CSA measures success in terms of actual performance, most notably with respect to actual progress toward the Target Number of Accessible Units, compliance by owners and managers with CSA-mandated policies and practices, and the availability of a Registry that permits people with disabilities to see the accessibility features of developments in all Covered Housing Developments, and apply for them.  The CSA requires the City to make all necessary expenditures until these and other requirements of the CSA are satisfied.  However, we do note that we continue to question the appropriateness and accuracy of the financial reporting, particularly on new and substantially rehabilitated developments, since the City continues to cite the entire cost of the accessible units, not just the cost of making them accessible.

## F.     AcHP Semi-Annual Reporting

**1.     Highlights/Challenges:**  Since the inception of the City's semi-annual reporting obligation in March 2017, ILCSC and CALIF have expressed their concerns that the City's reports are incomplete, internally inconsistent, mechanistic and wooden in nature, with far too little analysis of trends to guide expenditure of human and financial resources.  Since early 2019—when the Monitor requested that monthly or quarterly reporting of specified data and activities—the City has produced more data and documents, but has refrained from sharing any analysis of data or trends. Much of that data is still inconsistent or

incomplete, and fails to address required milestones and parameters.  In the absence of a dynamic, comprehensive database, the City's reporting has relied on "static" reports delivered in Word, PDF or Excel.  The format of such documents has evolved over the years, which means that it is difficult to compare relevant time periods, or to assess the rate of progress in CSA implementation.  The City's inability to provide analysis likely flows from the absence of the database, but also the absence of any direction from HCID leadership demanding such analysis.  As outlined below, the City's July 2020 Semi-Annual Report fails to report such important information as the extent of Owner noncompliance with CSA policies, fair housing training for HCID staff, or City efforts to relocate people living in accessible units who have no need for accessibility features.

**2.      Priorities and Initiatives:  Medium Priority**.  ILCSC and CALIF believe that thoughtful reporting (whether monthly, quarterly or semi-annually) provides an opportunity for the City to "get its nose up above the waves" and to assess how (and whether) the expenditure of thousands of hours of staff time and tens of millions of dollars in City funding is advancing the objectives of the CSA.  We hope that new leadership shares that perspective, and can commit to a more robust approach to reporting and analysis.  Plaintiffs offer our assistance in achieving that objective.

## III.   Substantive CSA Requirements

### A.    Progress Toward Target Number of 4000 Accessible Units

**1.      Highlights/Challenges:** The most enduring frustration for ILCSC and CALIF is that—as we approach the fourth anniversary of the settlement—we still have a ZERO on the board in terms of progress toward the Target Number of Accessible Units.  Well before the Covid-19 restrictions made surveying of occupied units infeasible, the City missed multiple opportunities to secure certifications of compliance with the CSA's Accessibility Standards. While some of these were related to LCM's inability to timely identify accessibility violations, the bulk of the responsibility lies in the City's two-year delay in finalizing an Accessible Housing Unit Plan, its

**Appendix 45**

failure to retrofit any of the "Tier 1" properties identified in the May 2019 Annual Production Schedule, its resistance to finalizing retrofit agreements and covenants, and its delays in lining up project architects and construction contractors.  The City claims that hundreds of Accessible Units have been developed since the Effective Date of the settlement, but none has been certified, and nearly all of these were leased out without the benefit of the Registry, and with no independent assessment of whether owners actually complied with the affirmative marketing requirements associated with the Accessible Units.

**2.      Priorities and Initiatives: High Priority**.  ILCSC and CALIF hope that new leadership at HCID, together with the hiring of ETA, means that the City will be able to "put a number on the board" toward the Target Number by the end of 2020.  As ILCSC and CALIF have been advocating for years, immediate priority should be given to properties that are completed but not yet occupied.  Not only would that avoid the Covid-19 restrictions, but it would ensure that new units were offered through the Registry, so that all people with disabilities—but especially those who are currently homeless, in nursing homes or living in inaccessible places—can have a fair opportunity to apply.  We also believe it is important to have agreement on legally enforceable, compliant retrofit agreements and accessibility covenants no later than August 15, 2020.

**B.    Accessible Housing Unit Plan:**

**1.      Highlights/Challenges:**  While it was two years late, the City finally adopted an Accessible Housing Unit Plan ("AHUP") in March 2019, and a 2019 Annual Production Schedule in May 2019.  ILCSC and CALIF anticipate the City will finalize the 2020 Annual Production Schedule in August 2020.  Although the City has yet to conduct any retrofits whatsoever, the 2019 and 2020 Schedules would prioritize a total of 88 Covered Housing Developments for retrofitting as soon as Covid-19 conditions permitted.  The Schedules also identify post-

settlement Developments since 2016.  To the extent feasible, those Developments should be prioritized for inspection and certification of compliance with Architectural Standards.

**2.     Priorities and Initiatives: Medium Priority**.  ILCSC and CALIF believe the Schedules provide a clear path for the City to prioritize retrofits of pre-settlement Developments and surveys/certifications of post-settlement Developments.  Now, the City needs to engage in the planning and logistical analysis necessary to follow that path.

**C.     Enhanced Sensory Program (ESP) in Existing Developments**

1.     **Highlights/Challenges:**  The Parties agreed that the Enhanced Housing Accessibility Program for Individuals with Disabilities from the VCA should be incorporated into the CSA for implementation, to replace the existing ESP language in CSA.III.10(i), pursuant to the agreement with the Court at the December 12, 2012 Hearing.  Transcript at 29-32, 38; Status Conference Report at 26-35.

There are two parts to the ESP program, one for new/substantially rehabilitated developments and one for existing developments.  There are no disputes about the ESP for new developments.  It provides incentives for developers to provide additional accessibility features.  It is Plaintiffs' understanding that the program for new/substantial rehabilitation is operational, although we do not recall receiving any reports on it.

In regards to the ESP for existing developments, The ESP for existing developments is still under development and not finalized.  the City developed a draft ESP program but it is our understanding is that COVID has delayed implementation.  Both HUD and the Plaintiffs had concerns about the draft and submitted significant comments.  Based on information from HUD, HUD is still considering comments and changes and the program has not been approved by HUD.  Plaintiffs' biggest concern is the lack of involvement by people in the blind/low vision and deaf/hard of hearing communities in the development of the program and on the proposed advisory

**Appendix 47**

board.  It is not sufficient to reach out to the disability community generally, and the initial survey performed by the City for this program was inadequate in many regards, but particularly in this regard.  Furthermore, it is not clear as currently drafted what this program provides that is not already required as a reasonable accommodation.  It was our understanding that this program would do more, such as actively seeking out providers for appropriate accessible unit technology and appliances and providing funds for such items for existing tenants.  See Schur email to HUD dated 2/4/20 with 1 attachment (list of LA groups serving the deaf and blind communities), commenting on the Enhanced Accessibility Proposal sent to HUD from the City on or about 1/29/20.  The email was forwarded to the Monitor and City on 6/24/20 upon receipt of HUD permission to share.

**2.      Priorities and Initiatives: Medium Priority.**  Plaintiffs would appreciate receiving quarterly updates on the implementation of the ESP for new developments, including information on the number of developments participating, the unit numbers, and the particular enhancements selected by the developments.  If the program is not operational, we would like to know why and the anticipated start date.  The Architectural Expert, ETA, should be made aware of the program and should be informed for each development which units and enhancements are included so they can conduct proper reviews and certifications.  ILCSC and CALIF would like to get an update from the City on the status of both components of the program by August 7, 2020.  This will provide plaintiffs an opportunity to respond and will facilitate an informed discussion at the August 25 monthly meeting.  We then anticipate that a Working Group Meeting will be scheduled within a few weeks following the August 25 meeting, to discuss in more detail the changes that need to be made in the ESP program for existing developments, to identify the timeline for HUD approval of the program, and to work with the City to establish a meaningful advisory board that includes plaintiff and community representatives.  Also, Plaintiffs have identified additional blind/low vision and deaf/hard of hearing organizations that

**Appendix 48**

should be contacted and included in the development of the program and the selection of additional enhancements. We also can supplement our list of potential organizational partners. Representative of those organizations, and individuals who are blind/low vision and deaf/hard of hearing should be the majority of members of any advisory board.

**D.    Internet Housing Registry**

**1. Highlights.** The results of the first handful of properties to fill new units through a lottery process after the Registry was live demonstrated that the design of the Registry was not working well for either housing applicants with disabilities or for housing providers. The Monitor proposed to address that issue by having the City redesign the website in conjunction with Knowbility. The Monitor issued a decision, attached to the Monitor's April 15, 2020 report as Attachment B, ordering "that the pre-application step in the Registry's three-step application process should be eliminated and that an applicant could choose to enter information on the initial indication of interest on the Registry site so that the Registry could match them automatically with housing units for which they are eligible or rule out Housing Developments for which they are ineligible. Applicants should also, as Plaintiffs propose, be permitted to submit applications online through the Registry." Pages 4-5 of Attachment B.

**2. Challenges.** On June 4, 2020, there was a meeting with the Monitor, Knowbility, the City, and Plaintiffs. The City presented its proposal for redesign of the Registry. The Monitor proposed that the Monitor and Knowbility communicate directly with the City concerning the Registry, and that the Monitor and Knowbility would talk directly with the Plaintiffs, since it was challenging to make progress in large meetings (although the parties would also still have large meetings with all parties from time to time). ILCSC and CALIF responded to the Monitor that this was agreeable to them.

However, this arrangement has as a practical matter left ILCSC and CALIF out of the loop. On June 16, 2020, the Monitor

contacted Autumn Elliott to let her know that Knowbility had been unable to reach her. She responded the same day to clarify her email address and phone number, and noted that she had not heard from Knowbility at all. Further attempts by Knowbility to contact her in order to seek feedback regarding the City's proposal, did not reach her due to technological problems, with the result that ILCSC and CALIF have had limited input into the City's most recent efforts to redesign its website or to otherwise come into compliance with the Corrected Settlement Agreement.

ILCSC and CALIF are also concerned by a July 7, 2020 report from Knowbility that if existing accessibility issues with the Registry "are not resolved before user testing, we believe that it is highly likely that they will continue to render the AcHP Registry site prohibitively difficult for users with disabilities to use." Page 2 of Accessibility and Usability Report.

The City's July 2020 Semi-Annual Report lacks any meaningful analysis of whether the Registry is functioning as required by the CSA.  For instance, while the City's list of Covered Housing Developments shows 857 developments, *see* https://hcidapp.lacity.org/AcHPWeb/ComCon/Tab/RenderTab?tabName=Property%20List, the Registry seems to have only 388 Developments listed for people seeking units.  Even the hyper-specific data in the Report does little to answer questions about the effectiveness of the Registry in streamlining the housing search and application process for people with disabilities seeking accessible units.  At a minimum, the City should amend its Report to: (1) Provide a meaningful update about the performance of the Registry as a whole; and (2) include an analysis of how effectively vacant accessible units are marketed through the Registry and whether e-mail notice of those vacancies drew responses from applicants.

**3. Priorities and Initiatives: High Priority.** Plaintiffs need to know the status of the redesign of the Registry and to have an opportunity to provide input. Plaintiffs likewise need to know the status of the City's efforts to bring the other elements of the Registry into compliance with the CSA. The Registry must

provide: complete data on all covered housing developments including eligibility requirements or restrictions; identification of accessibility features in units not certified as being fully accessible; and must permit people to make application online. The City must also provide a functional alternative to the Registry for people who cannot independently use the online service. Due to the pandemic, the City must ensure that a telephonic alternative is available and fully functional.

### E. Coordinated Entry System

**1.   Highlights.** ILCSC and CALIF remain concerned that (a) none of the CES-designated units has been certified as meeting the accessibility requirements in the CSA; (b) LAHSA does not have an adequate process for determining what units in its inventory are accessible and at what level of accessibility; (c) LAHSA has established no reliable system for assessing which homeless people needed the accessibility features or for prioritizing those units for people who need those features, and therefore (d) LAHSA was not ensuring that people who need the features were being placed in accessible units, and has no effective plan for addressing the needs of people who are already in the system and were never asked about their accessibility needs.

**2.   Challenges.** As demonstrated by the July 2020 Semi-Annual Report and an attachment, City's Update and Response to Monitor's LAHSA Remedial Objectives and Information Requested ("LAHSA Update" or "Update"). , neither the City not LAHSA has adequately responded to these problems, and ILCSC and CALIF are unaware of any progress made on them. In fact, the Report and the LAHSA Update amount to little more than the City covering its eyes to substantial dysfunction in the way the CES system is failing to ensure that CES applicants enjoy the protections of the CSA.

Rather than accept responsibility for this dysfunction, the LAHSA Update merely passes on information supplied by LAHSA. Without mentioning that LAHSA is a sub-recipient of the City's federal funds and that the City has substantial

**Appendix 51**

authority to direct LAHSA through a Joint Powers Agreement, the LAHSA Update uses the phrase "LAHSA has informed the City" a total of 28 times, with little apparent effort to verify that information or to specify whether the City has exercised any oversight authority with respect to LAHSA compliance with the CSA.

On several other occasions, the Update offers "dueling" or conflicting interpretations from LAHSA and the City, leaving the reader perplexed about the actual state of affairs. Update at 4, 5, 6, 7 and 8. Perhaps the most concerning of these is LAHSA's assertion that AcHP has not provided any information identifying mobility or sensory units in CES housing and AcHP's suggestion that it does supply such information (but does so two years prior to lease up). Update at 4. Similarly, LAHSA says that it has no information about CES residents who do not need accessibility features living in accessible units, and AcHP admits that it has authority to require such residents to move, but says nothing about actually exercising that authority. Update at 5.

Equally concerning is the fact that LAHSA "is unable to provide reports" about such critical issues such as which CES clients need mobility or sensory units, or the time needed to move them into such units, or efforts taken prior to February 2018 to inform CES clients of their rights under the CSA. Update at 3. And nothing in the Update suggests that AcHP has taken steps to compel LAHSA to remediate these problems.

The Update actually reveals that the City defers entirely to LAHSA to determine whether CES applicants need accessible units, and defers entirely to Owners to self-report whether their Covered Housing Units are "fully accessible" or have any specific accessibility features. Update at 2, 4. The City's failure to exercise oversight in these areas likely means that CES applicants are not enjoying the benefits of the CSA.

The Update reveals that the City and LAHSA do not share databases, and that the City has taken no steps to cross-check data relied upon by LAHSA. Update at 7 ("AcHP does not have

**Appendix 52**

access to LAHSA's database nor does AcHP share our database with LAHSA.  LAHSA is a separate legal joint powers authority.")

While it concedes that "confusion, miscommunication or misunderstandings" have likely impaired the ability of CES clients to get into accessible units, Update at 8, AcHP evidently has done nothing to correct those problems.

**3.    Priorities and Initiatives: High Priority**. The Monitor should direct the City forthwith to expedite the certification for CES-designated units, and to provide that and other information about the accessibility of units to LAHSA promptly and on an ongoing basis. The Monitor should direct the City and LAHSA to provide current, detailed data about which units have been identified in the CES system as accessible, the nature of the projects and units that are included (project names, funding sources and restrictions, bedroom size, type of accessibility). The inventory should include units which are not fully accessible but which have accessible features, such as no stairs. The Monitor should direct the City and LAHSA to conduct some quality control to confirm the accuracy of accessibility reports by property owners. The City and LAHSA should correlate their data to ensure that each is fully informed about the features of such units and accurate information is available to applicants. The Monitor should direct the City and LAHSA to explore how their respective databases can be merged or coordinated to ensure that oversight of CSA compliance (architectural and operational) can be achieved with respect to CES-designated units in the Covered Development portfolio. The Monitor should direct the City and LAHSA to report data sufficient to evaluate whether people with disabilities who seek housing via CES are receiving comparable access to the properties covered by the Corrected Settlement Agreement as people who seek housing via conventional methods.  Ultimately, because LAHSA is a sub-recipient of the City, the City must assume responsibility for CSA compliance of the entire CES process.

**Appendix 53**

## F.    Adoption of Uniform Marketing/Leasing Policies by Owners/Property Managers

**1.    Highlights.**  The City agreed in January that it would notify all Developments that they had to submit self-certifications of adoptions of policies, and tenant acknowledgments of receipt, by March 31, 2020.  Status Conference Report, at 19, lines 11-19.  The City reports that it has done so (but has not provided a list of names and properties that were sent this notice.)  AcHP COVID-19 Pandemic Monitoring Activities Report _06.30.20 ("Monitoring Report"), and Updated Monitoring Report 7/23/20, Item 2(c).  As a result, it has made some progress on this front.  The City reports that 469 properties out of 849[4] have self-reported adoption of the policies, an improvement over the last quarter.  420 developments have self-reported distribution to the tenants.

2.    **Challenges**:  The City continues to fall far short of its goals and obligations regarding adoption of the policies by 100% of existing covered developments, a goal that was supposed to be met in the first year of the CSA, but was extended to April 30, 2020.  Status Conference Report at 19, lines 19–25.   The City's written report of 469 properties complying means that the remaining almost 400 properties, almost half of the covered developments, have not even acknowledged that they have adopted the policies, let alone distributed them to tenants.   The verbal report would still mean almost 200 properties have not acknowledged adoption.  Either way, this is serious and significant non-compliance. This means that nearly four years into the settlement, we have no confirmation that tenants in hundreds of developments have been advised of their rights under the CSA.

The City further agreed that no later than April 30, 2020, it would provide the Monitor with a list of properties that have *not* submitted the required self-certification and tenant

---

[4] See the City's Monitoring Report 07/23/20, Item 3(g); the "Policy Certification and Compliance Status Report_06_30_20 ("Policy Certification Report", and the City's Q18 1st Qtr 2020 Policy Summary Data Report 06.30.20 ("First Quarter Data Report").  We note that we are somewhat confused by the reporting, which does not appear to have consistent data.

**Appendix 54**

acknowledgment and that described the efforts taken by the City to secure compliance at *each* such development.  *Id.* at p. 19, lines 25–28.  We have not received such a report, but at the 7/28/20 meeting Jeff Elder agreed on behalf of the City to provide the required list to the Monitor and Plaintiffs by August 10.  We think timely receipt of the list will assist the City in undertaking the effort Ann Sewill described of ascertaining the reasons behind the non-adoption so that the problems can be addressed.  We strongly support such an effort.

Furthermore, the City unilaterally stayed the obligation to return acknowledgments by the tenants of receipt of the policies, allegedly because of the pandemic, with no communication with the Monitor or the Plaintiffs.  Monitoring Report 7/23/20, Item 3(g) ("Distribution of Revised Policies to residents (suspended due to COVID-19) . . . .)  We object to this unilateral action suspending distribution.  We object to this unilateral action.  There is no reason why the acknowledgments cannot be safely distributed and returned to the management offices by mail or by dropping them off at tenants' units and the management offices.  In most instances, there is no need for personal contact to obtain these acknowledgements, and this obligation should be immediately reinstated.  To the extent acknowledgments cannot be obtained from some households without personal contact, those individuals can be identified and the situation explained in the submission of the acknowledgment to the City, for follow up at a later date. The significant delays in meeting the adoption, acknowledgment, and reporting deadlines cannot be blamed on the coronavirus.

3.     **Priorities and Initiatives:  High Priority.**  Plaintiffs have repeatedly insisted that adoption of policies and informing tenants in the covered Developments of their rights are critical components of ensuring compliance by Developments, as required by the CSA.  Receipt of the list required by the Agreement regarding noncompliant Developments should be submitted by August 10, 2020 to the Monitor and Plaintiffs, along with a property-specific description of the steps the City has taken to ensure compliance by *each* noncompliant Development.    This will facilitate discussion at the late August,

2020 MCE working group meeting as to how to best obtain full compliance in the areas of adoption of policies and distribution to tenants.

### G.    Training of Owners and Property Managers and Staff:

1.    **Highlights/Challenges:** The COVID-19 pandemic necessitated the temporary end of in-person training, but the City successfully met the challenge of transitioning to online training. After in-person training ceased on March 13, 2020, the City worked internally and with its Fair Housing Policy Trainers to develop and implement an online training webinar. Monitoring Activities Report, Items 1(b)&(c), 2(f). The content was shared with Plaintiffs, who worked collaboratively to update certain elements of the training. Monitoring Activities Report, Item 1(c). (The parties agreed to use the version of materials available at that time, even though HUD changes were pending. See below.) On May 15, the City notified the properties that training was ready to continue online, and a two-part session was held on May 26 and 27. Monitoring Activities Report, Item 1(d), 2(j). The City then changed to a 1-day webinar model for training on June 23, 2020. Monitoring Activities Report, Item 1(d)-(f). As such, it appears the City is currently honoring its commitment to hold a minimum of one training per month.  Status Conference Report at 16, lines 20-21. On the July 28, 2020 Monthly Meeting, the City represented that it is scheduling two live trainings via webinar per month. Depending on attendance, it is worth considering whether the number of trainings per month may need to increase to fulfill training requirements, given the current significant numbers of noncompliant properties (see below). It would be helpful if the City could inform Plaintiffs about the dates on which it plans to hold trainings in the future, and whether it will be 1-day or 2-day training.  It would also be helpful to hear if there were issues with the on-line training and if so how they were resolved.  Also, in the Semi-Annual Report, the City informs us that they are using the Go-to-Meeting platform for these trainings.  It has been our understanding that Go-to Meeting is not accessible for people with disabilities.  We would appreciate know if that problem has been corrected in the version used by the City.

Another challenge the City faced, and has made some progress on, is transitioning from training only one person at a property, to training all property owners and any persons who fit the definition in the MCE plan of Property Management Agent. MCE Plan, Ex. A; Status Conference Report at 16, lines 8-12. The City reported that it notified properties of this requirement on February 21, 2020, but has not provided a list of who was notified. The City has also been making efforts to track who is being trained. Monitoring Activities Report, Items 2(d) and (g).

Challenges remain to meet the goals agreed upon in January regarding training. The City notified participants that all owners and property managers must be trained by March 31, 2020. Status Conference Report at 16, lines 8-12. The pandemic made training by March 31, 2020, no longer possible. However, even accounting for the two months lost in developing an online webinar, the City is behind on this goal. All property management agents were to be trained by May 31, 2020. Status Conference Report at 17, lines 10-11.  Further, by April 30, 2020, the City was to provide a report listing all noncompliant properties and describing City efforts to secure compliance at each listed property. Status Conference Report at 16, lines 12-14. That report was also supposed to show noncompliance by each designated staff for the preceding quarter. Id. at lines 4-27. We have not received such a report, but at the 7/28/20 meeting Jeff Elder agreed on behalf of the City to provide the required list to the Monitor and Plaintiffs by August 10.  We look forward to receiving it.

The City has provided  spreadsheets listing some information about testing progress. June 30, 2020 Training Compliance Report; July 23, 2020 Training Compliance Report. The latest report shows that persons in the following positions having been trained: 548 Owners, 656 Property Managers, 510 ADA Coordinators, 474 Grievance Coordinators, and 539 Regional Managers. July 23, 2020 Training Compliance Report; July 23, 2020 Monitoring Activities Report, Item 1(g). According to the City, there are 847 properties being tracked. Id. The City notes

that 110 properties are in pre-construction and construction phases, which would indicate that training for those properties is on a different timeline based on when the Owners and Property Management Agents are hired or the building is leased up. July 23, 2020 Monitoring Activities Report, Item 1(g); Status Conference Report at 16, lines 17-19. However, the spreadsheet only highlights 53 properties as "currently in development," not the 110 properties reported by the City. July 23, 2020 Training Compliance Report.

Working from what is in the July 23, 2020 Training Compliance Report, there are 794 buildings that are not "currently in development," and thus subject to the deadlines agreed upon in January. As best we can ascertain from the spreadsheet, we have the following observations on compliance:

- 327 properties have full training compliance, in that training is complete for all five required positions.  This is a long way from the full compliance required by March 31, or even May 31, given the two months off line due to Covid.
- 467 properties do not have training complete for all five required positions, of those:
  - 84 have zero training indicated for all five required positions, and thus are clearly not in compliance.
  - An additional 184 properties are not in compliance because the owner representative has not been trained.
  - Therefore, we know at least 268 properties are not in compliance.
  - For the remaining 199 properties, compliance is unclear, because we do not know how/whether the spreadsheet records training compliance if one person holds multiple positions.

Thus, the City has a very long way to go to meet the training obligations that it agreed to in January.

For the 53 properties that are "currently in development" on the spreadsheet, two are fully trained, 27 have zero training indicated for all five required positions, and 22 have trained the owner representatives. July 23, 2020 Training Compliance Report.

**Appendix 58**

Without further information about leasing and hiring dates, we cannot assess whether the City is on track for these properties. We also remain unclear about how the training obligations for the "in development" properties are integrated with the PMP planning process.

One complicating factor for the City in meeting the training requirements, is that training obligations are triggered by certain events and must take place annually. MCE Plan, II.A; Status Conference Report at 16, lines 17-19. In the spreadsheet provided to Plaintiffs, there are no dates associated with the training. Therefore, we cannot assess whether the City is meeting its requirements to: 1) train each relevant person once a year, MCE Plan, II.A; 2) train new Property Management Agents within 30 days of hire or selection as Property Management Agent, Status Conference Report at p. 16, line 28 through p. 17, line 1; and 3) train Owners and Property Management Agents in new construction/substantial rehabilitation properties prior to lease up or hiring, whichever occurs first, *id.* at 16, lines 17-19.  As noted below, adding dates instead of checkmarks in each box would be helpful.

Finally, there are outstanding edits to the City's training program materials that need to be addressed. On July 2, 2020, HUD provided the City additional comments and edits on its trainings. HUD incorporated some of the comments that Plaintiffs had provided, and recommended that the City coordinate with Plaintiffs to incorporate edits from HUD and Plaintiffs, before sending a proposed final draft to HUD for approval.   See HUD email to Schur dated 7/2/20, enclosing HCD comments to two City training PowerPoints (HUD email attached as Exhibit #1); Schur email to HUD dated 4/15/20 with 2 attachments (redlined training PowerPoints), commenting on the draft training materials. The email was forwarded to the Monitor and City on 6/24/20 upon receipt of HUD permission to share; DLS email to Lowe dated12/25/19 with comments on refresher training with attached redlined PowerPoints.

 To our knowledge, the City has not incorporated these changes, and has not reached out to Plaintiffs to coordinate. Plaintiffs are also unaware if the City is developing a "refresher" training, and if

**Appendix 59**

so, Plaintiffs should be notified so that the parties comply with their agreement to collaborate on future training components. Status Conference Report at 16, lines 22-23.

The City's Semi-Annual Report fails to provide any information about training of City Housing staff, as required by CSA Section III.12(e).

**2. Priorities and Initiatives: Medium Priority.** The top priority in the area of training is ensuring that all Owners and Property Management Agents complete the training. To facilitate this process, we recommend that the City improve its tracking and reporting so that the Monitor and all parties can accurately track whether the training requirements have been met.

We suggest adding information to the Training Compliance Report to indicate the following:
- properties that are new construction/substantial rehabilitation (not just highlighted, but indicated in a column),
- dates training was completed for each category in each development,
- dates of relevant triggering events (hiring, lease up etc.) for each new construction/substantial rehab properties,
- and, indication of whether one person fills multiple positions (if it explains why there is no training recorded for a given position).

To obviate the need for the Monitor and Plaintiffs to do hand summaries or other work to actually determine the status of developments in compliance (as we did this time), future spreadsheets should separate lists of properties into the following categories, with subtotals for each category (until such time as the information is easily sortable in a database available to everyone):

- 1) Existing Developments that are fully compliant;
- 2) New Construction/Sub Rehab Developments that are fully compliant;

**Appendix 60**

- 3) Existing Developments that are partially compliant, with an explanation of what is missing; and
- 4) New Construction/Sub Rehab Developments that are partially compliant, with an explanation of what is missing.

Either in that spreadsheet, or separately, the City must also report to the Monitor what corrective action steps it is taking to address *each* property that is not fully in compliance with its training requirements, as previously agreed.
In terms of ongoing trainings, we ask that the City evaluate the effectiveness of the on-line trainings and provide information about effectiveness, problems, and necessary fixes.  We remain concerned that the ability to absorb and remember information from an all day, mostly non-interactive training is very limited, but there are ways to improve this process.

Finally, we recommend the City work with plaintiffs to implement the comments and edits to the training materials by the end of August so that they can be finalized and approved by HUD and available to the Expert Auditor.

## H.    MCE Plan, including AcHP Monitoring and Audits

**1.    Highlights.**  The parties have now agreed on a process for conducting audits of Covered Developments, using an outside expert, and have agreed upon a scope of work. The City reports that 614 properties filed a quarterly report for the first quarter of 2020 (January-March), a significant increase. Monitoring Report 7/23/20, Item 3(d).

**2.    Challenges:**

A.  Audits:  The parties need to agree on a process for timely hiring an auditor, and also to agree on the details of the contract and work.  Ann Sewill has agreed to expedite this process, and has identified a small pool of possible candidates.  We appreciate this effort.

B. Certification of Properties as Compliant with Policy Obligations.  We recognize that the City's prior

**Appendix 61**

certifications needed to be updated, due to the need to train additional staff members and some revisions due to the CRA. As a result, even though 149 were previously certified, the City now reports that only 156 developments are "pending certification" as compliant with their policy obligations. Policy Certification and Compliance Status Report 07_23_20 ("Policy Certification Report 07/23/20"), Tabs 1 and 4. This includes a combination of previously certified developments and some developments not previously certified.[5] This falls significantly short of the City's Agreement that 212 Developments (one quarter of the inventory) be certified by June 30, 2020. See the Status Conference Report at 20, lines 1-9.

One significant challenge here is that prior to the pandemic, certification required a site visit. The parties need to discuss and reach agreement on how to certify compliance in the absence of site visits, as well as discuss how and when in person visits could resume. ILCSC and CALIF are open either to having the City certify without an on-site visit during the pandemic, or provisionally certifying units pending future visits, so long as all the other requirements are met. We look forward to discussing how that can best occur. We note, however, that other components of compliance are not dependent on in-person contact.

C. Quarterly Reports[6]: Compliance reporting is unclear, incomplete and inconsistent. For example, while 614

---

[5] Plaintiffs are not certain what is meant by "pending certification," although it appears that it includes properties where all designated staff have been trained, policies and required documents and supports submitted, but not necessarily approved PMPs and no site visits.

[6] There are numerical obligations for complete reviews of quarterly reports do not begin until 2021, because the parties anticipated that the first step would be ensuring Certification of Policy Compliance. One Certifications were complete on 100% (or close) of the Covered Developments, required by March 31, 2021, the obligations to complete review and report on quarterly reports will kick in. We are pleased that so

**Appendix 62**

properties are reported as having submitted their quarterly report for the first quarter of 2020, most are missing significant documents, but there is no data about how many of these quarterly reports are complete. Monitoring Report, Items 3(d) and (e); Q18 1st Qtr 2020 Policy Summary Data Report 06.30.20 ("First Quarter Data Report").[7] The City's reports acknowledge a significant amount of critical missing data.  For example, only 461 Developments submitted the Unit Occupancy Utilization Survey, only 470 submitted Accessible Unit Transfer Lists, only 467 submitted accessible unit waiting lists, and only 253 submitted conventional waitlists. Monitoring Report Items 3(b), (d), and (e).

D. Property Management Reports (PMPs). Approval of the updated Property Management Plans are significantly behind schedule. Pursuant to the Agreements, the City reports that on February 28, 2020, it notified all existing properties that they must update the PMPs no later than May 4, 2020. Status Conference Report at 21, lines 16-23; Monitoring Report 7/23/20, Item 2(e).  The City was then required to have reviewed and approved all of the PMPs no later than May 31, 2020.  *Id. at.* 22, lines 4-5. However, the City reports that as of  July 23, 2020, only 416 proposed PMP revisions have been submitted by Developments, and only 2 or 3 have been approved and another 2 have preliminary approval.[8] Monitoring Report, Item 3(f); Policy Certification Report, Tab 3, Column Q.

many properties are now filing quarterly reports as required under the settlement, however it is important to address these problems with incomplete submissions of quarterly reports early so that they do not snowball.

[7] Note, the Semi-Annual Report says only 533 quarterly reports. Section 8(a)(iii).

[8] Note, the numbers vary from one tab to another and are different than those reported in the Semi-Annual Report (408 submitted), and we do not know the difference between preliminary approval and final approval noted in the reports. However, the differences do not change the overall picture of noncompliance.

Furthermore, the City agreed that no later than June 30, 2020, it would provide the Monitor with a list of properties that do not have an approved PMP and that describes the efforts taken by the City to secure compliance at each such development.    Status Conference Report at 22, lines 6-14.   We have not received such a report, but at the 7/28/20 meeting Jeff Elder agreed on behalf of the City to provide the required list to the Monitor and Plaintiffs by August 10. That will be helpful to determine next steps going forward.

E. Semi-Annual Report.  The City's recent Semi-Annual Report compounds the difficulties of ascertaining adequate and accurate information.  Different documents run through different time periods.  The PDF document entitlted "2020 Quarter 1 (Jan-March) Data for 614 Property Sites" ("2020 Quarter 1 Data Table"), a document in table form which reports most of the quantitative data required by CSA Section III.13, only provides information through March, and therefore it is difficult to track any progress since then or reconcile with other documents which provide information through July 23.  Because these charts are provided in static form, there is no good way of comparing current data to prior time periods to determine extent of progress, and the Semi-Annual Report does not provide any additional clarity as to data.  For example, while there is a description of some types of corrective actions, there is nowhere that the City reports what specific corrective actions were taken against specific properties (see the other comments on the required lists).  Further, the City describes some possible types of corrective actions, but does not describe how often they occur and whether any steps were taken against properties who did not respond in the first instance.  The Semi-Annual Report also says that disciplinary actions for policy violations begin with a "site audit," without explaining

what that means since on-site visits cannot occur during this phase of the pandemic and full scale audits have not started.   Further since the information is not provided in a way that links data to any specific properties, it is impossible to ascertain trends or whether certain properties are significantly noncompliant.  Hopefully some of this will be corrected when the data system is complete and operational, but until then these reports need to be more robust with more analysis.

We also note some very concerning trends in the data. The 2020 Quarter 1 Data Table shows a first quarter increase of 550 purportedly accessible units[9] occupied by individuals who do not need the disability features. We do not know if this reflects recent improper renting of units or new properties being added to the table, since the City provides no analysis or explanation.  It also is seriously concerning that there are 1,901 purportedly accessible units occupied by people who do not need the accessible features, but only 987 lease addenda executed, meaning there almost 1,000 accessible units which are improperly tenanted in violation of the policies, since they are lacking the required lease addendums which require tenants who don't need the features to move to standard units as they become available to free up accessible units. Furthermore, there are over 6,598 households reported on the waiting and transfer lists for the "purportedly" accessible units, making it even more critical that existing units be freed up as soon as possible.  The City reports 8,202 households listed on the registry seeking accessible units, but until the database is functional, there is no way to determine the overlap between the households on the waiting/transfer lists provided by the properties and

_____

[9] Since no units have been certified, owners determine what is an "accessible" unit without clear or legally compliant criteria and without any City oversight.

those on the registry.  But regardless of any overlap, the overwhelming need for the accessible units is clear from the 6,598 households on the waiting list and the 8,202 households on the registry.

F.  Compliance Forms.  The Parties have never resolved outstanding concerns raised by HUD and the Plaintiffs regarding a number of compliance forms. These are significant forms that need to be resolved prior to the audits.  See HUD email to Schur dated 6/29/20, enclosing HUD comments sent to the City on 1/30/20 regarding multiple forms (HUD email attached as Exhibit #2); email to HUD dated 12/23/19 regarding policies and forms.  The email to HUD was forwarded to the Monitor and City on 6/24/20 upon receipt of HUD permission to share.

3.    **Priorities and Initiatives:  High Priority.**  Effective compliance monitoring is required by the CSA and is critical to protect the rights of tenants and obtain adequate data. The lists required by the Agreement of properties who are noncompliant with the PMP obligations should be submitted by August 10 to the Monitor and Plaintiffs, along with a property specific description of the steps the City has taken to ensure compliance by *each* property.  The Parties need to agree on clearer and more complete reporting, and monitoring activities should be more robust.  The Parties should move forward expeditiously to implement the Audit Expert process, to agree upon the revised MCE Plan and compliance forms (which are necessary for the audits) and to resolve the issues around site visits in connection with Certifications of Policy Compliance. Plaintiffs will provide the Monitor and other parties proposed revisions to the MCE plan by August 10.  It will be helpful at the August MCE Plan meeting to identify which forms still need resolution and agree on a process and timeline for doing so, including any necessary HUD involvement.

I.    **Self-Evaluation/Transition Plan**

1.    **Highlights/Challenges:**  The City has taken no meaningful steps to conduct a Self-Evaluation or to adopt a Transition Plan with respect to the agencies touching on the availability of accessible housing in Covered Housing Developments.  Counsel for ILCSC and CALIF proposed a scope of work necessary for the City to issue a Request for Proposals in June 2019 and revised it in August 2019, but has had no response from the City since then.

2.    **Priorities and Initiatives: Low Priority**.  While a Self-Evaluation and Transition Plan would help the City identify the structural and programmatic barriers still faced by Angelenos with disabilities who are seeking accessible affordable housing, ILCSC and CALIF reluctantly agree that the City should concentrate its efforts on the High and Medium Priority items in this submission, and defer the development of the Self-Evaluation and Transition Plan.

## J.    Grievance and Complaint System

ILCSC and CALIF are concerned about the results of Knowbility's April 28, 2020 report that, upon re-testing, a number of accessibility barriers still remained on HCIS's Grievance Process and the errors and oversights regarding PDF's cited in Knowbility's prior report had not been remediated.

The City's reporting on its handling of grievances also raises significant concerns.  Grievances are a critical component of enforcement.  The City has provided 2 documents, a Grievance Summary Report_2019 thru 5-2020 (a chart entitled HCIDLA AcHP Program Grievance Between 1/1/2020 and 7/31/2020) ("Grievance Summary Report") and a set of tables, including a 2019 Grievance Summary, a 1st Quarter 2020 AcHP Grievance Summary, and a table entitled "May/June 2020 Grievances Filed."    None of these documents meet the reporting requirements of CSA Section III.12(h)(iii), which requires that: "The Report shall include . . . A list of the grievances or complaints that were received by the City through the Grievance Procedure (including copies of any written grievances or complaints) since the last report and the actions taken in response, redacting any private, personal information concerning residents of, or applicants for, Housing Units."    None of the reports filed by the City comply with these requirements. CSA Section III.13 also requires the number of grievances filed with the City and their resolution.  We have never received

actual copies of documents.  We have no information for January through April of the nature of the grievances or the resolution.  For the 11 properties for which there is some information for May and June, there do not appear to be appropriate referrals.

The Grievance Summary Report includes a total number (52) grievance filed with the City, but provides no analytical or descriptive information about the nature of any individual grievance or its resolution, merely noting "open" or closed" and a cryptic "referral to agent." The column labeled "grievance description" appears to have language taken verbatim from complaints with no analysis (one was still in Spanish with no translation).  Only 11 of the 52 grievances were included in the charts that did have some additional information.

These charts leave us greatly concerned that there is not uniform, meaningful handling of grievances.  While some staff may be doing an effective job, it's difficult to ascertain that from the information provided. It does appear that it is taking a very long time to resolve most grievances, and it is clear that the staff handling grievances need significant additional training.  For example, some grievances are rejected due to the fact that they are not covered properties, but referrals are not being made to appropriate and critical resources, including DFEH, HUD, DRC, Plaintiff Organizations, or legal services organizations, even when evictions are imminent or when disabled/elderly tenants do not have a working elevator or have other serious access issues.  We did not see a single referral to any of these organizations, including for a 92 year-old whose landlord has repeatedly failed to install a railing or ramp to enable him to navigate the three stairs to the building (unclear if it was a covered property).  At least one covered property (GR20-0014) filed a grievance regarding an inoperable elevator for an individual on the 3rd floor who uses a wheel chair, opened  in January, with no actions or resolution reported other than "in progress."

The City also reports on grievances filed with Owners in the 2020 Quarter 1 Data Table, which provides very little data other than total numbers of grievances to Owners filed, approved, and denied.  There is no analysis of the grievance data relating to Owners' handling of grievances, such as whether the City determined that any of the grievances were improperly denied, whether some properties have multiple grievances, or whether

**Appendix 68**

there are any trends in grievance.  We do not know if the City is even reviewing grievances to Owners other than recording a few data points.

### K.    Effective Communications

ILCSC and CALIF are concerned about the City's ability to provide effective communications to people with disabilities given the continuing accessibility barriers that remain on the City's webpages, even after significant training and testing by Knowbility. We are concerned that reporting on effective communications is not being appropriately monitored or recorded, which may relate to the confusing forms that are unresolved.  We find it hard to believe that only 3 requests for effective communications have been made in over 850 properties since the effective date of the CSA.  Of those 3, only 1 shows a resolution.

# Training Compliance Report 7.23.20

| Yellow Highlight: Currently In-Development | | Red Highlight: Non-Compliant in Fair Housing Training | | | | | | |
|---|---|---|---|---|---|---|---|---|
| AcHP No. | Project Name | Development Owner (Company) | Property Management (Company) | Designated Owner Representative | ADA Coordinator | Grievance Coordinator | Regional Manager | Property / On-Site Manager |
| F0160-01 | Chancellor I | Aedis / New Economics for Women (MGP) | McCormack Baron Management | X | X | X | X | X |
| B0370-01 | Mission Village Terrace Apts | 1010 Development Corporation | Barker | X | X | X | X | X |
| F0128-01 | Vintage Crossing Senior Apartments | Aedis | | X | X | X | X | X |
| F0778-01 | Sylmar Court Apts. | Western Community Housing, Inc. (MGP) | Solari | X | X | X | X | X |
| F0314-01 | Washington 722 Tod | Western Community Housing, Inc. (MGP) | | X | X | X | X | X |
| F0271-01 | Vermont Avenue Apartments | Western Community Housing, Inc. (MGP) | Solari | X | X | X | X | X |
| F0257-01 | Sherman Village | Western Community Housing, Inc. (MGP) | | X | X | X | X | X |
| F0224-01 | Cantabria Senior Apartments | Western Community Housing, Inc. (MGP) | WSH Management | X | X | X | X | X |
| F0221-01 | Adams & Central Mixed Use Development | Western Community Housing, Inc. (MGP) | Solari | X | X | X | X | X |
| F0730-01 | Emerald Terrace Apartments | Western Community Housing, Inc. (MGP) | Solari | X | X | X | X | X |
| F0157-01 | Pico Gramercy | Meta Housing | | X | X | X | X | X |
| S0588-01 | Buckingham Place Senior Housing | Western Community Housing, Inc. (MGP) | WSH Management | X | X | X | X | X |
| C0461-01 | Montecito Apartments | TSA | | X | X | X | X | X |
| F0273-01 | Del Rey Square Senior Housing | TSA | | X | X | X | X | X |
| B0337-01 | Canby Woods Housing | TSA | | X | X | X | X | X |
| F0052-01 | Plaza Vermont/CEDC aka Park Plaza | CRCD | TSA | X | X | X | X | X |

**Appendix 71**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0227-01 | Rittenhouse Square | TSA | | X | X | X | X | X |
| F0808-01 | McCadden Plaza | TSA | | X | X | X | X | X |
| F0848-01 | McCadden Campus Senior Housing | TSA | | X | X | X | X | X |
| F0717-02 | Avalon Place (Tri-City Apartments) | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0670-01 | Avalon Terrace / Nicolet Apartments | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0670-02 | Avalon Terrace / Nicolet Apartments | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0147-01 | Harvard Yard/Glenmary Senior Apartments | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0717-03 | Las Mariposas (Tri-City Apartments) | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0717-01 | Rockview (Tri-City Apartments) | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| B0385-02 | Hidden Haven (Watts/Athens Preservation XVII) | 1010 Development Corporation | Barker | X | X | X | X | X |
| B0385-03 | Normandie V (Watts/Athens reservation XVII) | 1010 Development Corporation | Barker | X | X | X | X | X |
| B0385-04 | Oakview (Watts/Athens Preservation XVII) | 1010 Development Corporation | Barker | X | X | X | X | X |
| B0385-05 | Pleasant Oaks I-III (Watts/Athen Preservation XVII) | 1010 Development Corporation | Barker | X | X | X | X | X |
| B0385-07 | Villa Broadway I-V (Watts/Athens Preservation XVII) | 1010 Development Corporation | Barker | X | X | X | X | X |
| B0385-08 | Woodside I-IV, Watts/Athens Preservation XVII) | 1010 Development Corporation | Barker | X | X | X | X | X |
| F0129-01 | West Angeles Villas | 1010 Development Corporation | Barker | X | X | X | X | X |
| F0738-01 | Rosewood Gardens | Los Angeles Housing Partnership (LAHP) | | X | X | X | X | X |
| F0051-01 | Parkview Apts. | | | x | X | X | x | X |

**Appendix 72**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0110-01 | Casa Rampart | | | X | X | X | X | X |
| B0390-04 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-05 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-06 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-07 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-08 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-09 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-10 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-11 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-12 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-13 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| B0390-14 | Lexington A & B Apts | Alpha | Alpha | X | X | X | X | X |
| F0250-01 | 28th Street YMCA | CRCD | | X | X | X | X | X |
| F0274-01 | Noho Senior Villas | Clifford Beers Housing | | X | X | X | X | X |
| F0779-01 | T. Bailey Manor | | | X | X | X | X | X |
| F0791-01 | Skid Row Southeast 1 Apartments | Skid Row Housing Trust | | X | X | X | X | X |
| C0415-01 | Senator Hotel | Skid Row Housing Trust | SRHT Property Management Company | X | X | X | X | X |
| C0416-01 | Weldon Hotel | Skid Row Housing Trust | SRHT Property Management Company | X | X | X | X | X |

**Appendix 73**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C0427-01 | Boyd Hotel | Skid Row Housing Trust | Skid Row Housing Trust | X | X | X | X | X |
| C0483-01 | Villa Metropolitano | Villa Metropolitano, LP | Solari Enterprises, Inc | X | X | X | X | X |
| C0822-01 | Strong Residence | LA Family Housing Corp | The John Stewart Company / Delano | X | X | X | X | X |
| F0053-01 | Rossmore Hotel | Skid Row Housing Trust | | X | X | X | X | X |
| F0064-01 | Halifax Hotel | | | X | X | X | X | X |
| F0096-01 | Dewey Hotel | Skid Row Housing Trust | | X | X | X | X | X |
| F0104-01 | Sammy Davis Jr. Manor (Reno Apts) | Little Tokyo Service Center | Barker Management | X | X | X | X | X |
| F0194-01 | Abbey Apartments | Skid Row Housing Trust | SRHT | X | X | X | X | X |
| F0297-01 | Young Burlington | | | X | X | X | X | X |
| F0309-01 | Santa Cecilia Apartments | | McCormack Baron Managent, Inc | X | X | X | X | X |
| F0727-01 | Mt. Zion Towers Senior Apartments (aka Juanita Tate Legacy Tower) | | | X | X | X | X | X |
| F0813-02 | SP7 Apartments (San Pedro House) | Skid Row Housing Trust | Skid Row Housing Trust | X | X | X | X | X |
| S0591-01 | Encore Hall (Aka Triangle Square) | | | X | X | X | X | X |
| S0596-01 | Imani Fe (East & West) | | John Stewart Company | X | X | X | X | X |
| F0810-01 | Sun Valley Senior Veterans Apartments aka Jerome Elder Care | ELACC | The John Stewart Company | X | X | X | X | X |
| F0288-01 | Vista Crest/Parkside Place Apartments aka Osborne Street Apts | Related | The John Stewart Company | X | X | X | X | X |
| F0817-01 | Florence Mills | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0750-01 | Star Apartments | Skid Row Housing Trust | | X | X | X | X | X |

**Appendix 74**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| F0292-01 | Teague Terrace | | | X | X | X | X | X |
| F0776-01 | Simone Hotel Apartment | Skid Row Housing Trust | | X | X | X | X | X |
| F0006-01 | Las Brisas | | | X | X | X | X | X |
| F0011-01 | Witmer City Lights | | | X | X | X | X | X |
| F0606-01 | Beverly City Lights | | Triumph Residential Services | X | X | X | X | X |
| F0060-01 | Casanova Gardens/Chinatown Service Center | | | X | X | X | X | X |
| F0061-01 | Fedora Apts. | | | X | X | X | X | X |
| F0088-01 | Vista Nueva | ACOF | | X | X | X | X | X |
| F0108-01 | Washington Court Family Hsng | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0715-01 | Santos Plaza Apts. | | | X | X | X | X | X |
| F0151-01 | St. George Hotel | Skid Row Housing Trust | | X | X | X | X | X |
| F0728-01 | Sheraton Town House | | | X | X | X | X | X |
| F0188-01 | Charles Cobb Apartments | Skid Row Housing Trust | | X | X | X | X | X |
| F0200-01 | Coronita Family Apartments (AKA Emerald Park Apartments) | Western Community Housing, Inc. (MGP) | Solari | X | X | X | X | X |
| F0791-02 | Skid Row Southeast 1 Apartments | Skid Row Housing Trust | | X | X | X | X | X |
| F0813-01 | SP7 Apartments | Skid Row Housing Trust | Skid Row Housing Trust | X | X | X | X | X |
| F0226-01 | Orion Gardens | Daylight & Decro | FPI | X | X | X | X | X |
| F0729-01 | St. Anne's Transitional | St. Annes Maternity Home | St. Annes Maternity Housing L.P | X | X | X | X | X |

**Appendix 75**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0172-01 | Pico New Hampshire Apartments | 1010 Development | 1010 Development Corporation | X | X | X | X | X |
| F0229-01 | 36th & Broadway Apts | CRCD | Barker | X | X | X | X | X |
| F0229-02 | 36th & Broadway Apts | CRCD | Barker | X | X | X | X | X |
| F0749-01 | Dunbar Village | CRCD | TSA | X | X | x | x | X |
| F0749-02 | Dunbar Village | CRCD | TSA | X | X | x | x | X |
| F0749-03 | Dunbar Village | CRCD | TSA | X | X | x | x | X |
| F0832-01 | Residences on Main | CRCD | JSCO | X | X | X | X | X |
| F0169-01 | Laguna Senior Apartments | DOMUS | Sunset Myra LP | X | X | X | X | X |
| F0838-01 | Gramercy Place Apartments | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0206-01 | Mariposa Place Apts | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0806-01 | Gateway Apartments | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| C0496-01 | Views At 270 | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0021-01 | Barnsdall Court | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| C0505-01 | Hollywood Bungalow Court Apartments | Hollywood Community Housing Corp | Barker Management | X | X | X | X | X |
| C0505-02 | Hollywood Bungalow Court Apartments | Hollywood Community Housing Corp | Barker Management | X | X | X | X | X |
| C0505-03 | Hollywood Bungalow Court Apartments | Hollywood Community Housing Corp | Barker Management | X | X | X | X | X |
| C0505-04 | Hollywood Bungalow Court Apartments | Hollywood Community Housing Corp | Barker Management | X | X | X | X | X |
| F0039-01 | Argyle Court | Hollywood Community Housing Corp | Barker | X | X | X | X | X |

**Appendix 76**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| S0578-01 | Casa Verde | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0765-01 | Casa Carmen Senior Apartments | 1010 Development Corporation | Barker | X | X | X | X | X |
| F0782-01 | Wilshire Towers | TSA | TSA | X | X | X | X | X |
| F0736-01 | Seven Maples Senior Apartments | Los Angeles Housing | EAH Housing | X | X | X | X | X |
| C0442-01 | Seventh And Coronado Apartments | LA Housing | Barker | X | X | X | X | X |
| F0153-01 | Tides Senior Apartments | LA Housing Partnership | Barker | X | X | X | X | X |
| F0186-01 | Bronson Courts | LA Housing Partnership | Barker | X | X | X | X | X |
| C0454-01 | Hollywood El Centro Apartments | TSA | TSA | X | X | X | X | X |
| B0341-01 | Oakridge Family Homes | Los Angeles Housing | Barker | X | X | X | X | X |
| F0308-01 | Path Metro Villas | Westlake Mercy House | John Stewart | X | X | X | X | X |
| F0214-01 | Tesoro Del Valle | AMCAL | FPI | X | X | X | X | X |
| F0218-01 | Villas Las Americas | AMCAL | John Stewart | X | X | X | X | X |
| F0793-01 | Path Metro Villas Phase II Buildings B and C (In Construction) | Path Ventures | John Stewart | X | X | X | X | X |
| F0302-01 | King 1101 | CB Housing (Clifford Bears) | Levine Groups | X | X | X | X | X |
| F0215-01 | The Mediterranean | | Triumph Residential | X | X | X | X | X |
| F0797-01 | 88th & Vermont (In Construction) | WorksUSA | Solari | X | X | X | X | X |
| F0798-01 | Cielito Lindo Phase II (In Construction) | ELACC | John Stewart | X | X | X | X | X |
| F0753-01 | Broadway Villas | AMCAL | John Stewart | X | X | X | X | X |

**Appendix 77**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| S0595-01 | Yale Terrace Apartments | | Triumph Residential | X | X | X | X | X |
| F0812-01 | Six Four Nine Loft Apartments | Skid Row Housing Trust | Skid Row Housing Trust | X | X | X | X | X |
| F0809-01 | 7th and Witmer | Deep Green Housing | FPI Management | X | X | X | X | X |
| F0298-01 | Durae Crenshaw Apts. aka Ldk Senior Apartments | Daylight & Decro | Levine | X | X | X | X | X |
| F0298-02 | Durae Crenshaw Apts. aka Ldk Senior Apartments | Daylight & Decro | Levine | X | X | X | X | X |
| F0295-01 | Rio Vista Apartments / TMBC-12-118780 | McCormack Baron | McCormackbaron | X | X | X | X | X |
| F0290-01 | Taylor Yard Apartments | McCormack Baron | McCormackbaron | X | X | X | X | X |
| F0178-01 | Palm Village Senior Apartments | Thai Community Development Center | Barker | X | X | X | X | X |
| F0310-01 | LA New Directions West Adams aka Ybarra Village | Chavez Foundation | Hyder Co. | X | X | X | X | X |
| C0477-01 | Martha Bryant Manor Apartments | Martha Bryant Village II LP | Levine | X | X | X | X | X |
| B0816-01 | Florence Morehouse | Century Housing | Levine | X | X | X | X | X |
| B0816-02 | Florence Morehouse | Century Housing | Levine | X | X | X | X | X |
| F0770-01 | Gilbert Lindsay Manor | TSA | TSA | X | X | X | X | X |
| C0825-01 | Selma Community Housing | Abode | Abode | X | X | X | X | X |
| F0282-01 | Tobias Terrace | Meta Housing Corp | Solari | X | X | X | X | X |
| C0405-01 | Casa Gloria | Casa Gloria, a California limited partnership | Solari Enterprises, Inc | X | X | X | X | X |
| C0424-01 | Villa Del Pueblo | Villa Del Pueblo, L.P. | Solari Enterprises, Inc | X | X | X | X | X |
| C0426-01 | Casa Heiwa | Little Tokyo Service Center | FPI Management | X | X | X | X | X |

**Appendix 78**

| C0433-01 | 1747 Normandie Avenue Apts. | Normandie Partners | Solari | X | X | X | X | X |
|---|---|---|---|---|---|---|---|---|
| C0566-01 | Gas Company Lofts | Essex Property Trust | Essex Property Trust | registered | X | X | X | X |
| F0048-01 | Mission Plaza Apartment | Mission Plaza Family Apt, LP | McCormack Baron | X | X | X | X | X |
| F0081-01 | Castlewood Terrace | Castlewood Terrace, Inc. | Mansermar, Inc. | X | X | X | X | X |
| F0097-01 | Echo Park Senior Housing | Menorah Housing | Menorah Housing Foundation | X | X | X | X | X |
| F0101-01 | Noble Senior Housing | Menorah Housing | Menorah Housing Foundation | X | X | X | X | X |
| F0142-01 | Castlewood Terrace Ii | Castlewood Terrace, Inc. | Mansermar, INc. | X | X | X | X | X |
| F0143-01 | Court Street Apts. | Ingram Preservation, LP | Court Street Apts. | X | X | X | X | X |
| F0168-01 | Ingram Preservation Properties | Ingram Preservation, LP | Solari Enterprises, Inc. | X | X | X | X | X |
| F0168-02 | Ingram Preservation Properties | Ingram Preservation, LP | Solari Enterprises, Inc. | X | X | X | X | X |
| F0168-03 | Ingram Preservation Properties aka St. Andrew Place | Ingram Preservation, LP | Solari Enterprises, Inc. | X | X | X | X | X |
| F0168-04 | Ingram Preservation Properties | Ingram Preservation, LP | Solari Enterprises, Inc. | X | X | X | X | X |
| F0168-05 | Ingram Preservation Properties | Ingram Preservation, LP | Solari Enterprises, Inc. | X | X | X | X | X |
| F0168-06 | Ingram Preservation Properties | Ingram Preservation, LP | Solari Enterprises, Inc. | X | X | X | X | X |
| F0168-07 | Ingram Preservation Properties | Ingram Preservation, LP | Solari Enterprises, Inc. | X | X | X | X | X |
| F0176-01 | Central Village Apts. | Central Village Apts, LP | Solari Enterprises, Inc. | X | X | X | X | X |
| F0181-01 | Parthenia Street Senior Housing | Parthenia Street Senior Citizen Housing Corporation | Menorah Housing Foundation | X | X | X | X | X |
| F0182-01 | Pisgah Village | Pisgah Village LP | Solari Enterprises, Inc. | X | X | X | X | X |

**Appendix 79**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| F0189-01 | El Dorado Family Apts. | 12129 El Dorado Avenue, L.P. | Solari Enterprises, Inc | X | X | X | X | X |
| F0234-01 | Pico/Veteran Senior Housing Project | Pico Veteran Senior Citizen Housing Corp | Menorah Housing | X | X | X | X | X |
| F0268-01 | Menlo Family Housing | Menlo Family Housing | Barker Mgt. | X | X | X | X | X |
| F0626-01 | Miracle Mile aka Masselin Sr. Housing | Miracle Mile Senior Housing Corp | Menorah Housing | X | X | X | X | X |
| F0679-01 | Hope Village | 1010 Development Corporation | 1010 Development | X | X | X | X | X |
| F0746-01 | Crossings At North Hills | Urban Housing Communities, LLC | Hyder Property Management | X | X | X | X | X |
| S0579-01 | Hope Manor | El Pueblo Community Development Corporation | Solari Enterprises, Inc | X | X | X | X | X |
| S0590-01 | Palomar Apartments | Hollywood Community Housing Corp | | X | X | X | X | X |
| F0735-01 | Asturias Senior Apartments | Asturias Senior Housing, LP | WSH Management | X | X | X | X | X |
| F0231-01 | Harvard Circle | 952 Harvard, L.P. | Triumph Residential | X | X | X | X | X |
| F0737-01 | New Carver Apartments | New Carver Apartments, LP | Skid Row Housing Trust | X | X | X | X | X |
| F0740-01 | Andalucia Senior Apartments | Andalucia Senior Apartments | WSH Management | X | X | X | X | X |
| F0743-01 | Magnolia On Lake | Magnolia on Lake | McCormack Baron | X | X | X | X | X |
| F0745-01 | Professional Housing & Development Apts. | PHD Apartments, LP | BARKER MANAGEMENT INC | X | X | X | X | X |
| F0745-02 | Professional Housing & Development Apts. | Little Tokyo Service Center | Little Tokyo Service Center | X | X | X | X | X |
| F0745-03 | Professional Housing & Development Apts. | Little Tokyo Service Center | Little Tokyo Service Center | X | X | X | X | X |
| F0745-04 | Professional Housing & Development Apts. | Little Tokyo Service Center | Little Tokyo Service Center | X | X | X | X | X |
| F0745-05 | Professional Housing & Development Apts. | Little Tokyo Service Center | Little Tokyo Service Center | X | X | X | X | X |

**Appendix 80**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0247-01 | New Genesis Apartments | Skid Row Housing Trust | Skid Row Housing Trust | X | X | X | X | X |
| F0286-01 | New Pershing Apartments | New Pershing Apts, L.P. | Skid Row | X | X | X | X | X |
| F0311-01 | Taylor Yard Senior Housing | Taylor Yard Senior Housing LP | McCormack Baron | X | X | X | X | X |
| C0402-01 | Produce Hotel | Skid Row Housing Trust | Skid Row Housing Trust | X | X | X | X | X |
| C0431-01 | Villa Flores Apartments aka 1010 Senior Housing Corporation | 1010 Development Corporation | 1010 Development | X | X | X | X | X |
| C0437-01 | Bellevue Apartments | Dolores Frances Affordable Housing LP | Genessy Management and Development LLC | X | X | X | X | X |
| C0502-01 | Pascual Reyes Apartments | Pascual Reyes Apartments L.P. | Genessy Management and Development LLC | X | X | X | X | X |
| B0321-01 | Sherman Oaks Garden/Villa | Berglas & Garfield Consulting Company Inc. | Berglas & Garfield Consulting Company Inc. | registered | registered | registered | registered | X |
| B0371-01 | Fountain Park Apts At Playa Vista, Phases I & II | Essex Property Trust | Essex Property Trust | X | X | X | X | X |
| B0371-02 | Fountain Park Apts At Playa Vista, Phases I & II | Essex Property Trust | Essex Property Trust | X | X | X | X | X |
| F0180-01 | Flores Del Valle | AMCAL | FPI | X | X | X | X | X |
| F0197-01 | Camino Al Oro | AMCAL | FPI | X | X | X | X | X |
| F0199-01 | Casa De Angeles | AMCAL | The John Stewart Company | X | X | X | X | X |
| F0217-01 | Villas Del Lago | AMCAL | FPI | X | X | X | X | X |
| F0256-01 | Montecito Terrace | AMCAL | The John Stewart Company | X | X | X | X | X |
| F0256-02 | Montecito Terrace | AMCAL | The John Stewart Company | X | X | X | X | X |
| F0261-01 | Linda Vista Nurses Building | AMCAL | FPI | X | X | X | X | X |
| F0303-01 | Linda Vista Apartments (Phase II) aka Hollenbeck Terrace | AMCAL | FPI | X | X | X | X | X |

**Appendix 81**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C0441-01 | Mosaic Apartments | AMCAL | FPI | X | X | X | X | X |
| B0549-01 | Hartford Ave. aka. Andalucia Heights | AMCAL | FPI | X | X | X | X | X |
| F0272-01 | Yale Street Family Housing | Westlake Mercy House | Solari | X | X | X | X | X |
| F0313-01 | Vermont Villas | Westlake Mercy House | Solari Enterprises, Inc. | X | X | X | X | X |
| F0220-01 | Crossings at 29th Street | Western Community Housing, Inc. (MGP) | Hyder Property Management | X | X | X | X | X |
| F0035-01 | 2010 Chariton | 1010 Development Corporation | Barker | X | X | X | X | X |
| F0152-01 | Terre One | 1010 Development Corporation | Barker | X | X | X | X | X |
| F0118-01 | Glenmary Kinder Care Apartments | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0018-01 | Paradise Arms | New Life Economic Development | New Life Economic Development | X | X | X | X | X |
| C0498-01 | Wilshire Vermont Station Apartments | Klein Financial | Greystar | X | X | X | X | X |
| F0102-01 | Park Lane Family Housing | West Angeles Community Development | Solari | X | X | X | X | X |
| F0002-01 | Central Court Apartments | Central Court Apartments | ACOF | X | X | X | X | X |
| F0216-01 | Union Point Apartments | Western Community Housing, Inc. (MGP) | Solari | X | X | X | X | X |
| F0734-01 | James Wood Apartments | Daylight & Decro | 1010 Development Corporation | X | X | X | X | X |
| F0734-02 | James Wood Apartments | Daylight & Decro | 1010 Development Corporation | X | X | X | X | X |
| C0494-01 | Irolo Senior Apartments | Highridge Costa | Barker | X | X | X | X | X |
| F0010-01 | Strathern Park East | TSA | | X | X | X | X | X |
| B0380-01 | Laurel Village | Abode | Abode | X | X | X | X | X |

**Appendix 82**

| F0191-01 | Ivy Terrace Fka Three Courtyards | Abode | Abode | X | X | X | X | X |
| F0259-01 | Glassell Park Community Housing aka Rio Vista | Abode | Abode | X | X | X | X | X |
| F0299-01 | Riverwalk At Reseda | Abode | Abode | X | X | X | X | X |
| F0707-01 | Skyline Village | TSA | | X | X | X | X | X |
| F0025-01 | Nordhoff Street Apartments aka Casa Familiar | Daylight & Decro | FPI | X | X | X | X | X |
| C0398-01 | Young Apartments | Abode | Abode | X | X | X | X | X |
| F0068-01 | New Harbor Vista | Abode | Abode | X | X | X | X | X |
| F0775-01 | Norwood Learning Village (In Construction) | Norwood Learning Village, LP. | TSA | X | X | X | X | X |
| B0376-01 | Morgan Place | Abode | Abode | X | X | X | X | X |
| F0190-01 | Hart Village | Abode | Abode | X | X | X | X | X |
| F0012-01 | Crescent Arms Apartments | Abode | Abode | X | X | X | X | X |
| F0193-01 | Osborne Family Apartments (Aka Osborne Gardens (CRA) | Daylight & Decro | FPI | X | X | X | X | X |
| F0208-01 | New Dana Strand Townhomes | Mercy Housing | Abode | X | X | X | X | X |
| F0007-01 | Parthenia Court | Abode | Abode | X | X | X | X | X |
| F0138-01 | Innes Heights Apts. | Hollywood Community Housing Corp | | X | X | X | X | X |
| F0034-01 | St. Andrews Bungalow Court | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0090-01 | La Mirada Apartments | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| C0440-01 | Alexandria House | Hollywood Community Housing Corp | Barker | X | X | X | X | X |

**Appendix 83**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| F0185-01 | Waterloo Heights Apartment | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| B0780-01 | E. Victor Villa | Abode | Abode | X | X | X | X | X |
| F0158-01 | Allesandro St. Apts., (Angeleno Court) | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| B0781-01 | Camino del Mar | Mercy Housing | Abode | X | X | X | X | x |
| B0799-01 | Vista Del Mar | Abode | Abode | X | X | X | X | X |
| F0044-01 | Evergreen Village Apartments | Barker | Barker | X | X | X | X | X |
| F0059-01 | Bryson Family Apts. | Los Angeles Housing Partnership | EAH Housing | X | X | X | X | X |
| F0294-01 | Moonlight Villas | Abbey Road, Inc., Los Angeles Housing Partnership | EAH Housing | X | X | X | X | X |
| F0783-01 | West "A" Homes (In Construction) | 1010 Development Corporation | Barker | X | X | X | X | X |
| C0410-01 | La Brea/Franklin Apartments | Hollywood Community Housing Corp | Thomas Safran & Associates | X | X | X | X | X |
| F0277-01 | Jefferson Boulevard And Fifth Avenue Apartments AKA Jefferson Square | Jefferson Boulevard Housing Partners, LP. | TSA | X | X | X | X | X |
| B0343-01 | Freeman Villas | Alpha | Alpha | X | X | X | X | X |
| B0391-01 | Concord A&B | Concord Partners | Alpha | X | X | X | X | registered |
| B0391-04 | Concord A&B | Concord Partners | Alpha | X | X | X | X | registered |
| B0391-05 | Concord A&B | Concord Partners | Alpha | X | X | X | X | registered |
| B0391-07 | Concord A&B | Concord Partners | Alpha | X | X | X | X | X |
| B0391-08 | Concord A&B | Concord Partners | Alpha | X | X | X | X | X |
| F0067-01 | Kenmore Apartments | Hollywood Community Housing Corp | Barker | X | X | X | X | X |

**Appendix 84**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0263-01 | Willis Avenue Apartments | ACOF | EAH Housing | X | X | X | X | X |
| B0393-01 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-02 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-03 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-04 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-05 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-06 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-07 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-08 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-09 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-10 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-11 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-12 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-13 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-14 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-15 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-16 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-17 | Windward A&B | Alpha | Alpha | X | X | X | X | X |

**Appendix 85**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B0393-18 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-19 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0393-20 | Windward A&B | Alpha | Alpha | X | X | X | X | X |
| B0384-02 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | X |
| B0384-08 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | X |
| F0080-01 | Ursula (Baldwin/Watson Terrace II) | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0080-02 | Tacana (Baldwin/Watson Terrace II) | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0080-03 | 4040 Nicolet (Baldwin/Watson Terrace II) | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0080-04 | 3919 Nicolet (Baldwin/Watson Terrace II) | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0080-05 | Watson Terrace II (Baldwin/Watson Terrace II) | Western Community Housing, Inc. (MGP) | Barker | X | X | X | X | X |
| F0233-01 | Mccoy Plaza | WLCAC | Barker | X | X | X | X | X |
| F0243-01 | Menlo Park | 831 Seventieth, LP | Triumph Residential | X | X | X | X | X |
| F0792-01 | Paul Williams Apartments | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| C0508-01 | Coronel Apartments | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0768-01 | Dudley Oaks | TSA | TSA | X | X | X | X | X |
| F0788-01 | Hancock Gardens Apartments | TSA | TSA | X | X | X | X | X |
| B0847-01 | Crescent Village Apartments | 1010 Development Corporation | Barker | X | X | X | X | X |
| B0847-02 | Crescent Village Apartments | Aedis | Barker | X | X | X | X | X |

**Appendix 86**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0771-01 | HCHC Recap I (Werner Illing) | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0771-02 | HCHC Recap I (Wilcox) | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0771-03 | HCHC Recap I (Carlton Way) | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| B0772-01 | Leaster Apartments (aka Miramar) | Genessy | Pico Union Housing Corp. | X | X | X | X | X |
| B0772-02 | Leaster Apartments | Genessy | Pico Union Housing Corp. | X | X | X | X | X |
| B0772-03 | Leaster Apartments | Genessy | Pico Union Housing Corp. | X | X | X | X | X |
| B0772-04 | Leaster Apartments | Genessy | Pico Union Housing Corp. | X | X | X | X | X |
| F0179-01 | Figueroa Place Apartments | Excel Residential Services | Triumph Residential | X | X | X | X | X |
| F0252-01 | Chinatown Metro Apartments | Western Community Housing, Inc. (MGP) | Western Senior Housing Inc. | X | X | X | X | X |
| F0296-01 | The Six (Formerly Carondelet Apartments) | Skid Row Housing Trust | Skid Row Housing Trust | X | X | X | X | X |
| F0773-01 | Jordan Downs Phase 1A | Bridge Housing | The John Stewart Company | X | X | X | X | X |
| B0394-02 | Hdr Preservation Proj | LA Property Group, LP | PK Management, LLC | X | X | X | X | X |
| B0394-04 | Hdr Preservation Proj | LA Property Group, LP | PK Management, LLC | X | X | X | X | X |
| B0339-01 | Vineland Senior Hsg | Menorah Housing | Menorah Housing | X | X | X | X | X |
| F0038-01 | Angelina Apartments | Little Tokyo Service Center Community Development | Barker | X | X | X | X | X |
| F0145-01 | Far East Building | Little Tokyo Service Center Community Development | Barker | X | X | X | X | X |
| F0173-01 | Rainbow Apartments | Skid Row Housing Trust | Skid Row Housing Trust | X | X | X | X | X |
| F0198-01 | Clinton Family Apartments | Western Community Housing, Inc. (MGP) | Western Community Housing Inc. | X | X | X | X | X |

**Appendix 87**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0211-01 | Sichel Family Apartments | Western Community Housing, Inc. (MGP) | Solari | X | X | X | X | X |
| F0225-01 | Macarthur Park Metro Apts Phase A | MPM Apartments, L.P. | McCormack Baron | X | X | X | X | X |
| F0287-01 | One Santa Fe | The McGregor Company | The McGregor Company | X | X | X | X | X |
| F0682-01 | Art Share Los Angeles/Chip Hunter | Art Share Los Angeles | Solari | X | X | X | X | X |
| B0389-01 | LA Preservation 78 | BLVD Capital Investment, Community Development Partners | FPI | X | X | X | X | X |
| B0389-02 | LA Preservation 78 | BLVD Capital Investment, Community Development Partners | FPI | X | X | X | X | X |
| B0389-03 | LA Preservation 78 | BLVD Capital Investment, Community Development Partners | FPI | X | X | X | X | X |
| B0389-04 | LA Preservation 78 | BLVD Capital Investment, Community Development Partners | FPI | X | X | X | X | X |
| B0389-05 | LA Preservation 78 | BLVD Capital Investment, Community Development Partners | FPI | X | X | X | X | X |
| B0389-06 | LA Preservation 78 | BLVD Capital Investment, Community Development Partners | FPI | X | X | X | X | X |
| B0394-01 | Hdr Preservation Proj | LA Property Group, LP | PK Management, LLC | X | X | X | X | X |
| B0394-03 | Hdr Preservation Proj | LA Property Group, LP | PK Management, LLC | X | X | X | X | X |
| B0394-05 | Hdr Preservation Proj | LA Property Group, LP | PK Management, LLC | X | X | X | X | X |
| B0394-06 | Hdr Preservation Proj | LA Property Group, LP | PK Management, LLC | X | X | X | X | X |
| B0394-07 | Hdr Preservation Proj | LA Property Group, LP | PK Management, LLC | X | X | X | X | X |
| B0394-08 | Hdr Preservation Proj | LA Property Group, LP | PK Management, LLC | X | X | X | X | X |
| S0581-01 | Western Carlton Apts. (Aka Western- Carlton Phase I) | Hollywood Community Housing Corp. | McCormack Baron | X | X | X | X | X |
| S0587-01 | Metro Hollywood Apts. (Aka Hollywood Western Apts./Western- | Hollywood Community Housing Corp | McCormack Baron | X | X | X | X | X |

**Appendix 88**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| S0592-01 | Lofts At Noho Commons (Aka Noho Commons-Phase Ii) | Redwood Partners Inc. | Polaris Property Management | X | X | X | X | X |
| C0807-01 | Dunning House Apartments | Hollywood Community Housing Corp | Barker | X | X | X | X | X |
| F0823-01 | 5400 Hollywood Family Apartments | Western Community Housing, Inc. (MGP) | WSH Management | X | X | X | X | X |
| F0824-01 | Crest Apartments | Crest Apartments Limited Partnership | Skid Row Housing Trust | X | X | X | X | X |
| B0826-01 | Orange Wood Court | Community Preservation Partners, LLC | FPI | X | X | X | X | X |
| F0755-01 | Rolland Curtis Apartments | Abode | Abode | X | X | X | X | X |
| F0789-01 | New Park Place | Abode | Abode | X | X | X | X | X |
| B0784-01 | Viviendas del Valle (recap) | Abode | Abode | X | X | X | X | X |
| B0784-02 | Viviendas del Valle (recap) | Abode | Abode | X | X | X | X | X |
| B0784-03 | Viviendas del Valle (recap) | Abode | Abode | X | X | X | X | X |
| B0855-01 | New Vista Court (Recap - 2 Sites) | Abode | Abode | X | X | X | X | X |
| B0855-02 | New Vista Court (Recap - 2 Sites) | Abode | Abode | X | X | X | X | X |
| B0544-01 | Park Plaza West (The Piedmont) | Western Community Housing, Inc. (MGP) | | X | ▓ | X | X | X |
| F0265-01 | Figueroa Senior Housing | Western Community Housing, Inc. (MGP) | WSH Management | X | X | X | ▓ | X |
| F0839-01 | Missouri & Bundy Housing | TSA | Thomas Safran & Associates | X | X | X | X | ▓ |
| F0260-01 | Glenoaks Gardens | Glenoaks Gardens, L.P., a CA limited partnership | | ▓ | X | X | X | X |
| B0328-01 | Cesar Chavez Garden | | | X | X | X | X | ▓ |
| C0425-01 | P & P Home For The Elderly | 1010 Development Corporation | | ▓ | X | X | X | X |

**Appendix 89**

| ID | Project | Owner | Company | | | | | |
|---|---|---|---|---|---|---|---|---|
| C0495-01 | Klump | LA Family Housing Corp | The John Stewart Company | | X | X | X | X |
| F0005-01 | Hope West Apts. | Hope-Net/ LACDC | Solari Enterprises, Inc. | | X | X | X | X |
| F0056-01 | Valley Village Senior Apts | | | | X | X | X | X |
| F0109-01 | Womens Village/Homeless No More (Phs II) | | | | X | X | X | X |
| F0139-01 | Ml Shepard Manor Senior Housing | | | | X | X | X | X |
| F0610-01 | Temple-Edgeware Apts aka Vista Angela Apts | | | X | | X | X | X |
| F0289-01 | Pwc Family Housing | LIttle Tokyo Service Center (MGP) | | X | X | X | | X |
| F0003-01 | 41st Street Apartments | | | X | | X | X | X |
| F0668-01 | Benton Green Apts. | | | X | X | X | | X |
| F0136-01 | Discovering Horizons | | | X | X | | X | X |
| F0722-01 | Imperial Highway Apartments | | | | X | X | X | X |
| F0164-01 | Vermont City Lights Apartments | | Triumph Residential Services | X | X | X | X | |
| F0170-01 | Las Brisas | AMCAL | JSCO | X | X | X | | X |
| F0174-01 | Saticoy Gardens | LA Family Housing Corp | The John Stewart Company | | X | X | X | X |
| F0819-01 | FLOR 401 Lofts | Skid Row Housing Trust | | X | X | X | X | |
| F0872-01 | Firmin Court | Daylight & Decro | | X | X | X | X | |
| F0836-01 | Metamorphosis on Foothill | | | X | X | X | X | |
| F0741-01 | Downtown Women's Center | Downtown Womens | Downtown Womens | X | X | X | | X |

**Appendix 90**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0762-01 | Knob Hill Apartments | AHCDC 6 LP | DOMUS | X | X | X | | X |
| F0694-01 | Harold Way Apartments | Hollywood Community Housing Corp | Barker | X | | X | X | X |
| F0270-01 | Step Up On Vine | Hollywood Community Housing Corp | Barker | X | X | | X | X |
| F0763-01 | Sage Park | Bridge | John Stewart | X | X | X | | X |
| F0016-01 | Marina Apts | 722 Coronado LP | Barker | | X | X | X | X |
| F0818-01 | Aria Apartments (fka Cambria Apts) | Westlake Mercy House | Solari | X | X | X | X | |
| C0445-01 | Argyle Apartments | AMCAL | John Stewart | X | X | X | | X |
| F0115-01 | Colonia Corona Apartments | Colonia Corona, L.P.,a California Limited Partnership | Solari | | X | X | X | X |
| F0245-01 | Swansea Park Senior Apartments | Deep Green Housing | FPI | X | X | | X | X |
| B0377-01 | Harbor Tower | RHF | RHF | X | | X | X | X |
| F0281-01 | The Gordon | RHF | RHF | X | X | | X | X |
| F0751-01 | The Serrano | RHF | RHF | X | | X | X | X |
| F0306-01 | Paloma Terrace | RHF | RHF | X | | X | X | X |
| F0228-01 | The Hobart / Aka Hobart Heights Apt. Homes | RHF | RHF | X | | X | X | X |
| F0802-01 | Bartlett Hill Manor | LINC Housing | John Stewart | X | | X | X | X |
| B0512-01 | Imogene Coop. Housing (16) | Route 2 Imogen Housing | Solari | | X | X | X | X |
| C0466-01 | Ballona Villa | Venice Housing Corp | VCH Corp | X | X | X | | X |
| F0119-01 | Highland Village Partners, L.P. | Ingram Preservation, LP | Solari | | X | X | X | X |

**Appendix 91**

| ID | Name | Entity | Management | | | | |
|---|---|---|---|---|---|---|---|
| F0184-01 | Temple Villas | Ingram Preservation, LP | Temple Villas | | X | X | X | X |
| F0602-01 | Tabor Courts | Venice Community Housing Corporation | VCH Corp | X | X | X | | X |
| F0652-01 | Washington Court Apts | Venice Community Housing Corporation | Venice Community Housing Corporation | X | X | X | | X |
| S0577-01 | Heavenly Vision Seniors | Heavenly Vision Seniors | Solari | | X | X | X | X |
| S0583-01 | Eastside Village (Lillian Mobley) | Eastside Village, LP | Solari Enterprises, Inc | | X | X | X | X |
| F0246-01 | Vendome Palms Apartments | Vendome Palms, LP | ACOF (A community of friends) | X | X | X | X | |
| F0264-01 | 5555 Hollywood (aka Metro Hollywood) | META Housing Corp. | WSH Management | | X | X | X | X |
| F0279-01 | New Hampshire Family Housing | Little Tokyo Service Center | Levine Management Groups, Inc | X | X | X | | X |
| F0316-01 | Winnetka Senior Apartments | META Housing Corp. | The John Stewart Company | | X | X | X | X |
| C0403-01 | Arlington Rodeo Apartments | Global Housing Development, Inc | GC Management, LLC | X | X | X | | X |
| C0417-01 | Navy Street Apartments aka Navy Blue | Venice Community Housing Corporation | VCH Corp | X | X | X | | X |
| C0420-01 | Edward Hotel | Skid Row Housing Trust, Edward Hotel L.P. | Skid Row | X | X | X | X | |
| C0421-01 | Fumbah Manor | Global Housing Development, Inc. | GC Management, LLC. | X | X | X | | X |
| C0422-01 | La Villa Mariposa | New Economics for Women (MGP) | New Capital, LLC | | X | X | X | X |
| C0455-01 | Filipino Service Group | Filipino American Service Group, Inc. | Filipino American Service Group, Inc. | X | X | X | X | |
| F0175-01 | Main Street Vistas | 5950 Main, LP | Triumph Residential | X | X | X | | X |
| C0439-01 | Bricker Building Housing | WSH Management | WSH Management | X | X | X | | X |
| B0322-01 | Woodbridge Park Apts. | Berglas & Garfield Consulting Company Inc. | Berglas & Garfield Consulting Company Inc. | registered | registered | registered | registered | |

**Appendix 92**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B0382-01 | Preservation I ProjectJPM | Concerned Citizens of South Central Los Angeles | Western America Properties | X | X | | X | X |
| B0382-02 | Preservation I ProjectJPM | Concerned Citizens of South Central Los Angeles | Western America Properties | X | X | | X | X |
| B0382-03 | Preservation I ProjectJPM | Concerned Citizens of South Central Los Angeles | Western America Properties | X | X | | X | X |
| B0382-04 | Preservation I ProjectJPM | Concerned Citizens of South Central Los Angeles | Western America Properties | X | X | | X | X |
| B0382-05 | Preservation I ProjectJPM | Concerned Citizens of South Central Los Angeles | Western America Properties | X | X | | X | X |
| B0541-01 | Preservation IV ProjectJPM | Concerned Citizens of South Central Los Angeles | Western America Properties | X | X | | X | X |
| B0542-01 | Preservation V ProjectJPM | Concerned Citizens of South Central Los Angeles | Western America Properties | X | X | | X | X |
| F0785-01 | Pilgrim Tower Apartments | Pilgrim Tower Apartments, L.P. | Front Porch | X | X | | X | X |
| F0095-01 | Central City Apartments | Central City Apartments | Solari | X | X | X | | X |
| B0540-01 | Preservation III ProjectJPM | Preservation Properties III, LP | Western America Properties | X | X | | X | X |
| F0276-01 | Sunrise Apartments | AMCAL | The John Stewart Company | X | X | X | | X |
| F0849-01 | Emerson Apartments(fka Melrose) | Westlake Mercy House | Solari | X | X | X | | X |
| F0852-01 | The Dahlia (fka South Main Street Apartments) | Westlake Mercy House | Solari | X | X | X | | X |
| B0347-01 | Parcel M- Grand Ave | Related California Urban Housing | Related Management Company | X | X | | X | X |
| F0619-01 | Cambria Apartments | Socios Cambria, LP | Solari | | X | X | X | X |
| F0733-01 | Woodland Terrace | ACOF | Barker | X | X | X | | X |
| B0352-01 | Berendos | ACOF/ Berendos LP | ACOF | | X | X | X | registered |
| B0352-02 | Berendos | ACOF/ Berendos LP | ACOF | | X | X | X | registered |

**Appendix 93**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0769-01 | El Segundo Apartments | Western Community Housing, Inc. (MGP) | The John Stewart Company | X | X | X | | X |
| F0045-01 | Figueroa Courts Apts/Acof | ACOF | ACOF | | X | X | X | X |
| B0391-02 | Concord A&B | Concord Partners | Alpha | X | X | X | X | |
| B0391-03 | Concord A&B | Concord Partners | Alpha | X | X | X | X | |
| B0391-06 | Concord A&B | Concord Partners | Alpha | X | X | X | X | |
| B0391-09 | Concord A&B | Concord Partners | Alpha | X | X | X | X | |
| C0401-01 | Central Avenue Villa Apts. | 1010 Development Corporation | Barker | | X | X | X | X |
| F0017-01 | Mercedes Apts. | Aedis | Barker | | X | X | X | X |
| F0093-01 | Hoover Senior Housing | Hoover Seniors | The John Stewart Company | | X | X | X | X |
| B0384-01 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-03 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-04 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-05 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-06 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-07 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-09 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-11 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-12 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |

**Appendix 94**

| ID | Name | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| B0384-13 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-15 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-16 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0384-17 | Leeward A & B Apts. | Alpha | Alpha | X | X | X | X | |
| B0548-01 | Witmer Preservation | Alpha | Alpha | X | X | X | X | |
| B0546-01 | San Lucas Apts | GSL Properties | San Lucas Senior Housing, LP | X | | | X | X |
| C0400-01 | Russ Hotel | SRO Housing Corporation | SRO Housing Corporation | X | X | | X | X |
| C0567-01 | Metropolitan Lofts | Berkshire Residential Investments | Berkshire Residential Investments | | X | X | X | X |
| F0203-01 | Lyndon Hotel | SRO Housing Corporation | SRO Housing Corporation | X | X | | X | X |
| F0239-01 | Renato Apartments | SRO Housing Corporation | SRO Housing Corporation | X | X | | X | X |
| B0395-01 | Queen Apts | Genessy | Pico Union Housing Corp. | X | | X | X | X |
| B0395-02 | Queen Apts | Genessy | Pico Union Housing Corp. | X | | X | X | X |
| B0395-03 | Queen Apts | Genessy | Pico Union Housing Corp. | X | | X | X | X |
| B0395-04 | Queen Apts | Genessy | Pico Union Housing Corp. | X | | X | X | X |
| B0340-01 | Fickett Towers | Camino Mercado Partners | California Commercial Development | X | registered | registered | | X |
| S0598-01 | Ford Apartments (Aka Ford Hotel) | Ford Apartments | SRO Housing Corporation | X | X | | X | X |
| F0843-01 | PATH Villas Montclair/Gramercy(Site 2 of 2) | PATH Ventures | The John Stewart Company | | X | X | X | X |
| B0540-02 | Preservation III ProjectJPM | Preservation Properties III, LP | Western America Properties | X | X | | X | X |

**Appendix 95**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| B0540-03 | Preservation III ProjectJPM | Preservation Properties III, LP | Western America Properties | X | X | | X | X |
| B0540-04 | Preservation III ProjectJPM | Preservation Properties III, LP | Western America Properties | X | X | | X | X |
| B0540-05 | Preservation III ProjectJPM | Preservation Properties III, LP | Western America Properties | X | X | | X | X |
| F0846-01 | Isla De Los Angeles | American Family Housing | The John Stewart Company | X | X | X | | X |
| F0876-01 | Building 207 | | | X | X | X | | X |
| C0503-01 | Alexandria Hotel | Aedis | | X | X | | | X |
| C0459-01 | Noho Senior Artists Colony | Meta Housing | | X | | | X | X |
| F0235-01 | Rayen Apartments | ACOF | | | X | | X | X |
| F0759-01 | Arlington Square | | | | X | | X | X |
| C0444-01 | Caroline Severance Manor | Mercy Housing | | X | X | | | X |
| F0135-01 | Cornerstone Apartments | | | | X | | X | X |
| F0300-01 | Mosaic Gardens at Westlake, fka Beverly & Lucas | | | X | | | X | X |
| B0390-02 | Lexington A & B Apts | Alpha | Alpha | registered | | | X | registered |
| B0390-03 | Lexington A & B Apts | Alpha | Alpha | registered | | | X | X |
| F0301-01 | Beverly Terrace | | | | X | | X | X |
| F0767-01 | Crenshaw Villas | RHF | RHF | X | | | X | X |
| F0766-01 | Crenshaw Gardens | RHF | RHF | X | | | X | X |
| F0796-01 | West Angeles City Place Senior Apts (In Construction) | Related | Related | X | | | X | X |

**Appendix 96**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C0438-01 | 1600  Vine (Hollywood And Vine) | Klein Financial | Greystar | | X | | X | X |
| C0489-01 | Villa De Esperanza | | Solari | X | | | X | X |
| F0042-01 | California Hotel | | | | X | | X | X |
| F0107-01 | Southern Hotel | | | | X | | X | X |
| F0647-01 | Penny Lane - 15256 Acre Street | | | X | | X | | X |
| F0699-01 | Willow Tree Village | | | X | | | X | X |
| F0764-01 | The Fiesta aka The Campus At L.A. Family Housing | PSH Campus, L.P. | | | X | X | X | |
| F0222-01 | Ardmore Apartments | RHF | RHF | X | | | X | X |
| F0269-01 | Normandie Terrace | RHF | RHF | X | | | X | X |
| F0201-01 | Harvard Heights | RHF | RHF | X | | | X | X |
| B0346-01 | Macarthur Park Tower | RHF | RHF | X | | | X | X |
| F0742-01 | Whittier Apartments | RHF | RHF | X | | | X | X |
| C0479-01 | Rio Vista Village | RHF | RHF | X | | | X | X |
| F0050-01 | Colonia Jess Lopez (fka Olympic Plaza) | RHF | RHF | X | | | X | X |
| F0790-01 | Saint James Park | RHF | RHF | X | | | X | X |
| F0223-01 | Bonnie Brae Apartment Homes | RHF | RHF | X | | | X | X |
| F0187-01 | Carondelet Court Apartment Homes | RHF | RHF | X | | | X | X |
| C0396-01 | Angelus Plaza I | RHF | RHF | X | | | X | X |

**Appendix 97**

| ID | Name | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C0397-01 | Angelus Plaza II | RHF | RHF | X | | | X | X |
| F0616-01 | 8727 Orion Ave. aka Garcia Marquez | | | X | | | X | X |
| F0030-01 | Sycamore Village | | | X | | | X | X |
| F0047-01 | Harbor Gateway Homes | Home for Life Foundation | Caring Housing Ministries | X | | | X | X |
| F0660-01 | Hart Alabama | | New Capital, LLC | | X | X | | X |
| F0070-01 | Normandie Senior Apartments | | Normandie Non-Profit Housing | | X | X | X | |
| F0071-01 | Palms Court | | CARING Housing Ministries | X | | | X | X |
| F0667-01 | Avenida Terrace | | EAH Housing | | X | X | X | |
| F0084-01 | Gwen Bolden Manor | | | | | X | X | X |
| F0711-04 | Curtis Johnson Apts. | | | X | | | X | X |
| F0150-01 | Reseda Horizons | | | X | X | | | X |
| F0161-01 | Hfl Van Nuys Apartments | | | X | X | | X | |
| F0083-01 | Greater Bethany | CRCD | Levine | | x | x | | X |
| F0632-02 | Tolton / Montclair Court | West 28th Street, L.P. | Mercy Housing | | X | | X | X |
| F0022-01 | Delano II | LA Family Housing Corp | JSCO | X | | | X | X |
| F0774-01 | Meridian Apartments | AMCAL | FPI | X | | | X | X |
| F0312-01 | The Paseo At Californian | RHF | RHF | X | | | X | X |
| C0465-01 | Villa Esperanza | Esperanza Housing Community Corporation | Deep Green | X | X | | X | |

**Appendix 98**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| S0585-01 | Amistad Plaza | RHF | RHF | X | | | X | X |
| C0435-01 | Hollyview Apartment | RHF | RHF | X | | | X | X |
| B0350-01 | West Valley Towers | RHF | RHF | X | | | X | X |
| B0349-01 | Vistas Seniors | RHF | RHF | X | | | X | X |
| F0219-01 | Witmer Heights Apartment Homes | RHF | RHF | X | | | X | X |
| F0820-01 | Casa del Sol | ACOF | Levine | X | X | X | | |
| F0795-01 | Rampart Mint | WHCHC | Affordable Living for the Aging | X | | | X | X |
| F0293-01 | Michael's Village | Stepuponsecond | Stepuponsecond | X | | X | | X |
| F0829-01 | Western Avenue Apartments | Stepuponsecond | Stepuponsecond | X | | X | | X |
| F0280-01 | Rosslyn Hotel / TMBC-12-118785 | Rosslyn Hotel Apartments, LP | SRO Housing Corp | | X | | X | X |
| B0511-01 | Lankershim Arms (56) | Lankershim Arms | GoldrichKest | registered | X | | | X |
| B0545-01 | San Regis Apts (Bellagio) | Th Real Estate | Pinnacle Living | X | | | X | X |
| F0072-01 | Penny Lane - 15260 Rayen | Abbey Road Inc. | Abbey Road Inc. | X | | X | | X |
| F0123-01 | Rivers Hotel | SRO Housing Corporation | SRO Housing Corporation | | X | | X | X |
| F0133-01 | Brownstone Hotel | SRO Housing Corporation | SRO Housing Corporation | | X | | X | X |
| F0156-01 | Yankee Hotel | SRO Housing Corporation | SRO Housing Corporation | | X | | X | X |
| F0232-01 | James M. Wood | SRO Housing Corporation | SRO Housing Corporation | | X | | X | X |
| F0632-01 | Tolton / Montclair Court | West 28th Street, L.P. | Mercy Housing | | X | | X | X |

**Appendix 99**

| ID | Property Name | Owner | Manager | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0850-01 | Sun King Apartments | Sun King LLC | Many Mansions | X | | | X | X |
| S0594-01 | Vista Monterey Senior Housing | 4651 Huntington, L.P. | New Capital, LLC | | X | X | | X |
| F0238-01 | Tres Lomas Garden Apartments | Eagle Rock Senior Housing | National Community | | X | | X | X |
| F0744-01 | Miramar Village | Miramar Village Partners, LLP | RMG Property Management | | X | X | | X |
| F0278-01 | Jefferson Park Terrace Aka Mercy Housing Calwest | Mercy Housing California 56, L.P. | Mercy Housing | X | X | | X | |
| C0460-01 | Van Nuys Apartments | Van Nuys Preservation, LP | Related Management Company | | | X | X | X |
| C0475-01 | Budlong Avenue Apartments | Esperanza Housing Community Corporation | Deep Green Property Management | X | X | | | X |
| C0476-01 | Casa Carondelet | Casa Carondelet, LP | Deep Green Property Management | X | X | | | X |
| C0428-01 | Parkside Apartments | 9th and Grand, LP | Deep Green Property Management | X | X | | | X |
| C0576-01 | Pacific Avenue Arts Colony | Meta Housing Corp | WSH Management | | X | X | | X |
| B0539-01 | Preservation II ProjectJPM | Concerned Citizens of South Central Los Angeles | Western America Properties | X | | | X | X |
| F0267-01 | La Coruna Senior Apartments | Meta Housing Corp | | | X | X | X | |
| F0291-01 | Day Street Apartments | Day Street, L.P. | The John Stewart Company | X | X | X | | |
| F0786-01 | 127th Street Apartments | Western Community Housing, Inc. (MGP) | The John Stewart Company | | X | X | | X |
| B0335-01 | Academy Hall | Academy Hall, LP. | John Stewart | X | | | X | X |
| B0804-01 | Harmony Gates Apartments (In Construction) | InSite Development | Ironwood Asset Management | X | X | | | X |
| F0204-01 | Manitou Vistas | Westlake Housing, LP | Westlake Housing | X | | | X | X |
| F0205-01 | Manitou Vistas II | Westlake Housing, LP | Westlake Housing | X | | | X | X |

**Appendix 100**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0814-01 | Jordan Downs Phase 1B | The Michael's Organization | The Michael's Organization | X | | | X | X |
| F0811-01 | Rise Apartments | Highridge Costa | SRO Housing Corporation | X | X | X | | |
| B0364-01 | Natick Place | Zero Plus Services, LLC. | Moss & Company | | X | X | | X |
| B0392-05 | Hollywoodland | Steele Properties | Monroe Group | | X | | X | X |
| C0412-01 | Courtland Hotel | SRO Housing Corporation | SRO Housing Corporation | X | X | | X | |
| F0074-01 | Telacu Las Flores | Telacu Residential Management | Telacu Residential Management | X | | | X | X |
| F0148-01 | Lakeview Terrace Silvercrest | The Salvation Army | The Salvation Army | X | | | X | X |
| F0266-01 | Gateways Apartments | Hollywood Community Housing Corp. | SRO Housing Corporation | X | X | | | X |
| B0330-01 | Broadway Village II | Deep Green Housing | Deep Green Property Management | X | X | | | X |
| B0342-01 | Hamlin Estate Apts | Fairstead | FPI | X | | | X | X |
| B0353-01 | Central Ave Village Square | CP Preservation Housing | Concerned Citizens of South Central Los Angeles | | | X | X | X |
| B0345-01 | Roberta Stephens | CP Preservation Housing | Concerned Citizens of South Central Los Angeles | | | X | X | X |
| B0345-02 | Roberta Stephens | CP Preservation Housing | Concerned Citizens of South Central Los Angeles | | | X | X | X |
| F0841-01 | Simpson Arbor Apartments | Brookmore Apartment Corporation | Caring Housing Ministries | X | | | X | X |
| F0116-01 | El Centro Loretto Apartments | | | X | | | | X |
| F0275-01 | Osborne Place Apartments | | | | X | | X | |
| B0390-01 | Lexington A & B Apts | Alpha | Alpha | registered | | | X | |
| F0315-01 | Silver Star Apartments/ West Villas | | | | | | X | X |

**Appendix 101**

| ID | Name | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0159-01 | Apple Tree Village | | | X | | | | X |
| B0378-01 | Harbor Village | Related California | Related | X | | | | X |
| C0474-01 | Liberty Village | | | | X | X | | |
| C0486-01 | Twin Palms Apartments | | | X | | | | X |
| F0009-01 | Project Independence | UCPLA | UCPLA | | X | | | X |
| F0009-02 | Project Independence | UCPLA | UCPLA | | X | | | X |
| F0054-01 | Telacu Pointe/Telacu Housing - L A Inc | | TELACU Residential Management | X | | | | X |
| F0127-01 | Victory Gardens | 13436 Victrory Partners, L.P. | | X | | | | X |
| F0183-01 | Royals Apartments | | | | | | X | X |
| F0698-01 | West Valley Community Development Corp. (Aka W. Valley Bungalow Ct. For Seniors) | West Valley Community Development Corp | | | X | X | | |
| F0604-01 | Norbo Hotel Development Corp | | | X | | | | X |
| F0014-01 | Main Street Apts. | | | X | | | | X |
| F0015-01 | Manila Terrace | Manila Terrace Limited Partnership | Manila Terrace Apartments | | | | X | X |
| F0613-01 | 43rd Street Apts. | HCID | | | X | X | | |
| F0058-01 | Blythe Street Apartments | | | | | | X | X |
| F0075-01 | Tres Palmas | Tres Palmas Partners, LP | New Capital, LLC | | X | X | | |
| F0125-01 | Santa Cruz Terrace | | | | X | X | | |
| F0126-01 | Towne Square Apartments, L.P. | | Caring Housing Ministries | | | | X | X |

**Appendix 102**

| ID | Name | Owner | Management | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0700-01 | Tierra Del Sol | | | | X | X | | |
| F0708-01 | Venice Senior Housing aka Adda & Paull Safran Senior Housing | | | X | | | | X |
| F0711-01 | Curtis Johnson Apts. | | | X | | | | X |
| F0713-01 | La Brea | | | X | | | | X |
| F0719-01 | Broadway Village I Apartments | | | X | | | | X |
| F0720-01 | Garcia, Alvaro A. And Raquel | | | X | | | | X |
| F0202-01 | Hfl Vanowen Apartments | Homes for Life Foundation | Caring Housing Ministries | X | | | X | |
| F0207-01 | Mimmim Townhomes | | Buckingham Property Management | X | | | | X |
| F0209-01 | Panorama View Apartments | Panorama Preservation | Preservation Partners Management Group | | | | X | X |
| F0149-01 | New Terminal Hotel | SRO Housing Corp | SRO Housing | | X | | | X |
| B0327-01 | University Gardens | CBG University Gardens, L.P. | Winn Companies | X | | | | X |
| C0413-01 | Crescent Court Apartments | Housing Authority of the City of Los Angeles (HACLA) | EAH Housing | | | | X | X |
| F0283-01 | Beswick Senior Apartments | East Los Angeles Community Corp. | JSCO | X | | | | X |
| F0037-01 | Alabama I-III | LA Family Housing Corp | JSCO | X | | | | X |
| F0253-01 | Cuatro Vientos | ELAC | John Stewart | X | | | | X |
| F0307-01 | Panama Apartments | SRO Housing Corp | SRO Housing Corp | | X | | | X |
| F0304-01 | Marmion Way Apartments | Path | Conam | | | | X | X |
| F0787-01 | Cielito Lindo | ELACC | John Stewart | X | | | | X |

**Appendix 103**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0019-01 | Adams Congress Apts. | ICDC | Levine | | | | X | X |
| F0794-01 | Pico Robertson Senior Community Apartments (In Construction) | Mercy Housing | Mercy Housing | | X | | X | |
| B0319-01 | Tarzana Terraces | Tarzana Terraces | GoldrichKest | X | | | | X |
| B0805-01 | 10201 LINDLEY AVENUE - CANYON CREEK APARTMENTS | Grand Apartments on Lindley | FPI Management | | | | X | X |
| C0430-01 | Palmer House Hotel | SRO Housing Corp | SRO Housing Corporation | | X | | | X |
| F0033-01 | White Oak Apts. | United Cerebral Palsy of Los Angeles | United Cerebral Palsy of Los Angeles | | X | | | X |
| F0076-01 | Vanowen Gardens | 11754 Vanowen Gardens LP, | John Stewart Co. | X | | | | X |
| F0258-01 | Dana Strand Senior Apartments | ROEM Corp | FPI Mgt. | | | | X | X |
| F0704-01 | North Hollywood Accessible Apartments | Cahuenga Housing Foundation | United Cerebral Palsy Foundation of Los Angeles | | | X | | X |
| F0754-01 | Blue Butterfly Village (aka Navy Village) | Volunteers of America National Services | Volunteers of America of Los Angeles | | | X | | X |
| F0210-01 | Second Avenue Preservations | Second Avenue Preservation, L.P. | Preservation Partners Management Group | | | | X | X |
| F0212-01 | St. Andrews Arms Apts | St. Andrews Preservation, L.P. | Preservation Partners Management Group | | | | X | X |
| F0213-01 | Stevenson Manor | 1230 Cole Avenue LP | Ironwood Management | | X | | | X |
| F0237-01 | Toberman Village | Alegre Vista | New Capital, LLC | | | X | | X |
| F0739-01 | Two Worlds Apartments | Two Worlds Preservation, L.P. | Preservation Partners Management Group | | | | X | X |
| F0739-02 | Two Worlds Apartments | Two Worlds Preservation, L.P. | Preservation Partners Management Group | | | | X | X |
| F0739-03 | Two Worlds Apartments | Two Worlds Preservation, L.P. | Preservation Partners Management Group | | | | X | X |
| F0739-04 | Two Worlds Apartments | Two Worlds Preservation, L.P. | Preservation Partners Management Group | | | | X | X |

**Appendix 104**

| ID | Property | Partnership | Management | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0739-05 | Two Worlds Apartments | Two Worlds Preservation, L.P. | Preservation Partners Management Group | | | | X | X |
| F0739-06 | Two Worlds Apartments | Two Worlds Preservation, L.P. | Preservation Partners Management Group | | | | X | X |
| C0449-01 | Casa Loma Apartments | New Economics for Women (MGP) | New Capital LLC | | X | X | | |
| C0561-01 | 1755 W Adams Blvd Property aka Adams Senior Garden | Adams Senior Gardens, L.P. | Fame Housing Corporation | | X | | | X |
| C0480-01 | T M Chambers Manors | T M Chambers Manors LP | Triumph Residential | | X | | | X |
| C0432-01 | Hfl Garden Villa Homes | Homes For Life Foundation | Caring Housing Ministries | X | | | X | |
| C0497-01 | Hikari Apartments | Equity Residential | Equity Residential | | X | | | X |
| C0501-01 | Security Lofts | Simpson Property Group | Simpson Property Group | X | | | | X |
| B0359-01 | Vanowen Plaza | Ironwood Management | Ironwood Management | | | X | | X |
| B0363-01 | Darby Villas | 6272 Darby Assc 44 LP | Ironwood Management | | | X | | X |
| B0365-01 | Saticoy Villas | 20358 Saticoy Assc 44 LP | Ironwood Management | | | X | | X |
| B0368-01 | Kittridge Park Villas | Grape APE LLC | Ironwood Management | | | X | | X |
| F0144-01 | Eads Apartments | New Economics for Women (MGP) | New Capital, LLC | | X | X | | |
| F0134-01 | Castelar Apartments | AMCAL | Avanath Castelar | | | | X | X |
| F0026-01 | Orion Villas aka Vargas Llosa | Orion Villas | Neighborhood Partners, Inc. | X | | | | X |
| F0828-01 | West Third Apartments | Step Up on Second | Step Up on Second | X | | | | X |
| C0448-01 | Village Acquistion 3 Archwd | Valley Village Center | Valley Village Center | | X | X | | |
| F0831-01 | Casa de Rosas Campus | Telacu | Telacu | X | | | X | |

**Appendix 105**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C0436-01 | Grand & Venice Apartments | Mercy Housing | Mercy Housing | | X | | | X |
| C0434-01 | Wisconsin III Apartments | Community Resource Talent Development (CRTD) | The John Stewart Company | | | | X | X |
| C0464-01 | 3804 Wisconsin Apartments | Community Resource Talent Development (CRTD) | The John Stewart Company | | | | X | X |
| F0066-01 | Harmony II | Harmony Gardens LP, | The John Stewart Company | X | | | | X |
| F0255-01 | Las Margaritas | East LA Community Corporation | The John Stewart Company | X | | | | X |
| S0597-01 | Villas At Gower | ACOF | The John Stewart Company | X | | | | X |
| F0600-01 | One Wilkins Place | | ccscla | X | | | | X |
| B0348-01 | Banning Villas | Preservation Partners Management Group | Preservation Partners Management Group | | | | X | X |
| C0429-01 | Hollywood Silvercrest | The Salvation Army | The Salvation Army | X | | | | X |
| C0446-01 | Village Acquisition II | Valley Village Center | Valley Village Center | | X | X | | |
| C0462-01 | Valley Village Condos | Valley Village Center | Valley Village Center | | X | X | | |
| F0049-01 | New Hope - Sta. Monica | Telacu Residential Management | Telacu Residential Management | X | | | | X |
| F0069-01 | New Hope - Silver Lake | Project New Hope | Telacu Residential Management | X | | | | X |
| F0087-01 | University Park Apartments | New Life Economic Development | New Life Economic Development | X | | | | X |
| F0177-01 | Columbus Permanent Housing | Abbey Road, Inc. | Penny Lane Centers | X | | | | X |
| F0236-01 | Rosa Parks Villas | Ward Economic Devleopment Corp. | Telacu Property Management | X | | | | X |
| F0305-01 | Mirage Town Homes | Leela Enterprises | Buckingham Property Management | X | | | | X |
| F0724-01 | Astoria Village | Valley Village Center | Valley Village Center | | X | X | | |

**Appendix 106**

| ID | Property | Developer | Manager | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0731-01 | Penny Lane - 15258 Gresham St. | Abbey Road, Inc. | Penny Lane Centers | X | | | | X |
| S0593-01 | Vermont Seniors | Community Resource and Talent Development | The John Stewart Company | | | | X | X |
| F0837-01 | Broadway Apartments | Figueroa Economical Housing Development Corporation | Step Up on Second | X | | | | X |
| F0840-01 | The Pointe on Vermont | EAH Inc. | EAH Inc. | | X | | X | |
| F0844-01 | Building 205 | Figueroa Economical Housing Development Corporation | Step Up on Second | X | | | | X |
| F0845-01 | Building 208 | Step Up on Second | Step Up on Second | X | | | | X |
| F0063-01 | Figueroa Senior Housing | Meta Housing | New Life Economic Development Corporation | | | | | X |
| F0254-01 | Juanita Villas Aka La Kretz Villas | Related | JSCO | | | | | X |
| F0141-01 | Asbury Apartments | | | | | | | X |
| F0046-01 | Gower Street Apts. | | | | | | | X |
| F0758-01 | Blossom Plaza | Brookfield Properties | Forest City Residential | | | | | X |
| B0334-01 | Burns Manor | | | | | | | X |
| F0183-04 | Royals Apartments | | | | | | X | |
| F0608-01 | Parker Hotel | ACOF | Barker | | | | | X |
| F0656-01 | Denker House | | Homes for Life Foundation | X | | | | |
| F0664-01 | Steel Plaza | | | | | | | X |
| S0584-01 | Grandview 9 | | Levine Group | | | | | X |
| F0601-01 | Ralph Bunche Villas | | | | | | | X |

**Appendix 107**

| F0603-01 | Deaf Community Mult. Center | Greater Los Angeles Agency on Deafness, Inc | Greater LA Council on Deafness (GLAD) | | | | | X |
| F0013-01 | Las Palomas Hotel | | | X | | | | |
| F0028-01 | Regency 50 | | Latin American Civic Association | | | | | X |
| F0032-01 | Tolton Court | Mercy Housing | | | | | | X |
| F0036-01 | 20258 Roscoe Dev LLC | | | | | | | X |
| F0641-01 | Hyde Park Place Apartments / CEDC | HCID | New Capital, LLC | | | X | | |
| F0645-01 | Oakwood Apts. | | Pinnacle American Mgnt Service West | | | | | X |
| F0073-01 | Pico-Gramercy Family Housing | | | | | | | X |
| F0079-01 | New Hope (Courtyard Apartments) - San Pedro | | TELACU Residential Management | | | | | X |
| F0082-01 | George Mcdonald Court | | | | | | | X |
| F0086-01 | Sycamore Park Apartments | Park Sycamore L.P. | Barrio Management Inc. | | | | | X |
| F0673-01 | Hillview Village | | | | | | | X |
| F0092-01 | New Hope Senior Villa | | | | | | | X |
| F0111-01 | Colorado Terrace | DDCM, Inc | DDCM, Inc | | | | | X |
| F0112-01 | Eugene Hotel | | | | X | | | |
| F0113-01 | Amistad Apartments | Esperanza Community Housing Corporation | Deep Green Property Management | | | | | X |
| F0711-02 | Curtis Johnson Apts. | | | X | | | | |
| F0711-03 | Curtis Johnson Apts. | | | X | | | | |

**Appendix 108**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0711-05 | Curtis Johnson Apts. | | | X | | | | |
| F0711-06 | Curtis Johnson Apts. | | | X | | | | |
| F0167-01 | Harbor City Lights | | Platinum Realty Management Inc. | | | | | X |
| F0171-01 | Magnolia City Lights | | | | | | | X |
| F0726-01 | Miramar City Lights Project | | Aperto | | | | | X |
| F0195-01 | Alegria Apartments | Esperanza Community Housing Corporation | Deep Green Property Management | | | | | X |
| F0183-02 | Royals Apartments | | | | | | X | |
| F0183-03 | Royals Apartments | | | | | | X | |
| F0867-01 | La Guadalupe | Many Mansions | | | | | | X |
| B0372-01 | Verde Del Oriente Preservation ProjectJPM | Lighthouse San Pedro 3rd Street LP | AIMCO | X | | | | |
| F0024-01 | Casa Seville-Memory Park Apartments | Memory Park | Pineridge | | | | | X |
| F0065-01 | Hardemion, John C | John C. Hardemion Clair M. Hardemion Faulty Trust | John C. Hardemion Clair M. Hardemion Faulty Trust | | | | | X |
| F0095-02 | Central City Apartments | Central City Apartments | Solari | | | | | X |
| F0095-03 | Central City Apartments | Central City Apartments | Solari | | | | | X |
| F0244-01 | My Town Homes | MIMMIM Town Home, LP | Buckingham Property Management | | | | | X |
| F0701-01 | Helms Manor | Helms Manor Housing Corporation | Home Ownership Made Easy | | | | | X |
| F0240-01 | Columbus Square Apartments | Preservation Partners Development, LLC | Preservation Partners Management Group | | | | X | |
| F0262-01 | Milan Town Homes | Mimmim Town Home, LP | Buckingham Property Management | | | | | X |

**Appendix 109**

| ID | Project | Owner | Management | 1 | 2 | 3 | 4 | 5 | 6 |
|---|---|---|---|---|---|---|---|---|---|
| F0285-01 | La Pro II | LA Pro II Preservation Partnership | Preservation Partners | | | | | X | |
| F0760-01 | Eastlake / Altura Walk | East LA Community Corp. | East LA Community Corp. | | | | | | X |
| C0399-01 | Metropolitan (Skyline) | Forest City South Park Two, Inc. | Forest City Residential | | | | | | X |
| C0451-01 | Tuelyn Terrace | Ward Economic | Ward Economic | | | | | | X |
| C0407-01 | New Opportunities For Living | The Help Group | The Help Group | X | | | | | |
| C0408-01 | New Opportunities For Living | The Help Group | The Help Group | X | | | | | |
| C0419-01 | Grand Central Square Project | Grand Central Square, LP | Grand Central Square | | | | | | X |
| C0492-01 | Geilim Gilbert & Violet | Violet Geilim Living Trust | Violet Geilim Living Trust | | | | | | X |
| C0565-01 | Thropay Rueben & Carol | Thropay Rueben & Carol | Aftonprop | | | | | | X |
| C0504-01 | Rosslyn Lofts | Rosslyn Lofts Housing Partners LP | Logan Property Management | | | | | | X |
| C0574-01 | Gateways Transitional Housing | Gateway Hospital & Mental Health | Little Tokyo Service Center | | | | | | X |
| B0517-01 | #1, Seven Palms | #1, Seven Palms | villageinvestments | | | | | | X |
| B0362-01 | Park Merridy | The Korda Group/RPK | The Korda Group/RPK | | | | | | X |
| B0320-01 | Oliveview Garden Apts. | 14500 Oliveview Investment Company, Inc. | Berglas & Garfield Consulting Company Inc. | | | | | | X |
| B0323-01 | The New Yorker | JMF Enterprises, LLC | JMF Development | | | | | X | |
| B0372-02 | Verde Del Oriente Preservation ProjectJPM | Lighthouse San Pedro 3rd Street LP | AIMCO | X | | | | | |
| S0589-01 | Gallery At Noho Commons (Phase I) | Gallery At Noho Commons (Phase I) | Greystar | | | | | | X |
| F0255-02 | Las Margaritas | East LA Community Corporation | The John Stewart Company | X | | | | | |

**Appendix 110**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0255-03 | Las Margaritas | East LA Community Corporation | The John Stewart Company | X | | | | |
| F0094-01 | Alegria | Salvation Army Southern California | The John Stewart Company | | | | | X |
| F0166-01 | Ardmore City Lights | Post Group X Ardmore LP | Aperto Property Management | | | | | X |
| B0379-02 | Hazeltine | Aedis | | | | | | X |
| F0130-01 | Westminster Senior Apts. | HDSI | | | | | | X |
| B0369-01 | Ridgecroft Apts | Northridge Redevelopment Group | Property Management Association | | | | | X |
| F0121-01 | Lime House | HDSI Management Inc. | HDSI Management Inc. | | | | | registered |
| F0611-01 | Vineland Place - (HCDBG) | VINELAND PLACE L.P. | The John Stewart Company | | | | | X |
| B0392-01 | Hollywoodland | Steele Properties | Monroe Group | | | | | X |
| B0392-02 | Hollywoodland | Steele Properties | Monroe Group | | | | | X |
| B0392-03 | Hollywoodland | Steele Properties | Monroe Group | | | | | X |
| B0392-04 | Hollywoodland | Steele Properties | Monroe Group | | | | | X |
| B0392-06 | Hollywoodland | Steele Properties | Monroe Group | | | | | X |
| B0379-01 | Wyandotte | Insite Development | Ironwood Company | | | | | X |
| S0580-01 | Don Hotel Apartments | 105 East "I" Street | WinnCo | | | | | X |
| S0582-01 | La Estrella Apartments | Esperanza Community Housing Corporation | Deep Green Property Management | | | | | X |
| S0586-01 | Paseo Del Sol | East LA Community Corporation | East LA Community Corporation | | | | | X |
| F0851-01 | Summit View Apartments | LA Family Housing Corp | The John Stewart Company | X | | | | |

**Appendix 111**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0162-01 | Lorena Terrace | | | | | | | |
| F0251-01 | Boyle Hotel Apartments | | | | | | | |
| B0351-01 | Silverlake | | | | | | | |
| C0558-01 | P.A.T.H. Servicenter | | | | | | | |
| F0230-01 | Bonnie Brae Village Apartments | | | | | | | |
| F0599-01 | Duane Heights | | | | | | | |
| F0001-01 | Watson Terrace I | | | | | | | |
| F0004-01 | Fame Manor | | | | | | | |
| F0614-01 | 509 S. Union Drive | | | | | | | |
| F0617-01 | 8735 Orion Ave. | NEIGHBORHOOD PARTNERS INC. | | | | | | |
| F0622-01 | Corridor Project | HCID | | | | | | |
| F0622-02 | Corridor Project | HCID | | | | | | |
| F0622-03 | Corridor Project | HCID | | | | | | |
| F0624-01 | La Townhomes | MIMMIM Town Home, LP | MIMMIM Town Home, LP | | | | | |
| F0630-01 | Orozco Villas | NEIGHBORHOOD PARTNERS INC. | | | | | | |
| F0634-01 | Fame West 25th Street | | | | | | | |
| F0040-01 | Arminta Square | Western Community Housing, Inc. (MGP) | | | | | | |
| F0043-01 | Canaan Gardens | | | | | | | |

**Appendix 112**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| F0640-01 | Hayward Manor Apts. | PACIFIC INVESTMENTS I AND M LLC | Pacific Investments, LLC | | | | | |
| F0649-01 | Sharp Manor | | | | | | | |
| F0062-01 | Figueroa Oaks | | | | | | | |
| F0078-01 | Westlake Apts. | Empress Apartments LP | Neighborhood Partners Inc | | | | | |
| F0085-01 | Los Altos Apartments | | | | | | | |
| F0089-01 | Courtyard Apts. | | | | | | | |
| F0672-01 | Foundation For Quality Housing | | | | | | | |
| F0103-01 | Richard N. Hogan Manor | | | | | | | |
| F0105-01 | Senderos Apartments | | | | | | | |
| F0692-01 | Corvalan, Lisa | | | | | | | |
| F0117-01 | Eugene Thomas Manor | | | | | | | |
| F0695-01 | Meera Townhomes | | | | | | | |
| F0122-01 | Plaza De Leon | | | | | | | |
| F0131-01 | Broadway Plaza Apts. | | | | | | | |
| F0137-01 | Historic Barbizon Hotel | | | | | | | |
| F0705-01 | Olive Manor Sr. Apartments | Bromont Housing Corporation | | | | | | |
| F0706-01 | Reyna (Trustee), Guadalupe | | | | | | | |
| F0146-01 | Fiesta House | Fiesta House Senior Housing, Inc. | HDSI Management, Inc. | | | | | |

**Appendix 113**

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| F0712-01 | Historic Hollywood Hillview Llc | | | | | | |
| F0154-01 | Victor Clothing/Live Work Loft | | | | | | |
| F0163-01 | Mansi Town Homes | | | | | | |
| F0165-01 | Afton Place Senior Apartments | | | | | | |
| F0725-01 | Baldwin Housing Associates Lp | | | | | | |
| F0732-01 | Toliver, Patricia A. | | Patricia Toliver | | | | |
| F0866-01 | Bell Creek Apartments | | | | | | |
| F0869-01 | Parque Vista | | | | | | |
| F0870-01 | Washington View Apartments | | | | | | |
| F0873-01 | Colorado East | | | | | | |
| F0871-01 | Chester Field | | | | | | |
| L0854-01 | 3551 E. 4th Sreet | | | | | | |
| F0865-01 | Talisa (fka 9502 Van Nuys Blvd) | | | | | | |
| X0860-01 | Park Western Estates | | | | | | |
| F0877-01 | Main St. Apts | | | | | | |
| F0859-01 | Marcela Gardens | CRCD | John Stewart Co. | | | | |
| F0284-01 | Figueroa Apartments | CRCD | Levine | | | | |
| F0242-01 | Maya Town Homes | Mimmim Town Home, LP | Buckingham Property Management | | | | |

**Appendix 114**

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| F0249-01 | Maple Tree/Coronel Village | American Housing | Cirrus Asset | | | | | | |
| C0450-01 | 11th Avenue Apartments | Ausar Economic | Ausar Economic | | | | | | |
| C0463-01 | Florence Crittenton Center | Florence Crittenton Center | Florence Crittenton Center | | | | | | |
| C0452-01 | Kraemer Apartments | Francisco Chavez; Soledad Trust; And Chavez Family Trust | Francisco Chavez; Soledad Trust; And Chavez Family Trust | | | | | | |
| C0406-01 | Great Expectations | Great Expectations | TLC For The Blind, Inc. | | | | | | |
| C0409-01 | Harmony St. Partnership | 5316 Harmony, LLC | 5317 Harmony, LLC | | | | | | |
| C0414-01 | Marion Hotel | Skid Row Development | Skid Row Development | | | | | | |
| C0418-01 | Carter House Apartments | Community Housing Management Services | HDSI Management, Inc. | | | | | | |
| C0453-01 | Yorkshire Hotel | Gill Family Properties | Gill Family Properties | | | | | | |
| C0471-01 | Arirang Senior Housing | Whitley Apartments LLC | HDSI Management, Inc. | | | | | | |
| C0559-01 | Fame Gardens | Fame Housing Corporation | Fame Housing Corporation | | | | | | |
| C0472-01 | Colden Oaks Apartments | Colden Oaks, LP | HDSI Management, Inc | | | | | | |
| C0560-01 | Adams-Western | The Bedford Group | The Bedford Group | | | | | | |
| C0423-01 | 1732 W. 24th Street Property | Fame Housing Corporation | Fame Housing Corporation | | | | | | |
| C0457-01 | Brynhurst Avenue Apartments | Brynview Terrace LP | Development Corporation (formerly known as Corridor Economic | | | | | | |
| C0487-01 | Golden Years Senior Apartments | The Levine Groups, Inc. | The Levine Groups, Inc. | | | | | | |
| C0488-01 | Freedom House | Center For Human Rights & Constitutional Law, Inc. | Center for Human Rights & Constitutional Law, Inc. | | | | | | |
| C0493-01 | Friedman, Morris & Shirley | Anna Morris Properties, LLC | Anna Morris Properties, LLC | | | | | | |

**Appendix 115**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C0500-01 | Villa Del Sol Apartments | FFAH Villa Del Sol LLC | Aperto Property Management | | | | | |
| C0458-01 | Martin Luther King Apartments | Skid Row Development | Skid Row Development | | | | | |
| C0507-01 | Bethany Senior Apartments | Bethany Senior Housing II, LP | Bethany Senior Housing II, LP | | | | | |
| C0443-01 | Ecovillage a.k.a. Urban Soil Tierra Urbana | Urban Soil/Tierra Urbana | Urban Soil/Tierra Urbana | | | | | |
| B0509-01 | Baldwin Villas Plaza (202) | Baldwin Villa Plaza LP | SK Managment Company LLC | | | | | |
| B0317-01 | Ethel Arnold Bradley (81) - (Casden Acquired) | WNC Community Preservation Partners, LLC | American Real Property Management, Inc. | | | | | |
| B0515-01 | Glenoaks Townhomes (48) | Alcole Properties | Alcole Properties | | | | | |
| B0526-01 | #26 | Arquilevich Family Revocable Trust/LBPM | LB Property Management | | | | | |
| B0357-01 | Owens Royale | | Vonderahe Management | | | | | |
| B0358-01 | Saticoy Terraces | Statewide Enterprises | Vonderahe Management | | | | | |
| B0367-01 | 14757 Sherman Way | Navid Investments, A California GP | Fountain Terrace | | | | | |
| F0868-01 | Jordan Downs S3 | Jordan Downs Phase S3, L.P. | Interstate Realty Management Company | | | | | |
| F0874-01 | La Veranda | La Veranda, L.P. | Adobe Communities | | | | | |
| F0878-01 | Quincy Apts | | | | | | | |
| F0879-01 | Sherman Oaks Senior Housing | Mercy Housing California | Mercy Housing Management Group | | | | | |
| F0248-01 | Stovall Villas | Waset | HDSI Management | | | | | |
| F0857-01 | Amani Apartments | Amani | ConAm | | | | | |
| F0612-01 | Harbour Community Housing | Neighborhood Partners Inc. | Neighborhood Partners Inc. | | | | | |

**Appendix 116**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| C0473-01 | Telacu Vistas Del Sol | Telacu | Telacu | | | | | |
| F0646-01 | Paz Villas | Neighborhood Partners Inc. | Neighborhood Partners Inc. | | | | | |
| F0697-01 | Sonya Gardens | Sonya Gardens LP | Barker | | | | | |
| F0697-02 | Sonya Gardens | Sonya Gardens LP/ACOF | Barker | | | | | |
| F0697-03 | Sonya Gardens | Sonya Gardens LP | Barker | | | | | |
| F0697-04 | Sonya Gardens | Sonya Gardens LP | Barker | | | | | |
| F0815-01 | Hartford Villa Apartments | SRO Housing Corporation | SRO Housing Corporation | | | | | |
| C0821-01 | Sol y Luna | | The John Stewart Company | | | | | |
| B0827-01 | Grand Avenue Parcel Q Apts. | Grand Avenue Parcel Q Developer | | | | | | |
| F0830-01 | Vermont Corridor Apartments (fka 433 Vermont Apts) | Western Community Housing, Inc. (MGP) | The John Stewart Company | | | | | |
| F0833-01 | Rosa De Castilla Apartments | East LA Community Corporation | The John Stewart Company | | | | | |
| F0842-01 | PATH Villas Montclair/Gramercy(Site 1 of 2) | PATH Ventures | The John Stewart Company | | | | | |
| F0861-01 | Hope on Broadway | Hope Street Development Group | FPI | | | | | |
| F0853-01 | Vista Ballona | Community Corporation of Santa Monica | Community Corporation of Santa Monica | | | | | |
| F0856-01 | LAMP Lodge | Daylight & Decro | The John Stewart Company | | | | | |
| F0858-01 | Rose Apartments | Venice Community Housing Corporation | Venice Community Housing Corporation | | | | | |
| F0863-01 | Cadence | LINC Housing Corporation | The John Stewart Company | | | | | |
| X0862-01 | Castle Argyle | | | | | | | |

**Appendix 117**

| X0864-01 | The Hotel Cecil | Simon Baron | | | | | | | |
| F0880-01 | LA Prense Libre | | | | | | | | |
| F0881-01 | Watts Works | | | | | | | | Est. Total Compliant Individuals |
| | | Total Compliant in Fair Housing (Sites): | 548 | 510 | 474 | 539 | 656 | | 2727 |

**Appendix 118**

# AcHP 2020 Quarter 1 (Jan-Mar) Data for 614 Property Sites

## ("2020 Q1 Property Report")

| 2020 QUARTER 1 (JAN- MAR) DATA FOR 614 PROPERTY SITES* | Applicant Changes on Accessible Unit Wait List | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | | | |
| | Added | Removed | | Added | Removed | | Current Waitlist Aggregate Total | | |
| | 1997 | 39 | | 1997 | 39 | | 6283 | | |
| | Applicant Changes on Accessible Unit Transfer Wait List | | | | | | | | |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | | | |
| | Added | Removed | | Added | Removed | | Current Waitlist Aggregate Total | | |
| | 93 | 3 | | 93 | 3 | | 315 | | |
| | # Lease Addendums Executed | | | | | | | | |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | Aggregate Total | | |
| | 203 | | | 203 | | | 987 | | |
| | Grievances | | | | | | | | |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | Aggregate Total | | |
| | # Registered | # Approved | # Denied | # Registered | # Approved | # Denied | # Registered | # Approved | # Denied |
| | 15 | 12 | 2 | 15 | 12 | 2 | 71 | 49 | 11 |
| | Reasonable Accommodations | | | | | | | | |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | Aggregate Total | | |
| | # Requested | # Approved | # Denied | # Requested | # Approved | # Denied | # Requested | # Approved | # Denied |
| | 160 | 84 | 4 | 160 | 84 | 4 | 817 | 577 | 26 |
| | Reasonable Modifications | | | | | | | | |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | Aggregate Total | | |
| | # Requested | # Approved | # Denied | # Requested | # Approved | # Denied | # Requested | # Approved | # Denied |
| | 215 | 123 | 6 | 215 | 123 | 6 | 592 | 417 | 24 |
| | Quarterly AU Occupancy Survey | | | | | | | | |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | Aggregate Total | | |
| | PWD | Non-PWD | | PWD | Non-PWD | | PWD | Non-PWD | |
| | 930 | 550 | | 930 | 550 | | 2145 | 1901 | |
| | Vacancies Listed (Unit Numbers) | | | | | | | | |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | Aggregate Total | | |
| | 100 | | | 100 | | | 205 | | |
| | Effective Communication | | | | | | | | |
| | Q1 2020 (JAN-MAR) | | | Annual Total | | | Aggregate Total | | |
| | # Requested | # Approved | # Denied | # Requested | # Approved | # Denied | # Requested | # Approved | # Denied |
| | 3 | 1 | 0 | 3 | 1 | 0 | 3 | 1 | 0 |
| | Assistance Animal Refund Log | | | | | | | | |
| | Aggregate Total | | | | | | | | |
| | 494 | | | | | | | | |

* Quarterly Reports are due on the 10th day following the end of the quarter period, i.e., Q1 2020 reports were due on April 10, 2020.

Appendix 120

# City's Response to Monitor's Request to the Parties for Information Regarding LAHSA

# ("City's Response")

### CITY'S RESPONSE TO MONITOR'S REQUEST TO THE PARTIES FOR INFORMATION REGARDING LAHSA

In the Monitor's Supplement to January 28, 2020 Status Conference Report, the Monitor requested information from the parties regarding LAHSA. Below are the City's responses to the Monitor's inquiries.

(a) whether the City's position is that LAHSA should be following CSA requirements in filling accessible units;

The City's position is that LAHSA is not a party to the CSA and is not subject to the requirements of the CSA. The obligations of the CSA relate to the City and owners of covered properties; LAHSA is neither. Notwithstanding, if LAHSA were subject to the CSA, LAHSA still does not fill accessible units, and thus, CSA requirements for filling accessible units would not apply. Units are filled by property owners either directly or through their property management agents. LAHSA's role related to these units is to connect homeless individuals and households to housing, utilizing the Coordinated Entry System (CES). CES connects the highest need, most vulnerable persons in the community to available housing. When LAHSA is informed by a covered property that a unit is available, LAHSA provides the name of the first qualified tenant for said unit as provided by CES. The property then confirms that the individual meets the qualifications of the unit and fills the unit. It is the property owners' responsibility, not LAHSA, to fill an available accessible unit with a person who needs the features of the unit.

(b) whether and how LAHSA is following CSA requirements for filling accessible units;

As discussed above, the CSA requirements for filling accessible units are not applicable to LAHSA.

(c) whether and how LAHSA is not following CSA requirements in filling accessible units;

As discussed above, the CSA requirements for filling accessible units are not applicable to LAHSA.

(d) whether the City has knowledge of whether the persons chosen for CES accessible units need the accessibility features and what that knowledge is;

Through the City's monitoring of covered properties the City is able to monitor and ensure that accessible units are filled with people who need the features of the units.

Through the PMP review and approval process and monitoring of the lease-up, the CES accessible units are identified and the contact information for CES matcher(s) for the development is included on the property information/contacts on the registry and on the marketing flyer. CES accessible units, as all other accessible units, are monitored to ensure that these are filled by persons with

**Appendix 122**

disabilities who require the features.  LAHSA, VA, and County Mental Health utilize the CES or a similar system to fill their respective restricted units. Also, for existing developments vacancies are first filled through the accessible unit transfer list and then through the CES process.

(e) the specific efforts the City has made with LAHSA to obtain LAHSA's voluntarily compliance with the requirements of the CSA, including identifying LAHSA officials the City has contacted in this respect, and providing copies of any documents;

LAHSA is not a party to the CSA and is not subject to the requirements of the CSA.  The obligations of the CSA relate to the City and owners of covered properties; LAHSA is neither. Notwithstanding, LAHSA has voluntarily worked with the City to take steps to address concerns raised by the plaintiffs regarding CES units. These efforts involved meetings between LAHSA, the City and plaintiffs to discuss concerns and steps that could be taken to address.

(f) whether it would be appropriate to join LAHSA as a necessary party or take other action to bring LAHSA under the CSA.

The City notes that LAHSA is a separate and distinct legal entity from the City, is not a part of the municipal entity, and is not affiliated with HCID. The Mayor and City Council do not have the authority to obligate LAHSA to this or any other Settlement Agreement with a third party. The City also questions whether LAHSA can be legally added, at this stage, as a "necessary party" to the CSA. LAHSA was not a party to the underlying litigation or a participant in the negotiations leading up to the CSA, nor is there any indication that Plaintiffs ever contemplated either.  However, to the extent that the Court Monitor believes that the Court possesses the legal authority to join LAHSA as a necessary party to the CSA in order to "achieve complete relief in this case," the City believes that, similarly, all owners and property management companies related to the entirety of the Covered Properties should also be joined.

**Appendix 123**

# City's Update and Response to Monitor's LAHSA Remedial Objectives and Information Requested

## ("City's Revised Response")

## CITY'S UPDATE AND RESPONSE TO MONITOR'S LAHSA REMEDIAL OBJECTIVES AND INFORMATION REQUESTED

On April 27, 2020, the Monitor provided the City with a document identifying seven remedial objectives relating to LAHSA and requesting information for each. The City advised the Monitor that it would review and discuss the document with LAHSA and begin gathering the requested information. The City has shared the Monitor's request with LAHSA and held a discussion with their legal counsel to discuss the requested items. Below please find the information that was shared with the City on each of the items. Additionally, please find below the information requested from the City.

*1. LAHSA should have in place for Service Planning Area ("SPA") caseworkers who identify individuals who need mobility features or sensory vision/hearing features available in Coordinated Entry System ("CES") housing units (a) an effective process, (b) clearly articulated criteria for identifying such individuals, (c) guidelines for applying the criteria, (d) record keeping adequate to develop waiting lists of persons eligible for housing with mobility features and for housing with sensory vision/hearing features, (e) training and development of written materials for the use of caseworkers, and (f) summaries of the preceding set forth for easy reference in the caseworker's manual used for interviewing clients.*

*Necessary information:*

*a. Describe the process used by LAHSA and/or each SPA to identify individuals who need mobility or sensory visual/hearing features, any changes in the process over time, the date changes were made, and reasons changes were made.*

- LAHSA has informed the City that it has guidance, which is available on its website, https://www.lahsa.org/documents?id=1804-interim-guidance-matching-participants-with-disabilities-to-fully-accessible-units.pdf, for the process used for filling mobility and hearing/vision units. This guidance became effective March 1, 2018.

- LAHSA has informed the City that Individuals are presented with a survey, made up of the Vulnerability Index Service Prioritization Decision Assistance Tool (VI-SPDAT) and program intake questions. The survey includes questions to capture if an individual needs an accessible unit and the type of unit needed, the question directed towards the individuals taking the survey can be found at number 38. The survey can be found on LAHSA's website, https://www.lahsa.org/documents?id=1306-form-1306-ces-survey-for-individuals-survey-packet.pdf. Question 38 asks:

    38. Question for Participant: Some housing units have disability related features that make it easier for people with certain disabilities to live in that housing. If you or anyone in your household are to be placed in housing, would you need: ☐ Yes: a mobility unit, ☐ Yes: a hearing/vision unit, ☐ Yes: a mobility and hearing/vision unit, ☐ No

*b. Describe the articulated criteria used by LAHSA and/or each SPA to identify such individuals, any changes over time, the date changes were made, and reasons changes were made.*

- LAHSA has informed the City that the criteria is contained within the survey given to individuals. As it relates to the need for accessible housing, the survey asks the following question:

**Appendix 125**

38. Question for Participant: Some housing units have disability related features that make it easier for people with certain disabilities to live in that housing. If you or anyone in your household are to be placed in housing, would you need: ☐ Yes: a mobility unit, ☐ Yes: a hearing/vision unit, ☐ Yes: a mobility and hearing/vision unit, ☐ No

- LAHSA has informed the City that Property owners also fill out a questionnaire when a unit becomes available, requires them to indicate if the available units is a mobility or hearing/vision unit.

  c. *Describe the articulated criteria used by LAHSA and/or each SPA to identify the relative need for housing, including vulnerability index*

- LAHSA has informed the City that the criteria is contained with the survey given to individuals. The survey measures acuity levels, any changes over time, the date changes were made, and reasons changes were made. The survey can be found on LAHSA's website, https://www.lahsa.org/documents?id=1306-form-1306-ces-survey-for-individuals-survey-packet.pdf.

  d. *Describe the guidelines for applying the criteria used by LAHSA and/or each SPA to identify such individuals, any changes over time, the date changes were made, and reasons changes were made.*

- LAHSA has informed the City that it has guidance, which is available on its website, https://www.lahsa.org/documents?id=1804-interim-guidance-matching-participants-with-disabilities-to-fully-accessible-units.pdf, for the process used for filling mobility and hearing/vision units. This guidance became effective March 1, 2018.

  e. *Describe the record keeping system used by LAHSA and each SPA to identify such individuals, any changes over time, the date changes were made and reasons changes were made.*

- LAHSA has informed the City that all data is kept in the Homeless Management Information System (HMIS). Anytime something is updated in the client's profile, it is date stamped.

  f. *Describe the training and development of written materials for the use of caseworkers provided by LAHSA and each SPA to identify such individuals, any changes over time, the date changes were made and reasons changes were made.*

- LAHSA has informed the City that it has guidance, which is available on its website, https://www.lahsa.org/documents?id=1804-interim-guidance-matching-participants-with-disabilities-to-fully-accessible-units.pdf, for the process used for filling mobility and hearing/vision units. This guidance became effective March 1, 2018.

- LAHSA has informed the City that it provides trainings, including online trainings for HMIS assessments, information on matching individuals with appropriate units, and a webinar on the guidance. The webinar is available on its website, https://lahsa.configio.com/pd/41/hmis-basic-navigation-online?cid=445&returncom=productlist&source=search.

  g. *Provide portions of the caseworker's manual used for interviewing clients used by LAHSA and each SPA that address any of the preceding matters, any changes over time, the date changes were made and reasons changes were made.*

**Appendix 126**

- LAHSA has informed the City that it has guidance, which is available on its website, https://www.lahsa.org/documents?id=1804-interim-guidance-matching-participants-with-disabilities-to-fully-accessible-units.pdf, for the process used for filling mobility and hearing/vision units. This guidance became effective March 1, 2018.

- LAHSA has informed the City that it provides trainings, including online trainings for HIMS assessments, information on matching individuals with appropriate units, and a webinar on the guidance. The webinar is available on its website, https://lahsa.configio.com/pd/41/hmis-basic-navigation-online?cid=445&returncom=productlist&source=search.

  *h.  Provide copies of any reports or studies, including by SPAs to LAHSA or by LAHSA to SPAs, concerning individuals who need mobility or sensory visual/hearing features in CES housing since January 2018.*

- LAHSA has informed the City that it is unable to provide reports at this time, but should be able to in the future.

  *2.  Where individuals have not been screened by caseworkers for need for housing with mobility or sensory vision/hearing features, for example, in the pre-February 2018 period, LAHSA should identify options to do so and should take immediate action to identify such individuals and match them with housing units with mobility or sensory vision/hearing features.*

- LAHSA has informed the City that it is constantly updating HMIS portfolio on clients. Anytime an individual comes in contact, they update their information to reflect changed circumstances, including need for accessible units.

- LAHSA has informed the City that the population is constantly changing and situations are changing, so they are always trying to update client information.

  *3.  LAHSA and SPAs should develop and maintain waiting lists of individuals eligible for mobility or sensory vision/hearing units in order of need for housing.*

  *Necessary information:*

  *a.  Provide any studies of time required by LAHSA or each SPA (1) to provide CES housing; and (2) to fill CES housing units with mobility and sensory visual/hearing features.*

- LAHSA has informed the City that it is unable to provide reports at this time, but should be able to in the future.

- LAHSA has informed the City that filling units is based on the availability of the market. The system tracks all available units and when an accessible unit becomes available, it is filled.

  *b.  Describe any use of waiting lists by LAHSA and/or each SPA.*

- LAHSA has informed the City that it has a waiting list of individuals eligible in the form of a community queue.

**Appendix 127**

- LAHSA has informed the City that after the survey, individuals receive a score based on the factors provided and inputted into the system. (based on all criteria, funding they qualify for, etc.)

- LAHSA has informed the City that, when an accessible unit becomes available, the individual with the highest score that qualifies based on criteria of the unit as well as a need for the accessible features is referred.

4. *AcHP should provide information identifying – by SPA or other demarcated area to expedite matching by LAHSA – CES units expected to become available with mobility and sensory vision/hearing features by type of features, project name, project code or identification number, funding sources and restrictions and bedroom size.*

   *Necessary information:*

   a. *Describe what information and the source of such information LAHSA and each SPA have relied on to identify mobility and sensory visual/hearing features in CES housing, any changes over time, the dates of any change, and reasons for the change.*

- LAHSA has informed the City that information about what units are available are self-reported by the properties, including the type of accessible unit. LAHSA started asking for this information on February 21, 2018.

- LAHSA has informed the City that if an individual is referred to a property that needed an accessible unit and the unit isn't as purported, the individual can decline to take the unit and return to the list, they do not lose their place in line.

   b. *Describe what information AcHP has provided LAHSA or SPAs, and whether it was timely provided, identifying mobility and sensory visual/hearing feature in CES housing.*

- LAHSA has informed the City that they do not receive any information.

   [REMAINDER OF RESPONSE TO 4.B. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- LAHSA receives list of properties from HCIDLA of new developments at the stage of closing of construction loan and/or notice to proceed.  This is approximately two (2) years prior to development completion and commencement of lease up.

- In addition, AcHP requires all covered housing developments, including those with CES units to list the development on the Accessible Housing Registry.  The development provides both property and unit information as follows:  Accessibility Type, Bedroom, Affordability Level Rental Subsidy, and other Accessibility Features.  In addition, the development is listed as either CES or Combo and the LAHSA matcher (service provider) contact information is also provided in addition to the development's contact information. LAHSA, its service providers and/or matchers can narrow their search on the Accessible Housing Registry to CES and Combo developments by clicking on the tab "More Search Options" and then clicking on either or both boxes "CES only" or "CES Combo".

**Appendix 128**

5. *LAHSA and AcHP should identify (a) all units with mobility or sensory vision/hearing features in CES housing developments and (b) all individuals who need units with mobility or sensory vision/hearing features. To the extent individuals who do not need units with mobility or sensory vision/hearing features occupy such units, LAHSA and AcHP should develop options for relocating such individuals and making accessible units in suitable developments available for those who need them. To the extent individuals who need mobility or sensory vision/hearing features are living in units without such features, LAHSA and AcHP should develop options for relocating such individuals to units with such features in suitable developments and do so expeditiously. LAHSA and AcHP should identify adaptable units and units that are not fully accessible, such as units with no stairs.*

   *Necessary information:*

   a. *Describe whether LAHSA or AcHP is aware of or has studied individuals who do not need units with mobility and sensory visual/hearing features in CES housing unit but currently occupy such accessible units, how many such individuals were identified, and identify what actions they have taken provide appropriate housing.*

- LAHSA has informed the City that it has no information available that would answer this question. LAHSA is not an enforcement agency and CES is just a listing. Additionally, some units pre-date the CES system. Not everyone uses the CES system, some units pre-date the CES system and some agencies place individuals without using CES.

   [REMAINDER OF RESPONSE TO 5.A. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- Through LAHSA's CES, matchers provide developments with a list of eligible tenants and assists with tenant matching. AcHP plays a monitoring of compliance and enforcement role. The Property Owner/Manager are responsible for actually filling their units with persons who need the features and for addressing tenant requests for reasonable accommodations/modifications, transfers, etc.

- Not all permanently supported housing developments or special needs housing utilize LAHSA's CES referral process. The CES is subject to HUD requirements. Other referral placement services are utilized by owners/property management of these developments such as the Veterans Administration, Los Angeles County Department of Mental Health, California Department of Disability Services, and similar systems.

- Depending on the funding sources, CES units are restricted by affordability levels and program funding sources as well as accessibility type and unit size. These restrictions have an impact on the placement and availability of the accessible CES units. As stated above, through review of the quarterly reports, and the unit utilization occupancy survey submitted by owners/property management, AcHP is able to identify which accessible CES units are occupied by persons without disabilities. For those accessible CES units that are occupied by persons who do not need the features, a lease addendum is required to be executed.

   b. *Describe whether LAHSA or AcHP is aware of or has studied individuals who need units with mobility and sensory visual/hearing features are living in CES housing units without such features, how many such individuals were identified, and what actions they have taken to provide appropriate housing.*

- LAHSA has informed the City that it has no information available that would answer this question. When an individual who needs accessible features is in a unit that does not have the

features of the unit, they can request a transfer directly from the property. If LAHSA became aware of this, they would inform the owner.

[REMAINDER OF RESPONSE TO 5.B. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- Through AcHP's monitoring, compliance, and enforcement responsibilities under the CSA, AcHP requires owners/property management of developments, including those with CES units, to submit completed utilization occupancy survey and quarterly reports.  The data collected identifies vacant accessible units and occupancy by tenants/persons with disabilities in the development in an accessible unit by type (mobility or hearing/vision) or a conventional unit, and whether they have requested an accessible unit transfer and/or a reasonable accommodation to address an accessibility need.  AcHP policy analyst conduct follow-up inquiries on tenant selection of the vacant accessible units, to ensure that individuals with disabilities are placed in those units.  In addition, AcHP policy analyst ensures tenants on accessible unit transfer lists are provided reasonable accommodations to meet their accessibility needs in the interim.

   c.   *Describe whether LAHSA or AcHP is aware of or studied adaptable units and units that are not fully accessible, such as units with no stairs in housing developments with CES units.*

- LAHSA has informed the City that information is self-reported, no studies done by LAHSA.

   [REMAINDER OF RESPONSE TO 5.C. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- The City does not own or manage the covered housing developments.  AcHP monitors compliance and enforcement of the City's Fair Housing Policies Related to Disabilities as required by the CSA. Through the Accessible Housing Registry, AcHP provides for owners/property management to select "other" accessible features on the Unit information for the property listing.  These are not mandatory fields.  The "other features" that can be selected are:

   - o   Street Level
   - o   No entry Stairs
   - o   No Stairs within the unit
   - o   Entry level bedroom
   - o   Entry level bathroom
   - o   Entry level kitchen
   - o   Grab bars in bathroom.

6.   *AcHP and LAHSA should coordinate their databases and cross-check information about units with mobility and sensory visual/hearing features, individuals eligible for housing filled through the CES process, and other relevant information.*

   *Necessary information:*

   a.   *Describe any coordination to date of AcHP and LAHSA databases.*

**Appendix 130**

- LAHSA has informed the City that there has been no coordination to date. LAHSA reports a willingness to coordinate and share data.

  [REMAINDER OF RESPONSE TO 6.A. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- Through the Accessible Housing Registry, applicants and housing advocates, including LAHSA Matchers (Service Providers) can search for developments by CES status.  The Accessible Housing Registry provides the contact information for the CES matcher for developments with CES or Combo status and provides a link to the SPA directory.

    *b.   Describe any cross-checking of information to date in LAHSA and AcHP databases.*

- LAHSA has informed the City that there is no cross-checking to date. LAHSA reports a willingness to share data.

  [REMAINDER OF RESPONSE TO 6.B. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- AcHP does not have access to LAHSA's database nor does AcHP share our database with LAHSA.  LAHSA is a separate legal joint powers authority.

7.  *LAHSA and AcHP should identify barriers to matching or placing individuals who need mobility or sensory vision/hearing features in CES housing units and develop options to overcome these barriers.*

    *Necessary information:*

    *a.   Describe any efforts LAHSA or AcHP has made to identify barriers to matching individuals who need mobility or sensory vision/hearing features in CES housing.*

- LAHSA has informed the City that it has identified barriers related to the funding sources of projects. The funding for the project often has restrictions on the individuals who can occupy the units.  For example, you could have funding that requires only families occupy the unit, additional funding that requires a veteran occupy the unit, income restrictions on the tenant, and an accessible unit.  In this situation, you would need to find a family that makes under a certain amount of money, with a member of the household being a veteran, and an individual who needs the accessible unit.  Because of these funding restrictions, it can be difficult to find people that meet every criteria.

  [REMAINDER OF RESPONSE TO 7.A. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- AcHP monitors compliance and initiates enforcement activities for non-compliance against the owner/property management for the development.   AcHP policy analyst monitoring responsibilities of new developments are conducted throughout the initial lease up process of CES or Combo developments to ensure that the accessible units are occupied by persons with disabilities who require the accessible features of the unit.

- Through the PMP review and approval process and monitoring of tenant lease up process, AcHP has observed the following:

**Appendix 131**

o In some instances, there appears to be confusion, miscommunications, or misunderstandings by owner/property management of LAHSA's procedures for referral placement of potential applicants, and vice versa by LAHSA's matchers (service providers) of the development's lease up requirements.

o Over-burdening of the CES accessible units by multiple program restrictions that can result in a barrier to lease up of accessible units by persons with disabilities who need the accessible features.

*b. Describe any efforts AcHP or LAHSA have made to develop options to overcome such barriers.*

- LAHSA attends bidders conferences to explain CES and encourage applicants to not 'layer' funding into units in such a way that limits the system's ability to match people to the units. LAHSA encourages applicants to reach out to them directly to receive feedback on their applications regarding funding mixed funding sources in their buildings.

[REMAINDER OF RESPONSE TO 7.B. BELOW HAS BEEN PROVIDED BY ACHP, NOT LAHSA]

- AcHP provides training on City's fair housing policy related to disabilities and policy compliance review training sessions for property owners and property management. AcHP has encouraged and offered to LAHSA for their staff and matchers/service providers to attend these training sessions.

- Through AcHP's monitoring and PMP review, AcHP highlights the need for developments to not overburden CES accessible units with multiple program restrictions.

**Appendix 132**