UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al*, | ) Case No.: 12-cv-00551 FMO (PJWx) |
| Plaintiffs, | ) ORDER RE: APPOINTMENT OF SECOND SETTLEMENT MONITOR FOR SETTLEMENT WITH CITY OF LOS ANGELES |
| vs. | ) |
| CITY OF LOS ANGELES, CALIFORNIA, *et al.* | ) |
| Defendants | ) |

Having considered the Joint Stipulation Regarding Court Appointment of Monitor filed by Plaintiffs and Defendant City of Los Angeles, and good cause appearing therefor, it is hereby ordered:

### **Appointment of the Monitor**

1.      Beginning on July 1, 2022, Timothy P. Fox shall serve as Court-appointed Monitor under the terms of the Corrected Settlement Agreement entered in this case, ECF No. 608-1, adopted by the Court in its Amended Judgment of December 13, 2017, ECF No. 608, and any amendment to the Corrected Settlement Agreement that may, in the future, be adopted by the Court. (The Corrected Settlement Agreement and any such future amendments are referred to herein as the "CSA.") Mr. Fox shall have  the powers and duties described in the CSA. Mr. Fox's resume is attached hereto as Exhibit A.

2.      The Monitor shall serve throughout the Settlement Term, as defined in the CSA, and shall report to the Court. The Monitor's authority shall derive from the Court, not the Parties.

### **Responsibilities and Powers of the Monitor**

3.      The Monitor shall evaluate the City's compliance with the provisions of the CSA to ensure full compliance with all of its terms.

4.      The Monitor will assess the City's progress toward achieving the Target Number of Accessible Units and implementation of policies and procedures by reviewing plans, policies, procedures, expenditures, staffing, and production of accessible units, among other things

5.      The Monitor shall have the obligation and authority to take steps to carry out this responsibility including but not limited to the obligation and authority to:

i.      Monitor, review, collect, evaluate, and verify written and electronic data and information on progress and completion of the Accessible Unit Housing Plan, as it is periodically revised ("AHUP"); accessibility of Housing Units and Housing Developments; City Housing Program Accessibility; Monitoring, Compliance, and

1

Enforcement Plan (MCE Plan), as it is periodically revised; City monitoring of Owner compliance, and all other components of the CSA.

   ii.  Conduct inspections, with appropriate notice to the affected individuals, of selected Housing Units and Housing Developments as the Monitor deems appropriate, and measure, photograph, or otherwise document accessibility compliance.

   iii.  Interview City staff, consultants, contractors, and agents as the Monitor deems appropriate.

   iv.  Hire experts or staff as needed, including but not limited to the authority to hire or contract with one or more persons with technical expertise to assist in monitoring the implementation of the AHUP and certification of accessible units, and the MCE Plan, within the budgetary limits of the  CSA and Paragraph 18 of this Order, to assist in carrying out these responsibilities.

    a) The Monitor shall inform the Parties in writing at least fourteen (14) days before the Monitor employs or contracts with such persons.

    b) If either Party objects to the contracting with or hiring of any such person, that Party shall submit its opposition to the Court for disposition no later than fourteen (14) days after receiving the Monitor's notice that the Monitor intends to retain such persons.

    c) If there is no objection submitted to the Court, the Monitor may proceed with the employment or contract.

   v.  Review and assess all reports prepared by the City as required by the terms and provisions of the CSA, and prepare recommendations for additional action, as needed.

   vi.  Maintain records of the Monitoring team's activities and relevant documents.

2

vii.      Provide Counsel for Plaintiffs and the City any relevant information known to or available to the Monitor under any provision of the CSA upon reasonable request.

viii.      Prepare a written semi-annual report for submission to Counsel for Plaintiffs and the City describing, for the periods January 1 through June 30 and July 1 through December 31 of each year, the Monitor's assessment of the City's progress in complying with all of the provisions of the CSA, and the Monitor's comments on Reports submitted by the City. A copy will be filed with the Court within 60 days of the end of each period. The Parties shall meet and confer among themselves or with the Monitor to resolve any problems identified by the Monitor or any of the Parties. If the Parties cannot reach agreement, either Party can request that the Monitor submit an additional report to the Court with recommendations for action, and shall file a motion with the Court for consideration of such recommendations or other requested relief.

ix.      Meet and confer with Plaintiffs and the City, to consider suggestions for implementing the spirit and letter of the CSA, and to clarify information contained in the Monitor's reports.

x.      Coordinate with the United States Department of Housing and Urban Development ("HUD") to provide consistency, as feasible and appropriate, in the implementation of the CSA and the Voluntary Compliance Agreement between the City and HUD to avoid imposing conflicting obligations.

xi.      The Monitor shall have authority to make decisions, subject to the Parties' request for review by the Court, to (1) resolve any dispute between the Parties, or (2) address actions by a Party or Parties that may be inconsistent with implementation and compliance with the CSA.

### Records and Other Information Available to Monitor

6.      For the duration of the CSA, except to the extent that disclosure of information is prohibited by law or applicable privileges, the City shall provide the

3

Monitor upon request information and records (or other computerized counterparts) sufficient to adequately monitor the City's compliance with all provisions of the CSA and to complete the reporting described in Paragraphs III.9 and III.11 of the CSA and Paragraph 5.viii of this Order, including but not limited to all records relating to implementation of the Accessible Housing Unit Plan, architectural accessibility compliance for existing and new Housing Developments (including surveys, plans, and architectural drawings), issuance of Certifications of Compliance with Accessibility Standards and Certifications of Adoption of Housing Policies, implementation of the MCE Plan, the City's program accessibility and ADA/504 self-evaluations, occupancy and utilization surveys and audits, reasonable accommodation and reasonable modification logs, grievances and complaints, progress in meeting the Target Unit Number, the Registry, Audits performed by contractors, training materials, and annual staffing and funding devoted to the program.

7.     The City shall make available to the Monitor any records relating to the implementation of any provision of the CSA, including records submitted by or required to be maintained by Owners and Property Management Agents.

8.     The City shall make clear when any such information or records are being withheld from the Monitor in accordance with this article.

9.     To the extent the Monitor reasonably determines after consultation with the City that such information or records must be reviewed in order for the Monitor to satisfy his responsibilities under the CSA or to the Court, the Monitor may request that disclosure of such information or records be made pursuant to protective order, and the City shall provide such information pursuant to a protective order to be negotiated by the Monitor and the Parties to the CSA or secured through an appropriate petition to the Court.

4

**Confidentiality**

10.     The Monitor is an agent of the Court, is not a state or local agency, or an agent thereof, and accordingly the records maintained by the Monitor shall not be deemed public records subject to public inspection within the meaning of California Government Code Sec. 6250 *et seq*. Nothing in this Paragraph shall change the obligations of the City regarding records in its control.

11.     The Monitor shall adhere to all conflict of interest rules and ethical obligations relevant to monitors appointed by the U.S. District Court for the Central District of California.

12.     Unless any conflict of interest is waived by the City and the Plaintiffs, the Monitor shall not accept employment or provide consulting services during the period of the Monitor's employment that would present a conflict of interest with the Monitor's responsibilities under this Order or the CSA. Following the period of the Monitor's employment, the Monitor shall not accept employment or provide consulting services on any matter related to the CSA or based on information obtained in the course of carrying out Monitoring duties, in connection with a claim or suit against the City or its departments, officers, agents or employees.

13.     Persons retained by the Monitor shall be subject to the same confidentiality and conflict of interest provisions as the Monitor.

14.     If the City believes that any documents or categories of documents provided to the Monitor are not public records and are subject to a requirement of confidentiality, the City shall identify such documents or categories of documents with specificity and propose a protective order concerning such documents. The proposed protective order shall be addressed through the meet and confer process set out in the CSA.

15.     The Monitor shall preserve the confidentiality of any record whose disclosure is prohibited by law or that is the subject of a protective order, and shall require any expert, consultant or agent he may retain to do the same.

5

**Meetings with Monitor**

16.     The Monitor shall hold at least one annual meeting with the City and the Plaintiffs to review progress.

17.     The Monitor may, as the Monitor deems appropriate, schedule additional meetings and/or conference calls with the Parties and their counsel to discuss any relevant issues concerning the implementation and enforcement of the CSA.

**Compensation of the Monitor**

18.     The City shall bear the cost of the Monitor during the Settlement Term. The Monitor's cost, including the Monitor's fees, retained experts or staff, and reasonable expenses, shall be capped at the amounts specified below:

    i.     Fiscal Years 1-3 (July 1, 2018 through June 30, 2021): previously invoiced and paid.

    ii.     Fiscal Years 4-5 (July 1, 2021 through June 30, 2023): $1,155,000 per year.

    iii.     Remaining Term of the CSA: the Monitor's fee will be established by agreement between the Monitor and the City. The Monitor and the City will agree on a proposed fee schedule for Years 6 through the Amended Agreement Term no later than September 30, 2022 to be submitted to the City Council as necessary by October 31, 2022. If the Monitor and City are unable to reach agreement that obtains necessary approvals, the amount will be set by Court order.

    iv.     The budgets set forth above are limited to payments for work done by Bill Lann Lee, Fox & Robertson, the Civil Rights Education and Enforcement Center, Knowbility, Access Compliance Consultants, Inc., and DeGerlia Expert Consulting LLC (collectively "Payees"). If the City determines that additional contractors, consultants, and/or experts are necessary or that additional, necessary but unanticipated work is required, the necessary funding for such contractors, consultants, experts, and/or work shall not be paid out of the Monitor's budgets as set forth above.

19.     The above budgets will be subject to increases based on reasonable increases in the rates charged by Payees, not to exceed 5% in any fiscal year, subject to the budgetary caps set forth above or any adjustments made thereto. The Monitor's current rate shall be set at a rate not to exceed $675 per hour subject to future increases pursuant to the preceding sentence.

20.     The above budgets may be reduced in future years of the Amended Agreement Term, based on mutual agreement of the Monitor and the City and subject to the provisions of Paragraph 25, *infra*, should the scope of responsibilities and services of the Monitor be reduced.

21.     Reasonable expenses incurred by the Monitor in performing his or her duties shall be reimbursed, subject to the budgetary limits in Paragraph 18 of this Order.

i.     The Monitor shall comply with Sections 1.8.12(B) (Airline Travel), 1.8.13, (Per Diem: Lodging, Meals and Incidentals), 1.8.15 (Ground Transportation), 1.8.16 (Automobile Rental), 1.8.17 (Laundry Services), 1.8.18 (Telephone Calls), 1.8.19 (Internet Connection Services) 1.8.20 (Gratuities) and 1.8.23 (Non-reimbursable Travel Costs) of the City Guidelines, attached hereto as Exhibit B, regarding travel expenses, as those rates may be increased from time to time by the City, except that the Monitor may procure lodging at 150% of the Federal Per Diem Rate set in Section 1.8.13, and that the City will reimburse any travel-related expenses necessary to accommodate personnel with disabilities.

ii.     Compensation for any experts or staff retained by the Monitor shall be limited to the actual rate charged by the expert or staff, and subject to the budgetary limits in Paragraph 18 of this Order.

22.     The Monitor periodically, as frequently as monthly and in no event less frequently than once every three months, at the Monitor's discretion, shall submit to the City, with a copy to the Plaintiffs, an itemized statement of the Monitor's fees and expenses, with supporting documentation, which shall be payable within Thirty (30)

7

business days of receipt of the statement. The City shall pay disbursements to the Monitor within 30 days of presentation of an invoice for work performed and costs incurred.

23.    Submitted statements shall include:

i.    General information on work provided during the statement period and time spent performing each task.

ii.    A record of any expenses, including receipts, incurred by the Monitor during the statement period.

iii.    Invoices for any work or expenses, including receipts, incurred by retained experts and staff.

24.    The Monitor shall maintain records, receipts and other appropriate documentation of all expenses, costs, fees, and services for a period of two (2) years after the Settlement Term, such records shall be available for inspection by the Parties.

25.    If a dispute should arise concerning the compensation or budget of the Monitor, the Monitor's authority or any matter concerning the actions of the Monitor, the Court will consider and resolve the dispute.

## **Insurance**

26.    The Monitor shall provide and maintain at its own expense not less than the following amounts and types of insurance:

i.    General Liability insurance in an amount not less than One Million Dollars ($1,000,000) combined single limit.

ii.    Automobile Liability insurance in an amount not less than One Million Dollars ($1,000,000) combined single limit.

27.    Such insurance shall protect City as an insured or an Additional Interest Party, or a Loss Payee As Its Interest May Appear, respectively, when such status is appropriate and available depending on the nature of applicable coverages.

IT IS SO ORDERED.

Date: _____June 21, 2022_____

/s/
_____
Hon. Fernando M. Olguin
UNITED STATES DISTRICT JUDGE

8

**Timothy P. Fox**
Fox & Robertson, P.C.
1 Broadway, Suite B205
Denver, CO 80203
303-951-4164

## EXPERIENCE

1996 - present   Lead counsel in multiple class actions and individual impact litigation, and frequent speaker on disability rights both as co-founder and Co-Executive Director of the Civil Rights Education and Enforcement Center (2013 to 2021), and as co-founder of Fox & Robertson, a plaintiffs' civil rights law firm (1996-2013, 2021 to present).

These cases required extensive experience in organizing and analyzing data relevant to compliance with disability rights statutes including, for example:

Litigation and monitoring of the class action settlement in *Lucas v. Kmart*, No. 99-cv-01923 JLK (D. Colo.), which covered more than 1400 Kmart stores across the country. Monitoring this settlement required creation and use of a database to organize and analyze detailed inspection reports for each store, visiting stores, interviewing and meeting with Kmart management personnel, and creating reports documenting the results of this monitoring.

Creation and use of multiple databases to organize and assess data concerning alterations to, and surveys of, pedestrian pathways in connection with class action settlements – all of which were obtained through structured negotiations – with cities across the country. Examples of these cases include *Denny v. City and County of Denver*, No. 2016CV30247 (Denver Dist. Ct.), *Reynoldson v. City of Seattle,* No. 2:15-cv-01608 (W.D. Wash.), and *Hines*, *et al. v. City of Portland,* No. 3:18 cv- 00869-HZ (D. Ore.).

Creation and use of databases to track alterations and surveys of places of public accommodations, and to monitor class action settlements involving places of public accommodations. Examples of these cases include *Vallabhapurapu et al., v. Burger King Corp.*, No. 11-cv-00667-WHA (N.D. Cal.), and *Moeller v. Taco Bell*, No. C 02–5849 PJH (N.D. Cal.).

Creation and use of database to track interviews of well over 1000 class members and witnesses in the *Taco Bell* litigation.

1995-96   Davis, Graham & Stubbs, Denver, CO.  Associate.

1991-95   Wilmer, Cutler & Pickering, Washington, DC.  Associate.

# EXHIBIT A

## EDUCATION

1988-91       <u>Stanford Law School</u>: J.D.; President, Law School Graduating Class 1991; Member, Stanford Law Review; Hilmer Oehlmann, Jr., Award for Excellence in the First-Year Research and Legal Writing Program.

1983-88       <u>St. Olaf College and University of Denver</u>:  B.A., University of Denver; Double major in math and economics; Stanley Hornbeck Scholar; Dean's List; Distinction in Math and Economics; Distinguished Senior; J. Fagg Foster Award in Economics.

## PUBLICATIONS & PRESENTATIONS

Co-author (with Amy F. Robertson) of "Federal Laws Addressing Discrimination in Employment Based on Disability," in <u>Colorado Employment Law</u>.

"Amendment Would Weaken ADA," published in the on-line disability magazine cando.com (Mar. 15, 2000).

Numerous presentations to legal and lay audiences on the Americans with Disabilities Act.

"Employees With Mental Disabilities: Discrimination, Defenses and Other Issues under the Americans with Disabilities Act," presented at the National Employment Lawyers Association Convention in Vail, CO in June 2003.

"Using Data in Disability Access Class Actions: Legal Overview," presented at the 2004 Annual Conference of the National Association of Protection and Advocacy Systems.

"Strategic & Ethical Issues in Negotiating Attorneys' Fees," presented at the 2006 Annual Conference of the National Disability Rights Network.

Co-presenter "The Americans With Disabilities Act Turns 30: How Have Class Actions Fared," Impact Fund 2020 Class-Action Conference.

## AWARDS

2018 ACLU of Colorado's Carle Whitehead Memorial Award (with Amy Robertson).

2012 Award of Excellence of the Colorado Chapter of the American College Trial Lawyers (with Amy Robertson).

2008 Colorado Bar Association Award of Merit.

2007 Impact Fund Award (with Amy Robertson).

2006 Colorado Trial Lawyers Association Case of the Year (with Amy Robertson).

2003 Paul A. Bilzi Memorial Access Award (with Amy Robertson).

Fellow, American Bar Foundation.

Fellow, Colorado Bar Foundation.

Included in 5280 Magazine's list of Top Lawyers: Civil Rights from 2015 through 2022.

Recognized as a "Super Lawyer" in multiple years.

1995 University of Denver Ammi Hyde Award for Young Alumni Achievement.

**BAR MEMBERSHIPS**

Colorado
District of Columbia (inactive)
California
United States Supreme Court
United States Courts of Appeals for the Ninth and Tenth Circuits
United States District Courts for the Districts of Colorado, the Northern District of California, and the District of Columbia

**PROFESSIONAL MEMBERSHIPS**

American Bar Association
Colorado Bar Association
California Bar Association
National Employment Lawyers Association
Plaintiff Employment Lawyers Association
American Association for Justice
Colorado Trial Lawyers Association
Association of Disability Rights Counsel

## 1.8  TRAVEL

### 1.8.1   Overview and General Guidelines

City employees and elected officials may be required to travel on official City business in the performance of their duties and responsibilities. The City Travel Policy provides guidelines in conformity with the Los Angeles Administrative Code (LAAC) Division 4, Chapter 5, Article 4 and the Internal Revenue Service (IRS) "Accountable Plan" criteria for allowable travel expenses.

The City Travel Policy provides guidelines for City employees traveling on official City business. Individual departments may, at their discretion, develop their own travel policies and impose greater restrictions and/or controls beyond what is required by the City Travel Policy. Departments should provide the Controller's Office with a copy of their internal travel policies. Departments and travelers should be mindful that documents related to City travel expenditures are public records and may be subject to disclosure under the California Public Records Act.

General guidelines:
- City employees or elected officials will only incur expenses that a reasonable and prudent person would incur if traveling on personal business.
- Before a City employee or elected official incurs travel expenses, due consideration must be given to such factors as suitability, convenience, and the nature of the business involved. Travelers should book their travel arrangements sufficiently in advance to minimize the cost of travel.
- Per LAAC 4.242.2(f), travel expenses are those incurred outside the geographic boundaries of Los Angeles County for official City business. In line with best practices of other governmental entities, the City follows the "50-mile" rule and will reimburse travel expenses if the travel destination is farther than 50 miles from both the individual's primary residence and headquarters.
- Travelers should use the most economical method of transportation. Departments should consider the cost of time employees will be away from headquarters before approving a method of transportation.
- Deviations from the City Travel Policy are generally not reimbursable. Per LAAC 4.242.3(j), travelers should be prepared to absorb the cost of unapproved expenses as a personal expenditure.

The City Travel Policy also applies to non-City employees whose travel expenses are paid by the City, such as individuals from non-profit organizations or other jurisdictions

**EXHIBIT B**

requested by the City to sit on interview or selection panels. For travel by City contractors, the City Travel Policy only applies in the absence of specific provisions in the contract regarding travel.

## 1.8.2    Terms and Definitions

**Authorized Approvers:** Generally, the Department Head, or other approvers designated by the Department Head, with the responsibility of reviewing and approving travel authorities and expenditures and ensuring compliance with the City Travel Policy.

**Headquarters**: This is where employees spend the largest part of their regular working time, or where the employee returns upon completion of a special assignment, or a specifically assigned geographic area regularly traveled.

**Official City Business:** Activities of an employee or elected official that demonstrates:
- A valid City interest to be served or gained thereby; or
- Relevance to the City operations or the individual's role in such operations; or
- The promotion or development of City programs, methods, or administration; or,
- Compliance with instructions or authorization from the Mayor or the Council.

**Per Diem Expenses:** Lodging, meals, and incidental expenses while traveling on official City business.

**Primary Residence:** This is the dwelling where the employee lives, which bears the most logical relationship to the employee's headquarters, regardless of other legal or mailing addresses. If an employee maintains more than one dwelling, the Department will designate the employee's primary/permanent residence.

**Other Travel Expenses:** These are costs, other than per diem and transportation that are necessary for the conduct of official City business. Examples include registration, seminar, or meeting fees, telephone calls, parking fees, and supplies.

**Transportation Expenses:** Costs to transport the employee for official City business.

**Travel:** Official City business that requires the traveler to be away from the general area of the individual's primary residence substantially longer than an ordinary day's work, and which requires the traveler to sleep or rest to meet the demands of work while away from the individual's primary residence.

**Travel Days:** Days spent en route between the primary residence/headquarter and a destination city (i.e., the first and last day of a trip).

**Travel Expenses:** Per diem, transportation, and other travel expenses incurred while traveling on official City business.

### 1.8.3    Controller Responsibilities

In accordance with Charter Section 262, the Controller has delegated the pre-review and approval of travel authorities and expenditures to Council-controlled Departments. The Controller will conduct periodic reviews of Departmental compliance with the City Travel Policy, as well as post-review of travel transactions. The Controller may suspend delegated travel approval authority until review findings are corrected.

The proprietary departments, the Los Angeles Fire and Police Pension (LAFPP), and the Los Angeles City Employees Retirement System (LACERS) are governed by their respective boards. The Controller review will be in accordance with the respective board-adopted travel policies.

### 1.8.4    Department Responsibilities

Departments are responsible for establishing a system of internal controls to ensure that its travel expenses are reasonable, economical, justified, a prudent use of public funds, and in compliance with the City Travel Policy. Department Heads may designate other Authorized Approvers for travel. For the purpose of this policy, Department Head generally means the general manager, board, body, or elected or appointed officer having control and management of the department.

Department Heads shall designate a Department Travel Coordinator who will:
- Serve as the primary contact for travel coordination and processing;
- Ensure travelers have read and understood the City Travel Policy;
- Review travel authority and expense documents for compliance with City policies;
- Identify exceptions to the City Travel Policy and obtain Department Head approval of written justification and supporting documentation for the exceptions;
- Ensure that unallowable and/or unapproved expenses are not paid;
- Track credits from canceled airline reservations;

- Monitor travel advances, and ensure that outstanding advances are collected and adjusted in a timely manner; and,
- Respond to Controller travel-related questions

### 1.8.5    Documenting and Approving Travel Plans (Travel Authorities)

A completed travel authority documenting the travel plan and estimated costs must be approved by the Department Head ten (10) business days prior to the commencement of travel. Supporting documentation as to the necessity and importance of the travel must be included with the travel authority. Travel arrangements should not be made until the travel authority has been approved.

Travel blanket authorities may be established when Departments have large groups of employees that travel throughout the year to perform functions or attend activities for the same purpose. Departments must include written justification explaining the recurring and same purpose nature of the requested trips. Departments may encumber the total estimated dollar amount needed to cover these trips for the entire fiscal year.

### 1.8.6    Other Required Approvals and Notifications

### A.    Travel for Department Heads and Commissioners

Department Heads and Commissioners must not review and approve travel authorities and travel expenses related to their own travel. Per the Mayor's 2014 Executive Directive No. 4 (2014 ED-4), travel authority documents for all Department Heads and Commissioners, including proprietary departments, must be approved by the Mayor's Office. Personal expense statements (PES) of Department Heads and Commissioners that have exceptions to the City Travel Policy also require approval by the Mayor's Office. The Department Heads and Commissioners for LAFPP and LACERS are exempt from these Executive Directive's requirements. Travel authorities and PES documents for Department Heads and Commissioners that do not require approval from the Mayor's Office must be reviewed and approved by an Authorized Approver other than the Department Head or Commissioners that are traveling.

### B.   Travel to Sacramento or Washington D.C.

Per LAAC 4.242.9, all non-elected City officials and all other City employees must notify the Mayor, the Chair of the Committee that oversees the Intergovernmental Relations function, and the Chief Legislative Analyst *prior to traveling on official City business* to Sacramento or Washington, D.C. Employees of the City Council or Office of the Mayor are exempt from this requirement.

### C.   Travel Related to Advocacy and Intergovernmental Relations

Per 2014 ED-4, travel to Sacramento and Washington, D.C. by City employees and non-elected officials for the purposes of advocacy on behalf of the City requires approval from the Mayor's Office. Mayoral approval is also required for any travel by any City employee outside of the State of California for the purpose of conducting official City business with any other government entity, commission, agency or department. Elected officials and their staff are exempt from this requirement.

### D.   Foreign Travel involving more than one City Commissioner

Per LAAC 4.242.9, advance Council approval must be obtained for foreign travel (except to Canada or Mexico) involving more than one City commissioner. A request for such foreign travel must be filed with the City Clerk for placement on the next available Council agenda.

### 1.8.7   Transportation Expenses

### A.   Transportation Selection Criteria

Travelers are expected to select the least costly method of transportation after considering total travel expenses and employee time away from headquarters. Travelers may use a more costly form of transportation, but will be reimbursed at the less costly rate. In such cases, the Traveler should prepare and document a cost-comparison to determine the less costly rate. Travelers should consider and document their justification for choice of transportation based on the following criteria:

1. The cost of personnel hours lost in travel.
2. Total travel costs (airline, rental vehicle, ground transportation, private or department vehicle, etc.).
3. Added per diem costs

### B.   Airline Travel

Airline travel expenses are reimbursable at the lowest regular fare available (coach or economy class) for regularly scheduled airlines for the date and time selected.

Travelers should do the following to avoid paying higher airfares:

- Use the City's authorized business travel service provider to make airline travel arrangements. If booking a flight using a personal credit card, the traveler must provide sufficient proof that selected airfare is at least equal to or lower than airfare available from City's authorized business travel service.
- Make airline reservations in advance to minimize the cost of travel
- Purchase non-refundable tickets, unless the risk of changes in travel plans outweigh the benefit of booking a non-refundable ticket
- Select an arrival/departure airport that is closest to the destination, unless flights are not available or airfare is more expensive than the additional ground transportation costs to reach the destination

Departments shall not reimburse its travelers for using of frequent flier points or other promotional benefits for official City business. Frequent flier points or any other promotional benefits earned by the traveler from official City business travel are the property of the employee. Although travelers may use frequent traveler benefits earned on official or personal travel for a subsequent City travel, the City will only reimburse for actual out-of-pocket expenses incurred.

### C.   Alternate Mode of Transportation (other than airline travel)

Departments should consider using a City car before using a private automobile or automobile rental. In addition, the use of a private automobile for travel is discouraged unless the Department can demonstrate a business need and has compared it to other alternatives such as a City car. The use of modes of transportation other than airline travel must be approved by Department Heads in advance and the allowable cost shall be the actual cost of the alternate mode of transportation (including incidental costs such as parking fees) or the cost allowable under a regularly scheduled airline, whichever is less. Parking tickets, traffic violations or other penalties for infractions of any law that occur during travel are not reimbursable.

When choosing to drive to a non-adjacent county, Departments should prepare a cost comparison between air travel and driving. A cost comparison is not necessary when the destination is in an adjacent county to Los Angeles since air travel is generally not

the most economical or convenient. Adjacent counties include Orange, Riverside, San Diego, San Bernardino, Ventura, Kern, Santa Barbara, and San Luis Obispo.

Travelers should comply with the following guidelines for the chosen alternate mode of transportation:

1) Private automobile
    a) Travelers operating the vehicle must have a valid driver's license and comply with LAAC section 4.232 insurance requirements.
    b) Documentation of miles traveled, such as a map print-out with the number of miles is required.
    c) Reimbursement for private automobile use shall be in accordance with the mileage provisions under the LAAC Division 4, Chapter 5, Article 2.
    d) Reimbursement for use of a personal automobile will be payable to only one employee when traveling together with other employees on the same trip and in the same vehicle.
    e) Reimbursement is not allowable if the traveler already receives a car allowance or any type of vehicle subsidy from the City on a regular basis through payroll.
    f) Travel mileage should be claimed on the PES and not on the mileage reimbursement form.

2) Automobile rental
    a) Travelers should select a mid-size or smaller rental car
    b) Domestic rental car insurance is not reimbursable. Expenses arising from auto accidents will be reimbursed by the City through the self-insurance program. Travelers should consult with the City Administrative Officer (CAO) Risk Management Section for additional guidance.
    c) For foreign travel, travelers should purchase that country's liability insurance from a reliable source.
    d) Receipts are required for reimbursement of rental car, gasoline, parking, and toll expenses. If receipts for toll and/or parking meter expenses are not available, provide printouts from official websites, credit card receipts, or other appropriate documentation.
    e) Travelers must fill the gas tank before returning a rental vehicle to avoid fuel surcharges.
    f) Add-ons (e.g., GPS device) or other rental fees are not reimbursable expenses.

### 1.8.8    Per Diem Expenses (Lodging, Meals and Incidentals)

Per LAAC 4.242.3(b), travelers are expected to seek moderately priced establishments of acceptable quality when selecting restaurants and hotel rooms. Per CF 82-0944, reimbursements for food and lodging shall not exceed the per diem limits expressed in the City Budget Manual published by the CAO. These limits do not apply to conferences or legislative activities. In the absence of per diem limits set by the CAO, travelers must use the federal per diem rate applicable to their location of travel and comply with the guidelines described below.

#### A. Lodging/Hotel

The traveler must select the most economical and practical accommodations taking into consideration transportation costs, time, and other relevant factors. The following guidelines apply to lodging for travel:

- The rate must be for single occupancy standard room and, if available, at the government-rate.
- Generally, lodging should be limited to the actual dates of official City business. Additional lodging for one day before and/or after the event may be authorized to mitigate hardship for the traveler.
- Reimbursement will be for actual hotel expenses but not to exceed the total of the applicable federal per diem rate (plus fees and taxes, if applicable) for the destination and length of stay for the individual traveler.
- If the traveler is staying at the meeting/convention hotel or "authorized/sponsor" hotel for the conference or convention, supporting documentation must be submitted with the travel request package in order to receive reimbursement for actual costs up to 200% of the per diem limits. Acceptable documentation include confirmation letter indicating the meeting will be held at a particular hotel, or brochure/literature indicating the selected hotel is an "authorized/sponsor" hotel.
- If a room is not available at the meeting/convention hotel or any of the "authorized/sponsor" hotels, reimbursement for actual costs up to 200% of the per diem limits is allowed. The traveler must select the most economical among three hotels within reasonable distance from the event.
- If travel is for the purpose of assisting an agency/municipality in a federal, state or local emergency incident and there is no alternative lodging, reimbursement of actual costs up to 200% of the per diem limits may be allowed.
- An itemized original lodging receipt (listing all expenses such as meals, phone calls, services charged to the room) must be provided for reimbursement to be made in all instances.

**B. Meals and Incidental Expenses (M&IE)**

Travelers may claim reimbursement for up to three meals per day. M&IE will be reimbursed at claimed amount but not to exceed the applicable federal per diem rate for the destination with certain exceptions.

The applicable federal per diem rates are as follow:
- First day of the trip, use the per diem rate for the destination city.
- Last day of the trip, use the per diem rate for the last location where the traveler stayed overnight.
- The first and last day of the trip are considered travel days and will be reimbursed at a prorated amount of 75% of the applicable federal per diem amount for M&IE.
- If traveler is in more than one city/location per day, use the per diem for the city/location in which the traveler spends the night.

The per diem rates for M&IE include gratuities for restaurant service, as well as fees and tips to porters, baggage carriers, hotel staff and staff on ships. Per IRS Bulletin 2013-44, transportation between places of lodging and places where meals are taken are no longer included in the definition of incidental expenses, and may be authorized by the Department Head for reimbursement up to $5 per day.

*1)  M&IE Reimbursement Limits – Travel with Overnight Lodging*

Travelers may select one of three M&IE reimbursement methods shown in the table for the entire trip. Travelers must follow the requirements for receipts, maximum and prorated reimbursable amounts, and allowable exceptions for meals and incidentals for the selected method. All three methods require the traveler to note the date, time, place, amount, and business purpose of the expense.

Receipts are required for any single meal exceeding $25 in accordance with LAAC 4.242.7, and for all meals when the traveler is using one of the actual costs methods. Traveler must use actual costs reimbursement method if the travel funding source requires receipts. In such cases, the travelers must submit receipts and will be reimbursed based on requirements specified by the funding source.

| **M&IE Reimbursement Methods for Travel with Overnight Lodging** **Selected Reimbursement Method (1, 2 or 3) must be used for the entire trip** | | | | |
|---|---|---|---|---|
| Methodology | Receipts Required | Reimbursement Cap at Destination | Prorated Reimbursement Cap for Travel Day/Conference Provided Meal[1]/"50-mile" Rule Exceptions | Exception: Full Reimbursement Cap for Travel Day/Conference Provided Meal [2] |
| Method 1: Federal Per Diem | No | Reimburse at federal per diem amount for destination | 75% proration of federal per diem amount | No exceptions allowed |
| Method 2: Actual costs capped at federal per diem | Yes | Reimburse actual costs *up to* federal per diem amount for destination | Reimburse actual costs *up to* 75% of federal per diem amount for destination | Reimburse actual costs *up to* full federal per diem amount for destination |
| Method 3: Actual costs capped at $60/day | Yes | Reimburse actual costs *up to* $60 per day | Reimburse actual costs *up to* $45 per day | Reimburse actual costs *up to* $60 per day |
| (1) Hotel complimentary breakfasts do not constitute a meal. | | | | |
| (2) Exceptions to proration for travel days may be granted for full days spent at destination or in transit. Exceptions to proration for conference-provided meals may be granted if conference cannot accommodate medical or religious restrictions. | | | | |

A traveler who stayed with a friend or family member overnight can be reimbursed for meals if traveler provides a signed statement as proof of overnight stay. Meal reimbursement will be subject to IRS taxable income reporting requirements without the signed statement.

*2) M&IE Reimbursement Limits – One-Day Travel (Travel without Overnight Lodging)*

Meal reimbursements for travel not involving an overnight stay must be reported as taxable income in accordance with IRS regulations. Departments are required

to report one-day meal reimbursements to the Controller at the end of the calendar year for W-2 adjustment in the payroll system.

The following guidelines apply to one-day meal reimbursements:

- Travel destination must meet the "50-mile" rule.
- Reimbursement cannot exceed 75 percent of the federal per diem for the destination.
- No meal reimbursement is allowed when the host provides meals at the event throughout the day.
- Receipts are required for any single meal exceeding $25.
- Traveler must attach a signed "One-Day Travel Meals Reimbursement – Taxable Income Acknowledgement" form to the PES.

### 1.8.9    Other Travel Expenses

Expenses other than per-diem and transportation that are necessary for the conduct of official City business, with receipts, are allowable and may be reimbursed separately from M&IE limits. Below are guidelines for certain types of expenses.

- **Airline Checked-In Baggage Fee**: Airline fee for the first checked-in baggage is reimbursable.

- **Airport Parking**: Airport parking fees are reimbursable up to 125% of the lowest rates for the following airport parking lots:

  o Burbank Airport Lot A
  o John Wayne Airport Main Street Lot
  o Long Beach Airport Lot B
  o LA International Airport Lot C
  o Ontario International Airport Lot 5

  For airports not listed above, traveler should use the lowest airport parking lot rate for that airport.

  In addition, travelers should consider alternatives to airport parking, such as public transportation, shuttles, rideshare services, other options to get to and from the airport. Travelers should compare the total cost of airport parking to the cost of these alternatives and select the most economic choice.

- **Hosting While Traveling**: Food and beverage expenses for persons other than the traveler must be certified by the Department Head as expenditures for a public purpose and necessary for official City business. The provisions for lodging and M&IE reimbursements will apply to persons hosted by City officials or employees. Alcoholic drinks are NOT reimbursable expenses. It is the responsibility of City employees to comply with Personnel Department policy regarding consumption of alcoholic beverages while on duty. The name(s) and organization(s) of the person(s) hosted and the nature of the City business discussed must be specified in the travel authority and other travel expense documentation.

- **Registration, Seminar or Meeting Fees**: Reimbursement of registration, seminar or meeting fees where required is allowed.

- **Ground Transportation:** Transportation expenses to and from the airport or hotel are allowable with receipts or supporting documentation. Travelers should use free or courtesy shuttle services offered by airports and hotels whenever available.

- **Gratuities**: Gratuities are allowable expenses, where reasonable and customary. Tips to waiters (up to 15 percent of the restaurant bill exclusive of taxes), and drivers (up to 15 percent of the fare) are considered customary. Service charges required by service providers (e.g., gratuity added to restaurant bill for large parties) are fully reimbursable. **However, gratuities to porters, bell hops and housekeeping are included in the IRS definition of "incidental expenses" and therefore not reimbursed separately from the M&IE limit**.

- **Laundry Service**: Expenses for laundry service are allowable if the duration of the trip is four consecutive nights or longer.

- **Telephone Calls**: One personal telephone call to the employee's immediate family in the locale of the residence of the employee is allowed if travel is in excess of three days. One such call is permitted for each successive three days thereafter.

Per LAAC 4.242.3(j), other expenses not specified in these guidelines or in the LAAC deemed necessary in the conduct of City business are allowable provided the reasons for such expenses have been reviewed and certified by the Department Head as reasonable, proper, and incurred in pursuit of City business.

## 1.8.10    Special Circumstances Requiring Exceptions to Standard Guidelines

There may be special circumstances that require exceptions to the standard guidelines set forth in this policy. In such instances, exceptions may be allowed when the

Department Head finds the expenses to be necessary in the conduct of official City business and reasonable. Allowed exceptions must be noted as "exceptions" on the travel authority and/or PES documents, along with the justification for the exception.

### A. Airline Travel

- Airfare other than for coach class may be allowed under any of the following conditions:
    - Medical necessity certified by a competent medical authority
    - Exceptional security circumstances
    - The origin and/or destination are outside the Continental United States and the scheduled flight time, including non-overnight layovers and change of planes, is in excess of 14 hours and the traveler is required to report to duty the following day or sooner
    - No coach class seats are available on any airline that is scheduled to leave within 24 hours of the proposed departure time, or scheduled to arrive within 24 hours of the proposed arrival time
    - Use of other than coach-class accommodations results in overall cost savings.
    - Seating upgrade in coach class may be allowed to accommodate a medical necessity certified by a competent medical authority.

### B. Alternate Modes of Transportation

- Reimbursements for rental cars other than mid-size or smaller may be allowed under any of the following conditions:
    - Insufficient car space for the number of City employees traveling together
    - Insufficient car space to accommodate work-related equipment
    - Terrain of destination requires a certain type of vehicle
    - Medical necessity certified by a competent medical authority
    - No extra cost for upgrade.
    - Reimbursement for fueling City vehicles may be allowed by the Department Head if the traveler presents documentation of efforts to obtain a Voyager Card from GSD prior to travel.

### C. Lodging/Hotel

- Department Heads may approve reimbursements of actual lodging costs for non-conference travel up to 200% of the per diem limit.

- Department Heads may approve reimbursements of actual lodging costs in excess of 200% of the per diem limit if the travel is for the purpose of assisting an

agency/municipality in a federal, state, or local emergency incident and there is no alternative lodging.

- If two City authorized travelers choose to share a room, the cost of a double occupancy room cannot exceed 300 percent of the federal per diem rate for the destination. The traveler who paid the bill should claim the total paid for the room on their PES and note the name of the other traveler. The other traveler should also note the name of the traveler that their shared lodging with on their PES.

- On rare occasions, the actual lodging costs may be higher than the limits outlined in this policy. Upon demonstration that the higher lodging cost is justified, Department Heads may use their discretion and judgment to approve reimbursements of actual lodging costs that exceed the limits established in this policy. If necessary, Department Heads may delegate the approval for such reimbursements to Assistant Department Heads. A detailed justification or explanation why the extra cost lodging cost was necessary to carry out official City business must be fully documented in the "Excess Lodging Reimbursement Justification" form. The form must be signed by the Department Head or Assistant Department Head and, together with supporting documentation, attached to the PES. These exceptions must be tracked by Department Travel Coordinators and reported to the Controller's Office at the end of the calendar year.

### D.  Other Travel Expenses

- Fees for additional checked-in baggage may be allowed for special equipment or extended travel.

- Airport parking rate that exceeds the applicable airport lot rate by more than 25% may be allowed with justification approved by the Department Head.

- Full reimbursement for meals may be allowed for long travel days. The traveler must use one of the actual cost methods to receive full reimbursement up to the federal per diem limit or $60 per day.

- Whenever possible, travelers with special meal requirements should contact conference host to obtain reasonable meal accommodation. Full reimbursement for meals may be allowed if the traveler is unable to consume conference-furnished meals due to medical reasons or religious beliefs. The traveler must use one of the actual cost methods to receive full reimbursement up to the federal per diem limit or $60 per day.

- Laundry service when travel is for less than four consecutive nights may be authorized when traveling conditions or special circumstances dictate.

- Department Heads may authorize reimbursement of internet connection service if free internet connection service is not available to conduct City business.

 **E.  Lodging and Meals and Incidental Expenses for travel under 50 miles**

- Reimbursements for lodging and M&IE may be authorized by the Department Head when the travel destination does not meet the "50-mile" rule under one of the following conditions:
- Conference/meeting starts before 8 a.m. or ends after 6 p.m.
- Traveler cannot drive to the destination and public transportation is not available to arrive in time for or leave after conference/meeting.
- Traveler is hosting the event (e.g., set up and pack up exhibit booth) and needs to arrive before 8 a.m. or cannot leave until after 6 p.m.

## 1.8.11    Interrupted and Indirect Travel

Where there is an interruption or deviation from the direct travel route, due to non-City related or unjustifiable reasons, the allowable travel expenses will not exceed those that would have been incurred for uninterrupted travel utilizing the usual route. A traveler who combines personal travel with City travel must identify and pay for the personal segment of the trip. The traveler must provide sufficient supporting documentation to prove the City-related portion of the travel costs to receive travel expense reimbursements. For example, the traveler must provide a quote from the air travel service provider showing the cost of the roundtrip ticket for the most economical and direct travel to/from the business destination for the dates of official City business. The quote will be used for comparison and reimbursement purposes.

A City employee who becomes sick or injured during travel should immediately seek competent medical attention. The traveler should notify his/her Department Personnel Officer regarding the injury at the earliest possible time.

## 1.8.12    Personal Expense Statement (PES) and Required Documentation

At the conclusion of the travel, the traveler must complete and submit Form Gen. 16, Personal Expense Statement (PES) for review and approval. The traveler must itemize all expenses claimed for reimbursement, note all exceptions to the City Travel Policy, and

attach receipts for lodging, transportation, and any other necessary supporting documentation required by this policy to substantiate the expenses. In addition, LAAC 4.242.7 requires receipts for any single item of expenditure in excess of $25. For grant-funded and special-funded travel, it is the traveler's responsibility to comply with the grant/special fund requirements on receipts or supporting documentation. In addition, per LAAC 4.242.75, travelers (other than elected officials or staff traveling on behalf of elected officials) must attach a report that summarizes the nature and purpose of the travel, the significant information gained, and/or benefits accruing to the City.

The Department Head or Authorized Approver shall review the PES and supporting documentation, resolve any issues to ensure compliance with all City policies, and certify all expenses were incurred in pursuit of City business. Falsification of such certification shall be ground for disciplinary action and any available legal sanctions.

Departments must finalize the PES with supporting documentation and process in FMS within 30 days of the trip conclusion. Departments should maintain original receipts and documents for at least five years for record-keeping and audit purposes.

**Submitted PES and supporting documentation become part of the City official travel records and the official property of the City. Travelers are advised to black out/redact any personal information contained in any submitted documents.**

### 1.8.13    Foreign Currency

The PES must indicate values in US dollars (USD). Travel expenses in foreign currency must be converted to USD based on exchange rates effective on the date of the original receipt. The following are acceptable supporting documentation for the foreign currency conversion and must be attached to the PES:
- Credit card statement showing conversion of foreign-denominated expenses to USD
- Foreign exchange receipts from money exchanges or banks showing foreign conversion rates
- Verifiable foreign exchange rates from the internet

### 1.8.14    Travel Advances

When approving travel authorities, Department Heads may authorize travel advances to City employees only. Travel advances must comply with the following guidelines:

- Travel advances can be issued for up to 90% of the traveler's total estimated out-of-pocket travel expenses, which includes lodging, meals and incidentals, and registration, seminar, and meeting fees paid by the traveler. Advances for airfare are not allowed as airline tickets can be purchased through the City's authorized business travel service provider. No travel advance check will be issued for any amount under $500.
- Travel advances must be approved by the Authorized Approver as part of the travel authority request package. If a traveler decides that they need a travel advance after the travel authority has already been approved, Departments may modify an existing travel authority to include the travel advance request.
- The travel authority must include the following information for a travel advance to be approved:
    - Travel authority number
    - Name of traveler
    - Travel period
    - Destination
    - Purpose of the trip and nature of the City business to be conducted
    - Cash advance request, with written justification and pre-approval by Department Head
    - Certification that the traveler has no outstanding travel advance
- Payment requests for travel advances must be submitted at least ten (10) business days, per LAAC 4.242.8, but not earlier than thirty (30) days, prior to travel.
- No travel advance will be provided to an employee with an outstanding travel advance
- Checks for approved travel advances will be available from the Controller Paymaster on a "Will-Call" basis one calendar week prior to travel.
- Travelers must return any unused travel advances by writing a check or money order payable to the City of Los Angeles. Refund checks, together with cash receipts (CR), should be forwarded immediately to the Office of Finance (OOF). Travelers should attach a copy of the CR with the OOF stamp (or other receipt verification) to the completed PES.
- Travel advances are considered delinquent if not settled within 30 days after the conclusion of the trip through the submission of a completed PES.

### 1.8.15   Travel Reimbursements Reported As Taxable Income

Departments must monitor and track the following types of reimbursements and report them to the Controller's Office on an annual basis. These reimbursements will be reported to the IRS as taxable income on the traveler's IRS Form W-2:

- Delinquent travel advances that have not been returned to the City within 120 calendar days after the last day of travel. For non-City employees, delinquent travel advances over 120 days will be reported through IRS Form 1099-MISC.
- Any unsubstantiated or unallowable travel expenses that were reimbursed to the employee, including expenses that exceeded the limits in this policy
- One-Day Travel Meal Reimbursements
- Expenses for travel assignments expected to last in excess of one year, or does in fact exceed one year (per IRS Publication 5137)

Upon review, the Controller's Office may determine that some one-day travel meal reimbursements qualify for the de minimis exclusion for occasional meal reimbursements and opt not to report the reimbursement as taxable income.

### 1.8.16   Related Resources

Travel forms and additional information are available on the Controller website. Questions regarding "Will-Call" policies and procedures should be directed to the Controller Paymaster Section. Departments should refer to the FMS policy and procedure documents and training manuals for specific instructions on how to process travel encumbrance and payment requests:

| Subject Area | FMS Guidance | |
|---|---|---|
| | Procedure | Training Manual |
| Travel Encumbrance | AP-301-5 | FMS 303 |
| Travel Expenditure | AP-401-5 | FMS 304 |

Questions regarding cash receipts should be directed to Office of Finance. Questions regarding this Policy should be directed to the Controller's Fiscal Oversight and Support Section.