UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al*, <br><br> Plaintiffs, <br><br> vs. <br><br> CITY OF LOS ANGELES, CALIFORNIA, *et al.* <br><br> Defendants | ) Case No.: 12-cv-00551 FMO (PJWx) <br> ) <br> ) <br> ) <br> ) **MONITOR'S SEMI-ANNUAL** <br> ) **REPORT FOR REPORTING PERIOD** <br> ) **SEPTEMBER 1, 2022 THROUGH** <br> ) **FEBRUARY 28, 2023** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**Table of Contents**

I.    Introduction........................................................................................................1

II.   Discussion..........................................................................................................3

   A.  Budget............................................................................................................3

   B.  Staffing and Management..............................................................................6

      1.  Construction Team ...................................................................................6

      2.  Policy Program ........................................................................................8

      3.  Administration Unit................................................................................13

   C.  Progress Toward Target Number of Accessible Units ................................14

      1.  Overview ................................................................................................14

      2.  Determining the Total Number of Accessible Units That Are Currently Under Construction..................................................................................16

      3.  Costs, Timing, and Funding for Creation of Remaining Units. ........................18

         a.  Costs, Timing, and Funding of Remaining Units Through New Construction/Substantial Rehabilitation....................................................18

         b.  Costs, Timing, and Funding of Remaining Units Through Retrofits of Existing Units. ......................................................................................19

      4.  Progress of Survey and Remediation Process ...................................................20

   D.  Comprehensive Database ...........................................................................26

   E.  Affordable and Accessible Housing Registry (AAHR) .............................30

   F.  Permanent Supportive Housing ..................................................................32

   G.  MCE Plan Implementation .........................................................................33

      1.  Implementation ......................................................................................33

i

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

2.  Focus on Policies Necessary to Address the Upcoming Significant Increase in the Number of Certified Accessible Units. .......................................................36

3.  Audits....................................................................................................................36

H.  Programs AcHP is Still Developing or Initially Implementing ............................42

1.  Enhanced Accessibility Program.........................................................................42

2.  Grievances/Complaints System...........................................................................43

3.  Self-Evaluation/Transition Plan ..........................................................................46

4.  Effective Communication Policy and Accessibility Requirements .................47

III.  Conclusion ..................................................................................................................48

ii

## I.    Introduction

Pursuant to the Amended Corrected Settlement Agreement by and Between City of Los Angeles and Plaintiffs ("ACSA"), adopted by the Court on November 2, 2022,[1] the Monitor hereby submits his Semi-Annual Report for Reporting Period September 1, 2022, through February 28, 2023.

The implementation of the ACSA is about to enter a busy but exciting stage. During the years 2023 through 2025, construction of approximately 2,000-2,500 Accessible Units that commenced several years ago will be completed. This is a huge increase over the number of Accessible Units that have come online to date in this case – indeed, only 360 Accessible Units have been certified so far.

This increase will have significant ramifications for the Los Angeles Housing Department ("LAHD") and particularly the Accessible Housing Program ("AcHP"). The Construction Team, working with the expert consultant Evan Terry Associates ("ETA"), needs to be prepared to conduct, among other tasks, plan reviews, accessibility surveys and, where necessary, ensure that any accessibility problems are remediated, and this must be done promptly so that whenever possible, the survey and remediation occur before the projects are occupied. The Policy Unit must also be prepared for this significant increase in projects to be monitored.  The job of the Policy Unit is to make

---

[1] The ACSA, ECF No. 714-3, replaced the Corrected Settlement Agreement ("CSA") adopted by the Court on December 13, 2017. ECF No. 608-1.

1

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

sure that policies relevant to fair housing obligations and to ensuring that new Accessible Units are occupied by people with disabilities – including policies governing accessible wait lists and transfer lists – are effectively implemented. The Policy and Systems groups also must work together to improve the functionality and usability of the Web Registry that matches tenants and units. Finally, Systems will need to make sure that the Comprehensive Database is functioning at a level to track accurately all relevant information concerning the completion, certification, and occupancy of these Accessible Units.

Changes in funding sources also will pose challenges. Funds from Proposition HHH, a 2016 Los Angeles ballot measure, have significantly increased the number of new construction and substantial rehabilitation projects that have commenced over the last several years; however, these funds are now fully committed, and no additional Accessible Units beyond those units already in the development pipeline will be constructed from them. Although Los Angeles voters recently passed another measure – United to House LA ("ULA"), a transfer tax on properties worth over $5 million – that would provide substantial funding for construction of Accessible Units, that measure is currently facing both legislative and judicial challenges, and those challenges likely will not be resolved for another couple of years. Even if the ULA measure survives the judicial and legislative challenges, there will be at least a two-year gap between when Proposition HHH funds end and the expenditure of ULA funds begins – FYE 2024 and

2

2025 – where funding for new construction and substantial rehabilitation will be reduced by almost 50%. It is possible that the ULA funds will never be available, raising long term funding issues for new construction and retrofits.

The Parties and the Monitor are exploring methods of reducing the impact of this funding shortfall, primarily by increasing the number of retrofits of existing units to make up, at least in part, for the decrease in new construction and substantial alterations. The Parties want to gain experience in retrofitting of existing properties to have a better understanding of the cost and timing of these retrofits. Although ETA has conducted accessibility surveys for several existing properties, the City has not yet commenced the process of retrofitting any of these properties. It must do so promptly, and this again will likely result in additional challenges.

## II.    Discussion

### A. Budget

The City's fiscal year runs from July 1 until June 30. The budget process for a fiscal year begins in the previous October, and pursuant to the Los Angeles City Charter, the Mayor must deliver a proposed budget to the City Council by April 20, and the Council must adopt or modify it by June 1. The City has not yet finalized the budget for 2023-24. The Monitor sets forth below information as to the current status of the budget, as well as two significant budget issues.

3

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

**Current status of the budget for 2023-24.** Although many components of AcHP's budget cannot be determined until the City's overall budget is set, AcHP has requested $45 million for the Accessible Housing Fund. This Fund pays for AcHP administration and operational expenses, as well as retrofits of existing developments. The Accessible Housing Fund was about $34 million in FY 2021-22, of which the City reports spending approximately $27 million; that Fund for FY 2022-23 was about $26 million. Although AcHP has requested $45 million in Accessible Housing Funds for FY 2023-24, the City Council may allocate less than the requested amount.

**Two significant budget developments.** There have been two significant budget developments relevant to implementation of the ACSA. The first concerns funding resulting from Proposition HHH, a City initiative passed in 2016 that generated up to $1.2 billion to support the development of permanent supportive housing units for people at risk of experiencing homelessness. All Proposition HHH funding has now been fully committed, and no additional Accessible Units (beyond those currently in the development process, discussed below) will result from Proposition HHH funds.

Proposition HHH funds have played a significant role in the creation of Accessible Units. Approximately 130 projects, with a combined total of 8,596 units, have received funding from Proposition HHH bonds. As of the date of this filing, 40 Proposition HHH-funded projects are in service, 62 projects are in construction, and 28 are expected to be completed by the end of 2024.

4

The second major budgetary development concerns the ULA ballot measure enacting a tax on the sale or transfer of properties valued at more than $5 million, which Los Angeles voters passed in November 2022. Although these funds would more than make up for the loss of Proposition HHH funds, it is uncertain at this time whether those funds will be available. First, opponents of the ballot measure brought suit challenging it, and that case is still pending. In addition, a second statewide measure will be on the ballot in 2024 which, if passed, would essentially invalidate ULA.

The City anticipates that these challenges to ULA will be resolved in the next couple of years.

Other funding – primarily state and federal funds – can also be used for new construction, but the amount of this funding is far less than the total funding in the past several years, which has included Proposition HHH funds. In FYE 2023 – the last budget that included Proposition HHH funds – approximately $170 million was budgeted for new construction and substantial rehabilitation. In FYE 2024 and 2025, this funding drops to approximately $93 million and $86 million respectively. Assuming that the ULA measure survives the legislative and judicial challenges, the City estimates that with those funds, the budget for new construction and substantial rehabilitation in FYE 2026 will increase to over $280 million. The impact of the 2024-25 reduction in funding on construction of Accessible Units is discussed below.

5

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

**B. Staffing and Management**

We discuss below the staffing situation of the Construction Program and the Policy Program.

### 1. Construction Team

AcHP's Construction Team works with ETA, the architectural expert retained pursuant to the ACSA, and oversees construction of new Accessible Units and future retrofitting of Accessible Units in existing developments.

**Background.** According to the current organizational chart, the Construction Program consists of the Construction Administration Team and the Construction Team, which – among other tasks – works with ETA, conducts accessibility surveys and inspections of new construction and substantial rehabilitation developments, and prepares cost estimates and scopes of work for the measures necessary to bring existing developments into compliance. The following table provides the number of positions within the Construction Program that were authorized from July 2021 through March 2023, and the number of positions that were actually filled during that timeframe:[2]

---

[2] *See* App. at 2-5 (July 2021, January 2022, July 2022, and February 2023 staffing charts). In addition to the construction staff identified on the February 2023 staffing chart, the City recently made offers to four RCS employees, all of which were accepted.

6

| Construction Program Staffing | | | | |
|---|---|---|---|---|
| | Construction Team | | Administration Team | |
| Date | No. Authorized | No. filled | No. Authorized | No. filled |
| July 2021 | 14 | 9 | 8 | 6 |
| Jan. 2022 | 14 | 13 | 8 | 6 |
| July 2022 | 25 | 11 | 7 | 5 |
| Feb. 2023 | 24 | 19 | 7 | 7 |

**Construction Team staffing.** As described in detail in the last Monitor Semiannual Report, the City historically has faced challenges in filling Reconstruction Specialist ("RCS") positions because there are relatively few people who are qualified and interested in these positions. During this reporting period, the City has done a better job of filling many of those positions. Of the 19 authorized RCS positions, 14 have now been filled.

In addition, the City newly authorized the Assistant Inspector I position. The Assistant Inspector I position is significant because it allows these Assistant Inspectors to get relevant on-the-job training to ensure that when they are eligible to become RCSs, and they have the skills necessary for the AcHP construction work. Additionally, the Assistant Inspector I position is eligible for a streamlined hiring program, that is not subject to the same hiring list constraints.

7

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

The City has now filled all five Assistant Inspector I positions. The Monitor understands that these employees have received online training, as well as hands-on training in the field, and are assisting RCSs with site surveys.

The staffing level of the Construction Team is now higher than at any time in the past several years, which is important because, as described below, the work of the Construction Team will likely significantly increase as the City ramps up its retrofit work, and as newly constructed projects are ready for accessibility surveys prior to occupancy. It is not yet clear whether construction staffing is currently sufficient to handle the surge in projects that will be completed over the next couple of years, as well as the additional retrofit work, and the Monitor plans on carefully tracking this issue.

**Administration Team staffing.** The Administration Team is fully staffed with seven employees. This Team is responsible for administrative tasks associated with the efforts to survey and remediate covered housing developments, including scheduling, staffing, and outreach to owners and property managers concerning upcoming surveys.

### 2. Policy Program

AcHP's large Policy Program, which regulates oversight of owners' and property managers' interaction with applicants for housing and residents in existing developments, has consistently suffered high levels of attrition, which was particularly problematic during this reporting period as the team lost two senior leaders in the Policy Program.

8

The LAHD leadership team and Policy Program managers have been attempting to remedy this situation by promoting existing staff and hiring externally to fill positions left vacant by attrition. The Policy Program has reorganized its staff to have specialized groups develop remaining implementation structures while two groups focus on implementing the Monitoring, Compliance, and Enforcement ("MCE") Plan. Management has also developed plans and made initial efforts to mitigate future attrition in the Policy Program. Nevertheless, as described above, staffing levels and attrition continue to be significant issues.

The staffing issues of the Policy Program contrast with those of the Construction Program. While the RCS position is highly specialized and hard to fill, the predominant job in the Policy Program is the Management Analyst ("MA") job, which is a generalist analyst position that exists in all City departments covering a broad range of subject matters. That characteristic makes the Policy Program MA position easy to fill because of the lack of specialized job skills and experience and the large pool of potential MA candidates. As a corollary, the City reports that the MA analyst position has a lot of turnover because MAs can move easily between different analyst jobs.

Unlike the RCS job, which is difficult to fill because of the high levels of skills and experience needed to be eligible for the Civil Service RCS test and the infrequency of list availability, the City's determination that the MA policy positions only required the generalized analytical skills, and a hiring freeze in other City departments due to the

9

pandemic from which AcHP was exempt, made it relatively easy to temporarily fill authorized Policy Program jobs in the 2020-21 period when the current leadership team arrived. Because of that influx, the vacancy rate for authorized MA positions of the Policy Program was relatively low in mid-2021, and Policy initiatives such as the MCE Plan could be developed and initially implemented by an adequate workforce in an effective manner. When the City lifted pandemic restrictions on hiring, transfers, and promotions at the end of 2021, the vacancy rate substantially increased as Policy MA employees left for other opportunities and, in many cases, more money for equivalent work at the City's Department of Water and Power, which has its own unique salary structure for the same position classifications.

To address attrition, the Policy Program has been hiring to fill positions left vacant, although over the last year, the vacancy rate has remained fairly consistent and high, with the City reports is true of all City departments. In January 2022, the vacancy rate approached 30 percent, in July 2022 it was approximately 28%, and in February 2023 the vacancy rate was approximately 27%, broken out as follows:

| Group | Total number | Number vacant |
|---|---|---|
| Systems, data & reporting | 10 | 6 |
| Grievances & tenant outreach | 9 | 4 |
| Training & policy | 10 | 3 |
| Projects Monitoring & Compliance – CES & PSH | 11 | 1 |

10

| | | |
|---|---|---|
| Project Monitoring & Compliance | 13 | 1 |
| Miscellaneous (Senior MA II & Senior MA I) | 2 | 0 |
| Total | 55 | 15 |

*See* App. at 5.

Over the last year, the Policy Program designed and implemented a reorganization that put a plurality of MAs into two groups that deal with the work of monitoring compliance by developments called for by the MCE Plan instead of having MAs perform the full range of Policy Program work. One of the groups, "Projects Monitoring-CES & PSH," specializes in monitoring housing developments serving the population of homeless individuals and families. This category requires that MAs work with a separate County/City entity, the Los Angeles Homeless Services Authority ("LAHSA"), and coordinate AcHP placement policies with LAHSA's separate Coordinated Entry System ("CES") requirements. Several other subsidized housing programs, requiring similar coordination, are also included in the CES & PSH group because of the similarity of tasks those MAs perform. MAs assigned to the second Projects Monitoring organizational group, "Projects Monitoring & Compliance," work with other subsidized housing developments, such as senior housing, that do not require coordination with LAHSA or CES filling processes.

11

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

The remainder of MAs are assigned to perform tasks distinct from the monitoring and compliance work of implementing the MCE Plan approved by the Monitor in 2021 because they still require policy or program development tasks.

The "Systems, Data & Reporting" group works with the technical Systems group and Construction on the development and improvement of the online Housing Registry and Comprehensive Database, and the reporting of information to track progress of developments in complying with AcHP requirements. In addition to systems and data, the Group also works with the technical Systems group on reporting.

The Grievance & Tenant Outreach group is responsible for developing, improving, and implementing a grievance and complaints system. In the last year, this group also assumed some responsibility for tenant outreach programs and the Enhanced Accessibility Program.

The Training and Policy group works on training programs for owners and property managers as well as AcHP staff. Originally, training was conducted in in-person sessions. During the pandemic, the Group developed many online programs that continue to be provided on a regular schedule. New training is introduced as needed. While training of owners and property managers is substantially developed but continues to be improved, outreach and training of residents is substantially less developed and will be a focus of this Group. This Group will also develop a Quality Assurance function.

While the reorganization may assist in addressing some of the issues on the policy side, it is not a solution to the significant vacancy rates.  These vacancy rates are likely attributable to a number of reasons, including City hiring and transfer policies that can make retention of employees difficult, heavy workloads, and frustration with attempting to implement the ACSA while also addressing detailed input from the Plaintiffs. The Monitor has requested to conduct exit interviews of several employees who recently moved to different departments or programs, and the City has agreed to make these employees available for interviews.

### 3.  Administration Unit

LAHD leadership also created an Administration Unit to serve the entirety of AcHP and to coordinate the administrative needs of AcHP with the other centralized departmental administration, such as Accounting, Procurement and Contracts, and Personnel. This unit is currently led by a Senior Management Analyst I with assistance from MAs. This unit is expected to grow in the future as it centralizes the administrative work for AcHP and relieves the Policy and Construction Program teams of administrative work, such as contract procurement and monitoring, invoicing, and other related work that requires a different substantive skill set than what is needed in the Policy and Construction Programs.

Overall, while AcHP leadership continues to make good faith efforts to address persistent staffing issues, attrition and staffing vacancies continue to be a significant

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

problem that AcHP will need to continue to address moving forward. A great deal of work remains under the ACSA, and can only be accomplished with appropriate staffing levels.

**C. Progress Toward Target Number of Accessible Units**

The ACSA requires the City to provide 4,000 Accessible Units (the "Target Number") by September 2026, ten years after the Effective Date. ACSA ¶ III.10(a). To achieve this goal, the ACSA requires that the Parties develop a Revised Accessible Housing Unit Plan ("Revised AHUP") and requires the City to hire one or more experts to "conduct accessibility surveys and otherwise advise the Parties on compliance with federal and state accessibility requirements." *Id.* ¶ III.10(b)(i). As described in earlier reports, the City has retained ETA to serve as the required expert.

**1. Overview**

The types of construction that produce Accessible Units fall within two broad categories: (1) new construction/substantial rehabilitation, which is essentially building Accessible Units from scratch; and (2) retrofits of existing units. As discussed in detail below, these two categories of construction have different funding sources, different construction timelines, and different logistical complications.

To date, only 360 Accessible Units have been certified, and thus the City must create and certify an additional 3,640 Accessible Units to meet the 4,000-unit requirement under the ACSA. The current deadline for completion and certification of

14

all 4,000 Accessible Units is September 2026, and the Parties and the Monitor do not believe that the City will meet this deadline. The Parties plan to address this issue with the Court in the future once they have greater clarity on whether an extension of the deadline will be necessary, and if so, the length and terms of the requested extension.

As discussed in greater detail below, the Monitor issued an order resolving a dispute among the Parties that should have the effect of speeding up the process of creating and certifying Accessible Units. The dispute concerned whether the ACSA requires that the City, in creating 4,000 Accessible Units, include retrofitted units in reaching that total, or instead whether the City has the discretion to rely entirely on new construction and substantial rehabilitation to create 4,000 Accessible Units. The Monitor resolved this issue in an order dated December 27, 2022, which was reissued to include agreed-upon deadlines on January 12, 2023, App. at 6-13, holding that although the City generally has discretion in determining the mix of types of construction it engages in, it must exercise that discretion in a manner that complies with all requirements of the ACSA. Because the City very likely will not comply with ACSA's September 2026 deadline to create 4,000 Accessible Units, the decision held that the required mix of new construction, substantial rehabilitation, and retrofits is the one that will result in completion of 4,000 units as close to the September 2026 deadline as possible.

The first step in determining the quickest path towards completion of 4,000 Accessible Units is to have a thorough understanding of the number of Accessible Units

that have been constructed and that are currently being constructed. This will allow the Parties and the Monitor to know how many Accessible Units need to be created in the future. This information, along with information that the Parties have gathered and plan to gather in the future concerning the relative cost and timeline of new construction and substantial rehabilitation units versus retrofit units, will allow them to create a plan to determine the number of remaining units that will be created through each type of construction, the schedule for completion of these units, and the funding sources for this construction. Although this evaluation is ongoing, the results to date are set forth below.

### 2. Determining the Total Number of Accessible Units That Are Currently Under Construction.

On average, it takes approximately three and a half years for new construction projects to go from the initial application for funding to the point where construction is finished and the project is ready for occupancy. As projects proceed through this process, they pass through various milestones, already tracked by the City, including for example the date on which the construction loans are executed, the date on which the building permit is issued, the notice to proceed date, and the date on which the project is ready for occupancy. Based on actual construction data from more than 40 completed construction projects, the Monitor and the Parties have developed a timeline of how long, on average, it takes from each milestone until a project is ready for occupancy. By doing so, they can project the approximate number of Accessible Units that will likely be ready for certification in the upcoming three years or so.

16

The City represents that it has a total of 30 developments in the pre-development financing stage, which if ultimately constructed will result in approximately 400 Accessible Units.[3] In addition, the City represents that it has a total of 151 developments in active construction, which will result in 1,920 Accessible Units. All told, there are approximately 2,300 Accessible Units in the pipeline (approximately 539 of which the City estimates will be certified in 2023) – a number consistent with the results of an independent analysis conducted by the Monitor of the number of Accessible Units in the construction pipeline. This amount, combined with the Accessible Units that have already been certified, totals approximately 2,500 units,[4] which means that the City still must fund and construct approximately 1,500 Accessible Units (the "Remaining Units"). That number may be higher if some of the projects at the predevelopment stage do not proceed to completion, which is not uncommon.

---

[3] This estimate is based on the requirement in the ACSA that a minimum of 15% of the total number of units in a project must be Accessible Units. The ACSA sets a maximum of 20% on the ratio of Accessible Units to total units in order to prevent segregated properties. To increase the efficiency of this process, the Monitor urges the City to ensure that in future projects, it require that 20% of total units be Accessible Units.

[4] As set forth above, a total of 360 Accessible Units have been certified to date. The reason why the estimated total number of certified units and units under construction is slightly less than the sum of 360 certified units and 2,300 Accessible Units in the pipeline is to account for some overlap between these two categories.

17

### 3. Costs, Timing, and Funding for Creation of Remaining Units.

The City can create the approximately 1,500 Remaining Units either through new construction and rehabilitation, through retrofits of existing properties, or through a mix of these.

### a. Costs, Timing, and Funding of Remaining Units Through New Construction/Substantial Rehabilitation.

It is unclear how much funding will be available in the future for new construction and substantial rehabilitation. As set forth above, all Proposition HHH funds have now been committed. In 2022, the City of Los Angeles passed the ULA measure, which imposed a tax on certain commercial and residential property sales to generate funds for affordable housing. Although the funds generated by this measure would more than make up for the loss of the Proposition HHH funds, the measure is being challenged in court and threatened with repeal by a statewide initiative.

Assuming the worst-case scenario that ULA funding never materializes, then the major remaining funding for new construction and substantial rehabilitation is through other funds, primarily consisting of state and federal funds.[5]  The City provides some funding in connection with programs such as the HOME program, but those funds require additional state or federal funds to fully fund a new development or substantial rehabilitation of a housing development.  As set forth above, the City estimates the

---

[5] *See supra* at 5.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

amount of this funding over the next two fiscal years will be approximately $93 million in fiscal year 2023-24, and approximately $86 million in fiscal year 2024-25. At this funding level, the City estimates that a total of approximately 300 Accessible Units will commence construction over these two years.

If the legislative and judicial challenges to ULA funds are ultimately unsuccessful, this would more than offset the loss of Proposition HHH funding. The City anticipates that one way or the other, the challenges to ULA may be resolved within the next two years, and the Monitor will carefully track developments related to these challenges.

**b. Costs, Timing, and Funding of Remaining Units Through Retrofits of Existing Units.**

The Parties and the Monitor have very little information concerning the costs or amount of time required to retrofit existing units. Although ETA has surveyed some existing developments, the City has not yet commenced the retrofit process for any of these units. Without this data, it is impossible to determine whether creating 4,000 Accessible Units will be more quickly achieved through new construction and substantial rehabilitation, through retrofits, or through a combination of these approaches. Thus the Monitor urges the City to commence the retrofit process on a sampling of units as soon as possible.

Retrofits are funded through the Accessible Housing Fund, which is also used to pay AcHP administration and operational expenses. AcHP has requested $45 million in

19

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

Accessible Housing Funds for FY 2023-24, but anticipates receiving less than that amount. In the absence of experiential data on the cost to retrofit units, it is impossible to estimate the level of funding necessary to retrofit a given number of units.

Retrofitting existing units also results in logistical complications that are largely absent from new construction and substantial rehabilitation. Most significantly, retrofitting existing units often requires temporarily relocating tenants in those units, potentially for up to six weeks. This can be disruptive and, in some cases, risky for tenants with disabilities. Obtaining consent and information from tenants concerning whether they are willing to be relocated and, if so, ensuring that their temporary housing meets their accessibility needs, is both time-consuming and logistically complicated.

Over the next year, as the City works on retrofitting existing units, the Parties and the Monitor will gather and analyze data relevant to this process, and then determine the best approach to completion and certification of 4,000 Accessible Units as quickly as possible.

### 4.  Progress of Survey and Remediation Process

After a number of delays,[6] the City began working with ETA as the designated expert in late 2020. Since that time, the City and ETA have made good progress toward

---

[6] The experts initially retained did not provide services of sufficient quality and had to be replaced. *See* Monitor's Semi-Annual Report for Reporting Period January 1, 2020 through June 30, 2020, ECF No. 684 at 2-3, 11-14. The process of replacing the expert

20

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

the Target Number. As of the date of this Report, ETA has recommended for certification and the City has certified 360 out of the 4,000 required Accessible Units. All of these units are the result of new construction or substantial alteration since 2016; as noted above, although ETA has surveyed a number of existing (pre-2016) developments, no retrofit work has begun or been scheduled and, accordingly, no retrofitted units have yet been certified.

The process of surveying new construction and substantial rehabilitation projects for compliance with the ACSA includes a series of progress surveys – during the construction process – by Construction Team personnel; at this time, those surveys now use tools and questions developed in collaboration with ETA. Once Construction determines that a project is ready, they notify ETA which conducts an initial accessibility survey and drafts a report documenting any features that are out of compliance with applicable standards. ETA submits that report to the Construction Team, which in turn transmits the report to the relevant personnel on the owner's side to remedy the barriers identified in the report. When ETA is notified that barriers have been removed, it performs one or more follow-up surveys; when the barriers identified in the initial survey have all been remedied, ETA recommends the project for certification by the City. If the City concurs, the project is certified.

---

occurred at the same time as accessibility surveys had to be suspended for the pandemic. *Id*. at 9-11.

21

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

ETA's process in surveying existing projects is identical; however, since they are not, by definition, currently under construction, there are no City-conducted progress surveys ahead of the ETA survey.

ETA's work during this reporting period has included:

- Conducting initial surveys of 45 housing developments (with 14 additional conducted or scheduled since the end of the reporting period) and approximately ten follow-up surveys to assess removal of barriers identified in its initial report.

- Issuing 36 initial reports and 30 follow-up reports.

- Conducting a two-day training for AcHP staff to ensure that the City's plan review and progress surveys are in sync with the surveys ETA conducts for purposes of the ACSA.

- Conducting two two-day trainings for architects, developers, and others involved in the design and construction of housing developments covered by the ACSA.

- Maintaining its online resource of the design and construction requirements under the applicable regulations and standards for housing developments covered under the ACSA, including citations, diagrams, interpretations, technical assistance, and surveyor notes. This resource is invaluable for developers, project managers, architects, contractors, and Certified Access Specialists to consult at all stages of development and construction.

22

- Collaborating with the City and the Monitor on methods to source data from the OLAP database as necessary to prepare for surveys and provide data to that database following each survey.

For the first 18 months of its work on this settlement, ETA's surveys were limited to newly constructed and substantially rehabilitated housing developments. In early 2022, they began conducting surveys of older, occupied housing developments. These surveys are longer and more complex than new construction surveys, as older buildings were often not built to applicable standards. City staff have been working diligently to provide ETA the information and documents it needs to prepare to survey these older developments and the pace of surveying has both increased and evened out since the last report.

Pursuant to the CSA, the Parties drafted an Accessible Housing Unit Plan ("AHUP") that was finalized in March 2019; however, it explicitly relied on reports from an earlier, now-replaced, survey expert. Based on this and other changed circumstances over the past four years, the ACSA requires the Parties to draft a Revised AHUP, a task to which the Parties, with the Monitor's assistance, have devoted a good deal of time over this reporting period. Once the Parties agree upon and Monitor approves a draft Revised AHUP, input will be sought from ETA. The Parties currently anticipate filing the Revised AHUP by May 2, 2023, the deadline established in Paragraph III.10(c)(ii) of the ACSA.

23

As noted above, the Parties' discussions around the Revised AHUP highlighted a disagreement concerning the question whether the City is obligated to produce a specific number of Accessible Units by retrofitting older developments. The Monitor requested briefing of this question and issued his decision on December 27, 2022, determining as follows:

> The Monitor holds that the City has the flexibility to rely on any combination of New Construction and Retrofit Units to achieve the Target Number, but only to the extent that doing so will comply with all other requirements in the ACSA, including requirements relating to geographical and other distribution of AUs and the September 2026 deadline. Because we are more than 60% of the way through the term of the ACSA, and the City has certified only 307 units to date, the appropriate mix of New Construction and Retrofit Units is the one most likely to ensure certification of 4,000 compliant AUs as quickly as possible. The Monitor further orders the City to provide the information necessary to permit the Parties to discuss and determine that mix, and to ensure continued access to information necessary for the Parties and the expert to efficiently survey and remediate AUs.

A revised decision was issued on January 12, 2023 that included agreed deadlines for production of required information. App. at 7.

Among the outstanding issues that remain under discussion are whether, in prioritizing housing developments for retrofit, the City can or should take into account (1) the willingness of an owner to participate in the retrofit process; and (2) the willingness of a disabled tenant in a unit slated for retrofit to have their unit altered and/or to have to relocate during alterations.

While the survey and certification process is largely moving smoothly, as described above, it faces several challenges.

**Helping older new construction developments carry out barrier removal**. When ETA surveys newly constructed developments, they are generally unoccupied and barrier removal and follow-up surveys can be accomplished quickly and efficiently. Owners and builders understand that they will need to devote the resources to remove barriers and prepare the development for final survey and certification. There is a subset of developments built after April 12, 2016 and thus considered "new construction" that are more challenging to finalize. Because the survey process took several years to get underway, then paused for the pandemic, and then restarted from scratch with the hiring of ETA to conduct surveys, a number of projects were constructed between April 12, 2016 and early 2021 and occupied either before any survey could be conducted or following a survey – now deemed inadequate – by the prior expert. Rather than being able to remove barriers as part of the process of finalizing construction, these "new construction" projects resemble retrofit projects with respect to logistics: owners will have to find a source of funding to make required changes; and in some cases, may need to arrange for the temporary relocation of tenants. It is the Monitor's understanding that the City is working with some of these owners to secure funding so these developments can move toward certification.

25

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

**Relocation consultant.** The ACSA requires the City to "temporarily relocate, or required Owners to temporarily relocate, existing tenants occupying units to be retrofitted." ACSA ¶ III.10(c)(i). Because the City's production of Accessible Units has focused entirely on new construction, no units have yet been so much as scheduled for retrofitting much less required tenant relocation. However, Plaintiffs and the Monitor have encouraged the City to retain and have ready relocation specialists with experience relevant to the needs of tenants with disabilities. According to the City's Semi-Annual Report January to June 2022, set forth at pages 96-114 of the Appendix to the Seventh Report, the City has issued "two requests for proposals … that would provide a bench of qualified tenant advocate service consultants and a bench of qualified relocation specialists from which the owners/developers can select for their respective retrofit projects." Appendix to Monitor's Semi-Annual Report for Reporting Period January 1, 2022 through August 31, 2022 at 105, ECF No. 712-1. The City has received responses to the RFPs and intends to move forward with an award for the relocation specialist, and plans on taking additional steps to retain a qualified firm to provide tenant advocate services.

**D. Comprehensive Database**

The Comprehensive Database is essential to both successful implementation of the ACSA, and to "reliably inform the Court and Monitor regarding compliance." Order Re: Further Proceedings at 2, Dec. 19, 2019, ECF No. 663. A Comprehensive Database that

26

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

contains all relevant and accurate data will be immensely helpful to all aspects of the implementation and monitoring of the ACSA Until the Database is up and running, the City will continue to have to spend time manually generating reports and will not be able to use the database to analyze data.

The Parties have broken up the overall development of the Database into component tasks, including: mapping existing data tracked by the City to data elements in the Database, and identifying new data elements to be included in the Database; populating the Database with new and existing data; putting in place processes and procedures to ensure that information in the Database is valid and accurate; using the Database to create queries and reports to assist in the implementation and monitoring of the ACSA; and creating an ad hoc query tool that will allow non-technical users to run queries on data within the Database. The Parties have made progress on each of these tasks.

**Mapping project.** The Parties originally agreed on a list of 312 data elements to be included in the Comprehensive Database, but later the Parties and the Monitor determined that it would be extremely helpful to identify all data elements and systems relevant to monitoring and implementation of the ACSA that the City currently tracks, as well as data elements that should be tracked in the future. This is known as the "mapping project." This project is now largely completed.

27

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

**Populating the database.** Through the mapping project, the Parties and the Monitor determined which data elements should be included in the Comprehensive Database, as well as the source for those data elements. The next step is to populate the database with the data for each element, and the City's Systems team has largely accomplished this task.

**Data validation and quality assurance.** The Comprehensive Database can only serve its purpose of assisting in the implementation and monitoring of the ACSA if the data it contains is accurate. To assure accuracy of data, the City developed a draft data quality assurance plan. The Plaintiffs have reviewed this draft plan, and provided their comments and edits, and the Parties and the Monitor are now working on scheduling a call to go over these comments and edits.

**Reporting project.** The last Monitor report indicated that the Database was close to being able to generate monthly compliance reports, which provide information to the Parties and the Monitor on a variety of subjects crucial to the implementation of the ACSA. That task has now been completed, subject to some possible quality control revisions, and the City has used the Comprehensive Database to generate monthly compliance reports over the last several months. This is a significant achievement.

Now that the monthly compliance report is finalized, the Parties and the Monitor are working on using the Database to generate quarterly reports, which like the monthly

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

compliance reports provide information crucial to the implementation and the monitoring of the ACSA.

**Ad hoc query tool.** Finally, the Parties and the Monitor are working to develop a user-friendly interface or dashboard that will allow the Parties to run queries on data elements that they select.  Significant questions have been raised as to whether the current database is structured in a manner that will allow efficient ad hoc queries, which all parties agree is an important function. The first step, and current focus of this task, is determining whether there are off-the-shelf tools that would work with the Database and that would allow users to easily query the database. This will likely take some time, both to identify the appropriate tool, and then to set it up in a fashion that will allow for queries of the Database.  It may turn out that the off-the-shelf tools are insufficient to complete the task, in which case a more major restructuring of components of the database system may be required.

**Useability and functionality of the database:**  As currently configured, accessing data through the database is slow. In addition, issues have also been identified with the interface used by the Owners/Managers as to its clarity and functionality.  The parties are beginning to explore these issues and possible solutions, which again may involve some significant upgrades to the database infrastructure.

Overall, the Parties have made substantial progress towards the development of a comprehensive, functioning database, a database that over the next year will be

29

incorporated into many facets of the implementation and monitoring of the ACSA. Significant issues remain to be resolved.

### E. Affordable and Accessible Housing Registry (AAHR)

The ACSA requires the City, with input from Plaintiffs and the Monitor, to make available an accessible website listing all Housing Units in Covered Housing Developments with various specified features permitting potential tenants to express interest in Accessible Units and meeting specific web-accessibility standards. ACSA ¶ III(10)(m)(i). The City currently makes an AAHR (otherwise referred to as the Tenant Registry) available, and has been working with Plaintiffs, the Monitor, and a consultant to improve its accessibility.

In the City's Semi-Annual Report July to December 2022 ("City Report"), set forth at pages 14-31 of the Appendix hereto, as of December 2022, the City reports that there were a total of 54,542 registered users of the AAHR, a 34% increase from the number of users as of June 30, 2022. App. at 22. Pages 9 and 10 of the City Report provide information concerning the number and source of these registered users, but the underlying data is not yet part of the database system being developed by the Parties.

Applicants can submit multiple "pre-applications" to be added to the wait lists at specific projects. The most recent information provided by the City shows:

- Number of Pre-Applications created since July 2019: 193,736

30

- Number of Pre-Applications created during the current reporting period: 64,734, of which

  - 21,252 were for Mobility Units;

  - 3,598 were for hearing/vision units;

  - 1,699 were for mobility and hearing/vision units; and

  - 38,185 were for conventional units.

- Number of Pre-Applications still open as of 3/24/2023: 151,653

- Number of applicants on the wait lists for Accessible Units (as reported by all properties in Q4 2022): 61,693.

There is clearly increasing use of the Tenant Registry by applicants and the need is overwhelming. Unfortunately, the number of available units continues to be very small compared to the need, and the Parties are considering capping the Accessible Unit Wait Lists on the registry at specific levels because they are too long to ever actually provide units to all who are on the lists. As of December 2022, there were more than 20,000 applicants added to individual property wait lists for Accessible Units. We do not yet have data from the City as to how many of the registry users have actually been able to obtain an Accessible Unit.

As reported in the Monitor's Seventh Report, the City has continued to improve the accessibility of the Tenant Registry for individuals with disabilities seeking housing. That Report documented the City's work with Knowbility, the Monitor's online

31

accessibility expert, to provide accessibility training and to take significant steps toward ensuring the accessibility of the Tenant Registry itself. During the current reporting period, the City developed an internal audit plan and also remediated accessibility issues identified by Knowbility during an earlier audit. *See* City Report at 11, App. at 24.

The City has continued to convene working sessions with representatives of Plaintiffs and the Monitor to discuss specific changes in language required to ensure that the Tenant Registry is understandable and accessible to the individuals who need to use it. Finally, the Tenant Registry has been expanded to permit homeless individuals to seek Accessible Units even if they lack online access.

In addition, there is not an adequate database system for gathering information from the registry, including such critical information as success rates for parties using the Registry. The parties have agreed to address the registry database issues later this year or early next year. Registry datapoints are not yet included in the Comprehensive Database.

**F. Permanent Supportive Housing**

A significant portion of the housing covered by the ACSA is housing for individuals experiencing homelessness built through the City's use of Proposition HHH and other government funding for Permanent Supportive Housing ("PSH") developments. In 2020, the Monitor determined that the CES operated by LAHSA, a joint city/county governmental entity for filling PSH with individuals with disabilities,

32

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

was ineffective in identifying and filling Accessible Units with homeless individuals and families with disabilities. In response, the Parties proposed – and the Monitor approved – a "Hybrid Plan" in which LAHSA and AcHP coordinate in filling PSH units for homeless persons with disabilities. *See* Monitor's Semi-Annual Report for Reporting Period July 1, 2021 through December 31, 2021 at 31-32, ECF No. 697.

As reported by the City, during the period July to December, 2022, it continued partnering with LAHSA to implement the Hybrid Plan, under which AcHP's Registry complements the CES, with the two systems working together to connect persons experiencing homelessness with accessible, supportive housing. Pages 11-13 of the City Report provide extensive details of this coordination. App. at 24-26.

Because of significant barriers in the LHSA/CES systems, the Parties have also set up a system to allow owners to select applicants with mobility and hearing/vision disabilities from outside the CES system.  The Parties are also working to fully include in this work other properties whose funding sources require filling units from specific referral sources, such as County Mental Health.

### G. MCE Plan Implementation

#### 1.  Implementation

 Sections III(10)(k) and (l) of the ACSA obligate the City to monitor property owners' and managers' compliance with various policies required by the ACSA, and to enforce compliance where necessary. The Parties submitted  a comprehensive

33

Monitoring, Compliance, and Enforcement Plan ("MCE Plan") addressing reporting, monitoring, and enforcement of owners' and managers' compliance with (then) CSA policies, which the Monitor approved. *See* Monitor's Decision Approving 2021 MCE Plan, June 15, 2021, ECF No. 692.

The Parties have taken a number of steps to ensure appropriate monitoring and enforcement of ACSA policies.

First, the City produces a monthly compliance report, generated from the Comprehensive Database, which provides property-specific and summary data concerning property owners' and managers' compliance with ACSA-mandated policies governing reporting, documentation, and training. The monthly compliance reports also provide information concerning the City's efforts to correct any properties that are out of compliance with these policies, and where those efforts have not been successful, to engage in enforcement actions. The most recent report shows that approximately 93% of the properties are in general reporting compliance, and that there are approximately 32 in some stage of enforcement proceedings. This is a significant improvement over prior years.

The parties are in agreement that work needs to be done to fully understand whether the properties are adequately implementing many of the required fair housing provisions. To that end, the parties have expanded the collection of data regarding such things as provision of reasonable accommodations and reasonable modifications,

34

provision of auxiliary aids and services for effective communications, compliance with grievance policies, and compliance with policies concerning tenant access to Accessible Units, waiting lists, and transfer lists. This information is primarily reported in quarterly reports, not the monthly report, and the parties have begun to address the specific parameters of the quarterly report. The parties have identified areas for additional training of owners/managers and others regarding these issues.

Second, the MCE working group – comprised of representatives from the City, Plaintiffs, and Monitor – meets monthly to discuss such topics as the City's training program, the most recent monthly compliance report, progress on goals established in the MCE plan, specific issues that have arisen, etc. One issue that has been resolved among the parties is identification of the properties that should be removed from the Covered Property List, and which should be restored to that List, and a system has been created to address any issues that arise regarding additions/removals. The Parties and the Monitor continue to work on policies and practices that will ensure that the Covered Property List remains up-to-date and is centrally sourced in the Comprehensive Database.

Third, the parties have reframed one of the major MCE Plan exhibits to identify deadlines in the context of overall goals and objectives for the program, to more comprehensively track progress and needs in the policy arena.

35

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**

Finally, as discussed in detail below, a private entity retained by the City conducts audits of owners' and managers' compliance with ACSA-required policies.

### 2. Focus on Policies Necessary to Address the Upcoming Significant Increase in the Number of Certified Accessible Units.

As described elsewhere in this report, over the next couple of years, construction will be completed on a significant number of Accessible Units. During the next reporting period, the Monitor intends to focus on effective implementation of policies that ensure that, as those units are completed and certified, they are occupied by people who need the accessibility features they provide. The Monitor will consult with the Parties on this issue, but at a minimum, this includes policies that relate to effective tracking of people on waiting lists and transfer lists for Accessible Units, informing those people of the availability of Accessible Units as they are certified, and enforcement of lease addenda where necessary to relocate people to comparable units who are currently residing in Accessible Units with accessibility features that they do not need. Audits have revealed that owners and property managers have had trouble understanding and complying with these policies, and so it is urgent that the parties take all necessary steps to ensure their effective implementation.

### 3. Audits

Pursuant to Paragraph III.10(l)(ii) of the ACSA, as well as two decisions by the Monitor addressing that paragraph, the City has entered a five-year contract with Abt

36

Associates, running through October 2025, to conduct audits of owners and managers of covered projects.

The contract provides that Abt may engage in the following tasks: random surveys of a statistically-valid sampling of projects to estimate overall implementation and compliance with AcHP policies ("Random Surveys"); surveys of subgroups of projects selected based on criteria developed by the Parties ("Subgroup Surveys"); triggered reviews of projects identified as potentially problematic ("Triggered Reviews"); site visits of properties ("Site Visits"); and technical assistance by Abt for the City ("Technical Assistance"), such as providing guidance to the City on conducting their own audits.

Random Surveys, Subgroup Surveys, and Triggered Reviews all consist of two phases: a document review to assess compliance with AcHP documentation policies; and interviews of owners, property managers, and residents with disabilities.

Each audit year, Abt provides a semi-annual report with its preliminary review and analysis of the results of the audits conducted to date for that year, and at the end of the year, provides a comprehensive report that covers the results and analysis of audits conducted during the year, as well as results and trends covering all previous audit years.

**Year 1:** The Parties and the Monitor considered year 1 to be a learning year which would generate lessons that would improve the Abt team's data collection efforts and processes in future years. The sampling plan for year 1 set a goal of conducting Random

37

Surveys of 77 projects, recognizing that it was likely that some surveys could not be completed. Ultimately, a total of 67 Random Surveys were completed in whole or in part during year 1.

The Parties also identified two subgroups for Subgroup Surveys: (1) number of properties owned, broken out by owners that owned only one property in the AcHP portfolio, owners that owned two to seven properties in the AcHP portfolio, and owners that owned eight or more properties in the portfolio; and (2) previous compliance status of properties, broken out by properties identified by the City in early 2021 as noncompliant, partially compliant, or fully compliant.

The Parties decided not to do any Triggered Reviews in year 1.

The details of Abt's year 1 findings are set forth in the Monitor's Semi-Annual Report for Reporting Period January 1, 2022 through August 31, 2022 at 34-39, ECF No. 712. In general, Abt estimated in its year 1 report that, across all projects, an average of 31% of AcHP requirements required follow-up by the City, meaning that 31% of AcHP requirements appeared not to be met. These requirements included follow-up on basic reporting requirements concerning filling open Accessible Units, lease addenda used to facilitate filling units with persons with disabilities, development of grievance policies, affirmative marketing and items concerning accessible communications.

38

**Year 2**: The Parties decided that during year 2, Abt would conduct fewer, but more intensive, Random Surveys. The Parties set a goal of 64 Random Surveys during year 2, divided into 10 batches, with the last batch commencing in December 2022.

The Parties identified two subgroups for year 2: (1) housing developments that had been permitted in 2016 or later; and (2) properties that are either partially or entirely subject to the CES process.

The Parties determined that Abt would conduct nine Triggered Reviews during year 2. These reviews would focus on projects with issues concerning lease addenda addressing accessibility issues, and projects which were the subject of multiple grievances by residents or applicants.

Abt submitted its semi-annual report for year 2 in October 2022 (its comprehensive report covering all of year 2 is due in April 2023). The semiannual report is voluminous, and the Monitor's summary below focuses only on findings that the Monitor believes are particularly significant, but the entire report is included in the appendix hereto. *See* App. at 33-88.

**Year 2 document review.** The following are key findings based on Abt's document review for 32 projects to date:

- Abt team estimates that an average of 31 percent of applicable AcHP requirements are recommended for follow-up. This is very similar to the findings in Year 1.

- Projects permitted in or after 2016 also had fewer items recommended for follow-up (23%) compared with those permitted prior to 2016 (32%).

39

- For nearly half of the projects reviewed, follow-up was recommended regarding the requirements for reasonable accommodation/modification (RA/RM) requests, the Conventional Wait List, and the Unit Utilization Survey of Occupancy.

To date, Abt has conducted document reviews for 32 projects.

**Year 2 interviews.** Abt has completed and analyzed 48 interviews to date in Year 2, consisting of 15 interviews with property management staff, eight interviews with owners, and 25 interviews with residents. The key findings from these interviews include:

- Owners and PM staff said that the Property Management Plan, Owner's Guide, and City trainings, as well as assistance from City analysts, are helpful. PM staff would like more interactive support and training for quarterly reports and other compliance activities.

- PM staff described similar challenges to Year 1, specifically related to the costs of complying with reporting requirements, distribution of the Tenant Handbook, matching residents from the Accessible Unit Wait List to available Accessible Units, and using the AcHP website.

- Some owners and PM staff described challenges placing appropriate applicants into Accessible Units related to inaccurate information in the Housing Registry and wait lists and highly specific requirements for who can be placed in some units.

- PM staff described minimal experience enforcing lease addenda, citing challenges of limited available and comparable units to which to relocate tenants. Conversations about lease addenda highlight lack of clarity amongst some PM staff and residents about definitions of Accessible Units.

- While a majority of interviewed residents reported that they understand their rights, discussions often indicated confusion over AcHP terminology and processes, as well as what qualifies as an accessibility need.

- Residents reported mixed experiences in getting their accessibility needs met through RA/RM requests (the City is now tracking additional information to address this).

Finally, the semiannual report also included suggestions for AcHP, including:

- Because property grievance policies frequently are missing key provisions, Abt suggested that AcHP monitor and request updates to property grievance policies. The City is taking steps to address this issue, including tracking additional relevant data.

- Abt's audits found that there is a lack of clarity on how Accessible Unit wait lists are managed and utilized, and thus suggested that AcHP collect more information on how each Accessible Unit vacancy is filled.

- To ensure that lease addenda requiring that tenants who do not meet accessibility features in Accessible Units are moved to other comparable units, Abt suggested that AcHP require that owners and property managers conduct annual unit utilization surveys with move-in dates and other eligibility requirements for each unit at the property (accessible and conventional).

- To ensure that residents understand unit utilization surveys, Abt recommended that AcHP conduct usability and cognitive testing of survey questions with residents.

**Year 3**: the Monitor, the Parties, and Abt have met several times to discuss what tasks Abt should conduct in year 3. Although the year 3 plan has not yet been finalized, the Parties appear to agree that during year 3: Abt will not conduct any Triggered Reviews; will conduct fewer but more intensive Random Surveys (approximately 50 random survey reviews); ensure geographic distribution of Abt's survey reviews; incorporate Site Visits in some reviews; and reserve some resources for planning and delivering Technical Assistance to the City (including, for example, conducting a workshop with City analysts on audit review procedures). The Parties, Abt, and the Monitor continue to discuss the details of the year 3 audits, including exactly what will happen during Sites Visits.

41

**H. Programs AcHP is Still Developing or Initially Implementing**

During this reporting period, the City continued making progress on its Enhanced Accessibility Program ("EAP"), Grievances/Complaints System, Self-Evaluation/Transition Plan, and implementation of its Effective Communication Policy.

### 1. Enhanced Accessibility Program

This program has two primary components, one focused on enhanced accessibility of recent newly constructed and substantially altered housing and the other focused on enhanced accessibility of existing housing. In April 2021, the City released the Affordable Housing Managed Pipeline Notice of Funding Availability ("NOFA"), which included a voluntary program offering bonus points to developers for new projects that commit to incorporating the enhanced accessibility design elements outlined in the EAP. During the second half of 2021, the City selected for awards 17 projects with EAP bonus points. As reported by the City, it "continues to ensure that the 17 EAP projects awarded funding in 2021 are meeting their EAP obligations through the use of Regulatory Agreements. Additional projects are anticipated to join the EAP through the 2022 NOFA." City Report at 9, App. at 22.

The City further reported that, "[i]n response to the [2022] NOFA, 36 applications were received, totaling just under 2,500 units. The final recommendation on those 2022 NOFA applications was due to the City Council and Mayor on January 12, 2023." *Id.*

42

The Parties are continuing to work together on development of the EAP for existing housing. The City, with input from the Plaintiffs, is conducting outreach to organizations serving individuals with hearing and vision disabilities, including Plaintiffs ILCSC and CALIF, as well as the Greater Los Angeles Agency on Deafness (GLAD), The Braille Institute, and the National Federation of the Blind, to ascertain the features that would be beneficial to these groups' constituents. The City conducted interviews with the GLAD community in December 2022 and with the Braille Institute in March 2023; meetings with other groups, including Plaintiff ILCSC and the Hearing Loss Association of America, are anticipated in the coming months.

Following this initial outreach, further input will be sought from residents of the properties and a detailed plan will be developed.

## 2. Grievances/Complaints System

The ACSA requires two types of grievance processes: properties are required to have an internal grievance process for complaints filed directly with properties which meets specific parameters, and the City is required to have a separate grievance process for people making complaints with the City.

The Parties' efforts to ensure that the grievance requirements of the ACSA are being met are similar to their approach to the MCE Plan, discussed above: reports with data relevant to grievances are circulated to the Plaintiffs and Monitor on a periodic

43

basis; and the Parties have formed a Grievances Working Group, which meets on a monthly basis.

Information concerning grievances filed with properties is tracked separately from information concerning grievances filed with the City. Property-filed grievances are reported by properties to the City in quarterly reports, and the City includes information about these grievances in reports it circulates to the Plaintiffs and Monitor each quarter. The parties are currently revising the quarterly report, which likely will include revisions to the portions of the reports with data concerning grievances.

Information concerning grievances filed with the City is tracked by the City and provided to the Plaintiffs and the Monitor in monthly grievance reports. These reports – which in the future will be generated from the Comprehensive Database – provide property-specific and comprehensive information on a variety of metrics, including for example: the types of grievances filed (*e.g.* grievances related to request for reasonable accommodation, maintenance related grievances, and grievances related to assistance animals); grievances by open and closed status, as well as the length of time to close grievances; whether grievances were granted; and how grievances were filed (*e.g.* by phone, email, or online).

The Grievance Working Group – composed of representatives of the City, Plaintiffs, and the Monitor – meets on a monthly basis to discuss such topics as the most

44

recent grievance reports, progress towards goals set in the MCE Plan relevant to grievances, and outreach to properties and tenants concerning grievance procedures.

At the request of Plaintiff FHC, the Monitor includes the following statement, as well as the City's response.[7] To date, neither party has asked the Monitor to address this dispute.

> The FHC wishes to reiterate its concerns regarding how the the current grievance process adversely affects the civil and fair housing rights of tenants with disabilities who participate in the City's grievance process established pursuant to the ACSA. The recent experience of [tenant],[8] a disabled tenant at one of the covered properties, who filed a grievance with the City against the property owners and managers is a clear example of the limitations of the grievance process. [Tenant] was evicted by her landlord while the City was still discussing resolution of her grievance complaint with the property owners/manager. While the FHC is presently exploring ways to assist [the tenant] and her three minor children since her family is essentially rendered [homeless] by the property owners/manager's retaliatory conduct, the FHC is requesting that the City revisit the utilization of the grievance process to prevent eviction of similarly placed disabled tenants and the flagrant violation of tenants' constitutionally protected civil rights.

> The City responds as follows:

> The grievance . . . involved property maintenance issues and availability of parking on-site for a second vehicle. We had been working with the tenant and property management to address the issues. In December 2022, the tenant received a notice of eviction for non-payment of rent. AcHP provided several referrals to the tenant for assistance with the pending eviction, including Stay Housed L.A., Bet Tzedek Legal Services, Eviction Defense Network, Shriver

---

[7] The Monitor hereby informs the parties that in the future, he is unlikely to include statements by a party, particularly on issues which have not been submitted to the Monitor for dispute resolution.

[8] The parties know the identity of the tenant. To preserve the tenant's confidentiality, the Monitor has redacted the tenant's name from this report.

Housing Project, BASTA, Inc. and the Legal Aid Foundation, Los Angeles. We also informed the San Fernando Valley Fair Housing Council and Disability Rights Center. We understand that an unlawful detainer action resulted in a judgement ordering the tenant to pay $27,000 in unpaid rent or face an eviction order.

Overall, the Monitor believes that the current processes and practices used by the Parties to track and respond to grievances are consistent with the requirements of the ACSA. The ACSA also requires that the City provide copies of written grievances and complaints submitted to the City. Now that a protective order has been entered, the parties will develop a way to review such information.

### 3. Self-Evaluation/Transition Plan

In February 2021, LAHD as a whole – not just AcHP – began planning concrete steps for development of a comprehensive self-evaluation and transition plan with the overall goal of creating a tailored self-evaluation and transition plan which will be in use for years to come. During 2021, the City completed development of a detailed training plan and training materials for use with everyone within LAHD to create a lasting culture shift and a deep fund of knowledge concerning the need for accessibility in all aspects of LAHD's work.

During 2022, LAHD launched a pilot training program within the Department. The training provided an overview of Fair Housing policies and procedures for staff to conduct a self-evaluation of their programs.

46

The City is coordinating the execution of the Self Evaluation/Transition Plan by each division and 3 phases – training, self-evaluation, and transition planning. This effort, and the lessons learned by the City today, are described in the City's semi-annual report. Based on the pilot-test and feedback on the SETP training program, the training program has been revised and additional materials developed. Training of Bureau-wide teams will begin later this year.

### 4. Effective Communication Policy and Accessibility Requirements

On November 14, 2019, the City adopted an effective communication policy approved by the Plaintiffs and HUD governing the City's obligations to provide auxiliary aids and services to members of the public with disabilities as necessary to ensure effective communication. In addition, on an ongoing basis, the City reviews the accessibility of its websites and the Housing Registry. The City works with Knowbility, a consulting firm, to improve the accessibility of its websites and processes for people with disabilities. For example, the Registry Working Group conducts regular meetings during which City staff provide an update on progress that has been made on previously-identified improvements to the Registry. The City will be moving forward with additional improvements in this area.

City policies also require that owners and managers of covered properties provide auxiliary aids and services to tenants and applicants with disabilities as necessary to ensure effective communication. During the second half of 2021, the City took concrete

47

steps to ensure that property managers understand and implement their obligation. For example, the City developed and began providing a comprehensive training module regarding the effective communication requirements applicable to properties and how to meet those requirements. The City has also begun gathering additional information on property implementation of these requirements.

**III.    Conclusion**

At long last, the parties are beginning to make substantial progress on one of the key requirements of the ACSA – creating and certifying Accessible Units. The Monitor looks forward to future reports focusing on the certification and occupancy of these units by people with disabilities.

Dated: April 3, 2023                              Respectfully submitted,


                                                  /s/ Timothy P. Fox_____

                                                  TIMOTHY P. FOX

                                                  *Court Monitor*

48

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023**