UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| INDEPENDENT LIVING CENTER OF SOUTHERN CALIFORNIA, *et al*,<br><br>Plaintiffs,<br><br>vs.<br><br>CITY OF LOS ANGELES, CALIFORNIA, *et al.*<br><br>Defendants | ) Case No.: 12-cv-00551 FMO (PJWx)<br>)<br>)<br>)<br>) **MONITOR'S SEMI-ANNUAL**<br>) **REPORT FOR REPORTING PERIOD**<br>) **MARCH 1, 2023 THROUGH**<br>) **OCTOBER 31, 2023.**<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**Table of Contents**

I.     Introduction ..................................................................................................1

II.    Discussion ....................................................................................................3

   A. Miscellaneous developments. ...................................................................3

   B. Budget .......................................................................................................4

   C. Staffing and Management .........................................................................7

      1. Construction Team .............................................................................7

      2. Policy Program ................................................................................10

      3. Administration Unit .........................................................................14

   D. Progress Toward Target Number of Accessible Units ...........................14

      1. Overview .........................................................................................15

      2. Determining the Total Number of Accessible Units That Are
         Currently Under Construction. ........................................................17

      3. Costs, Timing, and Funding for Creation of Remaining Units. .......18

         a. Costs, Timing, and Funding of Remaining Units Through New
           Construction/Substantial Rehabilitation. ...................................19

         b. Costs, Timing, and Funding of Remaining Units Through Retrofits
           of Existing Units. ......................................................................20

      4. Progress of Survey and Remediation Process ..................................21

         a. Revised AHUP and Flexibility Decision ....................................21

         b. Surveys, Reports, and Certified Units ........................................23

         c. New Construction ......................................................................24

         d.  Existing Projects .......................................................................24

   E. Comprehensive Database .........................................................................28

i

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

1. Reporting project. ............................................................................29

2. Usability and functionality of the database. ...................................29

3. Ad hoc query tool. ...........................................................................30

F. Affordable and Accessible Housing Registry (AAHR) ..........................30

G. Permanent Supportive Housing .............................................................34

H. MCE Plan Implementation ....................................................................35

1. Implementation. ...............................................................................35

2. Audits ...............................................................................................37

I. Programs AcHP is Still Developing or Initially Implementing ..............41

1. Enhanced Accessibility Program .....................................................41

2. Grievances/Complaints System .......................................................42

3. Self-Evaluation/Transition Plan ......................................................44

4. Effective Communication Policy and Accessibility Requirements ..................45

III.    Conclusion ....................................................................................................46

ii

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

## I.    Introduction

Pursuant to the Amended Corrected Settlement Agreement by and Between City of Los Angeles and Plaintiffs ("ACSA"), adopted by the Court on November 2, 2022,[1] the Monitor hereby submits his Semi-Annual Report for Reporting Period March 1, 2023, through October 31, 2023.

Since the submission of the last Semi-Annual Report in April 2023, the Parties have continued to cooperate and work in good faith towards the implementation of the ACSA. The number of certified accessible units increased from 360 units in April 2023, to over 680 units now, and the City projects that more than 500 additional accessible units will be certified by the end of 2024. The Parties are also working together to improve the City's policies and practices as required by the ACSA, including its oversight of project owners and managers to ensure that they comply with ACSA requirements.

Nevertheless, overall, the number of accessible units certified to date is far behind the pace required by the ACSA. The ACSA sets a deadline of September 2026 for construction and certification of 4,000 accessible units, and if the City's projections for 2023 and 2024 prove accurate, there will be a total of approximately 1,200 certified

---

[1] The ACSA, ECF No. 714-3, replaced the Corrected Settlement Agreement ("CSA") adopted by the Court on December 13, 2017, ECF No. 608-1.

accessible units by the end of 2024. It will be virtually impossible for the additional 2,800

accessible units to be in place by September 2026.

This situation will be exacerbated by the conclusion of Proposition HHH, a 2016

voter-approved measure that authorized the City to issue approximately $1 billion in

bonds over 10 years that, when combined with other financial sources, was intended to

fund the creation of 10,000 new units of affordable and supportive housing. As discussed

in the last Semi-Annual Report, all funds from Proposition HHH – which funded a

substantial number of new construction projects during the first seven years of the ACSA

– have now been committed. The conclusion of Proposition HHH will result in a

significant decrease in funding for the construction of new affordable and supportive

housing. Additional funding from the United to House LA ("ULA") ballot measure

would, based on current projections, more than offset the loss of Proposition HHH funds,

both when comparing funding on an annual basis as well as when considering that ULA

does not have an end date and, unlike Proposition HHH, will continue in perpetuity.

ULA, however, remains on hold, pending resolution of both litigation and legislative

challenges. Although the Parties hope that the decrease in new construction will be offset

by increases in retrofits of existing projects, to date, the retrofit process has been slow,

and the City has not yet put in place all necessary systems for the retrofit process.

As a result, the Parties and the Monitor do not believe that the City will meet the

ACSA's 2026 deadline for completion and certification of 4000 accessible units. The

Parties plan to address this issue with the Court in 2024 once they have greater clarity on whether an extension of the deadline will be necessary, and if so, the length and terms of the requested extension.

The Monitor will continue to observe the funding and pace of certification of accessible units, and will work with the Parties to identify steps necessary to accelerate the overall pace of certification of accessible units.

## II.    Discussion

### A. Miscellaneous developments

In this Section, the Monitor reports on an in-person meeting among the Parties in Los Angeles, and on a decision the Monitor issued resolving a dispute between the City and Plaintiff FHC.

On June 29 and 30, 2023, the Monitor convened an in-person meeting among the Parties in Los Angeles. During the meeting, the Parties and the Monitor discussed many issues and identified tasks that need to be accomplished in the short-term to continue momentum in implementing the ACSA. The most significant tasks identified during these meetings included:

- City to develop milestones in the retrofit process so that the Parties and the Monitor can better track progress on retrofits. This has now been accomplished.

- City to identify projects that it intends to retrofit during 2023 and 2024. This has now been accomplished – the City identified 10 projects for retrofit over 2023 and 2024.

- City to prepare a proposed pilot program to monitor covered projects for compliance with the ACSA. This is still in process.

3

- Plaintiffs and the City to work together to identify a task management app that the Parties and the Monitor can use to identify and track tasks. This is still in process.

In addition, during this reporting period, the Monitor was asked to resolve a dispute concerning a request by Plaintiff FHC for documents relating to grievances and complaints filed against a specific project. The key issues in dispute concerned the scope of FHC's request, and whether the City could completely redact any Personal Identifiable Information ("PII") such as tenant names and contact information or instead should be required to produce this information subject to the Protective Order entered in this case (*see* Protective Order Re: Mot. [717], March 13, 2023, ECF No. 719). The Monitor determined that FHC's requests would be narrowed to disability- and accessibility-related grievances rather than grievances on any subject, and that with respect to those grievances, the City was required to produce unredacted documents, designating any PII in those documents as subject to the Protective Order. The City has stated its intent to seek review by the Court of this decision.

## B. Budget

The City's fiscal year runs from July 1 until June 30. The budget process for a fiscal year begins in the previous October, and pursuant to the Los Angeles City Charter, the Mayor must deliver a proposed budget to the City Council by April 20, and the Council must adopt or modify it by June 1.

**2023-24 budget.** The last Semi-Annual Report was submitted in April 2023. At that time, the 2023-24 budget had not yet been finalized, but AcHP had requested $45

4

million for the Accessible Housing Fund. The final budget was authorized in July 2023, which included just under $40 million for the Accessible Housing Fund, which is somewhat less than what was originally requested by AcHP, but is consistent with the overall approval process in the City for departmental budget requests that are often not approved exactly as requested.[2]

By comparison, the Accessible Housing Fund for FY 2022-23 was about $26 million, and for FY 2021-22 was about $34 million.

**2024-25 budget.** The requested budget totals $41.7 million, which is slightly more than what was approved for FY 2023-24. The requested budget includes funding for three additional positions for the retrofit team (consisting of a Rehabilitation Construction Specialist III, Rehabilitation Construction Specialist II, and Management Analyst), two additional positions to support the Comprehensive Database, and $12 million for retrofits of existing developments.[3]

**Status of ULA Funding.** As discussed in the last Semi-Annual Report, all Proposition HHH funding – which was used to construct/remediate approximately 130

---

[2] The total budget of the Accessible Housing Fund for 2023-24, as reflected at page 1 of the attached Appendix hereto, is just under $39.8 million. Of that, $6 million for retrofits is available in a separate account (the Unappropriated Balance fund), which can be accessed by AcHP once it spends the $6 million contained in the Accessible Housing Fund and currently budgeted for retrofit costs.

[3] The FY 2023-25 budget request is broken down by expense category at page 77 of the Appendix.

5

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023

projects –has now been fully committed, and no additional Accessible Units (beyond those currently in the development process, discussed below) will result from Proposition HHH funds.

In November 2022, Los Angeles voters passed ULA, which would offset the loss of Proposition HHH funds. ULA funding, however, remains uncertain for two reasons. First, opponents of the ballot measure brought suit challenging it. This lawsuit was dismissed in September 2023, and that dismissal is likely to be challenged on appeal.

Second, a second statewide measure will be on the ballot in November 2024 which, if passed, would essentially invalidate ULA.

Other funding – primarily state and federal funds – can also be used for new construction, but the amount of this funding is far less than the total funding in the past several years, which has included Proposition HHH funds. In FYE 2023 – the last budget that included Proposition HHH funds – approximately $170 million was budgeted for new construction and substantial rehabilitation. In FYE 2024 and 2025, this funding drops to approximately $93 million and $86 million respectively. Assuming that the ULA measure survives the legislative and judicial challenges, the City estimates that with those funds, the budget for new construction and substantial rehabilitation in FYE 2026 will increase significantly. The impact of the 2024-25 reduction in funding on construction of Accessible Units is discussed below.

6

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

As discussed above, it is virtually certain that the City will not meet the 2026 deadline in the ACSA for completion of 4000 accessible units. The Parties and the Monitor intend to meet during 2024 to discuss a possible extension, and then to take this issue to the Court. This discussion, and any motion for an extension resulting from the discussion, will include specific proposals to ensure that the requested extension will be met, including any necessary budget increases or other steps.

**C. Staffing and Management**

We discuss below the staffing situation of the Construction Program and the Policy Program.

**1. Construction Team**

AcHP's Construction Team works with ETA, the architectural expert retained pursuant to the ACSA, and oversees construction of new Accessible Units and retrofitting of Accessible Units in existing developments.

**Background.** According to the current organizational chart, the Construction Program consists of the Construction Administration Team and the Construction Team, which – among other tasks – works with ETA, conducts accessibility surveys and inspections of new construction and substantial rehabilitation developments, and (with some assistance from ETA) prepares cost estimates and scopes of work for the measures necessary to bring existing developments into compliance. The following table provides the number of positions within the Construction Program that were authorized from July

7

2021 through October 2023, and the number of positions that were actually filled during that timeframe:[4]

| Construction Program Staffing | | | | |
|---|---|---|---|---|
| | Construction Team | | Administration Team | |
| Date | No. Authorized | No. filled | No. Authorized | No. filled |
| July 2021 | 14 | 9 | 8 | 6 |
| Jan. 2022 | 14 | 13 | 8 | 6 |
| July 2022 | 25 | 11 | 7 | 5 |
| Feb. 2023 | 24 | 15 | 7 | 7 |
| Oct. 2023 | 24 | 19 | 7 | 6 |

**Construction Team staffing.** As of the date of this report, there were 19 authorized Rehabilitation Construction Specialist ("RCS") positions, which has not changed from the last Semi-Annual Report. The number of those authorized RCS positions that have been filled, however, has increased from 10 to 16.

AcHP's proposed budget for 2024-25 includes two additional positions for the Construction Team, a Rehabilitation Construction Specialist III and a Rehabilitation Construction Specialist II.

As discussed in previous Semi-Annual Reports, historically the City has had difficulty filling all authorized RCS positions. As a result, during the last reporting period, the City newly authorized the Assistant Inspector I position. The Assistant

---

[4] *See* App. at 2-7 (July 2021, January 2022, July 2022, February 2023, and October 2023 staffing charts).

8

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

Inspector I position is significant because it allows these Assistant Inspectors to receive on-the-job training to ensure that when they are eligible to become RCSs, they have the skills necessary for the AcHP construction work. Additionally, the Assistant Inspector I position is eligible for a streamlined hiring program, that is not subject to the same hiring list constraints.

The Assistant Inspector position is a trainee position, which has four levels, and a five year cap. The City expects that all Inspector trainees will eventually become RCSs before the five years are up.

During the last reporting period, the City filled all five Assistant Inspector I positions. Since that time, two of the employees who had been brought on as Assistant Inspector I were promoted to emergency RCS positions, and the remaining three Assistant Inspector I employees were promoted to Assistant Inspector II positions.

The City believes that the new Assistant Inspector program has been successful in bringing people on board who eventually will fill RCS positions, and the Monitor agrees. The City is actively working on hiring additional people for the Assistant Inspector I position.

The City believes that it has sufficient construction staff to meet the requirements for both new construction and retrofits of existing units over the next year. As discussed below, at least until ULA funding is resolved and eventually kicks in, the number of new construction projects will decrease and the number of retrofit projects will increase. As

9

this transition occurs, the City intends to shift people on the Construction Team from new construction to retrofits. The Parties and the Monitor will need to assess whether, in connection with attempting to speed up the pace of certifying accessible units, the City will need to bring on additional construction staff.

**Construction Administration Team staffing.** The Administration Team is responsible for administrative tasks associated with the efforts to survey and remediate covered housing developments, including scheduling, staffing, and outreach to owners and property managers concerning upcoming surveys. Currently, there are 7 authorized positions within the Administration Team, of which 6 are filled. AcHP's proposed budget for 2024-25 adds a position to the team, consisting of a Management Analyst.

### 2. Policy Program

AcHP's large Policy Program, which regulates oversight of owners' and property managers' interaction with applicants for housing and residents in existing developments, has consistently suffered high levels of attrition.

The LAHD leadership team and Policy Program managers have been attempting to remedy this situation by promoting existing staff and hiring externally to fill positions left vacant by attrition. The Policy Program has reorganized its staff to have specialized groups develop remaining implementation structures while two groups focus on implementing the Monitoring, Compliance, and Enforcement ("MCE") Plan.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023

Management has also developed plans and made initial efforts to mitigate future attrition in the Policy Program.

At least preliminarily, these efforts appear to have helped. In January 2022, the vacancy rate approached 30%, in July 2022 it was approximately 28%, and in February 2023 the vacancy rate was approximately 27%. In October 2023, the vacancy rate improved to approximately 15%, broken out as follows:

| Group | Total number | Number filled |
|---|---|---|
| Systems, data & reporting | 5 | 5 |
| Grievances & tenant outreach | 7 | 6 |
| Training & policy | 9 | 7 |
| Projects Monitoring & Compliance – CES & PSH | 9 | 8 |
| Projects Monitoring & Compliance | 22 | 18 |
| Miscellaneous (Senior MA II & Senior MA I) | 1 | 1 |
| Internal Auditor IV (new position) | 1 | 1 |
| Total | 54 | 46 |

*See* App. at 6.

Over the last 18 months, the Policy Program designed and implemented a reorganization that put a plurality of MAs into two groups that deal with the work of monitoring compliance by developments called for by the MCE Plan instead of having MAs perform the full range of Policy Program work. One of the groups, "Projects Monitoring-CES & PSH," specializes in monitoring housing developments serving the

11

population of homeless individuals and families. This category requires that MAs work with a separate County/City entity, the Los Angeles Homeless Services Authority ("LAHSA"), and coordinate AcHP placement policies with LAHSA's separate Coordinated Entry System ("CES") requirements. Several other subsidized housing programs, requiring similar coordination, are also included in the CES & PSH group because of the similarity of tasks those MAs perform. MAs assigned to the second Projects Monitoring organizational group, "Projects Monitoring & Compliance," work with other subsidized housing developments, such as senior housing, that do not require coordination with LAHSA or CES tenanting processes.

The remainder of MAs are assigned to perform tasks distinct from the monitoring and compliance work of implementing the MCE Plan approved by the Monitor in 2021 because they still require policy or program development tasks.

The "Systems, Data & Reporting" group works with the technical Systems group and Construction on the development and improvement of the online Housing Registry and Comprehensive Database, and the reporting of information to track progress of developments in complying with AcHP requirements. In addition to systems and data, the Group also works with the technical Systems group on reporting. Although as of the last Semi-Annual Report, the Systems, Data & Reporting team had 10 authorized positions, AcHP reports that the team did not need this many people, and so AcHP assigned new hires to the Monitoring teams, which had reported heavy caseloads. This

resulted in a reduction in authorized positions for the Systems, Data & Reporting team to 5 positions, and an increase in the number of authorized positions for the Projects Monitoring & Compliance team.

The Grievance & Tenant Outreach group is responsible for developing, improving, and implementing a grievance and complaints system. In the last year, this group also assumed some responsibility for tenant outreach programs and the Enhanced Accessibility Program.

The Training and Policy group works on training programs for owners and property managers as well as AcHP staff. Originally, training was conducted in in-person sessions. During the pandemic, the Group developed many online programs that continue to be provided on a regular schedule. New training is introduced as needed. While training of owners and property managers is substantially developed but continues to be improved, outreach and training of residents is substantially less developed and will be a focus of this Group.

Finally, at the request of the Monitor and concurrence by AcHP staff, AcHP authorized and filled an Internal Auditor position. The responsibilities of the Internal Auditor will include tracking projects as they move through the financing and construction phases so that the parties and the Monitor have an accurate understanding of the number of projects and accessible units in the construction pipeline. The Internal

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023

Auditor, along with the Systems, Data & Reporting team, will develop a Quality Assurance function.

### 3. Administration Unit

LAHD leadership also created an Administration Unit to serve the entirety of AcHP and to coordinate the administrative needs of AcHP with the other centralized departmental administration, such as Accounting, Procurement and Contracts, and Personnel. This unit is currently authorized for three positions, although the unit is expected to grow in the future. Two of the three authorized positions are currently filled, but the lead for this team left over the last reporting period and has not yet been replaced.

### D. Progress Toward Target Number of Accessible Units

The ACSA requires the City to provide 4,000 Accessible Units (the "Target Number") by September 2026, ten years after the Effective Date. ACSA ¶ III.10(a). To achieve this goal, the ACSA requires that the Parties develop a Revised Accessible Housing Unit Plan ("Revised AHUP") and requires the City to hire one or more experts to "conduct accessibility surveys and otherwise advise the Parties on compliance with federal and state accessibility requirements." *Id*. ¶ III.10(b)(i). The Revised AHUP was approved by the Court on May 3, 2023. Order Incorporating Revised Accessible Housing Unit Plan into Second Am. J. and Am. Corrected Settlement Agreement

14

("Revised AHUP Order"), ECF No. 723. As described in earlier reports, the City has retained ETA to serve as the required expert.

### 1. Overview

The types of construction that produce Accessible Units fall within two broad categories: (1) new construction/substantial rehabilitation, which is essentially building Accessible Units from scratch; and (2) retrofits of existing units. As discussed in detail below, these two categories of construction have different funding sources, different construction timelines, and different logistical complications.

To date, 695 Accessible Units have been certified, and thus the City must create and certify an additional 3,305 Accessible Units to meet the 4,000-unit requirement under the ACSA. The current deadline for completion and certification of all 4,000 Accessible Units is September 2026, and the Parties and the Monitor do not believe that the City will meet this deadline. The Parties plan to address this issue with the Court in 2024 once they have greater clarity on whether an extension of the deadline will be necessary, and if so, the length and terms of the requested extension (including specific steps to ensure that the revised proposed deadline is met).

The Revised AHUP also requires the Parties and the Monitor to set Annual Certification Requirements, representing the total number of accessible units that must be certified each year. In 2023, the Certification Requirement is 539 certified accessible units, Revised AHUP at 3, ECF No. 722-1, and in 2024, the Certification Requirement is

500 certified accessible units (the 2024 Requirement consists only of new construction and substantial rehabilitation units, and does not include retrofitted units). In addition, if the City completes retrofits of the initial 10 existing projects chosen for retrofits, that will add approximately 100 certified accessible units.

As discussed in the last Semi-Annual Report, earlier this year, the Monitor issued an order resolving a dispute among the Parties that should have the effect of speeding up the process of creating and certifying Accessible Units. App. to Monitor's Semi-Annual Report for Reporting Period September 1, 2022 through February 28, 2023 ("Monitor's 8th Report") at 6, April 3, 2023, ECF No. 721-1. The decision held that going forward, the required mix of new construction, substantial rehabilitation, and retrofits is the one that will result in completion of 4,000 units as close to the September 2026 deadline as possible. *Id.* at 10-11.

The first step in determining the quickest path towards completion of 4,000 Accessible Units is to have a thorough understanding of the number of Accessible Units that have been constructed and that are currently being constructed. This will allow the Parties and the Monitor to know how many Accessible Units need to be created in the future. This information, along with information that the Parties have gathered and plan to gather in the future concerning the relative cost and timeline of new construction and substantial rehabilitation units versus retrofit units, will allow them to create a plan to determine the number of remaining units that will be created through each type of

construction, the schedule for completion of these units, and the funding sources for this construction. Although this evaluation is ongoing, the results to date are set forth below.

### 2. Determining the Total Number of Accessible Units That Are Currently Under Construction

As projects proceed through the financing and construction process, they pass through various milestones, already tracked by the City, including for example the date on which the construction loans are executed, the date on which the building permit is issued, the notice to proceed date, and the date on which the project is ready for occupancy. Based on actual construction data from more than 70 completed construction projects, the Monitor and the Parties have developed a timeline of how long, on average, it takes from each milestone until a project is ready for occupancy. By doing so, they can project the approximate number of Accessible Units that will likely be ready for certification in the upcoming three years or so.

On average, it takes approximately three and a half years for new construction projects to go from the initial application for funding to the point where construction is finished and the project is ready for occupancy. There is an additional delay between the date that a project is ready for occupancy, and when it has been certified as accessible and thus can be counted towards the 4000 unit requirement. During the time between when a project is ready for occupancy and when it is certified, the project is surveyed by ETA and any noncompliant conditions identified through those surveys are remediated. This process is getting faster as AcHP's construction team has developed expertise in

17

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

ensuring that projects are built fully in compliance with accessibility requirements before they are surveyed by ETA, but at this time, it can still take nine months or more to get through the survey and remediation process.

The City represents that it has a total of 130 developments in active construction, which will result in 1,820 Accessible Units (in light of the approximately four-year construction and certification timeline, some of these units will not be completed and certified until after the September 2026 deadline in the ACSA).[5] Adding this number to the 695 units that have already been certified totals approximately 2,500 accessible units that are either already certified or that are currently being constructed. Thus the City still must provide approximately 1,500 Accessible Units (the "Remaining Units") to achieve the Target Number of 4,000.

### 3. Costs, Timing, and Funding for Creation of Remaining Units.

The City can provide the approximately 1,500 Remaining Units either through new construction and rehabilitation, through retrofits of existing properties, or through a mix of these.

---

[5] In his previous Semi-Annual Report, the Monitor also included 30 projects in the pre-construction, financing stage. Because some unknown number of these projects will never get financing and thus never be constructed, the Monitor has chosen not to include those projects in estimating the number of accessible units in the construction pipeline.

### a. Costs, Timing, and Funding of Remaining Units Through New Construction/Substantial Rehabilitation

It is unclear how much funding will be available in the future for new construction and substantial rehabilitation. As set forth above, all Proposition HHH funds have now been committed. In 2022, the City of Los Angeles passed the ULA measure, which imposed a tax on certain commercial and residential property sales to generate funds for affordable housing. Although the funds generated by this measure would offset the loss of the Proposition HHH funds, opponents of ULA brought suit challenging the measure (a lawsuit that has been dismissed but will likely be appealed), and is still subject to repeal by a statewide initiative that will be on the ballot in November 2024. *See supra* at 2.

Assuming the worst-case scenario that ULA funding never materializes, then the major remaining funding for new construction and substantial rehabilitation is through other funds, primarily consisting of state and federal funds. As set forth above, the City estimates the amount of federal, state, and available local funding will be approximately $93 million in fiscal year 2023-24, and approximately $86 million in fiscal year 2024-25. At this funding level, the City estimates that a total of approximately 300 Accessible Units will commence construction over these two years. Given the time it takes for a project to go from funding through construction and certification, the projects commenced in 2023-25 likely will not be certified until approximately 2027-2029.

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

If ULA survives legislative and judicial challenges, the funds it generates may offset the loss of Proposition HHH funding. The City anticipates that one way or the other, the challenges to ULA will be resolved within the next 18 months, and the Monitor will carefully track developments related to these challenges.

### b. Costs, Timing, and Funding of Remaining Units Through Retrofits of Existing Units

The City's final 2023-24 budget provides $12 million for retrofits, and AcHP seeks the same amount of funding for 2024-25. It is unclear how many units can be retrofitted at this funding level, but it will likely be less than 200. As was the case when the Monitor filed the last Semi-Annual Report, the City has not yet completed any retrofits of existing units; all of the certified units to date come from new construction or rehabilitation. Thus the Parties and the Monitor have insufficient information concerning the costs or amount of time required to retrofit existing units. Without this data, it is impossible to determine whether creating 4,000 Accessible Units will be more quickly achieved through new construction and substantial rehabilitation, through retrofits, or through a combination of these approaches.

Since the date of the last Report, the City has identified 10 projects for retrofits (the "Priority Retrofits"). These Retrofits were chosen to give the Parties and the Monitor experiential data on a variety of metrics, including the cost and logistics of relocating tenants, when necessary, while their units are being retrofitted. Although these

20

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

projects were originally forecast to be completed in the first half of 2024, as detailed below, that now appears to be unlikely. As a result, the Parties and the Monitor may have to make determinations on the right mix of retrofits and new construction based on limited data.

Beyond just the cost of retrofits, retrofitting existing units involves logistical complications that are largely absent from new construction and substantial rehabilitation. Most significantly, retrofitting existing units often requires temporarily relocating tenants in those units, potentially for an extended period of time. This can be disruptive and, in some cases, risky for tenants with disabilities. Obtaining consent and information from tenants concerning whether they are willing to be relocated and, if so, ensuring that their temporary housing meets their accessibility needs, is both time-consuming and logistically complicated.

### 4. Progress of Survey and Remediation Process

#### a. Revised AHUP and Flexibility Decision

Pursuant to the CSA, the Parties drafted an AHUP that was finalized in March 2019; however, it explicitly relied on reports from an earlier, now-replaced, survey expert. Based on this and other changed circumstances over the past four years, the ACSA required the Parties to draft a Revised AHUP.  The Revised AHUP, ECF No. 722-1, was filed on May 2, 2023, the deadline established in Paragraph III.10(c)(ii) of

21

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

the ACSA, and approved by the Court on May 3, 2023. Revised AHUP Order, ECF No. 723.

As noted above, the Parties' discussions around the Revised AHUP highlighted a disagreement concerning the question of whether the City is obligated to produce a specific number of Accessible Units by retrofitting older developments. The Monitor requested briefing of this question and issued his decision on December 27, 2022, determining as follows:

> The Monitor holds that the City has the flexibility to rely on any combination of New Construction and Retrofit Units to achieve the Target Number, but only to the extent that doing so will comply with all other requirements in the ACSA, including requirements relating to geographical and other distribution of AUs and the September 2026 deadline. Because we are more than 60% of the way through the term of the ACSA, and the City has certified only 307 units to date, the appropriate mix of New Construction and Retrofit Units is the one most likely to ensure certification of 4,000 compliant AUs as quickly as possible. The Monitor further orders the City to provide the information necessary to permit the Parties to discuss and determine that mix, and to ensure continued access to information necessary for the Parties and the expert to efficiently survey and remediate AUs.

A revised decision was issued on January 12, 2023 that included agreed deadlines for production of required information. App. to Monitor's 8th Report at 6, ECF No. 721-1.

### b. Surveys, Reports, and Certified Units

After a number of delays,[6] the City began working with ETA as the designated expert in late 2020. Since that time, the City and ETA have made good progress toward the Target Number. As of the date of this Report, ETA has recommended for certification and the City has certified 695 out of the 4,000 required Accessible Units, up from 360 in the Monitor's 8th Report from April 2023. *Id*. at 21, ECF No. 721. Of these, approximately 290 were certified within the reporting period.  All of these units are the result of new construction or substantial alteration since 2016; as noted above, although ETA has surveyed a number of existing (pre-2016) developments, no retrofit construction work has begun and, accordingly, no retrofitted units have yet been certified.

During the reporting period, ETA concluded initial surveys of 68 housing developments (with seven additional concluded since the end of the reporting period) and approximately 25 follow-up surveys to assess removal of barriers identified in its initial report. As detailed below, these surveys included both new construction and retrofit/existing projects. It issued 76 initial reports and 34 follow-up reports.

---

[6] The experts initially retained did not provide services of sufficient quality and had to be replaced. *See* Monitor's Semi-Annual Report for Reporting Period January 1, 2020 through June 30, 2020 at 2-3, 11-14, Aug. 13, 2020, ECF No. 684. The process of replacing the expert occurred at the same time as accessibility surveys had to be suspended for the pandemic. *Id*. at 9-11.

23

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023

### c.  New Construction

The process of surveying new construction and substantial rehabilitation projects for compliance with the ACSA includes a series of progress inspections – during the construction process – by Construction Team personnel using tools and questions developed in collaboration with ETA. Once Construction determines that a project is ready, they notify ETA which conducts an initial accessibility survey and drafts a report documenting any features that are out of compliance with applicable standards. ETA submits that report to the Construction Team, which in turn transmits the report to the relevant personnel on the owner's side to remedy the barriers identified in the report. When ETA is notified that barriers have been removed, it performs one or more follow-up surveys; when the barriers identified in the initial survey have all been remedied, ETA recommends the project for certification by the City. If the City concurs, the project is certified.

ETA has conducted initial surveys of 105 new construction and substantial rehabilitation projects to date, 39 within the reporting period.  All projects certified to date fall into this category.

### d.  Existing Projects

Pursuant to the Revised AHUP, the City and ETA are to develop a process and standards for efficiently identifying Housing Developments that are deemed feasible to bring into compliance with applicable Accessibility Standards, commonly referred to

24

as a "triage process." Revised AHUP ¶ 4.c., ECF No. 722-1. It is the Monitor's understanding that the City has a working version of the triage process underway and has applied it to several existing projects. The Monitor will require that the City present the details of a formal process – approved by ETA – by January 31, 2024. Projects found to be infeasible to bring into compliance will not be surveyed by ETA.

Once the City's triage process has been applied, ETA will survey projects deemed feasible in reverse chronological order, starting with newer projects.  ETA's initial survey process with respect to existing projects is similar to that of new construction projects; however, since existing projects are not, by definition, currently under construction, there are no City-conducted progress inspections ahead of the initial ETA survey. In addition, surveys of existing projects are longer and more complex than new construction surveys, as older buildings were often not built to applicable standards. ETA has conducted initial surveys of 64 existing projects, 29 within the reporting period.

Because no existing projects have yet been retrofitted, ETA has not yet conducted any post-remediation follow-up surveys of existing projects. ETA, however, anticipates that those surveys will also be more complex than follow-up surveys of new construction. With new construction or substantial rehabilitation projects, the initial survey identifies barriers to be removed and – in most instances – the follow-up surveys review the identified features to ensure that barriers were removed. It is likely that

25

existing projects – especially older projects – will require significant overhaul to come into compliance, likely creating new spaces that will need to be subjected to a full survey rather than a simple review of previously-identified barriers.

Prior to this reporting period, no progress had been made in remediating existing projects. Pursuant to discussions at the late-June meetings, the City selected ten Priority Retrofits to move toward remediation and possible certification during calendar years 2023 and 2024. This process will be much slower than surveying and certification of new construction and substantial alteration projects. AcHP personnel first meet with owners to discuss financing and to connect them with a Financial Development Officer at the City's Housing Development Bureau. At the same time, the owner is expected to submit a statement of work with cost estimates, which the City reviews and returns for corrections. Once the statement of work and cost estimates are approved by the City, the City Council will need to approve funding and loan documents will need to be executed. In the meantime, the City,[7] the owner, and a relocation consultant must develop and implement a relocation plan, one that – as noted above – must consider the willingness and accessibility needs of tenants facing relocation. Only after these preparatory steps have been taken can construction get underway – construction that will likely take considerably longer than has been required to remove barriers in new construction. The

---

[7] The ACSA requires the City to "temporarily relocate, or require Owners to temporarily relocate, existing tenants occupying units to be retrofitted." ACSA ¶ III.10(c)(i).

City will conduct progress inspections during construction and only following its final inspection will ETA be called out to conduct its survey.

As of the date of this Report, only one of the Priority Retrofit projects has received approval of its statement of work and cost estimates, and another has resubmitted those documents to the City responding to earlier comments. The other eight Priority Retrofits have not yet submitted statements of work or cost estimates to the City.

This process is also being held up by a lack of progress contracting with a relocation consultant and developing a relocation process for projects in which barrier removal will require tenants to vacate their units for a period of time. The ACSA requires the City to temporarily relocate existing tenants occupying units to be retrofitted. While the City has identified a qualified contractor, it has not yet executed a contract. The Monitor understands that this is due in part to the lack of a qualified bid for the tenant advocacy portion of the project, and that the City has been hesitant to finalize a contract with no relocations on the horizon, this contract has lingered for several years with no progress. However, the Priority Retrofit projects were selected to present a variety of conditions including the need for relocation so that the parties have data to make determinations on the right mix of new construction, substantial rehabilitation, and retrofits to most quickly reach 4000 accessible units. Given this and the fact that the Monitor predicts vigorous involvement by the Plaintiffs in crafting a

27

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023

relocation plan, the City faces the very real prospect that Priority Retrofits that are otherwise ready to move forward will be held up by the inability to relocate tenants as needed. For this reason, the Monitor will request that the City take these steps by January 31, 2024: (1) identify which of the ten Priority Retrofits will require relocation; and (2) set forth a plan to ensure that a fully-qualified relocation consultant is under contract at least four months prior to the first anticipated relocation to give the Parties, Monitor, and the consultant time to develop a relocation plan and prepare for the first relocations.

**E. Comprehensive Database**

The Comprehensive Database is essential to both the successful implementation of the ACSA, and to "reliably inform the Court and Monitor regarding compliance." Order Re: Further Proceedings at 2, Dec. 19, 2019, ECF No. 663. A Comprehensive Database that contains all relevant and accurate data will be immensely helpful to all aspects of the implementation and monitoring of the ACSA. Until the Database is up and running, the City will continue to have to spend time manually generating reports and neither it, nor the Monitor nor the Plaintiffs, will be able to rely on the Database to review or analyze data concerning the City's compliance with the requirements of the ACSA.

Since the date of the last Semi-Annual Report, the Parties have focused their Database efforts primarily on creating and revising reports to be generated from the

28

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023

database, trying to improve the functionality of the Database, and developing an ad hoc query tool that will allow non-technical users to run queries on data within the Database.

## 1. Reporting project

The Parties have created a monthly compliance report, automatically generated from the Database, which provides information to the Parties and the Monitor on a variety of subjects crucial to the implementation of the ACSA. The Parties and the Monitor are now working on using the Database to generate quarterly reports, which like the monthly compliance reports provide information crucial to the implementation and the monitoring of the ACSA. Once the Parties have completed their work on the quarterly report, they will turn to other reports.

## 2. Usability and functionality of the database

As currently configured, accessing data through the Database is slow. In addition, issues have also been identified with the interface used by the Owners/Managers and others as to its clarity and functionality.

At the request of the Parties, the Monitor has entered two contracts with NexGen.Media ("NexGen"). NexGen has worked on this case for several years as a consultant to ILCSC and CALIF on Database issues. Pursuant to one of the contracts between the Monitor and NexGen, NexGen will perform an audit of AcHP's software application and systems, with the goal being "pinpointing areas of its systems that necessitate upgrades and enhancements, provide remedies for potential vulnerabilities,

29

and scrutinize integral facets of its software including infrastructure, code, security, and usability." The Monitor anticipates that NexGen's work will identify, and resolve, issues relating to the functionality of the Database.

### 3. Ad hoc query tool

Finally, the Parties and the Monitor have been working to develop a user-friendly interface or dashboard that will allow the Parties to run queries on data elements that they select. The second contract between the Monitor and NexGen addresses this issue. Specifically, pursuant to this contract, NexGen will assist in the evaluation and deployment of a Business Intelligence solution to use in conjunction with the Database which, among other things, will allow the Parties and the Monitor to perform queries of the data in the Database.

### F. Affordable and Accessible Housing Registry (AAHR)

The ACSA requires the City, with input from Plaintiffs and the Monitor, to make available an accessible website listing all Housing Units in Covered Housing Developments with various specified features permitting potential tenants to express interest in Accessible Units and meeting specific web-accessibility standards. ACSA ¶ III.10(m)(i). The City currently makes an AAHR (otherwise referred to as the Tenant Registry) available, and has been working with Plaintiffs, the Monitor, and a consultant to improve its accessibility.

30

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

In the City's Semi-Annual Report January to June 2023 ("City Report"), set forth at pages 8-25 of the Appendix hereto, as of June 2023, the City reports that there were a total of 70,747 registered users, an increase of 30% from the number of users as of December 31, 2022. App. at 15. Pages 8 and 9 of the City Report, App. at 15-16, provide information concerning the number and source of these registered users, but the underlying data is not yet part of the database system being developed by the Parties.

Applicants can submit multiple "pre-applications" to be added to the wait lists at specific projects. The most recent information provided by the City shows:

- Number of Pre-Applications created since July 2019: 289,354

- Number of Pre-Applications created during the City's reporting period of January to June, 2023: 87,019,[8] of which:

    o 24,451 were for Mobility Units;

    o 4,260 were for hearing/vision units;

    o 2,039 were for mobility and hearing/vision units; and

    o 56,269 were for conventional units.

- Number of Pre-Applications still open as of 7/31/2023: 233,781; and

- Number of applicants on the wait lists for Accessible Units (as reported by all properties in Q2 2023): 78,182.

---

[8] *See* City Report at 9, App. at 16.

31

There is clearly increasing use of the Tenant Registry by applicants and the need is overwhelming. Unfortunately, the number of available units continues to be very small compared to the need, and the Parties are considering capping the Accessible Unit Wait Lists on the Registry at specific levels because they are too long to ever actually provide units to all who are on the lists.

The Parties have been concerned that the Registry can be inaccessible or confusing to those who need to use it. They have been working over several reporting periods to improve the accessibility of the Registry for individuals with disabilities seeking housing. During this reporting period, at the request of Plaintiffs and following a number of meetings among the Parties, the City also began to update the language used throughout the Registry to plain English. City Report at 9, App. at 16. As reported by the City, some of the changes requested have required additional work because they involved updates to the user interface, and therefore, more software development time. These updates to the user interface are currently in progress. *Id.*

The Parties' concerns go beyond web accessibility and plain language, however, and include, for example, questions relating to the ability of applicants to determine the projects for which they may be eligible. Given that the programs that fund public housing are complex and contain intricate and overlapping eligibility rules, it is often a challenge for an individual not versed in public housing finance to figure this out and thus apply for all but only the projects for which they are eligible. An ideal system

32

would prompt potential applicants to enter relevant information and then list for them projects for which they are eligible. The Parties' discussions have appropriately, in the Monitor's view, focused on the balance between providing the broadest options to potential tenants – that is, not excluding projects for which they may be eligible – while not creating an overinclusive list that wastes their (and the projects') time.

During this reporting period, in accordance with a request from the Los Angeles City Council, the Parties have begun to explore the advantages of the Database of Affordable Housing Listing, Information, and Applications ("DAHLIA") Housing Portal used by the City of San Francisco,[9] which provides a single, comprehensive platform to search all available affordable housing units. On October 10, 2023, LAHD submitted a report and recommendation to the City Council requesting authorization to negotiate a sole source contract with Exygy, the developer of San Francisco's DAHLIA system, for the purpose of developing a centralized, comprehensive, multilingual online search system for affordable housing. *See* App. at 26-34. The City Council approved the request on November 14, 2023.[10]

---

[9] *DAHLIA San Francisco Housing Portal*, City & County of San Francisco, https://housing.sfgov.org/ (last visited Nov. 20, 2023).

[10] City of Los Angeles, Council Fil 23-0426, LACityClerk Connect, https://cityclerk.lacity.org/lacityclerkconnect/index.cfm?cfnumber=23-0426&fa=ccfi.viewrecord (last visited Nov 20, 2023).

33

### G. Permanent Supportive Housing

A significant portion of the housing covered by the ACSA is housing for individuals experiencing homelessness built through the City's use of Proposition HHH and other government funding for Permanent Supportive Housing ("PSH") developments. In 2020, the Monitor determined that the Coordinated Entry System ("CES") operated by the Los Angeles Homeless Services Authority ("LAHSA"), a joint city/county governmental entity for filling PSH with homeless individuals, was ineffective in identifying and filling Accessible Units with homeless individuals and families with disabilities. In response, the Parties proposed – and the Monitor approved – a "Hybrid Plan" in which LAHSA and AcHP coordinate in filling PSH units for homeless persons with disabilities. *See* Monitor's Semi-Annual Report for Reporting Period July 1, 2021 through December 31, 2021 at 31-32, Mar. 28, 2022, ECF No. 697.

As reported by the City, during the period January through June 2023, it continued partnering with LAHSA to implement the Hybrid Plan, under which AcHP's Registry complements the CES, with the two systems working together to connect persons experiencing homelessness with accessible, supportive housing. Pages 10-12 of the City Report provide extensive details of this coordination.  App. at 17-19.

The City has undertaken a number of measures to further the Hybrid Plan. *Id*. For example, AcHP Analysts attend lease up with the purpose of communicating with LAHSA, Service Provider Area (SPA) lead agencies, and Property Management Agents

34

the importance of ensuring that all the accessible units (AUs) are leased up to tenants that need the features of the AUs. Analysts also remind them that at any time if they encounter an issue finding a qualified tenant for an AU, they should communicate that information to their AcHP Analyst in order to help them expand that search and identify a qualified tenant. *Id.* at 10, App. at 17. Finally, the City is working to ensure that LAHSA's SPA leads are aware of upcoming accessible units.

The City has developed and circulated an amendment to the Property Management Plan ("PMP") that requires the use of the hybrid plan for any existing and new developments with supportive housing units subject to the CES. As of October 2023, 95% of the CES PMP agreements have been received.

On the tenant side, the Parties are working to ensure that the Registry provides clear and sufficient information so that eligible individuals can be directed to a CES access point with the goal that homeless people with disabilities will be able to obtain accessible units in the CES covered properties.

**H. MCE Plan Implementation**

**1. Implementation**

Sections III.10(k) and (l) of the ACSA obligate the City to monitor property owners' and managers' compliance with various policies required by the ACSA, and to enforce compliance where necessary. The Parties submitted a comprehensive Monitoring, Compliance, and Enforcement Plan ("MCE Plan") addressing reporting,

35

monitoring, and enforcement of owners' and managers' compliance with (then) CSA policies, which the Monitor approved. *See* Monitor's Decision Approving 2021 MCE Plan, June 15, 2021, ECF No. 692.

As described in the last Semi-Annual Report, the Parties have taken a number of steps to ensure appropriate monitoring and enforcement of ACSA policies. These steps include the City's preparation and circulation of periodic reports, such as the monthly compliance report, that provide information – both on the project level and summaries across all projects – on the compliance by projects with various ACSA requirements. The most recent monthly compliance report showed that the City certified 94% of currently reporting covered projects as compliant with the City policy compliance certifications pursuant to the requirements in the MCE Plan. According to the City, in October 2023, there are five projects for which the City has issued Corrective Action Plans to address noncompliance, and 15 covered properties have been referred to the City Attorney's Office for further enforcement action. Plaintiffs have requested a meeting with the City Attorney's Office to discuss these properties, but no such meeting has been scheduled or occurred. This is an issue that the Parties and the Monitor should address in the next reporting period.

In addition to the periodic reporting, the Parties and the Monitor meet on a monthly basis to discuss MCE issues. Finally, as described below, a private entity

retained by the City conducts audits of owners' and managers' compliance with ACSA-required policies.

The Parties are also actively working to improve MCE practices and policies. The Parties have created a document with five overall purposes, and goals and objectives within those purposes, all designed to improve MCE practices and policies. The five overall purposes are to: (1) effectively match tenants with disabilities with buildings and units that meet their needs and ensure that accessible units are tenanted with people who need the features; (2) ensure that covered projects meet the accessibility needs of tenants and applicants; (3) create an environment conducive to supporting tenants' fair housing rights; (4) continually assess and improve program performance; and (5) create and implement a self-evaluation and transition plan to assess LAHD services, policies, and practices to address any that discriminate against people with disabilities.[11]

### 2. Audits

Pursuant to Paragraph III.10(l)(v) of the ACSA, as well as two decisions by the Monitor, the City has entered a five-year contract with Abt Associates, running through October 2025, to conduct audits of owners and managers of covered projects.

---

[11] In the last Semi-Annual Report, the Monitor expressed an intent to focus on effective implementation of MCE policies to ensure that, as new units are completed and certified, they are occupied by people who need the accessibility features they provide. The first and second purposes described in the text relate directly to the Monitor's goals.

The contract provides that Abt may engage in the following tasks: random surveys of a statistically-valid sampling of projects to estimate overall implementation and compliance with AcHP policies ("Random Surveys"); surveys of subgroups of projects selected based on criteria developed by the Parties ("Subgroup Surveys"); triggered reviews of projects identified as potentially problematic ("Triggered Reviews"); site visits of properties ("Site Visits"); and technical assistance by Abt for the City ("Technical Assistance"), such as providing guidance to the City on conducting their own audits.

Random Surveys, Subgroup Surveys, and Triggered Reviews all consist of two phases: a document review to assess compliance with AcHP documentation policies; and interviews of owners, property managers, and residents with disabilities.

Each audit year, Abt provides a semi-annual report with its preliminary review and analysis of the results of the audits conducted to date for that year, and at the end of the year, provides a comprehensive report that covers the results and analysis of audits conducted during the year, as well as results and trends covering all previous audit years. The Monitor's last Semi-Annual Report provided a summary of audit results from Years 1 (ending April 2022) and 2 (ending April 2023). This Report will focus on the Abt semi-annual report provided to the Parties on November 1, 2023, *see* App. at 35-76, which presented preliminary findings for Year 3 (ending April 2024) based upon data from roughly half of the reviews planned to be completed in Year 3.

38

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023

The Monitor, the Parties, and Abt agreed that during Year 3, Abt would not conduct any Triggered Reviews, and would conduct fewer, but more intensive Random Surveys, including up to 10 Site Visits. Abt randomly selected 50 projects for Year 3 survey reviews, which were then scheduled in 10 monthly batches between March 2023 and December 2023.

**Summary of Year 3 document review to date**: As of the date of Abt's current Semi-Annual Report, it had conducted document reviews for 25 projects. The key findings from this document review include:

- From Year 1 to Year 3, there has been a statistically significant decrease in the estimated percentage of document review checklist items per project for which Abt recommends follow-up, dropping from 31% in Year 1 to 25% in Year 3. This suggests an improvement in how covered housing projects are implementing the AcHP document requirements (we will know more after Abt completes all of its Year 3 document reviews).
- The four document review checklist items most frequently recommended for follow-up include issues relating to lease, grievance policies, requests for reasonable accommodations or modifications, and unit utilization surveys.

**Summary of Year 3 interviews to date:** As of the date of Abt's current Semi-Annual Report, it had conducted interviews of owners, property management staff, and tenants during site visits at four projects.

- It was difficult for owners and property managers to properly maintain their accessible unit wait lists because many people on those lists did not need an accessible unit and/or did not meet various eligibility requirements.
- Owners and property managers report challenges in enforcing lease addendums, including a lack of comparable units to which to relocate the tenant and reluctance to force long-time tenants to move.

- With respect to at least three projects, Abt has questions as to whether projects are accurately reporting that their accessible units are being occupied by people with disabilities.

- The majority of property management staff interviewed stated that they found AcHP reporting to be inefficient, confusing, and logistically challenging[12]. Although staff typically reported that the City analysts were responsive and helpful in addressing questions or issues, frequent analyst turnover posed an obstacle.

- Two thirds of interviewed residents reported unmet accessibility needs, and difficulties in getting their accessibility needs met through requests for accommodations or modifications.

- Some residents reported that they were discouraged from making accessibility-related requests due to a fear of retaliation, past negative experiences with property staff, and their perception that staff are not approachable and are not prioritizing the needs of tenants with disabilities.

- A majority of interviewed residents reported understanding their fair housing rights, although some indicated that they would like verbal explanations of their rights and additional resources and assistance.

- Residents discussed how a lack of maintenance and cleanliness and a lack of access to common areas impact the accessibility of covered projects.

**Year 4 Sampling Plan**: Abt has circulated a proposed sampling plan for Year 4, in which Abt proposes to conduct 50 Random Surveys, and 20 Site Visits. In addition, in Year 4, Abt proposes to provide technical assistance to the City, which could include feedback on the City's Pilot Monitoring Program, sharing Abt team's site visit protocols and procedures, and sharing knowledge with City analysts regarding review procedures

---

[12] Owners and property managers submit reports through an online module. The Parties and the Monitor are working on improving the interface used by owners and property managers to submit their reports to make it more usable.

40

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

for specific AcHP policies and requirements. The Parties and the Monitor will discuss this proposal with Abt over the next few team calls.

## I. Programs AcHP is Still Developing or Initially Implementing

During this reporting period, the City continued making progress on its Enhanced Accessibility Program ("EAP"), Grievances/Complaints System, Self-Evaluation/Transition Plan, and implementation of its Effective Communication Policy.

### 1. Enhanced Accessibility Program

This program has two primary components, one focused on enhanced accessibility (above and beyond that required under federal law or the ACSA) of recent newly constructed and substantially altered housing and the other focused on enhanced accessibility of existing housing. In April 2021, the City released the Affordable Housing Managed Pipeline Notice of Funding Availability ("NOFA"), which included a voluntary program offering bonus points to developers for new projects that commit to incorporating the enhanced accessibility design elements outlined in the EAP. During the second half of 2021, the City selected for awards 17 projects with EAP bonus points; nine additional projects joined the EAP through the 2022 NOFA. City Report at 7, App. at 14. The City ensures that the EAP projects awarded funding in 2021 and 2022 are meeting and will meet their EAP obligations through the use of Regulatory Agreements. *Id.*

41

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023

The Parties are continuing to work together on development of the EAP for existing housing. The City, with input from the Plaintiffs, is conducting outreach to organizations serving individuals with hearing and vision disabilities, including Plaintiffs ILCSC and CALIF, as well as the Greater Los Angeles Agency on Deafness (GLAD), The Braille Institute, and the National Federation of the Blind, to ascertain the features that would be beneficial to these groups' constituents. The City conducted interviews with the GLAD community in December 2022 and with the Braille Institute in March 2023.  An outreach event took place with ILCSC on April 11, 2023, however no constituents attended. *Id.* A outreach event at Pilgrim Towers, which has 108 hearing/vision units, is anticipated for November.

## 2.  Grievances/Complaints System

The ACSA requires two types of grievance processes: properties are required to have an internal grievance process for complaints filed directly with properties, and the City is required to have a separate grievance process for people making complaints with the City.

The Parties' efforts to ensure that the grievance requirements of the ACSA are being met are similar to their approach to the MCE Plan, discussed above: reports with data relevant to grievances are circulated to the Plaintiffs and Monitor on a periodic basis; and the Grievances Working Group, composed of representatives of the City, Plaintiffs, and the Monitor, meets monthly to discuss such topics as the most recent

grievance reports, progress towards goals set in the MCE Plan relevant to grievances, and outreach to properties and tenants concerning their rights and grievance procedures.

Information concerning grievances filed with properties is tracked separately from information concerning grievances filed with the City. Property-filed grievances are reported by properties to the City in quarterly reports, and the City includes information about these grievances in reports it circulates to the Plaintiffs and Monitor each quarter.

Information concerning grievances filed with the City is tracked by the City and provided to the Plaintiffs and the Monitor in monthly grievance reports. These reports – which in the future will be generated from the Comprehensive Database – provide property-specific and comprehensive information on a variety of metrics, including for example: the types of grievances filed (*e.g.* grievances related to requests for reasonable accommodation, maintenance-related grievances, and grievances related to assistance animals); grievances by open and closed status, as well as the length of time to close grievances; whether grievances were granted; and how grievances were filed (*e.g.* by phone, email, or online).

Some data relevant to disability- and accessibility-grievances contains Personal Identifiable Information ("PII"), such as tenant names and contact information, and thus should be disclosed only pursuant to the Protective Order entered in this case (*see* ECF No. 719). The Protective Order requires the Parties to meet and confer to try to reach agreement on the type of data that should be subject to the Protective Order, and the

43

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

parties are currently doing so and have reached agreement on many of these issues. Any disputes that remain after the meet and confer process will be submitted to the Monitor.

As discussed above in the "Miscellaneous" section, the Monitor resolved a dispute concerning requests by Plaintiff FHC for grievance-related documents. The decision by the Monitor found that FHC was entitled to documents related to disability- and accessibility-related grievances, and further found that PII concerning such grievances should not be redacted but instead should be produced subject to the Protective Order.

The City has engaged in outreach efforts to tenants and applicants, including holding "Know your rights" meetings for tenants, advocates, and other interested parties at selected projects, and the City plans to continue to hold these meetings in the future. In addition, the City has put together a lengthy list of housing resources for tenants with disabilities, which the Grievance Working Group will review in the near future.

### 3. Self-Evaluation/Transition Plan

In February 2021, LAHD as a whole – not just AcHP – began planning concrete steps for development of a comprehensive self-evaluation and transition plan required under Section 504 of the Rehabilitation Act and the Americans with Disabilities Act to identify and remediate accessibility and other barriers in City-assisted housing. The Parties' overall goal is to create a tailored self-evaluation and transition plan which will be in use for years to come. During 2021, the City completed development of a detailed training plan and training materials for use with everyone within LAHD to create a

lasting culture shift and a deep fund of knowledge concerning the need for accessibility in all aspects of LAHD's work.

During 2022, LAHD launched a pilot training program within the Department. The training provided an overview of Fair Housing policies and procedures for staff to conduct a self-evaluation of their programs.

The City is coordinating the execution of the Self Evaluation/Transition Plan by each division and 3 phases – training, self-evaluation, and transition planning. The planning process for implementing the Self-Evaluation/Transition Plan will begin November 2023. Implementation of the LAHD-wide training and technical assistance will begin the week of January 8, 2024.

### 4. Effective Communication Policy and Accessibility Requirements

On November 14, 2019, the City adopted an effective communication policy approved by the Plaintiffs and HUD governing the City's obligations to provide auxiliary aids and services to members of the public with disabilities as necessary to ensure effective communication. In addition, as discussed above, the City continues to review the accessibility and useability of its websites and the Registry.  In this reporting period, the Registry Working Group completed their review of the Registry and submitted changes to Systems. Systems has implemented most of the recommended improvements to the language in the Registry and will likely complete their update in the next few months.

45

*Independent Living Center of Southern California, et al. v. City of Los Angeles, et al. Case 12-cv-00551-FMO (PJWx)*
**Monitor's Semi-Annual Report for Reporting Period March 1, 2023 Through October 31, 2023**

### III.    Conclusion

Although still far behind the pace required by the ACSA, the City made progress during the reporting period towards one of the key requirements of the ACSA – creating and certifying Accessible Units. It faces budget challenges in the years to come caused by the depletion of Proposition HHH funds and the delay in ULA funds, and those challenges will need to be resolved to ensure that progress continues towards the implementation of the ACSA.

Dated: November 21, 2023                    Respectfully submitted,


                                            /s/ Timothy P. Fox_____
                                            TIMOTHY P. FOX
                                            *Court Monitor*